**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

|  |  |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION, <br><br> *Defendants.* | Case No. 3:26-cv-01099-KC |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

STATEMENT OF ISSUES ................................................................................................... vi

INTRODUCTION ................................................................................................................. 1

LEGAL FRAMEWORK ...................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

ARGUMENT ....................................................................................................................... 4

I.      The Big Bend Waivers Violate the Major Questions Doctrine. ........................................ 4

        a.      The Big Bend Waivers and ultimate goal of a "Great Wall" are extraordinary. .......... 5

        b.      IIRIRA does not clearly authorize the Waivers or "Great Wall." .............................. 8

II.     If the Court Does Not Resolve Plaintiffs' Claims Under the Major Questions Doctrine, then the Waivers and IIRIRA § 102(c) Violate the Nondelegation Doctrine. ..................... 9

III.    The Big Bend Waivers Violate the Executive's Duty to Take Care that the Laws Be Faithfully Executed. .................................................................................................... 13

IV.     The National Park Waiver and IIRIRA § 102(c) Violate the Presentment Clause. ........... 16

V.      Plaintiffs Have Article III Standing. .............................................................................. 19

CONCLUSION .................................................................................................................... 20

## TABLE OF AUTHORITIES

**Caselaw**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021)......................................................................................................... 7, 9

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................................. 2

*Biden v. Nebraska*,
600 U.S. 477 (2023)..................................................................................................... 6, 7, 8

*Big Time Vapes, Inc. v. FDA*,
963 F.3d 436 (5th Cir. 2020) ............................................................................................ 10

*California v. Trump*,
379 F. Supp. 3d 928 (N.D. Cal. 2019) ............................................................................ 2, 6

*Clinton v. City of New York*,
524 U.S. 417 (1998).............................................................................................. 16, 18, 19

*Cnty. of El Paso v. Chertoff*,
No. EP-08-CA-196-FM, 2008 U.S. Dist. LEXIS 83045 (W.D. Tex. Aug. 29, 2008).............. 12

*Ctr. for Biological Diversity v. Mullin*,
No. CV-25-00365-TUC-AMM, 2026 U.S. Dist. LEXIS 64207 (D. Ariz. Mar. 26, 2026) ...... 12

*Defenders of Wildlife v. Chertoff*,
527 F. Supp. 2d 119 (D.D.C. 2007)................................................................................... 12

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025).................................................................................................... 10, 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000)........................................................................................................... 19

*Gonzales v. Oregon*,
546 U.S. 243 (2006)............................................................................................................. 8

*Gundy v. United States*,
588 U.S. 128 (2019)............................................................................................................. 9

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)........................................................................................................... 20

*Indus. Union Dep't v. API*,
448 U.S. 607 (1980)........................................................................................................... 13

*INS v. Chadha*,
   462 U.S. 919 (1983)..................................................................................................... 16

*Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*,
   334 F.3d 423, 427 (5th Cir. 2003) ............................................................................... 2

*Kendall v. United States*,
   37 U.S. 524 (1838)................................................................................................. 15, 16

*Learning Res., Inc. v. Trump*,
   607 U.S. ___ (2026)...................................................................................................... 8

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)..................................................................................................... 14

*Mayfield v. U.S. DOL*,
   117 F.4th 611 (5th Cir. 2024) ................................................................................... 5, 6

*Mistretta v. United States*,
   488 U.S. 361 (1989)................................................................................................ 10, 13

*Myers v. United States*,
   272 U.S. 52 (1926)....................................................................................................... 14

*Nat'l Fed'n of Indep. Bus. (NFIB) v. U.S. DOL*,
   595 U.S. 109 (2022).................................................................................................... 4, 7

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935)..................................................................................................... 13

*S. Texas Envt'l Just. Network v. Texas Comm'n on Env't Quality*,
   165 F.4th 356 (5th Cir. 2026) ..................................................................................... 19

*Save Our Heritage Org. v. Gonzales*,
   533 F. Supp. 2d 58 (D.D.C. 2008)............................................................................... 12

*Sierra Club v. United States*,
   23 F. Supp. 2d 1132 (N.D. Cal. 1998) ........................................................................ 17

*Touby v. United States*,
   500 U.S. 160 (1991)..................................................................................................... 13

*Trump v. Slaughter,*
   609 U.S. ___ (2026)..................................................................................................... 14

*W. Virginia v. EPA*,
   597 U.S. 697 (2022)............................................................................... 4, 5, 6, 7, 8, 9

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) .................................................................................................. 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................................ 14, 15

*Zapata Cnty. v. Biden*,
  No. 5:20-CV-00106, 2023 U.S. Dist. LEXIS 241487 (S.D. Tex. Mar. 31, 2023) ................... 12

**Constitutional Provisions**

U.S. Const. art I, § 1 ..................................................................................................... 16

U.S. Const. art I, § 7 ..................................................................................................... 16

U.S. Const. art. II, § 3 .............................................................................................. 13, 15

**Statutes**

16 U.S.C. § 1271 ...................................................................................................... 17, 20

16 U.S.C. § 1271(b) ....................................................................................................... 17

16 U.S.C. § 1274(a)(17) ........................................................................................... 17, 18

16 U.S.C. § 1275 ........................................................................................................... 17

16 U.S.C. § 1281(a) .................................................................................................. 17, 18

16 U.S.C. § 1281(c) ....................................................................................................... 18

16 U.S.C. §§ 1271–1287 ................................................................................................ 16

16 U.S.C. §§ 1272–1273 ................................................................................................ 17

54 U.S.C. § 306108 ....................................................................................................... 20

