**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 3:26-cv-01099-KC |
| *Plaintiffs*, | |
| v. | |
| MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION, | |
| *Defendants.* | |

**PROPOSED UNDISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1.    The U.S.-Mexico Border is approximately 1,975 miles long. Appendix of Evidence: Volume 1, Declaration of Connor Phillips, APX-V1-293 ("Phillips Decl."), ¶ 5.

2.    If built from the Pacific to the Gulf of Mexico, the "Great Wall" would span around 1,748 miles by a conservative estimate, shorter than the actual border in large part due to less contouring occurring in constructing border wall than occurs naturally along the curvatures of the Rio Grande. Phillips Decl. ¶ 7.

3.    If border wall is built through the entirety of the Big Bend Waiver areas (91 Fed. Reg. 7297 (Feb. 17, 2026), *as amended by* 91 Fed. Reg. 40550 (July 2, 2026); 91 Fed. Reg. 27969 (May 15, 2026), *as amended by* 91 Fed. Reg. 34831 (June 9, 2026)), approximately 339 miles of the "Great Wall" would span this corridor, filling in approximately one third of the total remaining unwalled portion of the southern border and walling off a portion the largest remaining

1

unobstructed stretch. Phillips Decl. ¶ 8.

4.      On June 16, 2015, President Trump announced his candidacy for president during a speech in New York City. He stated: "I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border. And I will have Mexico pay for that wall." Appendix of Evidence: Volume 2, Declaration of Zeynep J. Graves, APX-V2-147 ("Graves Decl.") ¶ 3 & Ex. 1.

5.      Upon entering the White House in 2017, President Trump directed DHS to construct a "physical wall" along the entirety of the U.S.-Mexico border, where wall was defined to mean a "secure, contiguous, and impassable physical barrier." Exec. Order No. 13767 §§ 2(a), 3(e), 82 Fed. Reg. 8793 (Jan. 30, 2017).

6.      During President Trump's first term in office, his administration completed approximately 458 miles of border barrier construction. Of those 458 miles, 87 were of new, primary border wall along previously unwalled stretches of the southern border. Appendix of Evidence: Volume 1, Expert Report of Adam B. Isacson, APX-V1-328 ("Isacson Rep.") ¶ 18.

7.      By 2023, after President Trump's first term in office, a total estimated 741 miles of border barrier existed along the southern border, of which 636 miles were pedestrian barrier. Phillips Decl. ¶ 7; *see* Isacson Rep. ¶ 19. Based on the approximation that the wall will span around 1,748 miles, that meant that around 1,112 miles of border wall remained to be built in order to finish the "Great Wall." Phillips Decl. ¶ 7.

8.      In 2023, a number of bills were introduced in Congress that sought to complete the border wall and/or expand the Secretary of Homeland Security's authority under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended. For example, Representative

Clay Higgins reintroduced legislation titled *Finish the Wall Act*, and Senator James Risch introduced the *Solving the Border Crisis Act*. H.R. 336, 118th Cong. (2023); S. 716, 118th Cong. (2023).

9.    Additionally, Representative Mario Diaz-Balart and Senator Ted Cruz introduced companion legislation titled *Secure the Border Act of 2023* to the House and Senate. H.R. 2, 118th Cong. (2023); S. 2824, 118th Cong. (2023). As proposed, this legislation sought to amend IIRIRA § 102(a) as follows (bold indicates proposed added text, strike through indicates proposed deleted text):

> (a) In general.—The Secretary of Homeland Security shall take such actions as may be necessary ~~to install additional physical barriers and roads~~ (including the removal of obstacles to detection of illegal entrants) **to design, test, construct, install, deploy, integrate, and operate physical barriers, tactical infrastructure, and technology** in the vicinity of the ~~United States~~ **southwest** border **to achieve situational awareness and operational control of the southwest border and deter, impede, and detect unlawful activity** ~~to deter illegal crossings in areas of high illegal entry into the United States~~.

*Compare* H.R. 2, 118th Cong. § 103(1) (2023) *and* S. 2824, 118th Cong. § 103(1) (2023) *with* 8 U.S.C. § 1103(a) note.

10.    Congress did not enact any of the aforementioned bills. *See* H.R. 336, 118th Cong. (2023); S. 716, 118th Cong. (2023); H.R. 2, 118th Cong. (2023); S. 2824, 118th Cong. (2023).

11.    On July 18, 2024, President Donald Trump accepted the presidential nomination at the Republican National Convention in Milwaukee, Wisconsin. He said: "I will end the illegal immigration crisis by closing our border and finishing the wall, most of which I've already built." Graves Decl. ¶ 4 & Ex. 2.

12.    On January 20, 2025, President Donald Trump issued Proclamation No. 10886, entitled "Declaring a National Emergency at the Southern Border of the United States," 90 Fed. Reg. 8327 (Jan. 29, 2025), which directed the Secretary of Homeland Security ("DHS Secretary")

to "immediately take all appropriate action, consistent with law . . . to construct additional physical barriers along the southern border." *Id.* § 2.

13.    On January 20, 2025, President Trump issued Executive Order No. 14165, entitled "Securing Our Borders," 90 Fed. Reg. 8467 (Jan. 30, 2025), which directed the DHS Secretary to "take all appropriate action to deploy and construct" physical barriers along the U.S.-Mexico border "to ensure [its] complete operational control." *Id.* § 3.

14.    On or around May 7, 2026, Fox Business released press footage of DHS Secretary Markwayne Mullin stating:

> The President had made it an initiative in his first term, he's made it a strong initiative to finish the wall in his second term. We're building miles of wall every single week. We expect to have the first preliminary wall put up that's going to go from the Pacific to the Gulf of America by hopefully April or June of next year. Now, we still have a secondary wall we've got build with that, but we'll be done before the President's out of office.

Graves Decl. ¶ 5.