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended

  IIRIRA § 102 ............................................................................................................. 2, 8

  IIRIRA § 102(a) ...................................................................................................... 2, 8, 9

  IIRIRA § 102(c) ......................................................... 2, 3, 5, 8, 10, 11, 13, 18, 20

  IIRIRA § 102(c)(2) ........................................................................................................ 2

**Rules**

Fed. R. Civ. P. 56.................................................................................................... 1

Fed. R. Civ. P. 56(a) ............................................................................................... 2

Fed. R. Civ. P. 56(c) ............................................................................................... 1

**Legislative Materials**

National Parks and Recreation Act, Pub. L. No. 95-625, § 702, 92 Stat. 3467, 3522 (1978) ...... 17

**Federal Register Publications**

91 Fed. Reg. 7297 (Feb. 17, 2026) ......................................................................... 4

91 Fed. Reg. 27969 (May 15, 2026) ....................................................................... 4

91 Fed. Reg. 34831 (June 9, 2026) ......................................................................... 4

91 Fed. Reg. 40550 (July 2, 2026)........................................................................... 4

**STATEMENT OF ISSUES**

1.  Whether the West Waiver (91 Fed. Reg. 7297–98 (Feb. 17, 2026), *as amended by* 91 Fed. Reg. 40550–51 (July 2, 2026)) and National Park Waiver (91 Fed. Reg. 27969–70 (May 15, 2026), *as amended by* 91 Fed. Reg. 34831–33 (June 9, 2026)) (together, the "Big Bend Waivers" or "Waivers"), issued by the Secretary of the U.S. Department of Homeland Security pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") violate the major questions doctrine.

2.  If the Court does not resolve Plaintiffs' claims under the major questions doctrine, whether the Waivers and IIRIRA violate the nondelegation doctrine.

3.  Whether the Big Bend Waivers violate the Take Care Clause for purporting to authorize IIRIRA § 102(c) for construction that extends beyond areas of "high illegal entry."

4.  Whether the National Park Waiver violates the Presentment Clause by granting the DHS Secretary the authority to unilaterally alter or repeal portions of duly enacted statutes without complying with the Constitution's dual presentment and bicameralism procedures.

**INTRODUCTION**

The Big Bend region of southwest Texas is known as one of this nation's crown jewel wilderness corridors—it is a place of immense canyons, dark skies, abundant archeological sites, tremendous biodiversity, and irreplaceable stretches of the Rio Grande's wild and scenic river. Winding along the curvatures of the Rio Grande, approximately one quarter of the U.S-Mexico border is contained in this region—and it encompasses the largest remaining unwalled stretch of southern border. Before this Court are four constitutional challenges opposing a plan to decimate this pristine wilderness to erect a wall cleaving through North America, relying on waivers issued pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Although various plaintiffs, including Plaintiff Center for Biological Diversity (the "Center"), have unsuccessfully challenged IIRIRA waiver decisions in the past—a court has never before been presented with the question of whether IIRIRA authorizes construction of a "Great Wall," spanning the length of our southern border. As Plaintiffs describe herein, the government's efforts to contort IIRIRA for such a purpose contravenes our nation's Constitution.

Pursuant to Fed. R. Civ. P. 56 and this Court's Standing Order Regarding Motions for Summary Judgment (May 1, 2012), Plaintiffs Friends of the Ruidosa Church, Danny William Miller Junior, and the Center ("Plaintiffs") move for summary judgment. This motion is supported by Plaintiffs' Proposed Undisputed Facts ("PUF"), Appendices of Evidence, and Proposed Order as filed herewith. Because the record evidence shows that there are no genuine issues of material fact in dispute, Plaintiffs are entitled to summary judgment.

**LEGAL FRAMEWORK**

IIRIRA directs the DHS Secretary to install physical barriers in the "vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA

1

§ 102(a). To construct the barriers, Congress also conferred on the Secretary waiver power in IIRIRA § 102(c), providing the "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section." Congress also curtailed the Judiciary's check on the Secretary's waiver decisions by constricting legal challenges to constitutional claims, brought within 60 days in federal district court. *Id.* § 102(c)(2).

Here, Plaintiffs move for summary judgment on the application of IIRIRA § 102 to waive dozens of laws in the Big Bend region. Pursuant to Rule 56, summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit," and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc*., 334 F.3d 423, 427 (5th Cir. 2003) (citation omitted). This standard "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## FACTUAL BACKGROUND

For years, the United States has been embroiled in an "extensive, and often intense" debate, *California v. Trump*, 379 F. Supp. 3d 928, 936 (N.D. Cal. 2019), propelled to the national stage by President Trump, about whether our southern border should be barricaded by a wall. *See* PUF ¶¶ 4–13. During his first term, President Trump accomplished just a small fraction of his project to build a "Great Wall," PUF ¶ 6, and committed to "finishing the wall" during his second term, PUF ¶ 11. Recently, the Secretary of Homeland Security Markwayne Mullin stated that the wall

2

will be completed by June 2027, stretching "from the Pacific to the Gulf of America" and that a *secondary wall*, parallel to the first, will be completed by the end of the President's term.[1] PUF ¶¶ 14–16.

Marking a significant initiation to this massive project, on October 15, 2025, the Secretary issued nine new waivers pursuant to Section 102(c), waiving dozens of procurement laws for barrier construction along the border (the "Procurement Waivers"). PUF ¶ 17. Each waiver encompasses the totality of a border patrol sector and for the first time, taken together, these waivers span the entirety of the U.S.-Mexico border. PUF ¶ 18.