15.    On June 3, 2026, Secretary Markwayne Mullin testified before the House Homeland Security Committee, stating:

> We are on track to have the primary wall done, *completed*, from the Pacific to the Gulf of America this time next year. We'll have all contracts out by the end of this month. We're having great progress. Now, the primary wall's not the secondary wall. The primary wall is the first wall up. Because of the way the cartels adjust and their criminals, and their thugs, and their terrorists, we have to push out a secondary wall because they've been going in and cutting the wall and before we can respond in some of these remote areas, they've been able to get through… so we're putting 150-foot some places, sometimes it's smaller than that, for a secondary wall that they've got to go over plus a smart wall which will tell us approximately how many people are there… So, we're well within track… We'll probably complete [the secondary wall] the Summer of '28 and so all of it will be fully completed.

Graves Decl. ¶ 6.

16.    On June 24, 2026, NewsMax released an interview with Secretary Markwayne

Mullin, where he reiterated plans to complete the wall:

> It will be done. So, this time next year, if we're on the track that we're projected to be and that we're currently on, this time next year, you and I can have the same meeting right here. In fact, we'll go to the wall. And the first primary, the preliminary wall, will be built from the Pacific to the Gulf of America. And then we're going to be already building the secondary wall. . . So now we're building the primary wall with technology on it that we can see when it's being tampered with. What the secondary wall does, is it gives us time to respond as they're trying to get through the second wall. So some of those are 150ft apart. Some are 60ft apart.

Graves Decl. ¶ 7.

## IIRIRA WAIVERS

17.     On October 15, 2025, the DHS Secretary issued nine new waivers pursuant to Section 102(c) of IIRIRA, waiving dozens of procurement laws for barrier construction along the border. Each waiver encompasses the totality of a border patrol sector and for the first time, taken together, these waivers span the entirety of the U.S.-Mexico border. 90 Fed. Reg. 48286 (Oct. 15, 2025) (Big Bend Sector); 90 Fed. Reg. 48281 (Oct. 15, 2025) (Tucson Sector); 90 Fed. Reg. 48282 (Oct. 15, 2025) (El Centro Sector); 90 Fed. Reg. 48283 (Oct. 15, 2025) (Del Rio Sector); 90 Fed. Reg. 48284 (Oct. 15, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48285 (Oct. 15, 2025) (Yuma Sector); 90 Fed. Reg. 48287 (Oct. 15, 2025) (Laredo Sector); 90 Fed. Reg. 48288 (Oct. 15, 2025) (El Paso Sector); 90 Fed. Reg. 48289 (Oct. 15, 2025) (San Diego Sector) (together, the "Procurement Waivers"); Isacson Rep. ¶ 26.

18.     As a result of the Procurement Waivers, there is no segment of the U.S.-Mexico border that lacks a Section 102(c) waiver and the entirety of the southern border has been deemed an "area of high illegal entry." Isacson Rep. ¶ 26.

19.     On February 17, 2026, then-Secretary Noem issued a Determination in the Federal Register purporting to invoke IIRIRA Section 102(c) in order to waive the application of the

5

National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the National Historic Preservation Act ("NHPA"), and over twenty five additional laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors" within the "project area," which is defined as the area in the vicinity of the border between GPS points 31.037623, −105.579877 and 29.325866, −104.046466. 91 Fed. Reg. 7297, 7298 (Feb. 17, 2026).

20.    On July 2, 2026, Secretary Mullin issued a Determination in the Federal Register purporting to amend the February 17 determination "by including additional legal requirements that are being waived." 91 Fed. Reg. 40550 (July 2, 2026) (together, with the February 17 determination, the "West Waiver").

21.    In the West Waiver, the DHS Secretary characterizes the Big Bend Sector as "an area of high illegal entry," stating that there were over 89,000 apprehensions over a span of half a decade. 91 Fed. Reg. 7297 (Feb. 17, 2026); 91 Fed. Reg. 40550 (July 2, 2026).

22.    The West Waiver purports to waive "in their entirety" the following federal statutes—and "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of":

    i.    National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*;

    ii.    Endangered Species Act, 16 U.S.C. § 1531 *et seq.*;

    iii.    Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

    iv.    National Historic Preservation Act, 54 U.S.C. §§ 100101 note, 300101 *et seq.*;

6

v. Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*;

vi. Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*;

vii. Clean Air Act, 42 U.S.C. § 7401 *et seq.*;

viii. Archaeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*;

ix. Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*;

x. Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*;

xi. National Trails System Act, 16 U.S.C. § 1241 *et seq.*;

xii. Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*;

xiii. Noise Control Act, 42 U.S.C. § 4901 *et seq.*;

xiv. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*;

xv. Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*;

xvi. Archaeological and Historic Preservation Act, 54 U.S.C. § 312502 *et seq.*;

xvii. Antiquities Act, 54 U.S.C. § 320301 *et seq.*;

xviii. Historic Sites, Buildings, and Antiquities Act, 54 U.S.C. § 320301–320303 & 320101–320106;

xix. Eagle Protection Act, 16 U.S.C. § 668 *et seq.*;

xx. Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*;

xxi. Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

xxii. Section 438 of the Energy Independence and Security Act, 42 U.S.C. § 17094;

xxiii.    National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a *et seq.*;

xxiv.    Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*;

xxv.    Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*;

xxvi.    Wild Horse and Burro Act, 16 U.S.C. § 1331 *et seq.*;

xxvii.    43 U.S.C. § 387;

xxviii.    Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq.*;

xxix.    Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*;

xxx.    33 U.S.C. § 408; and

xxxi.    Rivers and Harbors Act of 1899, 33 U.S.C. § 403 *et seq*.

91 Fed. Reg. at 7298; 91 Fed. Reg. at 40551.

23.    On May 15, 2026, Secretary Mullin issued a Determination in the Federal Register purporting to again invoke IIRIRA Section 102(c) in order to waive the application of NEPA, the ESA, the Wild and Scenic Rivers Act, and over 30 additional laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors" within the "project area." 91 Fed. Reg. 27969, 27969–70 (May 15, 2026).