In 2026, the Secretary published four more waivers in the Federal Register that, together, make up the "Big Bend Waivers" at issue in the present case. The waivers purport to invoke IIRIRA Section 102(c) in order to waive the application of the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the National Historic Preservation Act ("NHPA"), the Wild and Scenic Rivers Act ("WSRA") and numerous additional laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors." 91 Fed. Reg.

---

[1]    Throughout this Motion, Plaintiffs refer to the administration's goal of building a "Great Wall" on the southern border. Since 2017, the government's description of what this would entail has changed numerous times. In 2017, the "Great Wall" meant a "secure, contiguous, and impassable physical barrier." PUF ¶ 5. Secretary Mullin's more recent statements characterize it as a "Smart Wall" consisting of two parallel walls. PUF ¶ 15. Indeed, the online map of the wall available on the U.S. Customs and Border Patrol Website has changed over 100 times since April 24, 2026, revising things like border construction types and routes. PUF ¶ 33. Whatever form the "Great Wall" ultimately takes, all border barrier construction harms Plaintiffs. Moreover, Plaintiffs challenge the *waivers* at issue here, not an amorphous and constantly shifting online map. The waivers authorize *full border wall construction* and contain no sunset date.

7297–98 (Feb. 17, 2026), *as amended by* 91 Fed. Reg. 40550–51 (July 2, 2026) ("West Waiver");

91 Fed. Reg. 27969–70 (May 15, 2026), *as amended by* 91 Fed. Reg. 34831–33 (June 9, 2026)

("National Park Waiver"). The West Waiver encompasses an area just south of Fort Quitman down

through Ruidosa, Presidio, Redford, the Hoodoos, and ends midway through Big Bend Ranch State

Park. PUF ¶ 29. The National Park Waiver begins where the West Waiver ends in Big Bend Ranch

State Park, continuing through Lajitas, Big Bend National Park, and ending at the northeastern-

most edge of Black Gap Wildlife Management Area. PUF ¶ 29.

Together, the Waivers span approximately 430 miles of border, or nearly one-quarter of

the entire U.S.-Mexico border. PUF ¶ 30. A conservative estimate of the wall's route, spanning

the entire length of the border, approximates that the Big Bend Waiver segment would fill in one

third of the southern border's last remaining unwalled segments. PUF ¶ 3. The Big Bend Sector

accounts for just 1.1% of total border apprehensions this century, or approximately 1.5 migrant

apprehensions per border mile per month, despite being the largest sector. PUF ¶¶ 34–35.

## ARGUMENT

### I.      The Big Bend Waivers Violate the Major Questions Doctrine.

The major questions doctrine "ensures that the national government's power to make laws

that govern us remains where Article I of the Constitution says it belongs—with the people's

elected representatives." *Nat'l Fed'n of Indep. Bus. (NFIB) v. U.S. DOL*, 595 U.S. 109, 124 (2022)

(Gorsuch, J., concurring). To effectuate this constitutional safeguard, the Supreme Court has

instructed that "in certain extraordinary cases," courts should be "reluctant to read into ambiguous

statutory text the delegation claimed to be lurking there." *W. Virginia v. EPA*, 597 U.S. 697, 723

(2022) (cleaned up). Instead, the government must point to a clear congressional statement

authorizing the asserted power. *Id.* at 732. The government's asserted authority here—facilitating

construction of a near continuous border-wide barrier through serial invocation of IIRIRA Section 102(c) and the Big Bend Waivers—presents precisely the type of "extraordinary case" that requires a clear statement from Congress. Plaintiffs believe that this Court will be the first to consider whether IIRIRA waivers violate the major questions doctrine.

In the Fifth Circuit, "there are three indicators that each *independently* trigger" major questions review, two of which are readily apparent when considering the implications of the Big Bend Waivers: (1) if an agency asserts power "to resolve a matter of great political significance;" and (2) if an "agency seeks to . . . require billions of dollars in spending by private persons or entities." *Mayfield v. U.S. DOL*, 117 F.4th 611, 616 (5th Cir. 2024) (emphasis added) (cleaned up). Either alone is sufficient to trigger 'skepticism' in the court's review of a statutory grant of authority. "To overcome that skepticism, the Government must . . . point to clear congressional authorization" for the authority it seeks. *W. Virginia*, 597 U.S. at 732 (2022) (cleaned up). Ultimately, the plain language of IIRIRA falls far short of the clear statement that major questions precedent demands for government actions at this scale.

   a.   **The Big Bend Waivers and ultimate goal of a "Great Wall" are extraordinary.**

Under both Supreme Court and Fifth Circuit precedent, when an agency's assertion of authority has "great political significance" or "vast economic" consequences, it triggers scrutiny under the major questions doctrine. *W. Virginia*, 597 U.S. at 716; *Mayfield*, 117 F.4th at 616. Both are met here. The Big Bend Waivers are not an isolated infrastructure decision; they form a substantial component of a coordinated federal effort to implement President Trump's promise to "finish[]," PUF ¶ 11, the "Great, Great Wall," PUF ¶ 4, and as described by Secretary Mullin, a barrier that will span "from the Pacific to the Gulf of America," PUF ¶¶ 14–16, with a completion date of approximately June 2027 for the primary wall—and a *secondary wall* to be completed by

the end of President Trump's second term, PUF ¶¶ 14–16. A conservative estimate of the "Great Wall" approximates that its length would span around 1,748 miles, and the Big Bend Waivers alone authorize construction for a significant portion of this wall (approximately one-third of the remaining unwalled portion and around one quarter of the border). PUF ¶¶ 3, 30. This is extraordinary. Even standing alone, waivers of this geographic scope and consequence qualify as an "extraordinary case." Viewed in context of the broader, border-wide project they help effectuate, that conclusion is unavoidable.