24.    The "project area" is again defined with geographic coordinates, but here they contain apparent errors. *Compare* 91 Fed. Reg. at 27969 (May 15, 2026), *with* 91 Fed. Reg. at 34832 (June 9, 2026) (revising the project-area coordinates and stating that "[t]he project area description in the May 15, 2026, notice of determination was incorrect"). In the May 15 waiver, DHS stated that the project area starts "at approximately GPS point 29.7275568-101.6848011 and

extend[s] east to approximately GPS point 29.727557-102.684802." 91 Fed. Reg. 27969.

25.    On June 9, 2026 Secretary Mullin again issued a Determination in the Federal Register pursuant to IIRIRA Section 102, stating that the determination published on May 15, 2026 contained an "incorrect" description of the project area, and was therefore republishing the "document with the correct project area description." 91 Fed. Reg. 34832 (June 9, 2026) (together, with the May 15 waiver, the "National Park Waiver") (together, with the West Waiver, the "Big Bend Waivers").

26.    The determination published on June 9, 2026 defines the project area as beginning "at approximately GPS point 29.325866, -104.046466 and extending east to approximately GPS point 29.728522, -102.683945." 91 Fed. Reg. 34832.

27.    In the National Park Waiver, the DHS Secretary again described the Big Bend Sector as "an area of high illegal entry," and cited the same apprehension figures as the West Waiver. 91 Fed. Reg. 34832.

28.    The National Park Waiver purports to waive "in their entirety" the following federal statutes—and "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of":

    i.    National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*;

    ii.    Endangered Species Act, 16 U.S.C. § 1531 *et seq.*;

    iii.    Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

    iv.    National Historic Preservation Act, 54 U.S.C. § 100101 note, 54 U.S.C. § 300101 *et seq.*;

    v.    Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*;

    vi.    Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*;

9

vii.    Clean Air Act, 42 U.S.C. § 7401 *et seq.*;

viii.    Archeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*;

ix.    Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*;

x.    Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*;

xi.    National Trails System Act, 16 U.S.C. § 1241 *et seq.*;

xii.    Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*;

xiii.    Noise Control Act, 42 U.S.C. § 4901 *et seq.*;

xiv.    Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*;

xv.    Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*;

xvi.    Archaeological and Historic Preservation Act, 54 U.S.C. § 312502 *et seq.*;

xvii.    Antiquities Act, 54 U.S.C. § 320301 *et seq.*;

xviii.    Historic Sites, Buildings, and Antiquities Act, 54 U.S.C. §§ 320301-03, 320101-06;

xix.    Eagle Protection Act, 16 U.S.C. § 668 *et seq.*;

xx.    Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*;

xxi.    Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

xxii.    Section 438 of the Energy Independence and Security Act, 42 U.S.C. § 17094;

xxiii.    National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a, *et seq.*;

xxiv.    Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*;

xxv.     Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*;

xxvi.    Wild Horse and Burro Act, 16 U.S.C. § 1331 *et seq.*;

xxvii.   43 U.S.C. § 387;

xxviii.  Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq.*;

xxix.    Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*;

xxx.     Wilderness Act, 16 U.S.C. § 1131 *et seq.*;

xxxi.    National Park Service Organic Act and the National Park Service General Authorities Act 54 U.S.C. §§ 100101-02, 100301-03, 100501-07, 100701-07, 100721-25, 100751-55, 100901-06, 102101-02;

xxxii.   16 U.S.C. § 156;

xxxiii.  16 U.S.C. § 157;

xxxiv.   16 U.S.C. § 157c;

xxxv.    and 16 U.S.C. § 157d.

91 Fed. Reg. at 27969–70; 91 Fed. Reg. at 34832–33.

29.     The West Waiver encompasses a border segment starting just south of Fort Quitman, extending down through Candelaria, Ruidosa, Presidio, Redford, the Hoodoos, and ending midway through Big Bend Ranch State Park. Appendix of Evidence: Volume 1, Declaration of Laiken Jordahl, ("Jordahl Decl.") APX-V1-139 ("Jordahl Decl.") ¶ 19 The National Park Waiver picks up where the West Waiver ends in Big Bend Ranch State Park, continues through Lajitas, spans all of Big Bend National Park (including Santa Elena Canyon, Castolon, Mariscal Canyon, Hot Springs, and Boquillas), and ending at the northeastern-most edge of Black Gap Wildlife Management Area. Jordahl Decl. ¶ 19.

30.     Together, the Big Bend Waivers span over 430 miles of the U.S.-Mexico border,

11

or around one-quarter of the entire U.S.-Mexico Border. Phillips Decl. ¶ 8; Isacson Rep. ¶ 10.

31.     The Big Bend Waivers do not identify a specific barrier design or construction plan. Instead, they purport to waive laws with respect to construction throughout the Project area, leaving DHS and U.S. Customs and Border Protection with discretion to pursue a range of border infrastructure, including 3-foot-high vehicle barriers, 30-foot-high steel bollard walls, and double-layered parallel walls reinforced with artificial intelligence technologies. *See* 91 Fed. Reg. at 7298 (waiving laws "with respect to the construction of physical barriers and roads"); 91 Fed. Reg. at 34832 (same).

32.     U.S. Customs and Border Protection hosts an online map, titled the "Smart Wall Map," available at the following address: https://www.cbp.gov/border-security/along-us-borders/smart-wall-map. Appendix of Evidence: Volume 1, Declaration of Samuel Evan Stavinoha, APX-V1-129 ("Stavinoha Decl.") ¶ 5.

33.     Between April 24 and May 22, 2026, U.S. Customs and Border Protection made over 100 individual modifications to the wall-alignment data underlying the Smart Wall Map, altering the construction status, barrier type, and mileage of individual wall projects in at least eleven distinct updates. Stavinoha Decl. ¶ 6.

34.     The Big Bend Sector is the largest sector of all nine border patrol sectors, encompassing approximately one quarter of the entire southern border. Isacson Rep. ¶ 21, Figure 1.