First, political significance is generally characterized as whether the action involves a "politically controversial" or "contentious" topic; or where an agency unearths powers "Congress considered and rejected" on multiple occasions, *Mayfield*, 117 F.4th at 617 (cleaned up), or whether the pertinent issue is a matter of "earnest and profound debate across the country," *Biden v. Nebraska*, 600 U.S. 477, 504 (2023) (quoting *W. Virginia*, 597 U.S. at 743). Under any of these standards, building the "Great Wall" is clearly marked by great political significance.

The political significance of border wall construction is confirmed by years of sustained national controversy. President Trump launched his 2015 presidential campaign with a promise to "build a great, great wall on our southern border." PUF ¶ 4. This campaign promise instigated the already-divisive topic of border security further into the national spotlight, prompting years of debate across national media outlets, party platforms, and legislative bodies. Since 2015, Congress has considered and declined to pass numerous proposed bills that aimed to "finish" the wall or otherwise expand DHS's wall-building authority under IIRIRA. PUF ¶¶ 8–10. "These policy questions," surrounding border barrier construction "are the subject of extensive, and often intense differences of opinion," *California*, 379 F. Supp. 3d at 936, marking the "Great Wall" as a project that maintains a fierce and undeniable character of controversy and its status quo as an "earnest

and profound debate across the country." *W. Virginia*, 597 U.S. at 743.

Independently sufficient to evidence the extraordinary nature of this administration's plan to build the "Great Wall," its economic impacts are vast. The Supreme Court has found that economic impacts are vast when they amount to some billions of dollars. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (finding $50 billion to be "a reasonable proxy" for the eviction moratorium found in violation of the major questions doctrine). Here, a conservative calculation of the wall's total cost, is $513 billion. PUF ¶ 58. This figure accounts for direct costs (*e.g.*, construction and maintenance costs, and costs associated with equipping, administering, and ultimately removing a nearly continuous border wall system) as well as external and non-budgetary economic costs (*e.g.*, migrant mortality, ecological and natural resource damage, forgone cross-border trade and economic integration, enforcement-induced violence and other enforcement-related harms, and costs imposed on border communities). PUF ¶¶ 58–60. The low and high bounds of this estimate range from $220 billion to $1.3 trillion, PUF ¶ 58, and omit numerous substantial harms that evade traditional cost analyses such as loss of cultural or religious sites, PUF ¶ 61. These figures dwarf those considered in other major questions cases.[2]

The Big Bend Waivers are not a discrete or localized infrastructure decision. They authorize construction across the largest remaining unwalled stretch of the southern border, PUF ¶ 3, span nearly one quarter of the U.S.-Mexico border, PUF ¶ 30, target a region with the lowest rates of illegal crossings, PUF ¶ 35 and function as a substantial component of a broader effort to construct a near-continuous border-wide barrier—amounting to economic costs that could surpass $1 trillion, PUF ¶ 58. At this scale, the Big Bend Waivers carry "vast economic and political

---

[2]   *See Ala. Ass'n of Realtors, 594 U.S. at 764* ($50 billion); *Biden v. Nebraska*, 600 U.S. at 504 ($430 billion); *W. Virginia*, 597 U. S. at 714 ("billions of dollars"); *NFIB*, 595 U.S. at 120 ("billions of dollars").

significance" and therefore require a clear statement from Congress.

### b. IIRIRA does not clearly authorize the Waivers or "Great Wall."

Faced with these extraordinary circumstances, the Government must point to clear congressional authorization for the power it claims. *W. Virginia*, 597 U.S. at 732. The Supreme Court has repeatedly rejected efforts to locate sweeping authority in ambiguous statutory language; in these cases, "the statutory text might as a matter of definitional possibilities have been read to delegate the asserted power." *Learning Res., Inc. v. Trump*, 607 U.S. ___ (2026) (slip op. at 8) (opinion of Roberts, C.J.) (cleaned up). "But context counseled skepticism," where "separation of powers principles and a practical understanding of legislative intent suggested Congress would not have delegated highly consequential power through ambiguous language." *Id.* Here, the most the Government can offer is IIRIRA § 102, which fails to delegate the power the government seeks.

IIRIRA § 102 grants the Secretary of Homeland Security limited authority to take actions "necessary to install . . . physical barriers and roads" along the U.S. border in "areas of high illegal entry," and to waive laws that, in his "sole discretion," are "necessary to ensure expeditious construction of the barriers and roads" IIRIRA § 102(a), (c). But nothing in IIRIRA's text clearly authorizes DHS to waive laws for the purpose of creating a continental border-length barrier, "from the Pacific to the Gulf of America." PUF ¶¶ 14–16. The question before the Court "is not whether something should be done; it is who has the authority to do it." *Biden v. Nebraska*, 600 U.S. at 501; *see also Gonzales v. Oregon*, 546 U.S. 243, 265 (2006) (the Government's sought after authority was "inconsistent with the design of the statute").