35.      This Sector is also the least active; and has only accounted for 1.1 percent of all migrants apprehended this century, or an average of 1.5 migrant apprehensions per border mile per month. Isacson Rep. ¶¶ 10, 21. Since the start of President Trump's administration, this figure has dropped to less than 0.4 apprehensions per mile per month. *Id.* ¶ 21.

36.     Big Bend National Park sees even fewer apprehensions: across the 118-mile park

boundary, just 0.02 percent of total border apprehensions have occurred there in the past decade. Isacson Rep. ¶ 23. That equates to 0.14 apprehensions per border mile per month. *Id.*

## BORDER BARRIER CONSTRUCTION CONTRACT AWARDS

37. On or around February 13, 2026, DHS awarded a construction contract to Fisher Sand & Gravel Co. for over $1.2 billion. Graves Decl. ¶ 8 & Ex. 3. The contract is for "border wall construction – vertical barrier" in "Big Bend Texas Sector (BBT-2)." *Id.*

38. On or around March 5, 2026, DHS awarded construction contract delivery orders to Barnard Construction Company, Inc. for nearly $2 billion. Graves Decl. ¶¶ 9–10 & Ex. 4–5. The awards are for "border barrier construction in Hudspeth County, TX" and "BBT-3 border barrier construction project." *Id.*

39. On or around May 11, 2026, DHS awarded a construction contract to Southwest Valley Constructors Co. for over $1.7 billion. Graves Decl. ¶ 11 & Ex. 6. The contract is for a "construction task order for border wall in Big Bend Texas," for the "segment identified as BBT-4." *Id.*

40. On or around June 3, 2026, DHS awarded a construction contract to Fisher Sand & Gravel Co. for nearly $2.6 billion. Graves Decl. ¶ 12 & Ex. 7. The contract is for "border barrier design build" in the segment identified as "BBT-5." *Id.*

## BIG BEND BORDER WALL PROJECT

41. The Big Bend region provides essential habitat, migratory corridors, and breeding grounds for hundreds of species of birds, mammals, reptiles, amphibians, and fish. Jordahl Decl. ¶ 15. Many of these species are federally listed under the ESA or otherwise imperiled, including but not limited to the Mexican long-nosed bat, black-capped vireo, Big Bend gambusia, Rio Grande silvery minnow, and multiple endemic plant species uniquely adapted to Big Bend. Jordahl

13

Decl. ¶ 15.

42.     The Big Bend Region is the largest Dark Sky Certified place in the world. Appendix of Evidence: Volume 1, Declaration of Bernadette Devine, APX-V1-121 ("Devine Decl.") ¶ 7. Its low levels of light pollution provide exceptional opportunities for astronomical observation, scientific research, education, and public enjoyment. Devine Decl. ¶ 7.

43.     Dark sky conditions are also essential for numerous nocturnal species, migratory birds, and pollinators whose behavior, navigation, and reproduction depend on natural light cycles. Jordahl Decl. ¶ 9; Devine Decl. ¶ 7; *see generally* Appendix of Evidence: Volume 1, Declaration of Taylor McKinnon, APX-V1-027 ("McKinnon Decl.") ¶ 9 & Ex. 2.

44.     The Rio Grande forms the boundary between the U.S. and Mexico for about 1,250 miles, Graves Decl. ¶ 13 & Ex. 8, and has been inhabited by humans for nearly 12,000 years, *id.* ¶ 14 & Ex. 9. Archaeological sites throughout the region have abundant and irreplaceable cultural resources, including rock art, village remnants, burial grounds, and ceremonial sites. In the National Park, over 2,700 archeological sites have been recorded. *Id.*

45.     In 1978, Congress amended the Wild and Scenic Rivers Act to designate this segment of the Rio Grande as a Wild and Scenic River "because of its 'outstandingly remarkable' scenic, geologic, fish and wildlife, and recreational values." Graves Decl. ¶ 15 & Ex. 10 at i.

46.     The area is unique due to its "[r]ugged canyons, verdant riparian areas, scenic rapids, and unspoiled views." Graves Decl. ¶ 15 & Ex. 10 at 5. Geologic features include rock layers exposed by the river that were deposited about 100 million years ago, and topography shaped by years of geologic processes such as uplifting, folding, and faulting. *Id.*

47.     The river corridor serves as "an isolated outpost of rapidly dwindling and irreplaceable natural resources such as several fauna in association with species, including

14

threatened and endangered species, that depend on the rare aquatic and riparian habitats of the river," and an important travel corridor. Graves Decl. ¶ 15 & Ex. 10 at 5. Its canyons, rapids, primitive character, and "international flavor create a stimulating environment for a high-quality recreational experience." *Id*.

48.     The National Park Service at Big Bend National Park is responsible for managing the wild and scenic river. Graves Decl. ¶ 15 & Ex. 10 at i.

49.     The Texas Rio Grande River segment contains areas classified as "wild" and "scenic." Graves Decl. ¶ 16 & Ex. 11.

50.     The region has historically provided unparalleled recreational river access and supports a thriving ecotourism economy for river-based activities such as paddling, rafting, fishing, guided wilderness trips, and wildlife viewing. Appendix of Evidence: Volume 1, Declaration of Danny William Miller, APX-V1-002 ("Miller Decl.") ¶ 14.

51.     Single and multi-day river trips along the Rio Grande draw visitors from across the United States and internationally, serving as a cornerstone of the regional tourism economy. Miller Decl. ¶ 14. Outfitters, guides, lodging providers, restaurants, and small businesses in surrounding communities depend directly on the Rio Grande's continued ecological integrity, navigability, and scenic character. Stavinoha Decl. ¶¶ 10–11, 22; Miller Decl. ¶ 14.

52.     The National Park Waiver covers approximately half of the Texas Rio Grande River segment designated as part of the national wild and scenic river system under the Wild and Scenic Rivers Act. Phillips Decl. ¶ 6.