Here, the statutory text of IIRIRA confirms the absence of any clear authorization. IIRIRA authorizes construction only in "areas of high illegal entry," and limits waiver authority to what is "necessary" to ensure the "expeditious construction" of "barriers and roads." These textual

limitations imposed by Congress are irreconcilable with the government's assertion of authority to facilitate a border-length barrier through sweeping waivers applied across vast geography, including regions like Big Bend, that see minimal unlawful crossings and record the lowest levels of such crossings across all Border Patrol sectors. PUF ¶ 35. The Waivers amount to an unprecedented interpretation of IIRIRA, leaving to the Secretary's "sole" discretion, whatever actions he deems "necessary"—making it "hard to see what measures" would be "outside the [government's] reach." *Ala. Ass'n of Realtors*, 594 U.S., at 765. If Congress had intended to build a continent-long barrier system, it would have authorized IIRIRA waivers across the entire border, not limited to "areas" with "high illegal" crossings. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").[3]

At minimum, if IIRIRA could be read to support the government's goal of building the "Great Wall" through Big Bend as a matter of "definitional possibilities," that ambiguity is the deciding blow under major questions precedent. *W. Virginia*, 597 U.S. at 732. Here, where no clear statement exists, the government's asserted authority to construct a border-wide barrier system through the Big Bend Waivers fails.

**II.     If the Court Does Not Resolve Plaintiffs' Claims Under the Major Questions Doctrine, then the Waivers and IIRIRA § 102(c) Violate the Nondelegation Doctrine.**

The nondelegation doctrine enforces the Constitution's separation of powers by barring Congress from "transfer[ring] to another branch powers which are strictly and exclusively legislative." *Gundy v. United States*, 588 U.S. 128, 128 (2019) (cleaned up). In view of the

---

[3]     Context reinforces this conclusion. Congress has repeatedly considered—and declined—to enact legislation requiring completion of a contiguous border wall or expanding DHS's authority under IIRIRA to do so. PUF ¶¶ 8–10. For example, the Secure the Border Act of 2023 sought to revise IIRIRA § 102(a) by removing its limitation to "areas of high illegal entry," and expanding the statute to encompass the entire "southwest border." PUF ¶ 9.

legislative power underlying IIRIRA § 102(c), and DHS's increasingly capacious use of IIRIRA since the October 2025 Procurement Waivers,[4] IIRIRA's waiver authority is now squarely at odds with the Supreme Court's long-standing intelligible principle test. To be clear, this test is "not demanding," and the Supreme Court has not found a delegation of legislative power unconstitutional since 1935. *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020). This "does not mean, however, that [courts] must rubber-stamp all delegations of legislative power," *id.* at 443, and in instances such as this, the spirit and importance of the nondelegation doctrine are poised to address the increasing boundlessness of the Secretary's asserted authority under IIRIRA.

While affirming that Congress cannot altogether forfeit its legislative powers to the Executive, the Fifth Circuit and Supreme Court have explained that a delegation is constitutionally adequate "if Congress (1) clearly delineates its general policy, (2) the public agency which is to apply it, and (3) the boundaries of that delegated authority." *Big Time Vapes*, 963 F.3d at 443–44 (cleaned up) (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989)). Moreover, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (citation omitted). In other words, the strictness of the intelligible principle test tightens and the level of agency deference permitted recedes as the breadth of the purported delegated power expands.

Here, if this Court finds that the major questions doctrine does not prevent the Secretary from issuing the Big Bend Waivers under IIRIRA, then IIRIRA itself is fatally flawed. In this case,

---

[4]     The Procurement Waivers also act to degrade any meaning behind the term "area[] of high illegal entry." *See* PUF ¶ 17. Each encompasses an entire border patrol sector and, together, span the entire U.S.-Mexico border, characterizing all 1,975 miles as areas of high illegal entry. PUF ¶ 18. Although these waivers are not directly at issue in the present litigation, they underscore now total indifference towards IIRIRA's limitations, which should constrain DHS to specific *areas*— not the entire border.

the scope of the delegated power is astonishing. IIRIRA § 102(c) grants the Secretary *carte blanche* power to (1) unilaterally suspend the application of *any and all laws*, (2) in order to pursue *any kind* of border construction, (3) at *any* time and *in perpetuity* (without any sunset date), (4) *anywhere* within the border's "vicinity." Because Congress has presented a breathtakingly broad set of circumstances under which the Secretary may exercise his delegated power, mandating tight bounds on that delegation are necessary to satisfy the intelligible principle test. Under a statutory scheme that grants tremendous power with few guardrails, "areas of high illegal entry" fails to set forth an intelligible principle if it applies to the entire border and authorizes the Big Bend Waivers.

The Big Bend Sector is the largest sector of all nine geographic border patrol sectors, and it boasts the lowest apprehension rates. PUF ¶¶ 34–35. Since the start of this century, the sector has averaged 1.5 apprehensions per mile per month—and less than 0.4 apprehensions per mile per month since the beginning of President Trump's second administration. PUF ¶ 35. Thus, distinguishing the Big Bend Waivers from prior waivers challenged on nondelegation grounds, these Waivers do not merely push the established policy or boundaries of the statute—they collapse them altogether. Regardless of whether "areas of high illegal entry" is meant to act as a comparative guidepost or an absolute metric, the same conclusion must be made: the Big Bend Sector is not an area of high illegal entry. For example, using a comparative guidepost, the 118-mile boundary of Big Bend National Park has accounted for just 0.02% of total apprehensions in the last decade, out of all border apprehensions. PUF ¶ 36. Using an absolute metric, this translates to a total of 0.14 apprehensions per border mile per month over that same period. PUF ¶ 36. Under any framing, the park and surrounding Big Bend region is simply not an area of high illegal entry.

Here, with this limiting principle and general policy rendered meaningless, DHS invokes § 102(c) to authorize sweeping construction across a region that boasts the lowest illegal crossings.

11

If "areas of high illegal entry" is permitted to mean *any* area in the vicinity of the U.S. border the Secretary selects, it ceases to function as an intelligible principle. What remains is not a bounded delegation or clearly delineated general policy, but a grant of unreviewable authority to waive any law, anywhere along the border, in service of any barrier project the Secretary deems expedient. This transformation presents a nondelegation problem of a fundamentally different order than those previously considered, and one that the Constitution does not permit.