53.     Construction of border wall in Big Bend will fragment critical riparian and desert habitats, obstruct wildlife movement essential for endangered and transboundary species, disrupt natural river dynamics, and permanently damage fragile soils and vegetation that cannot be

15

restored. Jordahl Decl. ¶¶ 11–15.

54.     Disruption to the Rio Grande corridor risks cascading ecological impacts across the entire desert ecosystem, including groundwater depletion, habitat fragmentation, increased erosion, disruption to nocturnal species including pollinators, and permanent loss of native vegetation. Jordahl Decl. ¶¶ 9, 12, 15; Devine Decl. ¶ 7.

55.     Wall construction causes increased excavations, heavy truck traffic, and the use of dynamite to clear paths through rugged terrain. Jordahl Decl. ¶¶ 9, 15. Similar to the effects of a seismic event, these activities could cause permanent damage to world-renowned geologic formations and historical buildings, like the Sacred Heart Church, which is made of adobe. Stavinoha Decl. ¶ 2 –24; Appendix of Evidence: Volume 1, Declaration of Michael Wilber Green, APX-V1-012 ("Green Decl.") ¶¶ 21–23.

56.     Border wall construction would eliminate access to the Rio Grande from the U.S., effectively ending recreational, navigational, and economic uses along long stretches of the river. Miller Decl. ¶12–14.

57.     Wall infrastructure brings with it associated roads, traffic, construction, lighting, hardened walls, and patrol activity that causes death and injuries, degrades dark skies, impairs nocturnal wildlife behavior, harms border communities, and diminishes the region's scientific, scenic, and aesthetic values. Appendix of Evidence: Volume 2, Expert Report of Geert Dhondt, APX-V2-011 ("Dhondt Rep.") ¶¶ 28, 34; Jordahl Decl. ¶¶ 9–14.

58.     The gross total economic cost of building the wall is estimated to be approximately $513 billion, with low and high bounds of $220 billion and $1.3 trillion respectively. Dhondt Rep. ¶¶ 19, 96–103. These figures are conservative, Dhondt Rep. ¶¶ 46–49, 83, and account for the total cost of building, operating, maintaining, and decommissioning a nearly continuous border

wall system—considering both direct and external/non-budgetary costs. Dhondt Rep. ¶¶ 19–20.

59.     Of the gross total economic cost estimate, approximately half is attributable to direct/governmental costs ($256 billion), with low and high bounds of $174 billion to $406 billion respectively. Dhondt Rep. ¶¶ 23, 104–116. Direct costs consider the costs of constructing, maintaining, equipping, administering, and ultimately removing the nearly continuous border wall system, and rely on federal cost documentation, executed construction contracts, construction cost indices, land acquisition evidence, and other high-confidence datasets. Dhondt Rep. ¶¶ 23, 105.

60.     Of the gross total economic cost estimate, approximately half is attributable to external/non-budgetary costs ($257 billion), with low and high bounds of $40 billion and $857 billion respectively. Dhondt Rep. ¶¶ 27, 117–125. External costs and non-budgetary costs (*i.e.*, those not accounted for in agency construction budgets) include migrant mortality, ecological and natural-resource damage, forgone cross-border trade and economic integration, enforcement-induced violence and other enforcement-related harms, and costs imposed on border communities. Dhondt Rep. ¶¶ 28, 29. These costs are principally borne by local governments, hospitals, migrants and their families, landowners, borderland communities, Tribal communities, and the public. *Id.* ¶ 125.

61.     The cost estimates cited above do not include a wide range of values that nevertheless represent large-scale harms. Dhondt Rep. ¶ 49. Documented but unpriced categories include harms to substantial cultural and religious harm, effects on burial grounds and sacred sites, severance of family and community networks, certain harms to Mexican residents and communities, surveillance and checkpoint burdens on United States residents, the conversion of circular migration into longer-term settlement, the risk that construction degrades federal flood-control levees, and light pollution affecting dark-sky resources and scientific research. *Id.* ¶¶ 47–

50, 160.

62.     Cost estimates also do not fully capture the irreversible nature of some harms: species extinction cannot be reversed with expenditures; fossil-aged groundwater can be depleted faster than it can be replenished; a destroyed burial site, sacred place, archaeological feature, or historical resource cannot be brought back as it once was. Dhondt Rep. ¶¶ 38–41, 140.

## PLAINTIFFS HAVE STANDING

63.     Plaintiff Danny William Miller Junior has longstanding personal, professional, recreational, aesthetic, financial, and spiritual interests in the Rio Grande corridor and surrounding Big Bend region. Miller Decl. ¶¶ 2–5, 7, 10–11, 22.

64.     A professional river guide who has worked on the Rio Grande for more than twenty-one years, Mr. Miller regularly leads commercial and private river trips throughout the region and relies on continued access to the river for his livelihood. Miller Decl. ¶¶ 3, 14.

65.     Mr. Miller also frequently uses the Rio Grande with his wife, son, friends, and clients for boating, fishing, camping, hiking, wildlife observation, and other outdoor recreation, including from a family property in Presidio County near Redford that provides a longstanding and important access point to the river. Miller Decl. ¶¶ 9–11.

66.     Mr. Miller has deep familial and spiritual ties to the Rio Grande, including marrying on its banks, naming his son after the river, and spending years sharing the river's landscapes, wildlife, and recreational opportunities with his family and the public. Miller Decl. ¶¶ 4–8, 22. The areas Mr. Miller regularly uses and values—including his family's river-access property near Redford, Big Bend Ranch State Park, Big Bend National Park, and other portions of the Rio Grande corridor—fall within the areas covered by the challenged Big Bend Waivers. *Id.* ¶ 15.

67.     Mr. Miller intends to continue using and returning to these areas on a weekly, if not daily, basis for the foreseeable future. Miller Decl. ¶¶ 6, 25–26.

68.     The waivers and concomitant construction plans will harm Mr. Miller's recreation, aesthetic, and spiritual interests in the Rio Grande as well as end his ability to work as a professional river guide. Miller Decl. ¶¶ 17, 22–24. The construction of border barriers and associated infrastructure will result in restricted river access, safety hazards, and landscape alterations such as visually intrusive structures, light pollution, noise, and harms to wildlife. *Id.* ¶¶ 12–13, 18–21.