Prior courts have found that the Secretary's waiver authority contained a clearly delineated general policy prescribed by Congress, which is the expeditious construction of border barriers and roads to prevent unlawful border crossings "in areas of high illegal entry." *See e.g., Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 127 (D.D.C. 2007) (the general policy is clearly delineated: "to expeditiously install additional physical barriers and roads to deter illegal crossings in areas of high illegal entry") (cleaned up); *Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58, 63 (D.D.C. 2008) (same); *Cnty. of El Paso v. Chertoff*, No. EP-08-CA-196-FM, 2008 U.S. Dist. LEXIS 83045, at *11 (W.D. Tex. Aug. 29, 2008) (same); *Zapata Cnty. v. Biden*, No. 5:20-CV-00106, 2023 U.S. Dist. LEXIS 241487, at *38 (S.D. Tex. Mar. 31, 2023) (same); *Ctr. for Biological Diversity v. Mullin*, No. CV-25-00365-TUC-AMM, 2026 U.S. Dist. LEXIS 64207, at *12 (D. Ariz. Mar. 26, 2026) (same). Today, however, it is no longer possible to identify an intelligible principle in the term "areas of high illegal entry," which was central to earlier courts' conclusions that Congress clearly delineated a general policy to guide the Secretary's authority under IIRIRA. DHS has now effectively rendered that policy meaningless through the issuance of waivers across the entire U.S.-Mexico border and specifically in areas that, under any metric, are not areas of high illegal entry. *See* PUF ¶¶ 17, 34–36.

At base, in shifting legislative power to the DHS Secretary, Congress failed to fulfill its

basic obligation to at least set out *some* criteria, standards, or rules for the Secretary to adjudicate whether it is "necessary" to effectively void existing law, and how to weigh consequences against construction of border barrier.[5] If the intelligible principle test is to mean anything, it must mean that a total lack of meaning of "areas of high illegal entry" and complete absence of Congressional guidance is impermissible under the Constitution. The Supreme Court struck down a similarly unbridled delegation of legislative power when Congress offered no guidance on an authority to prohibit the transportation in interstate commerce of petroleum and related products. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 405–05 (1935). IIRIRA's paucity of congressional instruction is inexcusable, especially in light of Congress's history of providing robust intelligible principles for similarly broad delegations.[6] Thus, the Waivers and IIRIRA § 102(c) are unconstitutional.

III.    **The Big Bend Waivers Violate the Executive's Duty to Take Care that the Laws Be Faithfully Executed.**

Article II of the U.S. Constitution vests the executive power in the President and directs that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3. The President carries out that constitutional duty through executive officers and other subordinates,

---

[5]    The lack of a judicial standard that a court could apply to determine whether the Secretary acted within § 102(c)'s bounds exacerbates these issues. Where an intelligible principle exists, it "ensures that courts . . . reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards." *Indus. Union Dep't v. API*, 448 U.S. 607, 686 (1980) (Rehnquist, J., concurring); *see also FCC*, 606 U.S. at 673 (Congress should provide "sufficient standards to enable both the courts and the public to ascertain whether the agency has followed the law") (internal citations and alterations omitted).

[6]    Section 102(c) lacks substantive guidance found in other delegations deemed valid under the intelligible principle test. *See Touby v. United States*, 500 U.S. 160, 166–67 (1991) (requirement to consider at least three of eight codified factors in setting drug designations); *Mistretta*, 488 U.S. at 374–75 (explicit restrictions on range of minimum and maximum sentences, grade of offense, nature and degree of harm, and demographics of offender in sentencing guidelines); *FCC*, 606 U.S. at 680–92 (qualifications concerning populations, types of services and programs covered by telecommunications fee). These examples demonstrate that Congress *can* design necessary guardrails and failed to do so here.

including the Secretary. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 117 (1926); *see also Trump v. Slaughter,* 609 U.S. ___, (2026) (slip op at 14) (Gorsuch, J., concurring) (noting that "the executive branch must faithfully execute th[e] laws").

This is among the President's "most important constitutional dut[ies]." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 577 (1992). The Take Care clause duty requires the Executive to implement the laws enacted by Congress; it does not authorize the Executive to amend, suspend or dispense with those laws. As the Supreme Court explained in *Youngstown Sheet & Tube Co. v. Sawyer*, "[i]n the framework of our Constitution," the President's Take Care Clause duty "refutes the idea that he is to be a lawmaker," and instead limits the President's role in the legislative process "to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." 343 U.S. 579, 587 (1952). And it "is neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* As the Court recently reaffirmed, "[o]ur Constitution creates three branches, but only one President. That President is not all powerful—not by any means." *Trump v. Slaughter,* 609 U.S. at ___ (slip op at 35) (citations omitted).

Here, the Secretary is purporting to be a lawmaker by suspending or dispensing with duly enacted statutes without being confined and guided by any Congressional limits.[7] Through the multiple waivers discussed herein, the Executive has sought to construct the "Great Wall"—a project that would result in unprecedented and permanent changes to the Nation's borderlands. In furtherance of that plan, the Executive has unilaterally dispensed with bedrock environmental, historic-preservation, and numerous other statutory mandates, invoking the purported authority of IIRIRA Section 102(c) to expedite construction. PUF ¶¶ 17, 19, 20, 23, 25.