69.     The challenged waivers deprived Mr. Miller of meaningful access to information and opportunities to participate in the decision-making process regarding border construction in Big Bend. Miller Decl. ¶ 16. The statutory and regulatory schemes that would ordinarily disclose material information, as well as give the public an opportunity to comment, were all waived. *Id.* ¶ 15. As a result, information about the location, timing, and scope of the proposed wall has been limited, inconsistent, and frequently changing. *Id.* ¶ 16. This uncertainty has made it difficult for Miller to plan his life, protect his livelihood, understand how his interests will be affected, or engage meaningfully with the government's plans. *Id.* As a result, the waivers have denied Miller vital information and opportunities to advocate for the protection of his interests. *Id.*

70.     A favorable decision setting aside the challenged waivers would protect Mr. Miller's interests by preventing or requiring lawful environmental review of border-wall construction that would otherwise impair river access, damage wildlife habitat, degrade the Rio Grande corridor's scenic and wilderness character, and harm his professional, recreational, financial, aesthetic, and spiritual interests. Miller Decl. ¶¶ 11–13, 18–24, 26.

71.     Plaintiff Friends of the Ruidosa Church ("Friends") is a nonprofit organization

19

whose mission is to stabilize, restore, and revitalize the historic Ruidosa Church ("Church") to its status as a community gathering place. *See* Green Decl. ¶¶ 9–11.

72.    The Church was built in 1915 by Catholic families using traditional adobe construction methods. Green Decl. ¶ 7. Adobe is a construction material that requires periodic maintenance. *Id.* ¶ 15.

73.    The Church is located within the area covered by the Big Bend Waivers, lying approximately 1400 feet from the border where construction activities are planned. *See* Green Decl. ¶ 19.

74.    Plaintiff Friends' member Mike Wilber Green holds ongoing personal aesthetic, historical, cultural, spiritual, and recreational interests in the Big Bend region, and particularly the historic Ruidosa Church and its surrounding landscape in the Rio Grande corridor. *See* Green Decl. ¶¶ 2, 12–17. A longtime resident of Big Bend, Mr. Green is the board president and a founding member of Friends. *Id.* ¶¶ 2, 9–12.

75.    Mr. Green regularly visits the Church for restoration work, community events, adobe construction teach-ins, and to celebrate the region's rich cultural and architectural heritage. Green Decl. ¶¶ 2, 10–17. He derives significant aesthetic and recreational enjoyment from traveling through the remote Big Bend landscape to reach the Church and from participating in community gatherings and preservation activities at the site. *Id.* ¶¶ 13–17, 33–34.

76.    Mr. Green intends to continue visiting, restoring, and protecting the Church, as well as attend community events at the Church, for as long as he is able. Green Decl. ¶¶ 2, 12, 34. He plans to return in November of this year to attend a community day of celebration that Friends is hosting at the Church. *Id.* ¶ 12.

77.    Friends and its members were harmed by the waiver of environmental, historic-

20

preservation, and related laws because the waivers eliminated the ordinary processes under statutes like NEPA and the National Historic Preservation Act that would have required public disclosure, consultation, environmental review, and opportunities for public participation before the border barrier construction could proceed. Green Decl. ¶¶ 20, 27. As a result, Friends received little information regarding the location, timing, or scope of the proposed project, leaving the organization without meaningful transparency into the border barrier's construction impacts. *Id.* ¶ 20.

78.     Had statutes like NEPA and the National Historic Preservation Act not been waived, Mr. Green would have participated in those processes to ensure that risks to the Church and surrounding area were adequately analyzed, disclosed, and considered. Green Decl. ¶ 27. The Big Bend Waivers therefore harmed Friends and its members by depriving them of the opportunity to obtain information, provide input, and advocate for measures to avoid and minimize harm. *Id.* ¶ 20, 27.

79.     A favorable decision setting aside the challenged waivers would protect Mr. Green's interests by preventing or requiring lawful review of border barrier construction that imminently threatens to degrade the surrounding landscape, has precluded his public participation on behalf of Friends, and will harm Mr. Green's interests in preserving the Church and its surrounding landscape for present and future enjoyment. Green Decl. ¶¶ 21–35.

80.     The planned border wall project would directly impair Friends' mission by endangering the Church's fragile adobe structure through construction-related vibrations, traffic, runoff changes, and other impacts—thereby rendering the necessary restoration work and community gatherings unsafe or impossible to participate in. Green Decl. ¶¶ 21–31. Friends' core organizational activities, including its regular restoration work, teaching volunteer adobe-making

events, and hosting community gatherings at the Church, all depend on continued access to and safe use of the site. *Id.* ¶¶ 10–14, 30.

81.     A heightened risk of collapse for the Church would place people within and directly around the Church walls in danger, effectively ending its functions as a restoration site and a community gathering place that Friends has worked for over a decade to build. Green Decl. ¶ 29. Additionally, construction related impacts such as noise and vibrations would disrupt planned events and deter community participation, jeopardizing the Church's function as a community gathering place and the central purpose for which Friends was founded. *Id.* ¶¶ 21, 29–30.

82.     Further, construction plans have already caused the presence of heavy vehicles transporting construction equipment down FM 170, which curves around the Church and comes within ten feet of its left adobe bell tower. Green Decl. ¶ 24–25. Given the shape of the road, construction vehicles such as tractor trailers must turn in a manner that brings the vehicles into even closer proximity with the Church. *See id.* This risks direct impacts to the bell tower from vehicle collisions and a heightened risk of collapse from vehicle and equipment vibrations. *Id.*

83.     The organization has also been forced to divert scarce resources away from its core mission to address threats posed by the project, including by purchasing security cameras, planning protective barriers, and exploring costly structural protections for the building. Green Decl. ¶ 31.