---

[7]    Congress may, of course, delegate some legislative authority to an executive officer so long as those delegations are meaningfully constrained. *See* Section II, *supra*. But when it does so, the Executive remains confined by the limits Congress prescribed. *Id.*

Supreme Court precedent establishes that the Take Care Clause is judicially enforceable against executive assertions of a dispensing power. In *Kendall v. United States*, 37 U.S. 524 (1838), for example, the Court affirmed the issuance of mandamus compelling a cabinet official to settle claims with mail contractors as required by an act of Congress. The official argued that he could disregard the act because the President possessed exclusive authority to execute the laws. *Id.* at 545–47, 612. The Court rejected that contention: "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution and entirely inadmissible." *Id.* at 613; *see also Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb.")

The challenged Waivers form part of a broader program to displace, on a serial and sweeping basis, multiple statutory regimes in order to construct a border-wide barrier bisecting the North American continent. *See* Section I, *supra.* By invoking IIRIRA's limited waiver authority to authorize construction even in areas that do not experience high levels of illegal entry, the Executive has effectively dispensed with duly enacted laws governing the construction project. Such action exceeds any constitutionally permissible construction of IIRIRA and violates the Executive Branch's obligation to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

Outside the narrow bounds of a constitutionally valid exercise of IIRIRA's waiver authority, it is not the province of the Executive to decide whether Congress's statutory directives will be carried out. As the Court explained in *Kendall*, recognizing such authority amounts to:

> vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution; and is asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with

15

a power entirely to control the legislation of congress, and paralyze the administration of justice.

*Kendall*, 37 U.S. at 613. The Waivers do precisely what *Kendall* forbids: they permit the Executive, rather than Congress, to determine whether and to what extent duly enacted laws will govern executive action.

## IV.     The National Park Waiver and IIRIRA § 102(c) Violate the Presentment Clause.

The authority to legislate is entrusted solely to Congress. U.S. Const. art I, §§ 1, 7; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). This includes the "[a]mendment and repeal of statutes, no less than enactment, [all of which] must conform with" the bicameralism and presentment requirements of Article I. *INS v. Chadha*, 462 U.S. 919, 954 (1983). Indeed, the Supreme Court has stated that the Executive Branch cannot void any law, in whole or in part, without Congress passing a law voiding the previous law and presenting it to the President for signature. *Clinton*, 524 U.S. at 448–49. But IIRIRA grants the Secretary—an unelected executive official—precisely that power, one that not even Congress possesses.

IIRIRA grants the Secretary unbridled authority to dispose of any and all legal requirements to pursue border construction that causes irreversible damage to or complete destruction of places and properties that have been designated and granted protections by Congress through proper bicameralism and presentment procedures. Once those statutorily designated places and properties are irreversibly damaged or destroyed by wall construction, the specific legal protections guaranteed by statute can no longer be provided, preventing sections of duly enacted statutes from having continued "legal force or effect," and thus function as amendments or partial repeals of those statutes. *Id.* at 438.

Here the Secretary waived the WSRA, 16 U.S.C. §§ 1271–1287, for the construction of physical barriers and roads covering a segment of the Rio Grande designated by statute for

16

protection of its "scenic, geologic, fish and wildlife, and recreational values." 16 U.S.C. §§ 1271, 1274(a)(17); PUF ¶¶ 28, 45. The WSRA protects "certain selected rivers . . . which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values" in "free-flowing condition," as well as their "immediate environments" for the benefit and enjoyment of present and future generations. 16 U.S.C. § 1271(b). The Act sets forth a process by which certain rivers eligible for protection can be added as components of the wild and scenic rivers system, *id*. §§ 1272–73, 1275, and imposes substantive requirements on responsible agencies to administer designated rivers "to protect and enhance the values which caused it to be included in said system." *Sierra Club v. United States*, 23 F. Supp. 2d 1132, 1136-37 (N.D. Cal. 1998) (cleaned up); 16 U.S.C. § 1281(a). Congress amended the WSRA to include a segment of the Rio Grande River in Texas—on the U.S. side of the river from river mile 842.3 above Mariscal Canyon downstream to river mile 651.1 at the Terrell-Val Verde County line—as a component of the wild and scenic river system. National Parks and Recreation Act, Pub. L. No. 95-625, § 702, 92 Stat. 3467, 3522 (1978).

Border construction would decimate the "outstanding and remarkable" scenic, fish and wildlife, geological, and recreational values that made this segment of the Rio Grande eligible for inclusion as a component of the wild and scenic river system and serve as the basis for its protection under the WSRA. It would deteriorate the scenic and recreational values of the river and surrounding area by disrupting the vast, unobstructed landscape with unnatural manmade structures, such as bollard walls, roads, barbed wire, and stadium lights, PUF ¶¶ 54–55, 57, and entirely remove recreational access to the Rio Grande. PUF ¶ 56. Construction of border barriers and roads would also cause devastating impacts to fish and wildlife by, *inter alia*, fragmenting, degrading, and destroying species habitat, and obstructing wildlife movement essential for

17

endangered and transboundary species, cutting them off from vital food, water, and other resources. PUF ¶¶ 53–54. Finally, construction activities such as blasting, quarrying, and land-clearing for wall construction, roads, and staging areas can irreversibly damage the unique geologic formations shaped over the course of millions of years. PUF ¶ 55.

Accordingly, border construction in and near the Rio Grande would permanently alter this statutorily protected river and degrade each and every outstandingly remarkable value that Congress sought to protect when it added this segment to the National Wild and Scenic River System. This strips the responsible agency—the National Park Service—of its ability to administer the area in accordance with Congress's mandate to *protect and enhance* those values. 16 U.S.C. § 1281(a), (c); PUF ¶ 48. It therefore effectively amends 16 U.S.C. § 1274(a)(17) to shrink the Congressionally designated and statutorily protected component of the Wild and Scenic River System to "[t]he segment on the United States side of the river from ~~river mile 842.3 above Mariscal Canyon~~ GPS point 29.728522, -102.683945 downstream to river mile 651.1 at the Terrell-Val Verde County line."