84.     Plaintiff Center for Biological Diversity (the "Center") is a non-profit conservation organization whose mission is to protect endangered and threatened species and their habitats. McKinnon Decl. ¶ 3. The Center works to ensure the long-term health and viability of animal and plant communities and to protect both the natural world and humans from environmental harms and habitat degradation. *Id.* Working to protect species, their habitats, and ecosystem connectivity in the U.S.-Mexico border region has long been a part of the Center's priorities. *Id.* ¶¶ 3, 5.

85.    The Center carries out this mission on behalf of its more than 101,600 members, including members who visit, recreate in, and enjoy the wildlife and public lands of the Big Bend region. McKinnon Decl. ¶ 4.

86.    Consistent with its mission, the Center has for decades engaged in scientific research, public education, administrative advocacy, media outreach, and litigation to protect borderlands ecosystems and imperiled species affected by border industrialization. McKinnon Decl. ¶¶ 5–10. The Center has successfully litigated to secure protections for wildlife in the borderlands, produced reports documenting the environmental impacts of border infrastructure and associated lighting, monitored wildlife movement, educated the public about threats to ecosystem connectivity, and regularly advocated against proposed border wall construction in the Big Bend region and beyond. *Id.* ¶¶ 5–11.

87.    Challenging the Big Bend waivers and associated construction projects is germane to the Center's longstanding organizational mission and conservation work in the borderlands. McKinnon Decl. ¶¶ 5–12.

88.    Center member Bernadette Devine has maintained longstanding personal, educational, aesthetic, spiritual, community, recreational, and cultural interests in the Rio Grande corridor and surrounding Big Bend borderlands for decades. Devine Decl. ¶¶ 2, 5, 6. As an educator, former river guide, and longtime resident of the region Devine regularly leads student educational trips on the Rio Grande, including binational programs that teach river ecology and foster cross-border cultural connections. *Id.* ¶¶ 2–4.

89.    Ms. Devine regularly recreates throughout the Rio Grande corridor, including in Santa Elena, Mariscal, Boquillas, and Hot Springs Canyons for river running, camping, hiking, dark-sky viewing, and community gatherings. Devine Decl. ¶¶ 5–7. The region also holds deep

personal significance for Ms. Devine and her family, providing sites for important family milestones such as birthdays, celebrations of life, and family trips. *Id.* ¶¶ 8–9. Additionally, Ms. Devine regularly attends an annual event called Voices from Both Sides Festival, held in the water and on the banks of the Rio Grande. *Id.* ¶ 10.

90.     Ms. Devine continues to spend time on the Rio Grande and in the surrounding borderlands, and she plans to return regularly for recreation, education, and community purposes in the future, including an upcoming multi-day river trip planned for early August. Devine Decl. ¶ 14. The locations along the river and surrounding borderlands that Ms. Devine uses are areas impacted by the Big Bend Waivers. *Id.* ¶ 11.

91.     The proposed border barriers and associated physical infrastructure would seriously harm Ms. Devine's interests by preventing her from accessing the river, reducing the area's dark sky qualities, and otherwise impairing the area's natural and scenic character. Devine Decl. ¶ 12. A favorable decision setting aside the challenged waivers would protect her interests by preventing border barrier construction that would otherwise impair Ms. Devine's use and enjoyment of these areas or require lawful environmental review before proceeding, thereby avoiding or mitigating harms to her interests. *Id.* ¶ 11.

92.     Center member Samuel Evan Stavinoha has held deep aesthetic, spiritual, recreational, environmental, historical, anthropological, and moral interests in the Big Bend Region and the Rio Grande corridor since his childhood. Stavinoha Decl. ¶¶ 4, 7–16.

93.     Mr. Stavinoha first began visiting the region as a child and regularly recreated on the Rio Grande with family, later working as a river guide and outfitter in Terlingua, where he spent extensive time on the river and developed a lasting connection to the landscape. Stavinoha Decl. ¶¶ 4, 7–8. As the owner of a historic grocery store in Marathon and a hospitality business in

24

Terlingua, Mr. Stavinoha remains closely tied to visitors who come to experience the Rio Grande, Big Bend National Park, Big Bend Ranch State Park, the region's dark skies, wildlife, and wilderness character. *Id.* ¶¶ 10–11, 22.

94.    Mr. Stavinoha regularly recreates throughout the region with activities that include river trips, hiking, scenic drives, motorcycle trips, and dark-sky viewing in areas affected by the challenged border wall project. Stavinoha Decl. ¶¶ 16–21. Mr. Stavinoha intends to continue living, working, recreating, and welcoming visitors in the Big Bend region for the rest of his life, and has an upcoming trip on the Rio Grande planned for August of this year. *Id.* ¶ 25.

95.    The planned border barrier infrastructure would irreparably harm Mr. Stavinoha's deep and longstanding interests in the region by visually disturbing landscapes, obstructing desert views, diminishing the region's wilderness character, destroying or impairing access to geologic features, and reducing tourism. Stavinoha Decl. ¶¶ 13–16, 22–24. Mr. Stavinoha's interests would be protected if the Center prevailed in the lawsuit and the Big Bend Waivers were set aside. *Id.* ¶ 27.

96.    Center member Brandt Sheppard Buchanan has professional, recreational, aesthetic, economic, and spiritual interests in the wildlife, ecosystems, and landscapes of the Big Bend region and Rio Grande corridor. Appendix of Evidence: Volume 2, Declaration of Brandt Sheppard Buchanan, APX-V2-002 ("Buchanan Decl.") ¶¶ 4–5, 17–19. As a ranch manager in Presidio County with more than fifteen years of experience working on the land and a background in conservation biology, Mr. Buchanan regularly studies, observes, and manages habitat for species including black bears, mountain lions, desert bighorn sheep, and other wildlife that depend on cross-border habitat connectivity. *Id.* ¶¶ 4–11.