Because IIRIRA's extraordinarily broad delegation authorizes the Secretary to disregard acts of Congress in a manner that deprives portions of those laws of their legal force and effect without complying with the Constitution's requirements of bicameralism and presentment, the § 102(c) waiver power is not materially distinguishable from the power invalidated in *Clinton v. City of New York*. 524 U.S. 417. There, the Line Item Veto Act granted the President the unilateral authority to strike portions of duly enacted statutes concerning statutory spending and taxes, which effectively permitted the President to "amend" the underlying laws. *Id*. at 438, 448–49. The Supreme Court held that the Constitution prohibits such an Executive branch power, just as it prohibits the executive amendment of an enacted law. Additionally, in *Clinton*, Congress at least

18

retained the power to reject the vetoes. *Id*. at 436–37. By contrast, here, IIRIRA provides no procedure for Congress to override a waiver decision. This effectively grants the Executive exclusive lawmaking power, which is constitutionally impermissible. *Id*. at 448–49.

## V.    Plaintiffs Have Article III Standing.

Here, all Plaintiffs have Article III standing.[8] Members of Plaintiffs Friends and the Center, and Plaintiff Miller himself have a myriad of longstanding interests in the Rio Grande and surrounding borderlands injured by the Waivers, which invalidation will redress. *See* PUF ¶¶ 63–108. These interests, and the threats that the Waivers and imminent construction projects pose to them, *see* PUF ¶¶ 37–40, are more than sufficient to confer standing. *See, e.g.*, *S. Texas Envt'l Just. Network v. Texas Comm'n on Env't Quality*, 165 F.4th 356, 366 (5th Cir. 2026) (holding that members established injury in fact where a proposed construction site threatened "recreational, aesthetic, and religious experiences in the area surrounding the site"). These interests are germane to the Center's core mission to protect imperiled wildlife and their habitats, including in the southern borderlands, PUF ¶¶ 84–87, and Friends' core mission to restore the Ruidosa Church to its status as a community gathering place, *see* PUF ¶ 71. Moreover, the Big Bend Waivers and ongoing border wall construction also pose imminent, concrete, and particularized injuries to Plaintiff Miller's longstanding financial, professional, aesthetic, recreational and spiritual interests in the Rio Grande corridor. *See* PUF ¶¶ 63–69.

---

[8]    To show standing, a plaintiff must show an "injury in fact" that is "concrete and particularized," and "actual or imminent," that "the injury is fairly traceable to the challenged action of the defendant," and that the injury would likely be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000). Associations have standing "when its members would otherwise have standing to sue," the interests at risk of harm "are germane to the organization's purpose," and individual members are not required to participate in the lawsuit. *Id.*

Additionally, organizational Plaintiff Friends has standing to sue on its own behalf. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Border barrier construction threatens imminent and serious damage to the Ruidosa Church's fragile adobe structure. *See* PUF ¶¶ 71, 80. Defendants' actions will therefore directly affect and interfere with Friends' core organizational activities—restoring the Church's function as a community gathering place and carrying out ongoing restoration work to this end—and thereby impair Friends' ability to perform those activities. *See* PUF ¶ 81. Additionally, imminent and ongoing harms flowing directly from Defendants' unlawful conduct will force Friends to divert labor and financial resources away from activities central to its mission, further impairing its core activities. *See* PUF ¶ 83.

Injuries to Plaintiffs and their members have already occurred (*e.g.*, lack of notice and meaningful opportunity comment) or are imminent (*i.e.*, construction contracts have already been awarded), and would be redressed by the requested relief because, absent the Big Bend Waivers, wall construction would not occur or would occur in compliance with both procedural and substantive laws. *See, e.g.*, PUF ¶¶ 78, 99, 106–08. For example, the NHPA would require Defendants to consider the effects of construction on the Ruidosa Church and provide a reasonable opportunity for comment, 54 U.S.C. § 306108, and the WSRA, would require that the Rio Grande "be preserved in free-flowing condition," and its "immediate environments" "be protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271.

## CONCLUSION

Plaintiffs respectfully request that this Court grant summary judgment in their favor by declaring that the Big Bend Waivers and IIRIRA Section 102(c) violate the Constitution, setting aside the Waivers to avoid constitutional infirmities, and enjoining Defendants from building border barrier in the Big Bend Sector without first complying with all applicable laws.

DATED: July 17, 2026

Respectfully submitted,

*/s/* Emma Yip

Emma Yip (CA Bar No. 352446)*
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (206) 858-2297
Fax: (520) 623-9797
eyip@biologicaldiversity.org

Zeynep J. Graves (CA Bar No. 298533)*
Shannon Eva Labuschagne (CA Bar No. 365633)
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (510) 844-7160
Fax: (520) 623-9797
zgraves@biologicaldiversity.org
slabuschagne@biologicaldiversity.org

Dustin Rynders (TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 1108
Houston, TX 77251
Tel: (832) 767-3630 ext. 196
dustin@texascivilrightsproject.org

Kate Gibson Kumar (TX Bar No. 2413588)
Alana Park (TX Bar No. 24150568)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 17757
Austin, TX 78760
Tel: (512) 474-5073 ext. 225
kate@texascivilrightsproject.org
alana@texascivilrightsproject.org

*\* Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

21