97.    Mr. Buchanan frequently recreates in and around Big Bend Ranch State Park and

the Rio Grande through wildlife observation, hunting, river trips, stargazing, and conservation work, and regularly visits areas adjoining the State Park to monitor wildlife movement between protected lands and the ranch he manages. Buchanan Decl. ¶¶ 10–12, 17–19. Mr. Buchanan seeks to preserve the region's intact wildlife populations and values the area's exceptional dark skies, scenic vistas, and opportunities to share these landscapes with clients and family members, including his son. *Id.* ¶¶ 13–16, 19–23.

98.    The challenged waivers have harmed Mr. Buchanan's interests by depriving him of opportunities to obtain information about the project and participate in the government's decision-making process by sharing his expertise and knowledge of the landscape. Buchanan Decl. ¶ 22. Statutes like the ESA and NEPA, that would ordinarily provide such disclosure and participation opportunities, have been eliminated by the challenges waivers. *Id.*

99.    Had laws like the ESA and NEPA not been waived, Mr. Buchanan would have reviewed the relevant disclosures and provided comments to inform the government of the harms to the ranch and advocate to protect his interests. *See* Buchanan Decl. ¶ 22. The waivers therefore deprived Mr. Buchanan of meaningful procedural rights while heightening the risk of harm to wildlife, habitat, and landscapes that are central to his interests. *Id.*

100.    Mr. Buchanan intends to continue living, working, studying wildlife, and recreating in the Big Bend region and along the Rio Grande for as long as he is able, and intends to return to the Rio Grande in August for a river trip. Buchanan Decl. ¶¶ 17, 23.

101.    A favorable decision setting aside the challenged waivers would protect Mr. Buchanan's interests by preventing or requiring lawful environmental review of border-wall construction that would otherwise fragment wildlife habitat, impede species movement, degrade the Rio Grande corridor and surrounding landscapes, and impair his recreational, aesthetic,

26

procedural, and conservation interests. Buchanan Decl. ¶¶ 11–15, 24.

102.    Center member Laiken Jordahl has longstanding recreational, aesthetic, spiritual, moral, professional, and procedural interests in the Big Bend region, including Big Bend National Park, Big Bend Ranch State Park, the Rio Grande corridor, and surrounding borderlands that fall within the areas covered by the challenged Big Bend Waivers and associated border barrier construction. Jordahl Decl. ¶¶ 3–8.

103.    In 2015, Mr. Jordahl lived and worked in the Big Bend region as a National Park Service Wilderness Fellow and has since maintained a deep and ongoing connection with Big Bend and other U.S. borderland regions. Jordahl Decl. ¶¶ 2–7. Mr. Jordahl regularly visits and recreates in the Big Bend region through river trips, boating, swimming, camping, wildlife and bird watching, stargazing, and enjoying the Rio Grande and surrounding desert landscapes within the Waiver areas. *Id.* ¶¶ 4–6. Over the years, he has taken at least six river trips through the state and national parks. *Id.* ¶ 11.

104.    Mr. Jordahl values the region's wilderness character, dark night skies, connected cross-border ecosystems, and opportunities for solitude and recreation, and he intends to continue returning to Big Bend and the Rio Grande for the rest of his life, including a planned multi-day river trip in 2026. Jordahl Decl. ¶¶ 4–8, 11.

105.    Based on his firsthand observations of border-wall construction impacts elsewhere in the southwest, Mr. Jordahl is concerned that similar construction in the Big Bend waiver areas would degrade wildlife habitat, obstruct access to the Rio Grande, impair dark skies and wilderness character, and diminish the recreational, aesthetic, spiritual, and professional benefits he derives from these lands. Jordahl Decl. ¶¶ 8–17.

106.    The challenged waivers also harmed Jordahl's interests by eliminating the

environmental review, consultation, and public participation processes that ordinarily would have accompanied the planned border construction. Jordahl Decl. ¶ 10. Waived statutes such as NEPA, the ESA, the Wild and Scenic Rivers Act, and the Native American Graves Protection and Repatriation Act would prevent or significantly minimize the harms from construction through consultation with experts, Tribes, and people with local knowledge of the landscape. *Id.*

107.    Mr. Jordahl would have reviewed the government's disclosures and analyses and submitted comments based on his own experiences and observations of wildlife, ecosystems, and the landscape in Big Bend. Jordahl Decl. ¶ 10. The waivers deprived him of that opportunity and increased the risk of environmental harms by allowing construction to proceed without the safeguards and accountability ordinarily required by federal environmental laws. *Id.*

108.    A favorable decision setting aside the challenged waivers would protect Mr. Jordahl's interests by preventing or requiring lawful environmental review of border-wall construction that would otherwise harm the environmental, recreational, cultural, and wilderness values of the Big Bend region. *Id.* ¶¶ 5, 10, 18.

DATED: July 17, 2026                     Respectfully submitted,

                                         */s/* Emma Yip
                                         Emma Yip (CA Bar No. 352446)*
                                         Center for Biological Diversity
                                         2100 Franklin St., Ste 375
                                         Oakland, CA 94612
                                         Tel: (206) 858-2297
                                         Fax: (520) 623-9797
                                         eyip@biologicaldiversity.org

                                         Zeynep J. Graves (CA Bar No. 298533)*
                                         Shannon Eva Labuschagne (CA Bar No. 365633)
                                         Center for Biological Diversity
                                         2100 Franklin St., Ste 375
                                         Oakland, CA 94612

28

Tel: (510) 844-7160
Fax: (520) 623-9797
zgraves@biologicaldiversity.org
slabuschagne@biologicaldiversity.org

*\* Admitted Pro Hac Vice*

Dustin Rynders (TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 1108
Houston, TX 77251
Tel: (832) 767-3630 ext. 196
dustin@texascivilrightsproject.org

Kate Gibson Kumar (TX Bar No. 2413588)
Alana Park (TX Bar No. 24150568)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 17757
Austin, TX 78760
Tel: (512) 474-5073 ext. 225
kate@texascivilrightsproject.org
alana@texascivilrightsproject.org

*Attorneys for Plaintiffs*

29