**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION, <br><br> *Defendants*. | Case No. 3:26-cv-01099-KC |

## APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, VOLUME 1 OF 2

## TABLE OF CONTENTS

Declaration of Danny William Miller Junior ............................................................ APX-V1-002

Declaration of Michael Wilber Green ...................................................................... APX-V1-012

Declaration of Taylor McKinnon ............................................................................ APX-V1-027

Declaration of Bernadette Devine ........................................................................... APX-V1-121

Declaration of Samuel Evan Stavinoha ................................................................... APX-V1-129

Declaration of Laiken Jordahl ................................................................................. APX-V1-139

Declaration of Connor Phillips ................................................................................ APX-V1-293

Expert Report of Adam B. Isacson .......................................................................... APX-V1-328

**<u>APPENDIX VOLUME 1</u>**

**DOCUMENT 1**

Declaration of Danny William Miller Junior in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al., | Case No. 3:26-cv-01099-KC |
| *Plaintiffs,* | |
| v. | |
| MARKWAYNE MULLIN, et al., | |
| *Defendants.* | |

**DECLARATION OF DANNY WILLIAM MILLER JUNIOR IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Danny William Miller Junior, declare as follows:

1. This declaration is based on my personal knowledge. If called as a witness in this proceeding, I could and would competently testify to the facts stated below.

2. I have lived and worked in the Big Bend region of Texas since approximately March of 2005, building my life, my career, and sense of community around the Rio Grande and the Big Bend landscape.

3. I am a professional river guide and have worked continuously in the outdoor recreation industry in this region for more than twenty-one years. I began guiding trips on the Rio Grande in March 2005 and have guided both commercial and private river trips since that time. Over the course of my career, I have worked for several guiding companies in the region, including Far Flung Outdoor Center, where I worked for approximately ten years, Desert Sports, where I worked for about ten years, and Further Adventures, where I worked for about two years. I guide river trips along the Rio Grande for almost every regional outdoor recreational company in the area.

4. I live with my family near the historic ghost town of Terlingua, Texas. My wife, Brittany Lowe, was born and raised in the Big Bend National Park and Terlingua areas, and her connection to its geography is multi-generational. Her father was a guide on the river before he got a job with the National Park Service in Big Bend National Park, where he worked for thirty years. Through him, she gained a close familiarity with the Rio Grande, the National Park, and its surrounding landscape.

5. In 2014, my wife and I were married on the banks of the Rio Grande at Contrabando movie set. When our son was born in 2015, the river took on new importance for me as a parent. We chose "Rio" as his middle name because we knew the river would remain the heart of our family. I wanted him to grow up knowing how to connect with nature through fishing, canoeing, and tracking animals along the river. Over time, the Rio Grande ecosystem became more and more essential to who we are as a family, shaping our values and how we spend time together.

6. When river conditions allow, I visit and use the Rio Grande multiple times each week for professional guiding. For example, on February 14, 2026, I spent three days guiding a group of Boy Scouts. During the trip, we canoed, camped, and hiked, moving at a pace that let them experience the river rather than just passing through it. I could see their confidence grow throughout the trip as they became more comfortable being on the water, setting up camp, and paying attention to the plants and animals along the river. By the end of the trip, the group had changed. The boys were more self-assured and aware of their surroundings. When the trip ended, I felt that I had made a meaningful impact, helping them build practical outdoor skills and an understanding of the river and ecosystem's value.

7. When I'm not working, I return to the river with my family, friends, or by myself. For example, every year my family and I do a river trip to celebrate my son's birthday. For years, we've

2

been exploring the Rio Grande together. Spending time with my son and watching him experience parts of the river he hasn't seen before is always an incredibly meaningful moment for me as a father. I'm proud to say he has seen more of the Rio Grande than most professional river guides in the area. In December 2024, we did a nine-day trip to the Lower Canyons—a wild and isolated stretch of the Rio Grande downstream from the National Park and the last section of the river he hadn't seen. We hiked to see preserved dinosaur tracks near upper Madison Falls, an experience my son and I still talk about today.

8. As another example, at the end of April, I went on a three-day river trip with my wife. We boated, swam, and fished the whole time. I've experienced my most profound moments on the river, watching wildlife in its natural element or showing humans that there is more than just humanity—that there is an ecosystem that we are a part of. Spending time on the Rio Grande with my wife, son, and clients gives me a chance to share this with others.

9. I regularly access the Rio Grande from a family property located approximately forty-five minutes from my residence, in Presidio County near Redford. This property borders state park land and provides one of the few practical and reliable access points to the river in this region. I have personally relied on this access point for more than a decade to launch and retrieve boats, as well as to camp, fish, and recreate along the Rio Grande. Other river guides and friends also regularly rely on this same access point for river-based recreation.

10.    When water levels are too low to run boat trips, my family and I frequently use this property for camping, hiking, and other outdoor recreation. For example, in April this year, I camped on the property with my wife, my son, and three of my son's friends. Although the river was too low for boating, we spent hours fishing and swimming along the Rio Grande. The kids gathered sticks to build a fort, made their own campfires, and explored the riverbank looking for

3

hellgrammites underneath wet rocks. I showed them how to toast tortillas over the fire, and we spent the evening enjoying the sounds of the river corridor. The next morning, we woke up to a chorus of leopard frogs. Experiences like these are a meaningful part of my family's life. They allow us to enjoy the Rio Grande and surrounding landscape, connect with nature, and spend time together. It is also a key reason why this area is so important to us.

11.     Access to the river from this property location is essential to our continued use and enjoyment of both the property and the Rio Grande. Construction of a border wall in this area would block or render this access point unusable, entirely cutting off my access to the river from my family's property. I would no longer be able to run river trips, fish, or swim from my property due to a lack of river access. The wall would also diminish my enjoyment of the property by altering the character of the landscape itself, which I enjoy precisely because the lack of large, manmade structures helps me and my family connect with nature. The presence of a border wall would replace a sense of openness and connection to the natural landscape with a permanent, industrial barrier. These losses would end our regular river trips, fundamentally changing how we spend time together and connect as a family, harming our use and enjoyment of the Rio Grande, and destroying the reason we built our lives and community here.

12.     River access along the Rio Grande is inherently dynamic. The river carries heavy sediment loads and floods frequently, reshaping banks and altering or eliminating access routes. Over the course of my career, I have seen floods destroy specific access points, forcing me and other guides to find new places to launch boats and exit the river. As a result, safe and functional access requires flexibility and the ability to adapt to changing conditions. Fixed barriers, walls, gates, or controlled access points cannot accommodate the constantly shifting nature of the river.

A single access point could easily be destroyed in a flood, and if other areas along the river are walled off, it would be impossible to find and use newly created access points.

13. Even if access was not completely cut off, but still restricted to fixed gates or corridors, launch and landing sites could be hundreds or thousands of feet away from exit points in an emergency, making it impossible to get to safety quickly if needed. Based on my decades of experience guiding on the Rio Grande, the idea that river guiding or recreational boating could continue alongside a border wall is not realistic. I certainly would not feel safe taking my family or clients on river trips through the Rio Grande if the wall was built.

14. My livelihood depends directly on an open, barrier-free, and ecologically intact Rio Grande. Clients visit from all over the United States to experience the full desert ecosystem, including the landscape, canyons, geology, night skies, plants, wildlife, and sense of remoteness. No one comes to Big Bend to see steel barriers and razor wire. A thirty-foot tall steel border wall, flood lights, and roads would irreparably damage the wild character of the Big Bend region and make guided river trips and other commercial recreation on the Rio Grande undesirable and unsafe.

15. On February 17, 2026, the Secretary of Homeland Security issued a waiver in the Federal Register of dozens of laws for construction of border barrier between GPS points 31.037623, −105.579877 and 29.325866, −104.046466 in the vicinity of the Rio Grande. My family's property lies along the river, between these two points. Since February, more waivers have been issued that, together, authorize the government to build wall infrastructure across my property, all of Big Bend Ranch State Park, all of Big Bend National Park, and beyond. 91 Fed. Reg. 7297 (Feb. 17, 2026); 91 Fed. Reg. 40550 (July 2, 2026); 91 Fed. Reg. 27969 (May 15, 2026); 91 Fed. Reg. 34831 (June 9, 2026).

APX-V1-007

16.    Information about the location, timing, and scope of the proposed border wall has been limited, inconsistent, and frequently changing. I have received little clear or reliable information from the government about where the wall would be constructed or how it would affect specific access points along the Rio Grande. At various times, a map of planned border wall construction on Customs and Border Protection's website has indicated physical infrastructure will be built along my property and other areas vital to accessing the Rio Grande. At other times, the map showed scaled down construction plans that may not affect my property or the nearby river access locations. Then, the map was completely removed from the website for a period. This uncertainty has caused significant anxiety for me and others who live and work in the region and has made it difficult to plan our lives, protect our livelihoods, or engage in any meaningful way to inform our community or oppose the government's project. Despite the lack of publicly available information on the planned construction activities, the government has already awarded billions of dollars in construction contracts, building materials are arriving near the border, and construction is expected to start this summer.

17.    The planned border wall will destroy my ability to continue working as a professional river guide. Restricted access, safety hazards, and destruction of the landscape would eliminate my primary source of income and end the profession I have practiced for more than two decades.

18.    Loss of river access would also severely impair my recreational, aesthetic, and spiritual use of the Rio Grande. I would lose the ability to boat and fish from the family property I have used for years, and wall construction would permanently alter the surrounding landscape through visual intrusion, wildlife disruption, noise, and light pollution, affecting my ability to hike, camp, fish, observe wildlife, photograph nature, experience dark skies, and connect with nature.

6

19.    I have personally observed a wide range of wildlife along the river and its banks, including black bears, mountain lions, bighorn sheep, aoudad, badgers, porcupines, rabbits, reptiles, turtles, catfish, and countless bird species. I once observed a Mexican wolf traveling toward the river in approximately 2009. I have also observed animal tracks nearly every time I stop along the river, demonstrating how essential the Rio Grande is as a lifeline to wildlife in this desert ecosystem. Being able to view and experience wildlife along this corridor brings me tremendous joy.

20.    Wildlife on both sides of the border depends on an open, connected river corridor to breed, maintain genetic diversity, and survive. Animals in Mexico require access to habitat north of the river, and animals in the United States similarly depend on cross-border movement for survival throughout the seasons. Construction of a wall would fragment this habitat by effectively cutting the ecosystem in half, preventing seasonal migration and limiting the habitat, food, and movement wildlife depend on. Animals on the U.S. side of the Rio Grande would lose access to the river altogether. This would imperil the survival of animals already existing in the extremes of the Chihuahuan desert, diminishing my ability to observe and enjoy these spectacular wildlife habitats as I have done for decades.

21.    Based on my experience living, working, and recreating along the Rio Grande, I do not believe a border wall could be constructed in this region without destroying the wild character of the Rio Grande corridor. Construction would require blasting, heavy machinery, soil displacement, water extraction, power infrastructure, and artificial lighting in areas that are remote and have very little development. These activities would degrade water quality, destroy habitat, eliminate dark skies, and send debris downstream, significantly impacting my enjoyment of the river and surrounding landscape. I've personally seen several major flood events on the Rio Grande

7

over the years and how floodwaters carry large amounts of debris downstream. I am concerned that construction-related debris will create additional hazards for me and others navigating on the river.

22. My connection to the Rio Grande is deeply personal and spiritual. I and other guides often refer to it as our church or cathedral. There are specific places along the river where I go to reflect, fish, and recharge. I believe humans are part of the ecosystem and have a responsibility to act as stewards of the land for future generations. Sharing this connection, particularly with young people, is one of the most meaningful parts of my work, my life, and my relationship with my son and wife. It would be impossible to continue sharing this connection in the presence of a massive steel barrier dominating the landscape. The visual impact of the wall as well as the environmental impact to wildlife would destroy my ability to enjoy the natural beauty of the region and share this with others.

23. If the proposed wall is constructed, my family would be forced to leave the region due to the loss of river access, destruction of the tourism economy, and irreversible damage to the landscape that defines our home and my career.

24. The proposed wall and infrastructure would permanently damage the river, wildlife, my livelihood, my property, and my way of life.

25. I intend to return to the Rio Grande corridor on a weekly, if not daily, basis for as long as I physically can. In fact, I intend to return to the river as soon as I sign this declaration.

26. My personal, professional, financial, recreational, and spiritual interests in this area would be protected if I prevailed in this lawsuit and this breathtaking river corridor was not irrevocably altered by a waiver of environmental laws and subsequent, rushed, and secretive construction of a border wall.

8

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 10th, 2026, in Terlingua Texas.

Danny William Miller Junior

9

**APPENDIX VOLUME 1**

**DOCUMENT 2**

Declaration of Michael Wilber Green in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al., | Case No. 3:26-cv-01099-KC |
| *Plaintiffs,* | |
| v. | |
| MARKWAYNE MULLIN, et al., | |
| *Defendants.* | |

**DECLARATION OF MICHAEL WILBER GREEN IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, MICHAEL WILBER GREEN, declare as follows:

1.      This declaration is based on my personal knowledge. If called as a witness in this proceeding, I could and would competently testify to the facts stated below.

2.      I live in Marfa, Texas, in the Big Bend region. I have lived and worked in the Big Bend region since June 2005. I serve as the current board president of Friends of the Ruidosa Church, and I have held this position since 2024. I have been a member of Friends of the Ruidosa Church since its inception in 2020. I plan to contribute to restoring and protecting the Ruidosa Church, an essential piece of this region's history, for as long as I am able. To that end, I visit the church about once a month to work on restoration efforts, sometimes more, in addition to planning and attending Friends of the Ruidosa Church community days of celebration at the site.

3.      My professional career as an architect, interest in history, and desire for community drew me to preserving and restoring the Ruidosa Church. After graduating with a degree in architecture from the University of Houston in 1980, I worked as a professional architect until 2018. Throughout my career, I specialized in corporate architecture, and particularly in

construction management for large projects. I love working with teams towards a shared goal and purpose, which led me to concentrate on project management.

4.    I am deeply interested in regional history, and no area is more historied than Presidio County. Presidio is home to one of the longest continuously occupied settlements in North America, and the oldest continuously cultivated farmland on the continent. There has been migration through this area for not just hundreds, but *thousands* of years. I am still learning more about the Big Bend's prehistoric past whenever I can. I am fascinated by the evolution of its history, from the indigenous peoples of the region to the Spaniards who came in the 1500s, followed by rich communities of Mexican Americans.

5.    Álvar Núñez Cabeza de Vaca, the first historian of Texas, came through Presidio and the Big Bend area in the 1500s after being shipwrecked. Even then, Cabeza de Vaca found rich multicultural communities thriving here. The history of the region is everywhere, and it moves me.

6.    I first came across the Ruidosa Church (also called the El Corazón Sagrado de la Iglesia de Jesús, or the Sacred Heart of the Church of Jesus) in the spring of 1984, early in my architecture career. While camping and canoeing along the Rio Grande River, I decided to drive and explore the region when I chanced upon the church. I was struck by the simple, beautiful symmetry of its old adobe craftsmanship. Its structure had been degraded by years of neglect, which saddened me. Having long been attracted to the built environment and its history, I started looking more into the history of the church.

7.    What I learned about the church confirmed my feeling that the church was special, irreplaceable, and worth restoring. The Ruidosa Church is an architectural icon in Big Bend. I believe its freestanding adobe arches to be the largest remaining in Texas. Catholic families in the Texas border town of Ruidosa built the church in 1915 using traditional adobe construction

2

methods. Volunteers in 1915 spent six months gathering material from the adjacent arroyo and casting the adobe bricks for sun drying. I knew I wanted to return and see the church again to admire the significant community effort that it took to create its beautiful symmetric bell towers and original yet classic church design.

8.      My career as an architect took off in the 1980s, but I was able to come back to the area in 1997 to see the Ruidosa Church again. It had been further eroded by time and was steadily coming apart, which saddened me. My journey of discovering the history of the region kicked off again. I was—and remain—attracted to the beauty and the lay of the land and its remoteness, and deeply curious about its long and rich history.

9.      On March 23, 2016, out of concern for the building's condition, I petitioned the Catholic Diocese of El Paso to transfer the Ruidosa Church to a nonprofit so that we could raise money for its restoration. After years of dialogue with the diocese, it agreed to transfer the property's deed to Presidio County in 2019. My cofounders and I quickly filed for 501(c)(3) status to found Friends of the Ruidosa Church, and Presidio County deeded the property to our nonprofit in 2020. Ownership of the church allowed us to finally raise money for its restoration ourselves, which we have been doing ever since to fund our significant restoration and repair efforts.

10.      The other members of Friends of the Ruidosa Church and I rely on each other to work towards the restoration and preservation of the Ruidosa Church and its community significance. We bring community members together to protect, stabilize, and restore the structure using traditional adobe construction methods. Today, much of the church is stabilized and reinforced, but abundant work remains: numerous freestanding wing walls and arches remain vulnerable to collapse. We host regular community workshops that invite volunteers to make adobe

3

bricks and learn how to rehabilitate the building. The work is half restoration and half community-building and engagement.

11.    The goal of Friends of the Ruidosa Church is to restore the Ruidosa Church to its status as a community gathering place, returning the regular joys and sorrows that its walls once contained: weddings, funerals, quinceñeras, and celebrations of life. We aren't seeking to add new additions. We want to make the church usable for the community again, because allowing people in the area to congregate within its walls is the best way to continue its legacy of shared heritage and resilience. To that end, our mission is to stabilize, restore, and revitalize this historic site, ensuring its longevity for future generations. Friends of the Ruidosa Church aims to achieve its mission through its core organizational activities, which include community engagement, teaching traditional adobe restoration practices, leading sustainable preservation efforts, and bringing people together to honor the area's past while creating a meaningful gathering space for all.

12.    The Ruidosa Church has become the theme of my retired life. I like to stay busy and doing construction work on the church is a huge part of that, so I travel back and forth to the site about once a month. I intend to continue doing so for as long as I can. Lately, I have been busy with planning a community day of celebration, which Friends of the Ruidosa Church will be hosting at the church on November 14, 2026. I plan to attend this event at the church, and will likely visit sooner. I believe it is extremely important to stay busy and actively involved in one's community during retirement. I especially think that when you have a certain set of skills as I do from my work as an architect, it is crucial to give back to your community once you end your career. I firmly believe that every person needs a purpose in retirement that is greater than themselves, and offering my skills to this work is mine. This work is a vital component of my aesthetic, recreational, historical, and spiritual interests.

13.    The journey I take from Marfa to reach the church is almost as important to me as the destination. The part of the Big Bend region one must drive along to get there is a beautiful, remote, and rugged landscape. I find a profound aesthetic beauty in the land and its silence. I often have tools and building materials in my truck that lead me to take Highway 67 to reach Ruidosa, but whenever I can I take the Pinto Canyon Road, an unbelievably beautiful and quiet scenic route that is only half paved and leads right to the Ruidosa Church.

14.    When I visit the Ruidosa Church, I am most often participating in community construction and restoration efforts on the ground. When I'm not visiting for restoration, it's usually for community celebrations. I am already very involved with planning the community day of celebration that we have coming up in November. I have met with the Mexican artist that will be putting an installation of her work into the church, and it fills me with gratitude to see art and joy return to the building. I am deeply looking forward to the continuation of these gatherings. The construction efforts are truly satisfying, yet seeing them lead to community celebrations is even more meaningful to me and my cultural and community interests. Knowing the church has a future gives me joy even when I am not visiting it.

15.    My connection to preserving the Ruidosa Church is also grounded in a moral commitment to honor the intentions and legacy of the community that built it. Adobe is a sustainable material that requires periodic maintenance. The construction of the Ruidosa Church was a commitment by locals to the future maintenance necessary to sustain the building's usability for their community. The original builders did this difficult work out of a love for their community, just as we are working to restore the building today as a community effort. I view our work as bringing the church's story to a full circle, and I find a lot of meaning in that circle. We are bringing the community back to repair the church, which will then allow us to use the church to bolster

5

community. In this way, the church's restoration is also tied to deeply held historical and moral interests.

16.    I am not a regular churchgoer, but I do believe in a great spirit. There is something beautiful in certain creations of nature and light and sound, something that makes me feel a powerful gratefulness. At times when I am standing in the Ruidosa Church by myself, I am overcome by a deep, spiritual sense of those that have gone before me, that celebrated here with joy or mourned with loss for so many years. We have a cemetery adjacent to the property in which over a hundred and fifty people are interred. It is more than likely that all of them had their funeral services in the Ruidosa Church. That stirs my heart. This community has been in existence for a long time.

17.    I get a similar feeling from collaborating with our community members that come to the Ruidosa Church to volunteer and express themselves. I find it incredibly meaningful to see the big smiles on people's faces when we gather to participate in the traditional activity of adobe-making. When we're shaping adobe by hand (imagine us on our hands and knees and making "mud pies"), you can see people connecting with their inner child. I have watched these restoration efforts provide people meaning that they long for: authenticity, a deep cultural connection to the past, and a sense of achievement after a long day of hard work with their hands instead of at a desk or computer. The work connects us not just to each other, but also to the people who built and enjoyed the Church, and to the indigenous communities who lived here long before them.

18.    One of the church's most bitter-sweet achievements was announced very recently. Annually, the National Trust for Historic Preservation announces a list of "America's 11 Most Endangered Historic Places," and this year in May, they named the Ruidosa Church on its list. The proposal to construct a portion of the Mexico-United States border wall within just a few

hundred yards of the church is described as a primary threat to the sacred and historical building (https://savingplaces.org/stories/11-most-endangered-historic-places-2026). The church was also listed on the inaugural national list of Endangered Latinx Landmarks by the organization Latinos in Heritage Conservation in 2025, which highlighted the building's rich Latinx history and heritage. The Ruidosa Church is listed by the Texas Historical Commission as a Recorded Texas Historic Landmark, and its designation process to be placed on the National Register of Historic Places is in progress.

19.    The Ruidosa Church is located at GPS points 29.984362571863777, -104.68223833553409. This location is 1,400 feet east of the U.S.-Mexico border and within the "project area" as defined in the West Waiver, 91 Fed. Reg. 7297 (Feb. 17, 2026), as amended by 91 Fed. Reg. 40550 (July 2, 2026), which authorizes construction of a border wall along the southern border.

20.    Very little information about the location, timing, or scope of the proposed border wall was communicated to Friends of the Ruidosa Church. Friends of the Ruidosa Church has not had any transparency from the government. No community meetings were held, so we have struggled to learn about what is going to happen. The uncertainty has been a source of stress for me and for our organization's ability to plan for the future.

21.    The Department of Homeland Security's planned border wall in the Big Bend Region will fill the area with tractor trailers, heavy construction equipment, and vibrations that threaten adobe structures even before construction begins. I am deeply concerned that the combined effects could destroy the Ruidosa Church and its importance to our community. Because I regularly work on and spend time at the Ruidosa Church, construction activities associated with the border wall project will directly harm my use and enjoyment of the site. The presence of heavy

APX-V1-019

construction equipment, increased traffic along Farm to Market Road 170 immediately adjacent to the church, and associated noise and ground disturbance will interfere with my ability to safely carry out restoration work and participate in community events. These activities also create a risk of physical damage to the fragile adobe structure that I have spent years helping to restore. Damage to or loss of portions of the church would impair my ongoing restoration work and prevent me from continuing to use the site for the purposes that are central to my retirement and community involvement.

22.    The alluvial sedimentary soils in this part of the Rio Grande River Valley have high vibration transmission rates. The Ruidosa Church is only about 1,400 feet from the border. The use of heavy construction equipment, traffic from heavy vehicles, and excavation for a deep concrete footing will each cause vibrations that may travel through the local soils to reach the church. These vibrations pose a severe threat if they converge with the fragile adobe walls of the Ruidosa Church.

23.    Friends of the Ruidosa Church's design team knows what adobe can hold up to and what it cannot. Adobe's loading mechanics raise the risk from high vibrations. The material cannot easily resist lateral loads that come from the side. These loads can result in full or partial collapse of the adobe. The Ruidosa Church has several wing walls that lack 90-degree converging walls providing lateral support, which are seriously vulnerable to collapse if vibrated significantly. The uniquely large freestanding arches are even more sensitive to vibration than the freestanding walls. We are very concerned that when DHS's construction begins, we are going to start losing entire walls.

24.    DHS's construction plans will require transporting fleets of heavy vehicles and construction equipment down Farm to Market Road 170, known as FM 170, which runs parallel

8

to the border. FM 170 curves directly around the Ruidosa Church, coming within about ten feet of the corner of the Ruidosa Church left bell tower. I have seen the way drivers take the turn around that street corner, and I have found tire tracks concerningly close to the church. Tractor trailer rigs towing large excavators will need to make the turn in a manner that brings vehicles even closer, likely coming off the asphalt. I fear there is a significant danger of direct vehicle impacts on the left bell tower, which could cause collapses. Meanwhile, the directly adjacent heavy vehicles and equipment will transmit even more vibrations straight into the walls of the church.

25.    Embedded below and attached as Exhibit 1 is a true and correct copy of a Google Earth satellite image, captured on May 1, 2026, showing how close FM 170 comes while curving around the Ruidosa Church (and how close the Ruidosa Church is to the border, as shown in the "length" value of the yellow line drawn via Google Earth's distance measuring tool). The image embedded below and contained in Exhibit 1 is an accurate depiction of the conditions that I have witnessed and described in this declaration.



26.    I am concerned that it will be difficult for DHS to account for the severity of the seasonal rains here, and for the way the geology and geography of the area differ greatly from

other sections of the border. On average, hurricanes make their way up the Rio Grande Valley every six years. They can drop seventeen inches of rain in just two days. Our soils are full of porous limestone: the quantity of water that flows through these arroyos is a force to be reckoned with. The border wall will be constantly damaged in many different areas after these rain events, which could be so costly to maintain that I fear DHS will not be able to keep up with the degradation.

27.    Because laws like the National Environmental Policy Act, Endangered Species Act, National Historic Preservation Act, and Native American Graves Protection and Repatriation Act were waived to construct a border barrier here, there are essentially no meaningful processes for public input nor requirements for the government to consider any of these aspects, which harms my procedural, aesthetic, environmental, preservation, and community interests. Had any such opportunity been provided, I would have participated and submitted comments describing the concerns set forth in this declaration. For example, the failure to prepare any environmental analysis under the National Environmental Policy Act means that the environmental consequences of the wall, including impacts on the Rio Grande floodplain and surrounding areas like the church grounds, have not been adequately studied or disclosed. I would have reviewed and participated by commenting on such assessments. Similarly, the National Historic Preservation Act would require DHS to consider the effects of construction on the Ruidosa Church and provide a reasonable opportunity for comment. Friends of the Ruidosa Church would have participated in the comment opportunity to ensure the dangers to the structure described in this declaration were considered.

28.    The construction of the border wall will also block the flow of surface runoff, which I fear will place the Ruidosa Church itself at even greater risk. Nearby the corner of the church is a very large arroyo. I have seen the water flow in this arroyo, and it is a powerful force. The flow

10

becomes so significant when it accelerates that cars cannot drive through it. I fear the border wall will create a damming effect through clogged debris that congests water, which could cause flow from the arroyo to back up and saturate the base of the church walls. The arroyo is so close that a depth of just about three feet would cause water to reach the edge of the building, and that could cause the walls to collapse.

29.    The combined risks from vibrations, direct impacts, and water runoff changes threaten to end all our years of restoration progress, and could very well seal the fate of the entire Ruidosa Church. The wall would cut the church off from the Rio Grande River and communities who appreciate the building's importance. If the risk of collapse heightens, it will become unsafe to hold our community activities on the site. This damage could end Friends of the Ruidosa Church's cross-cultural community days, which aim to center love and community. The wall is a statement of the exact opposite: fear and division. The long-term impacts deeply concern me.

30.    These combined risks would severely impair the mission of Friends of the Ruidosa Church. Additionally, these risks would directly affect and interfere with Friends of the Ruidosa Church's core organizational activities and substantially impair the organization's ability to carry out the work for which it exists, including restoring the Church's function as a community gathering place and carrying out ongoing restoration work. We cannot stabilize, restore, and revitalize the historic site if vibrations, impacts, or water damage cause walls to collapse. Our adobe-making, stabilization, and rebuilding work all depend upon the structure remaining safe from the intense vibrations and saturation that the border wall construction could cause. We cannot create a meaningful community gathering space if the border wall construction stops community members from traveling to the church or being able to safely gather inside. In these ways, the

11

border barrier construction and associated activities would directly impair and interfere with Friends of Ruidosa Church's ability to perform the core organizational activities that constitute its raison d'être.

31.    Additionally, to protect the church from the impacts of the border wall and related construction, Friends of the Ruidosa Church will have to divert limited resources to find new, expensive forms of structural protection that will take time and resources away from activities central to our mission, as well as undermine our mission to teach and remain faithful to traditional adobe construction methods and restoration practices. If we have to divert our resources into protecting the church's structure against these new threats, it will be more difficult to find funding for community events. Friends is already in the process of purchasing security cameras because the border wall construction will bring an influx of workers into this remote area, raising security risks. Furthermore, we are now planning to build a temporary barrier around the church to keep vehicular traffic away from the walls. The barrier will be both an added expense and an aesthetic downgrade.

32.    I have spent an incredible amount of time in this area without ever seeing a migrant come through. I leave my tools out exposed overnight while working at the site because nothing ever goes missing here. I feel safer here than I do in parts of Austin, San Antonio, or Houston. It is quiet, peaceful, and a beautiful location. But instead of appreciating the wonder of this place now, I am increasingly deeply disturbed by the potential structural failure of the church and influx of out-of-town construction workers. I have put so much work into volunteering to repair and rebuild this place out of love for my community, and it is heartbreaking to imagine losing part of the church to border wall construction. I have dedicated so much time because I love my community and I love the region, and I don't want it to all have been for nothing.

33.    I can also only imagine what the effect will be on the aesthetic experience of my journeys from Presidio to the Ruidosa Church. The scenic 35-mile drive through Big Bend will be adjacent to an ugly, steel bollard picket fence. I have felt zero threat or danger from our Mexican neighbors across the Big Bend border, yet instead of enjoying my drives to the storied Mexican American community in Ruidosa, I will have to spend the route staring at a hateful, unnecessary, and expensive statement of divisiveness that deprives me of my joy in the journey to the church.

34.    My increased concern for the Ruidosa Church's survival detracts from my enjoyment of the Church now. I intend to continue working on restoration in Ruidosa regularly and for as long as I physically can, but a specter of danger now hangs over all my work with the adobe and all my community planning. The planned border wall is a horrible threat to the building and community that add purpose to my retirement. My historical, cultural, aesthetic, and spiritual interests in the Ruidosa Church and the Big Bend landscape are all in danger. Friends of the Ruidosa Church will struggle to spread community excitement for our celebrations if the wall is constructed, harming our community engagement.

35.    My personal, cultural, aesthetic, spiritual, and historical interests in this area would be protected if Friends of the Ruidosa Church prevailed in this lawsuit and this historical Catholic landmark was not irrevocably damaged by mass waivers of environmental laws to expedite the construction of a wall. I would be able to continue my restoration work, participate in community events, and experience the beauty and history of the Ruidosa Church and its surrounding landscape as I have for years. Friends of the Ruidosa Church's mission, grounded in cultural, community, historical, and spiritual interests, would be protected by prevailing in this lawsuit and thereby protecting our organization's ability to restore the Ruidosa Church and host community gatherings within its walls, now and into the future.

13

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___JULY 15___, 2026, in ___SANDERSON___ Texas.


                                      Michael Wilber Green

14

APX-V1-026

**APPENDIX VOLUME 1**

**DOCUMENT 3**

Declaration of Taylor McKinnon in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al., | Case No. 3:26-cv-01099-KC |
| *Plaintiffs,* | |
| v. | |
| MARKWAYNE MULLIN, et al., | |
| *Defendants.* | |

**DECLARATION OF TAYLOR MCKINNON IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR SUMMARY JUDGMENT**

I, Taylor McKinnon, declare as follows:

1.      The facts set forth in this declaration are based on my personal knowledge. If I am called as a witness in these proceedings, I could and would testify competently to these facts.

2.      I have been an employee of the Center for Biological Diversity (the "Center") since 2007. I currently serve as the Center's Southwest Director. As Southwest Director, I oversee the Center's conservation work in the U.S. Southwest. Since I started working with the Center, I have served in various other capacities, including as Public Lands Campaigner, Senior Public Lands Advocate, Public Lands Campaigns Director, and Public Lands Director. Given the broad topical and geographic scope of these positions, I am very familiar with the Center's work to protect public lands and imperiled species therein.

3.      The Center is a 501(c)(3) nonprofit corporation incorporated in the State of California that maintains offices across the country, including in Washington, DC, California, Arizona, Florida, Oregon, and Washington State, and in Baja California Sur, Mexico, and British

Columbia, Canada. The Center's primary mission is to protect threatened and endangered species and their habitats both within the United States and abroad. The Center works to ensure the long-term health and viability of animal and plant communities and to protect both the natural world and humans from environmental harms and habitat degradation. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. The Center's work to protect species, their habitats, and ecosystem connectivity in the U.S. and Mexico border region (hereafter "borderlands"), including Texas and the Big Bend region, is wholly consistent with the organization's mission.

4.     The Center has more than 101,600 active members from within the United States and abroad, including members who enjoy visiting public lands and state parks, viewing wildlife and other biodiversity, and recreating in the borderlands of the U.S. and Texas' Big Bend region. The Center carries out its mission on behalf of its members.

5.     The Center and its members have a strong interest in protecting the public lands and wildlife of the borderlands, including in Texas' Big Bend region. Through its Southwest and other programs, the Center has worked for years to protect imperiled species and ecosystems of borderlands through administrative, scientific, legal, media, public education, and other forms of advocacy.

6.     For example, the Center has written scientific petitions to secure Endangered Species Act protections for Sonoyta mud turtle and Quitobaquito tryonia, two aquatic species threatened by habitat dewatering from border wall construction.

7.     For over thirty years, the Center has engaged in litigation and advocacy to secure and enforce legal protections for imperiled species living in the borderlands, including federally endangered jaguars and ocelots. For example, after jaguars were stripped of their protections under

2

the Endangered Species Act, following litigation and a campaign by the Center, they were again protected as endangered. Center litigation additionally helped secure critical habitat and a recovery plan for the jaguar, and has halted projects and other harmful government activities that would negatively impact wild jaguars and ocelots. *See e.g.*, Endangered and Threatened Wildlife and Plants; Determination That Designation of Critical Habitat is Prudent for the Jaguar, 75 Fed. Reg. 1741, 1742–43 (Jan. 13, 2010); *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1095 (D. Ariz. 2009) (striking down U.S. Fish and Wildlife Service's determinations to not designate critical habitat or prepare a recovery plan for the jaguar and ordering the agency to make new determinations by a date certain).

8.    The Center also engages in wildlife monitoring, public education, and outreach to advance jaguar and ocelot conservation in the U.S. Attached as Exhibit 1 is a true and correct copy of a news release published by the Center for Biological Diversity on May 12, 2026, titled *New Video Captures Rare Jaguar Roaming Southern Arizona Sky Islands*, which is publicly available at https://biologicaldiversity.org/w/news/press-releases/new-video-captures-rare-jaguar-roaming-southern-arizona-sky-islands-2026-05-12/. The news release reports on the publication of a video by the Center, which captured a rare wild jaguar moving through a Sky Island mountain range south of Tucson.

9.    Reports published over the years further document the Center's educational and scientific work in the borderlands. In June 2023, the Center published *A Wall of Lights Through the Wild*, which documents the extensive installation of high-intensity lighting along the southern border. Through field surveys and scientific research, it explores how such artificial light harms wildlife, disrupts migration and behavior, and degrades sensitive ecosystems. Attached as Exhibit 2 is a true and correct copy of *A Wall of Lights Through the Wild*, which is publicly available at

3

https://www.biologicaldiversity.org/campaigns/border_wall/pdfs/border-lighting-wildlife-impacts-2023-05-06.pdf. In July 2025 the Center published *Destruction of a Jaguar Corridor*, documenting the impacts of border wall industrialization to imperiled jaguars in the United States. Attached as Exhibit 3 is a true and correct copy of *Destruction of a Jaguar Corridor*, which is publicly available at https://biologicaldiversity.org/species/mammals/jaguar/pdfs/Destruction_of_a_Jaguar_Corridor_Report_July_2025_Center.pdf?_gl=1*23ug3n*_gcl_au*NzYxODU2MzguMTc3MzcyMzQ4OQ.

10.     The Center has also contributed to significant media coverage of wildlife condition along the borderlands. For example, the Center contributed to an international news story in 2024 about wildlife deaths from a wildfire, where "scores of burned animals" were found "against a mile-long stretch of the border wall" in Texas. Attached as Exhibit 4 is a true and correct copy of the article, titled *More than 100 wild animals trapped by border wall killed in Texas wildfire*, authored by Nina Lakhani, and published by The Guardian on January 11, 2024. The article is publicly available at https://www.theguardian.com/us-news/2024/jan/11/texas-border-wall-wildfire-trapped-wild-animals-dead.

11.     In recent months, Center staff have provided regular social media updates to large public audiences about border wall industrialization in the Big Bend region, made appearances on national radio broadcasts, and provided interviews and commentary to numerous print news sources. Attached as Exhibit 5 are true and correct copies of representative information the Center shared about border wall industrialization in the Big Bend region with the public through its social media accounts and website. Attached in Exhibit 6 are true and correct copies of selected publicly available articles concerning proposed border-wall construction and related infrastructure in the Big Bend region that quote, cite or otherwise feature interviews and commentary from

representatives of the Center. These materials, which are publicly accessible from their respective publishers' websites, include: Roque Planas, *'It's Massive Destruction': Outcry in Texas Over Waivers to Allow Border Wall in Big Bend National Park*, The Guardian (June 12, 2026), https://www.theguardian.com/us-news/2026/jun/13/texas-border-wall-big-bend-national-park; Sarah Bahari, *Plans for Steel Barriers, Roads in Texas' Big Bend National Park Draw Fury*, The Dallas Morning News (June 11, 2026), https://www.dallasnews.com/news/immigration/article/big-bend-barriers-roads-texas-22300871.php; Arfie Ghedi, *What the Trump Administration Is Building in Big Bend*, 1A NPR, https://the1a.org/segments/what-the-trump-administration-is-building-in-big-bend/; Martha Pskowski, *Feds Seek Access to Three Texas State Parks for Border Wall*, Inside Climate News (Apr. 2, 2026), https://insideclimatenews.org/news/02042026/texas-state-parks-border-wall-construction/.

12.     There are many dozens more examples of the Center's decades-long history of advocating for the protection of borderlands species and ecosystems. These longstanding efforts of advocacy, research, and legal action demonstrate the Center's enduring commitment to the borderlands and are central to its mission to protect endangered and threatened species and their habitats.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this *14th* day of July, 2026 in ___FLAGSTAFF, AZ_____.

Taylor McKinnon

5

**MCKINNON DECLARATION**

**EXHIBIT 1**

News release published by the Center for Biological Diversity on May 12, 2026, titled *New Video Captures Rare Jaguar Roaming Southern Arizona Sky Islands*

CENTER for BIOLOGICAL DIVERSITY                                              *Saving life on Earth*

For Immediate Release, May 12, 2026

Contact: Russ McSpadden, (928) 310-6713, rmcspadden@biologicaldiversity.org

### New Video Captures Rare Jaguar Roaming Southern Arizona Sky Islands

TUCSON, *Ariz.*— A new video released today by the Center for Biological Diversity captures a rare wild jaguar moving through a Sky Island mountain range south of Tucson, offering a striking glimpse of one of North America's most endangered mammals.

"Seeing this incredible jaguar roaming in Arizona's wild sky islands is a powerful reminder that these cats belong in the American Southwest and northern Mexico," said Russ McSpadden, Southwest conservation advocate at the Center. "Tragically jaguars' northern range is being ripped apart by Trump's border wall construction, along with mining, groundwater depletion and climate-driven drought. We need to take urgent action to protect our vital cross-border ecosystems so jaguars can continue prowling the southern Arizona landscape alongside bears, pumas and ringtails. A landscape this wild is too precious to sacrifice."

The footage, captured by remote wildlife cameras, includes three clips recorded in March and April 2026. The videos show a large adult male jaguar nicknamed "Cinco" by the Wild Cat Research and Conservation Center in 2025 after it became the fifth jaguar documented through the group's monitoring efforts in the region. At least nine jaguars have been seen in the Southwest since 1996.

Jaguars are endangered in both the U.S. and Mexico, and their future depends on cross-border conservation efforts among governments, Tribal Nations, local communities and conservation groups to protect habitat, restore wildlife corridors and safeguard the interconnected ecosystems and Indigenous lands these cats have relied on for generations.

"I have prayed for the return of jaguars to these mountains, part of the ancestral lands of the O'odham" said Austin Nunez, chairman of the San Xavier District of the Tohono O'odham Nation. "Jaguars are protectors of the people and are a part of our spiritual life and our connection to this land. Seeing a jaguar still moving through these mountains gives me hope for future generations and reminds us of our responsibility to protect these majestic animals and the places they depend on."

#### Background
Jaguars are the world's third-largest cats, after tigers and lions. They once lived throughout the American Southwest, with historical records from the South Rim of the Grand Canyon, the mountains of Southern California and as far east as Louisiana. Over the past 150 years, jaguars largely disappeared from the U.S. portion of their range primarily because of hunting, habitat loss and U.S. government-sponsored predator eradication programs.

In 2014 the Center for Biological Diversity secured federal protection for hundreds of thousands of acres designated as critical habitat for jaguar recovery in the U.S.

The following year, Conservation CATalyst and the Center released the first video footage of a wild jaguar in Arizona, a male cat known as El Jefe.

In 2017 the Center released video footage of another wild jaguar in Arizona's Chiricahua Mountains, a male cat known as Sombra.

In a 2025 resolution, the San Xavier District of the Tohono O'odham Nation recognized the jaguar, or O:ṣhad, as a sacred animal and called for stronger habitat protections, restoration of wildlife corridors and the reintroduction of jaguars across parts of their historic range in the American Southwest.

APX-V1-034



Jaguar roaming in southern Arizona, captured in spring of 2026. Please credit: Russ McSpadden, Center for Biological Diversity.
Video footage and image are available for media use.

*The Center for Biological Diversity is a national, nonprofit conservation organization with more than 1.8 million members and online activists dedicated to the protection of endangered species and wild places.*

**Alaska . Arizona . California . Colorado . Florida . Hawaii . N.Carolina . New Mexico . New York . Oregon . Washington, D.C. . La Paz, Mexico**

P.O. Box 710, Tucson, AZ 85702-0710   tel (520) 623.5252   fax (520) 623.9797   BiologicalDiversity.org

More Press Releases

Programs:   Southwest Region

View for Email

APX-V1-035

**<u>MCKINNON DECLARATION</u>**

**EXHIBIT 2**

Russ McSpadden, Laiken Jordahl & Curt Bradley, Center for Biological Diversity, *A Wall of Lights Through the Wild* (2023).



# A WALL OF LIGHTS
# THROUGH THE WILD

**1,800 Stadium Lights on Arizona Conservation Lands Threaten Wildlife**

**Russ McSpadden, Laiken Jordahl and Curt Bradley**
**Center for Biological Diversity, June 2023**



Border lighting at San Bernardino National Wildlife Refuge.

# INTRODUCTION

Between 2019 and 2021, federal government contractors erected more than 1,800 stadium lights along the southern boundaries of some of the most biodiverse conservation lands in the United States, Center for Biological Diversity surveys estimate. The Department of Homeland Security authorized installation of these lights across more than 60 miles in Arizona along the U.S.-Mexico border without legal or scientific analysis. The Department failed to provide opportunity for meaningful engagement between border-protection and land-management agencies and the public.

If turned on, these high-intensity[1] stadium lights would cause severe light pollution impacting conservation lands, animal migration routes and wildlife, including more than a dozen endangered species. The Department of Homeland Security and Customs and Border Protection are evaluating lighting across the Southwest border,[2] which could lead to operationalizing existing lights and installing new lights. Artificial lighting would add to the harm already inflicted on wildlife and protected landscapes from border walls, roads and other infrastructure.

Public-records requests and phone calls to federal agencies indicate that officials lack an accurate account of the lighting infrastructure within or adjacent to their boundaries.

For this report, the Center inventoried border lighting installed on conservation lands along the Arizona border with Mexico to analyze potential harm to endangered species and wildlife habitat along the border. We found the following:

- **Cabeza Prieta National Wildlife Refuge:** 550 stadium lights across 18.9 miles

- **Organ Pipe Cactus National Monument:** 740 stadium lights across 24.6 miles

- **San Pedro Riparian National Conservation Area:** 12 stadium lights across one-third of a mile in the conservation area including five installed on the border wall bridge directly over the river

- **San Bernardino Valley and San Bernardino National Wildlife Refuge:** 500 stadium lights across 16.7 miles of the San Bernardino Valley, including 94 lights across the refuge

Border lighting installed on these conservation lands cuts across habitat for16 threatened and endangered species, including federally designated critical habitats for the yellow-billed cuckoo, Quitobaquito pupfish, Sonoyta mud turtle, beautiful shiner, Yaqui catfish, Yaqui chub and San Bernardino spring snail.



**550 stadium lights across 18.9 miles of Cabeza Prieta National Wildlife Refuge.**



**740 stadium lights across 24.6 miles of Organ Pipe Cactus National Monument.**



**12 stadium lights across one-third of a mile in the San Pedro Riparian National Conservation Area.**



**500 stadium lights across 16.7 miles of the San Bernardino Valley, including 94 lights across the San Bernardino National Wildlife Refuge.**

Photos by Russ McSpadden.

APX-V1-039

2



Map by Curt Bradley.

## METHODOLOGY

We conducted field surveys and spatial analysis to determine a close estimate of where stadium lights have been erected along the Arizona border in priority conservation areas. We used on-the-ground transect mapping and satellite imagery analysis in Organ Pipe Cactus National Monument, the Cabeza Prieta National Wildlife Refuge, the San Pedro Riparian National Conservation Area, the San Bernardino Valley and San Bernardino National Wildlife Refuge. The estimates are based on average light pole spacing measured at each location.

| Endangered and Threatened Species with Habitat at Surveyed Border Lighting Areas | | |
|---|---|---|
| Common | Scientific | Status |
| Beautiful Shiner | Cyprinella formosa | Threatened |
| California Least Tern | Sterna antillarum browni | Endangered |
| Chiricahua Leopard Frog | Rana chiricahuensis | Threatened |
| Jaguar | Panthera onca | Endangered |
| Mexican Spotted Owl | Strix occidentalis lucida | Threatened |
| Northern Mexican Gartersnake | Thamnophis eques megalops | Threatened |
| Ocelot | Leopardus (=Felis) pardalis | Endangered |
| Quitobaquito pupfish | Cyprinodon eremus | Endangered |
| San Bernardino Springsnail | Pyrgulopsis bernardina | Threatened |
| Sonoran Pronghorn | Antilocapra americana sonoriensis | Endangered |
| Sonoyta Mud Turtle | Kinosternon sonoriense longifemorale | Threatened |
| Southwestern Willow Flycatcher | Empidonax traillii extimus | Endangered |
| Yaqui Catfish | Ictalurus pricei | Threatened |
| Yaqui Chub | Gila purpurea | Endangered |
| Yaqui Topminnow | Poeciliopsis sonoriensis | Endangered |
| Yellow-billed Cuckoo | Coccyzus americanus | Threatened |

Endangered and threatened species with habitat at surveyed border lighting areas based on U.S. Fish and Wildlife Service Information for Planning and Consultation. Yaqui topminnow based on Arizona Game and Fish Department Heritage Data Management System.

3



**If activated, border lighting would extend the devastating habitat fragmentation impacts of the border wall far into the sky, potentially disrupting seasonal migrations of the Sonoran Desert's chief pollinators.**

Lesser long-nosed bat sips nectar and pollinates an agave flower.

## HARM TO WILDLIFE

Artificial light pollution is one of the most widespread threats to biodiversity around the globe.[3] Light pollution has numerous and severe impacts on wildlife, especially harming nocturnal wildlife, species active during twilight, insects, and migratory birds and bats. Artificial light disrupts natural rhythms, influences predator-prey relationships, and hinders navigation, reproduction, nourishment and sleep.[4]

The scientific record clearly shows that artificial light at night can have costly, even deadly effects on a wide variety of species including amphibians, reptiles, birds, mammals, insects and plants. High-intensity lighting in these priority conservation areas would be devastating to the rich biodiversity of southern Arizona and northern Sonora, Mexico.

For example, artificial lighting along the Mexico border on the San Pedro River would disrupt wildlife movement through this critical north-south wildlife corridor. Half of all breeding bird species in North America are known to use the San Pedro River corridor, along with 82 species of mammals and 43 species of reptiles and amphibians.[5]

Three years of camera monitoring of a single location just north of the international border have documented 1,165 instances of wildlife traveling this river pathway. This shows the San Pedro's importance as a wildlife corridor for numerous species including badger, bobcat, javelina, mountain lion, mule deer, raccoon, several skunk species, turkey and white-tailed deer as they roam in search of food, water and mates.[6]

## BATS

Artificial light disrupts the navigation, roosting and feeding of many species of bats. Some species change their behavior to hunt insects attracted to artificial lights and become exposed to predators. Other bats avoid lights and avoid feeding and watering sites within lighted areas. Lighting near bats' travel and migration routes can increase flight time and energy use and divert bats from important food and water resources along the way.[7]

The borderlands of southern Arizona and northern Mexico have a great diversity of bat species. At least 14 bat species have been documented at Organ Pipe Cactus National Monument[8] and 20 along the San Pedro River.[9] Bats play important roles in maintaining a functioning ecosystem in each of the conservation areas where we

**Artificial lighting could affect all mammal species that live, travel through, forage and hunt in these wild, rugged areas.**

Ocelot by Jitze Couperus, CC-BY.

surveyed border lights. Lighting near roosting, feeding, watering, travel and migration areas would harm bat species and the ecosystems they support.

Lesser long-nosed bats are critically important to Sonoran Desert ecosystems, acting as the principal pollinator of both saguaro and organ pipe cactuses. Each summer thousands of these bats follow seasonal cactus blooms northward, flying over the border wall to roost within Organ Pipe Cactus National Monument and the Cabeza Prieta National Wildlife Refuge.[10]

Artificial lighting is acutely harmful to slow-flying species like lesser long-nosed bats, who hover while feeding on cactus nectar. Studies have determined that lighting poses risks to migratory travel as well as nightly foraging activity, potentially disturbing or preventing entire migration patterns.[11] Turning on the existing border lighting infrastructure at Organ Pipe and Cabeza Prieta would be devastating for lesser long-nosed bats, shooting a massive wall of light into the sky stretching dozens of miles. If activated, border lighting would extend the devastating habitat fragmentation impacts of the border wall far into the sky, potentially disrupting seasonal migrations of the Sonoran Desert's chief pollinators.

## MAMMALS

Night lighting along the border is a significant concern for endangered ocelots, jaguars and Sonoran pronghorn, especially where lights encroach on designated critical habitat and important migration corridors. Lighting across the San Bernardino Valley is particularly troubling given its proximity to jaguar and ocelot migration corridors between Mexico and the United States. Exposure to artificial lighting has been demonstrated to substantially change behavior patterns of rodents and prey species, thereby altering predator-prey relationships and diminishing hunting opportunities for carnivores.[12] This is especially concerning for nighttime predators with habitat near border lighting infrastructure like endangered ocelots and jaguars.

Habitat fragmentation from existing border walls already threatens mammals in each of the conservation areas outlined in this report. These border walls destroy habitat, prevent genetic interchange and impede wildlife migration.[13] The addition of large-scale artificial lighting would worsen the already devastating harm caused by border walls, further altering behavior patterns and degrading habitat. Artificial lighting could affect all mammal species that live, travel through, forage and hunt in these wild, rugged areas.[14]

## BIRDS

Artificial light is known to have significant impacts on a wide variety of bird species. Depending on the species, birds flying at night can be attracted to, repelled by, or disoriented by lights.[15] Collisions with lighted objects or nearby structures are a serious concern. Lights can also change birds' perceptions of habitat quality.[16] Many bird species use light cues in the environment for navigation, even using these cues to calibrate their sensitivity to the Earth's magnetic field. Artificial light interferes with this process.[17]

More than 270 bird species have been recorded in Organ Pipe Cactus National Monument. There are 36 species of resident birds, but the majority migrate through the area for the desert's



Western yellow-billed cuckoo courtesy Leo-Shapiro, USGS.

seasonal flowers, fruits and warm winters.[18] Between San Bernardino National Wildlife Refuge and nearby Leslie Canyon National Wildlife Refuge, at least 335 bird species have been recorded.[19] The San Pedro Riparian National Conservation Area is home to more than 100 species of breeding birds and provides invaluable habitat for another 250 species of migrant and wintering birds.[20] Designated critical habitat for the rare yellow-billed cuckoo abuts border-wall lighting infrastructure where the San Pedro River crosses the border. If lights here were activated, artificial light pollution would blast into the cuckoo's habitat.

## AQUATIC AND SEMI-AQUATIC SPECIES

Aquatic species show distinct sensitivities to light polarization as it reflects off water.[21] This raises questions about potential harm to threatened and endangered aquatic and semi-aquatic species along the border. These include Quitobaquito pupfish and Sonoyta mud turtles at Quitobaquito Springs in Organ Pipe Cactus National Monument and San Bernardino spring snails, Yaqui topminnow, beautiful shiner, Yaqui catfish, Chiricahua leopard frogs and Mexican garter snakes at San Bernardino National Wildlife Refuge. Border lighting infrastructure has been installed directly adjacent to spring-fed pools at both protected areas.



Northern Mexican gartersnake courtesy USFWS.

Aquatic species are particularly vulnerable to harm from artificial lighting. Amphibians detect light at extremely faint levels as much as 100 times dimmer than humans.[22] Artificial lighting is expected to cause a range of riparian ecosystem changes, altering predator-prey relationships, sexual selection and reproduction.[23] The spectacularly unique aquatic habitats of Quitobaquito Springs and the San Bernardino National Wildlife Refuge would be severely compromised if nearby border lighting were activated, further endangering the numerous federally protected species who call these places home.

## INSECTS

Artificial lighting at night threatens insect biodiversity. Lighting can change nocturnal insect behaviors such as feeding, migration and dispersal, predator avoidance, and reproduction. Studies show a high likelihood that the effects of night lighting on insects can cause cascading effects on the larger food chain and ecosystem function.[24] Artificial lighting may even diminish pollination success by disrupting predator-prey relationships and natural rhythms. [25]

The borderlands between Arizona and Sonora, Mexico, contain some of the highest diversity of insects in the world. Though insects are poorly studied and tracked, scientists have highlighted Arizona as having the most species of insects presumed to be at risk of population declines.[26] Another study found that the highest diversity of bee species anywhere on Earth exists within just six square miles of San Bernardino Valley, including the San Bernardino National Wildlife Refuge.[27] The 10-year study found 497 species of bees, roughly 14% of all bee species found in the United States.

Additionally, the San Pedro River Basin is home to the Southwest spring firefly, one of only two flashing firefly species in Arizona. The charismatic firefly was recently petitioned for federal protection.[28] Artificial light pollution has been documented as one of the main threats to fireflies, diminishing reproductive success by interfering with courtship displays, temporally disorienting individuals and effectively blinding them by saturating dark-adapted photoreceptors.[29]

## CONCLUSION

Artificial lighting at night would be devastating to wildlife and conservation lands in Arizona along the U.S.-Mexico border. In addition to replacing border walls with wildlife-friendly vehicle barriers, lights and electrical infrastructure should be removed from Organ Pipe Cactus National Monument, Cabeza Prieta National Wildlife Refuge, the San Pedro Riparian National Conservation Area, the San Bernardino Valley, and San Bernardino National Wildlife Refuge.



**Studies show a high likelihood that the effects of night lighting on insects can cause cascading effects on the larger food chain and ecosystem function.**

7

# ENDNOTES

[1] The International Dark-Sky Association estimates these 500-watt lights would output at least 50,000 lumens, which is substantially more light than standard urban street lights. See: International Dark-Sky Association. Lights at the Border. https://www.darksky.org/lights-at-the-border-protecting-some-of-the-darkest-places-in-north-america/

[2] U.S. Customs and Border Patrol. July 11, 2022. DHS Update on Border Wall Remediation Efforts Webinar. https://www.dhs.gov/news/2022/07/11/dhs-update-border-wall-remediation-efforts

[3] Koen, E.L., Minnaar, C., Roever, C.L. and Boyles, J.G. Emerging threat of the 21st century lightscape to global biodiversity. Global Change Biology, 24(6):2315–2324, apr 2018. doi: 10.1111/gcb.14146. See also: Garrett, J.K., Donald, P.F. and Gaston, K.J. Skyglow extends into the world's key biodiversity areas. Animal Conservation, 23(2):153–159, feb 2019. doi: 10.1111/acv.12480.

[4] National Park Service. 2017. Draft National Park Service Air Quality Analysis Methods. Air Resources Division, September 2015. Department of the Interior. Lakewood, Colorado. See also: Svechkina, A., Portnov, B.A. and Trop, T. The impact of artificial light at night on human and ecosystem health: a systematic literature review. Landscape Ecology, 35(8):1725–1742, jun 2020. doi: 10.1007/s10980-020-01053-1.doi: 10.1371/journal.pone.0145432.

[5] Hanson, Roseann Beggy. 2015. The San Pedro River. The University of Arizona Press.

[6] Sky Island Alliance 2019. Unpublished research.

[7] Rowse, E.G., Lewanzik, D., Stone, E.L., Harris, S., Jones, G. (2016). Dark Matters: The Effects of Artificial Lighting on Bats. In: Voigt, C., Kingston, T. (eds) Bats in the Anthropocene: Conservation of Bats in a Changing World. Springer, Cham. https://doi.org/10.1007/978-3-319-25220-9_7. https://link.springer.com/book/10.1007/978-3-319-25220-9

[8] National Park Service. 2006. Ecological Monitoring Program Report, 1997−2005. https://www.nps.gov/orpi/learn/nature/upload/ch9_bats.pdf

[9] Arizona Important Bird Areas Program. Lower San Pedro River IBA. https://aziba.org/?page_id=461

[10] U.S. Fish and Wildlife Service. 2016. Species status assessment for the lesser long-nosed bat. December 2016. U.S. Fish and Wildlife Service, Southwest Region, Albuquerque, NM. 96 pp

[11] Stone, E.L., G. Jones, and S. Harris. 2009. Street lighting disturbs commuting bats. Current Biology 19: 1123–1127

[12] Grigione, M.M., Mrykalo, R. Effects of artificial night lighting on endangered ocelots (Leopardus paradalis) and nocturnal prey along the United States-Mexico border: A literature review and hypotheses of potential impacts. Urban Ecosystems 7, 65–77 (2004). https://doi.org/10.1023/B:UECO.0000020173.70355.ab

[13] Flesch, A.D., C.W. Epps, J.W. Cain, III, M. Clark, P.R. Krausman, and J.R. Morgart. 2010. Potential effects of the United States-Mexico border fence on wildlife. Conservation Biology, 24, 171–181.

[14] International Dark-Sky Association. 2022.

[15] Adams, C.A., Fernández-Juricic, E., Bayne, E.M. et al. Effects of artificial light on bird movement and distribution: a systematic map. Environ Evid 10, 37 (2021). https://doi.org/10.1186/s13750-021-00246-8

[16] Ibid.

[17] International Dark-Sky Association. 2022.

[18] Organ Pipe Cactus National Monument. Birds. https://www.nps.gov/orpi/learn/nature/birds.htm

[19] U.S. Fish and Wildlife Service. San Bernardino National Wildlife Refuge. https://www.fws.gov/refuge/san-bernardino/species

[20] Maricopa Audubon Society. Birds of San Pedro Riparian National Conservation Area. https://www.maricopaaudubon.org/bird-checklist-for-san-pedro-riparian-national-conservation-area

[21] Fraleigh, D.C., Heitmann, J.B. and Robertson, B.A. Ultraviolet polarized light pollution and evolutionary traps for aquatic insects. Animal Behaviour, 180:239–247, oct 2021. doi:10.1016/j.anbehav.2021.08.006.123. See also: Szaz, D., Horvath, G., Barta, A., Robertson, B.A., Farkas, A., Egri, A., Tarjanyi, N., Racz, G. and Kriska, G. Lamp-lit bridges as dual light-traps for the night-swarming mayfly, ephoron virgo: Interaction of Interaction of polarized and unpolarized light pollution. PLOS ONE, 10 (3):e0121194, mar 2015. doi: 10.1371/journal.pone.0121194.

[22] National Park Service. Animals Need the Dark. Article. Accessed May, 2023. https://www.nps.gov/articles/nocturnal_earthnight.htm#:~:text=Many%20species%20on%20Earth%20are,order%20to%20navigate%20at%20night.

[23] Perkin, E. K., F. Ho¨ lker, J. S. Richardson, J. P. Sadler, C. Wolter, and K. Tockner. 2011. The influence of artificial light on stream and riparian ecosystems: questions, challenges, and perspectives. Ecosphere 2(11):122. doi:10.1890/ES11-00241.1

[24] Stewart, Alan J.A. 2021. Impacts of Artificial Lighting at Night on Insect Conservation. Insect Conservation and Diversity Vol 14, Issue 2. 163-166. https://resjournals.onlinelibrary.wiley.com/doi/full/10.1111/icad.12490

[25] Owens, Avalon C.S., Cochard P., Durrant, J., Farnworth, B., Perkin, E.K., and Seymore B. Light Pollution is a Driver of Insect Declines. Biological Conservation. Volume 241. 2020. https://doi.org/10.1016/j.biocon.2019.108259.

[26] Janice L. Bossart, Christopher E. Carlton, Insect Conservation in America: Status and Perspectives, American Entomologist, Volume 48, Issue 2, Summer 2002, Pages 82–92, https://doi.org/10.1093/ae/48.2.82

[27] Minckley, Robert L. and William R. Radke. 2021 Extreme Species Density of Bees in the Warm Deserts of North America. Journal of Hymenoptera Research 82: 317-345. https://jhr.pensoft.net/article/60895/

[28] Xerces Society for Invertebrate Conservation and New Mexico BioPark Society. 2023. Petition to list the Southwest spring firefly Bicellonycha wickershamorum Cicero, 1982 as an endangered speciesunder the U.S. Endangered Species Act.

[29] Owens ACS, Lewis SM. 2022. Artificial light impacts the mate success of female fireflies. Royal Society Open Science 9:220468.

# BIBLIOGRAPHY

Adams, C.A., Fernández-Juricic, E., Bayne, E.M. and Clair, C.C.S. Effects of artificial light on bird movement and distribution: a systematic map. Environmental Evidence, 10(1), dec 2021. doi: 10.1186/s13750-021-00246-8.

Baxter-Gilbert, J., Baider, C., Florens, F.V., Hawlitschek, O., Mohan, A.V., Mohanty, N.P., Wagener, C., Webster, K.C. and Riley, J.L. Nocturnal foraging and activity by diurnal lizards: Six species of day geckos ( phelsuma spp.) using the night-light niche. Austral Ecology, 46(3):501–506, feb 2021. doi: 10.1111/aec.13012.

Bennie, J., Davies, T.W., Cruse, D. and Gaston, K.J. Ecological effects of artificial light at night on wild plants. Journal of Ecology, 104(3):611–620, feb 2016. doi: 10.1111/ 1365-2745.12551.

Bennie, J., Davies, T.W., Cruse, D., Inger, R. and Gaston, K.J. Artificial light at night causes top-down and bottom-up trophic effects on invertebrate populations. Journal of Applied Ecology, 55(6):2698–2706, aug 2018. doi: 10.1111/1365-2664.13240.

Brelsford, C.C. and Robson, T.M. Blue light advances bud burst in branches of three deciduous tree species under short-day conditions. Trees, 32(4):1157–1164, mar 2018. doi: 10.1007/s00468-018-1684-1.

Brüning, A., Kloas, W., Preuer, T. and Hölker, F. Influence of artificially induced light pollution on the hormone system of two common fish species, perch and roach, in a rural habitat. Conservation Physiology, 6(1), jan 2018. doi: 10.1093/ conphys/coy016.

Dananay, K.L. and Benard, M.F. Artificial light at night decreases metamorphic duration and juvenile growth in a widespread amphibian. Proceedings of the Royal Society B: Biological Sciences, 285(1882):20180367, jul 2018. doi: 10.1098/rspb.2018.0367.

Dani, M., Molnár, P. and Skribanek, A. The sensitivity of herbaceous plants to light pollution. Acta Universitatis de Carolo Eszterházy Nominatae. Sectio Biologiae, 46:173–181, 2021. doi: 10.33041/actauniveszterhazybiol.2021.46.17

Davies, T.W., Bennie, J., Cruse, D., Blumgart, D., Inger, R. and Gaston, K.J. Multiple nighttime light emitting diode lighting strategies impact grassland invertebrate assemblages. Global Change Biology, 23(7):2641–2648, jan 2017. doi: 10.1111/ gcb.13615.

de Jong, M., van den Eertwegh, L., Beskers, R.E., de Vries, P.P., Spoelstra, K. and Visser, M.E. Timing of avian breeding in an urbanised world. Ardea, 106(1):31, may 2018. doi: 10.5253/arde.v106i1.a4.

Deng, K., Zhu, B.C., Zhou, Y., Chen, Q.H., Wang, T.L., Wang, J.C. and Cui, J.G. Mate choice decisions of female serrate-legged small treefrogs are affected by ambient light under natural, but not enhanced artificial nocturnal light conditions. Behavioural Processes, 169:103997, dec 2019. doi:10.1016/j.beproc.2019.103997.

Desouhant, E., Gomes, E., Mondy, N. and Amat, I. Mechanistic, ecological, and evolutionary consequences of artificial light at night for insects: review and prospective. Entomologia Experimentalis et Applicata, 167(1):37–58, jan 2019. doi: 10.1111/eea.12754.

Dias, K.S., Dosso, E.S., Hall, A.S., Schuch, A.P. and Tozetti, A.M. Ecological light pollution affects anuran calling season, daily calling period, and sensitivity to light in natural Brazilian wetlands. The Science of Nature, 106(7-8), jul 2019. doi: 10.1007/s00114-019-1640-y.

Falcón, J., Torriglia, A., Attia, D., Viénot, F., Gronfier, C., Behar-Cohen, F., Martinsons, C. and Hicks, D. Exposure to artificial light at night and the consequences for flora, fauna, and ecosystems. Frontiers in Neuroscience, 14, nov 2020. doi: 10.3389/fnins.2020.602796.

Foster, J.J., Kirwan, J.D., el Jundi, B., Smolka, J., Khaldy, L., Baird, E., Byrne, M.J., Nilsson, D.E., Johnsen, S. and Dacke,

M. Orienting to polarized light at night – matching lunar skylight to performance in a nocturnal beetle. The Journal of Experimental Biology, 222 (2):jeb188532, dec 2018. doi: 10.1242/jeb.188532.

Fraleigh, D.C., Heitmann, J.B. and Robertson, B.A. Ultraviolet polarized light pollution and evolutionary traps for aquatic insects. Animal Behaviour, 180:239–247, oct 2021. doi:10.1016/j.anbehav.2021.08.006. 123.

Hoffmann, J., Palme, R. and Eccard, J.A. Long-term dim light during nighttime changes activity patterns and space use in experimental small mammal populations. Environmental Pollution, 238:844–851, jul 2018. doi: 10.1016/j.envpol.2018.03.107.

Kamrowski, R., Limpus, C., Moloney, J. and Hamann, M. Coastal light pollution and marine turtles: assessing the magnitude of the problem. Endangered Species Research, 19(1): 85–98, nov 2012. doi: 10.3354/esr00462.

Kumari, R., Verma, V., Kronfeld-Schor, N. and Singaravel, M. Differential response of diurnal and nocturnal mammals to prolonged altered light-dark cycle: a possible role of mood associated endocrine, inflammatory and antioxidant system. Chronobiology International, 38(11):1618–1630, jun 2021. doi: 10.1080/07420528.2021.1937200.

Kupprat, F., Hölker, F., Knopf, K., Preuer, T. and Kloas, W. Innate immunity, oxidative stress and body indices of eurasian perch perca fluviatilis after twoweeks of exposure to artificial light at night. Journal of Fish Biology, 99(1):118–130, mar 2021. doi: 10.1111/jfb.14703.

Lao, S., Robertson, B.A., Anderson, A.W., Blair, R.B., Eckles, J.W., Turner, R.J. and Loss, S.R. The influence of artificial light at night and polarized light on bird-building collisions. Biological Conservation, 241:108358, jan 2020. doi: 10.1016/j.biocon.2019.108358.

Macgregor, C.J., Evans, D.M., Fox, R. and Pocock, M.J.O. The dark side of street lighting: impacts on moths and evidence for the disruption of nocturnal pollen transport. Global Change Biology, 23(2):697 707, jul 2016. doi: 10.1111/gcb.13371.

O'Connor, J., Fobert, E., Besson, M., Jacob, H. and Lecchini, D. Live fast, die young: Behavioural and physiological impacts of light pollution on a marine fish during larval recruitment. Marine Pollution Bulletin, 146:908–914, sep 2019. doi: 10.1016/j.marpolbul. 2019.05.038.

Robert, K.A., Lesku, J.A., Partecke, J. and Chambers, B. Artificial light at night desynchronizes strictly seasonal reproduction in a wild mammal. Proceedings of the Royal Society B: Biological Sciences, 282(1816):20151745, oct 2015. doi: 10.1098/rspb.2015.1745.

Rodríguez, A., Holmes, N.D., Ryan, P.G., Wilson, K.J., Faulquier, L., Murillo, Y., Raine, A.F.,m Penniman, J.F., Neves, V., Rodríguez, B., Negro, J.J., Chiaradia, A., Dann, P., Anderson, T., Metzger, B., Shirai, M., Deppe, L., Wheeler, J., Hodum, P., Gouveia, C. et al. Seabird mortality induced by land-based artificial lights. Conservation Biology, 31(5):986–1001, may 2017. doi: 10.1111/cobi.12900.

Sanders, D., Frago, E., Kehoe, R., Patterson, C. and Gaston, K.J. A meta-analysis of biological impacts of artificial light at night. Nature Ecology & Evolution, 5(1):74–81, nov 2020. doi: 10.1038/s41559-020 01322-x.

Škvareninová, J., Tuhárska, M., Škvarenina, J., Babálová, D., Slobodníková, L., Slobodník, B., Stˇredová, H. and Minďaš, J. Effects of light pollution on tree phenology in the urban environment. Moravian Geographical Reports, 25(4):282–290, dec 2017. doi: 10.1515/ mgr-2017-0024.

Szaz, D., Horvath, G., Barta, A., Robertson, B.A., Farkas, A., Egri, A., Tarjanyi, N., Racz, G. and Kriska, G. Lamp-lit bridges as dual light-traps for the night-swarming mayfly, ephoron virgo: Interaction of polarized and unpolarized light pollution. PLOS ONE, 10 (3):e0121194, mar 2015. doi: 10.1371/journal.pone.0121194.

Zheleva, M. The dark side of light. light pollution kills leatherback turtle hatchlings. Biodiscovery, sep 2012. doi: 10.7750/biodiscovery.2012.3.4.

**<u>MCKINNON DECLARATION</u>**

**EXHIBIT 3**

Russ McSpadden & Laiken Jordahl, Center for Biological Diversity, *Destruction of a Jaguar Corridor* (2025).





**July, 2025
Center for Biological Diversity**

A report by
Russ McSpadden
& Laiken Jordahl

# Destruction of a
# JAGUAR CORRIDOR

Impending Border Wall Will Sever Vital Pathway
for Wildlife in Arizona's San Rafael Valley

APX-V1-049



*San Rafael Valley grasslands and southern foothills of the Huachuca Mountains. Credit: Russ McSpadden  / Center for Biological Diversity*

# EXECUTIVE SUMMARY

Hundreds of miles of border walls have already severed much of the Arizona–Sonora borderlands, blocking wildlife corridors, fragmenting ecosystems, and pushing endangered species closer to extinction. In the Sky Islands region — one of the most biologically rich and ecologically interconnected wildlands in North America — only a few unwalled cross-border corridors remain. One of the most important of these, the San Rafael Valley, is now in the crosshairs of the Trump administration for immediate new border wall construction.[1]

The San Rafael Valley, a sweeping grassland basin cradled between the Huachuca and Patagonia mountains, is one of the last vital pathways for wildlife movement between Arizona and Sonora.  Jaguars, ocelots, black bears, pronghorn and many other species rely on this corridor to move freely between the U.S. and Mexico. The San Rafael wildlife corridor is an ecological lifeline connecting the transboundary Sky Island Mountains.

At least 17 large wildlife species have been documented crossing through existing vehicle barriers or cattle fencing in the San Rafael Valley. This region has seen the highest number of modern jaguar detections anywhere in the U.S. and is home to 17 threatened and endangered species including Sonoran tiger salamanders and Mexican spotted owls, and 9 species with designated critical habitat.

Armed with waivers that override bedrock environmental laws, Trump's Department of Homeland Security (DHS) is moving at breakneck speed to wall off the San Rafael. In June 2025, U.S. Customs and Border Protection (CBP) awarded a more than quarter of a billion dollar contract for border wall construction[2] across the San Rafael Valley to Fisher Sand & Gravel Co  — a company with a long record of environmental and regulatory violations, including air quality infractions, criminal charges and millions in fines and settlements — raising serious concerns about the impacts to wildlife and ecosystems in this vital bioregion.[3] The proposed wall would cut across the transboundary watersheds of the San Pedro and Santa Cruz Rivers, fragmenting the hydrology of the corridor.

A barrier here would block species movement, destroy protected habitats, and inflict irreversible damage on critical ecological linkages. It could also bring a wall of artificial light to this Dark Sky landscape — stadium-bright illumination that would disrupt nocturnal pollinators like bats and insects, disorient migratory birds, and degrade the valley's natural light-dark cycle, which governs critical behavioral and physiological processes in wildlife.[4]

This report documents the San Rafael Valley's biodiversity, the species it sustains, and its indispensable role in the survival of endangered wildlife. It details nine key protected areas linked by the San Rafael Valley wildlife corridor. Finally, it also outlines the severe harms posed by new border wall construction and makes the urgent case for protecting this irreplaceable corridor before it is destroyed.



*A black bear obstructed by the new 30-foot-high border wall at the nearby San Pedro River. Credit: Sky Island Alliance*

# BORDER WALL HARMS

During Trump's first term, approximately 458 miles of new 30-foot-high, concrete and steel bollard-style border walls were built. In many areas, these new walls replaced existing vehicle barriers, which generally did not impede wildlife movement. A significant portion of this construction occurred on federally protected lands in Arizona and New Mexico, including the San Bernardino, Buenos Aires and Cabeza Prieta national wildlife refuges, National Park Service lands like Organ Pipe Cactus National Monument and the Coronado National Memorial, designated wilderness areas like the Pajarito Wilderness, and National Forest Service land. The result has been dire, sealing off most of the federally protected wildlands between the U.S. and Mexico, with only a few corridors — like the San Rafael Valley — remaining.

Scientists recognize border walls as ecological stressors that destroy habitat, divide genetic interchange and impede wildlife migration.[5] In 2018, more than 2,500 scientists published a paper detailing the harm that border walls cause, raising alarm about the barriers' threats to animal health, migration and dispersal.[6]

Border walls in Arizona and across the borderlands have inflicted extensive, well-documented harm to wildlife, blocking migratory routes, destroying habitat, isolating vulnerable populations and disturbing wildlife during construction. These harms are particularly severe for species like jaguars and ocelots, whose populations north of the U.S.-Mexico border depend on interconnected habitats to breeding grounds in Mexico for survival.[7]

Without permeable cross-border wildlife corridors, these species could face extirpation from the United States.

To fast-track border wall construction, the Trump administration invoked a little-known section of the 2005 Real ID Act to bypass dozens of environmental laws. As a result, ancient saguaro cacti were bulldozed, groundwater aquifers were depleted to mix concrete for construction, and critical migration corridors for species were severed. Tribal nations like the Tohono O'odham saw sacred sites dynamited and ancestral lands scarred, with no legal recourse to challenge these actions.

DHS's use of sweeping legal waivers to fast-track border wall construction across the San Rafael Valley bypasses bedrock environmental laws like the National Environmental Policy Act, Endangered Species Act, and Clean Water Act. This action strips local communities, Tribal nations and ecosystems of protections guaranteed elsewhere in the country. This unchecked waiver authority raises serious constitutional concerns by concentrating legislative power in the hands of a single executive official and denying borderland residents equal protection under the law. In the absence of judicial review or enforceable mitigation requirements, the San Rafael Valley's fragile wildlife corridor is left vulnerable to irreversible harm without public accountability or legal recourse.

With large portions of the borderlands now sealed off by barriers, the few remaining corridors serve as lifelines for species that require vast, interconnected landscapes to hunt, breed and adapt to climate change.

Scientists, local communities, and government agencies in the United States, Mexico and the United Nations (via UNESCO) have called for the restoration of ecosystems damaged by wall construction, urging policymakers to preserve wildlife corridors and protect transboundary biodiversity.[8]

To achieve these goals, decision makers have to prioritize protecting the last remaining wildlife corridors linking Arizona and Sonora. These transboundary pathways are vital for the survival of migratory species, the health of ecosystems and the cultural integrity of borderland communities. To do this, we must stop the Trump administration's plan to wall off the San Rafael Valley and take decisive action to permanently safeguard this irreplaceable wildlife corridor for generations to come.



*Map of San Rafael Corridor and Critical Habitat. Kara Clauser / Center for Biological Diversity*

## BIODIVERSITY IN THE SAN RAFAEL VALLEY AND SKY ISLANDS REGION

For millennia, the region now known as the U.S.-Mexico borderlands has been a sanctuary of interconnected ecosystems, shaped by a confluence of biogeographic, geologic and evolutionary forces.[9]

This biodiversity is especially rich in the Sky Island mountains.[10] Here, northern taxa like pines and junipers intermingle with subtropical agaves and Mexican oaks, forming a globally recognized biodiversity hotspot.[11]

This remarkably rich flora provides for an exceptional diversity of wildlife, from endangered jaguars and ocelots to elegant trogons, black bears, Monarch butterflies, coatimundis, mountain lions and more than a dozen hummingbird species. The Sky Island region holds the highest diversity of reptiles, mammals and ant species anywhere in the United States.[12]

A recent survey of a six-square-mile stretch of arid borderlands desert straddling southeastern Arizona and northeastern Sonora documented 497 species of bees — the highest bee diversity recorded anywhere on Earth.[13] This extraordinary diversity rivals that of entire European nations.

Across the U.S.-Mexico borderlands, at least 93 threatened and endangered species make their homes on both sides of the border.[14] The health of many of these species relies on core populations in one country to sustain their presence in another. For example, jaguars[15] and ocelots[16] have breeding populations only in Mexico, which sustain individual populations in the U.S., while species like Mexican gray wolves,[17] bighorn sheep[18] and black bears have larger, healthier populations in the U.S. that help sustain those south of the border.

And now, the Trump administration is targeting the few remaining wildlife corridors — including the San Rafael Valley — for wall construction.[19] These last corridors between Arizona and Sonora play a crucial role in maintaining biodiversity, facilitating gene flow and ensuring species survival in increasingly fragmented landscapes.

  

*Images above left to right: The jaguar El Jefe (credit Conservation CATalyst and Center for Biological Diversity); the jaguar O:ṣhad Ñu:kudam (credit Sky Island Alliance); the jaguar Yo'oko Nahsuareo (credit Ft. Huachuca).*

## SAN RAFAEL VALLEY CORRIDOR AND ADJACENT PROTECTED LANDS

Cradled by towering Sky Island mountain ranges and federally designated critical habitat for endangered jaguars, the San Rafael Valley provides the best connectivity for myriad species between Arizona and Sonora. This corridor spans 32 miles of oak woodlands, grassland savannah and mountainous slopes, where the border is currently marked only by vehicle barriers and cattle-fencing, neither of which poses substantial barriers to transboundary wildlife movement. Cross-border smuggling and human activity in this area have been extremely rare. Trail cameras posted just north of the border documented just two instances of human activity in five years of monitoring.[20]

Protecting the San Rafael Valley Corridor is crucial for the survival of jaguars and ocelots. Notably, this region has seen the highest number of modern jaguar detections anywhere in the U.S., including El Jefe, a jaguar extensively observed in the Santa Rita Mountains, Yo'oko Nahsuareo (Yo'oko for short) — a name meaning "jaguar warrior" in the Yaqui language, given by students on the Pascua Yaqui Pueblo and O:shad Ñu:kudam (O:shad) — a name given by students on the Tohono O'odham Nation meaning "jaguar protector." Yo'oko was spotted in the Huachuca Mountains in 2016 and 2017. O:shad has been documented more than a dozen times since 2023 and is likely still present in the region. In total, since 1904, at least 31 jaguar sightings have been recorded within this corridor.[21]

Multiple endangered ocelots have also been detected in this corridor. Researchers have confirmed the presence of a breeding population of ocelots at Rancho El Aribabi in northern Sonora, just 30 miles south of the border. This population consists of at least 18 individuals, including both males and females, with photographic evidence of reproduction.[22]

A 2024 study by the nonprofit Sky Island Alliance documented 17 large wildlife species crossing through existing vehicle barriers or cattle fencing in the San Rafael Valley, including black bear, mountain lion, pronghorn, mule deer, white-tailed deer, javelina, coyote and bobcat.[23]

The same study analyzed wildlife camera data from areas with and without border walls, establishing that border walls decrease transboundary wildlife crossings by 86% — entirely blocking migrations of deer, pronghorn, black bears, Gould's turkey and other large mammal species.

## KEY PROTECTED AREAS LINKED BY THE SAN RAFAEL VALLEY CORRIDOR

1. **Rancho Los Fresnos, Sonora, Mexico**

Rancho Los Fresnos is a 10,000-acre conservation ranch in the southeast corner of the San Rafael Valley. Acquired by The Nature Conservancy in 2005, Rancho Los Fresnos preserves fragile native grasslands and vital riparian habitats, including one of the largest remaining ciénagas (desert wetlands) in the upper San Pedro River basin. These habitats support nearly 400 species of migratory birds, 68 species of amphibians and reptiles, and 87 mammal species including jaguars, ocelots, black bears and coatimundis.[24]



*Rancho Los Fresnos. Credit: Russ McSpadden  / Center for Biological Diversity*

Rancho Los Fresnos forms a critical link between Sky Island mountain ranges and the riparian systems of the upper San Pedro basin. Through the reintroduction of natural fire regimes, reduced grazing pressure and wetland restoration — including the reintroduction of beavers that build ponds, which slow the flow of water and enhance habitat for birds and amphibians — Los Fresnos has become a model of ecosystem recovery. Its proximity to other protected areas like the Ecosistema Ajos-Bavispe and Northern Jaguar Reserve to the south and the San Pedro Riparian National Conservation Area to the north makes it a cornerstone of a broader transboundary conservation network.

2.  **Ecosistema Ajos-Bavispe, Cuenca Río San Pedro, Sonora, Mexico**

Ecosistema Ajos-Bavispe is a Mexican Natural Protected Area spanning nearly half a million acres across three Sky Island mountain ranges between Cananea and Moctezuma, Sonora. Forming the headwaters of the San Pedro River, Ajos-Bavispe was designated under the Ramsar Convention on Wetlands of International Importance in 2017. This ecosystem encompasses the vast Sky Island mountains and a mosaic of ciénegas and ephemeral and perennial streams that provide critical water resources in an otherwise arid region of Sonora. As one of the few undammed river systems in the North American Southwest, the upper San Pedro River originates in this area near Cananea and flows northward into Arizona, making it a lifeline for biodiversity across the U.S.-Mexico border.

Established in 1936, Ajos-Bavispe is the largest federally protected area within Mexico's portion of the Madrean Sky Islands region. This expansive protected habitat strengthens cross-border ecological connectivity, supporting seasonal migrations and genetic exchange for species ranging from river otters and beavers to apex predators like jaguars.

3.  **San Pedro Riparian National Conservation Area, Arizona, U.S.**

Covering nearly 57,000 acres, the San Pedro Riparian National Conservation Area protects one of the last undammed river ecosystems in the desert Southwest. This rare river corridor supports more than 400 species of birds — nearly 45% of North America's 900 bird species.[25]

It also provides essential water and cover for large mammals like jaguars and ocelots moving between the U.S. and Mexico. Remarkably, the San Pedro River Riparian National Conservation Area supports more native vertebrate species than Yellowstone National Park (which is 39 times larger), underscoring its unmatched biodiversity and ecological value.

4.  **Huachuca Mountains, Arizona, U.S.**

The Huachuca Mountains rise dramatically from 3,000 to 9,466 feet, supporting a rich mosaic of vegetation types and one of the most biologically diverse landscapes in the Sky Islands. The range is home to nearly 1,000 documented plant species and at least 78 mammal species, including 11 species of bats and a diverse array of reptiles and amphibians. The mountains also sustain an array of threatened and endangered species like the Chiricahua leopard frog, Mexican spotted owl, jaguar and ocelot.[26]

5

The Huachucas are part of the designated Jaguar Critical Habitat Unit 3, identified by the U.S. Fish and Wildlife Service in 2014 for its rugged, forested terrain and strategic connectivity to breeding populations in Sonora, including those within the Northern Jaguar Reserve. Ephemeral and perennial streams and remote canyons offer ideal conditions for wide-ranging carnivores. Notably, the jaguars Yo'oko and O:shad were detected in the Huachucas in recent years — in 2016-2017 and 2023-2024, respectively — confirming the range's role as a vital link for recolonization of the species' historical U.S. range. Ocelots have also



*Map of San Rafael Corridor and Key Protected Areas. Kara Clauser / Center for Biological Diversity*

been photographed in the range's oak woodlands and riparian zones, further affirming the Huachucas' importance for binational carnivore conservation. Ocelots have also been detected in the nearby Santa Rita and Wheststone Mountains.

### 5. San Rafael Grasslands, Coronado National Forest, Arizona, U.S.

A vast expanse of high-desert savannah along the U.S.-Mexico border in Arizona, the San Rafael grasslands, managed by the U.S. Forest Service and a mix of state natural areas and conservation easements, serves as critical foraging and breeding grounds for a wide array of wildlife. It hosts extensive populations of pronghorn, mule deer, white-tailed deer, Gould's turkey and javelina — all important prey for large carnivores like jaguar. The grasslands are especially vital for wintering grassland bird species, including chestnut-collared longspurs, Baird's sparrows, savannah sparrows, and Sprague's pipits. Recognized as a Global Important Bird Area, the region supports exceptional avian biodiversity.

### 6. Fort Huachuca, Arizona, U.S.

Fort Huachuca, a U.S. Army base in southeastern

Arizona, contributes to conservation efforts through its involvement in the Sentinel Landscapes Partnership, a federal partnership aimed at preserving wildlands and biodiversity around military installations. In coordination with The Nature Conservancy, the Arizona Game and Fish Department, and other agencies, the base supports efforts to protect and restore wildlife corridors used by mountain lions, deer and wide-ranging species like jaguars. The fort has supported efforts to remove barriers like fencing and roads to improve ecological connectivity.[27] Fort Huachuca's electromagnetic quiet zone, maintained for military intelligence missions, creates an unintended but highly effective buffer against urban sprawl and habitat fragmentation. The jaguar Yo'oko was detected on Fort Huachuca in 2016.

### 7. Sierra la Mariquita Sky Islands Reserve, Sonora, Mexico

The Sierra La Mariquita Sky Islands Reserve spans nearly 50,000 acres of pine-oak forests, oak woodlands and desert grasslands, rising to elevations of 7,500 feet. Just 16 miles south of the Arizona border within the upper San Pedro River watershed, the reserve plays a critical role in connecting the Sierra Madre

*Huachuca Mountains. Credit: Laiken Jordahl / Center for Biological Diversity*

Occidental to the Sky Islands of southern Arizona. Situated between the Sonoran protected areas of Ajos-Bavispe and Rancho Los Fresnos, Sierra La Mariquita strengthens a transboundary wildlife corridor that links core habitats for wide-ranging species, including jaguars, ocelots and black bears.[28] Its designation — driven by Sky Island Alliance and local conservation partners — recognizes the reserve as both a biodiversity hotspot and a key migratory passage across the U.S.-Mexico borderlands.

### 8. Rancho El Aribabi, Sonora, Mexico

Rancho El Aribabi, located 31 miles south of the U.S.-Mexico border, is a 10,000-acre conservation ranch in northern Sonora that has been a vital hub for transboundary wildlife in the region. Since 2000, ranch owners have shifted priorities from intensive cattle operations to conservation, protecting more than 447 plant species, 170 bird species, and critical wildlife like jaguars, ocelots and black bears. El Aribabi hosts the northernmost population of breeding ocelots in the world, with at least 18 individual cats documented.[29]

Jaguar sightings, documented by projects like Cuatro Gatos and Sky Island Alliance, underscore its role in cross-border wildlife movement — including individual jaguars like "El Jefe" reappearing in central Sonora after traversing the border.

Sadly, the Mexican government has bypassed environmental regulations to build a massive, industrial-scale train through the Río Cocóspera basin, damaging portions of the ranch. While the protected status of these lands is threatened and the landscape has been significantly degraded by construction, they still hold vital riverine habitat for endangered spotted cats and other species in the borderlands.

### 9. Northern Jaguar Reserve, Sonora, Mexico

Spanning more than 56,000 acres, the Northern Jaguar Reserve represents the largest private sanctuary dedicated to jaguar conservation in northwestern Mexico. Located in rugged mountain terrain interwoven with river corridors, this reserve provides a vital habitat for breeding jaguars and their prey, ensuring genetic flow between populations in Mexico and those moving into the southwestern United States. The diverse ecosystems within the reserve—from riparian habitats to Sinaloan thorn scrub, native palm forests, and grasslands—create an ideal environment

for jaguars, which rely on both dense cover and access to prey species to thrive. The reserve's strategic placement helps protect an array of other wildlife, including ocelots, mountain lions, and neotropical migratory birds.[30]

In 2021, a trail camera in Sonora, near the Northern Jaguar Reserve, photographed the famous jaguar El Jefe, who was last seen in 2015 in Arizona's



*A dead mule deer stuck along the new 30-foot-high border wall at Organ Pipe Cactus National Monument.*

Santa Rita Mountains. The Santa Ritas lie north of the San Rafael Valley and are a key part of the broader wildlife linkage The sighting provided compelling evidence of habitat connectivity between the San Rafael Corridor and the breeding population near the Reserve.[31]

## CONSERVATION IMPERATIVES

The San Rafael Valley is one of the last intact cross-border corridors for endangered species in the Sky Islands region. If the Trump administration succeeds in walling it off, migration routes for jaguars, ocelots, black bears and a host of other species will be permanently severed, leading to genetic isolation, habitat fragmentation and an increased risk of extirpation.

Congress must act now to stop this irreversible destruction. Lawmakers should immediately rescind funding for border wall construction and pass explicit legislative language prohibiting the Department of Homeland Security from using federal appropriations to build barriers in the San Rafael Valley or otherwise requiring that border security measures provide for transboundary wildlife permeability.

For species like jaguar, walling off corridors will block animals dispersing from source populations in Sonora

into the U.S. This is likely to foreclose the natural re-establishment of a breeding population in the U.S., thereby requiring reintroduction or population supplementation for recovery success.

During the first Trump administration, Congress included language in FY19 appropriations and subsequent appropriations bills to block wall construction in four ecologically sensitive areas of South Texas, including the Santa Ana National Wildlife Refuge and Bentsen-Rio Grande Valley State Park. With time running out, the same tool must be used to protect the San Rafael Valley. Without swift and decisive congressional action, this irreplaceable corridor — and the species that depend on it — may be lost forever.

The San Rafael Valley is one of the very last functional ecological arteries connecting the Sky Islands of Arizona and Sonora, a vital conduit for species and ecosystems of extraordinary conservation concern. Its continued permeability for wildlife is essential to the survival of species in the United States and Mexico. The ecological cost of landscape-level modification in the form of a massive, wildlife-impermeable border wall could be devastating and irreversible. With construction threats looming, Congress needs to act now to stop further destruction and permanently protect this last remaining artery before it is sealed shut forever.

# ENDNOTES

[1] Department of Homeland Security, DHS Issues New Waivers to Expedite New Border Wall Construction in Arizona and New Mexico, U.S. Customs and Border Protection, June 5, 2025, accessed June 9, 2025, https:// www.cbp.gov/newsroom/national-media-release/dhs-issues-new-waivers-expedite-new-border-wall-construction-0.

[2] U.S. Customs and Border Protection, "DHS awards contract for 27 miles of new border wall in Arizona; issues waiver to accelerate construction in Texas," CBP Newsroom, June 18, 2025, accessed June 20, 2025, https:// www.cbp.gov/newsroom/national-media-release/dhs-awards-contract-27-miles-new-border-wall-arizona-issues-waiver.

[3] Project On Government Oversight, "Bad Actors Among Border Wall Contractors," POGO, April 17, 2018, accessed June 20, 2025, https://www.pogo.org/analysis/bad-actors-among-border-wall-contractors; See also; Molly Olmstead, "Did the Pentagon Really Just Award a $400 Million Contract to a Guy Trump Liked on Fox News?," Slate, Dec. 3, 2019, accessed June 20, 2025, https://slate.com/news-and-politics/2019/12/border-wall-contract-trump-fisher-industries-fox-news.html; See also; Builder Developer News, "Fisher Sand & Gravel Still on the Hook After Settlement in Border Wall Suit with Federal Government," Builder Developer News, June 17, 2022, accessed July 1, 2025, https://www.builderdevelopernews.com/post/fisher-sand-gravel-corruption-settlement-borderwall-lawsuit-federal-government; See also: Carranza, Rafael. "Company Building Trump Border-Wall Prototype Fined in Phoenix for Air Quality." The Arizona Republic, September 17, 2017. https:// www.azcentral.com/story/news/politics/border-issues/2017/09/17/fisher-sand-gravel-building-border-wall-prototype-checkered-environmental-record/643189001/

[4] McSpadden, R., Jordahl, L., & Bradley, C. (2023). A Wall of Lights Through the Wild. Center for Biological Diversity. https://www.biologicaldiversity.org/campaigns/border_wall/pdfs/border-lighting-wildlife-impacts-2023-05-06.pdf

[5] Flesch, A.D., C.W. Epps, J.W. Cain, III, M. Clark, P.R. Krausman, and J.R. Morgart. (2010). Potential effects of the United States-Mexico border fence on wildlife. Conservation Biology, 24, 171–181.See also; Lasky, J. R., Jetz, W., & Keitt, T. H. (2011). Conservation biogeography of the US–Mexico border: A transcontinental risk assessment of barriers to animal dispersal. Diversity and Distributions, 17(5), 865–877.

[6] Robert Peters, William J Ripple, Christopher Wolf, Matthew Moskwik, Gerardo Carreón-Arroyo, Gerardo Ceballos, Ana Córdova, Rodolfo Dirzo, Paul R Ehrlich, Aaron D Flesch, Rurik List, Thomas E Lovejoy, Reed F Noss, Jesús Pacheco, José K Sarukhán, Michael E Soulé, Edward O Wilson, Jennifer R B Miller, 2556 scientist signatories from 43 countries (INCLUDING 1472 FROM THE UNITED STATES AND 616 FROM MEXICO), Nature Divided, Scientists United: US–Mexico Border Wall Threatens Biodiversity and Binational Conservation, BioScience, Volume 68, Issue 10, October 2018, Pages 740–743, https://doi.org/10.1093/biosci/biy063

[7] Rabinowitz, A., & Zeller, K. A. (2010). A range-wide model of landscape connectivity for the jaguar (Panthera onca). Biological Conservation, 143(4), 939–945. https://doi.org/10.1016/j.biocon.2010.01.002. Cavalcanti, S. M., & Gese, E. M. (2009). Spatial ecology and social interactions of jaguars (Panthera onca) in the southern Pantanal, Brazil. Journal of Mammalogy, 90(4), 935–945. https://doi.org/10.1644/08-MAMM-A-188.1.

[8] Government Accountability Office (GAO). (2021). Border Security: Additional Actions Needed to Ensure Border Barriers Do Not Undermine Wildlife and Ecosystem Protection. GAO-21-472. Retrieved from https://www.gao.gov/products/GAO-21-472. See also; Center for Biological Diversity. (2024, July 25). World

Heritage Committee urges U.S., Mexican action to protect site from border wall damage. Retrieved from https://biologicaldiversity.org/w/news/press-releases/world-heritage-committee-urges-us-mexican-action-to-protect-site-from-border-wall-damage-2024-07-25/.

9   Coblentz, D. (2005). The tectonic evolution of the Madrean Archipelago and its impact on the geoecology of the Sky Islands. USDA Forest Service Proceedings RMRS-P-36, 62-68. https://www.fs.usda.gov/rm/pubs/rmrs_p036/rmrs_p036_062_068.pdf.

10  Gottfried, G. J., Gebow, B. S., Eskew, L. G., & Edminster, C. B. (Eds.). (2005). Connecting mountain islands and desert seas: Biodiversity and management of the Madrean Archipelago II. Proceedings RMRS-P-36. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. https://research.fs.usda.gov/treesearch/21519.

11  Bahre, C. J., & Minnich, R. A. (2001). Madrean oak woodlands along the Arizona/Sonora boundary. Desert Plants, 17(1), 3–14. https://repository.arizona.edu/handle/10150/554331?show=full.

12  McLaughlin S. P. (1994). "An overview of the flora of the Sky Islands, southeastern Arizona: Diversity, affinities, and insularity," in Biodiversity and Management of the Madrean Archipelago: The Sky Islands of the Southwestern United States and Northwestern Mexico. Eds. DeBano L., Ffolliott P. F., Ortega-Rubio A., Gottfried G. J., Hamre R. H., Edminster C. B. (US Department of Agriculture, Fort Collins, CO, USA), Pp. 6–Pp.18.

13  Minckley, R. L., & Radke, W. R. (2021). Extreme species density of bees (Apiformes, Hymenoptera) in the warm deserts of North America. Journal of Hymenoptera Research, 82, 295–315. https://doi.org/10.3897/jhr.82.60895.

14  Center for Biological Diversity. (2017). A Wall in the Wild: The Disastrous Impacts of Trump's Border Wall on Wildlife. https://www.biologicaldiversity.org/programs/international/borderlands_and_boundary_waters/pdfs/A_Wall_in_the_Wild.pdf.

15  Rosas Rosas, O., & Bender, L. (2012). "Population status of Jaguars (Panthera onca) and Pumas (Puma concolor) in northeastern Sonora, Mexico." Acta Zoologica Mexicana 28: 86–101. https://doi.org/10.21829/azm.2012.281818.

16  James C. Rorabaugh, Jan Schipper, Sergio Avila-Villegas, Jessica A. Lamberton-Moreno, and Timothy Flood. 2020. "Ecology of an ocelot population at the northern edge of the species' distribution in northern Sonora, Mexico." PeerJ 8:e8414. https://doi.org/10.7717/peerj.8414.

17  U.S. Fish and Wildlife Service. (2024). 5-year evaluation of the Mexican wolf recovery strategy. U.S. Fish and Wildlife Service. https://www.fws.gov/sites/default/files/documents/2024-12/5-year-evaluation-of-the-mexican-wolf-recovery-strategy_508-compliant.pdf.

18  Rodríguez-Rodríguez, M. A., Gasca-Pineda, J., Medellín, R. A., & Eguiarte, L. E. (2015). "Analysis of genetic diversity of bighorn sheep (Ovis canadensis) from Mexican populations." Journal of Mammalogy 96(3): 473–480. https://doi.org/10.1093/jmammal/gyv066.

19  "CBP Proposed Border Barrier Projects" (2024). Source: U.S. Customs and Border Protection. Retrieved October 25, 2024. Accessible: https://drive.google.com/file/d/1WNaRucL__SQs9xtCxIT9fGSSfPu-ix00/view?usp=sharing.

[20] Sky Island Alliance. 2024. Data from Border Wildlife Study. Accessible: https://skyislandalliance.org/our-work/science/borderwildlife/

[21] Babb, Randall & Brown, David & Culver, Melanie & Childs, Jack & Thompson, Ronald & Kohls, Raymond & Taylor, Tom. (2022). Updates of Historic and Contemporary Records of Jaguars (Panthera onca) from Arizona. Journal of the Arizona-Nevada Academy of Science. 49. 10.2181/036.049.0205. See also; Wildlife Conservation Society and U.S. Fish and Wildlife Service Jaguar Data Observation Base. Accessed 5/28/2025. Accessible: https://jaguardata.info/#.

[22] Rorabaugh JC, Schipper J, Avila-Villegas S, Lamberton-Moreno JA, Flood T. (2020). Ecology of an ocelot population at the northern edge of the species' distribution in northern Sonora, Mexico. PeerJ 8:e8414. Accessible: https://doi.org/10.7717/peerj.8414.

[23] Harrity, E. J., Traphagen, M., Bethel, M., Facka, A. N., Dax, M., & Burns, E. (2024). USA-Mexico border wall impedes wildlife movement. Frontiers in Ecology and Evolution, 12, 1487911. Accessible: https://doi.org/10.3389/fevo.2024.1487911.

[24] Sky Island Alliance. (Accessed 2025). Partnerships for Sustainable Ranches in Sonora: Naturalia and Rancho Los Fresnos. Accessible: https://skyislandalliance.org/people/partnerships-for-sustainable-ranches-in-sonora/.

[25] Audubon Society. (accessed 2025). San Pedro River, Wester Rivers Action Network. Audubon Southwest. Accessible: https://southwest.audubon.org/conservation/san-pedro-river.

[26] Bowers, J.E., & McLaughlin, S.P. (1996). Flora of the Huachuca Mountains, a Botanically Rich and Historically Significant Sky Island in Cochise County, Arizona Author(s): Janice E. Bowers and Steven P. McLaughlin. Journal of the Arizona-Nevada Academy of Science, Vol. 29, No. 2, pp. 66- 107 Published by: Arizona-Nevada Academy of Sciences. Accessible: http://www.jstor.org/stable/40024176.

[27] U.S. Army Intelligence Center and Fort Huachuca. (2001). *Fort Huachuca Integrated Natural Resources Management Plan and Environmental Assessment: Appendix M – Programmatic Biological Assessment*. Environmental and Natural Resources Division, Directorate of Installation Support, Fort Huachuca, Arizona. Accessible: https://19january2021snapshot.epa.gov/sites/static/files/documents/AppendixM.pdf

[28] Sanchez-Escalante, J. Jesus; Avila-Jimenez, Denise Z.; Delgado-Zamora, David A.; Armenta-Cota, Liliana; Van Devender, Thomas R.; Reina-Guerrero, Ana Lilia. (2013). Vascular plants diversity of El Aribabi Conservation Ranch: A private natural protected area in northern Sonora, Mexico. In: Brooke S.; Eskew, Lane G.; Collins, Loa C., comps. Merging science and management in a rapidly changing world: Biodiversity and management of the Madrean Archipelago III and 7th Conference on Research and Resource Management in the Southwestern Deserts; 2012 May 1-5; Tucson, AZ. Proceedings. RMRS-P-67. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. A8-A12.

[29] Rorabaugh JC, Schipper J, Avila-Villegas S, Lamberton-Moreno JA, Flood T. (2020). Ecology of an ocelot population at the northern edge of the species' distribution in northern Sonora, Mexico. PeerJ 8:e8414. Accessible: https://doi.org/10.7717/peerj.8414.

[30] Northern Jaguar Project, "Northern Jaguar Reserve," Northern Jaguar Project, accessed March 26, 2025, https://www.northernjaguarproject.org/northern-jaguar-reserve/.

[31] Wildlands Network. (August 4, 2022). Arizona Jaguar "El Jefe" Reappears in Central Sonora. https://www.wildlandsnetwork.org/news/arizona-jaguar-central-sonora

**MCKINNON DECLARATION**

**EXHIBIT 4**

Nina Lakhani, *More than 100 wild animals trapped by border wall killed in Texas wildfire*, The Guardian (Jan. 11, 2024).

**US-Mexico border**

● This article is more than **2 years old**

# More than 100 wild animals trapped by border wall killed in Texas wildfire

## US Fish and Wildlife Service memos reveal officials found scores of dead animals along a mile-long stretch last of the wall last August



📷 A fire truck makes its way up a levee on 11 August 2023 in Texas where a wildfire consumed approximately 1,000 acres the day before. Photograph: Courtesy Delcia Lopez / The Monitor

**Nina Lakhani**

Thu 11 Jan 2024 06.00 EST

G  Prefer the Guardian on Google

More than a 100 wild animals including frogs, shrews and snakes were killed in a wildfire in Texas last summer, after becoming trapped behind the concrete border wall.

APX-V1-062

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 63 of 359

Internal US Fish and Wildlife Service (FWS) memos obtained by an environmental group reveal that government scientists found scores of burned animals against a mile-long stretch of the border wall last August, after a wildfire in the Lower Rio Grande Valley national wildlife refuge, a federally protected area.

According to the email from one biologist who visited the area in the aftermath, the concrete border wall "impeded the escape of wildlife from the fire" – which swept through the long grass, rapidly scorching about 1,500 acres thanks to high winds and dry conditions.

"… This is a good reminder of the impact the border wall can have on wildlife movement, especially in emergency situations like this."

"[Fires are] just another thing to assess for impacts to wildlife from the border fence; just like flooding, some wildlife cannot escape," wrote another FWS biologist.

Among the animals killed in the fire were 100 frogs, most likely native Rio Grande leopard frogs, six cane toads, two shrews, six tarantula spiders, a yellow-billed cuckoo, a groove-billed ani cuckoo and a dozen snakes including Mexican racers, checkered garters and Texas patch-nosed serpents. The dead birds were most likely trying to outpace the grass fire when they hit the wall and did not have time to fly 30ft up in the air.



📷 A groove-billed ani. Photograph: Kevin Elsby/Alamy

APX-V1-063

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 64 of 359

"This horrifying account of animals being burnt alive while trapped by the border wall is just the latest proof that border barriers are deathtraps for wildlife … We are fearful that this will only become a more common story as climate change progresses," said Laiken Jordahl, south-west conservation advocate with the Center for Biological Diversity, who obtained the FWS memos.

The FWS declined to comment.

About 40% of the entire 1,950-mile-long US-Mexico border is now fenced off, thanks mostly to construction during the Bush and Trump administrations. This includes almost 650 miles of pedestrian fencing, steel and concrete barriers impossible for most animals to cross. Biden has continued building new sections despite a campaign promise to halt all wall construction.

The Texas wildfire deaths took place at a Bush-era section of the concrete pedestrian fencing, built at the edge of the floodplain along existing earthen levees – human-made structures that wildlife were able to cross unimpeded. Some reports suggested that the wall may have helped contain the fire.

---

✉ Free newsletter | Every weekday

## Sign up to First Thing

Our US morning briefing breaks down the key stories of the day, telling you what's happening and why it matters

👁 **Preview latest**

**Enter your email**

| | |
|---|---|
| | **Sign up** |

In order to fast-track construction of the wall, consecutive governments have waived more than 20 laws designed to protect flora and fauna such as the Endangered Species Act, the Wildlife Refuge System Administration Act and the National Environmental Policy Act. As a result, there is little research into the effects of the 30-ft tall barriers on threatened and endangered species, or on the risks posed by fires and floods.

But environmentalists have long warned that the border wall poses a serious threat as it impedes wildlife from accessing food, water, shelter, mates – and safety. In 2009, hundreds of tortoise shells were found in the Rio Grande

APX-V1-064

Case 3:26-cv-01099-KC   Document 19-2   Filed 07/17/26   Page 65 of 359

after major floods, and the FWS suspected that other trapped animals including ocelots and jaguarundi may have also died.

Now, the climate crisis is exacerbating the risks as extreme weather events such as floods, fire and drought increasingly batter the entire US – including the southern border.

Customs and Border Protection (CBP) has created a few dozen small wildlife openings in the newer bollard wall in parts of Arizona, but nowhere along the concrete levee sections along the river, where the animals perished last August. Some additional wildlife openings are to be installed, under terms of a settlement in a long-running lawsuit over how the Trump administration paid for wall construction.

The CBP did not respond to request for comment.

APX-V1-065

## Most viewed

APX-V1-066

**MCKINNON DECLARATION**

**EXHIBIT 5**

True and correct copies of representative information the Center for Biological Diversity has shared about border wall industrialization in the Big Bend region with the public through its social media accounts and website



## NO BORDER WALL

# NO BORDER WALL

Walls built along the U.S.-Mexico border over the past several decades are a blight on the landscapes and cultures of the borderlands. Hundreds of miles of wall have been built across protected public lands, communities, and sovereign Tribal nations.

These barriers cut through sensitive ecosystems, destroy thousands of acres of habitat, cause catastrophic flooding, separate families, and impede the cross-border migration of dozens of animal species — including endangered jaguars and ocelots, plus Sonoran pronghorns, bighorn sheep, black bears, and mountain lions.

The Center's landmark 2017 report *A Wall in the Wild* found that wall construction and related infrastructure threaten 93 federally protected and candidate species. Our 2023 report *A Wall of Lights Through the Wild* showed that some 1,800 stadium lights along the border, if turned on, would cause severe light pollution impacting conservation lands, animal migration routes, and wildlife, including more than a dozen endangered species. We also have a 2025 report exposing how the Trump administration's plans for new border wall construction in Arizona pose dire and immediate threats to one of the last remaining jaguar corridors between the United States and Mexico.

All in all, the border wall is a tragedy for the region's diverse wildlife and people, as well as its rugged and spectacular landscapes. We're fighting in the courts, in Congress, and in our communities to repair the damage done by this cynical attack on our beautiful borderlands.

We won't stop fighting until the wall is torn down.



**Jaguars vs. the Border Wall**
Center for Biological Diversity



                                                                    Watch on

APX-V1-068

## OUR CAMPAIGN

With headquarters near the border in Tucson, Arizona, the Center has worked to preserve and protect the remote beauty and rich biodiversity of our borderlands for decades. We've been fighting against border militarization — including the wall — since the late 1990s, using litigation to block unlawful policy; grassroots lobbying to stop legislation that would worsen environmental damage; and creative-media and public-education campaigns to get out the truth about the real impacts of the hugely expensive, ineffective, and environmentally devastating border wall.

We were the first organization to sue the Trump administration over the border wall. Under the first administration we sued to challenge its construction in Organ Pipe Cactus National Monument, the San Pedro River, the Cabeza Prieta National Wildlife Refuge, the Rio Grande Valley, and near the Santa Teresa Port of Entry in New Mexico. In our work to mobilize resistance and unite with communities to fight wall construction across the borderlands, we also organized protest actions in all those areas.

We partnered with the Tohono O'odham Tribe in Mexico to file an endangerment petition for El Pinacate and Gran Desierto Biosphere Reserve, just south of the border in the Mexican state of Sonora. A wall built in that area blocks the cross-border migration of endangered Sonoran pronghorn and restricts access for the Tohono O'odham people, who travel across the border regularly for traditional and ceremonial purposes.

In 2022 the Center filed two legal challenges against Arizona Gov. Doug Ducey's illegal shipping-container wall in Yuma and across the Coronado National Forest along the southern slopes of the Huachuca Mountains, blocking a crucial migration corridor for jaguars and ocelots. We camped for weeks in the snow with our allies to successfully halt a wall of double-stacked shipping containers through Coronado National Forest and ensured Ducey's wall of junk was permanently removed from the Forest.

And now we're fighting the second Trump administration's plans for new wall construction. We sued after the U.S. Department of Homeland Security unconstitutionally waived dozens of environmental laws to speed wall construction through Arizona's San Rafael Valley, a biodiversity hotspot that includes the most significant wildlife corridor remaining along the Arizona-Mexico border. Using the same playbook, the department then waived laws to fast-track wall construction through the Big Bend region of Texas, exercising powers Congress never authorized — so we sued again in 2026.

*Check out our press releases to learn about all our actions against the border wall.*

## BACKGROUND ON THE BORDERLANDS

Joining the United States and Mexico, our borderlands to the south make up one of the biggest ecosystem complexes in North America, with some of the least populated areas and most important wildlife habitats remaining on the continent. The region is host to a diverse array of threatened, endangered and rare species — including Sonoran pronghorns, lesser long-nosed bats, Quino checkerspot butterflies, cactus ferruginous pygmy owls , and larger predators like jaguars, Mexican gray wolves, and ocelots — and it contains millions of acres of public lands, such as Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, Big Bend National Park, Coronado National Forest and Buenos Aires National Wildlife Refuge.

In the mid-1990s the U.S. government launched a strategy of militarization in the U.S.-Mexico borderlands that continues to this day. First the areas around ports of entry in El Paso, San Diego, and other urban areas along the border were hardened and walls were erected using solid steel panels from Vietnam War–era landing mats. This had the predictable effect of forcing undocumented migrants out into more remote areas to cross the border, where many died in the harsh, arid conditions. More than 10,000 people have died crossing the border over the past 20 years. Documents show that migrant deaths were a foreseen consequence of a deliberate deterrent strategy to increase the difficulty and dangers of crossing the border.

The strategy of pushing migrant traffic into wild areas did *not* work to stem the flow of undocumented immigration — but it did vastly increase the amount of environmental damage the process was causing, as both the flow of migrants and the resulting border-law-enforcement activities were pushed into formerly untrammeled sites.

Thousands of Border Patrol agents began driving offroad in remote areas, creating thousands of miles of new roads in designated wilderness and critical habitats for endangered species. As detailed in the Center's *A Wall in the Wild* report, more than 2 million acres of designated critical habitat exist within 50 miles of the border and are in danger of being degraded and destroyed by wall construction and related enforcement activities.

In 2005 the U.S. Congress passed the REAL ID Act, containing a clause that granted the secretary of Homeland Security the authority to waive any and all laws with regard to constructing walls and roads along the border. More than 50 environmental, public-health and Tribal-sovereignty laws have since been ignored using this authority, resulting in the construction of hundreds of miles of additional border barriers and roads with no environmental review. The administration has used this authority dozens of times to rush border-wall construction.

The results of these waivers have been predictable. Without the thorough analysis of environmental impacts normally required by law, new border infrastructure has been constructed in ill-advised locations with poor engineering — resulting in massive flooding, erosion, and millions of dollars of damage to both private property and public lands.

APX-V1-069

Get the latest on our work for biodiversity and learn how to help in our free weekly e-newsletter.

| Enter Your Email | Join now |

## DONATE NOW

**Your support is key in our work protecting species and their habitat.**

$15    $50    Other

---

**SPREAD THE WORD:** Make sure your anti-wall posts on social media include the hashtag #NoBorderWall.

---

### Help Overhaul This Shady Pesticide-Spraying Program



TAKE ACTION

---

**RELATED CAMPAIGNS**
Sonoran Desert
Mojave Desert
Borderlands and Boundary Waters
Sky Islands Conservation
International Program

**SPECIES**
Jaguar
Mexican gray wolf
Ocelot
Mexican spotted owl
Mexican bobcat
Quino checkerspot butterfly
Chiricahua leopard frog
Cactus ferruginous pygmy owl
Southwestern willow flycatcher
Desert pupfish
Desert kit fox

**MEDIA**
Press releases
Search our newsroom

**DOCUMENTS AND PUBLICATIONS**
• 2025 report: *Destruction of a Jaguar Corridor*
• 2023 report: *A Wall of Lights Through the Wild*
• 2017 report: *A Wall in the Wild*

*Questions? Email us.*

APX-V1-070

Ocelot by Robin Silver/Center for Biological Diversity.



DONATE NOW / TAKE ACTION / JOIN US / CONTACT US / PRIVACY POLICY

The Center for Biological Diversity is a 501(c)(3) registered charitable organization. Your donation is tax deductible. Tax ID: 27-3943866.

APX-V1-071

 **facebook**

Log In

## Center for Biological Diversity's Post ✕

 **Center for Biological Diversity**
June 9 · 🌐

Yesterday the Department of Homeland Security waived dozens of environmental laws to speed construction of border barriers and roads through Big Bend National Park and Big Bend Ranch State Park.

This move marks the first time in American history that the federal government has cast aside a broad slate of environmental laws — including the National Park Service Organic Act, Endangered Species Act and National Wild and Scenic Rivers Act — in a national park.

New barriers, associated infrastructure and patrol roads through this region would damage roadless canyon country, impede river access, fragment wildlife habitat and flood one of America's darkest night skies with artificial light.

Here's how you can help right now: Call your Congressional representatives and urge them to protect Big Bend by stripping away federal funding from being used to build border walls in the region.

Call the Capitol switchboard at 202-224-3121 to get connected to your legislators.

**BREAKING / NEWS**

Trump Administration just waived dozens of environmental laws to speed construction of border barriers and roads through Big Bend National Park.

*The only people benefiting from this destruction are the billionaire contractors set to pad their pockets while paving over our natural heritage and **permanently locking a great American river** behind hideous steel barriers.*

***We won't stop fighting** for this crown-jewel national park and the Rio Grande.*

**–Laiken Jordahl**
**National Public Lands Advocate**

**TAKE ACTION**

Call your Congressional representatives and urge them to **protect Big Bend by stripping away federal funding** from being used to build border walls in the region.

Call the Capitol switchboard at **202-224-3121** to get connected to your representatives.

😡👍😢 593

48 comments   356 shares

APX-V1-072

Case 3:26-cv-01099-KC   Document 19-2 - Filed 07/17/26   Page 73 of 359

facebook                                                                                                  Log In

APX-V1-073

facebook

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 74 of 359

**facebook**                                                                    Log In

## Center for Biological Diversity's Post                                    ✕



**Center for Biological Diversity**
March 16 · 🌐

The Trump administration is pushing to wall off Big Bend National Park, a crown jewel of America's national heritage.

The 517-mile Big Bend Sector is only a tiny slice of that vast, remote border between the United States and Mexico. Yet the Department of Homeland Security is rapidly moving forward with plans to wall off virtually every river access point to Big Bend National Park.

This would wall off wildlife from their only water source, the Rio Grande. It would plow through cultural sites and lock the river behind a wall of steel.

Last week, the Center joind more than 130 conservation groups, outfitters and rural Texas businesses to urge Congress to block federal funding for border wall construction in Big Bend National Park and Big Bend Ranch State Park.

Big Bend is worth fighting for and we're just getting started.

How you can help: Use the Capitol switchboard at 202-224-3121 to call your Congressional representatives and urge them to protect Big Bend.

We've been fighting against the border wall for years. Learn more  https://bit.ly/4sM0LgX



👍😡😢 519                                              29 comments    191 shares

APX-V1-074

Case 3:26-cv-01099-KC Document 19-2 - Filed 07/17/26 Page 75 of 359

facebook

APX-V1-075

















**MCKINNON DECLARATION**

**EXHIBIT 6**

Select publicly available articles concerning proposed border wall construction and related infrastructure in the Big Bend region that quote, cite, or otherwise feature interviews and commentary from representatives of the Center for Biological Diversity

Case 3:26-cv-01099-KC   Document 19-2   Filed 07/17/26   Page 85 of 359

## Texas

🕐 This article is more than **1 month old**

# 'It's massive destruction': outcry in Texas over waivers to allow border wall in Big Bend national park

Despite plunging border crossings, the Trump administration is circumventing laws to expedite building in a vast, pristine wilderness



📷 The Rio Grande, in the Santa Elena canyon on 11 April 2026 in Big Bend national park, Texas. Photograph: John Moore/Getty Images

## Roque Planas

Fri 12 Jun 2026 10.00 EDT

🔵 Prefer the Guardian on Google

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 86 of 359

Τhe Trump administration has waived a slew of environmental and historical preservation laws that would allow it to build a towering border wall that cuts through Big Bend national park, a vast protected wilderness in south Texas.

Congress poured a whopping $46.5bn for border wall construction into the "Big, Beautiful" bill last year, supercharging Donald Trump's ambition to wall off the southern border with Mexico. The longest unwalled stretches lie along a roughly 500-mile (800km) section of west Texas that Customs and Border Protection calls the "Big Bend sector".

That corridor includes some of the largest chunks of protected land in a state that is 95% privately owned, including Big Bend national park, Big Bend Ranch state park and Black Gap wildlife management area.

The prospect of marring those landscapes in the name of border security at a time of plummeting unauthorized immigrant crossings has drawn fierce backlash from a bipartisan group of local leaders and protest from public land users. The notion of walling off Big Bend national park has sparked the most fury. The 800,000-acre (325,000-hectare) expanse of Chihuahuan desert punctuated by the Chisos mountain range draws half a million visitors annually to hike, camp, stargaze and float the Rio Grande.

For months, CBP has sent mixed signals about its intentions for Big Bend national park, while limiting its comments about its plans to vague and infrequent statements. CBP updated an interactive map on its website in February to indicate that the agency planned to erect a steel bollard wall along the park's river frontage, sparking an outcry from public land advocates, local business owners and elected officials.

APX-V1-086

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 87 of 359



📷 A spring thunderstorm on the Rio Grande, which cuts through Santa Elena canyon, on 11 April 2026 in Big Bend national park. Photograph: John Moore/Getty Images

CBP later changed the map to show that it only intended to use detection technology along the length of the park's border. The current iteration shows that the agency plans to build new roads along the length of the park's southern border, along with four separate 4-6ft-tall barriers intended to stop incoming vehicles. CBP officials have rarely discussed their plans for the wall publicly.

The park's advocates worry that an opaque agency with a huge war chest could still wreak severe damage on the most beloved park in Texas. The waiver that the Department of Homeland Security (DHS) published on Tuesday in the Federal Register empowers CBP to build seemingly whatever security infrastructure it wants in the park – from 30ft steel bollard fencing to unpaved roads.

The waiver casts aside protections outlined in major laws including the National Environmental Policy Act, the Endangered Species Act, the Clean Water Act, the Native American Graves Protection and Repatriation Act and many others. The Big Bend area is home to several endangered species, a struggling population of bighorn sheep and a large concentration of Native rock art and petroglyphs.

APX-V1-087

Case 3:26-cv-01099-KC   Document 19-2   Filed 07/17/26   Page 88 of 359

The US representative Lloyd Doggett, a Texas Democrat, criticised the move as ludicrous in a region where illegal border crossings are already rare. "Billions of taxpayer dollars are being wasted on this unnecessary project, as Big Bend's rugged mountains make illegal crossings nearly impossible, with crossings in the area accounting for under half a percentage point of all illegal border crossings nationwide last year," Doggett said in a statement.

## Vehicle barriers and surveillance

The only infrastructure project formally proposed within the park itself so far is a 17-mile, non-contiguous "vehicle barrier system" in four separate locations, composed of steel rails and posts measuring 4-6ft tall, along with 205 miles of roads up to 24ft wide equipped with detection technology. The project also envisions the erection of utility poles, lighting and surveillance cameras. Two of the proposed vehicle barriers are located in the middle of the park's river frontage, along with one on each end.

The vehicle barriers are enough to dramatically alter an otherwise wild landscape, according to Bob Krumenaker, former Big Bend national park superintendent.

"It's massive impact, massive destruction," said Krumenaker, who now heads a non-partisan advocacy group called Keep Big Bend Wild. "You're looking at some of the most remote parts of a remote national park."

The DHS has signed off on border wall-related waivers for other federally protected lands in the past, including Organ Pipe Cactus national monument, Buenos Aires national wildlife refuge and Coronado national memorial, all in Arizona. But Tuesday's waivers marks the first time the agency has used that authority to install border security infrastructure in a national park, Krumenaker said.

APX-V1-088

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 89 of 359



📷 Big Bend national park, 2015. Photograph: Inge Johnsson/Alamy

Like many other public land advocates, Krumenaker is concerned that CBP's infrastructure development won't stop with the vehicle barriers. Though he viewed a 30ft steel bollard wall as an unlikely "worst-case scenario", the waiver's broad authority makes it possible for the agency to add virtually any security infrastructure it wants in an area prized for its scenic beauty and wildness.

"Waiving the law undermines all credibility and makes them completely unaccountable to anyone," Krumenaker said. "They don't care about the impact on the environment. If they have, say, a fuel spill, they're not subject to any laws – they've just waived the Clean Water Act and the Clean Air Act.

"Their words, whether intended to be truthful or not, mean nothing," he added.

In a statement, a CBP spokesperson said its border security infrastructure plans in "the areas adjacent to the Big Bend National Park and State Park are still in the planning stages, while CBP focuses on other higher priority locations".

"CBP continues to coordinate with the National Park Service, Texas Parks and Wildlife Department, and other federal and state agencies, throughout

APX-V1-089

Case 3:26-cv-01099-KC   Document 19-2   Filed 07/17/26   Page 90 of 359

the planning of border barrier and technology deployments, in order to achieve Border Patrol's operational priorities," the statement said.

## Border crossings remain low

The Big Bend sector of west Texas contains some of the longest stretch of terrain on the US-Mexico border that remain untouched by significant border wall and fencing. It is also one of the most remote, with steep cliffs and vast stretches of Chihuahuan desert on both sides of the border that make it unattractive as a crossing point.

DHS justified the waiver as an emergency measure necessary to contain illegal crossings in the area. But the area was always among the least-trafficked corridors of the southern border, and unauthorized immigrant crossings have plummeted since Trump retook office in 2025. His administration has largely dismantled humanitarian protections that allowed some immigrants to gain entrance to the United States, while the Republican-backed Congress has heaped tens of billions of new dollars into border security and mass deportation.

Within Big Bend national park itself, border patrol made only 100 arrests in 2023, and 125 in 2024, according to data obtained by Krumenaker and shared with Public Domain. Those numbers probably continued to drop last year, after Trump took office and unauthorized crossings plummeted.



APX-V1-090

📷 Local residents stage a weekly protest against proposed border wall construction, on 11 April in Terlingua, Texas. Photograph: John Moore/Getty Images

The CBP commissioner, Rodney Scott, told the Washington Examiner last month that it would be "kind of silly to put like a 30-foot border wall on top of a 90-foot granite cliff".

Big Bend national park's scenic Santa Elena canyon cliffs, which are composed of limestone, in fact reach heights of 1,500ft.

Democrats in Congress have attempted to block the DHS from using its funds from the "Big, Beautiful" bill to build barriers through Big Bend national park. But the measure, proposed by the Texas representative Henry Cuellar, failed in an appropriations committee vote on Tuesday in the face of Republican opposition, according to the Texas Tribune.

The waiver has already prompted a legal challenge. The Friends of the Ruidosa Church, river guide Billy Miller and the Center for Biological Diversity updated an existing lawsuit on Thursday that challenges DHS border wall-related waivers of environmental laws in the Big Bend sector, arguing that they violate due process and other constitutional rights

"This is an attack on the integrity of the National Park Service itself," said Laiken Jordahl, a national public lands advocate with the Center for Biological Diversity. "They have never waived these laws on a national park itself. If they're willing to do this in a national park, where virtually no one is crossing the border, where won't they?"

The story is co-published with Public Domain, an investigative newsroom co-founded by Roque Planas that covers public lands, wildlife and government

APX-V1-091

7/16/26, 9:47 AM

It's massive destruction': outcry in Texas over waivers to allow border wall in Big Bend national park | Texas | The Guardian

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 92 of 359

# Most viewed

News          World Cup          Business          Sports          High School Sports          Politics          Entertainment          Food          Things to D

**BREAKING**

## Months after Comerica acquisition, Fifth Third lays off more than 100 workers

**Trending:**   Hill Country flood wave  |  Trump's national address  |  'Landman' pay raises  |  Karmelo Anthony  |  World Cup grass  |

**NEWS // IMMIGRATION**

# Plans for steel barriers, roads in Texas' Big Bend National Park draw fury

The Trump administration is moving forward with a project for steel barriers and roads after abandoning plans for a border wall.

By **Sarah Bahari**, *Staff Writer*

☰   The Dallas Morning News                                SUMMER SALE: ONLY 25¢          **Sign in**

**Summer Sale! Stay connected wherever summer takes you with digital access.**

ONLY 25¢



Trump administration plans to build steel barriers like this in Texas' Big Bend National Park.
U.S. Customs and Border Protection

🎧 Listen Now:
Plans for steel barriers, roads in Texas' Big Bend National Park draws fury
About 4 Minutes

1x   ⤳

ılıl Everlit

The Trump administration plans to build steel barriers in Texas' Big Bend National Park, infuriating park advocates and lawmakers who say the project will devastate the park.

Dallas to get $211 million from DART as part of bid to save transit agency     READ MORE



In a public letter Thursday, U.S. Customs and Border Protection detailed the plans for 17 miles of barriers and patrol roads to prevent off-road vehicles from crossing the border. The barriers, spaced 4 feet apart, will each rise 4 to 6 feet tall and be supported by a continuous cross beam.

Get Digital Access and Stay Informed With Trusted Local News.

ONLY 25¢

A spokesperson for the agency confirmed the plans for the barriers to *The Dallas Morning News*.

**ADVERTISEMENT**
Article continues below this ad

An additional 205 miles of the U.S. Southern border will be outfitted with surveillance technology that could include lights, cameras and sensors, according to the letter.

In a letter filed in the Federal Register, Homeland Security Secretary Markwayne Mullin wrote there is "an acute and immediate need to construct physical barriers and roads" to prevent illegal entry into the United States.

To expedite construction, the homeland security department waived 28 laws and regulations meant to protect clean air and water, migratory birds, endangered species and Native American gravesites, according to the filing in the register.

The administration for now appears to have scrapped a separate project to build a 30-foot border wall in the park following a bipartisan outcry, but park supporters assailed plans for barriers and roads.



The Chisos Mountains rise from the Chihuahuan Desert floor at Big Bend National Park.
Dan Leeth/Special Contributor

Seven former park leaders told the Trump administration in a letter last month that barriers and roads would "irreparably damage" the park's "plants, animals and iconic desert beauty."

"The landscape would be altered forever for minimal improvements to security, if any," the former superintendents wrote.

The Center for Biological Diversity, a nonprofit conservation group, accused the administration of "militarizing the border" and said installation of barriers and roads would harm campgrounds, hiking trails, scenic overlooks and river access points.

"These horrific plans are an affront to the millions of Americans who treasure Big Bend," said Laiken Jordahl, national public lands advocate for the center. "Politicians who've never set foot here are signing a death warrant for this wild and beautiful place."

**Related: Plans to build border wall in Texas' Big Bend National Park sparks outrage**

In May, the homeland security department awarded a $1.7 billion contract for border work through the Big Bend region, which includes the barriers.

U.S. Rep. Henry Cuellar, a Laredo Democrat, tried this week to block the construction of barriers in the park, but the bill died along party lines in the House Appropriations Committee.

Big Bend sees fewer border crossings compared with other parts of Texas because of its harsh desert climate and rugged terrain. In fiscal year 2025, the 517-mile Big Bend Sector recorded 3,096 apprehensions of migrants, accounting for 1.3% of the total 237,538 apprehensions across the entire U.S.-Mexico border, according to Customs and Border protection data.

One of the country's largest and most remote national parks, Big Bend is home to the Chisos Mountains and Chihuahuan Desert and is considered to have some of the darkest skies in the continental U.S. The park spans more than 800,000 acres, making it larger than the state of Rhode Island. Roughly 568,000 people visited the park in 2025.

President Donald Trump made building a wall along the U.S.-Mexico border a centerpiece of his first term. His second term shifted to sweeping mass deportations and arrests, but Congress last year allocated $46 million to complete a wall.

Customs and Border Protection is accepting public comments on the plan for barriers and roads through July 13. To comment, email BigBendComments@cbp.dhs.gov and include "Brewster County Vehicle Barrier System Construction" in the subject line.

**Related: Water shortage threatens shutdown in Texas' Big Bend National Park**

June 11, 2026

**Sarah Bahari**
**TRENDING REPORTER**

Sarah Bahari is a trending news reporter. She previously worked as a writer for the Fort Worth Star-Telegram, where she covered a bit of everything. She is a graduate of Kansas State University.

**See more on:**

( Donald Trump )  ( Environment )  ( Texas )

APX-V1-098

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 99 of 359

MAY 27, 10:00 AM

# What the Trump administration is building in Big Bend

 Arfie Ghedi

**LISTEN**



BIG BEND NATIONAL PARK, TEXAS — APRIL 11: From an aerial view, the Rio Grande flows through the Santa Elena Canon on April 11, 2026 in Big Bend National Park, Texas. In between 1,500 foot cliffs, the U.S.-Mexico border is demarcated in the center of the river (Mexico on L). Trump Administration plans to extend the U.S.-Mexico border wall into the region have sparked rare bi-partisan unity among Texans against construction through one of the most rugged and pristine parts of the United States. Critics of the construction say there is no need for a wall there, citing the low number of immigrants who attempt to cross through the forbidding terrain, even before current historic lows. (Photo by John Moore/Getty Images)

Is the Trump administration building a segment of the border wall in Big Bend National Park? That's the question that's at the heart of a public debate in West Texas right now. The Department of Homeland Security says no, after scoring billions of dollars in federal contracts for construction in the Big Bend region. One contract won by a New

APX-V1-099

Mexico–based contractor is worth $1.7 billion, for a project labelled "border wall" on the federal spending database.

The Department of Homeland Security has also waived a series of environmental protections to begin construction in the Big Bend region. So far, none of those waivers applies to the national park itself. Community members in the region have been speaking out against any kind of construction in Big Bend.

What do we know about what's being built in the Big Bend region? What impact could increased border security have on one of the largest expanses of protected land in the country? We take a look, in the latest in 1A's "Local Spotlight" series.

**Customs and Border Protection sent us a statement about the $1.7 billion award:**

> *On May 11, 2026, CBP awarded a contract for the Big Bend 4 Wall Project to Southwest Valley Constructors Co. for $1,720,040,000 to construct approximately 17 miles of vehicle barrier system (vehicle barrier, patrol roads and technology) and an additional approximately 205 miles of system attributes, which will include a mix of patrol roads and/or technology, depending upon the location. This project is located within the U.S. Border Patrol's Big Bend Sector in the Alpine Area of Responsibility in Texas. It does not involve the construction of a 30-foot-high barrier in Big Bend National Park, Big Bend Ranch State Park or the Black Gap Wildlife Management Area. Instead, it utilizes technology like cameras and sensors, along with limited, low-profile, post-on-rail barriers in strategic areas designed to restrict vehicle access while leveraging the natural barriers that already exist in the area.*

## GUESTS

### Travis Bubenik  𝕏
news director, Marfa Public Radio

### Laiken Jordahl
National Public Lands Advocate, Center for Biological Diversity

### Sam Karas
reporter, The Big Bend Sentinel

We depend on your support...          DONATE

## TRANSCRIPT    expand ⌄

APX-V1-100

Science    Politics    Justice & Health    Fossil Fuels    Clean Energy    ≡

# Inside Climate News

Donate

TRUMP 2.0: The Reckoning

**Justice & Health**

# Feds Seek Access to Three Texas State Parks for Border Wall

In February, the Border Patrol requested access to Big Bend Ranch, Seminole Canyon and Bentsen-Rio Grande Valley State Parks. The access request included 14 parcels in Big Bend Ranch as first steps in a discussion of easement rights, leasing or purchasing the property.

 By Martha Pskowski  𝕏
April 2, 2026

## Share This Article

      Republish

## Inside Climate News

Donate

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 102 of 359



The Border Patrol has requested access to parcels in Big Bend Ranch State Park, the largest in the Texas state park system, for border wall construction. Credit: Martha Pskowski/Inside Climate News

Federal officials have already traced a path for a border barrier through multiple Texas state parks, according to documents obtained by Inside Climate News.

A top Border Patrol official wrote to leaders of the Texas Parks & Wildlife Department (TPWD) on March 6, assuring them that border wall construction at state parks and Big Bend National Park was "on hold."

# Inside Climate News

Donate

prior, those documents show. Letters sent by the Border Patrol to TPWD included detailed maps of where the border barrier would go within Big Bend Ranch, Seminole Canyon and Bentsen-Rio Grande Valley State Parks.

APX-V1-102

The documents, obtained under the Texas Public Information Act, show that Border Patrol is targeting an area in Seminole Canyon that could restrict access to ancient rock art on the Rio Grande. In Big Bend Ranch State Park, the maps show the barrier project near the Grassy Banks campground and Contrabando Canyon.

## Newsletters

We deliver climate news to your inbox like nobody else. Every day or once a week, our original stories and digest of the web's top headlines deliver the full story, for free.



### ICN Weekly
**Saturdays**

Our #1 newsletter delivers the week's climate and energy news — our original stories and top headlines from around the web.

☐ Get ICN Weekly



### Inside Clean Energy
**Thursdays**

Dan Gearino's habit-forming weekly take on how to understand the energy transformation reshaping our world.

☐ Get Inside Clean Energy



### Today's
Tues

A once-a-week d pressing climat written by Kiley P every T

☐ Get Today's

Paul Enriquez, the director of the Border Patrol's infrastructure portfolio, said in an email obtained through

# Inside Climate News

Donate

high-traffic areas. But he did not rule out construction at the state parks. He wrote that these areas will eventually be reviewed to determine whether to implement a "barrier, roads, and/or technology."

APX-V1-103

Public outcry has mounted since early February, when plans of a border wall through Big Bend became public. Customs and Border Protection (CBP) has since updated an online map to show "detection technology" in the Big Bend national and state parks instead of a physical barrier. But agency leadership in Washington, D.C., has not publicly stated that a wall is off the table. Facing mixed messages from federal sources, Big Bend residents and outdoors enthusiasts remain on high alert. A protest against the border wall in Big Bend is planned outside the Texas state capitol on Saturday, April 4.

"None of these comments are binding in any way. They are just statements," said Laiken Jordahl, a national public lands advocate with the nonprofit Center for Biological Diversity. "They could show up with bulldozers and dynamite trucks and start building in the state park tomorrow. And nothing could stop them."

TPWD referred questions about the border wall to CBP. The federal agency did not provide responses to questions about the requests for access to state parks.

Records also indicate that the Border Patrol has offered to buy a parcel in the Kisadee Unit of Las Palomas Wildlife Management Unit in the Rio Grande Valley from the state.

### "News to Me"

The first Border Patrol letter to TPWD went out on Feb. 13

# Inside Climate News                                    Donate

Palomas Wildlife Management Area. Congressional carveouts previously protected the state park from the border wall, but those protections were not renewed in last year's One Big Beautiful Bill.

APX-V1-104

TPWD executive director David Yoskowitz wrote back to Border Patrol on Feb. 23 asking for more information and saying the agency would execute a "Right of Entry Agreement" for the parcels to expedite access for "surveys, site assessments or appraisals."

Border Patrol sent the next letter to TPWD headquarters on Feb. 20 identifying 14 parcels within Big Bend Ranch State Park that could be in the path of border barrier construction. The letter was an "initial notification" to discuss easement rights, and leasing or purchasing the property.



The Rio Grande separates Big Bend Ranch State Park from Mexico. Credit:

# Inside Climate News

Donate

construction," or the state could negotiate a purchase or easement agreement. Failing those options, CBP would request the Department of Justice take the property through eminent domain.

APX-V1-105

7/16/26, 9:54 AM
Feds Seek Access to Three Texas State Parks for Border Wall - Inside Climate News
Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 106 of 359

Big Bend Ranch is the largest state park in Texas. Federal environmental laws have already been waived to expedite border wall construction along a section of the Rio Grande in the park that is popular for rafting trips.

FM 170, also known as River Road, follows the river from Presidio to Lajitas through the state park. With its commanding views of the remote canyonlands, it is considered one of the most scenic drives in Texas. A border wall would limit access and transform the views this park is known for. Maps included in the letter shows CBP's "project area" for the border barrier would separate FM 170 from the Rio Grande.

## This story is funded by readers like you.

Our nonprofit newsroom provides award-winning climate coverage free of charge and advertising. We rely on donations from readers like you to keep going. Please donate now to support our work.

Donate Now

On Feb. 27, the Border Patrol wrote TPWD regarding two parcels in Seminole Canyon State Park in Val Verde County.

Ancient rock art is preserved in the canyon walls at Seminole

# Inside Climate News                                    Donate

the paintings were made over a 4,000-year period. The maps Border Patrol sent to TPWD show the border barrier project reaching the edge of Seminole Canyon and continuing on the other side. A barrier in this location would separate park

APX-V1-106

headquarters from the Panther Cave rock art along the Rio Grande.



Border Patrol has sought access for border wall construction in Seminole Canyon State Park in Val Verde County, Texas. Credit: Martha Pskowski/Inside Climate News

TPWD did not respond to questions about whether the agency has responded to the Border Patrol's requests for access at Big Bend Ranch State Park and Seminole Canyon State Park. CBP did not respond to questions about these attempts to access the parks.

# Inside Climate News                        Donate

social media.

A contractor with Keiwit, a construction company based in Omaha, emailed Big Bend Ranch State Park's superintendent

APX-V1-107

in January to discuss his bid for border wall construction. The superintendent forwarded the request up the chain of command.

"This is news to me as well," a deputy director in Austin replied.

"This is quite the surprise," wrote a program director.

Word spread during February and public pressure mounted. TPWD staff met with the Border Patrol on March 4, according to the email from Enriquez, the director of the Border Patrol's infrastructure portfolio. When he wrote that construction was on hold at state parks, the message was circulated among TPWD staff.

One staff member responded to the update in a Teams message: "That's great news!!!!"

A spokesperson for the Big Bend Border Patrol sector told Marfa Public Radio on March 23 there are not currently border wall construction plans in the state park.

But Jordahl, of the Center for Biological Diversity, is circumspect. He has spent the past week in the Big Bend region and observed surveyor's markings in several locations in the state park. He said residents are reporting seeing trucks belonging to contractors. He said won't take public statements from the Border Patrol seriously unless existing contracts are amended and the federal waivers rescinded.

"We know that the Department of Homeland Security wants

# Inside Climate News

Donate

possible."

He said TPWD's silence on the border wall has been "deafening."

Case 3:26-cv-01099-KC   Document 19-2   Filed 07/17/26   Page 109 of 359

"[TPWD] has one responsibility and that is to preserve Texas state parks for Texans, for future generations," he said. "They owe it to all of us to be actively opposing border wall construction through the state park."

## About This Story

Perhaps you noticed: This story, like all the news we publish, is free to read. That's because Inside Climate News is a 501c3 nonprofit organization. We do not charge a subscription fee, lock our news behind a paywall, or clutter our website with ads. We make our news on climate and the environment freely available to you and anyone who wants it.

That's not all. We also share our news for free with scores of other media organizations around the country. Many of them can't afford to do environmental journalism of their own. We've built bureaus from coast to coast to report local stories, collaborate with local newsrooms and co-publish articles so that this vital work is shared as widely as possible.

Two of us launched ICN in 2007. Six years later we earned a Pulitzer Prize for National Reporting, and

# Inside Climate News

Donate

complexity. We hold polluters accountable. We expose environmental injustice. We debunk misinformation. We scrutinize solutions and inspire action.

APX-V1-109

Case 3:26-cv-01099-KC   Document 19-2   Filed 07/17/26   Page 110 of 359

Donations from readers like you fund every aspect of what we do. If you don't already, will you support our ongoing work, our reporting on the biggest crisis facing our planet, and help us reach even more readers in more places?

Please take a moment to make a tax-deductible donation. Every one of them makes a difference.

Thank you,

David Sassoon
Founder and Publisher

Vernon Loeb
Executive Editor

☐ One-time

☐ Monthly

☐ $35

☐ $50

☐ $100

# Inside Climate News

Donate

Donate

## Share This Article

      Republish



### Martha Pskowski

**Reporter, El Paso, Texas**

Martha Pskowski covers climate change and the environment in Texas from her base in El Paso. She was previously an environmental reporter at the El Paso Times. She began her career as a freelance journalist in Mexico, reporting for outlets including The Guardian and Yale E360. Martha has a B.A. in Environmental Studies from Hampshire College and a master's degree in Journalism and Latin American Studies from New York University. She is a former Fulbright research fellow in Mexico. Martha can be reached on Signal at psskow.33.

 @psskow   ✉ martha.pskowski@insideclimatenews.org

## Newsletters

We deliver climate news to your inbox like nobody else. Every day or once a week, our original stories and digest of the web's top headlines deliver the full story, for free.

- ☐ **ICN Weekly**
- ☐ **Inside Clean Energy**

# Inside Climate News                                    Donate

- ☐ **Breaking News**
- ☐ **Inside Climate Podcast**
- ☐ **Justice & Health**

APX-V1-111

Email Address

☐  I agree to the terms of service and privacy policy.

Sign Up

---

**Related**



## Blasting Begins For Border Wall On Cherished New Mexico Mountain

By Martha Pskowski

**Inside Climate News**                    Donate

---

7/16/26, 9:54 AM
Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 113 of 359
Feds Seek Access to Three Texas State Parks for Border Wall - Inside Climate News



## Border Communities Remain in the Dark About Federal Government's Billion-Dollar Buoy Project

By Martha Pskowski

# Inside Climate News

Donate



## Razor Wire and Clearcutting at the Border Threaten Native Rio Grande Habitat

By Martha Pskowski

---

## Most Popular

# Inside Climate News

Donate

---



## A Key Forever Chemicals Lawsuit Settles Out of Court in North Carolina

By Lisa Sorg

# Inside Climate News

Donate

7/16/26, 9:54 AM
Case 3:26-cv-01099-KC   Document 19-2   Filed 07/17/26   Page 116 of 359
Feds Seek Access to Three Texas State Parks for Border Wall - Inside Climate News



## Europe Opens a New Front in the Mackerel Wars

By Johnny Sturgeon

# Inside Climate News

Donate

Case 3:26-cv-01099-KC    Document 19-2    Filed 07/17/26    Page 117 of 359



## The Case of the (France-Sized) Missing Antarctic Ice

Interview by Aynsley O'Neill, Living on Earth

**Justice & Health**

# Inside Climate News

Donate

Case 3:26-cv-01099-KC Document 19-2 Filed 07/17/26 Page 118 of 359



# A Shark-Feeding Ban Exposes a Deeper Fight Over Florida's Changing Seas

A federal bill would ban Florida shark dive operators from feeding sharks. Its sponsors say the ban is about safety. People who know the water, including fishers, doubt it would change much.

By Kate Waxman

---

As Climate Change Expands Mosquito Ranges, Better Monitoring Is Key to Preventing Disease

Fracking Ban in the Delaware River Basin Survives a Republican Challenge (For

# Inside Climate News

Donate

# Keep Environmental Journalism Alive

ICN provides award-winning climate coverage free of charge and advertising. We rely on donations from readers like you to keep going.

**Donate Now**

# Inside Climate News

    

Science
Politics
Justice & Health
Fossil Fuels
Clean Energy

Home
About
Contact Us
Whistleblowers
Privacy Policy

# Inside Climate News                    Donate

APX-V1-119

APX-V1-120

**<u>APPENDIX VOLUME 1</u>**

**DOCUMENT 4**

Declaration of Bernadette Devine in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> MARKWAYNE MULLIN, et al., <br><br> *Defendants.* | Case No. 3:26-cv-01099-KC |

**DECLARATION OF BERNADETTE DEVINE IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Bernadette Devine, hereby declare as follows:

1. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would competently testify to these facts.

2. I am a resident of Terlingua, Texas and have lived and worked in the Big Bend region for over 30 years. I have been a member of the Center for Biological Diversity ("the Center") since 1994 and rely on the Center to represent my interests in protecting the Big Bend region and the Rio Grande.

3. I am an educator with the Terlingua Common School District, where I have taught students from Pre-K through eighth grade. I also serve as the *English as a Second Language*, or ESL, coordinator. In my professional role, I regularly incorporate outdoor education into my teaching and have led multiple educational trips along the Rio Grande to locations including Colorado Canyon, Madera to Lajitas, Hot Springs Canyon, Barton Warnock Center, and Fort Leaton. These trips are an important component of my work, fostering students' understanding of and connection to the river, surrounding ecosystems, and public lands.

4.      For example, in November 2016 I led a binational student group that included Big Bend High School students plus students from the Boquillas area in Northern Mexico on an educational trip to Hot Springs Canyon in Big Bend National Park. Together, we discussed river ecology and native plants, and provided students from neighboring nations an opportunity to meet each other. Student trips like this are an incredibly impactful way for people to learn about connected ecologies and find relationships with each other across borders. Many children that live along the border actually live in very close proximity to each other—and being able to talk about life on either side of the border can be a tremendous educational and cultural experience for them. I am constantly renewed in my dedication to my profession and ongoing cultural and recreational interests when I can lead or participate in student trips like this. I plan to continue organizing river trips for students in the years to come—so long as the river is not obstructed by border barrier or its ecosystem degraded beyond the point of recreational or educational use.

5.      I have a longstanding personal and professional connection to the Big Bend region, particularly the Rio Grande corridor. I am a former river guide, and over the years I have regularly recreated and run trips on the Rio Grande, most regularly starting at Rancherias Canyon. We often run day trips through Big Bend Ranch State Park, largely through Colorado Canyon, or Madera to Lajitas, and occasionally launching in Redford or the Hoodoos area depending on water levels. Additionally, we run day trips and overnight trips through Santa Elena Canyon, Mariscal Canyon, Boquillas Canyon, and Hot Springs Canyon in and around the National Park.

6.      Over the course of many years, I have used these areas for a wide range of recreational, educational, and personal purposes, including river trips, camping, dark sky viewing, hiking, and gathering with family, friends, students, and members of my community. These

2

experiences provide me with aesthetic, recreational, educational, spiritual, community, and emotional benefits.

7.      One really fabulous trip I took was with a group of second and third grade students in March 2016. We went camping at Castolon, which is right near the mouth of Santa Elena Canyon and within the Greater Big Bend International Dark Sky Reserve (the "Reserve"). We hiked Cattail Falls, hiked into Santa Elena Canyon, and we even had Park Ranger Maria Lavender do a night skies program for us—which was spectacular and incredibly eye-opening for the students. The Reserve is the largest dark sky reserve in the world, providing exceptional opportunities for educational and scientific dark sky viewing, as well as for the public's use and enjoyment. Border barrier infrastructure includes lighting fixtures, which would ruin any opportunities for night sky programs and opportunities to learn about astronomy in and around Big Bend National Park. More than just providing exceptional education and enjoyment opportunities, dark skies are necessary for many nocturnal species to survive, plus migratory birds, and pollinators rely on natural and seasonal light rhythms to maintain normal habits, navigation, and reproduction. Bats, such as the endangered Mexican long-nosed bat, are primary nighttime pollinators. Below is a true and correct copy of a map depicting the Reserve, available online at: https://www.bigbenddarkskyreserve.org/ (last accessed June 26, 2026).

3



**International Dark Sky Places**

in the Greater Big Bend region

8.    I have also used areas in and around Big Bend Ranch State Park and Big Bend National Park for significant life events, including family trips, commemorations, birthdays, memorial gatherings, and celebrations of life. These places are deeply important to me and my family. My husband, now retired, was a National Park Service Law Enforcement Ranger in the Rio District at Big Bend National Park. My son, now in his twenties, learned boating and river skills on the Rio Grande and grew up mountain biking in these areas. He was born in 2003 and his first river trip was around 2004 when he was just a baby. As he grew up, the Rio Grande is where I taught him how to row a boat, kayak, and canoe. Today he is doing scientific research on the river. These experiences formed an important part of his upbringing and our family life.

4

9.      Annually, my goddaughter visits me with a group of her friends around New Years. Her name is Elena, named after Santa Elena Canyon. Elena, like me, used to be a river guide, and on these annual trips she takes her friends to explore portions of the Rio Grande designated as a Wild and Scenic River and experience what Big Bend has to offer. These young women are an inspiration to me. She says that she will continue to visit me even if she can't access the river, but I fear how the loss of this place that connects us might impact the foundations of our familial connections and the recreational interests that bring us together here.

10.     Most years since around 2013 I have also attended the Voices from Both Sides Festival, which is an annual gathering that takes place in Lajitas, *in* the water and on the banks of the Rio Grande, where people from both sides of the water wade in and spend time with each other. For many families and friends that are separated by the border, this is the one time every year when they can spend time with each other. Both Mexico and the U.S. set up sound systems, tents, and food tables. We swap songs, stories, and hugs. I always see a lot of my former students at these gatherings—many of them come because they're meeting friends and family, getting to hug their *tías* and *tíos*, sometimes seeing loved ones that they haven't seen since the year prior. My favorite part of the event every year is when we do "hands across the river"—which is phenomenally empowering and a beautiful celebration of friendship and community. Events like these are so uniquely intertwined in West Texas culture, community, and my sense of belonging here. I would mourn the installation of a border wall cutting off our access to the river because it would eliminate this tradition which is such a huge part of our community. It would mean the destruction of a place and time where the river and the border become a place of unity, community, a place of song, of love, and of laughter. A wall here would devastate memory, tradition, and the rituals that keep our communities connected despite everything designed to pull us apart. Children would not know the

5

simple joy of sharing a day with our neighbors in Mexico, and for those of us who have stood in that water, who have grasped hands with someone from the other side, the absence of this tradition would stay with us for the rest of our lives.

11.    Essentially all of the places I use and value along the river fall within areas impacted by the Big Bend border wall waivers that are at issue in the present litigation. If the Center were to prevail in this lawsuit it would protect my interests by ensuring that no border wall is built in Big Bend or at least that necessary environmental and historic preservation laws are followed in advance of such a massively destructive and unnecessary federal project.

12.    The construction of border wall infrastructure pursuant to the Big Bend Waivers would harm the areas I use and value by, among other things, degrading the natural and scenic character of the landscape, diminishing dark night sky conditions, restricting or impairing access to the Rio Grande, and damaging cultural and recreational sites. These changes would directly impair my ability to recreate in, teach in, maintain familial and community connections, and otherwise enjoy these areas. For example, if the waiver remains in place and the border wall is built without appropriate environmental review, I worry that I would no longer be able to run the river, my goddaughter and her friends would not be able to run the river, and the annual event, Voices from Both Sides, in addition to our birthday parties, commemorations of loved ones, and other events on the river would not be possible. As another example, I fear that I will not be able to take students on educational trips to visit and explore the Rio Grande or for night sky viewing if the area is degraded beyond educational use and the sky is filled with light pollution. The wall project would also interfere with my professional activities as an educator by limiting access to outdoor learning sites, diminishing the educational value of these landscapes, and disrupting opportunities for students to connect with the natural and cultural resources of the region.

6

13.    These harms would affect specific places that I have used in the past and plan to continue using in the future. The loss of access, degradation of environmental quality, and disruption of the natural character of these areas would diminish the personal, professional, and educational benefits I derive from them.

14.    I intend to continue visiting and using the Big Bend region, including the Rio Grande corridor and surrounding public lands, on a regular basis in the future, as much as I can. The next trip on my horizon in the Rio Grande corridor is a four- or five-day river run through Boquillas Canyon, starting at Rio Grande Village, launching in early August. I spend at least a half dozen to two dozen or more days a year on the river. I plan to return as often as I can, for long as I can. Next school year, I hope to bring at least one but possibly two groups of students to the river.

15.    For these reasons, I am harmed by the Big Bend Waivers and the associated border wall project.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __14  July__ , 2026, in __Athlone, Co Westmeath, Ireland__

Bernadette Devine

7

**APPENDIX VOLUME 1**

**DOCUMENT 5**

Declaration of Samuel Evan Stavinoha in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al., | Case No. 3:26-cv-01099-KC |
| *Plaintiffs,* | |
| v. | |
| MARKWAYNE MULLIN, et al., | |
| *Defendants.* | |

**DECLARATION OF SAMUEL EVAN STAVINOHA IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Samuel Evan Stavinoha, hereby declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge, and if called as a witness in this proceeding, I could and would testify competently thereto under oath.

2. I live in Marathon, Texas. I am the owner of The French Company Grocer in Marathon, Texas, and a co-owner of a hotel property in Terlingua, Texas. I have lived in and been deeply tied to the Big Bend region since my childhood, through my residence, businesses, recreation, and personal history.

3. I became a member of the Center for Biological Diversity ("the Center") in March of 2026, and rely in part on the Center to represent my interests in protecting the Rio Grande corridor, the Big Bend region, and the wildlife, ecosystems, and cultural landscapes that make this area unique. I would not be able to adequately protect these interests on my own, and I depend on the Center's advocacy and litigation efforts to do so.

1

4.       I was born in Midland, Texas in 1988, and I have spent my life connected to what I refer to as the greater Big Bend region. This region encompasses the northern Chihuahuan Desert along the Rio Grande—in the U.S., nestled between the Rio Grande and Highway 90. My grandparents were schoolteachers in West Texas, and my father is a petroleum engineer with a natural and occupational interest in geology. My father first brought me to the Big Bend area when I was a child. Beginning at approximately age eight, I visited the region nearly every year, recreating on the Rio Grande with my father, family, and family friends. We often put in for our river trips at various locations in the State and National Parks and spent days floating down the river, in awe at the chaotic beauty of the rock formations and wildlife.

5.       In October of 2025 I became concerned about federal plans to build border barriers in the Big Bend region. Other business owners and community leaders in the region shared this concern, and many of us found ourselves checking CBP's Smart Wall Map webpage over and over, because the plans it described seemed to change constantly. I am a software engineer by profession, and I decided to build a system that would keep track of these changes for us automatically. As a result, I developed an automated change-detection system that monitors 32 CBP-controlled website surfaces on the agency's Smart Wall Map webpage (https://www.cbp.gov/border-security/along-us-borders/smart-wall-map). It polls every 6-12 hours and stores cryptographically-hashed before and after snapshots in immutable storage. In other words, this program is designed to automatically check CBP's Smart Wall Map for changes, and when there has been an alteration since the previous check, store that data.

6.       Since I began tracking these changes on October 16, 2025, CBP has altered its Smart Wall Map materials repeatedly. Between April 24 and May 22, 2026 alone, CBP made more than 100 individual edits to the wall-alignment data underlying the Smart Wall Map, altering the

2

construction status, barrier type, and mileage of individual wall projects across at least 11 distinct updates. Separately, between October 16, 2025 and May 22, 2026, CBP revised its public Border Wall webpage no fewer than 48 times; each of those revisions is independently verifiable through the Internet Archive. As an active member of the greater border region, the constantly changing descriptions of border barrier construction plans on CBP's Smart Wall Map have caused me significant alarm and confusion.

7.      Much of my early connection to Big Bend was formed through time spent on the river. I paddled and boated regularly through areas such as Santa Elena Canyon, La Junta, and stretches within Big Bend Ranch State Park, observing the dramatic geology, canyon walls, desert ecosystems, and remote wilderness character of the region. These formative experiences made the Big Bend landscape central to my sense of place and identity.

8.      I attended high school in Andrews, Texas and then attended Texas State University in San Marcos, where I studied electrical engineering. After two years, something pulled me to leave school and reconnect with the Big Bend. Intending to take a break from college in 2009, I moved to Terlingua, Texas, where I became a river guide and outfitter on the Rio Grande. At the peak of my time working as a river guide, I managed to work 50 days straight on the river without taking a single day off. This time was a formative period in my life that deepened my connection to the Rio Grande and surrounding desert landscape. At the end of my season working the river, I was encouraged to go back to school by a man who was one of my last river outfit clients—a lawyer from Houston who had been visiting Big Bend annually for decades. This was his first year back on the river since his wife had passed away, and we spent three days on the river sharing stories. The Rio Grande mattered deeply to him and his family's history—and I think he could tell how deeply the river meant to me too. When he urged me to go back to school and finish my

3

degree, I understood that it didn't mean I had to leave this place forever or that I loved it any less. The day we pulled out from that river trip was the same day I resolved to return to San Marcos and finish my degree.

9.      I returned to school and eventually started working as a software engineer. I worked remotely for firms in Texas and New York, and took the opportunity to travel the world. But in the end, there's nothing like seeing Tsitsikamma, South Africa to make you appreciate how rare and irreplaceable Big Bend is. Extensive travel only reinforced for me that there are very few remaining landscapes that are this wild, intact, and spiritually grounding.

10.      In 2019, I made a permanent commitment to the region by purchasing The French Company Grocer, a historic small-town grocery store in Marathon that has served the community for over a century. Since acquiring the business, I have worked to preserve it not only as an essential service, but also as a community gathering place that supports artists, hosts events, and sustains the town's limited but vital tourism-based economy.

11.      I also own and operate a hospitality property in Terlingua, providing lodging to visitors who come to experience Big Bend National Park, Big Bend Ranch State Park, the Rio Grande, dark night skies, and the surrounding desert landscape. These visitors frequently seek access to outdoor recreation, wildlife viewing, hiking, river trips, and the sense of isolation and natural beauty that defines the region.

12.      The areas affected by the Department of Homeland Security Secretary's waivers of environmental laws, planned border wall construction, and other infrastructure in the Big Bend region include remote portions of Big Bend Ranch State Park, Big Bend National Park, areas near Candelaria, Pinto Canyon Road, and other backcountry locations and remote archeological and

4

historical sites that are central to the character and functioning of the region. These areas currently remain wild, unwalled, open, and ecologically connected.

13.     My interests in this region are aesthetic, spiritual, recreational, environmental, historical, anthropological, economic, and moral. A defining feature of Big Bend is its vast, unobstructed desert and river landscapes. It is also home to some of the most interesting and world-renowned geologic formations in the nation. The absence of major infrastructure allows me to experience calm, clarity, and connection that I cannot find elsewhere. It is trivially easy to find countless others who feel the same. The construction of a border wall and other infrastructure would insert a permanent visual, physical, and psychological obstruction into this environment and severely detract from these experiences, and therefore directly impair my aesthetic, spiritual, and recreational interests in this region. I also believe that there is non-negligible risk associated with the construction of roads and sites for solutions that are considered less invasive and less destructive, i.e., "detection technology," and the development of those solutions must also be carried out with great care, especially in an area as biologically and culturally significant as Big Bend National Park.

14.     Spiritually, the open desert and river corridor provide me with a sense of presence and reflection that depends on the landscape remaining unfragmented. A border wall would fundamentally alter this experience by creating an artificial barrier in a place that has otherwise always been unperturbed, open, and wild. This would be an intrusion that I and many others would find deeply disruptive and distressing.

15.     More specifically, I believe that there is something uniquely special, contagious, and compelling about the Big Bend region. I believe that many of us are fortunate to have a friend who brings something out in us, and for me, Big Bend is that friend who brings out my courage,

5

my sense of adventure, and my willingness to take risks and pursue meaningful paths. The life decisions I have made that are tied to this place were not the result of conventional planning or rational calculation; they were a side effect of being inspired by the landscape itself. There are fewer and fewer wild and protected places that can move people in this way—places that prompt belief in oneself and the courage to act. I believe that humans are hard wired to respond in these ways that expose our courage. My relationship to Big Bend feels deeply spiritual. Many of the decisions I have made that dramatically altered my life were not choices I carefully weighed, but responses to a sense of being called by this place. I was not seeking to buy a rural grocery store or chart a new path in the region, but I, like many others before me, found that I was one rooted conversation away from conviction and discovery in the Big Bend. I felt compelled to act, and there was nothing I could do to resist that pull. This connection to Big Bend continues to guide my life and sense of purpose in a spiritual way.

16.     Recreationally, I regularly travel throughout the Big Bend region for hiking, river trips, scenic drives, motorcycle trips, and dark-sky viewing. The prospect of a border wall would diminish my ability to enjoy these activities and would degrade the wilderness character that draws me back to this area repeatedly and indefinitely.

17.     For example, in late March of 2022, I took a motorcycle trip through Big Bend Ranch State Park, to Chinati Hot Springs, and along Pinto Canyon Road with two friends. None of us were experienced riders at the time. The heat was brutal for spring, and the rocky backcountry roads in the state park tested our skills and endurance. We camped in the state park and lived on tinned fish. In the entirety of our time riding through Big Bend Ranch State Park, we encountered only one other person. We had the wild country entirely to ourselves.

18.    The camaraderie of that trip was extraordinary. With no egos among us, when one rider went down, the others were there to lift him back up, check on him and his gear, and keep moving. The trip instilled an immense sense of gratitude in us—we felt so lucky to have access to a public land wilderness where we could test our skills and endurance, especially in that heat. It was a vulnerable learning experience: out there in the wild, alone in the heat, we were searching for something and didn't know what. Big Bend always delivers what is sought, even when you don't know what you're looking for. It dares you and exposes your courage and reveals to you that it was already there.

19.    We stayed at Chinati Hot Springs, where the communal kitchen and hot showers became the setting for unforgettable conversations and stories. A small dirt road connects Chinati Hot Springs back to Pinto Canyon Road. The blacktop between Presidio and Ruidosa, near Chinati Hot Springs, is something out of a Cormac McCarthy novel—the road rolls at every wash where the arroyos meet the pavement, shaped for flash flood water to flow across.

20.    I have also floated Colorado Canyon in Big Bend Ranch State Park many times, beginning when I worked as a river guide at Far Flung Outdoor Center in 2009, when Colorado Canyon and Dark Canyon were our go-to stretches for half-day trips. Most memorably, in 2021, I attempted to canoe approximately twelve miles of Colorado Canyon at only seventeen cubic feet per second. The water had dropped so low that my partner and I spent nearly three days dragging our canoe through the shallows, pushing ourselves to the point of exhaustion. I wouldn't trade it for the world. Encounters like these, at the mercy of nature, teach us much and are crucial for personal development.

21.    In contrast, in the fall of 2025, during monsoon season, I joined Mike Naccarato of Far West Texas Outfitters and a group of local entrepreneurs to "ride the bubble"—floating the

7

high water in rafts from Rancherias to Lajitas, a little over twenty miles through all of Colorado Canyon. It was a spontaneous, effortless, and beautiful day trip. I got to simply ride in the raft and enjoy the company of friends and the canyon around us. Two trips on the same stretch of river, at vastly different water levels with vastly different people and circumstances, produced entirely different experiences—both of which depended on the river corridor remaining wild and accessible.

22.    Economically, the border wall threatens the already fragile local economy, which relies overwhelmingly on tourism and outdoor recreation. Even a modest decline in visitation would have severe consequences for small businesses like my grocery store and hotel. Many businesses in the region, including mine, operate on thin margins. Even a small loss of visitors could determine whether we survive.

23.    I am also morally concerned about the destruction of habitat and the loss of access to the river and its world-renowned geologic formations. The landscape and biodiversity in the Big Bend region have inherent value, and we create tremendous losses for ourselves if we build walls across this region, especially without environmental safeguards that would lessen many of the harms associated with the project.

24.    What makes the Big Bend region's geology so extraordinary is not any single formation but the wholeness and enormity of the landscape—vast, intact, untouched, and open. It is this completeness that produces the spiritual effect on people and keeps them coming back. Big Bend National Park has one of the highest return rates of visitation of any national park, and it is this same quality that draws artists to live in or retreat to the region. The landscape looks and feels almost extra-terrestrial in its otherworldliness. That said, among the region's most captivating features are the hoodoos of Big Bend Ranch State Park—towering rock formations sculpted by

8

erosion into shapes that seem to defy gravity. These famous formations would, at a minimum, be disrupted, obstructed, or have access to them cut off by the construction of border walls or the development of maintenance roads for border barrier infrastructure. Many of them could be destroyed outright.

25.    I plan to continue living in, working in, recreating in, and welcoming visitors to the Big Bend region for the rest of my life. In August of this year, I am guiding a commercial river trip on the Rio Grande at Boquillas Canyon and plan to also do a solo canoe trip on the river at some point before then.

26.    The harms caused by the construction of a border wall would directly, personally, and irreparably injure my economic interests, spiritual connection, moral beliefs, aesthetic interests, and ability to recreate in this place.

27.    My interests in the Big Bend region would be protected if the Center prevails in this lawsuit. Preventing the construction of a border wall in this area would preserve the landscapes, wildlife corridors, and community life that are essential to my livelihood and well-being.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____7/10_____, 2026, in ___MARATHON, TX___.

_____

Samuel Evan Stavinoha

9

**APPENDIX VOLUME 1**

**DOCUMENT 6**

Declaration of Laiken Jordahl in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

FRIENDS OF THE RUIDOSA CHURCH, et al.,

     *Plaintiffs,*

     v.

MARKWAYNE MULLIN, et al.,

     *Defendants.*

Case No. 3:26-cv-01099-KC

**DECLARATION OF LAIKEN JORDAHL IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Laiken Jordahl, hereby declare as follows:

1.     I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would competently testify to these facts.

2.     I live in Tucson, Arizona. I have been a member of the Center for Biological Diversity (the "Center") since 2017. As a Borderlands Campaigner, Southwest Conservation Advocate, and National Public Lands Advocate for the Center, I work to protect wildlife, ecosystems, and public lands throughout the West with a specific focus on the U.S.-Mexico borderlands. My work focuses on protecting endangered species and their habitats, and people's access to public lands and wild places, with a specific focus on wildlife and wildlands in the border region.

3.     Before joining the Center, I served as a National Park Service Wilderness Fellow, where I worked with stakeholders to monitor conditions in five national parks and monuments, including Big Bend National Park and Organ Pipe Cactus National Monument, and prepared in-depth reports assessing threats to wilderness character. My work was published in a series of reports entitled "Wilderness Character Narrative and Baseline Monitoring Assessments" for

specific national parks and monuments. At Big Bend National Park, I analyzed threats to wilderness character and examined, among many other factors, how border security activities impact natural soundscapes and dark night skies, interfering with both the biotic community and people's ability to enjoy solitude and sounds of nature in wilderness. Attached as Exhibit 1 is a true and correct copy of the report I authored titled *Big Bend Recommended and Potential Wilderness: Building Blocks for Wilderness Stewardship*, December 2015.

4.     My time working and living in the Big Bend region in 2015 was incredibly formative to my personal, professional, and spiritual development. The Big Bend region is the least populous place in the continental United States. It holds the best dark night skies in the country, and the feeling of looking up at the Milky Way in Big Bend is unlike any stargazing experience I've had anywhere else in the world. I was immediately intrigued by the incredible desert plant life that can survive in the region, even though the area only averages seven inches of rainfall annually. In many ways, Big Bend made me fall in love with the deserts of the American Southwest. This love has only grown, and in the time since I worked and lived in the region, I have devoted much of my life to exploring and protecting desert ecosystems across the border region.

5.     In addition to my professional work protecting ecosystems, wildlife, and public lands in the Big Bend region, I enjoy many recreational activities in Big Bend National Park, Big Bend Ranch State Park and surrounding areas where waivers of law have been issued. These activities include whitewater boating, swimming, bird and wildlife watching, camping, stargazing, admiring the breathtaking geology while thinking about geologic time, and relaxing, picnicking and recharging along the Rio Grande. These activities bring me professional, recreational, aesthetic, spiritual and moral benefit. I am harmed by the U.S. Department of Homeland Security's ("DHS") waiver of applicable environmental and historical preservation laws—which would

normally prevent a project like this from occurring at all, or at minimum, require review, public input, and minimum standards to be met prior to commencing construction; and I will be harmed by border wall construction carried out in these areas.

6.    There is no place I've ever been that can match the rugged, remote and expansive beauty of the Big Bend region. Simply put, it's the most wild, intact, unspoiled and hard-to-reach place left anywhere along the 2,000-mile U.S.-Mexico border. It brings me a deep sense of hope to visit this place and imagine it existing outside of the modern era of border walls and militarization. When I'm looking south into Mexico from Big Bend Ranch State Park, I feel like I'm at the edge of the known world. It is incredible to realize that just south of the Rio Grande is a massive network of roadless, wild Mexican protected areas that are much larger than Big Bend National Park. This sense of scale is mind-boggling. It makes me feel small, but connected to the natural world, and part of a deeper universal nature that knows no borders.

7.    In many ways, Big Bend is my north star. For more than a decade now, I've had the dream of seeing an International Peace Park, modeled after Waterton-Glacier International Peace Park on the U.S.-Canada border, established along the Southern border. This park would encompass Big Bend National Park, Big Bend Ranch State Park, the Black Gap Wildlife Management Area, the Maderas del Carmen, Ocampo, and Cañón de Santa Elena flora and fauna protection areas—all of which together, at 3.3 million acres, would encompass the largest expanse of protected desert ecosystem in all of North America. This dream is grounded in my belief that that a world is possible where border security can exist without destroying desert ecosystems and livelihoods. If the wall is built between these cross-border protected areas, the possibility of achieving this long-term goal would be greatly diminished, as would my conviction to work towards this future.

8.      I plan on continuing to return to the Big Bend region and Big Bend Ranch State Park as long as I'm alive. In the modern world where everything moves so quickly, true presence is hard to come by. I feel this sense of peace and presence when I'm swimming in the Rio Grande or gazing at the stars in Big Bend that I haven't felt anywhere else. I am especially excited to return to Big Bend in late summer/early fall of 2026 when I hope the river flow is high enough for a multi-day river trip through the state and national parks. If the border wall is built, even through a portion of the Big Bend region, it will significantly impact my ability to enjoy this place and find peace, and will directly cut off my access to the Rio Grande wherever wall is constructed. These harms seriously degrade my spiritual and aesthetic interests rooted in experiencing Big Bend as the interconnected, vast, and remote place it has been for thousands of years. It will also harm my professional livelihood, as I will lose access to the one place left on the U.S.-Mexico border where I can bring colleagues and journalists to experience a non-militarized version of the U.S.-Mexico borderlands where border security and the environment are existing largely in harmony. Significantly, the border wall would also harm my recreational interests because it would eliminate access to the Rio Grande or at least degrade the river beyond recreational use.

9.      I've spent much of my free time since 2019 documenting wall construction. I have seen firsthand the horrific damage that wall construction has wrought, aided by legal waivers and the total absence of environmental law. At Organ Pipe Cactus National Monument, I witnessed construction crews butcher ancient saguaro cactuses, some of which were likely 200 years old—older than the establishment of the border itself. I've watched construction crews dynamite mountainsides to clear pathways for the border wall—including through Native American gravesites—leading to severe damage and erosion issues that continue to make the area unstable for people and wildlife. At the San Bernardino National Wildlife Refuge, I documented wall

contractors drilling 1,000-foot-deep wells to pump millions of gallons of groundwater to mix concrete for the border wall, leading sensitive desert springs home to federally protected species to drop so significantly that they no longer functioned as natural systems without human intervention. None of these activities would have been legal without the use of the waivers.

10.    If laws like the National Environmental Policy Act (NEPA), the Endangered Species Act, the Wild and Scenic Rivers Act, and the Native American Graves Protection and Repatriation Act were adhered to, so many of these devastating elements of wall construction could be avoided by proper consultation with expert agencies, Tribes, and people with local knowledge like me. For example, NEPA would require DHS to prepare a detailed statement considering, among other things, the reasonably foreseeable environmental effects of the proposed agency action in an environmental analysis that considers information provided by other agencies and the public. Had NEPA not been waived, I would have reviewed the government's environmental analysis and submitted comments documenting my concerns to help avoid unnecessary devastation in such a magnificent landscape. Additionally, the Endangered Species Act would prohibit the unauthorized "take" of threatened and endangered species and require DHS to consult with the U.S. Fish and Wildlife Service prior to initiating such an ecologically devastating project as border wall construction. But with waivers in hand, I have watched DHS act with reckless impunity as the agency blasts, bulldozes, and pumps millions of gallons of groundwater with little thought and no accountability. The waivers thus harm my procedural, aesthetic, and moral interests.

11.    I have taken at least six river trips down the Rio Grande in the Big Bend region, through the state and national parks, and also on adjacent land upriver. I find incredible joy canoeing down the Rio Grande—it's one of my favorite recreational opportunities on public lands anywhere in America. Watching birds like great blue herons, flycatchers, kingfishers, cormorants

and phainopeplas while floating downriver makes me feel connected to the natural world and at peace. The experience of floating down the Rio Grande is especially unique, as you are physically floating along the dividing line between two nations, which is entirely unrecognizable in the landscape. Looking up at the stars from inside one of the canyons on the Rio Grande makes me feel like time does not exist and like I'm a part of something much bigger than myself. The night sky, so free of light pollution, provides an extreme sense of remoteness and solitude, free from visual reminders of our developed society. Beyond cutting off all river recreation and destroying the wilderness character of the river, I am extremely concerned that wall construction will alter the world-class dark night skies in the region. I have seen stadium lighting installed along the wall and massive lighting installations around construction operations and man camps in Arizona as wall construction happened in 2019 and 2020. These lights disrupt seasonal migration and reproduction patterns for species and cause harms to nocturnal wildlife.

12.    I've also seen firsthand how wildlife is blocked by construction of 30-foot high steel bollard border wall, but humans are not. I have seen mule deer, pronghorn and javelinas blocked by walls in Arizona. I have also documented sections of wall that have been cut through by a simple angle grinder that anyone can purchase at a hardware store, which I know because I have found numerous grinder blades scattered along the wall where I've seen cuts made. Especially during peak cross-border migration in 2020, I watched people cross through cuts in the newly built wall at Organ Pipe Cactus National Monument. All of this reinforces my belief that border walls do not have a significant effect on slowing human migration, but they cause devastating and permanent harm to wildlife and ecosystems.

13.    Embedded below and attached as Exhibit 2 is a true and correct copy of a photograph that I took on February 19, 2020, of a bulldozed saguaro cactus at Organ Pipe Cactus

National Monument along the Mexico-Arizona border. The photo embedded below and contained in Exhibit 2 is a true, accurate, and unedited depiction of the conditions that I witnessed and described in this declaration.



14.    Embedded below and attached as Exhibit 3 is a true and correct copy of a photograph that I took on December 21, 2020, of a blasted path for border wall construction in the Peloncillo Mountains in Arizona. The photo embedded below and contained in Exhibit 3 is a true, accurate, and unedited depiction of the conditions that I witnessed and described in this declaration.



15.    Since new border walls went up in Arizona, spreading across the majority of the state's border, I've watched landscapes and ecosystems suffer profoundly. This construction has fundamentally changed the Arizona borderlands region, destroying ecosystems and severing critical corridors that wildlife have used to move across the border for millennia. Before a wall is even erected, construction often necessitates new roads or road improvements/widening, increased heavy truck traffic, excavations, dynamite to clear paths, and new lighting, all of which destroys or degrades sensitive borderland ecosystems. Once the wall is built, it stops migrating wildlife in their tracks, preventing animals like desert bighorn sheep, mule deer, pronghorn, kit foxes, javelina, jaguar, ocelot, and black bears from finding water, food and mates. The Big Bend region provides essential habitat for hundreds of species of birds, mammals, reptiles, amphibians, and fish, many of

which are endangered or otherwise imperiled such as the Mexican long-nosed bat, black-capped vireo, Big Bend gambusia, Rio Grande silvery minnow, and multiple plant species, including the endemic Chisos hedgehog cactus, found only in Big Bend. Wall construction has caused severe soil erosion, and if built along the Rio Grande, would disrupt natural river flows and cause heightened risks from flooding. I am terrified of seeing this level of destruction come to the Big Bend region in Texas.

16.    I believe new walls built across the Big Bend region will pose severe danger to both wildlife and people. Additionally, the deployment of concertina wire, which I have already seen along private lands upriver from Big Bend Ranch State Park, poses extreme danger to the public and wildlife. With one heavy flood—which is a common seasonal occurrence on this stretch of the Rio Grande—these seemingly endless coils of razor wire will wash downstream into the state and national parks, where hundreds of boaters and various species run the risk of being entangled in razor wire. The Wild and Scenic Rivers Act, waived for border wall construction in Big Bend, would otherwise prevent this type of destruction on the Rio Grande, which was congressionally designated for protection under this statute in 1978 because of its "outstandingly remarkable" scenic, geologic, wildlife, recreational, and other values.

17.    DHS has waived dozens of environmental and cultural resource protection laws in order to rush this border wall construction. I fear for the severe and irreversible damage that's being inflicted on our environment with all of our nation's most important environmental and cultural resource protection laws suspended.

18.    My interests in the Big Bend region would be protected if the waivers were found invalid, rescinded, or otherwise withdrawn, because DHS would not proceed with these incredibly destructive plans for border barrier construction. Or, at a minimum, DHS would be required to

comply with environmental, cultural, and historic preservation laws before proceeding. This compliance would ensure harm does not occur, or is avoided and minimized, to protect the region's unique environmental and cultural resources.

19.    The Big Bend Waivers are alarmingly massive in scale. The West Waiver encompasses a border segment starting just south of Fort Quitman, Texas, and runs through Candelaria, Ruidosa, Presidio, Redford, the Hoodoos, and ends midway through Big Bend Ranch State Park. The National Park Waiver picks up where the West Waiver ends in Big Bend Ranch State Park, continuing through Lajitas, spanning all of Big Bend National Park (including Santa Elena Canyon, Castolon, Mariscal Canyon, Hot Springs, and Boquillas), and ending at the northeastern-most edge of the Black Gap Wildlife Management Area.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___July  17___, 2026, in ___Port townsend, WA_____.

Laiken Jordahl

**JORDAHL DECLARATION**

**EXHIBIT 1**

Laiken Jordahl, Nat'l Park Service, *Big Bend Recommended and Potential Wilderness: Building Blocks for Wilderness Stewardship* (2015).

National Park Service
U.S. Department of the Interior

**Big Bend National Park**



# Big Bend Recommended and Potential Wilderness

*Building Blocks for Wilderness Stewardship*

Prepared by Laiken Jordahl

December 2015

APX-V1-151

**ON THE COVER**
*Chisos Mountains from Ward Spring*
*Photo: Laiken Jordahl*

i | Page

# Big Bend Recommended and Potential Wilderness
*Building Blocks for Wilderness Stewardship*

Big Bend National Park
National Park Service
U.S. Department of the Interior
Brewster County, Texas

*Wilderness Assessment Prepared by:*
Laiken Jordahl, Wilderness Fellow
National Park Service
December 2015



**Cindy Ott-Jones, Superintendent**                                        **Date**
**Big Bend National Park**

"We need wilderness whether or not we ever set foot in it. We need a refuge even though we may never need to go there. We need the possibility of escape as surely as we need hope."

**--Ed Abbey**

i | P a g e

## ACKNOWLEDGEMENTS

A special thank you to the following staff for offering their assistance, time and knowledge throughout the production of this report:

| | |
|---|---|
| Thomas C. Alex | *Archeologist (Retired), Big Bend National Park* |
| Jeffery Bennett | *Physical Scientist/Hydrologist, Big Bend National Park* |
| Emma Brown | *Acoustical Resource Specialist, Natural Sounds and Night Skies Division* |
| Don Corrick | *Geologist, Big Bend National Park* |
| Greg Drum | *U.S. Park Ranger Pilot, Big Bend National Park* |
| Dan Duriscoe | *NPS Night Skies Lead Physical Scientist, Natural Sounds and Night Skies Division* |
| Richard Gatewood | *Fire Ecologist, SW Texas, Permian and Southern Plains Fire Groups* |
| Ryan Hajek | *Acting Supervisory Border Patrol Agent, U.S. Customs and Border Protection* |
| Lisa Hendy | *Chief Ranger (Acting), Big Bend National Park* |
| David Larson | *Chief, Science and Resource Management, Big Bend National Park* |
| Marie Landis | *Cartographic Technician, Big Bend National Park* |
| Peter Landres | *Ecologist, Aldo Leopold Wilderness Research Institute* |
| Elizabeth Mejicano | *Wilderness Research Fellow, Aldo Leopold Wilderness Research Institute* |
| Cheryl McIntyre | *Physical Scientist, Chihuahuan Desert Network* |
| Bob Meadows | *Physical Scientist, Natural Sounds and Night Skies Division* |
| Michael Ryan | *River District Supervisory Ranger, Big Bend National Park* |
| Katherine Sinsky | *Archaeology Technician Intern, Big Bend National Park* |
| Joe Sirotnak | *Botanist, Big Bend National Park* |
| Raymond Skiles | *Wildlife Biologist and Wilderness Coordinator, Big Bend National Park* |
| Lydia Smith | *Physical Science Technician, Big Bend National Park* |
| Ed Waldron | *Fire Management Officer, Big Bend National Park* |
| Erik Walker | *Trail Maintenance Supervisor, Big Bend National Park* |
| Vicki L. Ward | *Overflights Program Manager, NPS Natural Sounds and Night Skies Division* |

## TABLE OF CONTENTS

INTRODUCTION TO WILDERNESS CHARACTER MONITORING .............................................................. 5

WILDERNESS CHARACTER IN THE NATIONAL PARK SERVICE ............................................................ 8

HISTORICAL AND ADMINISTRATIVE SETTING OF THE BIG BEND WILDERNESS ................................. 9

WILDERNESS CHARACTER NARRATIVE ........................................................................................... 14

**Untrammeled** ............................................................................................................................ 16

**Natural** .................................................................................................................................... 18

**Undeveloped** ........................................................................................................................... 20

**Solitude or Primitive and Unconfined Recreation** .................................................................... 22

**Other Features of Value** ........................................................................................................... 24

WILDERNESS CHARACTER MONITORING ........................................................................................ 26

**Process Used for Identifying Measures:** ................................................................................... 26

**Overview of Wilderness Character Monitoring Measures** ......................................................... 27

**UNTRAMMELED** ........................................................................................................................ 32

          *Number of Plant Species Manipulated*............................................................................... 33

          *Actions that Manipulate Wildlife* ..................................................................................... 35

          *Percentage of Naturally Ignited Fires Not Receiving a Suppression Response* .................... 37

          *Number of Fuels Reduction Projects* ................................................................................. 39

          *Number of Trespass Livestock Captured in Roundups* ........................................................ 41

          *All Other Unauthorized Trammeling Actions* ..................................................................... 43

**NATURAL** .................................................................................................................................. 44

          *Priority Exotic Plant Species* ............................................................................................. 45

          *Priority Exotic Animal Species* .......................................................................................... 48

          *Human-Wildlife Incidents*................................................................................................. 50

          *Days of Rio Grande Flows Below 40 cfs* ............................................................................ 52

          *Visibility*........................................................................................................................... 54

          *Concentration of Sulfur in Wet Deposition* ....................................................................... 56

          *Concentration of Nitrogen in Wet Deposition*................................................................... 58

          *Regional Nighttime Radiance*........................................................................................... 60

**UNDEVELOPED**.......................................................................................................................... 64

          *Authorized Non-Recreational Physical Developments* ....................................................... 65

          *Miles of Telephone and Powerlines* .................................................................................. 68

BIG BEND WILDERNESS

APX-V1-157

*Miles of Roads* ............................................................................................................... 70

*Number of Inholdings* ..................................................................................................... 72

*Administrative Flight Hours* ........................................................................................... 73

*Commercial Scenic Flight Operations* ............................................................................ 75

*Authorized Administrative Motorized and Mechanized Use* .......................................... 77

**SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION** ....................................................... 79

*Backcountry Overnight Stays* ......................................................................................... 80

*Illegal Campfires* ........................................................................................................... 82

*Heavily Impacted Chisos Backcountry Campsites* .......................................................... 83

*Percentage of Time Noise-Free* ..................................................................................... 85

*Night Sky Visibility* ........................................................................................................ 87

*Facilities that Decrease Primitive and Self-Reliant Recreation* ...................................... 90

*Visitor Behavior Restrictions* ......................................................................................... 92

**OTHER FEATURES OF VALUE** .................................................................................................... 95

*Condition of Archaeological Sites* .................................................................................. 96

*Cultural Sites Impacted by UDA Activity* ........................................................................ 98

**Measures Not Used for Wilderness Character Monitoring** ....................................................... 100

**Conclusions** ............................................................................................................................. 102

FUTURE PLANNING ................................................................................................................... 103

REFERENCES CITED .................................................................................................................... 105

APPENDICES .............................................................................................................................. 109

**Appendix A—Overview of the framework for wilderness character monitoring** ..................... 109

**Appendix B – What is a trammeling action?** ......................................................................... 110

**Appendix C—Bureau of Land Management Development Index\*** ........................................... 114

**Appendix D — 1978 Big Bend Wilderness Recommendation** ................................................... 115

**Appendix E – Index of Invasive Animal Species (as of November 2015)** .................................. 127

**Appendix F — Big Bend National Park Surrounding Protected Areas** ...................................... 128

**Appendix G – High Chisos Designated Campsites** .................................................................. 129

**Appendix H – Native American Tribes with "Aboriginal Occupation" Rights** .......................... 130

**Appendix I — Data sources and protocols for all measures used** ............................................ 131

## LIST OF TABLES

Table 1. Description of Big Bend Wilderness Units.............................................................................12
Table 2. Overview of Big Bend Wilderness Character Monitoring Measures.........................………...27
Table 3. Data Quantity and Quality Definitions.................................................................................30
Table 4. Data Adequacy Scoring.......................................................................................................30
Table 5. General Guidance for Counting Trammeling Actions ...........................................................32
Table 6. Untrammeled Quality.........................................................................................................32
Table 7. Authorized Annual Actions That Manipulate Wildlife..........................................................36
Table 8. Natural-Start Fire Suppression History 2010-2014................................................................38
Table 9. Fuels Reduction Projects.....................................................................................................40
Table 10. Natural Quality..................................................................................................................44
Table 11. Priority Exotic Plant Species...............................................................................................46
Table 12. Priority Exotic Animal Species............................................................................................49
Table 13. Mountain Lion and Black Bear Incidents.............................................................................51
Table 14. Days of Rio Grande Flows Below 40 cfs..............................................................................53
Table 15. Visibility Condition Categories............................................................................................55
Table 16. Sulfur Wet Deposition Categories.......................................................................................57
Table 17. Nitrogen Wet Deposition Categories..................................................................................59
Table 18. Undeveloped Quality..........................................................................................................64
Table 19. Index of Authorized Non-Recreational Physical Developments.............................................66
Table 20. Weight Values of Authorized Non-Recreational Physical Developments...............………....67
Table 21. Index and Weighted Scores of Roads in Wilderness..............................................................70
Table 22. Authorized Administrative Motorized and Mechanized Use 2009-2015.................................78
Table 23. Solitude or Primitive and Unconfined Recreation Quality.....................................................79
Table 24. Chisos Campsites by Condition Class...................................................................................84
Table 25. Percentage of Time Boise-Free at Acoustical Monitoring Sites.............................................86
Table 26. ALR Condition Categories....................................................................................................89
Table 27. Facilities that Decrease Self-Reliant Recreation...................................................................90
Table 28. Visitor Use Restriction Extent..............................................................................................93
Table 29. Visitor use Restriction Index................................................................................................93
Table 30. Other Features of Value Quality...........................................................................................95
Table 31. Archaeological Site Conditions.............................................................................................97
Table 32. ASMIS Condition Categories.................................................................................................97
Table 33. Cultural Sites Impacted by UDA Activity 2010-2014.............................................................99

## LIST OF FIGURES

Figure 1. Keeping It Wild Hierarchical Framework................................................................................7
Figure 2. Official 1978 Wildernes Recommendation Map......................................................................9
Figure 3. Map of Managed Wilderness Areas Adapted from 1978 Recommendation............................11
Figure 4. Nighttime Radiance Composite, Big Bend Region..................................................................62
Figure 5. Map of Drilling permits Issued 2009-2014.............................................................................63
Figure 6. Drilling Permits Approved by Year - Reeves County, TX..........................................................63

BIG BEND WILDERNESS

## INTRODUCTION TO WILDERNESS CHARACTER MONITORING

The Wilderness Act of 1964 (Pub. L. No. 88-577, 78 Stat. 890) was passed by a nearly unanimous vote in the United States Congress to protect natural lands from the seemingly endless threats of "expanding settlement and growing mechanization." The primary mandate of the Wilderness Act is given in Section 4(b) and states that "each agency administering any area designated as wilderness shall be responsible for *preserving the wilderness character of the area*" [emphasis added]. In order to establish a common understanding of this directive, wilderness character was formally defined by an interagency monitoring team representing the Forest Service (FS) (Department of Agriculture), as well as the U.S. Fish and Wildlife Service (USFWS), National Park Service (NPS), and Bureau of Land Management (BLM) (Department of the Interior) as follows:

> Wilderness character is a holistic concept based on the interaction of (1) biophysical environments primarily free from modern human manipulation and impact, (2) personal experiences in natural environments relatively free from the encumbrances and signs of modern society, and (3) symbolic meanings of humility, restraint, and interdependence that inspire human connection with nature. Taken together, these tangible and intangible values define wilderness character and distinguish wilderness from all other lands. (Landres et al. 2015)

Wilderness character encompasses the five qualities that are described in the definition of wilderness from Section 2(c)) of the Wilderness Act. Together, these five qualities are used to monitor how stewardship actions, impacts from modernization, and other changes occurring outside of a given wilderness area affect the wilderness area over time. The five qualities apply nationally to all wilderness areas – regardless of their size, location, administering federal agency, or other unique place-specific attributes – because they are rooted in the legal definition of wilderness. Descriptions of these qualities from Section 2(c) of the Wilderness Act are below.

**Untrammeled**
*Wilderness is "…an area where the earth and its community of life are untrammeled by man"*
➢ Wilderness ecological systems are essentially unhindered and free from the actions of modern human control or manipulation when the Untrammeled Quality is preserved.

**Natural**
*Wilderness "…is protected and managed so as to preserve its natural conditions"*
➢ Wilderness ecological systems are substantially free from the effects of modern civilization when the Natural Quality is preserved.

**Undeveloped**
*Wilderness is "…an area of undeveloped Federal land … without permanent improvements or human habitation"*
➢ Wilderness retains its primeval character and influence, and is essentially without permanent improvement or modern human occupation when the Undeveloped Quality is preserved.

**Solitude or Primitive and Unconfined Recreation**
*Wilderness "…has outstanding opportunities for solitude or a primitive and unconfined type of recreation"*
➢ Wilderness provides opportunities for visitors to find solitude and to challenge themselves with a primitive and unconfined type of recreation when the Solitude or Primitive and Unconfined Recreation Quality is preserved.

**Other Features of Value**

Wilderness *"…may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value"*

➢ Other tangible features of scientific, educational, scenic, or historical value in wilderness add to wilderness character when they are preserved.

In addition to these five tangible qualities of wilderness character, wilderness also has important intangible aspects that are difficult or impossible to quantify or monitor. These intangible aspects are diverse and can include the scenic beauty, spiritual value, immensity of an area, and opportunities for self-discovery, self-reliance, and challenge that come from wilderness settings. These intangible aspects of wilderness can only be addressed in narrative form and are discussed in the Wilderness Narrative section of this assessment.

Wilderness character may change over time, and may be improved or diminished by the actions or inaction of managers. The challenge of wilderness stewardship is that decisions and management actions taken to protect one quality of wilderness character can often degrade another quality. In addition, the accumulated result of seemingly small decisions and actions may cause a significant gain or loss of wilderness character over time. Because of this complexity, preserving wilderness character requires that agency staff document the management decisions made for wilderness and monitor the impacts of those decisions.

In 2008, an interagency team published a national strategy for monitoring trends in wilderness character titled *Keeping It Wild*: *An Interagency Strategy for Monitoring Trends in Wilderness Character Across the National Wilderness Preservation System* (Landres et al. 2008). The monitoring strategy described in *Keeping It Wild* was implemented nationally from 2008 to 2014, and has proved to be an effective tool for wilderness managers with limited resources. Based on lessons learned during this initial implementation of wilderness character monitoring, the framework was revised and updated; the changes made are reflected in *Keeping It Wild 2: An Updated Interagency Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System* (Landres et al. 2015). The wilderness character monitoring strategy for the Big Bend wilderness contained in this document reflects the revised monitoring strategy described in *Keeping It Wild 2.*



**Figure 1. Keeping It Wild Hierarchical Framework**

Big Bend wilderness

The framework of wilderness character monitoring is based on the five qualities defined above. Each quality is divided into a hierarchical set of monitoring questions, indicators, and measures to assess trends in wilderness character over time. Monitoring questions frame wilderness character monitoring to answer particular management questions, indicators are distinct and important elements within each monitoring question, and measures are a specific aspect of wilderness on which data are collected to assess trend in an indicator (Landres et al. 2008 and 2015). Expanded definitions of wilderness character monitoring qualities, monitoring questions, indicators, and measures are available in Appendix A. While the qualities, monitoring questions, and indicators are nationally consistent, measures are specific and sometimes unique to individual wilderness areas (Figure 1).

This framework balances national and local needs for monitoring by defining locally relevant measures whose trends can be compiled at higher levels for national or regional reporting, and ultimately used to understand national trends in wilderness character. This interagency monitoring strategy:

- Provides on-the-ground information to assess trends and make defensible decisions;
- Provides valuable information about wilderness on regional and national scales;
- Provides a set of key wilderness stewardship goals;
- Communicates a common definition of wilderness character;
- Communicates a tangible vision of wilderness within the agency and to the public;
- Clarifies how stewardship decisions and actions influence wilderness;
- Evaluates and documents the effects of actions taken inside the wilderness and effects from threats outside the wilderness;
- Synthesizes data into a single, holistic assessment of wilderness character;
- Creates a legacy of staff experience and knowledge of a wilderness;
- Improves on-the-ground wilderness stewardship.

This monitoring strategy offers a consistent means for documenting the status and trends of wilderness character and a means to understand and monitor the effects wilderness management practices have within a wilderness. Under this monitoring strategy, trends in wilderness character are classified as upward (positive), downward (negative), or stable. These trends are both nationally consistent and independent of the unique aspects specific to any given wilderness, allowing trends in wilderness character to be compared between wildernesses or across regions. While *trends* can be compared between wildernesses, comparing *wilderness character itself* among different wildernesses is inappropriate. Each wilderness is unique in its legislative and administrative direction, and in its social and biophysical setting; therefore wilderness character in a particular wilderness cannot, and will not, be compared to that of another wilderness.

The purpose of this report and the measures of wilderness character is to improve wilderness stewardship by informing managers' understanding of the wilderness they manage, how wilderness character is changing over time, and why changes may have occurred. The following report establishes a baseline condition and monitoring strategy for the Big Bend wilderness based on the five qualities of wilderness character as well as the measures that are specific to the Big Bend wilderness and indicative of local trends in wilderness character. An online Wilderness Character Monitoring Database (at https://wc.wilderness.net/) accompanies this document and includes entries for all measures and baseline data specific to Big Bend wilderness where trends in wilderness character can be monitored. In order to ensure that data will be collected and entered into the Wilderness Character Monitoring Database in the future, it is recommended that wilderness character monitoring be added to annual workload planning.

## WILDERNESS CHARACTER IN THE NATIONAL PARK SERVICE

Preserving wilderness character in the National Park Service is vital to national wilderness preservation. The NPS administers 40% (43,932,843 acres) of designated wilderness within the National Wilderness Preservation System. Of all lands managed by NPS, 83% have been designated as wilderness or are formally eligible, proposed, potential, or recommended wilderness – more total land and a greater proportion of land than any other wilderness management agency.

NPS policy affirms the mandate of the Wilderness Act to preserve wilderness character. The NPS 2006 Management Policies on Wilderness Preservation and Management assert preservation of wilderness character as one of the first and foremost directives and cite wilderness character as a consideration for a range of actions spanning resource management, environmental compliance, analysis of minimum requirements, cultural resource protection, management of facilities and signs, and interpretation and education.

Spurred by NPS policy and building on the framework of *Keeping It Wild*, the National Park Service Wilderness Character Integration Team published *Keeping It Wild in the National Park Service: A User Guide to Integrating Wilderness Character into Park Planning, Management, and Monitoring* (hereafter referred to as the *NPS User Guide*) in 2014. The purpose of the *NPS User Guide* is to provide a NPS-specific reference tool to help managers "integrate wilderness character into park planning, management, and monitoring" while serving as a companion document to the 2014 *Wilderness Stewardship Plan Handbook: Planning to Preserve Wilderness Character*. Both documents are included as part of *Reference Manual 41: Wilderness Stewardship*, which acts as the primary level 3 guidance for wilderness stewardship in the NPS.

Director's Order #41: Wilderness Stewardship, signed in 2013, provides specific direction for the preservation of wilderness character, mandating that each wilderness park:
- "will integrate the concept of wilderness character into park planning, management, and monitoring"
- "should develop a wilderness character narrative which describes what is unique and special about a specific wilderness"
- "will conduct a wilderness character assessment, which includes identifying what should be measured, establishing baseline data, and conducting ongoing monitoring of trends"

Director's Order #41 also references the five qualities of wilderness character in *Keeping It Wild*, which form the basis of this document, and directs managers to the *NPS User Guide* to inform the implementation of these wilderness character directives.

This assessment of wilderness character for the Big Bend recommended and potential wilderness is intended to fulfill two parts of the directive in Director's Order #41 through the development of a wilderness character narrative and the completion of a wilderness character monitoring baseline assessment. Additionally, this document is intended to fulfill the *NPS User Guide* recommendation that encourages every park with wilderness resources "to identify any immediate concerns in wilderness, and to inform managers and the public about the current status of wilderness character."

BIG BEND WILDERNESS

## HISTORICAL AND ADMINISTRATIVE SETTING OF THE BIG BEND WILDERNESS

Deep in the great curve of the Rio Grande, amidst mountains, canyons and sprawling desert, Big Bend National Park preserves a principal 801,163 acres of the Chihuahuan Desert – a land mass larger than the State of Rhode Island. Big Bend National Park was authorized by the 74th Congress on June 20, 1935, although this authorization did not yet appropriate funding for land acquisition. In 1944, after nine years of negotiation, fundraising and infrastructure improvement projects, some of which were carried out by the Civilian Conservation Corps (CCC), the State of Texas delivered Big Bend's deed to the Federal Government, thereby establishing the national park.

In accordance with the Wilderness Act of 1964, a wilderness suitability study of all roadless areas in Big Bend National Park commenced in 1969. Based on the study's findings, President Nixon officially recommended 533,900 acres within the park for wilderness designation, and another 25,700 acres as potential wilderness on November 28, 1973. On May 11, 1978, the Carter Administration recommended additional lands in Big Bend National park for wilderness designation, updating and superseding the 1973 recommendation and increasing the total wilderness area to 538,250 acres of recommended wilderness and 44,750 acres of potential wilderness (Figure 2, below) (See Appendix D *1978 Big Bend Wilderness Recommendation* for complete text*)*. The administration cited "technological advances, land acquisition, and administrative changes which have taken place since 1973" (Office of the Secretary, Department of the Interior. 1978) as the prompting factors for an updated wilderness recommendation. Unless another United States president transmits an updated wilderness recommendation to Congress, the 1978 recommendation will serve as the only official document with the authority to determine the boundaries and acreage for all Big Bend wilderness lands.



**Figure 2. Official 1978 wilderness recommendation map**

BIG BEND WILDERNESS

**Additional Recognitions and Designations:**

Big Bend National Park was internationally recognized in 1976, when the park was designated as a United Nations Education, Scientific and Cultural Organization (UNESCO) International Biosphere Reserve due to the area's exemplary conservation of a protected core area of the Chihuahuan Desert ecosystem, offering "remarkable biodiversity… research and environmental education projects" (UNESCO. 2015). The UNESCO designation also recognizes the park's purpose to promote the social and natural sciences, fostering harmonious relationships between humans and the environment on an international scale.

In 1978, Congress designated 196 miles of the Rio Grande as a unit of the National Wild and Scenic Rivers System based on its "outstandingly remarkable scenic, geological, fish and wildlife, and recreational values" (NPS. 2004). Sixty-nine miles of the designated Wild and Scenic Rio Grande flow through Big Bend National Park, beginning at the border of the Mexican states of Chihuahua and Coahuila – just above Mariscal Canyon and continuing to the park's eastern boundary (See Appendix F for map of surrounding areas). The recommended wilderness boundary extends to the river's waterline in three major canyons – Santa Elena, Mariscal and Boquillas – and includes the cliff faces and floodplain areas. In these three canyons, where recommended wilderness and the Wild and Scenic River corridor intersect, the Rio Grande is designated as both "scenic" and "wild." Resource management goals outlined by the National Wild and Scenic Rivers System are in tune with wilderness values, further encouraging the preservation of "natural, free-flowing character" and "opportunities for challenge, adventure and solitude," where "natural conditions and processes predominate" (NPS. 2004).

In 2001, Big Bend National Park was further distinguished as an Audubon Globally Important Bird Area (IBA). The park's warm winter climate, desert springs and multiplicity of habitats provide an important migratory refuge for a host of species. In all, over 450 species of birds have been documented in the park (NPS. 2015).

Though it has been over 50 years since the passage of the Wilderness Act and almost 40 years since the Carter Administration recommended the Big Bend wilderness for official designation, Congress has taken no action towards permanent designation. Despite nearly 40 years of congressional inaction, wilderness managers at Big Bend have continued to manage recommended and proposed wilderness within the park to the highest standards, maintaining the wilderness character of the area with the hope and expectation that these lands will one day be designated in perpetuity.



*Boquillas Canyon. Photo: Laiken Jordahl*

BIG BEND WILDERNESS



Figure 3. Map of managed wilderness areas adapted from 1978 recommendation

11 | P a g e

**Description of Wilderness Units**

Big Bend National Park's 538,250 acres of recommended wilderness and 44,750 acres of potential wilderness are divided into 12 different management units ranging in size from just over 5,000 acres (Unit 2) to the largest unit of almost 150,000 acres (Unit 4). Unit numbers and boundaries are illustrated in Figure 3, on the previous page, and descriptions of each wilderness unit are offered in Table 1, below.

| Table 1. Description of Big Bend wilderness units | |
|---|---|
| Unit # | Description |
| 1 | Western park boundary to Old Maverick Road corridor, covering Mesa de Anguila and the north side of Santa Elena Canyon to Rio Grande waterline. |
| 2 | Area east of the mouth of Santa Elena Canyon between Ross Maxwell Scenic Drive and Old Maverick Road. |
| 3 | Roadless area between Old Maverick Road, Park Route 13, and the Ross Maxwell Scenic Drive, encompassing Burro Mesa. |
| 4 | Chisos Mountains and Basin area extending southeast to include Talley Mountain. Northern part of this section is classified as potential wilderness due to the presence of a powerline. |
| 5 | West of Park Route 11 to Rosillos Ranch. This area was classified as potential wilderness due to a telephone line and valid mineral rights. Nonconforming uses have since been extinguished and the park considers this land ready to be designated, nonetheless, the area is classified as potential wilderness. |
| 6 | Area west of Mariscal Mountain bordered by two river access road corridors. |
| 7 | Mariscal Mountain and Mariscal Canyon area, extending to Rio Grande waterline. |
| 8 | Chilicotal Mountain area, bordered by Glenn Springs and Park Route 12 road corridors |
| 9 | Northeast of Park Route 12 extending through Tornillo Creek to Old Ore Road corridor. Southwestern portion of this unit are classified as potential wilderness due to the presence of a powerline. |
| 10 | Spans Dead Horse Mountains with southern boundary extending to Rio Grande waterline in Boquillas Canyon. Eastern and northern boundaries extend to NPS boundary line, western boundary is Old Ore Road corridor. |
| 11 | Bounded by road corridors to on all sides but north, where Rosillos Ranch Area begins. 4,200 acres classified as potential wilderness because of the presence of a powerline. |
| 12 | Bounded to the northwest by NPS boundaries and to the south by Park Route 13 Road corridor. 5,200 acres classified as potential wilderness due to a nonfunctioning powerline. |

It is important to note that the Rosillos/Harte Ranch area (illustrated with light green shading in Figure 3, page above) is also in the process of being considered for wilderness designation. This area was acquired in 1978, long after the original wilderness suitability study of Big Bend was completed. A preliminary wilderness suitability assessment – the first step in the process of determining eligibility for inclusion into the National Wilderness Preservation System – was initiated in 2002. This assessment ultimately determined 63,700 acres of the North Rosillos/Harte Ranch area to have wilderness characteristics, although a formal Wilderness Suitability Study – the next step in the process of recommending lands for wilderness designation – has not yet been initiated. Because it has not been officially recommended, the Rosillos/Harte Ranch area is not considered in this assessment.

In this assessment, the term "Big Bend wilderness" will refer to all wilderness lands within the park classified as "recommended" or "potential," as illustrated by Figure 2. A lowercase "w" in the word "wilderness" is used because these lands still await official designation.

**Recommended vs. Potential Wilderness Differentiation**

Because the Big Bend wilderness includes areas classified as both *potential wilderness* and *recommended wilderness*, it is important to note the policy distinctions that differentiate the two levels of classification. Definitions of potential and recommended wilderness, outlined in NPS *Director's Order 41,* are as follows:

*Potential Wilderness:* Lands which possess wilderness characteristics which would normally qualify them for designation within the National Wilderness Preservation System but contain temporary nonconforming or incompatible conditions (such as structures or roads) or uses (such as in-holdings, valid mining claims or operations) which prevent their being immediately designated as wilderness. These lands may be identified as "potential wilderness" in NPS wilderness proposals, wilderness recommendations, and by Congress in legislation designating other portions of a park as wilderness. Designated potential wilderness should be converted to designated wilderness once the nonconforming uses have been extinguished by publishing a notice in the Federal Register.

*Recommended Wilderness:*  An eligible wilderness area that has been studied and proposed by the NPS, recommended for wilderness designation by the Secretary to the President, and then transmitted by the President as his recommendation for wilderness designation to Congress.

*Potential wilderness,* in contrast with *recommended wilderness,* allows for increased management flexibility where certain activities and management actions are tolerated despite their nonconforming nature to wilderness character. Existing nonconforming uses are acceptable in these areas, but their removal is considered desirable.

Nonconforming uses are still present in much of Big Bend National Park's potential wilderness, as well as in certain isolated areas of recommended wilderness. Powerline corridors and their accompanying access roads present in units three, four, nine, eleven and twelve have prevented significant areas of wilderness acreage from being classified as recommended. While some of these powerlines are still active, the line bisecting Unit 12 has been defunct for decades. Park managers have considered cutting this section of power-poles at the base and removing all wire and hardware. This project may be further explored in the coming years.

In the potential wilderness-classified area of Unit 5, the powerline has been successfully removed and the unresolved mineral rights have been phased out. As noted in the map description in Figure 3, park managers consider this area to be fit for designation, and manage the area to the same standards as all recommended wilderness.



*View from the South Rim of the Chisos Mountains. Photo: Laiken Jordahl*

Big Bend wilderness

## WILDERNESS CHARACTER NARRATIVE

*This wilderness character narrative qualitatively describes what is unique and special about the Big Bend wilderness in terms of the five qualities of wilderness character. It is a foundational document intended to convey the current and foreseeable future condition of the wilderness, identify fundamental wilderness resources and threats, and acknowledge important intangible values associated with the wilderness.*

Far into the remote heart of the Chihuahuan Desert, amidst one of the least populous areas of the contiguous United States, lies the Big Bend wilderness. Spanish explorers dubbed this wild expanse north of the Rio Grande *"La Tierra Despoblada"* – the uninhabited land. Legend says that the Spaniards took one look at the endless horizons of the Big Bend area and left it alone, unexplored and unexploited. Though the Spaniards were wrong in their assumptions of an unpeopled landscape – the region has been continuously inhabited for over 13,000 years – the sentiment of a seemingly endless and unforgiving "Tierra Despoblada" holds true today.



*Sunset over the Chisos Range from Roy's Peak Vista. Photo: Laiken Jordahl*

The landscape of the Big Bend wilderness is sprawling and weather-beaten. The energetic volcanism that ravaged the region 30 to 40 million years ago has since subsided, but the present day landscape is no less dynamic. Now, instead of the violent and vigorous volcanoes that spat volcanic ash and spewed lava, the dominating force of the Big Bend region is a patient, silent strength: erosion. Each year, the erosional forces of water and wind cut further into the Earth's surface, slowly unearthing ancient stories of geological periods past. Although much of the region averages less than 7 inches of rainfall each year, water is the

BIG BEND WILDERNESS

incontestable architect of this landscape. Runoff from summer monsoons creates ephemeral streamflow, flooding through ravines, desert washes and slot canyons. Parched soils that endure months of uninterrupted sunlight become saturated in a matter of seconds, turning to sediment and washing downstream. The landscape here is in motion as sun, wind and water whittle away layers of geologic time.

Interlaced with the region's geologic dynamism and varying topography, a thriving and diverse community of biotic life abounds. Thousands of plant and animal species are found in the Big Bend wilderness, some of which cannot be found anywhere else in the world. Artifacts and features scattered through the landscape tell the story of a deep-rooted history of human habitation, suggesting that the abundant ecosystem supported ancient hunter-gatherer peoples dating back millennia. Today, visitors make the journey into the wilderness to convene with the same environment that has inspired and supported past cultures, in search of solitude, adventure and escape.

Regional oil and gas development, increasing border activity and enforcement efforts, diminishing flows to the Rio Grande and the looming impacts of a changing climate threaten to alter much of the region, but the Big Bend wilderness is a resilient environment that has weathered change for millennia. In the face of mounting threats to public lands and wilderness character, land managers must take active steps to assure the existence of wild, untamed places like the Big Bend wilderness for the enjoyment and wonder of future generations.



*Pour-off at Alto Relex. Photo: Laiken Jordahl*

## Untrammeled

*Wilderness is essentially unhindered and free from modern human actions that control or manipulate the community of life.*

The Big Bend wilderness is an environment of extremes. Months sometimes pass without a drop of precipitation, turning leaves brittle and leaving soils parched and dusty. Suddenly, out of nowhere, thunderstorms erupt, illuminating the vast horizon with electricity and unleashing torrential rains and gale force winds. Rainwater flows across the parched earth faster than it can be absorbed, taking with it layers of sediment. floodwater, saturated with particulates of desert soils, plant matter and animal scat flash into arroyos before culminating in a final confluence with the Rio Grande. Then, as quickly as the precipitation materializes, it disappears. Any attempts to control the flows of water or stem the impacts of erosion in this landscape seem futile. The Rio Grande corridor itself has meandered over the course of millennia, refusing to be fastened by what we in recent centuries have defined as an international political boundary.

Environmental disturbance regimes like flooding, erosion, rockslides and fire move freely through the wilderness, sometimes observed but seldom manipulated by human hands. On occasion, certain trammeling actions authorized by NPS do occur when wilderness resources are in danger of being diminished or human lives are threatened. Invasive plants and animals are monitored and removed when possible in an effort to preserve the native biological community. Riparian restoration projects are underway on the wilderness river corridor, treating the non-native monoculture of *Arundo donax* – an invasive giant cane – with controlled burning and chemical herbicides. Wildfires are suppressed when sensitive plant communities, cultural sites, or human lives are at risk. Prescribed burning projects in the Chisos Range, while seldom, help reduce unnatural fuel loading in an attempt to avert potentially catastrophic wildfires.



*Slot canyon in a Tornillo Creek tributary.*
*Photo: Laiken Jordahl*

In addition to actions authorized and carried out by NPS staff and partners, certain unauthorized trammeling actions also occur. In some areas the wilderness boundary extends to the Rio Grande waterline, adjacent to the international border separating the United States and Mexico. Political and social pressures emerging from United States/Mexico relations bring unique threats to the Big Bend wilderness. Much of the land south of the border is still used for ranching and grazing – a practice upon which the livelihoods of many Mexican families depend. As borderland areas in Mexico are overgrazed, some ranchers allow their cattle to cross the river in search of greener pasture. These cattle often enter into the wilderness area, forming stock trails and causing erosion, altering the natural vegetative composition and impact the biotic community. Trespass grazing is considered an unauthorized trammeling action and poses a significant threat to Big Bend's wilderness character.

As climate change progresses and ecological processes deviate from once-natural variation, opportunities to trammel will likely increase. The proliferation of existing and future exotic species, the growing dangers of fuel-accumulation resulting from an increasingly unnatural and continually suppressed fire regime, and the diminishing flows to the Rio Grande may invite the authorization of future trammeling actions. In the face of these ecological changes, wilderness managers must apply restraint wherever possible. All potential

BIG BEND WILDERNESS

APX-V1-171

trammeling actions should be carefully weighed for impacts that would diminish the Untrammeled Quality of wilderness. As written into Big Bend's Final Environmental Statement (FES) for the original wilderness proposal, "The Big Bend National Park wilderness will preserve vast desert and mountain landscapes that are unaltered by the hand of man" (NPS. 1975).



*Ernst Tinaja Wash.Photo: Laiken Jordahl*

BIG BEND WILDERNESS

APX-V1-172

## Natural

*Wilderness maintains ecological systems that are substantially free from the effects of modern civilization.*

From the oak and pine forests encircling the 7,832 foot summit of Emory Peak, to the sweeping sotol grasslands and creosote scrub, to the winding riparian ribbon of the Rio Grande, the Big Bend wilderness hosts diverse habitats and a multiplicity of plant and animal species. The wilderness preserves the heart of a 3.3 million acre binational conservation area, spanning from Big Bend Ranch State Park and the Black Gap Wildlife Management Area in the United States, to the Cañon de Santa Elena, Maderas del Carmen and Ocampo Flora and Fauna Protected Areas south of the Rio Grande in Mexico (see Appendix F for a map of regional protected areas). Together, these parks and protected areas preserve a 240-mile corridor of the Rio Grande and a wide range of Chihuahuan desert, mountain and riparian habitat, allowing life to move freely through the unbroken landscape.

The Big Bend wilderness, ranging from the High Chisos to the Rio Grande, provides a home for almost 1,300 plant species including 59 cacti species, 75 mammal species, 56 reptile species, 40 fish species, 12 amphibian species, 190 butterfly species, and 450 bird species – a greater diversity of birds than any other national park. This incredible biotic diversity is attributed to the area's naturally varying micro-climates where widely varying elevation ranges, soil types and water resources allow plant and animal habitats ranging from the Colorado Rockies to the Sierra Madre to overlap.



*Coryphantha macromeri. Photo: NPS*

Species typically absent from desert landscapes – such as ponderosa pine, Douglas fir, oak and isolated stands of aspen – are present in the Chisos Mountains, thriving in Big Bend's cooler, wetter, forested sky island. These mountains provide crucial habitat for a number of charismatic mammals including white-tailed deer, mountain lions and the Mexican subspecies of the American black bear. Once common throughout western Texas, black bears were poisoned, shot and hunted to near-extirpation by the mid-1900s. After decades without regular sightings, bears were again spotted consistently in the Chisos beginning in the 1980s. Biologists attribute this natural population resurgence to a few individual bears that likely made the trek across the Rio Grande from Mexico's Sierra del Carmen Mountains. The return of the Mexican black bear is an inspiring testament to the resilience of Chihuahuan Desert fauna – and a clear demonstration of the importance of international cooperation in protecting borderland ecosystems



*Black capped vireo. Photo: NPS*

Descending from the forested Chisos, the sotol grasslands and desert scrub expand over vast, undulating alluvial deposits as far as the eye can see. Where less hearty plants wither, drought-resistant succulents thrive. Creosote bush, cacti, yucca and agave dot the landscape, providing modest forage and occasional shade-cover for javelina, jackrabbits, lizards and snakes. Quiet during the daytime heat, the Chihuahuan Desert comes alive at dusk. As temperatures cool with the dipping sun, scorpions, centipedes, ringtail, bobcat, and an array of the park's 24 bat species emerge from daytime slumber.

Big Bend wilderness

Though riparian areas only comprise a fraction of Big Bend's wilderness lands, springs, seeps, tinajas and the winding Rio Grande serve as the lifeblood for the region's biotic community. Peregrine falcons, cliff swallows and canyon wrens nest along the cliffs of the Rio Grande, keeping an eye on the borderlands. Pockets of willows, mesquite and the occasional cottonwood dot the riverbank, offering a corridor of shade and greenery. Life abounds from the river and its floodplains.

From the forest overstory to the sandbars of the Rio Grande, the Big Bend wilderness is home to a number of species found nowhere else in the United States. Each year, numerous birders make their way to the Chisos Range for a chance to see the flitting yellow flash of the Colima warbler's tail. Typical in mountains further south in Mexico, this uncommon warbler graces no other place in the country but the Chisos Range. Perhaps less dramatic but equally rare, a small migratory songbird called the black-capped vireo nests in the arroyos and ravines that descend from the Chisos Mountains. In addition to these rare birds, the Big Bend wilderness is home to a number of plant and animal species federally listed for protection, including the Mexican long-nosed bat, the Rio Grande silvery minnow and the Chisos hedgehog cactus. Protecting these rare and sensitive species is a complex task, especially in the face of invasive plants and animals and a changing climate.

Despite the flourishing biotic community of the Big Bend wilderness, the spread of invasive species has impacted major aspects of the landscape, posing significant threats to the Natural Quality of wilderness character. Invasive grasses have gained strongholds through much of the sotol grasslands, outcompeting native grass shrubs and cacti. African buffelgrass, a particularly noxious introduction, has invaded large tracts of desert wilderness, increasing mortality among Chisos Mountain hedgehog cactus and other native species, while threatening the desert ecosystem with unnaturally frequent and high-temperature fires. Feral hogs have been spotted in northern reaches of the park and have the potential to severely impact sensitive spring habitats. Invasive giant cane proliferates throughout the Rio Grande corridor, creating a thick, impassible monoculture in which native plants have little chance of competing. Barbary sheep, an African native originally imported as a game species, leave the native desert bighorn little chance of recovery.

Invasive plant and animal species, and their impacts on native communities, pose the most significant threat to the Natural Quality of the Big Bend wilderness. The future existence of many imperiled native plants and animals may be determined by the action or inaction of park resource managers. Carefully-weighed management decisions will need to be made regarding the preservation of the natural ecosystem; in this process, wilderness managers should seek to preserve the Natural Quality while minimizing the impacts of preservation actions on the other qualities of wilderness character.



*Mouth of Santa Elena Canyon. Photo: Laiken Jordahl*

Big Bend wilderness

## Undeveloped

*Wilderness retains its primeval character and influence, and is essentially without permanent improvements or modern human occupation*

The remoteness and isolated location of the Big Bend wilderness has in many ways allowed the landscape to evade the influences of modern civilization. Harsh temperatures, scant water resources and a generally unforgiving climate have posed historic challenges to all prospective settlers, while the enduring powers of water, wind and the blistering desert sun have made attempts to develop the area largely impractical. A number of corroding historic structures, defunct water tanks and century-old mining equipment can still be found throughout the park and within wilderness, but the earth's forces are continually working these remnants of human life back into dust. Remoteness and environmental extremes have throughout history, safeguarded the undeveloped character of the Big Bend wilderness. As technological advances have in recent years allowed for energy exploration and increased development in the region, park managers must strive to preserve the undeveloped, primeval character of the Big Bend wilderness for generations to come.

Two main exceptions exist to the undeveloped nature within the Big Bend wilderness – almost 60 miles of telephone and powerlines that bisect much of the landscape, and more than 55 miles of operational roads. Most of these roads service the powerline network, while one road – Black Gap – remains open to off-roading recreationalists. The telephone and powerline network, constructed in the mid 1900's, electrifies and connects the developed areas of Panther Junction, Rio Grande Village, Chisos Basin and Castolon, entering the wilderness at locations near the Maverick Junction and Persimmon Gap entrance stations. Although the telephone, powerlines, and operational road networks were present over a decade before Big Bend's wilderness recommendation, the presence of these developments contradicts the very value and purpose of the Wilderness Act and they are considered nonconforming wilderness uses. These nonconforming uses of wilderness lands continue to prevent significant acreage from meeting qualifications for designation. The ongoing operation and maintenance of these developments fundamentally impacts the Undeveloped Quality of the Big Bend wilderness.

Another key issue in wilderness borderlands is the impact of illegal border crossing and smuggling, as well as Department of Homeland Security enforcement actions carried out by the United States Customs and Border Protection (CBP). Migrant passages through the park take place almost exclusively in wilderness, as border-crossers avoid developed areas in fear of being apprehended. Migrants have in the past been implicated in littering trash during their journeys, although the current level of environmental impacts from UDA activity is considered minimal. Border-related enforcement activity has generated more direct impacts to wilderness character, as noise from aircraft and ground patrols disturbs both visitors and wildlife, and CBP uses a network of radio repeaters, cameras and motion sensors scattered throughout the wilderness at undisclosed locations. If levels of illegal border activity increase, or if the political climate shifts in a way that demands intensified border enforcement, many qualities of wilderness character would be further negatively impacted.

Other developments are present in wilderness lands, in the form of scientific instrumentation, vegetation study plots, motion cameras and radio repeaters; however, the massive scale of Big Bend's wilderness landscape makes these installations seem few and far between. Motorized use does occur on occasion, most often in the form of aerial law enforcement patrols and border security-related patrols on powerline maintenance roads. The use of chainsaws, rock-drills and generators is occasionally authorized and employed by NPS staff on an incidental individual-project basis. Motorized uses should be employed only when deemed absolutely necessary, following a Minimum Requirement Analysis (MRA) conducted by park managers.

Threats to many qualities of wilderness are compounded by forces outside the park and beyond NPS control. Increased development related to border security could drastically impact Big Bend's wilderness character, as motorized patrols, security installations and lighting systems could be installed in wilderness lands. Urban, agricultural and energy-related developments also pose significant external threats to wilderness character, as plans are underway to complete the first paved highway connecting Chihuahua and Coahuila, as well as to pave a historically-rugged 30-mile road to the border village of Boquillas del Carmen. These transportation infrastructure developments could open up new areas south of Big Bend to development and energy exploration. Pollution attributed to urban and industrial development on the Gulf Coast of Texas and eastern United States combined with emissions from coal-burning power plants in northwest Mexico often settles over the park, impairing visibility and depositing pollutants throughout the park. On certain days of the year, Big Bend has been known to have the worst visibility of any western national park (NPS. 2015). The Rio Grande is also severely impacted by upstream development. Often, the river lies dry between El Paso and Ojinaga as water is diverted for crop irrigation and municipal use in both the United States and Mexico (Wong et al. 2007). For the first time since severe droughts in the 1950s, portions of the Rio Grande within the Big Bend wilderness stopped flowing entirely in 2003, as a result of upstream development and extraction (National Parks Conservation Association. 2003). Diminishing flow levels have increased sedimentation, contributed to poor water quality and aided in the proliferation of invasive monocultures, severely impacting many qualities of wilderness character.

Despite the external threats of development, pressures related to border security, and the nonconforming telephone, powerline and road networks through much of the potential wilderness area, the great majority of the Big Bend backcountry remains an untamed and expansive wilderness. The vastness of this landscape has protected the wilderness from modern human development, preserving the true primeval character for which Big Bend is so known and loved.



*Tornillo Creek. Photo: Laiken Jordahl*

## Solitude or Primitive and Unconfined Recreation

*Wilderness provides outstanding opportunities for solitude or primitive and unconfined recreation.*

Two years after President Lyndon B. Johnson signed the Wilderness Act into law, the First Lady, "Lady Bird" Johnson embarked on a trip to the Big Bend wilderness as a part of the National Park Service's 50th anniversary celebration. After ascending Lost Mine Trail and floating Mariscal Canyon, the First Lady shared her impression of Big Bend as "wild country, completely untamed by man…a good place to come to get your troubles in perspective" (NPS. 2015). As noted by the former First Lady, the Big Bend wilderness provides ample opportunity for reflection where individuals can escape the chatter of mechanized society and immerse in the natural world.

From an easy day hike to the Window pour-off, to a multi-day, trailless traverse of the Dead Horse Mountains, the Big Bend wilderness offers a range of outdoor experiences suited for visitors of all comfort-levels and abilities. Massive areas of the backcountry are completely free from trails and development. These pristine reaches of wilderness provide an arena where the most dedicated recreationalists can find tranquility and challenge, miles from the nearest developed campsite, signpost or fellow human. The true scale of the Big Bend wilderness may be best comprehended in such locations at dusk, as the contours of each rolling ridgeline melt into a seemingly infinite shading of pink, orange, purple, obscure shades of grey and, finally, to darkness. On a moonless night, wilderness stargazers can see more than 4,000 stars, flawless views of the Milky Way and even the Andromeda Galaxy, set to the playful and eerie yipping of a wandering coyote. On such occasions, the contemplation of one's place in the world is an almost unavoidable side-effect. For those who venture deep into the Big Bend wilderness, far out of the sights, sounds and worries of mechanized society, tranquility and perspective are the reward.



*Lady Bird Johnson rafting the Rio Grande in 1966. NPS Photo Archives.*

Beyond the values of solitude and meditations on human scale, the Big Bend wilderness provides world-class opportunities for adventure, challenge and recreation. The Rio Grande River – nationally recognized for its incredible recreational opportunities under the National Wild and Scenic Rivers Act – provides a playground of rapids and riffles that flow unimpeded through thousand-foot limestone cliffs. River-runners often hear the compelling call of a canyon wren echoing overhead, as boaters paddle along the border where Texas meets the Mexican states of Chihuahua and Coahuila. The unique opportunity to float an international river, and cross the Rio Grande's centerline – where the international border is defined – perhaps a hundred times each day, adds another aspect of intrigue to an adventure through the Big Bend wilderness.

Big Bend National Park visitation levels have remained fairly stable since the early 1990s at around 300,000 annual visitors. While park managers once expected use to increase to upwards of 1.2 million annual visitors (NPS. 1975), this ballooning never occurred. Remoteness has protected the park and the wilderness

from increased use. Generally speaking, crowding, backcountry capacity and the protection of visitor's opportunities for solitude have never been significant wilderness management issues for the park.

Current threats to the Solitude of Primitive and Unconfined Recreation Quality in the Big Bend wilderness mirror many of the threats to other wilderness qualities. Increased border activity, in the form of both illegal actions and enforcement efforts can impact visitors and detract from feelings of peace and isolation. Already, many wilderness users express safety concerns to permitting officers and park rangers, while some likely skip the trip altogether due to their hesitations. While these precautions are, for the most part, statistically unfounded, activity on the border and its media portrayal likely deter many visitors from visiting the park and wilderness at all.

Development outside of the park, compounded by environmental changes, has also impacted visitor opportunities for recreation on the Rio Grande. While droughts have been historically common in the region, heightened rates of upstream water extraction have further diminished Rio Grande flows, making river trips cumbersome and unpredictable. The proliferating monoculture of giant reed has consumed open riverbanks that were once choice campsites, forcing river-runners to find camp elsewhere. Border security concerns have caused some recreationalists to steer clear of the river corridor altogether, deterring them from paddling through the Big Bend wilderness. Because of these compounding factors, recreation on the Rio Grande seems to be the most vulnerable aspect of the Opportunities for Solitude or Primitive and Unconfined Recreation Quality.



*Hikers in a trailless area near Rough Run Creek. Photo: Laiken Jordahl*

BIG BEND WILDERNESS

## Other Features of Value

*Wilderness may also contain other features of scientific, educational, scenic, or historical value.*

A description of the Big Bend wilderness would not be complete without an account of the human element. Artifacts and features found in the region indicate that lands within the modern-day Big Bend wilderness have been occupied by humans for at least 13,000 years, beginning with nomadic Paleo-Indian hunter gatherers. The climate of the region was substantially cooler and wetter in the early Holocene era and lush woodlands covered much of the landscape. Large game animals like bison were once common throughout the region and were a staple food source for early indigenous peoples. As the climate evolved to the hotter, drier conditions that we know today, native peoples adapted by subsisting on desert plant foods, trading with nearby communities, and innovating agricultural techniques. By the time the early Spanish explorers arrived in the 1500s, the Chisos Indians were the presiding inhabitants of the region, until the arrival of the Comanche and Mescalero Apache, who asserted regional dominance in the 1700s.

Throughout the Big Bend wilderness, physical remnants of these bygone cultures are abundant, offering subtle clues and insights to how traditional peoples interacted with the landscape. In many areas it's impossible to wander more than a dozen feet without passing over a stone tool or flake, charred and fire-cracked rock from ancient hearths, or manos and metates from prehistoric food-processing stations. For those with a trained eye and an interest in archaeology, the Big Bend wilderness is a compelling cultural puzzle of treasures and surprises. Nearly 3,000 sites have been documented in the surveyed areas of the park, offering a wealth of cultural information. Despite this abundance of artifacts and sites, the vast majority of the park's cultural resources have yet to be discovered. An estimated 10% of lands within the Big Bend National Park have been surveyed for cultural resources, leaving 90% completely unexplored. Great value lies in the likely tens of thousands of sites that rest undiscovered in wilderness lands – untapped resources vulnerable to environmental and human-caused degradation.



*CCC enrollees during the construction of the Window Trail. Photo: NPS Archives*

The Big Bend wilderness also holds a wealth of historic resources, from structural ruins from Mexican farming and ranching in the 1800s to historic trails constructed by the Civilian Conservation Corps (CCC) in the Depression Era. These historic resources serve as important reminders of the toils and triumphs of cultures past. From weathered arrowhead points dating back millennia, to the more recent structures constructed by the CCC in the 1930s and 40s, the cultural and archaeological resources of the Big Bend wilderness reveal an ever-evolving history of human use and ingenuity.

Beyond human history, evolutionary processes are amply on display, evidenced by an array of hundreds of species preserved in fossilized specimens ranging from dinosaurs, fish and crocodiles, to mangroves, laurel, conifers and even early mammals. The fossil record present in the Big Bend wilderness spans an incredible 120 million years, cataloging the last days of the dinosaurs and providing exceptional insights into the process of their evolution and extinction.

Cultural and paleontological resources in the Big Bend wilderness are threatened by theft, neglect and erosion. Numerous thefts of these resources have been documented, but in such an immense environment

scattered with fossils and artifacts, the apprehension of illegal looters and collectors is rare. Archeological and paleontological sites also face damage from recreationalists, as resource managers lack the funding to perform adequate site inventories and to implement stabilizing actions. Most of these sites have persisted throughout thousands of years, but in the face of these new threats, preservation of cultural and paleontological resources has become a vulnerable and important issue to wilderness character.



*NPS photos from late 1990's (left) and 2010 (right) showing the unauthorized removal of an* Alamosaurus *femur. Black arrows point to visually identifiable photopoint landmarks.*

## WILDERNESS CHARACTER MONITORING

This wilderness character monitoring assessment is based on the wilderness character monitoring framework of *Keeping it Wild 2*. This assessment discussed the measures selected for monitoring wilderness character in Big Bend National Park and provides a quantitative baseline data value for each measure to which future data will be compared. In contrast to the qualitative descriptions found in the wilderness character narrative, this is a quantitative assessment of the area's wilderness character. The measures selected for the Big Bend wilderness, and the corresponding data compiled and analyzed for each, establish a foundation for continued monitoring of the wilderness character of the Big Bend wilderness.

## Process Used for Identifying Measures:

The process used to identify and select measures to monitor wilderness character is outlined below. All actions were carried out by the Wilderness Fellow unless otherwise specified.

**Gather information**—Background information was gathered to understand the wilderness, including its history, ecosystems, and potential future threats. This information was gathered by reading background and guiding documents for the wilderness and park, interviews with park staff, and visiting the wilderness.

**Create list of possible measures**—Preliminary measures were identified and compiled for all indicators based on the information gathered and interviews with park staff. Several measures were based on measures described in wilderness character monitoring documents, such as the *Forest Service Technical Guide* (Landres et al. 2009), or measures developed for other wilderness areas and adapted to suit the Big Bend wilderness.

**Refine measures**—Measures were prioritized and refined through discussions and workshops with relevant staff, evaluating the significance, feasibility, vulnerability, and reliability of measures. Availability of existing reports and scientific information was also considered.

**Approval of measures**—The final list of measures was developed and submitted to Wilderness Character Monitoring Supervisor Peter Landres (*Ecologist, Aldo Leopold Wilderness Research Institute*).

**Locate and synthesize data**—Available data for each measure were collected by contacting relevant individuals and pulling information from national databases, shared drives, and GIS or paper files. Data were processed and analyzed as necessary.

**Write report**—Background information, collection protocol, data adequacy, data source, and significant change were described for each measure.

**Enter data**—Data were entered into the Wilderness Character Monitoring Database at https://wc.wilderness.net/.

**Incorporate comments**—Changes, edits, and feedback from park staff and wilderness supervisors were received by the Wilderness Fellow. Edits were incorporated into the final draft.

**Approval of final report**—Report was reviewed and approved and finalized by park Wilderness Coordinator and relevant staff.

Big Bend wilderness

## Overview of Wilderness Character Monitoring Measures

The table below provides a basic overview of the 30 wilderness character monitoring measures selected for the Big Bend wilderness. Each measure is described in detail in its respective section later in the report.

| Table 2. Overview of Big Bend Wilderness Character Monitoring Measures | | |
|---|---|---|
| **INDICATOR** | | **MEASURE** |
| UNTRAMMELED | Actions authorized by the federal land manager that intentionally manipulate the biophysical environment | Number of Plant Species Manipulated |
| | | Actions That Manipulate Wildlife |
| | | Percentage of Naturally Ignited Fires Not Receiving a Suppression Response |
| | | Number of Fuels Reduction Projects |
| | Actions not authorized by the federal land manager that intentionally manipulate the biophysical environment | Number of Trespass Livestock Captured in Roundups |
| | | All Other Unauthorized Trammeling Actions |
| NATURAL | Plants | Priority Exotic Plant Species |
| | Animals | Priority Exotic Animal Species |
| | | Human Wildlife Incidents |
| | Air and water | Days of Rio Grande Flow Below 40 cfs |
| | | Visibility |
| | | Concentration of Sulfur in Wet Deposition |
| | | Concentration of Nitrogen in Wet Deposition |
| | Ecological processes | Regional Nighttime Radiance |

BIG BEND WILDERNESS

| Table 2. Overview of Big Bend Wilderness Character Monitoring Measures | | |
|---|---|---|
| UNDEVELOPED | Presence of non-recreational structures, installations, and developments | Authorized Non-Recreational Physical Developments |
| | | Miles of Telephone and Powerlines |
| | | Miles of Roads |
| | Presence of inholdings | Number of Inholdings |
| | Use of motor vehicles, motorized equipment, or mechanical transport | Authorized Administrative Flight Hours |
| | | Commercial Scenic Flight Operations |
| | | Authorized Administrative Motorized and Mechanized Use |
| SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION | Remoteness from sights and sounds of human activity *inside* wilderness | Backcountry Overnight Stays |
| | | Illegal Campfires |
| | | Heavily Impacted Backcountry Campsites |
| | Remoteness from sights and sounds of human activity *outside* of wilderness | Percentage of Time Noise-Free |
| | | Night Sky Visibility |
| | Facilities that decrease self-reliant recreation | Facilities that Decrease Primitive and Self-Reliant Recreation |
| | Management restrictions on visitor behavior | Visitor Behavior Restrictions |
| OTHER FEATURES | Deterioration or loss of integral cultural features | Condition of Archaeological Sites |
| | | Cultural Sites Impacted by UDA Activity |

For each measure, this report includes the following subsections: measure baseline data value, 2015 data value, year(s) of data collection, background and context, measure description and collection protocol, data source, data adequacy, data frequency, and significant change. The content and purpose of each of these subsections is described below.

**Measure Baseline Data Value**—specifies the earliest data value that exists for a measure. Although the overall baseline year for wilderness character monitoring in the Big Bend wilderness is 2015 (the first year for which all selected measures have data), the baseline year for a measure may predate this when historical data exist for that measure. Historical data used for a measure can include any data collected from 1978, when the Big Bend wilderness was recommended for designation, onward. Trends for each measure are calculated by comparing the most recent data value with the data value for the measure baseline year.

**2015 Data Value**—specifies the data value entered into the Wilderness Character Monitoring Database for 2015 (the overall baseline year for Big Bend wilderness character monitoring). If 2015 is the measure baseline year, **2015 (Measure Baseline) Data Value** is used in place of "Measure Baseline Data Value" and "2015 Data Value." Note that the Wilderness Character Monitoring Database uses "year measured" to refer to the year of any given data value (e.g. the "year measured" of the "2015 data value" is 2015).

**Year(s) of Data Collection**—specifies the year(s) the data for a measure's data value was/were collected. For some measures, the protocol may be to report the most recent available data, regardless of when the data were specifically collected. For example, if data pulled from a national website are only available to the public two years after data collection, the 2015 data value would have a date year of 2013. Measures that use data collected over the course of a year (as opposed to instantaneously collected data) use calendar years unless otherwise noted.

**Background and Context**—defines the context and relevance for the measure at an individual wilderness and addresses why the measure was selected.

**Measure Description and Collection Protocol**—defines what is being measured and how, including the process through which data is compiled or gathered. "Collection protocol" is included in this document to describe the process by which data are gathered from existing sources; in-the-field data collection instructions are not included. If field data collection protocols are relevant to a measure and available, a location of where the protocol can be found is included. Additional instruction for completing simple linear regressions accompanies this report as a separate document.

**Data Source**—defines where baseline information for the measure can be found in the future. The intent of this section is to encourage written documentation of wilderness character so that information is accessible into the future.

**Data Adequacy**—defines the reliability of the data in terms of being able to assess trends in the measure. Data adequacy is based on both data quantity and data quality. Data quantity refers to the level of confidence that all appropriate data records have been gathered. Data quality refers to the level of confidence about the source(s) of data and whether the data are of sufficient quality to reliably identify trends in the measure. Further information on the role of data quantity and quality in wilderness character monitoring is available in the *Forest Service Technical Guide* (Landres et al. 2009, p. 26). These two aspects of data adequacy are subjectively evaluated according to the categories described in Table 3. Data adequacy (scored as high, medium, or low) must be determined on a case by case basis from the assessments of data quality and quantity; however, a general scoring framework (Table 4) can be used as a

starting point for this determination. Note that the Wilderness Character Monitoring Database refers to data adequacy as "data confidence."

| Table 3. Data Quantity and Quality Definitions | |
| --- | --- |
| Data Quantity | Data Quality |
| **Complete**—There is a high degree of confidence that all data records have been gathered.  For example, to assess the occurrence of nonindigenous invasive plants, a complete inventory of the wilderness was conducted or all likely sites were visited. | **High**—There is a high degree of confidence that the quality of the data can reliably assess trends in the measure.  For example, data on the occurrence of nonindigenous invasive plants are from ground-based inventories conducted by qualified personnel; for visitor use, data would come from visitor permit data. |
| **Partial**—Some data is available, but the data are generally considered incomplete (such as with sampling).  For example, to assess the occurrence of nonindigenous invasive plants, a partial inventory was conducted or a sampling of sites was conducted where these plants are likely to occur. | **Moderate**—There is a moderate degree of confidence about the quality of the data.  For example, data on invasive plants could come from national or regional databases; for visitor use, data could come from direct visitor contacts. |
| **Insufficient**—Even fewer data records have been gathered, or perhaps this measure is not dependent on actual field data.  For example, no inventory for nonindigenous invasive plants has been conducted, and visitor use was not assessed anywhere. | **Low**—There is a low degree of confidence about the quality of the data.  For example, data on invasive plants and visitor use could come from estimates rather than hard data. |

| Table 4. Data Adequacy Scoring | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Data Quantity | | + | Data Quality | | = | Data Adequacy | |
| Complete | 3 |  | High | 3 |  | High | 6 |
| Partial | 2 | + | Moderate | 2 | = | Medium | 4-5 |
| Insufficient | 1 |  | Low | 1 |  | Low | ≤3 |

**Data Frequency**—defines how often data for this measure should be entered into the Wilderness Character Monitoring Database. Frequency is typically determined by the time frame in which data becomes available under existing monitoring protocols or by how many years of data are necessary to show significant change. In most cases, data frequency was determined by the Wilderness Fellow and approved by park staff.

BIG BEND WILDERNESS

APX-V1-185

**Significant Change**—defines how much the data must change from the baseline data value to indicate an upward or downward changing trend in the measure. "Significant change" is defined and used in this document differently than definitions used by other departments within NPS and is not intended to mean "statistically significant change" or as considered by National Environmental Protection Act analysis. In most cases, significant change was determined by the Wilderness Fellow and approved by park staff.

Together, these subsections provide a comprehensive overview of each measure, provide transparency into the wilderness character monitoring measures selected at the park, and form the basis of the wilderness character monitoring strategy of the Big Bend wilderness.



*Chisos Range. Photo: Katherine Sinsky.*

BIG BEND WILDERNESS

## UNTRAMMELED

*Wilderness is essentially unhindered and free from modern human control or manipulation*

Measures for the Untrammeled Quality monitor the *actions* of humans in wilderness that intentionally manipulate the biophysical environment. Actions that intentionally manipulate or control ecological systems inside wilderness degrade the Untrammeled Quality regardless of what instigated the action or if benefits to other qualities of wilderness character are gained by the action. Withholding action is a key concept for understanding this quality; management of wilderness, in contrast to management of other types of land, should be approached with restraint and humility. When monitoring the Untrammeled Quality we can track either the decision to manipulate the biophysical environment, or the opportunity for humans to let natural processes occur without intervention.

| Table 5: General Guidance for Counting Trammeling Actions* |
| --- |
| • Only count actions that are of sufficient scale (that cross the threshold);<br>• All actions above the threshold are counted equally;<br>• Actions are counted once per year the action occurs;<br>• Minimum requirements analyses (MRAs) or other National Environmental Policy Act (NEPA) analyses can often (though not always) be used to indicate the extent of possible trammeling actions in wilderness. |

*See Appendix B for detailed guidance about how to count trammeling action

| Table 6. Untrammeled Quality | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **Indicator** | **Measure** | **Frequency** | **Data Adequacy** | **Significant Change** | **Baseline** | **2015 Data Value** |
| Actions authorized by the federal land manager that intentionally manipulate the biophysical environment | Number of Plant Species Manipulated | 1 | High (6) | Any | 1 | 1 |
| | Actions that Manipulate Wildlife | 1 | High (6) | Any | 2 | 3 |
| | Percentage of Naturally Ignited Fires Not Receiving a Suppression Response | 5 | High (6) | ≥ 10% | 22% | 22% |
| | Number of Fuels Reduction Projects | 5 | High (6) | Any | 1 | 1 |
| Actions *not* authorized by the federal land manager that intentionally manipulate the biophysical environment | Number of Trespass Livestock Captured in Roundups | 1 | Medium (4) | ≥ 50% | 112 | 77 |
| | All Other Unauthorized Trammeling Actions | 5 | Medium (4) | Any | 0 | 0 |

| UNTRAMMELED QUALITY | Actions authorized by the federal land manager that intentionally manipulate the biophysical environment |
|---|---|

## Number of Plant Species Manipulated

**2015 (Measure Baseline) Data Value:** 1 species
**Year(s) of Data Collection:** 2014

**Background and Context:**

Actions to manipulate vegetation and control the spread of invasive species are sometimes necessary to preserve healthy ecosystem balances. Non-native species can outcompete native plants, take over vegetative composition, impact wildlife habitat and forage, and cause changes in natural ecosystem processes. Over 70 exotic plant species have been documented in Big Bend National Park, six of which have been identified as "priority exotic plant species" that are prioritized for removal. A list of these priority exotic species can be found in Table 11 on Page 46 under a separate measure in the Natural Quality. Infestations of these exotic species are most highly concentrated around areas where human use and manipulation has occurred like roadways, campsites, trails, river corridors and areas where grazing was once present.

Big Bend National Park vegetation managers have employed chemical, mechanical, biological and prescribed fire methods to control the spread of exotic species. Most of these treatments are isolated around roadways and developed areas and take place, for the most part, outside wilderness lands. In 2014, only one species was treated in the Big Bend wilderness – *Arundo donax,* commonly known as giant cane. The typical treatment regime for giant cane involves intensive chemical spraying from watercraft, followed by prescribed fire. This treatment has been successful in eliminating the giant cane monoculture and restoring riparian vegetation in much of Boquillas Canyon, and treatments have now been implemented in many areas of the river corridor. While the elimination of the giant cane monoculture clearly benefits the Natural Quality of wilderness, any action taken to manipulate the biophysical environment – including the treatment of exotic plants – is counted as a trammeling action, and degrades the Untrammeled Quality of wilderness.

In the face of a changing climate and the likely arrival of new exotic species, the potential for future trammeling actions in wilderness lands is likely.  Already, much of the park's desert grassland habitat is threatened by infestations of Lehman's lovegrass and African buffelgrass. These invasive grasses are currently present in wilderness, and have clear impacts on native plants, animals and ecosystem processes. While current treatment of these grasses is isolated to non-wilderness, the possibility exists for future mitigating actions to occur in wilderness lands. Future actions to control salt cedar – a riparian invasive known for its deep root systems and high water intake – may also occur.  Any authorization of future trammeling actions should involve careful consideration for the Untrammeled Quality, and be taken only when truly necessary.

**Measure Description and Collection Protocol:**

Data value is a count of the number of species manipulated, on a broad scale, by NPS staff or associates within wilderness. This may include any actions required to uphold other laws, aspects of wilderness character or any research-related actions of a significant scale. This measure does not count incidental actions, like removing hazard trees or hand pulling of a few weeds, since the principal intent of these actions is not meant to manipulate vegetation on a broad scale. Prescribed burning is not counted in this

measure, as it is counted in a separate measure below. See Appendix B for detailed information about how to count trammeling actions. As with all measures monitoring trammeling actions, the intent of this measure is to track whether management programs are trending toward more or less human manipulation in the wilderness; therefore, this approach to counting trammeling actions focuses on the *decision* to trammel, and not on the *magnitude* of trammeling's effects.

Consult with vegetation specialists to develop a count of the number of plant species manipulated within wilderness.  An increase in the number of authorized actions that manipulate vegetation would contribute to a downward trend for this indicator of the Untrammeled Quality.

**Data Source:**

Joe Sirotnak, *Botanist, Big Bend National Park*

**Data Adequacy:**

High (6)
> Data quantity is high because all vegetation-management actions taken are well-documented and new actions typically require an MRA. Data quality is high for the same reasons.

**Frequency:**

Annually

**Significant Change:**

Any change in number of actions from the baseline data value is considered significant.



*Chemical Spraying of* Arundo donax *on the Rio Grande Corridor. Photo: NPS*

BIG BEND WILDERNESS

| UNTRAMMELED QUALITY | Actions authorized by the federal land manager that intentionally manipulate the biophysical environment |
|---|---|

## Actions that Manipulate Wildlife

**Measure Baseline Data Value:** 2 actions
**Year(s) of Data Collection:** 2013

**2015 Data Value:** 3 actions
**Year(s) of Data Collection:** 2014

**Background and Context:**

Preserving wildlife in the Big Bend wilderness sometimes requires actions that diminish the Untrammeled Quality of wilderness. Certain trammeling actions may at times be necessary in order to preserve sensitive species and natural habitats, and to understand complex ecosystem processes. These actions should be considered only when the action cannot take place outside of wilderness, and if the action is taken, restraint should be exercised wherever possible.

A number of wildlife management actions occur in the Big Bend wilderness each year, some of which qualify as trammeling actions. Vulnerable species like the Mexican long-nosed bat and the mountain lion have warranted extensive study and occasional manipulation in order to understand species trends and preserve the presence of these animals in the wilderness. As a part of an ongoing project, the U.S. Department of Agriculture (USDA), in conjunction with local partners, has air-dropped rabies vaccination bait throughout the wilderness, targeting foxes and skunks in efforts to stem the spread of the disease and protect humans from exposure. All current management actions that manipulate wildlife in the Big Bend wilderness are indexed and totaled below in Table 7. Future trammeling actions may become more likely as park managers complete the *Exotic Animal Management Plan (EA)* that may implement the removal of priority invasive species through an Integrated Pest Management (IPM) approach including lethal and non-lethal removal methods.

**Measure Description and Collection Protocol:**

Data value is the number of annual actions that manipulate wildlife within wilderness authorized by NPS. Any action to intentionally manipulate, hinder, restrict, or control the biophysical environment is considered a trammeling action (see Appendix B for detailed information on what qualifies as a trammeling action). Actions occurring as part of research projects or administrative actions that have foreseeable impacts on the ecological community are considered trammeling actions. Consult with wildlife biologists, relevant staff, NEPA and research permitting records to obtain a description and count of all actions that manipulate wildlife. See Appendix B for detailed information about how to count trammeling actions.  An increase in the number of actions that manipulate animals would contribute to a downward trend for this indicator of the Untrammeled Quality.

**Data Source:**

Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator;* Jeff Bennet, *Physical Scientist/Hydrologist*

| Table 7. Authorized Annual Actions That Manipulate Wildlife | |
|---|---|
| **Manipulating Action** | **Purpose of Action** |
| **2013** | |
| Two mountain lions collared | Mountain lion study |
| Aerial rabies vaccination baiting | Annual procedure by USDA and local partners |
| **2014** | |
| One mountain lion collared | Mountain lion study |
| Mexican long-nosed bats PIT tagged | Migration research |
| Aerial rabies vaccination baiting | Annual procedure by USDA and local partners |
| **2015 (YTD)** | |
| Mexican long-nosed bats PIT tagged | Migration research |
| Aerial rabies vaccination baiting | Annual procedure by USDA and local partners |

**Data Adequacy:**

High (6)
> Data quantity is complete because authorized wildlife-related trammeling actions are well documented by park managers and typically require completion of an NPS research permit or MRA. Data quality is high for the same reasons.

**Frequency:**

Annually

**Significant Change:**

Any change in number of actions from the baseline data value is considered significant.

BIG BEND WILDERNESS

| | |
|---|---|
| **UNTRAMMELED QUALITY** | **Actions authorized by the federal land manager that intentionally manipulate the biophysical environment** |

## Percentage of Naturally Ignited Fires Not Receiving a Suppression Response

**2015 (Measure Baseline) Data Value:** 22%
**Year(s) of Data Collection:** 2000-2014

**Background and Context:**

Fire is a naturally occurring and essential part of wilderness ecosystems that serves as a natural disturbance regime and provides a host of ecosystem services. Letting fires burn in wilderness is ecologically desirable; however, unsuppressed fires can easily escape to non-wilderness areas, posing serious threats to existing infrastructure and public safety. Fires in wilderness are often suppressed with the justification of reducing danger to nearby non-wilderness developments and protecting resources and human safety. Additionally, the remote location of the Big Bend wilderness makes response resources difficult to deploy with efficient

timing, as fire crews have to travel from regional centers far from the park. While fire suppression is openly allowed by the Wilderness Act and subsequent wilderness policy for reasons including threat to life and property, the action of fire suppression is a significant manipulation of the biophysical environment and diminishes the Untrammeled Quality of wilderness character. Decisions to suppress natural-ignition fires in wilderness should be taken only when absolutely necessary.



The fire regime in the Big Bend wilderness, especially in the higher-elevation Chisos Mountains, has been significantly altered from historical norms. Grazing practices beginning in the late 1800s led to the decimation of native grasses and caused erosion, creating an environment in which shrubs and trees

*Lost Mine Fire, 2014. Photo: NPS*

increased in stand density. In the years between 2009 and 2011, a severe drought killed 63 percent of trees monitored in sample plots in the Chisos Mountains (Poulos. 2013), increasing downed dry fuels and overall fire danger. The cumulative impacts of grazing, historical fire suppression and drought have created a densely-forested and highly fuel-loaded vegetative composition in the Chisos Mountains where the potential for a high-severity stand-replacing wildfire is ever-increasing. Because of this potentially catastrophic fire danger, combined with the extremely limited personnel and financial resources available to fire managers at the park, the standard operating procedure is to suppress all unplanned ignitions, natural or human-started. Only four fires were allowed to burn without suppression in the five year monitoring period between 2010 and 2014 (see Table 8). These fires went unsuppressed because the fire was either in an area that posed little threat of spreading into fuel-loaded areas, or the fire burnt out before fire managers arrived on site.

BIG BEND WILDERNESS

**Measure Description and Collection Protocol:**

Data value is the percent of naturally-occurring wilderness fires that are not suppressed over a five-year period. To determine the data value, consult with the park fire ecologist (Richard Gatewood in 2015), isolate all naturally occurring fires in wilderness, and calculate percentage value. Data were collected dating back one five-year period from 2010 to 2014 (shown in Table 8, below). Allowing naturally ignited fires to burn without suppression would increase the percentage of fires not receiving a suppression response and contribute to an upward trend for this indicator of the Untrammeled Quality.

**Data Sources:**

Richard Gatewood, *Fire Ecologist;* Ed Waldron, *Fire Management Officer*

**Data Adequacy:**

High (6)
> Data quantity is complete because all fires and fire suppression actions in Big Bend National Park are documented by fire management and ecologists. Data quality is high for the same reasons.

**Frequency:**

Five years

**Significant Change:**

Any change of 10% or more from the baseline data value is considered significant.

| Table 8. Natural-Start Fire Suppression History 2010-2014 | | |
|---|---|---|
| **Year** | **Fire Name/Location** | **Suppressed?** |
| **2010** | Sotol Vista | Yes |
| **2010** | Casa Grande | Yes |
| **2010** | Dagger Flats | Yes |
| **2010** | Katerine | Yes |
| **2010** | Sublett | No |
| **2010** | Joselyn | Yes |
| **2011** | Texan Dairy | Yes |
| **2011** | Burro Mesa | No |
| **2011** | Elephant Tusk | No |
| **2012** | Easter | Yes |
| **2012** | Avino House | Yes |
| **2012** | Yetti | Yes |
| **2013** | Chilicotal | No |
| **2013** | Oak Springs | Yes |
| **2013** | Ward Springs | Yes |
| **2014** | Lost Mine | Yes |
| **2014** | Oak Springs | Yes |
| **2014** | Willow | Yes |
| Total Natural-Start Fires: 18 | Percentage of Natural-Start Fires not Suppressed: 22% | |

BIG BEND WILDERNESS

| UNTRAMMELED QUALITY | Actions authorized by the federal land manager that intentionally manipulate the biophysical environment |

## Number of Fuels Reduction Projects

**Measure Baseline Data Value:** 1 Project  
**Year(s) of Data Collection:** 2000 - 2004

**2015 Data Value:** 1 Project  
**Year(s) of Data Collection:** 2010 - 2014

**Background and Context:**

Fuels reduction projects allow resource managers to reduce fire danger and mitigate the risk of escaped wildfires. Fuels reduction projects often attempt to mimic the role a natural fire would have in an ecosystem, thinning ground cover, removing dead and downed vegetation and reducing overall fuel-accumulation. In areas that have historically seen extensive fire suppression, fuels reduction projects provide fire managers with an important tool to avert potentially catastrophic wildfires. Fuels reduction methods include mechanical, chemical or biological methods of thinning, as well as the use of prescribed fire where ignitions and perimeters are specified by park managers to meet specific objectives. While fuels reduction methods are allowed by the Wilderness Act and subsequent wilderness policy for reasons including threat to life and property, these methods employ significant manipulations of the biophysical environment by altering natural vegetative composition and are considered trammeling actions

Fuels reduction projects in the Big Bend wilderness are relatively rare, with an average of one project occurring every four years. Despite significant fuel-loading in the Chisos Mountains, extensive reduction projects have not yet taken place in wilderness. A lack of resources and staff have prevented fire managers from initiating additional fuels reduction projects, keeping the overall number of projects relatively low for such a large area. Currently, Big Bend fire management employs only two full-time wildland fire management staff to manage over 800,000 acres of park lands. This lack of resources has played a central role in determining fire management decisions at the park in recent years, creating an environment where almost all fires are suppressed out of fear of escape and few fuels reduction projects are employed.

Since the year 2000, four fuels reduction projects, all prescribed fires, have taken place in the Big Bend wilderness. The Casa Grande prescribed fire in the year 2000 escaped from the prescription area and burned 19 acres of unintended area. These prescribes fires are indexed below in Table 9.

**Measure Description and Collection Protocol:**

Data value is the number of total fuels reduction projects that have occurred over a five year period. Consult with Big Bend's Fire Management Officer (Ed Waldron in 2015) to obtain data. Fuels reduction projects may include mechanical, chemical or biological methods of thinning, as well as the use of prescribed fire. Treatment of Giant Cane on the river corridor, which involves a regimen of spraying herbicides and subsequent burning, is not counted in this measure as the primary purpose of the action is invasive species management rather than fuels reduction. Giant cane treatment is counted in the above measure "Authorized Actions that Manipulate Non-Native Vegetation." An increase in the number of fuels reduction projects would contribute to a downward trend in the Untrammeled Quality.

| Table 9. Fuels Reduction Projects | | |
|---|---|---|
| Year | Project Location/Description | Five Year Total |
| 2011 | Chisos Basin – Prescribed burning near developed areas that encroached into Wilderness Unit 4 boundary | 2010 – 2014 total: 1 |
| 2007 | Hannold Draw – Prescribed burning around Panther Junction developed area that encroached into Wilderness Unit 4 boundary | 2005 – 2009 total: 2 |
| 2005 | South Rim of the Chisos – Prescribed burning | |
| 2000 | Casa Grande – Prescribed burning that escaped and burned approximately 19 acres in the Chisos Basin | 2000 – 2004 total: 1 |

**Data Sources:**

Richard Gatewood, *Fire Ecologist;* Ed Waldron, *Fire Management Officer*

**Data Adequacy:**

High (6) **-** Data quantity is complete because all fires and fire suppression actions in Big Bend National Park are documented by fire management and ecologists. Data quantity is high for the same reasons.

**Frequency:**

Five years

**Significant Change:**

Any change from the baseline data value of one project per five-year monitoring period is considered significant.



*Prescribed fire on the South Rim, 2005. Photo: NPS*

| | Actions *not* authorized by the federal land manager that |
|---|---|
| **UNTRAMMELED QUALITY** | intentionally manipulate the biophysical environment |

## Number of Trespass Livestock Captured in Roundups

**Measure Baseline Data Value:** 112 stock          **2015 Data Value:** 77 stock
**Year(s) of Data Collection:** 2012 (fiscal year)          **Year(s) of Data Collection:** 2013 (fiscal year)

**Background and Context:**

The presence of livestock can cause significant environmental and ecological impacts, including altering natural communities by grazing and trampling vegetation, displacing native wildlife, contaminating water sources, creating networks of stock trails, and spreading invasive species into wilderness areas. Trespass stock herds have also been known to damage cultural resource sites including a rare *petroform* (indigenous boulder mosaic) site and a historic graveyard. Grazing has been prohibited in the Big Bend National Park since its establishment in 1944, however, for many years trespass livestock originating from ranches in Mexico have crossed the Rio Grande and grazed in Big Bend National Park and wilderness. Trespass animals are typically most active in summer months when Rio Grande flows are low enough to facilitate an easy crossing and fewer NPS and CBP staff and resources are available for roundup operations. Aerial surveys of the river corridor have regularly shown at least 100 head on NPS lands at one time.

With the consultation and support of science and resource managers, NPS law enforcement rangers perform routine roundups to capture trespass livestock. These roundups can span multiple days and are equipment and personnel intensive. In FY2013, NPS spent almost $25,000 on roundup efforts, bringing in 77 trespass animals – 46 cattle, 28 horses, two burros and one mule. Despite these major roundup efforts, trespass grazing continues to be a problem in the park and wilderness. Environmental factors like extreme weather and topography make roundups problematic, and in many cases, Mexican ranchers serve as look-outs for their trespass stock, mobilizing their herds back across the international border when NPS or CBP vehicles appear in the vicinity. A Trespass Livestock Management Plan and Environmental Assessment (EA) is currently underway. This document should outline an updated strategy for future roundups and management.



*Trespass horses grazing in Big Bend National Park. Photo: NPS*

APX-V1-196

**Measure Description and Collection Protocol:**

Data value is the number of trespass animals collected in NPS roundup efforts. Consult with Science and Resource Management and Visitor and Resource Protection to obtain annual reports. Fiscal year reporting is used as the roundup reports are compiled on a fiscal year basis for annual budgeting purposes. Counting the number of stock collected may reflect changes in NPS action or inaction as well as staff ability, rather than accurately accounting for the number of stock and degree of impact. Rangers anticipate more or less the same degree of budget and priority level for trespass stock roundups in the coming years, and because no other metric of trespass livestock was available, roundup counts were determined the best metric for this measure. Aerial inventory counts of livestock have been highly variable and performed infrequently and for these reasons, were not considered for use in monitoring. An increase in the number of trespass livestock collected would contribute to a downward trend in the Untrammeled Quality.

**Data Source:**

Greg Drum, *U.S. Park Ranger Pilot;* Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator*; Joe Sirotnak, *Botanist;* Beau Bracken, *River Ranger.*

**Data Adequacy:**

Medium (4)
> Data quantity is complete because all trespass cattle roundups are conducted and monitored by NPS staff. Data quality is low because the data value can be affected by a change in the number or frequency of roundups, which may reflect a management shift rather than a change in the number of trespass cattle, and because these roundups are not isolated to wilderness lands.

**Frequency:**

Annually

**Significant Change:**

Any change of 50% or more from the baseline data value of this measure is considered significant.



*Livestock trails near river corridor. Photo: NPS*

BIG BEND WILDERNESS

APX-V1-197

| | Actions *not* authorized by the federal land manager that |
|---|---|
| **UNTRAMMELED QUALITY** | **intentionally manipulate the biophysical environment** |

## All Other Unauthorized Trammeling Actions

**2015 (Measure Baseline) Data Value:** 0 actions
**Year(s) of Data Collection:** 2010-2015

**Background and Context:**

Unauthorized trammeling actions may be more common than documented, as park staff cannot be aware of all actions that take place in wilderness at all times. With the exception of the trespass livestock issue, Big Bend National Park staff and rangers are unaware of other unauthorized trammeling taking place within the wilderness.

**Measure Description and Collection Protocol:**

Data value is the sum total of unauthorized trammeling actions that take place within wilderness over a five year period, not including trespass livestock incursions, which are counted in the above measure. A general categorization of actions that would be counted in this measure includes any unauthorized action by another agency, a citizen group, or an individual citizen that *intentionally* manipulates the biophysical environment. Unintentional actions such as accidental ignition of human-caused fire or upstream diversion of water for irrigation or other purposes are not trammeling actions because the intent of the action is not based on manipulating the biophysical environment within the wilderness. Examples of actions that could be counted under this measure include use of herbicides or mechanical means to eradicate any plant species, seeding or planting of any plant species, arson, collection of wildlife and plants, harm to native wildlife or plants, and intentional release of a native or non-native wildlife species.

Consult with law enforcement officers and science and resource managers to determine whether any illegal activity has occurred within wilderness that would qualify as a trammeling action. See Appendix B for detailed information about how to count trammeling actions. An increase in unauthorized trammeling actions would contribute to a downward trend in the Untrammeled Quality.

**Data Source:**

Lisa Hendy, *Chief Ranger (Acting);* Greg Drum*, U.S. Park Ranger Pilot.*

**Data Adequacy:**

Medium (4)
    Data quantity is partial because events may occur in wilderness that are not detected. Data quality is moderate for this same reason.

**Frequency:**

Five years

**Significant Change:**

Any change in number of actions from the baseline data value is considered significant.

43 | P a g e

## NATURAL

*Wilderness ecological systems are substantially free from the effects of modern civilization.*

The Natural Quality assesses the integrity of local ecosystems and their freedom to change and develop without human manipulation. The Natural Quality tracks the *effects* of human actions and modern civilization on natural ecosystems (in contrast to the Untrammeled Quality which tracks the actions themselves). Ecosystems include all living and non-living things in an area, as well as the interactions between them. Within wilderness, changes to the Natural Quality can be caused directly or indirectly, and intentionally or unintentionally. While some aspects of the Natural Quality may be under the control of wilderness managers, other aspects (such as air quality or the effects of climate change) may not be. Monitoring ecosystem changes inside wilderness is critical to understanding the unique character of each wilderness area and how it is impacted by human actions.

| Table 10. Natural Quality | | | | | | |
|---|---|---|---|---|---|---|
| Indicator | Measure | Frequency in Years | Data Adequacy | Significant Change | Baseline | Data Value |
| Plants | Priority Exotic Plant Species | 5 | High (6) | Any | 6 | 6 |
| Animals | Priority Exotic Animal Species | 5 | High (6) | Any | 5 | 5 |
| | Human Wildlife Incidents | 5 | Medium (4) | ≥25% | 3.4 | 3 |
| Air and water | Days of Rio Grande Flow Below 40 cfs | 1 | Medium (5) | ≥50% | 42 | 51 |
| | Visibility | 5 | High (6) | Categorical | 7.0 dV | 6.8 dV |
| | Concentration of Sulfur in Wet Deposition | 5 | High (6) | Categorical | 0.8 kg/ha | 1.0 kg/ha |
| | Concentration of Nitrogen in Wet Deposition | 5 | High (6) | Categorical | 1.1 kg/ha | 1.5 kg/ha |
| Ecological processes | Regional Nighttime Radiance | 1 | High (6) | ≥0.1% | 2.025% | 2.025% |

BIG BEND WILDERNESS

**NATURAL QUALITY** | Plants

## Priority Exotic Plant Species

**2015 (Measure Baseline) Data Value:** 6 species
**Year(s) of Data Collection:** 2015

**Background and Context:**

Non-native and invasive plants alter ecosystems and threaten biodiversity by outcompeting native plant species. Without the natural competitors or predators that would be present in their native ranges, invasive plant species can proliferate in landscapes where they have been introduced free from the processes that have evolved to regulate the growth of native vegetation. Invasive species can affect native vegetative composition which, in turn, impacts wildlife habitat, with the potential to cause cascading impacts through the ecosystem. Both plant and animal species biodiversity, as well as healthy fire regimes are in danger of being altered as invasive plants proliferate. Transportation corridors like roads, trails, historical grazing routes, and the Rio Grande River corridor have the highest intensity and diversity of invasive plant infestations, providing a vector for the spread of seeds facilitated by human and animal movement. Controlling invasive plants along these corridors is critical to preventing future introductions and controlling the proliferation of existing invasive populations.

Invasive plant species pose one of the most significant threats to the Natural Quality of wilderness in Big Bend National Park. NPS vegetation managers have identified over 70 exotic plant species at various infestation levels that currently occupy areas in Big Bend National Park. While many of these species pose lesser impacts to Big Bend's biotic community, some of the species have already substantially altered wilderness landscape and habitats, and are classified as noxious weeds prioritized for removal. Big Bend vegetation managers have identified six species as "priority exotic plant species" due to their current impacts and future potentials to alter native ecosystems (see Table 11, below, for list of priority exotic plant species). Johnson grass, an invasive plant not included in this priority species list has also caused vegetation managers concern, but at this time is not classified on the priority list of exotic plant species.

**Measure Description and Collection Protocol:**

Data value is the number of species identified as "priority exotic plant species" by vegetation management staff. Consult with vegetation management staff to obtain an updated list of priority species. Although this list is not wilderness specific, each of the species counted in this measure are present in wilderness, and any future admittances to this list will have similarly significant impacts on park and wilderness lands. If future admittances to Big Bend's list of "priority exotic plant species" are determined to have no impact on wilderness lands, they should not be counted in the data value. An increase in number of "priority exotic plants species" targeted for removal would contribute to a downward trend for this indicator of the Natural Quality.

**Data Source:**

Joe Sirotnak, *Botanist, Big Bend National Park*

APX-V1-200

| Table 11. Priority Exotic Plant Species | |
|---|---|
| **Species Name** | **Description** |
| African Buffelgrass *(Pennisetum ciliare)* | African buffelgrass was introduced in the 1930s as livestock forage (Hauser. 2008) and has since covered much of the sotol grasslands and the Chisos Basin. Buffelgrass competes for water and soil resources with many native plants, including three federally-listed cacti species. Buffelgrass has been identified as the single biggest threat to the Chisos Mountain hedgehog cactus, while altering historic fire regimes by fuel-loading in desert scrublands, increasing burn severity and frequency. Current treatments include mechanical removal and chemical spraying. |
| Lehmann Lovegrass *(Eragrostis lehmanniana)* | Native to South Africa, Lehmann lovegrass was introduced to the Southwest in the 1930s for range restoration purposes and has been used widely in seed mixes for roadside stabilization (Uchytil. 1992). Lovegrass causes fuel-loading and alters historic fire regimes by increasing burn temperature and frequency. Park managers have shown concern for lovegrass' impact to native agaves and the Mexican long-nosed bat and black-capped vireo, both of which are federally-listed as endangered species that depend on agaves for food sources; however lovegrass is not yet established in significant portions of these species' habitats. Lehmann lovegrass is currently treated by mechanical removal and chemical spraying. |
| Salt Cedar *(Tamarix ramosissima)* | Salt cedar was imported by the U.S. Department of Agriculture for ornamental, shading and fuel purposes, and was established in Texas as early as 1877 (Zouhar. 2003). Salt cedar has invaded nearly all riparian areas in the park, from the Rio Grande corridor to grassland springs and seeps. Salt cedar uptakes significant amounts of water, increases sedimentation, reduces species diversity, degrades water quality and decreases aquatic habitat. Current treatments include biological, chemical, mechanical and prescribed fire methods. |
| Giant Reed *(Arundo donax* L.) | Giant reed was introduced for erosion control purposes in the early 1800s (National Invasive Species Information Center. 2015), but has only proliferated along the Rio Grande corridor recent decades, as river flows have diminished. Giant reed uptakes high quantities of water, decreases aquatic habitat and impacts water quality by choking the river channel. Current treatments include a combination of mechanical, biological, chemical and prescribed fire methods. |
| King Ranch Bluestem *(Bothriochloa ischaemum* var. *songarica)* | King Ranch Bluestem thrives in developed and previously disturbed areas, competing with native grasses, reducing biodiversity and causing fire danger by fuel-loading. Current treatments include mechanical removal, prescribed fire, and chemical spraying. |
| Malta Star-thistle *(Centaurea melitensis* L.) | Malta star-thistle is mostly concentrated in developed areas with infestations noted in the Chisos, Panther Junction and Persimmon Gap. Malta star-thistle is known to outcompete native plants for scant water resources. Current treatments include mechanical and chemical control. |

BIG BEND WILDERNESS

APX-V1-201

**Data Adequacy:**

High (6)

Data Quantity is complete because vegetation crews keep accurate records of noxious weed locations and proliferation, and the priority list is updated by vegetation managers accordingly. Data quality is high for the same reasons.

**Frequency:**

Five years

**Significant Change:**

Any change from the baseline data value for this measure is considered significant.

 

*Image at left: African Buffelgrass. At right: giant reed monoculture on the Rio Grande. Photos: NPS*

47 | P a g e

48 | P a g e

**NATURAL QUALITY**  Animals

## Priority Exotic Animal Species

**2015 (Measure Baseline) Data Value:** 5 species
**Year(s) of Data Collection:** 2015

**Background and Context:**

Twenty-six exotic animal species have been identified in Big Bend National Park (index of all exotic animal species available in Appendix E). Eight of these species have been identified as "priority exotic animals" that damage native resources or present the risk of damaging native resources at significant levels. Three of the eight species currently identified as priority exotics – blue tilapia, green treefrog and red imported fire ants – are not currently documented in wilderness areas, as their ranges are isolated to the Rio Grande Village spring-fed ponds and the Chisos Basin developed areas. These three species, though identified by park managers as high priorities, are not counted by this measure because they have not yet spread into wilderness. Descriptions of each of the five priority exotic animals species counted in this measure are available in Table 12, on the following page.

**Measure Description and Collection Protocol:**

Data value is the number of non-native animal species identified by park managers as "priority exotic animal species" that are present in wilderness. Consult with wildlife management staff to obtain an updated species list. Only count species that are present in, or have notable impacts on wilderness lands. An increase in the number of priority exotic animal species would contribute to a downward trend for this indicator of the Natural Quality.

**Data Source:**

Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator*

 

*Left: Auodad. Right: Feral Hog. Photos: NPS*

48 | P a g e

**Data Adequacy:**

High (6)

Data quantity is high because park staff continually monitor for the presence of new non-native species. Data quality is high, as all of the species listed have been well documented in wilderness.

**Frequency:**

Five years

**Significant Change:**

Any change from the baseline data value for this measure is considered significant.

| Table 12. Priority Exotic Animal Species | |
| --- | --- |
| **Species Name** | **Description** |
| **Aoudad** (Ammotragus lervia) | Aoudad have been documented in the park since the 1980s, frequenting arid mountainous areas. Aoudad are of high concern due to their impact on the native desert bighorn sheep, which have been the subject of extensive reintroduction efforts for more than 50 years. Aoudad can outcompete desert bighorn communities and act as disease vectors further imperiling the native species. Recent sightings have suggested significant increase in aoudad population size and range. |
| **Feral Hog** (Sus scrofa) | Feral hogs were first documented in northern reaches of the park in 1998, but have since been sighted in isolated areas further south. Hogs are known to congregate near springs and other water sources where they can contaminate water quality and impact sensitive habitats. Hogs disturb soil in their destructive rooting behavior, damaging plants and water sources as well as scattering cultural resources. |
| **Nutria** (Myocastor coypus) | Nutria are aquatic rodents that were first documented in Big Bend's Rio Grande in the 1980s and 1990s. Nutria can degrade aquatic ecosystems and alter species composition in riparian zones. |
| **Bullfrog** (Rana catesbiana) | Bullfrogs have been documented in much of the Rio Grande corridor, impacting native amphibians and reptiles through competition and predation. Bullfrogs have been noted as a species of concern due to their impact on the federally endangered Big Bend mosquitofish. |
| **Red-eared Slider** (Trachemys scripta) | Red-eared sliders were likely introduced directly by individuals who discarded the species as pets into the Rio Grande. Red-eared sliders are a species of concern due to their competition with the native Big Bend slider, and hybridization with the native species. |

## Human-Wildlife Incidents

**Measure Baseline Data Value:** 3.4 incidents
**Year(s) of Data Collection:** 2005-2009 average

**2015 Data Value:** 3 incidents
**Year(s) of Data Collection:** 2010-2014 average

**Background and Context:**

The chance to see wildlife is a fundamental part of any wilderness experience, and this brings many visitors into the Big Bend wilderness each year. Encounters with deer, javelina, snakes, and sometimes bears and mountain lions happen often and rarely result in anything more than a passing sighting. On occasion, these encounters can lead to incidents where animals obtain anthropogenic foods, exhibit aggression or come into physical contact with humans or human property. These incidents most commonly involve black bears and mountain lions, and should be reported to wildlife management staff. When incidents occur, food rewards and prolonged contacts can lead to animal habituation to humans, causing deviations from natural behavioral patterns and creating dangerous conditions for both humans and wildlife. After incidents occur, wildlife management staff follows a response protocol outlined in Big Bend's Bear and Lion Response Plans, which determines the appropriate management actions to be taken depending on the severity of the incident. An index of all human incidents involving mountain lions and black bears is presented on the following page, in Table 13.

**Measure Description and Collection Protocol:**

Data value is a five-year annual average of all reported incidents that occur between humans and black bears, and humans and mountain lions in wilderness. An encounter with a lion or bear is considered an "incident" when the animal has damaged property, obtained anthropogenic foods, exhibited aggression in close proximity such as a bluff-charge, has injured or killed humans, or has been injured or killed by humans. Human-wildlife incident data are collected annually by Big Bend's wildlife biologist and entered into the Science and Resource Management (ScRM) network drive. Incidents tables should be reviewed for location and isolated into wilderness areas. An increase in the number of human-bear and/or humain-lion conflicts would contribute to a downward trend in this indicator of the Natural Quality.



*Bears sighted off of Lost Mine Trail. Photo: Katherine Sinsky.*

50 | P a g e

**Data Source:**

Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator*

**Data Adequacy:**

Medium (4)
    Data quantity is partial because incidents likely occur that are not reported, and because it was impossible to determine certain incident locations were in wilderness. Data quality is moderate for the same reasons.

**Frequency:**

Five years

**Significant Change:**

Any change of 25% or more from the baseline data value is considered significant.

| Table 13. Mountain Lion and Black Bear Incidents | | | | |
|---|---|---|---|---|
| Year | Lion Incidents | Bear Incidents | Total Incidents | 5 year average |
| 2005 | 1 | 0 | 1 | 2005-2009 average: 3.4 |
| 2006 | 1 | 1 | 2 | |
| 2007 | 0 | 1 | 1 | |
| 2008 | 0 | 5 | 5 | |
| 2009 | 1 | 7 | 8 | |
| 2010 | 2 | 0 | 2 | 2010-2014 average: 3 |
| 2011 | 0 | 0 | 0 | |
| 2012 | 7 | 3 | 10 | |
| 2013 | 0 | 1 | 1 | |
| 2014 | 0 | 2 | 2 | |

**NATURAL QUALITY** | Air and water

## Days of Rio Grande Flows Below 40 cfs

**Measure Baseline Data Value:** 42 days          **2015 Data Value:** 51 days
**Year(s) of Data Collection:** 2001               **Year(s) of Data Collection:** 2014

**Background and Context:**

Urban, industrial and agricultural development in the Upper Rio Grande Basin combined with long-term drought has put significant pressure on the water resource of the Rio Grande. Increasing water extraction in both the United States and Mexico has diminished flows to the Big Bend reach of the river, causing an accumulation of sediment, an increase in salinity, chlorides and sulfates, and diminishing the diversity and availability of aquatic habitats for fish and wildlife. In 2010, a segment of the Rio Grande within Big Bend National Park was identified on the Environmental Protection Agency (EPA) 303(d) Impaired Waters List due to failure to attain water quality standards for chloride, sulfate and total dissolved solids. While the pollutants themselves are a major concern, diminished flows to the river resulting from upstream extraction have drastically reduced the capacity for water to wash these pollutants downstream, creating an environment where water quality is directly tied to water quantity.

Historically, flow levels in the park have varied greatly, with significant channel-resetting floods and severe droughts occurring at somewhat consistent intervals. While historical periods of low flows have been common, prolonged periods of drought that the river sees now, such as the drought between 2011 and 2013, have been exacerbated by recent human over-extraction. As the more recent channelization process has altered the river's geomorphology such that low flows now have a more significant impact on the biotic community than they would have had pre-channelization. In light of these changes, the Upper Rio Grande Basin and Bay Expert Science Team has identified a "subsistence flow level" that represents "the minimum stream flow needed during critical drought periods to maintain tolerable water quality conditions and provide minimal aquatic habitat space for the survival of aquatic organisms" (Upper Rio Grande Basin and Bay Expert Science Team. 2012). A subsistence flow level of 40 cubic feet per second (cfs) was set for the International Boundary and Water Commission gauge near Johnson's Ranch in Big Bend National Park. Flow levels of 40 cfs by no means guarantee tolerable water conditions and some experts believe this threshold has been set too low. This report will use the 40 cfs subsistence level as a point for monitoring trend, not as a target condition or subsistence level for future management.

**Measure Description and Collection Protocol:**

Data value is the number of days each year that the Rio Grande flow is below levels identified by the Upper Rio Grande Basin and Bay Expert Science Team as "subsistence flow levels" of 40cfs. Flow level data are accessible via the International Boundary and Water Commission and United States Geological Survey (USGS) websites (hyperlinks in Data Sources section below). Flow levels should be measured at Johnson's Ranch gauging station. An increase in the number of days Rio Grande flows are below 40cfs would contribute to a downward trend in this indicator of the Natural Quality.

**Data Sources:**

Jeffery Bennett, *Physical Scientist/Hydrologist*

APX-V1-207

53 | P a g e

International Boundary and Water Commission: http://www.ibwc.state.gov/wad/DDQJOHNS.htm
United States Geological Survey: http://waterdata.usgs.gov/tx/nwis/uv?site_no=08374550

Upper Rio Grande Basin and Bay Expert Science Team. 2012. Environmental Flows Recommendations
        Report. Final Submission to the Environmental Flows Advisory Group, Rio Grande Basin and Bay
        Area Stakeholders Committee and Texas Commission on Environmental Quality.

**Data Adequacy:**

Medium (5) - Data quantity is complete because stream flow data is recorded regularly within the park. Data quality is moderate because data since 2011 were not available through IBWC database and USGS stream gauge data that had certain data gaps were used from 2011 – present.

**Frequency:**  Annually

**Significant Change:**

Any change of 50 % (21 days) or more in either direction from the baseline data value is considered significant.

| Table 14: Days of Rio Grande Flows Below 40 cfs | |
| --- | --- |
| 2001 | 42 |
| 2002 | 55 |
| 2003 | 110 |
| 2004 | 47 |
| 2005 | 20 |
| 2006 | 25 |
| 2007 | 0 |
| 2008 | 30 |
| 2009 | 0 |
| 2010 | 1 |
| 2011 | 166 |
| 2012 | 148 |
| 2013 | 109 |
| 2014 | 51 |



*The Rio Grande stops flowing entirely in Mariscal Canyon - 2003. Photo: Raymond Skiles.*

BIG BEND WILDERNESS

APX-V1-208

**NATURAL QUALITY** | Air and water

## Visibility

**Measure Baseline Data Value:** 7.0 Deciviews
**Year(s) of Data Collection:** 2001-2005

**2015 Data Value:** 6.8 Deciviews
**Year(s) of Data Collection:** 2008-2012

**Background and Context:**

The open, sprawling country of the Big Bend wilderness offers spectacular viewsheds, where visitors can sometimes see up to 100 miles away (NPS. 2015). Big Bend National Park is classified as a Class I Airshed under the Clean Air Act, and should meet the nation's strictest standards for air quality and visibility. Despite Big Bend's remoteness and priority airshed class, pollution continues to have a significant impact on air quality in the park, and clear days with good visibility have become the exception rather than the norm.

Spurred from the concern of worsening visibility and pollution levels, an extensive study of Big Bend National Park's air quality, known as the Big Bend Regional Aerosol and Visibility Observational (BRAVO) Study, was conducted in 1999. The BRAVO findings pinned Big Bend as one of the only national parks where particulate haze levels had been continually increasing rather than declining, and identified contributing haze sources ranging from biomass smoke from Mexico and Central America during the spring, to African dust particulates in the summer. While pollution sources vary from global to local levels, the BRAVO report attributed the majority of Big Bend's air pollution to emissions in the eastern United States, industrial and urban areas on the Gulf Coast of eastern Texas, and coal fired power plants in northwest Mexico (Pitchford et al. 2004).  Air quality experts have identified sulfate particles as the largest contributor to haze at Big Bend National Park, muting colors, softening textures and reducing the visible definition of forms. In the years since the BRAVO study, haze levels have stopped increasing, actually dropping a subtle amount (0.2 deciviews) during the last recorded 5-year average monitoring period (NPS Air Resources Division. 2014).

**Measure Description and Collection Protocol:**

Data value is reported from 'Group 50 Visibility minus Natural Conditions' for Big Bend National Park from the NPS Air Resources Division *5-Year Average Visibility Estimates* table. Each year, park staff send results from on-site air quality monitoring to the NPS Air Resources Division for analysis. The Air Resources Division then calculates Group 50 visibility by summing the individual contributions to light extinction from each of five major fine particle species (sulfate, soil, organic carbon, elemental carbon, and nitrate) and from coarse mass. The calculated value represents a Haze Index, measured in deciviews (dV), which describes the difference in current visibility from natural conditions. Visibility worsens as the haze index increases (NPS. 2011). The 2015 value reported here represents the 5-year average between 2008 and 2012. For the next data collection period in 2020, the most recent rolling 5-year average available should be used. A decrease in the haze index would signify an increase in visibility, contributing to an upward trend in this indicator of the Natural Quality.

**Data Source:**

National Park Service Air Resources Division:
http://www.nature.nps.gov/air/maps/airatlas/IM_materials.cfm.

Data on wet deposition, ozone and visibility are available for all NPS Inventory and Monitoring (I&M) Program parks through this database.

**Data Adequacy:**

High (6)

Data quantity is complete because air quality data were recorded regularly during and prior to the 5-year reporting span. Data quality is high because there is an air quality monitoring station within Big Bend National Park.

**Frequency:**

Five years.

**Significant Change:**

Any change to/from one of the following categories is considered significant. Visibility Condition ratings are taken directly from the NPS Air Resources Division document titled "Rating Air Quality Conditions" revised September 28, 2011.

| Table 15: Visibility Condition Categories | |
| --- | --- |
| **Visibility Condition** | **Group 50 Visibility – Natural Condition (dV)** |
| **Good** | **<2** |
| **Moderate Concern** | **2-8** |
| **Significant Concern** | **>8** |



*48-hour backward trajectory analysis of airflow into Big Bend National Park for the date of October 19, 2015. Source: Texas Commission on Environmental Quality.*

BIG BEND WILDERNESS

APX-V1-210

**NATURAL QUALITY** | Air and water

## Concentration of Sulfur in Wet Deposition

**Measure Baseline Data Value:** 0.8 kg/ha          **2015 Data Value:** 1.0 kg/ha
**Year(s) of Data Collection:** 2005-2009          **Year(s) of Data Collection:** 2008-2012

**Background and Context:**

Sulfur is a major component of acidic deposition, which causes chemical changes in freshwater lakes, rivers, ponds, and soils that can affect both aquatic and terrestrial plants and animals. The main source of sulfur oxides is the burning of fossil fuels (NPS. 2015). Similar to particulate haze pollution sources, levels of sulfur in wet deposition can be affected by a range of local and long-range emission sources. Wet sulfur deposition occurs when sulfur is dissolved in cloud droplets and deposited during precipitation, commonly known as acid rain.

**Measure Description and Collection Protocol:**

Data value is reported from 'Total-S' for Big Bend National Park from the NPS Air Resources Division *5-Year Average Wet Deposition Estimates* table. Each year, wet deposition values are collected by park staff and submitted to regional sources for analysis. Sulfur concentrations in precipitation are multiplied by 30-year normalized precipitation amounts for monitoring sites. Data on wet deposition of sulfur are obtained from the National Atmospheric Deposition Program which monitors deposition in Class 1 areas across the U.S. An index of 5-year average wet sulfur deposition is used to rate condition in kilograms per hectare per year (kg/ha/yr) (NPS. 2011). The baseline data value reported here represents the 5-year average taken from 2005 and 2009, and the 2015 data value reports the 5-year average taken from 2008 and 2012. For the next data collection period in 2020, the most recent rolling 5-year average available should be used.  An increase in wet deposition of sulfur would contribute to a downward trend in this indicator of the Natural Quality.

**Data Source:**

NPS Air Resources Division: http://www.nature.nps.gov/air/maps/airatlas/IM_materials.cfm.
          Data on wet deposition, ozone and visibility are available for all NPS Inventory and Monitoring
          (I&M) Program parks through this database.

**Data Adequacy:**

High (6)
          Data quantity is complete because air quality data were recorded regularly during and prior to the
          5-year reporting span. Data quality is high because there is an air quality monitoring station within
          Big Bend National Park.

**Frequency:**

Five years

57 | P a g e

**Significant Change:**

Any change to/from one of the following categories is considered significant.

| Table 16: Sulfur Wet Deposition Condition Categories | |
|---|---|
| **Deposition Condition** | **Wet Deposition of Sulfur (kg/ha/yr)** |
| Good | <1 |
| Moderate Concern | 1-3 |
| Significant Concern | >3 |



*Wet deposition monitoring instrumentation at K-Bar. Photo: Laiken Jordahl*

APX-V1-212

**NATURAL QUALITY**          Air and water

## Concentration of Nitrogen in Wet Deposition

**Measure Baseline Data Value:** 1.1 kg/ha          **2015 Data Value:** 1.5 kg/ha
**Year(s) of Data Collection:** 2005-2009          **Year(s) of Data Collection:** 2008-2012

**Background and Context:**

Like sulfur, nitrogen is a major component of acidic deposition, which causes physical and biological changes in rivers, ponds, and soils that can affect both aquatic and terrestrial ecosystems. The deposition of nitrogen can result in unnatural nutrient enrichment, which can lead to changes in plant and animal diversity and shifts away from natural ecosystem processes. The main source of nitrogen oxides is the burning of fossil fuels (NPS. 2015) Similar to particulate haze pollution sources, levels of nitrogen in wet deposition can be affected by a range of local and long-range emission sources. Wet nitrogen deposition occurs when nitrogen is dissolved in cloud droplets and deposited during precipitation, commonly known as acid rain.

**Measure Description and Collection Protocol:**

Data value is reported from 'Total-N' for Big Bend National Park from the NPS Air Resources Division *5-Year Average Wet Deposition Estimates* table. Wet deposition values are collected by park staff and submitted to regional sources for analysis. Nitrogen concentrations in precipitation are multiplied by 30-year normalized precipitation amounts for monitoring sites. Data on wet deposition of nitrogen are obtained from the National Atmospheric Deposition Program which monitors deposition in Class 1 areas across the U.S. An index of 5-year average wet nitrogen deposition is used to rate condition in kilograms per hectare per year (kg/ha/yr) (NPS. 2011). The baseline data value reported here represents the 5-year average taken from 2005 and 2009, and the 2015 data value reports the 5-year average taken from 2008 and 2012. For the next data collection period in 2020,the  most recent rolling 5-year average available should be used.  An increase in wet deposition of nitrogen would contribute to a downward trend in this indicator of the Natural Quality.

**Data Source:**

NPS Air Resources Division: http://www.nature.nps.gov/air/maps/airatlas/IM_materials.cfm.
> Data on wet deposition, ozone and visibility are available for all NPS Inventory and Monitoring (I&M) Program parks through this database.

**Data Adequacy:**

High (6)
> Data quantity is complete because air quality data were recorded regularly during and prior to the 5-year reporting span. Data quality is high because there is an air quality monitoring station within Big Bend National Park.

**Frequency:**

Five years

**Significant Change:**

Any change to/from one of the following categories is considered significant.

| Table 17: Nitrogen Wet Deposition Condition Categories | |
|---|---|
| **Deposition Condition** | **Wet Deposition of Nitrogen (kg/ha/yr)** |
| Good | <1 |
| Moderate Concern | 1-3 |
| Significant Concern | >3 |



*Big Bend Physical Science Technician calibrating rain gauge. Photo: Laiken Jordahl*

BIG BEND WILDERNESS

**NATURAL QUALITY** | Ecological processes

## Regional Nighttime Radiance

**2015 (Measure Baseline) Data Value:** 2.025%
**Year(s) of Data Collection:** 2015 (Month of October)

**Background and Context:**

Habitat fragmentation of the regional landscape, even in areas far beyond park boundaries, can have significant ecosystem impacts within the park and wilderness. The disturbance and fragmentation of intact habitats can alter the movement and interaction of animals, plants, water and other previously unconstrained ecosystem processes, affecting the entire biotic community. While the Big Bend region is considered to be one of the least developed areas in the continental United States, a number of factors have led to an increase in present and future plans for energy and urban/suburban development in the region. An upsurge in oil and gas exploration permit issuances in neighboring counties north of the park have already shown visible impacts to habitat connectivity on the U.S. side of the border. Mexico's state-owned oil company Pemex has begun drilling exploration wells near Ojinaga, Chihuahua, where a Mexican executive told reporters that at least 18 trillion cubic meters of oil and gas had been identified (Matalon. 2014). With the help of newly-available fracking technology, large-scale extraction of these reserves could begin in the near future. Plans to connect the town of Boquillas, Mexico to larger cities further south in Coahuila and west in Chihuahua are expected to be implemented within the next 10 years, opening up rural lands in the Sierra del Carmen region to the possibility of increased urban, agricultural and energy development.

Using remote sensing data, this measure tracks developments and disturbances in the region by monitoring upward radiance of anthropogenic light within a 150-mile radius of Big Bend National Park (see Figure 4). Urban and suburban areas are captured in nighttime radiance data, as are oil rigs and their associated equipment, which emit significant amounts of light through gas flares, disposal wells, road lighting and completion units (Peterson. 2014). Radiance concentrations currently visible within the monitoring area include the urban and suburban areas of Del Rio TX/Ciudad Acuña Coah., Presidio, TX/Ojinaga, Chih., Ft. Stockton, TX, Alpine, TX and Pecos, TX. Fainter illuminations are also visible from many smaller towns and settlements. The Interstate 10 corridor is also evident, as remote sensors can capture headlights striking the pavement on frequented travel routes.

The highest-intensity radiance concentration within the monitoring radius emanates from the area south of Pecos, Texas, where oil and gas production has surged in the last decade (see Figures 5 and 6 for map of drilling permits issued between 2009 and 2014 and annual permit issuances for the Pecos area in Reeves County). In addition to the high levels of oil and gas development in the Pecos area, a number of active mineral leases are present in Brewster County, some of which are less than ten miles north of the wilderness boundary.  Adverse ecological effects caused by oil and gas development include: "1) direct loss of habitat; 2) physiological stress to wildlife; 3) disturbance and displacement of wildlife; 4) habitat fragmentation and isolation; 5) alteration of environmental functions and processes (e.g., stream hydrology, water quantity/quality); 6) introduction of competitive and predatory organisms; and 7) secondary effects created by work force assimilation and growth of service industries" (WGFD. 2004). Individual gas flares have also been implicated in causing deaths of as many as 7,500 migratory birds in a single day (Mandel. 2013). If trends in the development of the region continue at current levels, many of

these ecological impacts may become more apparent in their effects on the biotic community of entire ecoregion, including the Big Bend wilderness.

**Measure Description and Collection Protocol:**

Data value is the percentage of area within a 150-mile radius around the geometric center-point of Big Bend National Park that emits an upward radiance level greater than 0.33 nanoWatts/cm^2 sr. Data is collected from the Earth Observation Group (EOG) at the NOAA National Geophysical Data Center (Link in Data Source description below), where new satellite readings of upward radiance are uploaded each month. Data for the month of October, 2015 was used to calculate the baseline data value of 2.025%. An increase in the regional nighttime radiance data value would contribute to a downward trend in this indicator of the Natural Quality.

**Data Source:**

Earth Observation Group, National Oceanic and Atmospheric Administration (NOAA) National Geophysical Data Center. Visible Infrared imaging Radiometer Suite (VIIRS) Day/Night Band (DNB) composites are updated monthly and available at: http://ngdc.noaa.gov/eog/viirs/download_monthly.html.

Dan Duriscoe, *NPS Night Skies Team Lead Physical Scientist;* Marie Landis, *Cartographic Technician;* Dave Larson, *Chief, Science and Resource Management.*

**Data Adequacy:**

High (6)
> Data quantity is complete, as recent data were available for all areas within the target monitoring zone. Data quality is high because a median value of 17 cloudless observation dates within the sample area was taken to generate the composite data used.

**Frequency:**

Annually

**Significant Change:**

Any change greater than one tenth of one percent (0.1%) from the baseline data value is considered significant.



Figure 4. Nighttime Radiance Composite, Big Bend Region

BIG BEND WILDERNESS

APX-V1-217



Figure 5. Map of Drilling Permits Issued 2009-2014. *Graphic extracted from NPS McDonald Observatory Presentation. Credit: Bill Wren*



Figure 6. Drilling permits approved by year – Reeves County, TX. Data source: Texas Data Application LLC. 2015

63 | P a g e

BIG BEND WILDERNESS

# UNDEVELOPED

*Wilderness retains its primeval character and influence, and is essentially without permanent improvement or modern human occupation*

The Undeveloped Quality is the most familiar and recognizable quality of wilderness for many people. Without buildings, roads, evidence of other people, or improvements on the landscape, the Undeveloped Quality speaks to the idea that humans are visitors that do not remain. The Wilderness Act of 1964 makes the following allusions to the Undeveloped Quality of wilderness character:

- The National Wilderness Preservation System was created *"in order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy all areas within the United States"* (2a);

- Wilderness is *"in contrast with those areas where man and his own works dominate the landscape"* (2c);

- Wilderness should be managed in such a way that *"the imprint of man's work is substantially unnoticeable"* (2c);

- And that *"there shall be no permanent road within any wilderness area…no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installations within any such area"* (4c).

| Table 18. Undeveloped Quality | | | | | | |
|---|---|---|---|---|---|---|
| Indicator | Measure | Frequency in Years | Data Adequacy | Significant Change | Baseline Data Value | 2015 Data Value |
| Presence of non-recreational structures, installations, and developments | Authorized Non-Recreational Physical Developments | 5 | Medium (5) | ≥ 5 points | 93 | 93 |
| | Miles of Telephone and Powerlines | 5 | Medium (5) | ≥ 1 mile | 57.31 | 57.31 |
| | Miles of Roads | 5 | Medium (5) | ≥ 1 point | 62.23 | 62.23 |
| Presence of inholdings | Number of Inholdings | 5 | High (6) | Any | 0 | 0 |
| Use of motor vehicles, motorized equipment, or mechanical transport | Authorized Administrative Flight Hours | 1 | Medium (4) | ≥ 15% | 400 | 400 |
| | Commercial Scenic Flight Operations | 1 | High (6) | ≥ 25% | 10 | 46 |
| | Authorized Administrative Motorized and Mechanized Use | 5 | Medium (5) | ≥ 10 hours | 29 | 29 |

| UNDEVELOPED QUALITY | Presence of non-recreational structures, installations, and developments |
|---|---|

## Authorized Non-Recreational Physical Developments

**2015 (Measure Baseline) Data Value:** 93 (weighted score)
**Year(s) of Data Collection:** 2015

**Background and Context:**

The Wilderness Act defines wilderness as an area "with the imprint of man's work substantially unnoticeable… where man himself is a visitor who does not remain" (Section 2(c)). Structures, installations, and developments directly impact the Undeveloped Quality of the Big Bend wilderness by leaving signs of human presence and resource use. Developments can vary in sizes from large patrol cabins and corrals, to less-noticeable wildlife cameras and stream thermometers.

Many structures counted in this measure support the preservation of other wilderness qualities, but any structure in wilderness – regardless of its purpose – negatively impacts the Undeveloped Quality of wilderness character. Developments that exist primarily for recreational purposes are not counted in this measure; they are monitored in the Solitude or Primitive and Unconfined Recreation Quality. While many historic structures, ruins and stone-masonry tanks, wells and dams exist throughout the wilderness, these developments are not reflected in this inventory because they are minimally, if at all maintained. The locations and descriptions of current non-recreational structures, installations, and developments present in the Big Bend wilderness are described below in Table 19. The assigned weight of these structures is detailed following in Table 20.

**Measure Description and Collection Protocol:**

Data value is a weighted score that measures the extent of authorized non-recreational physical developments in the Big Bend wilderness. Data value is derived using the Bureau of Land Management Development Index (Appendix C) as a guideline for weighing individual developments based on their respective sizes and impacts. Multiply the number of installations by their associated weight index value to attain a development score. The reported data value is the sum of the development scores for all developments in wilderness.



*Photos from left to right: Boot Canyon cabin, Boot Canyon corral, rain gauge. Photos: Laiken Jordahl and NPS*

BIG BEND WILDERNESS

APX-V1-220

Developments that are in place for less than two months are not counted. Roads, telephone lines and powerlines are not included in this measure because they are counted in the measure below. Collared or banded animals are counted as one development per species, regardless of the number of animals banded. An increase in the number of authorized non-recreational physical developments within wilderness would contribute to a downward trend for this indicator of the Undeveloped Quality.

| Table 19. Index of authorized non-recreational physical developments | | | | |
|---|---|---|---|---|
| Category | Development | # of Develop-ments | Locations | Description |
| Buildings and Associated Developments | Boot Canyon cabin | 1 | Boot Canyon | Research and trail crew base |
| | Boot Canyon tools cache | 1 | Boot Canyon | Tools caching |
| | Boot Canyon corral | 1 | Boot Canyon | Corral for mule team |
| Vegetation-Related Installations | Plot markers | 45 | Boquillas Canyon, Chisos Basin, other sites | Vegetation monitoring |
| | Non-functioning exclosures | 5 | Throughout wilderness | Left from Warnock study |
| | Fire surrogate study plots | 3 sites (48 acres total) | Three separate locations in Chisos Range | Perimeters marked with rebar |
| Wildlife-Related Installations | Wildlife cameras | 88 | Throughout wilderness | 80 cameras are specifically for mountain lion study |
| | Collared mountain lions | 1 (3 lions) | Roaming | Sul Ross lion study |
| | Tagged bats | 1(100-200 bats) | Seasonally at Emory roost | Research permitee study |
| | Emory roost bat counter | 1 | Emory roost | Research permitee study |
| Geologic and Climate Monitoring Installations | Rain gauges | 8 | Throughout wilderness | Climate monitoring |
| | Sediment gauge and instrumentation | 1 | Near Solis | Sedimentation study |
| Other | Radio repeaters | 4 | Emory Peak | CPB, NPS and Brewster Co. repeaters |
| | Trail counters | 12 | Throughout wilderness trails | Visitor use monitoring |
| | CBP motion cameras | 10 | Areas of high border activity | CBP intelligence |
| | Investigative monitoring equipment | 2 | "Confidential" | 4'x4'x1' surface instrumentation |
| | Metal gate | 1 | Smith Ranch Road | Old access road closure |

BIG BEND WILDERNESS

| Table 20. Weight Values of Authorized Non-Recreational Physical Developments | | | | | |
|---|---|---|---|---|---|
| Category | Development | Number of Developments | Weight of development | Total Development Score | Total Category Score |
| Buildings | Boot Canyon cabin | 1 | 5 | 5 | 9 |
| | Boot Canyon tools cache | 1 | 2 | 2 | |
| | Boot Canyon corral | 1 | 2 | 2 | |
| Vegetation-Related Installations | Plot markers | 45 | 0.1 | 4.5 | 10 |
| | Non-functioning exclosures | 5 | 0.5 | 2.5 | |
| | Fire surrogate study plots | 3 (48 acres) | 1 | 3 | |
| Wildlife-Related Installations | Wildlife cameras | 88 | 0.5 | 44 | 46 |
| | Collared mountain lions | 1 (3 lions) | 0.5 | 0.5 | |
| | Tagged bats | 1 (100-200 bats) | 0.5 | 0.5 | |
| | Emory roost bat counter | 1 | 1 | 1 | |
| Climate Monitoring Installations | Rain gauges | 8 | 0.5 | 4 | 5 |
| | Sediment gauge and instrumentation | 1 | 1 | 1 | |
| Other | Radio Repeaters | 4 | 2 | 8 | 23 |
| | Trail counters | 12 | 0.5 | 6 | |
| | CBP motion cameras | 10 | 0.5 | 5 | |
| | Investigative monitoring equipment | 2 | 1 | 2 | |
| | Metal gate | 1 | 2 | 2 | |
| | | | Reported Data Value: | | 93 |

**Data Source:**

Lisa Hendy, *Chief Ranger (Acting);* Joe Sirotnak, *Botanist;* Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator;* Erik Walker, *Trail Maintenance Supervisor.* Richard Gatewood, *Fire Ecologist;* Cheryl McIntyre, *Physical Scientist.* Jost Zwiebel, *Supervisory Dispatcher;* Ryan Hajek, *Acting Supervisory Border Patrol Agent.*

**Data Adequacy:**

Medium (5) - Data quantity is complete because it is believed that most functioning structures, installations, and developments are documented. Data quality is moderate because no official inventory of structures in wilderness has been completed, and GIS does not coordinate with all departments to maintain an up-to-date inventory. Additionally, non-functioning installations from past research projects are likely still present, however management staff does not have an inventory of these items. While this index has been verified with relevant staff, the number of different projects and developments in wilderness made the accuracy of these numbers difficult to verify.

**Frequency:**

Five years

**Significant Change:**

Any change of five points or more from the baseline data value is considered significant.

| UNDEVELOPED QUALITY | Presence of non-recreational structures, installations, and developments |
|---|---|

## Miles of Telephone and Powerlines

**2015 (Measure Baseline) Data Value:** 57.31 miles
**Year(s) of Data Collection:** 2015

**Background and Context:**

More than 57 miles of powerlines and telephone lines currently run through Big Bend's potential wilderness lands. This network was constructed between 1948 and 1961 by the Rio Grande Electric Cooperative and the Southwestern Bell Telephone Company to bring electricity and phone service to the developed areas in the park (Maxwell. 1985). When Big Bend's wilderness boundaries were drawn in the 1970s, areas through which telephone and powerlines ran were classified as potential wilderness because of the nonconforming nature of these developments. In the 1990s, telephone utility providers installed a network of underground telephone cables paralleling roadways outside of wilderness, rendering the aboveground telephone lines in Wilderness Units 12 and 5 out of service. The entire defunct telephone line in Wilderness Unit 5 has been removed and this area is now considered to be free of nonconforming uses that would preclude designation. Approximately 9.5 miles of defunct telephone line is still present in Wilderness Unit 12 near Rough Run Creek, with 112 poles standing. While resource managers have considered many methods of removal, logistical difficulties, safety hazards and sensitive cultural sites in the vicinity have obstructed this project for years.

Like all permanent installations in wilderness, telephone and powerlines are considered a nonconforming use in wilderness lands. While NPS policy allows nonconforming uses in potential wilderness (NPS Management Policies. 2006; 6.2.2.2), the visual and environmental impact of these developments clearly impacts wilderness character and detracts from the Undeveloped Quality of wilderness.



*Defunct telephone lines cut through wilderness lands near Rough Run Creek. Photo: Laiken Jordahl*

APX-V1-223

**Measure Description and Collection Protocol:**

Data value is the total miles of telephone and powerlines within the wilderness area. Consult with the Geographic Information System (GIS) office to develop the mileage count of all telephone and powerlines within wilderness. Non-functioning telephone or powerlines, like the one along Rough Run Creek in Wilderness Unit 12, are counted in the data value. An increase in the total miles of telephone and powerlines within wilderness would contribute to a downward trend for this indicator of the Undeveloped Quality.

**Data Source:**

Marie Landis, *Cartographic Technician;* Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator*

**Data Adequacy:**

Medium (5) – Data quantity is complete because a GIS analysis was performed specifically for this measure. Data quality is moderate because the BIBE wilderness shapefile has shown certain errors that could slightly affect the data value.

**Frequency:**

Five years

**Significant Change:**

Any change of 1 mile or more from the baseline data value of this measure is considered significant.

| | |
|---|---|
| **UNDEVELOPED QUALITY** | **Presence of non-recreational structures, installations, and developments** |

## Miles of Roads

**2015 (Measure Baseline) Data Value:** 62.23 (weighted score)
**Year(s) of Data Collection:** 2015

**Background and Context:**

While the Wilderness Act explicitly states that there shall be no permanent or temporary road within any wilderness, the BIBE wilderness has over fifty miles of road networks bisecting both potential and recommended wilderness lands. The majority of these roads are powerline maintenance access roads, which follow powerline corridors through potential wilderness areas. These roads are rarely maintained and public use is prohibited. In recent years, CBP officers have been granted permission to use specific sections of powerline access roads for routine patrols, which has increased overall traffic, motorized use and impact in potential wilderness areas. Because these roadways are in potential wilderness, their operation is permissible; however, their removal would greatly improve wilderness character.

One publicly-accessible road is also present in Big Bend's recommended wilderness lands – Black Gap Road. Black Gap Road is an 8.5 mile unmaintained four-wheel-drive-only route connecting Glenn Springs Road to River Road, with 2.89 miles running through recommended wilderness. Big Bend's 1978 wilderness recommendation called for the closure of Black Gap Road, along with a number of other roads running through areas recommended for wilderness. Since the 1978 recommendation, all public roadways in wilderness have been closed except for Black Gap, which remains a popular destination for off-road recreationalists. The existence of the Black Gap Road has been a contentious wilderness issue at the park, as any attempt to close the wilderness section of the roadway would likely cause significant protest from the off-roading community.

Because the Black Gap road is in recommended wilderness rather than potential wilderness, this road directly contradicts NPS policy (NPS Management Policies. 2006; 6.4.3.3). The continued operation and maintenance of this road would likely preclude this area from wilderness designation, until either the road was closed or the wilderness boundaries redrawn through an official wilderness recommendation.

**Measure Description and Collection Protocol:**

Data value is a weighted count of the total miles of road within wilderness areas. Mileage of roadways in potential wilderness are multiplied by one, while mileage of roadways in recommended wilderness are multiplied by three. Sum the weighted mileage scores to obtain the data value. Consult with the (GIS) office to develop the mileage count of all roads within wilderness. Dog-legs and loops occur within the road network, and are reflected in the total mileage count.  An increase in total miles of roads within wilderness would contribute to a downward trend for this indicator of the Undeveloped Quality.

| Table 21. Index and weighted scores of roads in wilderness | | | |
|---|---|---|---|
| **Road Type** | **Total Miles** | **Weight** | **Miles x Weight Score** |
| Powerline access roads | 53.56 | x 1 (potential wilderness) | 53.56 |
| Public roads | 2.89 | x 3 (recommended wilderness) | 8.67 |
| | | **Total Weighted Score :** | **62.23** |

**Data Source:**

Marie Landis, *Cartographic Technician*

**Data Adequacy:**

Medium (5)

> Data quantity is complete because a GIS analysis was performed specifically for this measure. Data quality is moderate because the BIBE wilderness shapefile has shown certain errors that could slightly affect the data value.

**Frequency:**

Five years

**Significant Change:**

Any change of 1 point or more from the baseline data value in the weighted score for this measure is considered significant.



*An off-road recreationalist ascends Black Gap Road. Photo: NPS*

BIG BEND WILDERNESS

**UNDEVELOPED QUALITY**  Presence of inholdings

## Number of Inholdings

**Measure Baseline Data Value:** 0 inholdings      **2015 Data Value:** 0 inholdings
**Year(s) of Data Collection:** 1978                **Year(s) of Data Collection:** 2015

**Background and Context:**

Inholdings in wilderness are not subject to the same laws and policies as wilderness lands. Inholdings pose a problem for wilderness managers as activities and developments that take place within inholdings are often incompatible with wilderness character. Access to inholdings can encourage future developments or mechanized use in the wilderness via access roads or aircraft flights through wilderness areas.

There are currently no inholdings in the recommended or potential wilderness areas within Big Bend National Park. The potential for inholdings within wilderness to become a factor is unlikely, but possible if land containing inholdings is acquired by the park and becomes potential, recommended or designated wilderness.

**Measure Description and Collection Protocol:**

Data value is the number of inholdings within wilderness. Acreage is not used for this measure because there are no current inholdings within wilderness and the establishment of future inholdings is unlikely. To collect data on inholdings, consult local staff knowledge and current GIS files. Report each inholding as a separate entity. The reported value is this number of individual inholdings. An increase of inholdings would contribute to a downward trend in this indicator of the Undeveloped Quality.

**Definitions:**

> **Inholding –** A parcel of privately owned land located inside the boundaries of a national park, national forest, state park, or other publicly owned protected area

**Data Source:**

David Larson, *Chief, Science and Resource Management*

**Data Adequacy:**

High (6)
> Data quantity is complete because all necessary files have been gathered and staff consulted. Data quality is high reflecting the high level of certainty in data accuracy.

**Frequency:**

Five years

**Significant Change:**

Any change from the baseline data value for this measure is considered significant.

APX-V1-227

| UNDEVELOPED QUALITY | Use of motor vehicles, motorized equipment, or mechanical transport |
| --- | --- |

## Administrative Flight Hours

**2015 (Measure Baseline) Data Value:** 409 hours
**Year(s) of Data Collection:** 2014 (fiscal year)

**Background and Context:**

Mechanical or motorized transport is prohibited by the Wilderness Act, except when "necessary to meet minimum requirements of the administration of the area for the purpose of this Act (including measures required in emergencies involving the health and safety of persons within the area)" (Section 4(c)). While permitted if necessary, aircraft use – like all motorized use in wilderness – diminishes the Undeveloped Quality of wilderness character. Aircraft noise can also disturb wildlife and hamper visitor solitude thus impacting both the Natural and Solitude or Primitive and Unconfined Recreation Qualities.

The expansive roadless landscape mosaicked with steep washes, canyons and mountain ranges make aircraft use in the Big Bend wilderness an important and sometimes lifesaving tool. The additional pressure of an international border frequented by smugglers, trespass cattle and illegal migrants, combined with a small staff for such an immense area, often necessitates the use of aerial patrols; as a result of these pressures, Big Bend is one of the few national parks with a full-time pilot on staff. On a typical year, the park's aviation base budget allocates funds for an estimated 400 flight hours with approximately 240 days airborne. The majority of these flight hours consist of law enforcement patrols, but science and resource management-related flights and search and rescue operations and trainings also occur. Customs and Border Protection also flies an estimated 8 operations each year, and the U.S. Department of Agriculture in conjunction with local partners flies one flight each year to aerially distribute rabies vaccinations for wildlife. Examining the patterns of authorized administrative flight operations over a period of time will enable managers to be aware of trends in aircraft use and make well-informed decisions regarding the necessity of authorizing motorized use in wilderness.



*NPS patrol plane 104PS. Photo: Greg Drum*

BIG BEND WILDERNESS

**Measure Description and Collection Protocol:**

Data value is the total number of authorized administrative flight hours, including NPS patrols, search and rescues, CBP-related flights and USDA rabies vaccination flights that take place in wilderness. To obtain data, consult with park pilot (Greg Drum in 2015). While not all flight hours occur directly over wilderness, the vast majority of the typically patrolled area lies within wilderness boundaries. Flights outside wilderness, if nearby, can still be seen and heard inside wilderness and because of this all flight hours logged by the park pilot are counted in the data value. The number of allocated flight hours is expected to remain more or less the same in the coming years (save aviation budget changes), since most flight operations are routine rather than incidental.  An increase in the number of authorized administrative flight hours within wilderness would contribute to a downward trend in this indicator of the Undeveloped Quality.

**Data Source:**

Greg Drum, *U.S. Park Ranger Pilot;* Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator*

**Data Adequacy:**

Medium (4)
    Data Quantity is partial because exact data on flight hours were not available and estimates derived from budgeted flight operations were used. Additionally, CBP sometimes flies over wilderness, but could not supply an estimate of flight hours. Data quality is moderate because not all flight hours occur directly over wilderness.

**Frequency:**

Annually

**Significant Change:**

Any change of 15% or more in either direction from baseline data value is considered significant.



*Mariscal Canyon taken from NPS patrol flight. Photo: Laiken Jordahl*

| | |
|---|---|
| **UNDEVELOPED QUALITY** | **Use of motor vehicles, motorized equipment, or mechanical transport** |

## Commercial Scenic Flight Operations

**Measure Baseline Data Value:** 10 flight operations
**Year(s) of Data Collection:** 2013

**2015 Data Value:** 46 flight operations
**Year(s) of Data Collection:** 2014

**Background and Context:**

Like administrative flights, commercial scenic flights impact the Undeveloped Quality of Wilderness by radiating mechanized noise throughout the backcountry. *NPS Director's Order 41* clearly states that: *"Commercial air tours are inconsistent with preservation of wilderness character."* Aircraft noise alters natural soundscapes, disturbing wildlife and detracting from visitor's opportunities for solitude. Scenic tours of the Big Bend wilderness have seen a recent uptick, increasing from 10 flights in 2013 to 46 flights in 2014, all of which are attributed to a recently-initiated air-tour business based in Terlingua. Two businesses are currently permitted to fly over the national park (Rio Aviation and Southwest Safaris); however, only Rio Aviation has actively used its permit in since 2013.  Both air-tour businesses operate under voluntary agreements with Big Bend National Park on the condition that they report total annual operations to the NPS Overflights Program.

During a scenic flight in November of 2015, the Rio Aviation plane experienced engine failure and made an emergency landing near Terlingua Abajo, within Big Bend wilderness lands. Park managers are currently exploring alternatives for removing the downed plane and aim to minimize impact to wilderness character; however, motorized equipment will almost certainly be used, and the removal is scheduled for December 16, 2015. While uncommon, emergency landings or crashes like this one have clear impacts to wilderness lands and are an unplanned and undesired side effect of flying over wilderness. It is unknown at this time how this instance may affect future trends in commercial scenic flights over the Big Bend wilderness, but a temporary decrease in total operations could occur over the 2015 and 2016 reporting seasons.

**Measure Description and Collection Protocol:**

Data value is the number of scenic flight operations that occur in Big Bend National Park. Because the majority of the park is wilderness and many sightseeing destinations lie in the backcountry, it is presumed that all scenic flights pass over wilderness lands. The Federal Aviation Administration Modernization and Reform Act of 2012 requires all commercial air tours over national parks to report flight information to NPS Natural Sounds and Night Skies Division (NSNSD). Consult with NSNSD office to obtain updated data. An increase in the number of commercial scenic flight operations would contribute to a downward trend in this measure of the Undeveloped Quality.

**Data Source:**

Vicki L. Ward, *Overflights Program Manager –NPS  Natural Sounds and Night Skies Division*

APX-V1-230

76 | P a g e

**Data Adequacy:**

High (6)
> Data quantity is complete because all commercial scenic flight operations are reported to the National Park Service and compiled in a national air tours database. Data quantity is high for the same reasons.

**Frequency:**

Annually

**Significant Change:**

Any change of 25% or more in either direction from the baseline data value of this measure is considered significant.



*Rio Aviation plane after emergency landing in wilderness near Terlingua Abajo. Photo: Katherine Sinsky.*

| | Use of motor vehicles, motorized equipment, or |
|---|---|
| **UNDEVELOPED QUALITY** | **mechanical transport** |

## Authorized Administrative Motorized and Mechanized Use

**2015 (Measure Baseline) Data Value:** 29 hours
**Year(s) of Data Collection:** 2009-2015

**Background and Context:**

The use of motorized equipment is permitted in wilderness only when there is no reasonable alternative and the action is necessary for the administration of the area. A minimum requirements analysis must be completed prior to the approval of any non-emergency prohibited use in wilderness. *Director's Order 41* states "the use of motorized equipment and the establishment of management facilities are specifically prohibited when other reasonable alternatives are available" (6.4).

Motorized and mechanized use of rock drills, chainsaws, and occasionally explosives, in the Big Bend wilderness is at this time isolated to incidental events like the construction of new trails, the removal of fallen boulders, and the mitigation of hazard trees after high periods of mortality. Water pumps and chainsaws are also used on a more routine basis for the treatment of giant cane in the river corridor. The most significant motorized and mechanized use projects have been the Emory Peak Trail construction in 2009 (146 total hours), the Chisos hazard tree mitigation project in 2014 (26 hours) and a recent boulder fall that blocked the Laguna Meadows trail in 2015 (27 hours). Apart from the four hours generally planned for the Boquillas Canyon cane treatment project, motorized and mechanized use is authorized on a case-by-case basis, so data value may vary greatly from year to year depending on isolated events and management goals

**Measure Description and Collection Protocol:**

Baseline data value is the average annual mechanized and motorize use hours from 2009-2015. Because use hours data are based on staff memory, collecting data for years before 2009 was not attempted. The baseline data value was calculated from an average of all prior years where data were available. Because motorized and mechanized use in wilderness is not routine and can vary greatly from year to year, a five year monitoring frequency should be used, calculating the average annual hours per year. An increase in the hours of motorized and mechanized use within wilderness would contribute to a downward trend for this indicator of the Undeveloped Quality.



Chisos hazard tree removal project, 2014. *Photo: NPS*

BIG BEND WILDERNESS

APX-V1-232

| Table 22. Authorized Administrative Motorized and Mechanized Use 2009 - 2015 | | | |
|---|---|---|---|
| Year | Project | Type of Use | Duration of Use (hours) |
| 2009 | Emory Peak Tail Construction | Rock drill | 36 |
| 2009 | Emory Peak Tail Construction | Explosives | 1 |
| 2009 | Emory Peak Tail Construction | Chainsaws | 109 |
| | | | 2009 total hours: 146 |
| 2010 | Boquillas Canyon cane reduction | Water pumps | 2 |
| 2010 | Boquillas Canyon cane reduction | Chainsaws | 2 |
| | | | 2010 total hours: 4 |
| 2011 | Boquillas Canyon cane reduction | Water pumps | 2 |
| 2011 | Boquillas Canyon cane reduction | Chainsaws | 2 |
| | | | 2011 total hours: 4 |
| 2012 | Boquillas Canyon cane reduction | Water pumps | 2 |
| 2012 | Boquillas Canyon cane reduction | Chainsaws | 2 |
| | | | 2012 total hours: 4 |
| 2013 | Boquillas Canyon cane reduction | Water pumps | 2 |
| 2013 | Boquillas Canyon cane reduction | Chainsaws | 2 |
| | | | 2013 total hours: 4 |
| 2014 | Chisos hazard tree mitigation | Chainsaws | 26 |
| 2014 | Boquillas Canyon cane reduction | Water pumps | 2 |
| 2014 | Boquillas Canyon cane reduction | Chainsaws | 2 |
| | | | 2014 total hours: 30 |
| 2015 | Boulder fall – Laguna Meadows | Rock drill | 27 |
| 2015 | Boquillas Canyon cane reduction | Water pumps | 2 |
| 2015 | Boquillas Canyon cane reduction | Chainsaws | 2 |
| | | | 2015 total hours: 31 |
| | | | Average annual hours: 32 |

**Data Source:**

Erik Walker, *Trail Maintenance Supervisor;* Ed Waldron, *Fire Management Officer;* David Larson, *Chief, Science and Resource Management;* Joe Sirotnak, *Botanist*

**Data Adequacy:**

Medium (5)
      Data quantity is high because all relevant staff were consulted and all actions were accounted for. Data quality is moderate because use hours estimates were based on staff memory or inferred from project descriptions rather than counted from hard data.

**Frequency:**

Five years

**Significant Change:**

Any change of 10 hours or more from the baseline data value is considered significant.

BIG BEND WILDERNESS

# SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION

*Wilderness provides outstanding opportunities for solitude or primitive and unconfined recreation.*

As populations increase and technology advances, wilderness provides opportunities for solitude and for a primitive or unconfined recreation that are not available in many other places. Wilderness is unique in that its managers are mandated to provide outstanding opportunities for a specific type of recreational experience. Although managers cannot guarantee or require that visitors experience solitude or primitive and unconfined recreation, they must protect and uphold the *opportunity* to have those experiences. The Solitude or Primitive and Unconfined Recreation Quality focuses on the tangible aspects of the setting that affect the visitor experience, and not on the subjective nature of the visitor experience itself.

| **Table 23. Solitude or Primitive and Unconfined Recreation Quality** | | | | | | |
|---|---|---|---|---|---|---|
| Indicator | Measure | Frequency | Data Adequacy | Significant Change | Baseline | 2015 Data Value |
| **Remoteness from sights and sounds of human activity *inside* of wilderness** | Backcountry Overnight Stays | 1 | Medium (5) | ≥ 10% | 22,928 | 22,928 |
| | Illegal Campfires | 1 | High (6) | ≥ 25% | 48 | 47 |
| | Heavily Impacted Backcountry Campsites | 5 | Medium (5) | ≥ 5 sites | 23 | 23 |
| **Remoteness from sights and sounds of human activity *outside* of wilderness** | Percentage of Time Noise-Free | 5 | Medium (5) | ≥ 15% | 73.45% | 73.45% |
| | Night Sky Visibility | 5 | Medium (5) | Categorical | < 0.04 (ALR) | < 0.04 (ALR) |
| **Facilities that decrease self-reliant recreation** | Facilities that Decrease Primitive and Self-Reliant Recreation | 5 | High (6) | ≥ 10 points | 203.5 | 203.5 |
| **Management restrictions on visitor behavior** | Visitor Behavior Restrictions | 5 | High (6) | Any | 48% | 48% |

BIG BEND WILDERNESS

APX-V1-234

| SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION QUALITY | Remoteness from sights and sounds of human activity *inside* of wilderness |
| --- | --- |

## Backcountry Overnight Stays

**2015 (Measure Baseline) Data Value:** 22,928 overnight stays
**Year(s) of Data Collection:** 2014

**Background and Context:**

Big Bend National Park is renowned for its expansive and exceptional backcountry camping. With vast roadless areas, much of the Big Bend wilderness can only be seen on foot or by paddle. The ability to spend multiple days away from roads and mechanization in the backcountry enables users to truly experience solitude, remoteness and self-reflection. While the majority of park visitors opt for the comforts of front-country lodges and campgrounds, around 20,000 backcountry overnights are enjoyed by visitors to the Big Bend wilderness every year. Permits are required for all backcountry overnights in the Big Bend wilderness, requiring a $12 user fee. The majority of backcountry camping currently takes place in the High Chisos, where sites are designated and require reservations. Backcountry campers may also elect to zone camp in lower elevations and trailless areas. Zone camping has become more popular in recent years, especially when sites in the Chisos are fully booked. Recent problems with zone camps have emerged as campers drag bags and coolers over the landscape, using the backcountry zone camps as hike-to car-camping areas rather than low-impact backpacking sites. Additionally, zone camps are not equipped with bear boxes and because of this, wildlife management staff are concerned with proper food storage, especially among inexperienced campers.

**Measure Description and Collection Protocol:**

Data value is the number of total permitted visitors that stay overnight in the Big Bend wilderness. All permits are entered into the El Campo permitting database, accessible at: http://75.41.147.131/cgi-bin/permits/backcountry.exe. To obtain the data value, exclude all roadside campsites and stock permits, counting only backcountry and river campsites. Zoned camping does not take place exclusively in wilderness, and a small number of zone campers may camp outside of wilderness bounds. Due to the nature of Big Bend's wilderness boundaries, however, the vast majority of backcountry zoned camping is estimated to take place within wilderness and all zoned camping is reflected in data value. Similarly, not all overnight stays in river sites are sure to be in wilderness, but the vast majority of river use and overnight river trips occur in one of the park's three wilderness canyons. While unpermitted illegal camping does occur, rangers estimate the numbers of illegal overnights to be insubstantial and have a negligible impact on overall data accuracy.

In 2013, the "El Campo" permitting system and online database was employed by park managers, replacing the prior physical database. Because of the these changes in the backcountry permitting system, data on backcountry overnight stays from previous years were not available. An increase in number of backcountry overnight stays would contribute to a downward trend in this indicator of the Solitude or Primitive and Unconfined Recreation Quality.

BIG BEND WILDERNESS

**Data Source:**

Bob Smith, *Permitting Officer;* David Larson, *Chief, Science and Resource Management;* Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator;* El Campo permitting database: http://75.41.147.131/cgi-bin/permits/backcountry.exe

**Data Adequacy:**

Medium (5)
> Data quantity is complete because all overnight visitors are required to file a backcountry permit. Data accuracy is moderate because not all zone and river camping occurs within the Big Bend wilderness, and the reflected data value could be slightly inflated from the actual number of overnight stays as a result.

**Frequency:**

Annually

**Significant Change:**

Any change of 10% or more in either direction from the baseline data value is considered significant.



*Hiker on a South Rim Trail overlook. Photo: Laiken Jordahl*

APX-V1-236

| SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION QUALITY | Remoteness from sights and sounds of human activity *inside* of wilderness |
| --- | --- |

## Illegal Campfires

**Measure Baseline Data Value:** 48 fire impacts  **2015 Data Value:** 47 fire impacts
**Year(s) of Data Collection:** Nov. 2012 – Mar. 2013  **Year(s) of Data Collection:** Nov. 2014 – Mar. 2015

**Background and Context:**

Campfires impact backcountry campsites by leaving behind fire-scars and fire-rings that are clear remnants of human activity and misuse. Campfires are illegal in all areas of the Big Bend wilderness, the only exception being the river corridor with the proper use of a firepan. Groups that ignite campfires often collect wood from nearby sources, creating social trails and increasing the overall impacted area around campsites. Campfires can easily escape fire-rings and ignite into full-blown wildfires, imperiling human life and severely altering the environment. Additionally, the presence of fire-scars and fire-rings may encourage other campers to have illegal fires and further impact the wilderness resource. While illegal campfires affect many qualities of wilderness, this measure examines the impact on the Solitude or Primitive and Unconfined Recreation Quality.

**Measure Description and Collection Protocol:**

Data value is the total number of illegal campfires discovered in backcountry sites over the course of the winter high-use season running from November to March. Consult with Fire Management Officer (Ed Waldron in 2015) to obtain the data. An increase in the number of illegal campfires would contribute to a downward trend in this indicator of the Solitude or Primitive and Unconfined Recreation Quality.



*Illegal campfire found at Pinnacles 2 campsite. Photo: NPS*

**Data Source:**

Ed Waldron, *Fire Management Officer*

**Data Adequacy:**

High (6)
    Data Quantity is complete because patrols looking for impacts to backcountry campsites occur regularly and illegal campfire impacts are well-reported.  Data quality is high for the same reasons.

**Frequency:**

Annually

**Significant Change:**

Any change of 25% or more in either direction from the baseline data value is considered significant.

| **SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION QUALITY** | **Remoteness from sights and sounds of human activity** *inside* **of wilderness** |
| --- | --- |

## Heavily Impacted Chisos Backcountry Campsites

**2015 (Measure Baseline) Data Value:** 23 campsites
**Year(s) of Data Collection:** 2003

**Background and Context:**

The Chisos Range backcountry receives the highest use levels of all areas in the Big Bend wilderness. Backcountry campers are required to camp in one of the 42 designated sites in the High Chisos (see Appendix G for an index of designated sites), which require advanced reservations. Zone camping is allowed along the Outer Mountain Loop as this areas sees less intensive use. Campsites in the Chisos see routinely high use, and because of this, the area of trampled soils has increased and satellite sites and social trails have formed. These campsite impacts have long been a management concern, and if backcountry use increases, additional mitigation actions may be necessary to protect the limited campsites available in the Chisos Range from degradation.

In 2003, 143 campsites in the Chisos Mountains and along the Outer Mountain Loop trail were surveyed for resource conditions and campsite condition class (see Table 24 and "Definitions" section below). Both designated and non-designated zone-campsites were inventoried in this survey. Findings showed that 21% of all assessed campsites fell into condition classes of 4 or 5, indicating widespread impacts to areas within and surrounding the site area. Since the 2003 survey, a number of isolated campsite condition assessments were completed, but no thorough assessment with usable data was available. Science and resource managers plan on undertaking an updated comprehensive campsite condition assessment in the near future, and these data should be used for wilderness character monitoring.

**Measure Description and Collection Protocol:**

Data value is the number of backcountry campsites assigned a condition of "class 4" or "class 5" as defined in the "Definitions" section below. Consult with science and resource managers to obtain the data. An increase in the number of impacted sites would contribute to a downward trend for this indicator of the Solitude or Primitive and Unconfined Recreation Quality.

**Definitions** (Extracted from 2003 Campsite Assessment)**:**

> **Class 1:** *Campsite Barely distinguishable*. Soil surface only slightly disturbed. Vegetation cover barely altered. Organic litter barely disturbed compared to littler present outside of campsite boundaries in similar adjacent areas.
>
> **Class 2:** *Campsite apparent, effects confined*. Large stones absent from soil surface in areas where primary activities occur, and any previous vegetation cover or organic litter is either lost or pulverized. Obvious effects are concentrated, with effects tapering toward boundary.
>
> **Class 3:** *Campsite obvious, effects throughout site.* Very distinct boundary exists between campsite and undisturbed adjacent areas. Vegetation cover or organic litter is lost or pulverized on much of the site. Few stones or gravel remain where primary activities occur. Most gravel or stones present on the site are outside of primary activity areas.

**Class 4:** *Campsite obvious, effects widespread.* Distinct boundary exists between campsite and undisturbed areas. Nearly complete or total loss of vegetation cover and organic litter. Bare soil widespread with little gravel or few stones present anywhere within boundaries.

**Class 5:** *Campsite obvious, effects widespread, and condition greatly different from adjacent areas.* In addition to criteria for class 4: soil compressed and may show small gullies, vegetation absent within boundaries, roots exposed, and little gravel or few stones present.

| Table 24. Chisos Campsites by Condition Class | | | | | |
|---|---|---|---|---|---|
| | **Class 1** | **Class 2** | **Class 3** | **Class 4** *(Heavily impacted)* | **Class 5** *(Heavily impacted)* |
| **Designated sites** | 0 | 0 | 20 | 16 | 6 |
| **Non-designated sites** | 23 | 35 | 8 | 0 | 1 |
| **Total** | 23 | 35 | 28 | 16 | 7 |
| | | | | | **Total Heavily Impacted Sites: 23** |

**Data Source:**

Hersey, Marlys. 2003. Assessment of Backcountry Campsite Conditions in Big Bend National Park.

**Data Adequacy:**

Medium (5) - Data quantity is complete because an exhaustive survey of 143 campsites was conducted. Data quality is moderate because data value was collected over 10 years ago and conditions have likely changed since.

**Frequency:** Five years, or when new data become available thereafter.

**Significant Change:** Any change greater than or equal to five impacted sites is considered significant.



*Boot Canyon. Photo: Laiken Jordahl*

APX-V1-239

| SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION QUALITY | Remoteness from sights and sounds of human activity *outside* of wilderness |
|---|---|

## Percentage of Time Noise-Free

**2015 (Measure Baseline) Data Value:** 73.45%
**Year(s) of Data Collection:** 2010

**Background and Context:**

The ability to enjoy the sounds of nature separate from anthropogenic noise is a vital component of wilderness solitude. Noise can affect many of the intangible, spiritual and self-reflective values of wilderness that visitors seek. Natural sounds also play an important role in the ecosystem, allowing animals to communicate, find mates, sense danger, and hunt effectively. The presence of non-natural human-caused sounds can adversely impact the natural acoustic environment, altering sensitive ecological processes and affecting wildlife stress levels, movement, and habitat utilization. These noise intrusions detract from wilderness character to varying degrees, depending on the type of noise and the expectations of the listener. While anthropogenic noise has clear impacts on the Natural Quality of wilderness character, this measure is focused on the human aspect, and how these sounds detract from visitor solitude.

Soundscapes in the Big Bend wilderness are affected most significantly by aircraft and road noise. Administrative and border-enforcement flights over the wilderness have been common for many years, but given the recent uptick in sight-seeing flights, overall aircraft noise in wilderness may be increasing. Other anthropogenic noises monitored in the Big Bend wilderness include the operation of construction equipment and heavy machinery in the Chisos Basin and motorcycle revving from roadways the numerous park highways. In order to preserve visitors' opportunities for solitude, the impacts of noise pollution should be considered in all future planning efforts.

**Measure Description and Collection Protocol:**

Data value is the percentage of time observed to be noise-free, averaged from the four acoustical monitoring sites sampled by the NPS Natural Sounds and Night Skies Division (NSNSD) as outlined in Table 25, below. Consult with NSNSD to obtain updated information. An increase in the percentage of time noise-free would contribute to an upward trend in the Solitude or Primitive and Unconfined Recreation Quality.

**Data Source:**

Emma Brown, *Acoustical Resource Specialist - NPS Natural Sounds and Night Skies Division;*

National Park Service, Department of the Interior. 2013. Acoustical Monitoring Report – Big Bend National Park, 2010. Natural Sounds and Nights Skies Division. Fort Collins, Colorado.

**Data Adequacy:**

Medium (5)
Data quantity is complete because acoustical monitoring samples were taken at four separate locations by regional experts. Data quality is partial because two of the four sampling sites are in

relatively developed areas near the wilderness boundary. Data quality would be improved if additional monitoring sites were placed further into the wilderness.

**Frequency:**

Five years, or when new data become available thereafter.

**Significant Change:**

Any change of 15% or more in either direction from the baseline data value is considered significant.

| Table 25: Percentage of Time Noise-Free at Acoustical Monitoring Sites | | | | |
|---|---|---|---|---|
| Site Name | Coordinates | Description | % of time noise-free | Noises Monitored |
| Mule Ears Trail | 29.16188° / 103.41767° | 1.1 miles southeast of Mule Ears overlook | 98.8% | Fixed wing aircraft and helicopter: 0.4%; other aircraft: 0.5%; other human: 0.4% |
| Grapevine Hills Road | 29.3816° / 103.22229° | ¼ mile from dirt road | 45.3% | Fixed wing aircraft and helicopter: 1.9%; other aircraft: 0.9%; other human: 52.0% |
| Boulder Meadow | 29.26129° / 103.29601° | Forested site in Chisos Mountains | 59.4% | Fixed wing aircraft and helicopter: 1.0%; other aircraft: 0.5%; other human: 39.1% |
| Old Ore Road | 29.46813° / 103.07986° | Located "few hundred feet from road" | 90.3% | Fixed wing aircraft and helicopter: 1.1%; other aircraft 0.3%; other human 8.3% |

| SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION QUALITY | Remoteness from sights and sounds of human activity *outside* of wilderness |
|---|---|

## Night Sky Visibility

**2015 (Measure Baseline) Data Value:** < 0.04 (anthropogenic light ratio)
**Year(s) of Data Collection:** 2007

**Background and Context:**

The Big Bend wilderness is renowned for its incredible night skies. Remoteness from urban centers, low humidity levels and infrequent cloud cover in the Big Bend area create the conditions for some of the darkest skies in the country. In 2012, Big Bend National Park was designated as a "Gold Tier" International Dark Sky Park by the International Dark Skies Association – one of 28 such sites in the world (International Dark Sky Association. 2015). On clear nights, stargazers can see more than 4,000 stars – as noted in the most recent NPS monitoring – with flawless views of the Milky Way, zodiacal light, and even the Andromeda Galaxy (Nadeau et al. 2014). Big Bend Park managers have taken active steps to protect the night sky resource by installing night-sky-friendly shielded LED lighting systems and coordinating with neighboring communities to reduce anthropogenic light pollution.

All night skies free of light pollution provide a visible sense of remoteness, contributing to the solitude and primitive aspects of wilderness character. From a human perspective, light pollution can impact the wilderness experience by detracting from the ability to experience the natural world free from visual reminders of developed society. Unnatural brightening of the night sky reduces levels of contrast between stars and space, obscuring the glow of stellar objects and preventing the human eye from fully adapting to darkness. The photic environment – *the totality of the pattern of light at night at all wavelengths* – is also a critical habitat component for nocturnal wildlife species. Light pollution can impact wildlife behavior by disrupting natural rhythms, influencing predator-prey relationships, and hindering navigation for nocturnal wildlife species (NPS. 2015).

The biggest threat to Big Bend's pristine night skies is the increased urban and industrial development of the park's neighboring regions. During their most recent visit in 2007, the NPS Natural Sounds and Night Skies Division (NSNSD) noted extremely faint "light domes" emanating from the Del Rio/Ciudad Acuña and Presidio/Ojinaga urban areas, with even subtler artificial light intrusions from the Alpine, Odessa and Midland areas. Light domes like these could be worsened by future development in the region, as paved roads are expected to reach the Boquillas area south of the park in the next 10-15 years, and new oil and gas exploration on both sides of the border is projected to commence. Despite the existing anthropogenic illuminations noted during photometry monitoring, the NPS night skies expert noted on his most recent visit that Big Bend was "an exceptionally dark site considering all factors, still unmatched for remoteness from light polluting cities and towns" (NPS. 2007).

**Measure Description and Collection Protocol:**

Data value is the anthropogenic light ratio (ALR)*. ALR is calculated by removing natural night sky conditions from the total observed sky brightness (Moore. 2013). The data value reported is a decimal but can also be interpreted as a percentage. The current value of less than 0.04 indicates that the sky night in the Big Bend wilderness is less than 4% brighter than it would be if only natural conditions were present (NPS Night Skies Program Data Night Report. 2015).

The ALR data value of less than 0.04 was collected at the Emory Peak monitoring site on April 14, 2007 by the NPS Natural Sounds and Night Skies Division. Big Bend National Park staff does not currently have the means to conduct in-house night skies monitoring. Future data will have to come from NPS Natural Sounds and Night Skies Division. Bob Meadows was a knowledgeable contact in collecting and interpreting this dataset in 2015.  An increase in ALR would contribute to a downward trend in the Solitude or Primitive and Unconfined Recreation Quality.

*\* ALR and LPR have been used interchangeably in recent night sky reporting; these are the same metrics labeled differently.*

**Definitions**

> **Lightscape:** "the human perception of the nighttime scene, including both the night sky and faintly illuminated terrain" (Moore. 2013).
> **Photic Environment:** "the totality of the pattern of light at night at all wavelengths" (Moore. 2013).

**Data Source:**

NPS Night Skies Monitoring Database: http://www.nature.nps.gov/night/skymap.cfm; Dan Duriscoe, *NPS Night Skies Team Lead Physical Scientist.*





*Night sky photometry photos taken at Emory Peak on April 14, 2007. Above: photometry of all light sources. Below: photometry of artificial skyglow by removing natural light sources. NPS Night Skies Division.*

88 | P a g e

**Data Adequacy:**

Medium (5)

>Data quantity is complete because an accurate measurement of the photic environment was taken by national experts. Data quality is moderate because an assessment hasn't been taken for eight years and changes may have occurred since the most recent sampling.

**Frequency:**

Five years, or when new data become available thereafter.

There is no regularly scheduled assessment of Big Bend night sky visibility; measurements require the assistance of the NPS Natural Sounds and Night Skies Division, and must be requested by park staff through the Solution for Technical Assistance Requests (STAR) application at: https://irma.nps.gov/Star/. New data should be recorded as they are made available, but not more often than every five years.

**Significant Change:**

Change from one threshold category to another is considered significant. A new condition category of "outstanding" was established for this report with the approval of NPS NSNSD experts. This condition category should be used in future wilderness character monitoring assessments where pristine or near-pristine night skies are present.

| Table 26. ALR Condition Categories | |
|---|---|
| **ALR** | **Threshold Category** |
| <0.1 | Outstanding |
| 0.1 – 0.33 | Good |
| 0.33 – 2.00 | Moderate |
| >2.00 | Concern |



*Night sky over Casa Grande. Photo: Erik Walker, NPS*

BIG BEND WILDERNESS

## Facilities that Decrease Primitive and Self-Reliant Recreation

**2015 (Measure Baseline) Data Value:** 203.5 (weighted score)
**Year(s) of Data Collection:** 2015

**Background and Context:**

Facilities and conveniences like bear boxes, benches, signs and toilets may increase the comfort and safety levels of wilderness recreationalists, but these developments also impact wilderness character by reducing the need for primitive skills and self-reliance, as well as being readily visible as clear signs of human use.

Bear boxes help avert human-wildlife conflicts and animal habituation, providing backcountry users with a simple and effective way to store food without requiring extensive rigging of a pulley system or the extra weight of a bear canister. Bear boxes are useful management tools that protect certain qualities of

wilderness; however they are clear signs of human occupation that reduce the degree of skill and self-reliance needed in bear country. A total of 54 bear boxes are present in the Big Bend wilderness. Each of the 42 designated backcountry campsites in the High Chisos are equipped with at least one bear box, and additional boxes are present at larger group sites, composting toilets, and trail junctions.



*Bear Boxes at group campsite in the Chisos. Photo: NPS*

Other wilderness amenities provided by NPS that decrease primitive and self-reliant recreation include: seven benches, five composting toilets, 43 directional trails signs, 83 campsite location signs and one interpretation-related sign. In addition to impacting self-reliant recreation, these developments are sometimes installed and extracted via motorized means, sometimes requiring helicopter use in wilderness. The Blue Creek Fire interpretation sign has been slated for removal by park managers for years, however as of December 2015, the sign was still in place. See Table 27, below for an index and weighted total score of all facilities that decrease primitive and self-reliant recreation.

| Table 27. Facilities That Decrease Self-Reliant Recreation | | | |
|---|---|---|---|
| **Facility Type** | **Number of facilities** | **Respective Weight*** | **Total Category Score** |
| Bear Boxes | 54 | 2 | 108 |
| Composting Toilets | 5 | 5 | 25 |
| Directional Signs | 43 | 0.5 | 21.5 |
| Campsite Signs | 83 | 0.5 | 41.5 |
| Interp. Signs (Blue Creek Fire) | 1 | 0.5 | 0.5 |
| Benches | 7 | 1 | 7 |
| | | | **Total Score:  203.5** |

*\* Note: "respective weight" value for each facility type is a subjective ranking that was selected to be proportional to the overall impact of each facility. If new facility types are added to wilderness, "respective weight" should be estimated using best professional judgement.*

BIG BEND WILDERNESS

APX-V1-245

**Measure Description and Collection Protocol:**

Data value is a total weighted score of all facilities that decrease primitive and self-reliant recreation. Consult with backcountry rangers, wildlife management specialists and search NEPA records to obtain information about new installations or removals. Calculate total category score for each facility type and sum total category scores to obtain data value. An increase in facilities that decrease primitive and self-reliant recreation would contribute to a downward trend in this indicator of the Solitude or Primitive and Unconfined Recreation Quality.

**Data Source:**

Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator;* Erik Walker, *Trail Maintenance Supervisor*

**Data Adequacy:**

High (6)
> Data quantity is complete because necessary files and staff have been gathered and consulted and an inquiry was conducted specifically for this report. Data quality is high reflecting the high level of certainty in data accuracy.

**Frequency:**

Five years

**Significant Change:**

Any change of ten points or more from the baseline data value is considered significant.



*Blue Creek Fire sign on Laguna Meadows Trail. Photo: Katherine Sinsky*

| SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION QUALITY | Management restrictions on visitor behavior |
|---|---|

## Visitor Behavior Restrictions

**2015 (Measure Baseline) Data Value:** 48%
**Year(s) of Data Collection:** 2015

**Background and Context:**

Opportunities for solitude or primitive and unconfined recreation are written into the Wilderness Act of 1964 as a key component of wilderness; however, at times, providing for visitor use can compromise other wilderness resources and values. The Natural Quality can be impacted by visitor disturbances to wildlife, the Undeveloped Quality can be affected by trails and trail signs, and opportunities for solitude can be reduced as visitor numbers increase.

Use and behavior restrictions are important tools used by park managers to achieve a balance between the sometimes conflicting qualities inherent to wilderness management. Limiting length of stay and group sizes prevents overcrowding and allows more visitors to enjoy solitude. Prohibition of campfires prevents fire damage and preserves wood sources. Regulations on human waste disposal ensure that the wilderness will remain clean and unmarred for future visitors. Continued reassessment of the effectiveness, relevance, and enforceability of these visitor use restrictions will be important as the number and nature of wilderness visits change, and as park management strives to preserve the wilderness value of unconfined recreation while preserving other wilderness qualities.

**Measure Description and Collection Protocol:**

Data value for this measure is calculated using a numerical scale where low numbers represent the lowest amount of restriction and high numbers represent the highest amount of restriction. Use the index in Table 29 to develop a score for each restriction category; multiply that score by the value listed for the restriction's geographic extent (Table 28) to develop a final score for each restriction type. Sum the scores for all applicable restriction types and report the value as a percentage of all possible points. If the resulting value is a decimal, round to the nearest whole percent. A percentage is used rather than a straight total to facilitate reporting consistency if restrictions are added to or removed from the list of user restrictions. An increase in the percentage value of user restrictions would contribute to a downward trend in this indicator of the Solitude or Primitive and Unconfined Recreation Quality.

**Data Source:**

2014 Compendium: Listing of Special Regulations in Effect for Big Bend National Park; Lisa Hendy, *Chief Ranger (Acting)*

**Data Adequacy:**

High (6)

> Data quantity is complete because visitor use restrictions are clearly defined in park policy. Data quality is high for this same reason.

| Table 28. Visitor Use Restriction Extent | |
| --- | --- |
| Score | Geographic Extent |
| 1 | applies to a subarea of the wilderness |
| 2 | applies to the entire wilderness |

| Table 29. Visitor Use Restriction Index | | | | | |
| --- | --- | --- | --- | --- | --- |
| Category | Score | Type of Restriction | Geographic Extent | Restriction Rating | TOTAL SCORE |
| Campfires | 0<br>1<br>3 | No regulation<br>Designated sites only<br>Total prohibition | 1 | 3 | 3 |
| Campsite Location | 0<br>1<br><br>2<br>3 | No regulation<br>Mandatory setback or other general regulation<br>Designated site<br>Total prohibition | 1 | 2 | 2 |
| Permits | 0<br>1<br>2 | No permits required<br>Permit required for overnight use<br>Permits required for day use | 2 | 1 | 2 |
| Length of Stay | 0<br>1 | No restriction on length of stay<br>Length of stay limited | 2 | 1 | 2 |
| Area Closure | 0<br>1<br>2 | None<br>Area closed seasonally/temporarily<br>Area closed year-round | 0 | 0 | 0 |
| Group Size Limit | 0<br>1<br>2 | No restriction<br>Overnight group size limit<br>Day use group size limit | 2 | 1 | 2 |
| Domesticated Animals | 0<br>1<br>2 | No regulation<br>Required to be leashed<br>Prohibited | 2 | 2 | 4 |
| Horses and Pack Animals | 0<br>1<br>2 | No regulation<br>Restricted to limited areas<br>Prohibited | 1 | 1 | 1 |
| Hunting | 0<br>1<br>2 | Regulated by state laws<br>Restrictions in addition to state laws<br>Total prohibition | 2 | 2 | 4 |
| Human Waste | 0<br>1<br>2 | No regulation<br>Catholes or toilet facilities<br>Carry-out required | 2 | 1 | 2 |
| Rock Climbing | 0<br>1<br>2 | No regulation<br>Permit Required<br>Total Prohibition | 0 | 0 | 0 |
| | | | | | 22 |
| | | | Percent of possible points (46 possible): | | 48% |

BIG BEND WILDERNESS

APX-V1-248

94 | P a g e

**Frequency:**

5 years

**Significant Change:**

Any change from the baseline data value is considered significant.



*Casa Grande: Photo: Katherine Sinsky*

## OTHER FEATURES OF VALUE

*Wilderness may also contain other tangible features of scientific, educational, scenic, or historical value.*

Wilderness areas may possess tangible, site-specific features that are integral to wilderness character and whose presence adds value to the wilderness resource. These features may:

- Be specifically identified in the enabling legislation for the wilderness, be on the National Register of Historic Places, on a State Register, or part of a National Historic Trail, or be identified as a Priority Heritage Asset;
- Contribute to making the area's meaning and significance clear and distinct, or help define how people think about and value an area;
- Help tell a broader story of a distinctive human relationship with the land;
- Contain additional educational, scientific, or scenic value.

The Other Features of Value Quality is different from the other four qualities in that it may *not* be relevant for all wildernesses. Even if a feature fits in one or more of the above categories, it may not necessarily be considered under this quality; ultimately, it is up to local resource specialists and wilderness managers to determine if any other features of value are present and should be included in wilderness character monitoring. Features included in this quality are also counted under other qualities if relevant. For example, a building that is on the National Register of Historic Places could add value to wilderness character under the Other Features of Value Quality for its historic or cultural significance, but as a structure in wilderness it would also be counted under the Undeveloped Quality.

| Table 30. Other Features of Value Quality | | | | | | |
|---|---|---|---|---|---|---|
| Indicator | Measure | Frequency in Years | Data Adequacy | Significant Change | Baseline Data Value | 2015 Data Value |
| Deterioration or loss of integral cultural features | Condition of Archaeological Sites | 5 | Medium (5) | Categorical | 2.71 | 2.71 |
| | Cultural Sites Impacted by UDA Activity | 5 | Low (3) | Categorical | 4 | 4 |

**OTHER FEATURES OF VALUE**

**QUALITY**  **Deterioration or loss of integral cultural features**

## Condition of Archaeological Sites

**2015 (Measure Baseline) Data Value:** 2.71 (condition ranking)
**Year(s) of Data Collection:** 2015

**Background and Context:**

Archaeological sites within the Big Bend wilderness give us important insights to cultures past. Artifacts and features in the region show a history of human habitation dating back more than 13,000 years. Sixteen Native American tribes are recognized to have "aboriginal occupation" under the Native American Graves Protection and Repatriation Act (NAGPRA) (listed in Appendix H), and consider lands now within the national park to be a part of their ancestral home. These tribes are centrally involved in the preservation and protection of cultural sites and are consulted regularly by NPS cultural resource staff.

Archaeological resources in Big Bend can range from an isolated artifact to a site that shows evidence of an entire community. There are 1,578 known archaeological sites in the Big Bend wilderness, 1,386 of which have been assigned an ASMIS (Archeological Sites Management Information System) condition ranking. An archaeological resource is considered a "site" when 15 or more artifacts are present in the same area, or if it has features that indicate human habitation.  The vast majority of wilderness lands have not been surveyed and the true potential of the archaeological resource in the Big Bend wilderness remains largely untapped.  Archaeological site conditions degrade when a site is permanently damaged, lost or destroyed by environmental or human factors. Environmental factors that often contribute to site degradation include erosion, flood events, fire, and animal activity. Human factors contributing to site degradation include general visitor use, vandalism, looting, collection of isolated artifacts, and new development or ground disturbance. Border-related impacts from trespass livestock as well as undocumented migrants have also been noted in wilderness archaeological sites. Losing even a single artifact erases a piece from the puzzle of cultures past and can limit our ability to understand prehistoric and historic cultures.



*Bedrock mortars near the mouth of Boquillas Canyon.*
*Photo: Katherine Sinsky*

**Measure Description and Collection Protocol:**

Data Value is the average condition of archaeological sites in wilderness. The sensitive nature of cultural resource data at Big Bend National Park may require these analyses to be completed by archaeological staff. If access to archaeological site and condition data is available, import updated condition rankings from ASMIS database and create shapefile of sites, isolating sites with condition rankings into wilderness. Calculate the number of sites falling into each of the four condition classes: 'good', 'fair', 'poor', and 'destroyed' and obtain the average. Exclude sites with no condition data or where condition is categorized

as 'unknown.' An increase in the average condition value of archaeological sites in the Big Bend wilderness would contribute to an upward trend in this indicator of the Other Features of Value Quality.

**Data Source:**

Marie Landis, *Cartographic Technician;* Katherine Sinsky, *Archaeology Technician Intern;* Tom Alex, *Archaeologist (Retired)*

**Data Adequacy:**

Medium (4)

> Data quantity is partial because not all discovered sites have been inventoried and entered into ASMIS. Data quality is moderate because ASMIS condition rankings for many sites have not been updated on the BIBE shapefile for many years.

**Frequency:**

5 years

**Significant Change:**

Change from one threshold category to another is considered significant.

| Table 31. Archaeological Site Conditions | | | |
|---|---|---|---|
| **Site Condition** | **Index Value** | **Number of Sites** | **Condition Value** |
| Good | 4 | 118 | 472 |
| Fair | 3 | 750 | 2,250 |
| Poor | 2 | 514 | 1,028 |
| Destroyed | 1 | 4 | 4 |
| Unknown or Excavated | Not counted | 242 | |
| | **Total sites with condition rankings: 1,386** | | **Total condition value: 3,754** |
| | **Average condition** *(total condition value/number of sites with condition rankings): 2.71* | | |

| Table 32. ASMIS Condition Categories | |
|---|---|
| **Site Condition** | **Index Value** |
| Good | > 3.25 |
| Fair | 2.51 - 3.25 |
| Poor | 1.76 – 2.50 |
| Destroyed | ≤ 1.75 |

| OTHER FEATURES OF VALUE | | |
|---|---|---|
| | QUALITY | Deterioration or loss of integral cultural features |

## Cultural Sites Impacted by UDA Activity

**2015 (Measure Baseline) Data Value:** 4 sites
**Year(s) of Data Collection:** 2010 - 2014

**Background and Context:**

In addition to the typical concerns of natural resource management, activity associated with undocumented aliens (UDAs) and border enforcement actions also pose a threat to many qualities of wilderness. Resource damage caused by illegal traffic of UDAs includes the littering of trash, increased erosion, formation of social trails, increases in illegal fires, and damage to cultural and historic sites (Alex et al. 2010). Beginning in 2007, resource management began the Border Protection Inventory project, producing annual surveys of UDA activity and impacts. The current level of these impacts is not considered to be a widespread resource management issue and is considered "far less obtrusive than similar impacts imparted onto park resources by regular, legal visitation activities" (Sirotnak et al. 2007). Though minor, UDA-produced effects do occur in wilderness lands and park managers have expressed concern over the possibility of increased border activity as changes in the international political climate unfold. In the fall and winter of 2015 during the time of this reporting, an unprecedented a hike in UDA activity was experienced in the national park. CBP officers stated that in the months of October and November alone, more apprehensions were made than in the previous two years combined. Because levels of UDA activity are subject to so many external factors and are inherently volatile, resource managers should work closely with CBP officials to understand trends in migrant crossings, and assess the resulting environmental and cultural impacts.

A review of the annual UDA surveys from 2010 to 2014 revealed a five-year total of four impacted cultural sites within wilderness that suffered damage due to UDA activity. Three of these sites are in Wilderness Unit 10 near the Old Ore Tramway – an area which has long seen some of the highest levels of UDA activity in the park – and the remaining site is in Wilderness Unit 1 in an unnamed cave on Mesa de Anguilla. Impacts at these sites range from trash left behind to the removal of vegetation to construct sleeping surfaces. Individual sites and impacts are outlined below in Table 33.

**Measure Description and Collection Protocol:**

Data value is the total number of cultural sites impacted by UDA activity over the course of five years. All historic and prehistoric sites within wilderness are counted. An "impact" includes any damage to the resource or the landscape surrounding the resource, including: physical removal of resources, littering, contamination of water sources, campfire impacts, disturbance of soil or vegetation, etc. Consult annual UDA surveys and develop a count of the number of impacted cultural sites within wilderness over the course of a five-year period. It is often difficult to determine if a site has been impacted by UDAs or regular park visitors. Sites counted in this measure should demonstrate evidence that provides managers with a high level of confidence suggesting impacts are from UDAs and not general recreationalists. An increase in the number of cultural sites impacted by UDA activity would contribute to a downward trend in this indicator of the Other Features of Value quality.

BIG BEND WILDERNESS

**Definitions:**

**Undocumented Alien (UDA):** 1) non-USA citizens entering the USA illegally at a point other than a legal port-of entry, 2) anyone participating in illegal trafficking of drugs or other contraband into the United States. (Alex et al. 2010)

| Table 33. Cultural Sites Impacted by UDA Activity 2010 - 2014 | | |
|---|---|---|
| **Year** | **Site** *(Wilderness Unit)* | **Observations** |
| **2010** | Old Ore Terminal *(Unit 10)* | Spanish label cans 1-2 months old |
| **2010** | Old Ore Terminal *(Unit 10)* | Pinto beans, sock, bean dip |
| **2010** | Prehistoric Rock Structure *(Unit 10)* | Candelilla beds |
| **2011** | Mesa de Anguila cave site *(Unit 1)* | Water bottles, sardine, tuna and bean cans |
| | | **Total impacted sites 2010-2014: 4** |

**Data Source:**

Annual BIBE Science and Resource Management UDA reports, available on network drive under "UDA" folder; Katherine Sinsky, *Archaeology Technician Intern;* Tom Alex, *Archaeologist (Retired)*

**Data Adequacy:**

Low (3)
    Data quantity is partial because significant areas of wilderness have not been surveyed for UDA effects and it is likely that additional resources have been impacted beyond NPS knowledge. Data quality is low because in many cases it is difficult to discern the origin of the impacts.

**Frequency:**

Five years

**Significant Change:**

Any change of 4 impacted sites or more from the baseline data value is considered significant.



*UDA trash discarded at wilderness cultural sites near Old Ore Terminal (left) and Mesa de Anguilla (right). Photos: NPS*

99 | P a g e

## Measures Not Used for Wilderness Character Monitoring

*The measures described below were considered for wilderness character monitoring but were ultimately not used. Descriptions of each measure and the rationales for exclusion are included.*

**Natural**

*Success Rates of Threatened and Endangered Plant Species*

Although the success of threatened and endangered plant communities is viewed as a highly important indicator of the overall ecosystem and identified as vulnerable by much of the park staff, specific data on species numbers, locations and abundance were not readily available. Vegetation specialists determined it more important to focus on non-native and invasive plant proliferation in measuring the health of the vegetative community. Additionally, measuring the success of native species can create complications by setting target populations or conditions for naturally varying processes, which may not truly reflect anthropogenic impacts.

*Presence/Absence of Mexican Long-Nosed Bat:*

Mt. Emory in the Big Bend wilderness is home to the only known roosting location of the Mexican long-nosed bat in the United States. The Mt. Emory roost has been monitored since the 1960s, and ample data exists on bat colony condition. In recent years, bat populations have declined below what experts believe to be the range of natural variation, dropping from historic roost estimates of as many as 10,000 bats, to present numbers closer to 1,000 individuals. Mexican long-nosed bats feed on the nectar and pollen of flowering agave plants, and the success of the population depends largely on the abundance of agave, which varies significantly from year to year. An intensive study is underway between the U.S. Fish and Wildlife Service (USFWS), Bat Conservation International (BCI) and NPS, that will establish target populations and assess current threats. Datasets generated by this study may have applications in future wilderness character monitoring, and this measure should be reassessed upon the completion of the study. Current data on population numbers were ruled out because of an inability to determine that the condition of the bat population is tied to directly identifiable anthropogenic impacts.

*Persistence of Springwater:*

Springs provide integral water sources and crucial habitats for many Chihuahuan Desert plant and animal species. Over 350 springs have been documented in Big Bend National Park (NPCA. 2003), creating a network of desert oases that provide aesthetic beauty and support biological diversity. Deer, javelina, mountain lions and frogs commonly utilize desert springs, and an abundance of vascular plants depend on spring habitats. Springs and seeps in the Big Bend wilderness also help improve water quantity and quality of the Rio Grande, providing reliable flows that recharge the river for hundreds of miles downstream of the park. Data for spring persistence are currently being collected by the Chihuahuan Desert Network (CHDN), however data were not complete or usable in December of 2015 and this measure was excluded due to the lack of available data.

**Undeveloped**

*Number of Animal Species with Mobile Developments:*

Animals with collars and bands are considered mobile installations, and impact the Undeveloped Quality of wilderness. An individual measure on the number of species with mobile developments was considered,

100 | P a g e

BIG BEND WILDERNESS

but determined not sufficiently important to receive its own measure. Additionally, some collared or tagged animals, like the Mexican long-nosed bat and mountain lion, have ranges that are partially within wilderness. These animals are essentially part-time wilderness residents, making the accurate counting of these species difficult. Ultimately, this measure was absorbed into the "Authorized Non-Recreational Physical Developments" measure. Only species that were estimated to spend more than half of their time within wilderness lands were counted.

*Authorized Emergency Uses of Motor Vehicles in Wilderness:*

The use of motorized vehicles in wilderness areas clearly contradicts wilderness values; however, in emergency circumstances, motorized vehicles can be authorized to operate within wilderness. Only one emergency motor vehicle-use authorization has taken place in recent memory in 2010, when a CBP ATV entered Tornillo creek for a body recovery. Another motorized use may be authorized in December of 2015, allowing an ATV to tow out the fuselage of a downed aircraft approximately 2 miles within the wilderness boundary. Ultimately, park staff did not see the authorized emergency use of motor vehicles in wilderness to be a sufficiently significant or vulnerable measure for future monitoring.

## Solitude or Primitive and Unconfined Recreation

*Extent of Cell-Phone Reception:*

The ability to call, text, or browse the web from inside the wilderness can impact opportunities for solitude and diminish the need for primitive and self-reliant skills in the backcountry. At this time, no adequate mapping of cell-phone coverage in the Big Bend wilderness was available. It is expected that the vast majority of wilderness lands are out of reception; however, this could change in coming years as new cell phone towers are built in the region. In 2015, cell-phone services are being proposed for the Chisos Basin developed areas and the potential for cell-phone reception to be receivable in wilderness surrounding the developed area is likely.  This potential impact on solitude or primitive and unconfined recreation will be assessed through park NEPA procedures.  As cell-phone services increase in the surrounding area and within the park, additional GIS analysis related to this measure will need to take place in the next 5 years. Once the reception-extent analysis is completed, this measure should be incorporated into wilderness character monitoring.

## Other Features of Value

*Unauthorized Removal of Cultural and Paleontological Resources:*

Illegal collection, looting and theft of cultural and paleontological resources have long been an issue in the Big Bend wilderness. The massive size of wilderness lands and abundance of resource artifacts, combined with a minimal law enforcement staff have created an environment in which illegal collections are rarely documented, and collects almost never apprehended. Although this potential measure was considered to be both important and vulnerable, insufficient data was available to set an adequate baseline.

## Conclusions

As mandated by *Director's Order# 41,* this document has provided Big Bend National Park with an official wilderness character narrative, an establishment of baseline wilderness character measures and data, and a framework for continuing this monitoring to assess changes and trends in wilderness character over time. Beyond fulfilling a policy requirement, this report seeks to empower park managers to make carefully-weighed wilderness stewardship decisions with the ultimate goal of facilitating the preservation of wilderness character.

The measures selected for wilderness character monitoring by this assessment are not all-inclusive. Future monitoring should continue to revisit the adequacy of these measures and their data sources, and new measures should be incorporated if new issues become relevant to Big Bend wilderness character or new data become available. The results of this assessment are not intended to score or judge the character of the Big Bend wilderness against any other wilderness area, as all wildernesses have their own distinct and incomparable character. Rather, this report should illuminate an on-the-ground understanding of the current condition of wilderness character, while instilling a sense of pride for and responsibility to the awe-inspiring wilderness landscape.

Significant wilderness-related datasets were generated though this project, including: the clarification of the administrative history of Big Bend's wilderness recommendations, the GIS mileage-mapping of roadway, powerline and telephone line networks in wilderness lands, the inventorying of all physical developments and installations in wilderness, the use of remote sensing data to track regional habitat connectivity and fragmentation, a count of all cultural sites impacted by UDA activity, an inventory of all designated wilderness campsites and bear boxes, and the aggregation of wilderness-specific datasets from local, regional and national sources. The information generated by this assessment has applications far beyond wilderness character monitoring, and should serve as a resource for future park planning as a whole.

The completion of this assessment does not automatically ensure the preservation of wilderness character or the longevity of wilderness character monitoring. Park managers will be responsible for continuing wilderness character monitoring efforts and updating data values to the national wilderness character monitoring database at: https://wc.wilderness.net/. Files related to this report, general wilderness-related resources, and data for the individual wilderness character monitoring measures (as well as unused measures) can be accessed on the Science and Resource Management Division public drive (also referred to as MONGO Drive) at: M:/Wilderness /Wilderness Character Files. Appendix I summarizes data sources and collection protocol for each measure to simplify future data collection. The park's wilderness coordinator (Raymond Skiles in 2015) will be responsible for this data collection and entry.



*Sunset over the Window in the Chisos Basin. Photo: Katherine Sinsky*

## FUTURE PLANNING

Threats to the Big Bend wilderness are as wide-reaching and diverse as the landscape itself. Encroaching development of the region, the proliferation of invasive plant and animal species, diminished flows to the Rio Grande, increasing border activity and enforcement actions, and the mounting impacts of a changing climate pose significant threats to the Big Bend wilderness. In order to preserve wilderness character, these concerns will need to be monitored and engaged with in future wilderness stewardship planning.

Current threats to the Natural Quality of wilderness character are varied, complex and interrelated. The spread and intensification of exotic plant and animal species is currently considered the most direct threat to the Natural Quality, as native species have been displaced by exotics and complex ecological balances deviate from the historical range of variation. Controlling exotic species is a familiar challenge for resource managers, and will be an enduring issue of concern in all Big Bend wilderness-related future planning; however, as climate change progresses, the control of exotics may become even more difficult. In the face of warmer temperatures and worsened drought, preserving water quality and quantity of the Rio Grande and assuring the persistence of Big Bend's many spring habitats will also be imperative to preserving the Natural Quality of wilderness.  Maintaining staffing and budget levels of regional Inventory and Monitoring (I&M) networks like the Chihuahuan Desert Network (CHDN) will also be necessary to continually implement the existing vital signs monitoring protocols. CHDN provides park managers with vital data necessary to understand trends in native/exotic plant composition monitoring, spring monitoring, and other vital sign indicators. The continued collection of this data will be crucial in understanding the effects and implications of a changing climate and in monitoring threats to wilderness lands.

Preserving the Natural Quality is a complex process that sometimes involves the manipulation of the natural environment, which may diminish the Untrammeled Quality of wilderness. Decisions to trammel should be made only when absolutely necessary, with the understanding that the Untrammeled Quality is degraded wherever manipulation occurs, even if the Natural Quality is improved. Humility, respect and restraint are key aspects of wilderness management, and these principles differentiate the management of wilderness from that of all other federal lands. Wilderness is the one place where allowing natural processes to unfold free from human manipulation is a legislative requirement, and management decisions should respect the inherent and symbolic value of an untrammeled wilderness.

Many threats facing Big Bend's wilderness character originate from political and economic factors far beyond NPS control. Energy, industrial and urban/suburban development, as well as pressures related to the international border could fundamentally alter the Big Bend region and affect many qualities of wilderness character. The Pecos, Texas area, about 100 miles north of the wilderness boundary, has seen a surge in oil and gas extraction over the last decade, and active mineral leases much closer to the park may be explored in coming years. Energy development south of the border will also see a likely uptick, as the discovery of formidable oil and gas reserves near Ojinaga, Chihuahua has caused a wave of exploratory drilling and speculation. Ecological effects from oil and gas development are manifold, including habitat loss and fragmentation, alteration of natural processes, increased water usage and the potential contamination of groundwater. While these effects would originate from areas outside of the park, impacts from energy extraction could alter the entire ecoregion and significantly diminish the wilderness character of Big Bend National Park.

Political pressures and policy shifts related to border security and immigration could also cause vast consequences to Big Bend's wilderness character. The current level of UDA activity in the region is relatively low compared to that of border areas closer to urban centers, and presently, the environmental impact from UDA activity is considered to be minimal. Border enforcement activities, in contrast, have clearly

BIG BEND WILDERNESS

visible impacts to the Natural, Undeveloped and Solitude or Primitive and Unconfined Recreation Qualities of wilderness, as noise from routine patrol flights disturbs both wildlife and visitors, and dispersed motion cameras and sensors show clear signs of human use. To minimize these impacts, effective communication channels must be maintained between resource managers and CPB officials, stressing the importance of wilderness values and environmental stewardship. If renewed political pushes for increased border enforcement occur, or if illegal border activity balloons in the region, additional wilderness impacts may be incurred.

While the complexities of managing wilderness in the borderlands pose a number of threats and concerns, resource managers at Big Bend also have the unique opportunity to forge international relationships and work together in accomplishing conservation goals. Binational resource management projects like the ongoing giant cane eradication efforts should continue to a be a priority, as the ecology of the region – as well as the threats that it faces – are deeply connected to both sides of the Rio Grande. Fostering a close relationship with Mexican officials and strengthening ties to neighboring communities south of the Rio Grande will provide a host of mutual benefits ranging from expanded visitor opportunities for cultural exchange, to increased efficacy in wildland fire protection and resource management. Because many threats facing the wilderness extend far beyond NPS lands, successful mitigations will have to involve a high degree of collaboration with regional and international partners, with the ultimate goal of resource protection for the entire Big Bend region.

With official wilderness designation still awaiting congressional action, preserving the wilderness character of the Big Bend wilderness should be at the forefront of park policy. As the designation process moves forward, the careful preservation of Big Bend's wilderness character will serve as a clear testament to the area's natural significance and iconic stature – worthy of official designation.



*Storm clouds over the Chisos Range. Photo: Katherine Sinsky*

BIG BEND WILDERNESS

# REFERENCES CITED

Alex, B., A. Leavitt, J. Timmer, and J. Sirotnak. 2006. Final Report on the Sensitive Plant Project: Big Bend National Park, Texas field seasons: June 2003 - April 2006. National Park Service and U.S. Geological Survey, Fort Collins, Colorado.

Alex, T., Wick, S., Murphy, A., & Leavitt, A. 2010. Effects of Undocumented Aliens (UDAs) and Illegal Border Activity on Big Bend National Park Resources - 2010 Report. Division of Science and Resource Management: Big Bend National Park.

Big Bend Regional Aerosol and Visibility Observational Study (BRAVO) Steering Committee. 2004. Big Bend Regional Aerosol and Visibility Observational Study Final Report.

Clinton, W. 1999 (February 3). Executive Order 13112: Invasive Species. Federal Register, *64*(25), 6183.

Duriscoe, D. 2001. Preserving pristine night skies in National Parks and the wilderness ethic. *George Wright Forum*. 18(4) 30-36.

Hauser, A. Scott. 2008. Pennisetum ciliare. In: Fire Effects Information System, [Online]. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory (Producer): http://www.fs.fed.us/database/feis.

International Dark Sky Association. Retrieved 2015. International Dark Sky Places, International Dark Sky Parks: http://darksky.org/idsp/parks/.

Keller, David. 2015. Reading Desert Stones: Archeology in Big Bend National Park. Crossroads in Science. National Park Service, Intermountain Region Resource Stewardship and Science. Issue 3, Fall 2015. P 82 – 89.

Landres, P., C. Barns, S. Boutcher, T. Devine, P. Dratch, A. Lindholm, L. Merigliano, N. Roeper, and E. Simpson. 2015. Keeping it Wild 2: An Updated Interagency Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System. USDA Forest Service, Rocky Mountain Research Station, General Technical Report RMRS-GTR-340, Fort Collins, CO.

Landres, P., C. Barns, J.G. Dennis, T. Devine, P. Geissler, C.S. McCasland, L. Merigliano, J.  Seastrand, and R. Swain. 2008. Keeping It Wild: An interagency strategy to monitor trends in wilderness character across the National Wilderness  Preservation System. General Technical Report RMRS-GTR-212. Fort Collins, Co: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Landres, P., S. Boutcher, L. Dean, T. Hall, T. Blett, T. Carlson, A. Mebane, C. Hardy, S. Rinehart, L. Merigliano, D. N. Cole, A. Leach, P. Wright, D. Bumpus. 2009. Technical guide for monitoring selected conditions related to wilderness character. USDA Forest Service General Technical Report WO-80, 282 pp.

Mandel, Jenny. 2013. "Gas Flare Drawn Thousands of Birds to Their Deaths, and Ignites Questions." E & E Publishing: Energywire. Friday, October 11, 2013: http://www.eenews.net/stories/1059988683

Matalon, Lorne. 2014. "Mexico Drilling Exploratory Wells Across from Presidio: Texas Economic Benefit Expected." Marfa Public Radio, Fronteras Desk. March 5, 2014: http://marfapublicradio.org/blog/mexico-drilling-exploratory-wells-across-from-presidio-texas-economic-benefit-expected/

BIG BEND WILDERNESS

Maxwell, Ross. 1985. Big Bend Country: A history of Big Bend National Park. Big Bend Natural History Association. Big Bend National Park, Texas.

Moir, W. H. 1982. A fire history of the High Chisos, Big Bend National Park, Texas. The Southwestern Naturalist 27(1):87-98.

Moore, C, F. Turina, and J. White. 2013. Recommended Indicators and Thresholds of Night Sky Quality for NPS State of the Park Reports. National Park Service.

Nadeau, A., S. Amberg, K. Allen, M. Komp, K. Stark, S. Gardner, J. Zanon, E. Iverson, J. Sopcak, L. Danielson, L. Danzinger, and B. Drazkowski. 2014. Big Bend National Park: Natural resource condition assessment. Natural Resource Report NPS/BIBE/NRR—2014/779. National Park Service, Fort Collins, Colorado.

National Invasive Species Information Center. Retrieved October 2015. Species Profiles: Giant Reed. National Agricultural Library, United States Department of Agriculture: http://www.invasivespeciesinfo.gov/aquatics/giantreed.shtml#cit.

National Park Service, Department of the Interior. Retrieved October 2015. Air Quality. Big Bend National Park: http://www.nps.gov/bibe/learn/nature/airquality.htm

National Park Service, Department of the Interior. Retrieved October 2015. Big Bend Bird Watching. Big Bend National Park: http://www.nps.gov/bibe/planyourvisit/birding.htm

National Park Service, Department of the Interior. Retrieved October 2015. Endangered Species. Big Bend National Park: http://www.nps.gov/bibe/learn/nature/endangered.htm.

National Park Service, Department of the Interior. Retrieved October 2015. Texas' Gift to the Nation. Big Bend National Park: http://www.nps.gov/bibe/learn/historyculture/tgttn.htm

National Park Service, Department of the Interior. Retrieved October 2015. Visitor Use Statistics: Big Bend National Park. Washington DC: https://irma.nps.gov/Stats/Reports/Park/BIBE

National Park Service, Department of the Interior. Retrieved October 2015. When Lady Bird Came to Big Bend. Big Bend National Park: http://www.nps.gov/bibe/learn/historyculture/lady_bird.htm

National Park Service, Department of the Interior. Retrieved July 2015. Night Sky. Natural Sounds and Night Skies Division: http://www.nature.nps.gov/night/index.cfm

National Park Service, Department of the Interior. Retrieved July 2015. Noise Pollution. Natural Sounds and Night Skies Division: http://www.nature.nps.gov/sound/effects.cfm

National Park Service, Department of the Interior. 2013. Acoustical Monitoring Report – Big Bend National Park, 2010. Natural Sounds and Nights Skies Division. Fort Collins, Colorado.

National Park Service, Department of the Interior. 2013. Director's Order #41: Wilderness Stewardship. Washington DC.

National Park Service, Department of the Interior. 2011. Rio Grande Wild and Scenic River: Outstandingly Remarkable Values. Big Bend National Park. Brewster County, Texas.

BIG BEND WILDERNESS

National Park Service, Department of the Interior. 2010. Chihuahuan Desert Network Vital Signs Monitoring Plan. Natural Resource Report NPS/CHDN/NRR—2010/188. Chihuahuan Desert Inventory and Monitoring Network, National Park Service, Fort Collins, Colorado.

National Park Service, Department of the Interior. 2007. Night Sky Quality Monitoring Report: Big Bend National Park, Emory Peak, April 14, 2007. NPS Natural Sounds and Night Skies Division. Fort Collins, Colorado.

National Park Service, Department of the Interior. 2007. Illegal Border and Counter-Measure Activities Impacts Findings and Recommendations. Southern Arizona Office. Phoenix, Arizona

National Park Service, Department of the Interior. 2006. Management Policies 2006.Washington DC.

National Park Service, Department of the Interior. 2004. Big Bend National Park Final General Management Plan/Environmental Statement. Big Bend National Park, Brewster County, Texas.

National Park Service, Department of the Interior. 2003. Resource Issues in Southern U.S. Border Parks from Drug Trafficking and Undocumented Alien Activity. NPS Southern Arizona Office, Phoenix, Arizona.

National Park Service, Department of the Interior. 2001. Rio Grande Wild and Scenic River: Final General Management Plan and Environmental Impact Statement. Big Bend National Park. Brewster County, Texas.

National Park Service, Department of the Interior. 1975. Final Environmental Statement (FES) on Proposed Wilderness Classification. Big Bend National Park. Brewster County, Texas.

National Parks Conservation Association. 2015. Polluted Parks: How Dirty Air is Harming America's National Parks. Washington D.C.: http://www.npca.org/assets/pdf/NPCA-Polluted-Parks-July-2015.pdf

National Parks Conservation Association. 2003. Big Bend National Park Resource  Assessment. State of the Parks Program. Washington, D.C.

Office of the Secretary, Department of the Interior. 1978 (May 11). Draft Bill To Designate Certain Lands within Units of the National Park System as Wilderness. Washington DC.

Peterson, Laura. 2014. "Drilling Boom Brings 'Light Pollution' to Southwest's Pristine Night Skies." E & E Publishing: Greenwire. Wednesday, March 12, 2014: http://www.eenews.net/stories/1059996009

Pitchford, L., I. Tombach, M. Barna, K. A. Gebhart, M. C. Green, E. Knipping, N. Kumar, W. C. Malm, B. Pun, B. A. Schichtel, C. Seigneur. 2004. Big Bend Regional Aerosol and Visibility Observational (BRAVO) Study. Big Bend Regional Aerosol and Visibility Observational Study (BRAVO) Steering Committee: http://www.nps.gov/bibe/learn/nature/aq_bravo.htm

Poulos, H.M. 2013. Tree Mortality from a Short-Duration Freezing Event and Global-Change-Type Drought In a Southwestern Pinon-Juniper Woodland, USA. College of the Environment, Wesleyan University. Middletown, Connecticut.

Sirotnak, Joe. 2011. Binational Cooperation in the Big Bend Region. The George Wright Forum, vol. 28 no.3. pp. 291-295 (2011). The George Right Society.

Sirotnak, J., Wick, S., Stone, D., Leavitt, A., & Daniels, F. 2007. Effects of Undocumented Aliens (UDAs) and Illegal Border Activity on Big Bend National Park Resources - 2007 Report. Division of Science and Resource Management, Big Bend National Park.

Texas Data Applications, LLC. Retrieved December, 2015. Oil Well and Production in Reeves County, TX: http://www.texas-drilling.com/reeves-county

Uchytil, Ronald J. 1992. Eragrostis lehmanniana. Fire Effects Information System, U.S. Department of Agriculture, Forest Service. Rocky Mountain Research Station, Fire Sciences Laboratory: http://www.fs.fed.us/database/feis/.

United Nations Educational, Scientific and Cultural Organization (UNESCO). Retrieved 2015. Biosphere Reserve Information: United States of America, Big Bend: http://www.unesco.org/mabdb/br/brdir/directory/biores.asp?mode=gen&code=USA+02

United States Environmental Protection Agency. Retrieved August 2015. Visibility: Basic Information: www.epa.gov/visibility/what.html

United States Census Bureau. 2014. State and County Quickfacts: Pecos, Texas. U.S. Department of Commerce. Available: http://quickfacts.census.gov/qfd/states/48/4856516.html

Upper Rio Grande Basin and Bay Expert Science Team. 2012. Environmental Flows Recommendations Report. Final Submission to the Environmental Flows Advisory Group, Rio Grande Basin and Bay Area Stakeholders Committee and Texas Commission on Environmental Quality.

Wallace, R. L., E. J. Walsh, M. L. Arroyo, and P. L. Starkweather. 2005. Life on the edge: Rotifers from springs and ephemeral waters in the Chihuahuan Desert, Big Bend National Park. Brewster County, Texas.

Welsh, Michael. 2002. Landscape of Ghosts, River of Dreams: A History of Big Bend National Park. University of Colorado Press. Boulder, Colorado.

Wick, S., Alex, T., Peyton, B., & Spalding, J. 2014. Effects of Undocumented Aliens (UDAs) and Illegal Border Activity on Big Bend National Park Resources - 2014 Report. Division of Science and Resource Management, Big Bend National Park.

Wong, CM, Williams, CE, Pittock, J, Collier, U and P Schelle. 2007. World's Top 10 Rivers at Risk. World Wildlife Fund International. Gland, Switzerland: http://wwf.panda.org/about_our_earth/about_freshwater/freshwater_problems/river_decline/10_rivers_risk/rio_grande_bravo/

Wyoming Game and Fish Department. 2004. Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitat: A Strategy for Managing Energy Development Consistently with the FLPMA Principles of Multiple Use and Sustained Yield. Cheyenne, WY.

Zouhar, Kris. 2003. Tamarix spp. In: Fire Effects Information System. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory. Ft. Collins, CO: http://www.fs.fed.us/database/feis/.

BIG BEND WILDERNESS

## APPENDICES

## Appendix A—Overview of the framework for wilderness character monitoring

*An excerpt from <u>Keeping It Wild 2</u> (*Landres et al. 2015*)*

This interagency monitoring strategy is organized around a hierarchical framework that divides wilderness character into successively finer elements.  These elements, starting from wilderness character, are:

- *Qualities.*  Qualities are the primary elements of wilderness character that link directly to the statutory language of the 1964 Wilderness Act.  The same set of qualities applies nationwide to all wildernesses managed by all agencies.  In this framework, the Untrammeled, Natural, Undeveloped, and Solitude or Primitive and Unconfined Recreation Qualities are all necessary to assess trend in wilderness character and each wilderness would report the trend in each of these qualities.  Where other features of value exist in and are integral to a wilderness, the Other Features of Value Quality would also be reported.

- *Monitoring questions.*  Monitoring questions capture essential components of each quality that are significantly different from one another and address particular management questions and goals.  The same set of monitoring questions applies nationwide to all wildernesses, although some agencies do not use these questions and instead go directly from qualities to indicators.

- *Indicators.*  Indicators are distinct and important elements under each monitoring question.  In nearly all cases there is more than one indicator under a monitoring question.  Each wilderness and agency would be responsible for reporting the trend in all indicators.  The same set of indicators applies nationwide to all wildernesses managed by all agencies.

- *Measures.*  Measures are the specific elements under each indicator on which data are collected to assess trend in an indicator.  Each agency is responsible for determining how their measures will be selected (that is, whether by a national or regional team, or by each wilderness).  Examples of measures for each indicator are given in the chapters that describe each quality in detail.

This hierarchical framework…allows managers to look at the overall trend in wilderness character and drill down through the various levels to understand how this trend was derived, including how change in an individual measure contributes to the overall trend in wilderness character.

BIG BEND WILDERNESS

APX-V1-264

## Appendix B – What is a trammeling action?

*Appendix extracted from <u>Keeping it Wild 2</u> (Landres et al. 2015)*

This appendix provides guidelines and examples to clarify what is and is not a trammeling action. These are intended to capture about 90% of the cases and provide sufficient guidance for local staff to figure out the novel and rarer cases as they occur. A trammeling action is defined as an action that intentionally manipulates "the earth and its community of life" inside a designated wilderness or inside an area that by agency policy is managed as wilderness.

The following terms and phrases clarify this definition above:

- Intentional: done on purpose; deliberate; willful.
- Manipulation: an action that alters, hinders, restricts, controls, or manipulates "the earth and its community of life" including the type, amount, or distribution of plants, animals, or physical resources.
- Intentional manipulation: an action that purposefully alters, hinders, restricts, controls, or manipulates "the earth and its community of life."

Two concepts are crucial for understanding what is and is not a trammeling action: restraint and intention. Restraining our power to manipulate or control the earth and its community of life is at the core of the Untrammeled Quality of wilderness character. Trammeling actions occur when opportunities for restraint are ignored or bypassed; when there is no opportunity for restraint, there is no opportunity to trammel. Wilderness legislation and policies mandate that managers exercise restraint when authorizing actions that interfere with or control wilderness ecological systems. While other agencies, organizations, and the public are not beholden to these same restrictions, activities that have not been authorized by the federal land manager and that manipulate the wilderness environment are counted as trammeling actions.

The second concept central to the idea of trammeling is intentionality. Actions that deliberately interfere with, manage, or control an aspect of wilderness ecological systems are intentional and clear instances of trammeling. As explained in the chapter on the Untrammeled Quality, intentional actions are counted as a trammeling regardless of the magnitude of their effects (including areal extent, intensity, frequency, and duration). For pragmatic reasons, however, some actions are not monitored if they fall below a minimum practical threshold of scale and scope (for example, hand pulling a few individual noxious plants). Much more complex and nuanced is determining whether to include actions whose purpose is not to manipulate the earth and its community of life, but some manipulation of the environment is required to produce the desired outcome. These types of actions can be confusing because the biophysical environment is intentionally manipulated even though it is not the purpose behind the action. In general, when such actions have substantial and foreseeable effects on the wilderness ecosystem, they are counted as a trammeling.

The following sections describe three types of activities: those that *are* trammeling actions, those that are *not* trammeling actions, and those that *may be* trammeling actions. Following these sections, a flowchart provides general guidance for making these determinations.

Activities that are trammeling actions:

There are two broad classes of trammeling actions: those that are authorized by the federal wilderness manager, and those that are not. Three subclasses under each of these reflect whether the action is taken

BIG BEND WILDERNESS

on a biological resource, on a physical resource, or on a resource outside the wilderness with the intent to manipulate biophysical resources within the wilderness.

*Agency authorized trammeling actions*.  These are actions that are authorized by the federal wilderness manager as well as actions by other agencies, organizations, or individuals that have been approved or permitted by the federal land manager.

1.  Actions taken inside the wilderness on a *biological* resource to intentionally affect "the earth and its community of life."  Examples include:
    a.  Removing or killing indigenous or non-indigenous vegetation or fish and wildlife.
    b.  Adding or restoring indigenous or non-indigenous vegetation or fish and wildlife.
    c.  Using chemicals or biocontrol agents to control indigenous or non-indigenous vegetation or fish and wildlife.
    d.  Collecting, capturing, or releasing plants and animals under a research permit.
    e.  Enclosing or excluding fish and wildlife from an area.

2.  Actions taken inside the wilderness on a *physical* resource or natural process to intentionally affect "the earth and its community of life."  Examples include:
    a.  Suppressing naturally-ignited fire.
    b.  Lighting fire (under management prescription) for any purpose.
    c.  Constructing or maintaining a dam, water diversion, guzzler, or other persistent installation intended to continuously alter wilderness hydrology; each agency will need to determine their counting rules for monitoring such installations.
    d.  Adding acid-buffering limestone to water to neutralize the effects of acid deposition.

3.  Actions taken *outside* the wilderness on a physical or biological resource or process to intentionally affect "the earth and its community of life" inside a wilderness.  Examples include:
    a.  Cloud seeding to intentionally increase precipitation inside the wilderness.
    b.  Damming a river outside a wilderness to intentionally alter the hydrology inside the wilderness.
    c.  Killing fish and wildlife outside the wilderness, or planting or stocking fish or wildlife outside the wilderness, to intentionally affect the population or distribution of this species inside the wilderness.

*Unauthorized trammeling actions.*  These are citable or other actions taken by other agencies, organizations, or individuals that have not been authorized, approved, or permitted by the federal wilderness land manager.

➢  Actions taken inside the wilderness on a *biological* resource to intentionally affect "the earth and its community of life."  Examples include:
    a.  Adding or removing plants or fish and wildlife.
    b.  Other direct manipulation of plants or fish and wildlife.
    c.  Indirect manipulation of fish and wildlife, such as changing hunting regulations with the goal of decreasing predator populations within the wilderness.

➢  Actions taken inside the wilderness on a *physical* resource or natural process to intentionally affect "the earth and its community of life."  Examples include:
    a.  Setting arson fire.
    b.  Modifying water resources to provide water for wildlife, or otherwise store water or alter the timing of water flow.

111 | P a g e

➢ Actions taken *outside* the wilderness on a physical or biological resource to intentionally affect "the earth and its community of life" inside a wilderness.  Examples include:

    a.  Releasing or killing species outside of the wilderness with the intention to affect populations whose ranges expand into the wilderness.

In some situations, staff may assume that they do not have the opportunity for restraint because an action is required to comply with other laws or agency policies, or to protect human life or property.  Examples of such situations include restoring habitat for a listed endangered species, spraying herbicides to eradicate an invasive non-indigenous plant that is degrading wildlife habitat, transplanting an extirpated species back into the wilderness, or suppressing a naturally-ignited fire.  These are still considered trammeling actions because even in these situations staff are deciding to take action as well as deciding the type and intensity of action.

Activities that are not trammeling actions:

Actions for which there is no opportunity for managerial or individual restraint are not considered a trammeling.  For example, climate change, air pollutants wafting into a wilderness, and the presence of non-indigenous species that naturally dispersed into a wilderness are not intentional decisions or actions, and therefore do not provide an opportunity for management restraint.  Accidental unauthorized actions, such as escaped campfires and oils spills, similarly lack an opportunity to restrain our power over the landscape.  Past actions that manipulated the biophysical environment before the area was designated as wilderness are not considered a trammeling because the provisions of the 1964 Wilderness Act did not apply to the area prior to designation.

Another group of examples that are not a trammeling encompass those small-scale actions with no intent to manipulate the earth and its community of life, such as installing meteorological or other science instrumentation, landing a helicopter for search and rescue operations, and removing trash.  Camping violations, unauthorized motorized incursions, and other illegal activities that are not intended to manipulate the biophysical environment are also not counted as trammeling actions; legality is irrelevant in determining whether an action is a trammeling.

Hunting, for sport or subsistence, has provoked an enormous amount of discussion about whether it degrades the Untrammeled Quality.  The consensus from the Lessons Learned Workshop was that hunting is generally not a trammeling action because individual hunters are taking individual animals without the intention to manipulate the wildlife population.  However, if a state wildlife agency manipulates hunting quotas (or takes other management action) to alter the predator/prey relationship in order to maximize certain hunting opportunities, this manipulation of the "community of life" would degrade the Untrammeled Quality (see above).

Activities that may be trammeling actions

There are two types of actions that may or may not be considered trammeling actions.  The first includes intentional manipulations that interfere with or control an aspect of wilderness ecosystems but are too small in scale or scope to be practically monitored.  The second type encompasses those nuanced cases where the primary purpose of the action is not to manipulate the ecosystem but a foreseeable and substantial effect on the earth and its community is required to achieve this purpose.  As shown in the table below, several hypothetical situations illustrate how an action may or may not be a trammeling depending on the extent of the action and its effects.  Each bullet in the table presents a situation where the action being taken likely would, or would not, be considered a trammeling.

BIG BEND WILDERNESS

| Examples of actions that likely are not and likely are trammeling actions based on the scale and scope of the action and its effects on the earth and its community of life | | |
|---|---|---|
| **Action** | **Likely Not a Trammeling** | **Likely a Trammeling** |
| Treating non-indigenous invasive plants | • Hand pulling a small area of non-indigenous invasive plants | • Spraying herbicide |
| Permitting scientific activities | • Installing research plot monumentation, such as rebar stakes or nails<br>• Installing most scientific instrumentation<br>• Collecting a limited number of voucher specimens with no impact on species distribution or abundance | • Installing enclosures or exclosures<br>• Installing instrumentation that disrupts the movement or behavior of plants, or fish and wildlife<br>• Capturing, collaring, and releasing wildlife |
| Building system trail | • Routing a trail around a rock slide<br>• Building a bridge across a stream to prevent stream bank erosion<br>• Installing a small section of corduroy across a wet area<br>• Installing in waterbars or building rock-cribbing | • Routing a trail through an area of sensitive alpine butterfly habitat<br>• Building a large amount of trail to go around a section of river or cliff<br>• Building a trail that requires extensive earth movement or tree cutting |
| Obliterating non-system trail | • Piling vegetation or rocks at the beginning and end of trail sections that cut a switchback | • Obliterating a large section of non-system trail that requires extensive earth movement |
| Restoring campsites | • Restoring a single, isolated campsite<br>• Restoring a number of campsites that don't require disrupting the soil or vegetation in the surrounding area | • Restoring a number of campsites that requires moving a significant amount of soil or number of plants in the surrounding area |
| Removing hazard trees | • Removing one or a few hazard trees that threaten designated campsites or that are along a trail | • Removing all of the hazard trees over a large area |

BIG BEND WILDERNESS

APX-V1-268

## Appendix C—Bureau of Land Management Development Index*

| | For each building, if the building type is: | Assign that building the value: |
|---|---|---|
| **Buildings** | Non-residential: buildings that do not house people, such as toilets and storage sheds, or structures that were intended to house people but can no longer fulfill that purpose *AND are not eligible for the National Register of Historic Places.* | 2 |
| | Part-time (seasonal) residential: buildings that are occupied by people for a cumulative total of 6 months or less each year. This may include some lookouts, as well as certain recreation shelters, including buildings that only receive day use. | 5 |
| | Full-time (year-round) residential: for buildings that are occupied by people for a cumulative total of more than 6 months each year. This may include crew quarters, outfitter and guide lodges, and certain recreational cabins, including buildings that only receive day use. | 10 |
| **Fences** | For each Fence Line segment, if the fence is: | Assign that segment its miles (to nearest tenth) in length multiplied by the value: |
| | Primitive: constructed of native materials or native materials and wire | 1 |
| | Non-primitive: constructed predominantly of nonnative materials (metal or treated wood posts) | 2 |
| **Dams** | For each dam, if the dam type is: | Assign that dam the value: |
| | Small dams constructed of native materials (including stock ponds): less than 6 feet high and a maximum storage less than 15 acre-feet. | 3 |
| | Medium dams constructed of native materials (including stock ponds): greater than 6 feet high but less than 10 feet high; or a maximum storage greater than 15 acre-feet but less than 25 acre-feet. | 5 |
| | Large dams constructed of native materials or any dam constructed of non-native materials: greater than 10 feet high or maximum storage greater than 25 acre-feet that are constructed with native materials; OR any dam constructed with non-native materials (e.g., concrete). | 10 |
| **Roads & Trails** | For each linear travel feature: | Assign that segment its miles (to nearest tenth) in length multiplied by the value: |
| | Impassable to vehicles. | 1 |
| | Not maintained but suitable for high-clearance vehicles. | 3 |
| | Suitable and maintained for high-clearance vehicles. | 5 |
| | Suitable and maintained for passenger vehicles. | 10 |
| **Small & Medium-scale Installations** | For each piece of non-linear infrastructure or site: | Assign each piece of infrastructure the value: |
| | Small-scale undeveloped installations or other structures (e.g. unimproved designated helicopter landing site or designated but undeveloped research plot) | 0 |
| | Signs | 0.5 |
| | Small scale developed installations (e.g. marked research plots*, benches, and significant trail features such as a bridge, or non-conforming staircase) *Count any research plot that is present for 3 or more months.* | 1 |
| | Medium-scale, developed installations or other structures (e.g., a repeater, improved helicopter landing site, utility lines and poles, windmill, stock trough, guzzler, old dump, plane crash). Count each piece of infrastructure separately (e.g., a windmill and associated stock trough are two pieces of infrastructure). | 2 |
| **Mines** | For each mine, if the mine is: | Assign that mine the value: |
| | Reclaimed and restored | 0 |
| | Small, inactive: mines whose disturbed area is less than or equal to 1 acre and that are no longer actively being worked, including abandoned historical mines that are still apparent. | 2 |
| | Small, active: mines whose disturbed area is less than or equal to 1 acre and that are currently under development. | 10 |
| | Large, inactive: mines whose disturbed area is greater than 1 acre and that are no longer actively being worked, including abandoned historical mines that are still apparent. | acreage of disturbance (to the nearest acre) * 2 |
| | Large, active: mines whose disturbed area is greater than 1 acre and that are currently under development. | acreage of disturbance (to the nearest acre) * 10 |

* Extracted from: Measuring Attributes of Wilderness Character: BLM Implementation Guide 1.5 Pages 25-26

BIG BEND WILDERNESS

APX-V1-269

## Appendix D — 1978 Big Bend Wilderness Recommendation

BIG BEND NATIONAL PARK

TEXAS

IN HIS LETTER TO CONGRESS OF NOVEMBER 28, 1973, THE PRESIDENT
RECOMMENDED THAT WILDERNESS OF 533,900 ACRES AND 25,700 ACRES OF POTENTIAL
WILDERNESS ADDITIONS BE DESIGNATED WITHIN BIG BEND NATIONAL PARK.  IN
VIEW OF TECHNOLOGICAL ADVANCES, LAND ACQUISITION, AND ADMINISTRATIVE
CHANGES WHICH HAVE TAKEN PLACE SINCE 1973, CAREFUL CONSIDERATION HAS
BEEN GIVEN THE 1973 WILDERNESS RECOMMENDATION.  IT IS POSSIBLE THAT
MICROWAVE CONVERSION WILL PERMIT REMOVAL OF TELEPHONE LINES IN SOME OF
THE POTENTIAL WILDERNESS AREAS MAKING THESE AREAS SUITABLE FOR INCLUSION
AS WILDERNESS IN THE FUTURE.  SOME NONFEDERAL PROPERTY HAS BEEN ACQUIRED
AND SOME MANAGEMENT ROADS ARE NO LONGER NEEDED FOR MANAGEMENT PURPOSES.
WE NOW RECOMMEND 538,250 ACRES AS WILDERNESS AND 44,750 ACRES AS POTENTIAL
WILDERNESS ADDITIONS.

AVAILABILITY OF AN ADEQUATE WATER SUPPLY IS THE SINGLE MOST CRITICAL
DETERMINER OF DEVELOPMENT AND USE OF THE PARK.  EXCEPT AT RIO GRANDE AND
COSTOLON, WATER IS NOT ABUNDANT THROUGHOUT THE PARK.  PRUDENT USE OF
SUPPLIES AND CONSERVATION MEASURES ARE NOW REQUIRED.  THE NEED FOR
POSSIBLE FUTURE HYDROLOGICAL DEVELOPMENT TO SUPPORT THE PANTHER JUNCTION
DEVELOPMENT AREA IS NOW PLANNED FOR THE APPROXIMATELY 5,000 ACRE AREA
SOUTH OF TORNILLO CREEK AND WEST OF THE PARK ROAD.  IT IS NOT POSSIBLE
AT THIS TIME TO ESTIMATE LOCATIONS OR NUMBER OF SUCH WATER DEVELOPMENTS.
AS A RESULT WE ARE NOT RECOMMENDING THIS AREA FOR WILDERNESS DESIGNATION.





United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C.  20240

MAY 1 1 1978

Honorable Thomas P. O'Neill, Jr.
Speaker of the
  House of Representatives
Washington, D. C.  20515

Dear Mr. Speaker:

Enclosed is a draft bill "To designate certain lands within units of
the National Park System as wilderness."

We recommend that the draft bill be referred to the appropriate
Committee for consideration, and that it be enacted.

The purpose of the bill is to designate, in accordance with section 3(c)
of the Wilderness Act (78 Stat. 890; 16 U.S.C. 1132(c)), 25 areas as
wilderness or potential wilderness.  This proposed omnibus legislation
represents completion of this Administration's review of wilderness
proposals for areas within the National Park System made by previous
Administrations, and consolidates into one legislative package many
separate pieces of wilderness legislation currently pending before
the Congress.

There are currently 30 National Park System wilderness proposals
submitted by this Administration or previous Administrations which
are not yet enacted.  The bill proposes the following:

> 1.  Four of the proposals should be enacted as previously
> submitted:  Buffalo National River, Cedar Breaks,
> Everglades, and Glacier;
>
> 2.  Action should be postponed on five of the proposals
> pending further study:  Yosemite, Canyonlands, Capital
> Reef, Death Valley, and Assateague;
>
> 3.  Action should be postponed on Great Smokies until
> the Park Service and the State of North Carolina resolve
> a dispute regarding the location of a road;

BIG BEND WILDERNESS

APX-V1-272

4.  As the Katmai National Monument is being considered as part of the D-2 deliberations, we have not proposed designating it in this legislation;

5.  The remainder of the previously submitted proposals should be revised in various ways which are described in the attached descriptions.

In addition, we have proposed wilderness and potential wilderness designation for portions of Gulf Islands National Seashore.

We have attached to this proposal a description of each area and other information, such as the facilities currently existing in those areas and management practices.

The Office of Management and Budget has advised that this legislative proposal is in accord with the program of the President.

Sincerely,

Bob Herbst
Assistant   SECRETARY

2

BIG BEND WILDERNESS

APX-V1-273

A B I L L

To designate certain lands within units of the National Park System as wilderness.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, in accordance with section 3(c) of the Wilderness Act (78 Stat. 890; 16 U.S.C. 1132(c)), the following lands are hereby designated as wilderness.

(1)  Arches National Park, Utah, wilderness comprising 61,547 acres, and potential wilderness additions comprising 8,461 acres, depicted on a map entitled "Wilderness Plan, Arches National Park, Utah", numbered 138-20,014-A and dated January 1978, to be known as the Arches Wilderness

(2)  Big Bend National Park, Texas, wilderness comprising 538,250 acres, and potential wilderness additions comprising 44,750 acres, depicted on a map entitled "Wilderness Plan, Big Bend National Park, Texas", numbered 155-20,004-D and dated January 1978, to be known as the Big Bend Wilderness.

(3)  Bryce Canyon National Park, Utah, wilderness comprising 20,810 acres depicted on a map entitled "Wilderness Plan, Bryce Canyon National Park, Utah", numbered 129-20,004-C and dated January 1977, to be known as the Bryce Canyon Wilderness.

BIG BEND WILDERNESS

APX-V1-274

(4) Buffalo National River, Arkansas, wilderness comprising 10,529 acres, and potential wilderness additions comprising 25,471 acres, depicted on a map entitled "Wilderness Plan, Buffalo National River, Arkansas", numbered 173-20,036-B and dated March 1975, to be known as the Buffalo River Wilderness.

(5) Carlsbad Caverns National Park, New Mexico, wilderness comprising 33,125 acres, and potential wilderness additions comprising 320 acres, depicted on a map entitled "Wilderness Plan, Carlsbad Caverns National Park, New Mexico", numbered 130-20,003-B and dated January 1978, to be known as the Carlsbad Caverns Wilderness.

(6) Cedar Breaks National Monument, Utah, wilderness comprising 4,830 acres, depicted on a map entitled "Wilderness Plan, Cedar Breaks National Monument, Utah", numbered 154-20,000 and dated May 1973, to be known as the Cedar Breaks Wilderness.

(7) Colorado National Monument, Colorado, wilderness comprising 13,842 acres, and potential wilderness additions comprising 937 acres, depicted on a map entitled "Wilderness Plan, Colorado National Monument, Colorado", numbered 119-20,006-C and dated January 1978, to be known as the Colorado Wilderness.

(8) Crater Lake National Park, Oregon, wilderness comprising 127,058 acres, depicted on a map entitled "Wilderness Plan, Crater Lake National Park, Oregon", numbered 106-20,006-E and dated January 1978, to be known as the Crater Lake Wilderness.

BIG BEND WILDERNESS

APX-V1-275

(9) Cumberland Gap National Historical Park, Kentucky, Tennessee, Virginia, wilderness comprising 12,191 acres, and potential wilderness additions comprising 1,900 acres, depicted on a map entitled "Wilderness Plan, Cumberland Gap National Historical Park, Tennessee, Virginia, Kentucky", numbered 380-20,026-C and dated January 1978, to be known as the Cumberland Gap Wilderness.

(10) Dinosaur National Monument, Colorado and Utah, wilderness comprising 205,672 acres, and potential wilderness additions comprising 5,055 acres, depicted on a map entitled "Wilderness Plan, Dinosaur National Monument, Utah and Colorado", numbered 122-20,009-B and dated January 1978, to be known as the Dinosaur Wilderness.

(11) Everglades National Park, Florida, wilderness comprising 1,296,500 acres and potential wilderness additions comprising 81,900 acres, depicted on a map entitled "Wilderness Plan, Everglades National Park, Florida", numbered 160-20,011 and dated June 1974, to be known as the Everglades Wilderness.

(12) Glacier National Park, Montana, wilderness comprising 927,550 acres, and potential wilderness additions comprising 3,360 acres, depicte on a map entitled "Wilderness Plan, Glacier National Park, Montana", numbered 117-20,010-A and dated March 1974, to be known as the Glacier Wilderness.

BIG BEND WILDERNESS

(13)  Grand Teton National Park, Wyoming, wilderness comprising 122,604 acres, and potential wilderness additions comprising 20,850 acres, depicted on a map entitled "Wilderness Plan, Grand Teton National Park, Wyoming", numbered 136-20,013-A and dated January 1978, to be known as the Grand Teton Wilderness.

(14)  Guadalupe Mountains National Park, Texas, wilderness comprising 55,746 acres, and potential wilderness additions comprising 703 acres, depicted on a map entitled "Wilderness Plan, Guadalupe Mountains National Park, Texas", numbered 166-20,006-C and dated January 1978, to be known as the Guadalupe Mountains Wilderness.

(15)  Gulf Islands National Seashore, Florida and Mississippi, wilderness comprising 1,792 acres, and potential wilderness additions comprising 2,800 acres, depicted on a map entitled "Wilderness Plan, Gulf Islands National Seashore, Mississippi, Florida", numbered 635-20,018-A and dated March 1977, to be known as the Gulf Islands Wilderness.

(16)  Hawaii Volcanoes National Park, Hawaii, wilderness comprising 123,100 acres, and potential wilderness additions comprising 7,850 acres, depicted on a map entitled "Wilderness Plan, Hawaii Volcanoes National Park, Hawaii", numbered 124-20,020 and dated April 1974, to be known as the Hawaii Volcanoes Wilderness.

BIG BEND WILDERNESS

APX-V1-277

(17) Mount Rainier National Park, Washington, wilderness comprisir 208,000 acres, and potential wilderness additions comprising 165 acres, depicted on a map entitled "Wilderness Plan, Mount Rainier National Park, Washington", numbered 105-20,007-A and dated August 1977, to be known as the Mount Rainier Wilderness.

(18) North Cascades Complex, Washington, wilderness comprising 537,120 acres, and potential wilderness additions comprising 1,508 acres, depicted on a map entitled "Wilderness Plan, North Cascades, Washington", numbered 168-20,009-B and dated January 1978, to be known as the North Cascades Wilderness.

(19) Olympic National Park, Washington, wilderness comprising 861,179 acres, and potential wilderness additions comprising 2,855 acres, depicted on a map entitled "Wilderness Plan, Olympic National Park, Washington", numbered 149-20,009-B and dated January 1978, to be known as the Olympic Wilderness.

(20) Organ Pipe Cactus National Monument, Arizona, wilderness comprising 312,600 acres, and potential wilderness additions comprising 1,240 acres, depicted on a map entitled "Wilderness Plan, Organ Pipe Cactus National Monument, Arizona", numbered 157-20,001-A and dated January 1978, to be known as the Organ Pipe Cactus Wilderness.

(21) Rocky Mountain National Park, Colorado, wilderness comprising 240,030 acres, and potential wilderness additions comprising 284 acres, depicted on a map entitled "Wilderness Plan, Rocky Mountain National Park, Colorado", numbered 121-20,015-A and dated January 1978, to be known as the Rocky Mountain Wilderness.

BIG BEND WILDERNESS

(22)  Sequoia and Kings Canyon National Parks, California, wilderness comprising 802,880 acres, and potential wilderness additions comprising 6,570 acres, depicted on a map entitled "Wilderness Plan, Sequoia and Kings Canyon National Parks, California", numbered 102-20,003-C and dated January 1978, to be known as the Sequoia and Kings Canyon Wilderness.

(23)  Theodore Roosevelt National Memorial Park, North Dakota, wilderness comprising 29,920 acres, depicted on a map entitled "Theodore Roosevelt National Memorial Park, North Dakota", numbered 387-20,007-E (sheets 1 and 2) and dated January 1978, to be known as the Theodore Roosevelt Wilderness.

(24)  Yellowstone National Park, Idaho, Montana and Wyoming, wilderness comprising 2,032,721 acres, depicted on a map entitled "Wilderness Plan, Yellowstone National Park, Idaho, Montana, Wyoming", numbered 101-20,005-A and dated January 1978, to be known as the Yellowstone Wilderness.

(25)  Zion National Park, Utah, wilderness comprising 120,620 acres, and potential wilderness additions comprising 10,364 acres, depicted on a map entitled "Wilderness Plan, Zion National Park, Utah", numbered 116-20,002-A and dated January 1978, to be known as the Zion Wilderness.

Sec. 2.  A map and description of the boundaries of the areas designated in this Act shall be on file and available for public inspection in the office of the Director of the National Park Service, Department of the Interior, and in the office of the Superintendent of each area designated in this Act.  As soon as practicable after this Act takes

effect, maps of the wilderness areas and descriptions of their boundaries shall be filed with the Interior and Insular Affairs Committees of the United States Senate and House of Representatives, and such maps and descriptions shall have the same force and effect as if included in this Act:  Provided, That correction of clerical and typographical errors in such maps and descriptions may be made.

Sec. 3.  All Park Service lands which represent potential wilderness additions are designated wilderness subject only to the cessation of all uses thereon prohibited by the Wilderness Act except that the Secretary of the Interior may: extend grazing permits at Dinosaur National Monument, and Grand Teton National Park; extend a missile site permit at Everglades National Park; and he may permit a realignment of roads at Guadalupe Mountains National Park and Sequoia and Kings Canyon National Parks. At such time as all uses thereon prohibited by the Wilderness Act have ceased, the Secretary of the Interior is directed to publish notice thereof in the Federal Register, and effective upon such publication the lands represented as potential wilderness additions shall be administered as wilderness.

Sec. 4.  Nothing in this Act shall be construed to diminish the authority of the Coast Guard, pursuant to 14 U.S.C. 2 and 81 and title 1 of the Ports and Waterways Safety Act of 1972 (33 U.S.C. 1221), or the Federal Aviation Administration to use the areas designated wilderness by this Act within the Everglades National Park, Florida; Olympic National Park, Washington; and the Gulf Islands National Seashore, Florida and Mississippi, for navigational and maritime safety purposes.

BIG BEND WILDERNESS

Sec. 5. Nothing in this Act shall be construed as altering in any way any rights or claims which the Blackfeet Tribe of Indians may have within or in the vicinity of Glacier National Park; and the third sentence of Section 1 of the Act of May 11, _10 (36 Stat. 354; 16 U.S.C. 161), as amended, is repealed.

Sec. 6. Nothing in this Act shall be construed as altering in any way the authority granted to the International Boundary Commission under the treaties between the United States and Great Britain of April 11, 1908 (35 Stat. 2003; 12 Bevans 297) and February 24, 1925 (44 Stat. 2102; 6 Bevans 7) as related to lands within the North Cascades Wilderness and the Glacier Wilderness as designated by section 1 of this Act

Sec. 7. Section 1 of the Act of January 26, 1915 (38 Stat. 798, 800; 16 U.S.C. 191), pertaining to the use for reclamation purposes of lands within Rocky Mountain National Park, is amended by deleting therefro the proviso.

Sec. 8 The areas designated by this Act as wilderness shall be administered by the Secretary of the Interior in accordance with the applicable provisions of the Wilderness Act governing areas designated by that Act as wilderness, except that any reference in such provisions to the effective date of the Wilderness Act shall be deemed to be a reference to the effective date of this Act, and, where appropriate, any reference to the Secretary of Agriculture shall be deemed to be a reference to the Secretary of the Interior.

BIG BEND WILDERNESS

APX-V1-281

## Appendix E – Index of Invasive Animal Species (as of November 2015)

| Appendix E. Index of Invasive Animal Species (2015) | |
|---|---|
| **Common Name** | *Scientific Name* |
| Barbary sheep | *Ammotragus lervia* |
| European/western/common honey bee | *Apis mellifera* |
| Cattle (feral) | *Bos taurus* |
| Elk, wapiti | *Cervus elaphus canadensis* |
| Rock dove, rock pigeon | *Columba livia* |
| Asian clam | *Corbicula fluminea* |
| Blacktail shiner | *Cyprinella venusta* |
| Common carp | *Cyprinus carpio* |
| Tamarisk beetle | *Diorhabda elongata* |
| Burro (feral) | *Equus asinus* |
| Horse (feral) | *Equus caballus* |
| Plains killifish | *Fundulus zebrinus* |
| Western mosquitofish | *Gambusia affinis* |
| Mediterranean house gecko, common house gecko | *Hemidactylus turcicus* |
| Green tree frog | *Hyla cineria* |
| Redear sunfish | *Lepomis microlophus* |
| American bullfrog | *Lithobates catesbeianus* |
| Inland silverside | *Menidia beryllina* |
| Coypu, nutria, river rat | *Myocastor coypus* |
| Blue tilapia | *Oreochromis aureus* |
| House Sparrow | *Passer domesticus* |
| Red imported fire ant | *Solenopsis invicta* |
| Eurasian collared-dove | *Streptopelia decaocto* |
| Common starling, European starling | *Sturnus vulgaris* |
| Boar, hog, pig, swine (feral) | *Sus scrofa* |
| Red-eared slider turtle | *Trachemys scripta elegans* |

## Appendix F — Big Bend National Park Surrounding Protected Areas



BIG BEND WILDERNESS

## Appendix G – High Chisos Designated Campsites

| Appendix G. Index of High Chisos Designated Campsites ||
|---|---|
| **El Campo Site Code** | **Site Name** |
| JF2 | Juniper Flats Campsite #1 |
| JF2 | Juniper Flats Campsite #2 |
| JF3 | Juniper Flats Campsite #3 |
| BM4 | Boulder Meadow Campsite #4 |
| BM3 | Boulder Meadow Campsite #3 |
| BM2 | Boulder Meadow Campsite #2 |
| BM | Boulder Meadow Campsite #1 |
| BM5 | Boulder Meadow Campsite #5 |
| PI3 | Pinnacles Campsite #3 |
| PI2 | Pinnacles Campsite #2 |
| PI | Pinnacles Campsite #1 |
| TM1 | Toll Mountain Campsite |
| EP1 | Emory Peak Campsite |
| BC4 | Boot Canyon Campsite #4 |
| BC2 | Boot Canyon Campsite #2 |
| BC | Boot Canyon Campsite #1 |
| BC3 | Boot Canyon Campsite #3 |
| JC1 | Juniper Canyon Campsite |
| CO | Colima Campsite #1 |
| CO2 | Colima Campsite #2 |
| CO3 | Colima Campsite #3 |
| NE1 | Northeast Rim Campsite #1 |
| NE2 | Northeast Rim Campsite #2 |
| NE3 | Northeast Rim Campsite #3 |
| NE5 | Northeast Rim Campsite #5 |
| NE4 | Northeast Rim Campsite # 4 |
| SE3 | Southeast Rim Campsite #3 |
| SE4 | Southeast Rim Campsite #4 |
| SE2 | Southeast Rim Campsite #2 |
| SE1 | Southeast Rim Campsite #1 |
| SW4 | Southwest Rim Campsite #4 |
| SW3 | Southwest Rim Campsite #3 |
| SW2 | Southwest Rim Campsite #2 |
| BL2 | Blue Creek Campsite #2 |
| LM2 | Laguna Meadow Campsite #2 |
| LM4 | Laguna Meadow Campsite #4 |
| LM3 | Laguna Meadow Campsite #3 |
| LM1 | Laguna Meadow Campsite #1 |
| LW1 | Laguna West Campsite #1 |
| LW2 | Laguna West Campsite #2 |
| LW3 | Laguna West Campsite #3 |
| BL | Blue Creek Campsite #1 |

BIG BEND WILDERNESS

APX-V1-284

## Appendix H – Native American Tribes with "Aboriginal Occupation" Rights

The following tribes have been federally recognized to have "aboriginal occupation" rights in Big Bend National Park under the Native American Graves Protection and Repatriation Act (NAGPRA)

- Absentee-Shawnee Tribe of Indians of Oklahoma
- Apache Tribe of Oklahoma
- Comanche Nation, Oklahoma
- Fort Sill Apache Tribe of Oklahoma
- Jicarilla Apache Nation, New Mexico
- Kickapoo Traditional Tribe of Texas
- Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas
- Kickapoo Tribe of Oklahoma
- Kiowa Indian Tribe of Oklahoma
- Mescalero Apache Tribe of the Mescalero Reservation, New Mexico
- San Carlos Apache Tribe of the San Carlos Reservation, Arizona
- Shoshone Tribe of the Wind River Reservation, Wyoming
- Tonto Apache Tribe of Arizona
- White Mountain Apache Tribe of the Fort Apache Reservation, Arizona
- Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma
- Ysleta Del Sur Pueblo (previously listed as the Ysleta Del Sur Pueblo of Texas)

# Appendix I — Data sources and protocols for all measures used

APX-V1-286

| MEASURE | DESCRIPTION OF DATA SOURCE(S) AND PROTOCOLS FOR HOW TO GATHER DATA |
|---|---|
| **UNTRAMMELED** | |
| Actions that Manipulate Vegetation | Joe Sirotnak, *Botanist, Big Bend National Park.* Consult with relevant staff to develop a count of trammeling actions. Guidance for counting trammeling actions can be found in Appendix B of this report. |
| Actions that Manipulate Wildlife | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator;* Jeff Bennet, *Hydrologist.* Consult with relevant staff to develop a count of trammeling actions. Guidance for counting trammeling actions can be found in Appendix B of this report. |
| Percentage of Naturally Ignited Fires Not Receiving a Suppression Response | Richard Gatewood, *Fire Ecologist;* Ed Waldron, *Fire Management Officer.* Consult with fire ecologists and isolate all naturally occurring fires into wilderness, determining 5-year average. |
| Trespass Livestock | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator;* Michael Ryan *Head River Ranger.* Obtain annual round-up report from ScRM and river rangers. |
| Unauthorized Trammeling Actions | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator.* Dave Larson, *Chief, Science and Resource Management.* Consult with Law Enforcement and resources management to determine any illegal activity that has occurred within wilderness that would qualify as a trammeling action. Guidance for counting trammeling actions, including unauthorized trammeling actions, can be found in Appendix B of this report. |
| **NATURAL** | |
| Priority Exotic Plant Species | Joe Sirotnak, *Botanist.* Consult with resources staff to determine if any species have been added to "priorities" list. |
| Priority Exotic Animal Species | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator.* Consult with resources staff to determine if any species have been added to "priorities" list. |
| Human Wildlife Incidents | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator.* Locate excel sheet on M:/ drive that contains annually-updated data on human-wildlife incidents |
| Days of Rio Grande Flow Below 40 cfs | Jeff Bennet, *Physical Scientist/ Hydrologist.* Obtain most recent river flow data from International Boundary and Water Commission: http://www.ibwc.state.gov/water_data/Reports/RG_Flow_data.html. Determine number of days flows dipped below 40cfs. |
| Visibility | National Park Service Air Resources Division. http://www.nature.nps.gov/air/maps/airatlas/IM_materials.cfm. Data on wet deposition, ozone and visibility are available for all NPS Inventory and Monitoring (I&M) Program parks through this database. |
| Concentration of Sulfur in Wet Deposition | National Park Service Air Resources Division. http://www.nature.nps.gov/air/maps/airatlas/IM_materials.cfm. Data on wet deposition, ozone and visibility are available for all NPS Inventory and Monitoring (I&M) Program parks through this database. |

BIG BEND WILDERNESS

| MEASURE | DESCRIPTION OF DATA SOURCE(S) AND PROTOCOLS FOR HOW TO GATHER DATA |
|---|---|
| Concentration of Nitrogen in Wet Deposition | National Park Service Air Resources Division. http://www.nature.nps.gov/air/maps/airatlas/IM_materials.cfm. Data on wet deposition, ozone and visibility are available for all NPS Inventory and Monitoring (I&M) Program parks through this database. |
| Regional Nighttime Radiance | Earth Observation Group, National Oceanic and Atmospheric Administration (NOAA) National Geophysical Data Center. Visible Infrared imaging Radiometer Suite (VIIRS) Day/Night Band (DNB) composites  are updated monthly and available at: http://ngdc.noaa.gov/eog/viirs/download_monthly.html. Dan Duriscoe, *NPS Night Skies Team Lead Physical Scientist;* Marie Landis, *Cartographic Technician;* Dave Larson, *Chief, Science and Resource Management.* Conduct GIS analysis using VIIRS data of 150 mile radius focus area from BIBE centroid. Calculate percentage of focus area with radiance level >.33 nanoWatts/cm^2 sr |
| **UNDEVELOPED** ||
| Authorized Non-Recreational Physical Developments | Lisa Hendy, *Chief Ranger (Acting),* Joe Sirotnak, *Botanist;* Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator;* Erik Walker, *Trail Maintenance Supervisor.* Richard Gatewood, *Fire Ecologist;* Cheryl McIntyre, *Physical Scientist.* Jost Zwiebel, *Supervisory Dispatcher.* Consult with relevant staff to determine an index of all authorized non-recreational physical developments. Use Bureau of Land Management Development index (Appendix D) as a guideline for assigning individual development weight and estimating weight values for developments not defined based on their respective size and impact. |
| Miles of Telephone and Powerlines | Marie Landis, *Cartographic Technician.* Conduct GIS analysis of total miles of telephone and powerlines in wilderness. |
| Miles of Roads | Marie Landis, *Cartographic Technician.* Conduct GIS analysis of total miles of roads in wilderness. Assign roads in recommended wilderness a weight multiplier of 3. |
| Number of Inholdings | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator.* Consult local staff knowledge and current GIS files. |
| Authorized Administrative Flight Hours | Greg Drum, *Park Ranger Pilot.* Consult with park pilot to obtain estimate. |
| Commercial Scenic Flight Operations | Vicki Ward, *Overflights Program Manager.* Consult NPS Natural Sounds and Night Skies Division to obtain data for all permitted commercial flight operations. |
| Authorized Administrative Chainsaw, Rock-Drill and Generator Use Hours | Erik Walker, *Trails Maintenance Supervisor.* Consult trails supervisor to obtain estimate. |
| **SOLITUDE OR PRIMITIVE AND UNCONFINED RECREATION** ||
| Backcountry Overnight Stays | Obtain data from El Campo permitting database: http://75.41.147.131/cgi-bin/permits/backcountry.exe. |
| Illegal Campfires | Ed Waldron, *Fire Management Officer.* Consult with fire management to obtain annual reports. |
| Heavily Impacted Backcountry Campsites | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator.* Consult ScRM staff to obtain updated assessments. |

BIG BEND WILDERNESS

APX-V1-288

| MEASURE | DESCRIPTION OF DATA SOURCE(S) AND PROTOCOLS FOR HOW TO GATHER DATA |
|---|---|
| Percentage of Time Noise-Free | Emma Brown, *Acoustical Resource Specialist.* Consult with NPS Natural Sounds and Night Skies Division to obtain updated reports. |
| Night Sky Visibility | NPS Night Skies Monitoring Database: http://www.nature.nps.gov/night/skymap.cfm; Dan Duriscoe, *NPS Night Skies Team Lead Physical Scientist.* Consult with NPS Natural Sounds and Night Skies Division to obtain updated reports. |
| Number of Bear Boxes | Raymond Skiles, *Wildlife Biologist and Wilderness Coordinator.* Consult ScRM staff to obtain updated count. |
| Number and Extent of Visitor Behavior Restrictions | Regulations can be found at: http://www.nps.gov/bibe/planyourvisit/campground_rules.htm. Consult with permitting supervisor and rangers to determine if any changes in regulations have occurred. If changes have occurred, fill out the Visitor Use Restriction Index, and input new data value representing the percent of possible points for all restrictions. |
| **OTHER FEATURES OF VALUE** | |
| Condition of Archaeological Sites | Katherine Sinsky, *Archaeological Technician Intern.* National Park Service ASMIS (Archeological Sites Management Information System) Database. Obtain condition rankings for each individual archaeological site from ASMIS database. Calculate the number of sites falling into each of 4 condition classes: 'good', 'fair', 'poor', and 'destroyed' and obtain average. Exclude sites with no condition data or where condition is categorized as 'unknown.' The sensitive nature of cultural resource information may require access only granted to cultural resources staff. |
| Number of Historic and Archaeological Sites Impacted by UDA Activity | Tom Alex, *Archaeologist (retired);* Katherine Sinsky, *Archaeological Technician Intern.* Consult ScRM staff to obtain annual reports on UDA impacts to cultural resource sites. |

BIG BEND WILDERNESS

**JORDAHL DECLARATION**

**EXHIBIT 2**

Photograph taken by Laiken Jordahl on February 19, 2020



**JORDAHL DECLARATION**

**EXHIBIT 3**

Photograph taken by Laiken Jordahl on December 21, 2020

APX-V1-292



**APPENDIX VOLUME 1**

**DOCUMENT 7**

Declaration of Connor Phillips in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al., | Case No. 3:26-cv-01099-KC |
| *Plaintiffs,* | |
| v. | |
| MARKWAYNE MULLIN, et al., | |
| *Defendants.* | |

**DECLARATION OF CONNOR PHILLIPS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Connor Phillips, declare as follows:

1.      I have personal knowledge of the matters contained in this declaration and, if called

and sworn as a witness, I can and will completely testify to all of the matters contained herein.

2.      I hold a Geographic Information System (GIS) graduate certificate and a Master of

Science in Geography from University of Wisconsin – Madison, and have career experience in

GIS analysis for non-profit organizations and federal agencies such as the U.S. Geological Survey

(USGS). I currently serve as an associate GIS specialist for the Center for Biological Diversity

(the "Center") and have over five years of experience in GIS analysis and cartography.

3.      I prepared the map relied upon in this case by Plaintiffs regarding the probable

geographic scope of a nearly contiguous pedestrian border wall along the full length of the U.S.-

Mexico border (the "Wall").[1] This analysis includes mapping the Wall segments that have already

---

[1]      For the purposes of this project, I define the Wall as a nearly contiguous pedestrian border barrier spanning the length of the U.S.-Mexico border. Pedestrian border reflects barrier types that are considered "high enough, with slats close together enough, to block someone crossing on foot (and unwilling to climb)." Adam Isacson, *U.S.-Mexico Border Barriers Now Total 741 Miles*, Sept.

1

been built, the segments that are under construction or planned, and filling in the gaps. The analysis also includes estimating the number of acres that would fall between the Wall and border. These areas effectively become spaces of limited or no access to the public if the Wall is built. I refer to those areas as "restricted borderland(s)" throughout this declaration. To create the data layers for the restricted borderlands, the probable path of a continuous border wall and perform the related analyses, I used ArcGIS Pro version 3.7 from Esri. In my professional opinion they are accurate with respect to the data they represent.

4.    I used the following data sources to create the map and complete my analysis: 1) U.S. Customs and Border Protection (CBP) Smart Wall Map data layers for planned and existing border wall routes, 2) U.S. Census Bureau International Boundary data and U.S. Geological Survey (USGS) 3D Hydrography Program to define the extent of the U.S.-Mexico border, 3) Federal Geographic Data Committee (FGDC) Administrative Boundaries and Texas Parks & Wildlife State Parks Division Texas State Parks Boundaries to define the boundary extents of Big Bend National Park and Big Bend Ranch State Park respectively, 4) Esri World Imagery data and U.S. Department of Agriculture (USDA) - USA National Agriculture Imagery Program (NAIP) imagery data to validate data delineation and interpretation of the probable path of a continuous border wall at specific sites such as border wall crossings, 5) U.S. Department of the Interior - Bureau of Land Management (BLM) National Surface Management Agency (SMA) Area Polygons, USGS Gap Analysis Project (GAP) Protected Areas Database of the United States (PAD-US) 4.1, and Texas General Land Office, Permanent School Fund Lands data to define land ownership of restricted borderland areas, 6) U.S. Forest Service - National Wild and Scenic River

---

10, 2023, https://adamisacson.com/u-s-mexico-border-barriers-now-total-741-miles/. Nearly contiguous reflects small gaps in the wall for border crossings and large bodies of water (such as Lake Amistad).

2

Lines and Texas Parks & Wildlife State Parks Division – WMA Boundaries for Public Distribution to define extent and calculate percentage of the waived portion of the Rio Grande Wild and Scenic River from its total delineated length. The section below titled "METHODOLOGY" describes the references and software I applied in detail.

5.      Using both the U.S. Census Bureau International Boundaries data and USGS 3D Hydrography Program data to map sections of the border delineated across land and water-defined areas respectively, I calculate that the U.S.-Mexico border is approximately 1,975 miles long.[2] A significant portion of this figure includes miles of border demarcated by the Rio Grande, which forms the international border for much of the state of Texas.

6.      The Texas portion of the Rio Grande's Wild and Scenic River designation is 197 river miles, with 104 total miles waived by the June 9 National Park Waiver. The waived portion constitutes 53% of the Rio Grande Wild and Scenic River in Texas (263 total miles of the Rio Grande are designated as Wild and Scenic River, of which the waived portion of river miles constitutes 40%).

7.      Based on my modeling, if the Wall is completed, stretching the full length of the U.S.-Mexico border, it would be approximately 1,748 miles long. This figure is shorter than the actual length of the border primarily because it contains fewer curves and contouring across terrain than the natural winding pathway of the Rio Grande. In 2023, approximately 741 miles of border

---

[2]      The total mileage of the U.S.-Mexico border varies across different sources and reports due to natural shifting of the Rio Grande, which forms a significant portion of the boundary. To more accurately map the *thalweg* (the center of the deepest channel of the river) that delineates the border and to maintain consistency across datasets used in the analysis, the USGS 3D Hydrography Program data was used in lieu of the U.S. Census data for river-defined sections. Delineating the border this way increases the total mileage of the border from most other reports by approximately 20 miles.

barrier infrastructure had been completed.[3] Of that total, 636 miles were pedestrian barrier and just 105 miles were vehicle barrier. Using those figures, approximately 1,112 miles of pedestrian barrier remained to be built in 2023 to complete the Wall.

8.    The Big Bend waivers issued pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act on February 17 and July 2, 2026 (91 Fed. Reg. 7297 (Feb. 17, 2026); 91 Fed. Reg. 40550 (July 2, 2026)) and on May 15 and June 9, 2026 (91 Fed. Reg. 27969 (May 15, 2026); 91 Fed. Reg. 34832 (June 9, 2026)) waive laws to build border barrier along a total of 431 miles of the border in the Big Bend Sector, and span 339 miles of uncompleted Wall in my map (the Wall is shorter than the length of the border here because it contours less than the Rio Grande and does not follow the river's natural curving path). These waivers encompass over one third of the Wall's remaining unbuilt sections in my map.

9.    The Big Bend sector has the largest gap between existing border barrier. This distance totals 499 miles along the Wall path taken through the Big Bend sector, delineated using both planned project data and the 150-feet border buffer for sections with no planned constructions. *See* ¶¶ 12, 46, *infra* (explaining use of 150-feet border buffer).

10.    Based on the Wall route described in this declaration, I estimate that a total of 312,068 acres will become restricted borderlands if the Wall is completed. These areas fall between the international border and Wall, limiting the public's access or use of them. Eliminating waterbodies from this calculation, the total acreage is 283,606.

---

[3]    Adam Isacson, *U.S.-Mexico Border Barriers Now Total 741 Miles*, Sept. 10, 2023, https://adamisacson.com/u-s-mexico-border-barriers-now-total-741-miles/.

4

11.     Within these sections of restricted borderland areas, there are five different ownership classes: (1) federally owned: 100,923 acres; (2) state owned: 48,339 acres; (3) tribal lands: 3,365 acres; (4) locally owned: 1,053 acres; and (5) privately owned: 131,655 acres.

12.     To map the Wall, I relied on Smart Wall Map data to estimate the route for sections that have already been built, or where there are planned routes available for pedestrian or vehicle barrier. To map the Wall route for remaining sections, I used one of two different methodologies. First, in Big Bend Ranch State Park and Big Bend National Park, I used the March 5, 2026 iteration of the smart wall map layer that was previously available on the Customs and Border Patrol ("CBP") Smart Wall Map website, since this route contains a more reasonable and conservative Wall route than the currently available route layer on CBP's Smart Wall Map website. For all remaining Wall sections along the Rio Grande that remain to be mapped by CBP with planned construction routes, I routed the Wall along a conservative and uniform buffer of 150-feet from the Rio Grande shoreline.[4]

13.     The steps taken to complete this task do not define where a continuous border wall will or is most likely to be routed in all locations, nor is it representative of where restricted borderland area would occur in all cases. Rather, the steps taken use publicly available data based on current and historical border barrier construction plans to route the likely pathway of the Wall, and where no such data exists, apply a conservative estimate of 150-feet border buffer to determine an estimate of what restricted borderland area acreage and continuous border wall mileage might be within this scenario.

---

[4]     150 feet is the width of "Enforcement Zone" sites created between the Rio Grande and levee wall constructions where vegetation was cleared in some national wildlife refuge parcels in the Rio Grande Valley in Texas (GAO 2023). This width value was used as it is the most concrete parameter for the distance between wall constructions and the Rio Grande shoreline, until more specific parameters are made available.

5

14.     The images attached in Exhibit 1 are true and correct copies of the map of the Wall I created, which reflect the figures in this document.

## METHODOLOGY

15.     The following methodology details the GIS processes I used to map the route of the Wall and areas described as restricted borderlands.

### a.  References and Software

16.     The below-referenced data sources and software detail those that I used for this project.

- Esri, DigitalGlobe, GeoEye, i-cubed, USDA FSA, USGS, AEX, Getmapping, Aerogrid, IGN, IGP, swisstopo, and the GIS User Community, Esri World Imagery: https://www.arcgis.com/home/item.html?id=10df2279f9684e4a9f6a7f08febac2a9#overview

- Federal Geographic Data Committee, Administrative Boundaries of National Park System Units - OGC Features: https://hub.arcgis.com/content/cc6106f20aa641398a74185947c74005/about

- GAO 2023. Southwest Border Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction. Available at: https://www.gao.gov/products/gao-23-105443

- Texas General Land Office, Permanent School Fund Lands (Public), https://data-glo.hub.arcgis.com/datasets/2714ddd9c4c8437994eb4cb0d0f4e8c1_0/about

- Texas Parks & Wildlife State Parks Division - Texas State Parks Boundaries: https://www.arcgis.com/home/item.html?id=47c52b2c0edb4af0ad2c27a17b262b87#overview

- Texas Parks & Wildlife State Parks Division – WMA Boundaries for Public Distribution: https://gis-tpwd.opendata.arcgis.com/search?tags=aph%2Chunt%2Cwl%2Ccwd%2Cdiscover%2Cdove%2Cgcwa%2Cwma%2Cdeer%2520management%2520units

- U.S. Customs and Border Protection Smart Wall Map data layers (download versions March 5, 2026 and May 21, 2026): https://www.cbp.gov/border-security/along-us-borders/smart-wall-map

- U.S. Department of Commerce, U.S. Census Bureau, Geography Division TIGER/Line Shapefile, Current, Nation, U.S., International Boundaries: https://catalog.data.gov/dataset/tiger-line-shapefile-current-nation-u-s-international-boundaries

6

- U.S. Department of the Interior, Bureau of Land Management, BLM National SMA Surface Management Agency Area Polygons: https://gbp-blm-egis.hub.arcgis.com/datasets/6bf2e737c59d4111be92420ee5ab0b46/aboutU.S.

- Department of Agriculture, Farm Production and Conservation Business Center, USA National Agriculture Imagery Program (NAIP) Imagery : Natural Color: https://www.arcgis.com/home/item.html?id=3f8d2d3828f24c00ae279db4af26d566

- U.S. Forest Service - National Wild and Scenic River Lines (Feature Layer): https://data-usfs.hub.arcgis.com/datasets/71c40a05063f4e6ebec08af558a9145c_0/explore?location=29.262466%2C-101.472364%2C7

- U.S. Geological Survey Gap Analysis Project (GAP), 2024, Protected Areas Database of the United States (PAD-US) 4: U.S. Geological Survey data release, https://doi.org/10.5066/P96WBCHS

- USGS, The USGS 3D Hydrography Program (3DHP) database: https://hydro.nationalmap.gov/arcgis/rest/services/3DHP_all/MapServer

- Adam Isacson, *U.S.-Mexico Border Barriers Now Total 741 Miles*, Sept. 10, 2023, https://adamisacson.com/u-s-mexico-border-barriers-now-total-741-miles/

- 91 Fed. Reg. 7297 (Feb. 17, 2026); 91 Fed. Reg. 40550 (July 2, 2026); 91 Fed. Reg. 27969 (May 15, 2026); 91 Fed. Reg. 34832 (June 9, 2026).

- Software used: ArcGIS Pro version 3.7.0

17.     I chose these datasets to perform my analysis because they are public authoritative datasets published and provided by federal and state agencies, or research relying on such data. I used the CBP Smart Wall Map data layers for planned and existing border wall constructions because they contain the most up-to-date sources on the current status of border barriers along the border between the U.S. and Mexico. I used U.S. Census Bureau International Boundary data to delineate the U.S.-Mexico border as it relies on authoritative data from the International Boundary and Water Commission. The USGS 3D Hydrography Program flowline and polygon data tailors the extent of the U.S.-Mexico border across river-defined sections of the border as well as the Rio Grande shoreline and provides a higher-resolution delineation of the Rio Grande proper and a closer representation of the river's *thalweg* (the river's deepest channel) and shoreline. The FGDC Administrative Boundaries and Texas Parks & Wildlife State Parks Division Texas State Parks

7

Boundaries are authoritative sources of boundary data provided by the managing agencies. Esri World Imagery data and U.S. Department of Agriculture - USA National Agriculture Imagery Program (NAIP) Imagery data validate data delineation and interpretation of the probable path of a continuous border wall at specific sites such as border wall crossings as these are authoritative high-resolution imagery datasets. The BLM National SMA Polygons, USGS GAP PAD-US 4.1 database, and the Texas General Land Office, Permanent School Fund Lands data define land ownership of restricted borderland areas as these datasets are authoritative and comprehensive datasets depicting land ownership. The U.S. Forest Service - National Wild and Scenic River Lines and Texas Parks & Wildlife State Parks Division – WMA Boundaries for Public Distribution layers define the extent of the Rio Grande Wild and Scenic River from its total delineated length based on the description of the waived area.

**b. Summary of Assumptions and Rationale**

18.     The map I created for this project is based, in part, on construction for pedestrian border barrier along the U.S.-Mexico border that does not yet exist. In order to estimate the extent of a nearly contiguous Wall along the border, I was required to make some assumptions and estimations. As described below, these assumptions can be categorized in three ways and are based on educated inferences and conservative estimates.

19.     Assumption 1: All current existing and proposed vehicle barrier segments will be converted to pedestrian barrier segments for the purpose of mapping the Wall. I base this assumption on the premise that future wall segments will be built along previously established infrastructure, understanding that segments of already-existing border barrier infrastructure provide pathways of least resistance for conversion to pedestrian barrier.

8

20.    Assumption 2: I used historical CBP Smart Wall Map data from March 5, 2026 to route the Wall through Big Bend Ranch State Park and Big Bend National Park. I made this decision because the March version of the route through this region of protected lands contains a more reasonable and conservative Wall route than the currently available route layer on CBP's Smart Wall Map website.

21.    Assumption 3: For the areas along the Rio Grande with no current or historical plans that could be translated into a Wall route, I assumed a 150-foot buffer from the Rio Grande shoreline to route the Wall. 150 feet is a conservative estimate of the distance between future border Wall segments (in areas with no planned construction) and the shoreline of the Rio Grande, as this is the width of "Enforcement Zone" sites created between the Rio Grande and levee wall constructions where vegetation was cleared in some national wildlife refuge parcels in the Rio Grande Valley in Texas (GAO 2023). At this time, CBP has not reported more specific parameters for delineating future wall construction projects that could otherwise be used to tailor the assumptions made regarding this portion of the border wall analyses.

**c.  Datasets and Procedures Used in Core Map Development**

**General Strategy and Methods**

22.    The following are primary methods I used to create or edit individual GIS data for this project: 1) I created a refined border layer using 3DHP flowline data for water-defined regions (i.e., the border segments where the Rio Grande acts as the international border). 2)  I used the boundaries of the U.S. – Mexico border and the planned and existing border wall construction data to define restricted borderland area polygons. 3) For areas with no border wall data, I used a uniform buffer from the Rio Grande 3DHP polygon using the "Enforcement Zone" value of 150 feet and mapped the enclosed space. 4) I defined a continuous border wall layer along the outside

9

extent of the restricted borderland areas (this is my estimated path for "the Wall"). 5) I calculated the miles of the Wall and the acreage of the restricted borderland areas.

**Combine TIGER/Line U.S. – Mexico border data with 3DHP flowline data**

23.    In ArcGIS Pro, I added the TIGER/Line U.S. International Boundaries layer, "tl_2025_us_internationalboundary", to a new map with a "USA Contiguous Albers Equal Area Conic USGS" projection.[5]

24.    The "tl_2025_us_internationalboundary" layer includes the U.S. – Canada border; I zoomed out to a national scale and use the "Select ‑ Lasso" tool to select only the U.S. – Mexico border.

25.    I exported the selected feature lines to a new layer named "US_Mexico_Border".

26.    I added the 3DHP "Flowline" data layer to the map.

27.    I used the "Select By Attributes" tool to select flowline features where gnisid is equal to "1385432" (Rio Grande). I exported selected features to a new layer named "BorderRivers_3DHP". I manually selected the flowline sections for the Colorado River coinciding with the U.S. – Mexico border, because the Colorado River gnisid (45730) has not been carried over to these features. I copy/pasted the selected features into separate layers, named "RioGrande_3DHP" and "ColoradoRiver_3DHP".

28.    I removed river sections in river layers that do not coincide with the border. I added a vertex to the river section intersecting with the "US_Mexico_Border" (with snapping turned on) where the border features transition from river‑defined border to land‑defined border. I deleted all

_____

[5] USA Contiguous Albers Equal Area Conic USGS projection was maintained for all subsequent layers produced in the analyses.

10

vertices delineating river sections up to the added vertices that don't delineate the U.S. – Mexico border.

29.     I performed the inverse of the previous step, adding a vertex to the border features in "US_Mexico_Border" that intersect with the river layers. I deleted all vertices for border river sections delineated by the International Boundary and Water Commission ("IBWC") up to the added vertices, keeping everything beyond the added vertices that map the land-defined border. (Figure 1)



**Figure 1. This is a true and correct screenshot showing the intersecting vertices between the "RioGrande_3DHP" layer (green) and the "US_Mexico_Border" layer (pink) defining river and land sections of the border respectively.**

30.     I copy/pasted all features from "US_Mexico_Border", "RioGrande_3DHP" and "ColoradoRiver_3DHP" into a new feature class named "FullUSMexicoBorder_w3DHP".

**Assemble planned and existing border wall constructions from Smart Wall Map data**

31.     I added CBP Smart Wall "Projects" and "Existing Border Barrier" data layers (downloaded May 21, 2026) to the map.

11

32.     I added the March 5, 2026 iteration of the "Projects" data layer to the map.

33.     For the May version of the "Project_Alignments" layer, I queried the "Status_2" field[6] to select only the features matching the border wall types of "Bollard Barrier System" or "Vehicle Barrier System" using the "Select by Attributes" tool.

34.     For the March version of the "Project_Alignments" layer, I queried the "Fence_Type" field[7] to select only the features matching the border wall system types containing the text "Primary" or "Secondary" using the "Select by Attributes" tool.

35.     I exported the selected features for both layers into layers named "BorderWallPlanned_March" and "BorderWallPlanned_May" respectively.

**Delineate restricted borderland areas using planned projects data**

36.     From the immediate western edge of Big Bend Ranch State Park to the eastern edge of Big Bend National Park, I used the March version of the planned projects. Outside of this section, I used the May version of the map.

37.     I added the NPS Administrative Boundaries layer ("Administrative_Boundaries_of_National_Park_System_Units") to the map. I used a definition query to only display Big Bend National Park ("unit_name" is equal to "Big Bend National Park").

---

[6]     The "Status_2" field provides specific definitions on the planned construction type, which could then be queried for construction types matching wall constructions (e.g., 'Bollard Barrier System') while filtering out border barrier definitions that are not consistent with where physical wall constructions would be put in place (e.g., 'Waterborne Barrier System').

[7]     The March iteration of the "Project_Alignments" layer lacks data in the "Status_2" field defining specific construction types (e.g. 'Bollard Barrier System'). The "Fence_Type" field was chosen instead in this case as it defines wall systems (primary and secondary) needed to map restricted borderland areas. Definitions for 'Detection Technology', 'System Attributes (Adding technology in locations with existing barrier)', 'System Attributes (Installed Along State of TX Wall)', and 'Waterborne Barrier System' were filtered out, as these definitions are not representative of locations where planned wall constructions would occur.

12

38.      I added the Texas state parks layer ("Texas_State_Parks_Boundaries") to the map. I used a definition query to only display Big Bend Ranch State Park ("Park Name" is equal to "Big Bend Ranch"). (Figure 2)



**Figure 2. This is a true and correct screenshot showing Big Bend Ranch State Park (yellow) and Big Bend National Park (purple) alongside the U.S.-Mexico border (pink line) where I used the March version of the planned project data to map the Wall path.**

39.      I created a new feature class named "RestrictedBorderlands".

40.      Using the "Create Features – Trace" tool (with snapping turned on), I traced along the May version and existing project data, with the cursor on the U.S. side. If planned and existing lines intersected and overlapped, the tool continues to trace the line most inland from the border as long as the cursor is moved in the tracing direction on the most inland side (i.e., mapping the fullest extent of area between project data and the border). (Figure 3) (Figure 4)

13



**Figure 3. This is a true and correct screenshot of Hidalgo County, Texas centered on 98.1045533°W, 26.0698107°N showing the result of the trace function applied to connecting or intersecting feature lines (blue lines are existing barriers, orange lines are planned bollard barrier wall systems, red polygons are restricted borderland areas); dragging the cursor outside of the mapped polygon area automatically snapped the trace line to the outermost feature line.**



**Figure 4. This is a true and correct screenshot of San Diego County, California centered on 116.7962636°W, 32.5629582°N showing a location where the planned project data**

14

**intersects with itself.[8] Keeping the cursor outside of both lines causes the cursor to move from one line being traced to the other at the point of intersection.**

41.   Occasionally, there are short gaps between planned or existing barriers (i.e. where a road passes through). At these points, I stopped tracing at the end vertex of the line. For small gaps such as these (i.e., where planned or existing barriers immediately continue beyond the gap), click the end vertex of the adjacent planned or existing barrier (using vertex snapping) and continue tracing.[9] (Figure 5)



**Figure 5. This is a true and correct screenshot of Cameron County, Texas centered on 97.4485455°W, 25.8778229°N with white arrows showing two terminating vertices of lines delineating existing border constructions intersected by a road.**

---

[8]   The intersecting or potentially redundant segment lines for the CBP planned border constructions could either mean primary or secondary constructions or could be referring to the same project using multiple redundant, yet spatially inconsistent vertex lines.

[9]   Potential border wall constructions were not considered across these gaps, and the gaps are not part of the final continuous border wall measurement.

15

42.    When planned and existing project data ends in each area with such data, there is no line or data intersecting between the U.S.-Mexico border and the planned and existing wall projects. To fill these gaps, I stopped tracing at the end vertex of the wall project data and snapped the cursor to the U.S.-Mexico border feature line at the point where the connecting line falls within both border and wall feature lines (i.e., a straight line describing the boundary of the area that is perpendicular to both non-intersecting boundaries). (Figure 6)



**Figure 6. This is a true and correct screenshot of Starr County, Texas centered on 99.1627383°W, 26.5544456°N showing a straight line drawn perpendicular to both the U.S.-Mexico border (pink line) and a section of existing border wall (blue line) to enclose the feature boundary while using the "Trace" tool.**

43.    I continued mapping the remaining areas that fall between the May version and existing wall project data and the U.S.-Mexico border using the methods described so far (excluding the areas between Big Bend Ranch State Park and Big Bend National Park).

44.    I then turned off the visibility of the May planned projects layer and turned on the March version. I continued the same process to map the restricted borderland areas from the

16

westernmost boundary of Big Bend Ranch State Park (intersecting with the U.S. – Mexico border) to the easternmost boundary of Big Bend National Park.

**Map areas with no planned or existing Wall construction data using the 150-foot buffer**

45. To fill the gaps along sections of the Rio Grande where no planned or existing data is present, I mapped the potential route of a continuous border wall and the restricted borderlands between the continuous wall and the border, perform the following steps.

46. For the purposes of estimating a reasonable and conservative figure of restricted borderland acreage if the Wall is completed, I chose a value of 150 feet from the border. This width value is the diameter of the "enforcement zone," created between the Rio Grande and levee wall constructions where vegetation was cleared in some national wildlife refuge parcels in the Rio Grande Valley in Texas (GAO 2023). As of this time, CBP has not reported more specific parameters for delineating future wall construction projects that could otherwise be used to tailor the assumptions made regarding this portion of the border wall analyses.

47. I exported a copy of the "RestrictedBorderlands" layer named "RestrictedBorderlands_150ft".

48. I added the 3DHP "Waterbody" data layer to the map. I used the "Select By Location" tool to select waterbody polygons intersecting with the "RioGrande_3DHP" layer. I deselected any non-river waterbodies selected that are not the Rio Grande polygons. I exported to a new layer named, "Border_Waterbodies_3DHP".

49. I used the "Pairwise Buffer" tool to buffer the river polygons using a distance value of 150 feet. I used a geodesic method and dissolved all output features into a single feature. I named the output layer "Border_Waterbodies_3DHP_150ftBuffer". (Figure 7)

17



**Figure 7. This is a true and correct screenshot showing the geoprocessing parameters used within the "Pairwise Buffer" tool to create a layer buffered off the outer boundary (the shoreline) of the Rio Grande polygons using a radius value of 150 feet.**

50.     In the gaps between previously mapped restricted borderland areas, I used the "Trace" tool to create new features in the "RestrictedBorderlands_150ft" layer that are enclosed by the buffer radius (the U.S. side), the U.S.-Mexico border, and the adjacent restricted borderland areas already mapped. (Figure 8) Because the restricted borderland polygons now enclose the ends of the new areas to be mapped, their boundaries can automatically be used by the "Trace" tool as long as the cursor is dragged in the general direction of where the new area needs to be mapped. (Figure 9) I finished tracing when returning to the starting vertex.

18



**Figure 8. This is a true and correct screenshot of Brewster County, Texas centered on 102.7034429°W, 29.6710020°N  showing a new area being mapped using the buffered distance from the shoreline and the U.S.-Mexico border layer.**



**Figure 9. This is a true and correct screenshot of Brewster County, Texas centered on 102.8336529°W, 29.4083701°N showing where the edge of an adjacent restricted borderland area (red polygon flanked by yellow line delineating planned border wall constructions) can be used to enclose an area defined by the buffered shoreline value (red polygon highlighted in blue).**

19

**Define the nearly continuous border wall**

51.     Once I completed mapping all the restricted borderland areas, I was able to define the location for a nearly continuous border wall using the "RestrictedBorderlands_150ft" features.

52.     I created a new feature class named "ContinuousBorderWall". I used the "Trace" tool to follow along the outside (U.S. side) of the restricted borderland areas. (Figure 10)



**Figure 10. This is a true and correct screenshot of Cameron County, Texas centered on 97.4077770°W, 25.8482545°N showing a section of continuous border wall (blue highlighted vertex line) mapped on the outer perimeter of the completed restricted borderland area layer (red polygon).**

53.     In some areas such as border crossings where there are gaps in planned and existing wall project data, I maintained the gaps in the continuous border wall data. I toggled between aerial imagery layers (e.g. NAIP data) as a visual check. (Figure 11)

20



**Figure 11. This is a true and correct screenshot of Cameron County, Texas centered on 97.4762288°W, 25.8877540°N showing the gap in planned and existing border wall data (highlighted blue vertex line and yellow vertex line) being maintained at a border crossing.**

**Calculate restricted borderland area acreage and near-continuous border wall mileage**

54.    I renamed the restricted borderland area and continuous border wall layers "RestrictedBorderlands_150ft_final" and "ContinuousBorderWall_final" respectively.

55.    I added a new field (type = Double) named "Length_Miles" to "ContinuousBorderWall_final" and right clicked this field in the layer table and selected the "Calculate Geometry" tool. I chose "Length (geodesic)" for the geometry property and "Statute Miles" for the length unit and selected "OK". (Figure 12)

21



**Figure 12. This is a true and correct screenshot showing the geoprocessing parameters used to calculate the continuous border wall length in miles within "Calculate Geometry" tool.**

56.     I right clicked the "Length_Miles" field and selected the "Explore Statistics" tool. I recorded the sum value, rounding to the nearest mile (1,748 miles).

57.     I added a new field (type = Double) named "Acres" to "RestrictedBorderlands_150ft_final", right clicked this field in the layer table and selected the "Calculate Geometry" tool. I chose "Area (geodesic)" for the geometry property and "International Acres" for the length unit and clicked OK. (Figure 13)

22



**Figure 13. This is a true and correct screenshot of the geoprocessing parameters used to calculate total acreages of restricted borderlands within the "Calculate Geometry" tool.**

58.     I right clicked the "Acres" field and selected the "Explore Statistics" tool. I recorded the sum value, rounding to the nearest acre (312,068 acres).

**<u>Define the land ownership of restricted borderlands</u>**

59.     To calculate the land ownership of the entire restricted borderland areas, I needed to first create a layer of the restricted borderlands without the areas of the Rio Grande up to the *thalweg*, as these areas would not be able to be classified using land ownership datasets. I removed these areas from the "RestrictedBorderlands_150ft_final" using the "Pairwise Erase" tool with "Border_Waterbodies_3DHP" as the erasing features, naming the output feature class "RestrictedBorderlands_150ft_final_noWaterbodies". I recalculated the acreage of this layer using the "Calculate Geometry" tool (283,606 acres).

60.     I added the BLM National SMA polygons "SurfaceManagementAgency" layer to the map. I clipped this layer to the "RestrictedBorderlands_150ft_final_noWaterbodies" layer using the "Pairwise Clip" tool. I named the output feature class "SMA_RestrictedBorderlands".

23

61.     I  added  a  text  field  to  the  "SMA_RestrictedBorderlands"  layer  named "OwnershipClass". I classified this field using the "Calculate Field" tool, writing code to define ownership based on the "Admin_Agency_Code" field. (Figure 14)

```
OwnershipClass = classify(!ADMIN_AGENCY_CODE!)

def classify(code):
    if code in ['ST']:
        return 'State'

    elif code in ['PVT']:
        return 'Private'

    elif code in ['BIA','NTVALL','NTVPIC']:
        return 'Tribal'

    elif code in ['LG']:
        return 'Local'

    elif code in ['UND']:
        return 'Undetermined'

    else:
        return 'Federal'
```

**Figure 14. This is a true and correct screenshot of code written for the block box within the geoprocessing parameters of the "Calculate Field" tool in order the classify the ownership of "SMA_RestrictedBorderlands" feature polygons.**

62.     I selected the features with a value of 'Undetermined' and exported them to a separate feature class named "SMA_RestrictedBorderlands_UndeterminedAreas" before deleting the selected features within "SMA_RestrictedBorderlands".

63.     I              added              the              USGS              GAP "PADUS4_1Combined_Proclamation_Marine_Fee_Designation_Easement" layer to the map and clipped the layer to the "SMA_RestrictedBorderlands_UndeterminedAreas" layer using the "Pairwise     Clip"     tool.     I     named     the     output     feature     class "SMA_RestrictedBorderlands_UND_PADUS".

24

64.     I added a text field to the "SMA_RestrictedBorderlands_UND_PADUS" layer named "OwnershipClass". I classified this field using the "Calculate Field" tool, writing code to define ownership based on the "Mang_Type" (Manager Type) field. (Figure 15)

```
OwnershipClass = classify(!Mang_Type!)

def classify(code):
    if code in ['STAT']:
        return 'State'

    elif code in ['PVT', 'NGO']:
        return 'Private'

    elif code in ['TRIB']:
        return 'Tribal'

elif code in ['FED']:
        return 'Federal'

    elif code in ['LOC', 'DIST']:
        return 'Local'

    elif code in ['UNK', 'JNT', 'TERR', 'DESG']:
        return 'Undetermined'

    else:
        return 'Federal'
```

**Figure 15. This is a true and correct screenshot of code written for the code block box within the geoprocessing parameters of the "Calculate Field" tool in order the classify the ownership of "SMA_RestrictedBorderlands_UND_PADUS" feature polygons.**

65.     A small number of "SMA_RestrictedBorderlands_UND_PADUS" features were classified as 'Undetermined'; these features were manually reviewed using available site information and reassigned where appropriate. I then exported a copy of "SMA_RestrictedBorderlands" named "SMA_RestrictedBorderlands_afterPADUS" and copied all the now classified features from "SMA_RestrictedBorderlands_UND_PADUS" into it.

66.     I removed the classified areas from "SMA_RestrictedBorderlands_UndeterminedAreas" using the "Pairwise Erase" tool, naming the

25

output feature class "SMA_RestrictedBorderlands_UND_afterPADUS". This layer showed the remaining areas still to be classified following the ownership checks using the first two data layers.

67.    Areas that remained unclassified after the SMA and PAD-US analyses were reviewed using supplemental ownership information, including Texas General Land Office (GLO) mapping resources, Permanent School Fund (PSF) land data, and available county parcel datasets. I added the "Permanent_School_Fund_Lands" data layer to the map, as this layer overlapped with a considerable amount of the remaining unclassified areas, and could be reclassified as state lands. I clipped the "Permanent_School_Fund_Lands" layer to "SMA_RestrictedBorderlands_UND_afterPADUS" using the "Pairwise Clip" tool, naming the output feature class "SMA_RestrictedBorderlands_UND_afterPADUS_PSL". I then exported a copy of "SMA_RestrictedBorderlands_afterPADUS" named "SMA_RestrictedBorderlands_afterPADUS_afterPSL" and copied all the features from "SMA_RestrictedBorderlands_UND_afterPADUS_PSL" into it, before classifying these features as state lands.

68.    I examined representative samples of the remaining unclassified areas, including large residual polygons in Brewster and Val Verde Counties, Texas. These areas generally corresponded to undeveloped rangeland and desert landscapes and were not identified within federal, state, tribal, local government, or other public ownership datasets used in this analysis.

69.    Following review of SMA, PAD-US, and available state land ownership information, any remaining areas not identified as federal, state, tribal, or local public lands were classified as 'Private' for the purposes of summary ownership reporting. This classification reflects a residual ownership approach in which publicly owned and managed lands are first identified and removed from consideration, with remaining lands assigned to the private ownership category.

26

70. I dissolved classified features within the "SMA_RestrictedBorderlands_afterPADUS_afterPSL" across the "OwnershipClass" field using the "Pairwise Dissolve" tool, naming the output feature class "SMA_RestrictedBorderlands_Dissolved". I then added a double field named "Acres" to the layer and calculated the acreages of the classified land ownership types. (Figure 15)



**Figure 15. This is a true and correct screenshot of the geoprocessing parameters used in the "Calculate Geometry" tool to calculate acreages of the classified land ownership types.**

71. The total acreage of the classified land ownership types was 285,335 acres, exceeding the acreage of the "RestrictedBorderlands_150ft_final_noWaterbodies" layer by 1,729 acres (0.01% of the restricted borderlands study area[10]). This is due to the land ownership datasets having minor spatial inconsistencies amongst boundaries and ownership precedence, resulting in the total acreage value of land ownership types slightly exceeding the acreage of the restricted borderlands areas. The acreage values of land ownership types within restricted borderland areas are presented in Table 1.

---

[10] This percentage calculation was performed using the "RestrictedBorderlands_150ft_final_noWaterbodies" acreage value.

27

**Table 1. Acreage of restricted borderlands based on land ownership class.**

| Ownership Class | Acres |
|---|---|
| Federal | 100,923 |
| State | 48,339 |
| Tribal | 3,365 |
| Local | 1,053 |
| Private | 131,655 |

**Define percentage of the Rio Grande Wild and Scenic River length waived by the June 9 National Park waiver.**

72.    To define the percentage of the Rio Grande Wild and Scenic River length waived by the June 9 National Park waiver, I added the coordinates to the map as stated: "starting at approximately GPS point 29.325866, -104.046466 and extending east to approximately GPS point 29.728522, −102.683945" (91 Fed. Reg. 34832).

73.    I added the U.S. Forest Service "National Wild and Scenic River Line" feature layer and the Texas Parks and Wildlife Department "WMA_Boundaries_4PublicDistribution" layer to the map. I selected the segments within the feature delineating the Wild and Scenic River sections for the Rio Grande, exporting them to a new feature class named "RioGrande_NationalWildandScenicRiverLine".

74.    I used the "Split" tool to divide the line segment representing the Texas portion of the Rio Grande Wild and Scenic River at the downstream coordinate near the Black Gap Wildlife Management Area northeastern boundary. I then added a double field named "RiverMiles" to the "RioGrande_NationalWildandScenicRiverLine" layer and calculated the mileage length for all

28

line segments within the feature layer, noting the length for the section between the waiver coordinates in particular. (Figure 16)



**Figure 16. This is a true and correct screenshot of the geoprocessing parameters used in the "Calculate Geometry" tool to calculate the river miles of the Texas portion of the Rio Grande Wild and Scenic River.**

75.     The Texas portion of the Rio Grande is 197 river miles, with 104 total miles waived by the June 9 National Park waiver. The waived portion constitutes 53% of miles of the Rio Grande Wild and Scenic River along the U.S.-Mexico border in Texas (263 total miles of the Rio Grande are designated as Wild and Scenic River, of which the waived portion of river miles is 40%).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, 2026, in _____.

*See Scanned Signature on Following Page*

Connor Phillips

29

line segments within the feature layer, noting the length for the section between the waiver coordinates in particular. (Figure 16)



**Figure 16. This is a true and correct screenshot of the geoprocessing parameters used in the "Calculate Geometry" tool to calculate the river miles of the Texas portion of the Rio Grande Wild and Scenic River.**

75. The Texas portion of the Rio Grande is 197 river miles, with 104 total miles waived by the June 9 National Park waiver. The waived portion constitutes 53% of miles of the Rio Grande Wild and Scenic River along the U.S.-Mexico border in Texas (263 total miles of the Rio Grande are designated as Wild and Scenic River, of which the waived portion of river miles is 40%).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___JULY 16___, 2026, in ___TUCSON, ARIZONA___.

Connor Phillips

29

**PHILLIPS DECLARATION**

**EXHIBIT 1**

True and correct copies of maps created by Connor Phillips



**Above is a true and correct image of the map I created for this project, depicting the possible scale and route of a nearly continuous border wall spanning the length of the U.S.- Mexico border.**



**Above is a true and correct image of the map I created, zoomed in to show the route for the Wall I estimated for Big Bend National Park based on historical CBP data.**

32



**Above is a true and correct image of the map I created, zoomed in to show a segment of the Lower Canyons in the Big Bend Sector where, if the Wall is built along this path, it would strand significant acreage and limit or prohibit access to areas that I describe as restricted borderlands, shown in red.**

33

**APPENDIX VOLUME 1**

**DOCUMENT 8**

Expert Report of Adam B. Isacson in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

|  |  |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al., | Case No. 3:26-cv-01099-KC |
| *Plaintiffs,* |  |
| v. |  |
| MARKWAYNE MULLIN, et al., |  |
| *Defendants.* |  |

**EXPERT REPORT OF ADAM B. ISACSON**

1.      I am the Director for Defense Oversight at the Washington Office on Latin America ("WOLA"), a nonprofit research and advocacy organization based in Washington, D.C., committed to advancing human rights in the Americas. Since 2011, a significant part of my work has been focused on border security in the United States. I have visited the U.S.-Mexico border approximately 40 times and the Mexico-Guatemala border 4 times. Since 2020 alone, I have overseen WOLA's publication of over 110 reports, memos, and multimedia projects about border and migration trends, the successes and failures of border security and migration policies, and human rights impacts. In addition to those products, since September 2020, I have published a Weekly Border Update with over 500 email subscribers and more than 400,000 downloads over the past year. I have testified about border and migration issues in the U.S. Congress three times since November 2023. My professional opinions and work product are cited in major media outlets, on average, a few times monthly.

1

**ASSIGNMENT**

2.     I have been retained by counsel for Center for Biological Diversity (the "Center") to opine on the number of unlawful border crossings in the Big Bend Border Patrol Sector in Texas (the "Big Bend Sector"); to compare those figures with unlawful border crossing data from other U.S. Border Patrol sectors along the U.S.-Mexico border; and to determine whether the Big Bend Sector, or any subdivision thereof, reflect comparatively elevated unlawful-entry activity.

3.     I have declined to be compensated for my time.

**DOCUMENTS REVIEWED**

4.     As part of my assignment, I have reviewed the complaint filed by Plaintiffs in this case. I have also reviewed:

   a.  A Border Patrol table detailing annual migrant apprehensions by U.S.-Mexico border sector from fiscal years 1960 to 2020, available online at https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/US59B8~1.PDF.

   b.  A Border Patrol table detailing monthly migrant apprehensions by U.S.-Mexico border sector from fiscal years 2000 to 2020, available online at https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/U.S.%20Border%20Patrol%20Monthly%20Encounters%20(FY%202000%20-%20FY%202020)%20(508).pdf.

   c.  A CBP dataset of monthly migrant encounters nationwide from fiscal years 2020 through May 2026, identifying sectors where encounters occurred, updated monthly and available at https://www.cbp.gov/document/stats/nationwide-encounters. I have created a

2

web resource that allows easy searching of this dataset at https://cbpdata.adamisacson.com.

d. A CBP dataset of the agency's nationwide drug seizures since fiscal year 2020, updated monthly and available at https://www.cbp.gov/document/stats/nationwide-drug-seizures.

e. I have combined all yearly data from sources a, b, and c, covering fiscal years 1960 to the present, into a single table, publicly available at https://docs.google.com/spreadsheets/d/16TROMDMHLAJF7ch_UUctdZCm 0FcuN8McGne__osrkN4/edit?usp=sharing.

f. I have combined all monthly data from sources b and c, covering fiscal years 2000 to the present, into a single table, publicly available at https://docs.google.com/spreadsheets/d/1dINyDcCWRB0efJvdHGaBzmHmo CNYi_oEMTdqhU6gmNU/edit?usp=sharing.

g. A great deal of secondary-source coverage of the Big Bend barrier construction plan, which I have saved in a database with links to sources available at https://defenseoversight.adamisacson.com/permanews.php?region%5B%5D= U.S.- Mexico%20Border&tag%5B%5D=Fencing&tag%5B%5D=Border%20Securi ty&search_terms%5B%5D=Big%20Bend.

h. Determinations pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as published in the Federal Register.

3

i.   Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories and Defendants' Objections and Responses to Plaintiff's First Set of Requests for Production.

5.    All of the documents I have considered in forming my opinions are cited in this report. I reserve the right to supplement this report based on any additional materials I may review.

**QUALIFICATIONS**

6.    I earned a B.A. in Social Science from Hampshire College and an M.A. in International Relations from Yale University. Though I do a lot of fieldwork, my work as a researcher and advocate is centered in Washington. This gives me a "higher-altitude" view of trends border-wide, in all nine geographic sectors into which Border Patrol divides the U.S.-Mexico border. I gather information by consuming media, government, non-governmental, and academic articles and reports. I gather numerical data from Customs and Border Protection's (CBP) datasets, which I analyze with tools I have coded myself, and from the datasets of other nations along the U.S.-bound route that share data. While in Washington, I also gather information through constant contact with service providers, scholars, and journalists along the border over the phone, via email, via text messaging services, and via social media. I participate in weekly or biweekly virtual meetings with multiple coalitions, many of them based along the border, to share information and stay informed about developments on the ground.

7.    A copy of my curriculum vitae, listing all publications authored in the previous ten years, is attached as Appendix I.

8.    I have not previously testified as an expert at trial or by deposition during the previous four years.

4

**SUMMARY OF OPINIONS**

9.      Section 102(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA, 8 USC 1103 note), as amended, permits the Secretary of Homeland Security to waive other laws to install physical barriers and roads "in areas of high illegal entry into the United States."

10.     CBP's own data includes ample evidence that Border Patrol's Big Bend Sector is not an area of high illegal entry. In fact, it is by far the least active of all the nine geographic sectors into which Border Patrol divides the U.S.-Mexico border. Even though it makes up about a quarter of all U.S.-Mexico border miles, it is not a significant zone of entry for undocumented migrants or illicit drugs.

11.     The lack of activity in the Big Bend Sector is notorious. Of all nine Border Patrol sectors along the U.S.-Mexico border, it is the only one that I have never visited. Until the current administration issued its border barrier proposals, there was little security or humanitarian reason to carry out research visits there, and it would have been difficult to convince the individuals and foundations that support my work to fund such a trip.

**METHODOLOGY**

12.     In order to determine whether the Big Bend Sector is an area of "high illegal entry," I examined migrant apprehension and drug seizure data compiled by CBP and shared on the agency's website. This data is noted in the "Documents Reviewed" section above.

13.     CBP presents yearly Border Patrol apprehensions by sector from 1960 to 2020 in a single PDF table. I was able to save that table in spreadsheet (Microsoft Excel) format using a MacOS app ("PDF Expert"), and verified the conversion by ensuring that the totals for each column matched those presented in the PDF.

5

14.    CBP presents monthly Border Patrol apprehensions by sector from 2000 to 2020 in a series of PDF tables. I was able to save those tables in spreadsheet (Microsoft Excel) format using a MacOS app ("PDF Expert"), and verified the conversion by ensuring that the totals of all columns matched those presented in the PDF.

15.    CBP presents monthly Border Patrol apprehensions according to several metrics, including sectors, between 2020 and 2026 in a dataset that is updated monthly and available online. That data is in "Comma Separated Values" (CSV) format, which any spreadsheet program can read. I combined all years' CSV files into a single file, then imported that into the MySQL database format for use in a web resource that I coded myself and share publicly. Using the PHP programming language, the resource at cbpdata.adamisacson.com allows users to generate custom data tables of migrant apprehensions, covering 2020-2026, in HTML (web page) format.

16.    Combining data from all three sources enabled me to generate single tables of Border Patrol apprehensions by U.S.-Mexico border sector: one with annual data since 1960, and one with monthly data since 2000. I've shared both updated tables using Google Sheets.

17.    For drug seizures data by sector, CBP offers a public CSV dataset going back to 2020 that is updated monthly. I combined all years' CSV files into a single file, then imported that into the MySQL database format. I hand-coded PHP pages to show monthly seizures since 2020, by kind of drug, for (a) the Big Bend Sector (https://cbpdata.adamisacson.com/all_drugs_month_big-bend.php), for (b) all Border Patrol sectors (https://cbpdata.adamisacson.com/all_drugs_month_all-sectors.php), and for (c) all Border Patrol sectors and CBP field offices (https://cbpdata.adamisacson.com/all_drugs_month_all-sectors-all-cbp.php, including the ports of entry, where most non-marijuana drug seizures occur). By copying-and-pasting the resulting HTML tables into a spreadsheet and comparing

6

corresponding cells and totals, I was able to determine the percentage of all drug seizures that occurred in the Big Bend Sector.

## OPINION

18.     During President Trump's first term in office, his administration completed 458 miles of new or replacement border barrier—but of those 458 miles, just 87 miles were of new, pedestrian border wall along previously unwalled stretches of the southern border (*Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction.* 2023. GAO-23-105443. Washington: U.S. Government Accountability Office. https://www.gao.gov/products/gao-23-105443.)

19.     In 2023, after President Trump's first term in office, a total estimated 741 miles of border barrier existed along the southern border. (I derive this estimate, using U.S. Government Accountability Office data, at https://adamisacson.com/u-s-mexico-border-barriers-now-total-741-miles/.)

20.     Border Patrol's Big Bend Sector web page notes that the Sector "is responsible for patrolling 517 miles of river front along the Rio Grande River which is the international boundary between the United States and Mexico. The Sector's border boundary is almost one-quarter of the country's Southwest Border."[1]

21.     Along that one quarter (approximately 25 percent) of the border, Border Patrol has apprehended:

    a.  1.6 percent of all migrants since 1960 (797,128 out of 51,097,057 apprehensions over nearly 67 years). That is about 1.9 migrant apprehensions

---

[1] "Big Bend Sector Texas," U.S. Customs and Border Protection, Washington, August 6, 2025, https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/big-bend-sector-texas.

per border mile per month. The border-wide average over these nearly 67 years is 17 times greater: 32 apprehensions per mile per month.

b.  1.1 percent of all migrants this century (248,551 out of 22,661,502 apprehensions). That is about 1.5 migrant apprehensions per border mile per month. The border-wide average over these nearly 27 years is 24 times greater: 35 apprehensions per border mile per month.

c.  1.2 percent of all migrants in the 2020s (99,042 out of 8,141,918 apprehensions). That is about 2.4 migrant apprehensions per border mile per month, during a period (2021-2023) that broke migrant apprehension records along the border. The border-wide average over these nearly seven years is 21 times greater: 51 apprehensions per border mile per month.

d.  2.5 percent of all migrants during the second Trump administration (3,029 out of 119,715 apprehensions between February 2025 and May 2026). That is about 0.4 migrant apprehensions per mile per month. The border-wide average over these 16 months is 10 times greater: 4 apprehensions per border mile per month.

Embedded below as Figure 1 is a true and correct copy of a table I created, compiling this data and comparing total apprehensions by sector.

## Border Patrol Migrant Apprehensions by Sector

| Sector | Sector Land Border Miles | 1960-May 2026 | | 2000-May 2026 | | 2020-May 2026 | | Trump administration through May 2026 | |
|---|---|---|---|---|---|---|---|---|---|
| | | Migrant Apprehensions | Per mile per month | Migrant Apprehensions | Per mile per month | Migrant Apprehensions | Per mile per month | Migrant Apprehensions | Per mile per month |
| San Diego | 60 | 13,155,787 | 274.08 | 2,677,415 | 139.45 | 984,489 | 205.10 | 16,023 | 16.69 |
| El Centro | 70 | 3,184,707 | 56.87 | 1,399,439 | 62.47 | 233,315 | 41.66 | 2,340 | 2.09 |
| Tucson | 262 | 9,259,397 | 44.18 | 6,353,487 | 75.78 | 1,399,075 | 66.75 | 21,079 | 5.03 |
| El Paso | 268 | 7,318,766 | 34.14 | 2,514,179 | 29.32 | 1,297,754 | 60.53 | 24,042 | 5.61 |
| Laredo | 136 | 3,487,243 | 32.05 | 1,464,967 | 33.66 | 370,538 | 34.06 | 14,651 | 6.73 |
| Yuma | 126 | 2,884,859 | 28.62 | 1,525,410 | 37.83 | 670,504 | 66.52 | 2,684 | 1.33 |
| Rio Grande Valley (formerly McAllen) | 320 | 6,764,849 | 26.43 | 4,186,989 | 40.89 | 1,630,010 | 63.67 | 22,898 | 4.47 |
| Del Rio | 245 | 4,244,321 | 21.65 | 2,291,065 | 29.22 | 1,457,191 | 74.35 | 12,969 | 3.31 |
| Big Bend (formerly Marfa) | 517 | 797,128 | 1.93 | 248,551 | 1.50 | 99,042 | 2.39 | 3,029 | 0.37 |
| Southwest Border Total | 2,004 | 51,097,057 | 31.87 | 22,661,502 | 35.34 | 8,141,918 | 50.79 | 119,715 | 3.73 |
| Big Bend Percentage of Border-Wide | 25.8% of total | 1.6% of total | 6% of average | 1.1% of total | 4% of average | 1.2% of total | 5% of average | 2.5% of total | 10% of average |

**Figure 1**

22.    When I attempt to represent this data graphically, charting Border Patrol apprehensions by sector, the Big Bend Sector barely appears. Embedded below as Figure 2 is a true and correct copy of a graph I created, which shows the Big Bend Sector's migrant apprehensions in dark brown; the reader may have to look closely to spot them.



**Figure 2**

9

23.    The available primary-source data only reports Border Patrol apprehensions aggregated across the entire 517-mile-long Big Bend Sector. Within the 118-mile boundary of Big Bend National Park itself, apprehensions appear even scarcer. Data compiled by a former park superintendent "suggests that agency apprehensions within National Park boundaries have constituted an average of 0.02% of nationwide totals over the past decade." Sam Karas, "Former National Park Superintendents Ask DHS Not to Waive Laws for Border Wall Construction," *Big Bend Sentinel*, May 27, 2026, https://bigbendsentinel.com/2026/05/27/former-national-park-superintendents-ask-dhs-not-to-waive-laws-for-border-wall-construction/. Over the 10 years between Fiscal Year 2016 and Fiscal Year 2025, Border Patrol apprehended people 10,041,222 times at the entire U.S.-Mexico border; 0.02 percent of that would be just 2,008 people in 10 years across 118 border miles, or 0.14 apprehensions per border mile per month.

24.    Data since 2020 reports nationalities and demographics of people apprehended in the Big Bend Sector. It shows that 43 percent of those entering Border Patrol custody during those years came from countries other than Mexico, and that 9 percent were either unaccompanied children or parents traveling with children. Children, families, and people from farther-away countries are more likely to be asylum seekers. While Border Patrol does not report the number of apprehended migrants who willingly turn themselves in to agents to seek asylum or other protection, a conservative estimate based on nationality and demographic characteristics would be 1 in 10 people apprehended in the Big Bend Sector since 2020 who did not seek to evade capture at all: they were trying to reach U.S. soil in order to turn themselves in to U.S. agents. U.S. law (Section 208 of the Immigraiton and Nationality Act, 8 U.S.C. 1158) affords the right to seek asylum to people who have "arrived" in the United States: who are physically on U.S. soil. As it is impossible to build a wall flush against the bank of the Rio Grande, there will always be U.S.

10

soil on which to stand south of any barrier and await apprehension. The existence of a border wall is irrelevant to, and does not deter, asylum seekers, so the true population of Big Bend border crossers who might be stopped by a wall is even smaller than the apprehensions figure suggests.

25.    Data about drug seizures similarly indicates that the Big Bend Sector is not an area of high illegal entry. CBP publicly reports monthly border drug seizures by sector since fiscal year 2020. During that period, the Big Bend Sector has accounted for 20 percent of all Border Patrol's seizures of marijuana, a drug that, due to legal recreational sales in other border states, is rarely seized outside of Texas. Big Bend accounts for just 1.4 percent of Border Patrol's seizures of all other drugs (cocaine, ecstasy, fentanyl, heroin, methamphetamine, and others). These estimates leave out ports of entry, the official border crossings where CBP seizes the overwhelming majority of all drugs except marijuana. Including ports of entry would reduce Big Bend's share of border drug seizures even further. Embedded below as Figure 3 is a true and correct table I created that compares total drug seizures in the Big Bend Sector across the rest of the U.S.-Mexico border patrol sectors.

## U.S.-Mexico Border Drug Seizures

| Drug | 2020-2026 Big Bend Sector Seizures, Pounds | 2020-2026 All Border Patrol U.S.-Mexico Border Seizures, Pounds | Big Bend Share of Border Patrol Total | 2020-2026 All CBP U.S.-Mexico Border Seizures, Including Ports of Entry, Pounds | Big Bend Share of All-CBP Total |
|---|---|---|---|---|---|
| Cocaine | 981 | 98,715 | 1% | 489,540 | 0.2% |
| Ecstasy | 14 | 207 | 7% | 6,351 | 0.2% |
| Fentanyl | 137 | 12,840 | 1% | 99,150 | 0.1% |
| Heroin | 22 | 2,102 | 1% | 18,031 | 0.1% |
| Marijuana | 126,029 | 637,914 | 20% | 1,794,297 | 7.0% |
| Methamphetamine | 1,640 | 100,988 | 2% | 1,140,182 | 0.1% |
| Other Drugs** | 348 | 9,438 | 4% | 1,369,959 | 0.0% |
| Total | 129,171 | 862,204 | 15% | 4,917,510 | 2.6% |
| Non-Marijuana | 3,142 | 224,290 | 1% | 3,123,213 | 0.1% |

**Figure 3**

11

26.     Further supporting the position that the Big Bend Sector is not an area of high illegal entry, DHS has applied this label indiscriminately across the entire border. As of October 15, 2026, there are no longer any segments of the U.S.-Mexico border that lack an IIRIRA waiver. 90 Fed. Reg. 48286 (Oct. 15, 2025) (waiving procurement laws across the entirety of the Big Bend Sector); 90 Fed. Reg. 48281 (Oct. 15, 2025) (waiving procurement laws across the entirety of the Tucson Sector); 90 Fed. Reg. 48282 (Oct. 15, 2025) (waiving procurement laws across the entirety of the El Centro Sector); 90 Fed. Reg. 48283 (Oct. 15, 2025) (waiving procurement laws across the entirety of the Del Rio Sector); 90 Fed. Reg. 48284 (Oct. 15, 2025) (waiving procurement laws across the entirety of the Rio Grande Valley Sector); 90 Fed. Reg. 48285 (Oct. 15, 2025) (waiving procurement laws across the entirety of the Yuma Sector); 90 Fed. Reg. 48287 (Oct. 15, 2025) (waiving procurement laws across the entirety of the Laredo Sector); 90 Fed. Reg. 48288 (Oct. 15, 2025) (waiving procurement laws across the entirety of the El Paso Sector); 90 Fed. Reg. 48289 (Oct. 15, 2025) (waiving procurement laws across the entirety of the San Diego Sector). As a result, the entire southern border is now characterized as an "area of high illegal entry."

27.     The publicly available data about migrant apprehensions and drug seizures in the Big Bend Sector leads to the inescapable conclusion that the Big Bend is not a region of high illegal entry. This is true in relative terms: even though it comprises a quarter of the U.S.-Mexico border Big Bend falls far behind Border Patrol's other U.S.-Mexico border sectors—including sectors with large amounts of recently built border wall segments—accounting for about 1 percent of migrant apprehensions and non-marijuana drug seizures. It is also true in absolute terms: the 67-year average of 1.9 Border Patrol apprehensions per mile per month means that, in a typical mile of the Big Bend Sector's border, agents have encountered just one migrant every 16 days. This sector is, in fact, very quiet, and the very definition of "low" illegal entry.

## CONCLUSION

28.    Seeking to waive all other laws in order to build barriers in a sector as quiet as Big Bend runs afoul of the letter and the intent of Section 102(a) of IIRIRA. The intent to build border barrier in the Big Bend seems to reflect the amount of funding DHS has on hand from recently approved legislation, rather than any urgency over illegal entries.


Pursuant to 28 U.S.C. § 1746, I, Adam Isacson, declare under penalty of perjury that the foregoing is true and correct.

Executed on __July 16__, 2026, in Washington, DC.


Adam Isacson

13

**APPENDIX I**

*Curriculum Vitae* of Adam B. Isacson

# Adam B. Isacson

*Office:*
Washington Office on Latin America
1666 Connecticut Ave NW
Suite 400
Washington, DC 20009
(202) 797-2171
aisacson@wola.org
www.wola.org - @adam_wola

*Home:*
406 R St NW
Washington, DC 20001
+1 (202) 329-4985
thisisadamsmail@gmail.com
www.adamisacson.com
Signal: adamisacson.98

## EDUCATION

**Yale University**  New Haven, Connecticut
Master of Arts in International Relations, May 1994.
Concentration in development policy and Latin American studies.

**Hampshire College**  Amherst, Massachusetts
Bachelor of Arts in International Relations / Latin American Studies, May 1992. Senior year field study / thesis on popular movement activity in Mexico.

## EXPERIENCE

May 2010-  **Washington Office on Latin America**  Washington, D.C.
*Director for Defense Oversight*
Management of a program that monitors U.S. security relations with Latin America and the Caribbean, border security, migration, and civil-military relations. Frequently consulted on issues like Colombia's conflict, U.S.-Mexico border security, arms transfers, citizen security, drug policy, and human rights.

October 1995-
April 2010  **Center for International Policy**  Washington, D.C.
*Director of Programs; Coordinator, Latin America Security Program*
Management of a program that advocated security relations between the United States and the Western Hemisphere based on respect for human rights and peaceful resolution of conflicts. The program focused especially on Central America and Colombia.

June 1994-
September 1995  **Center for Peace and Reconciliation, Arias Foundation for Peace and Human Progress**  San José, Costa Rica
*Program Officer*
Coordinated institutional development efforts, including project design and funding.  Participated in administration and execution of projects advocating demilitarization, conflict prevention, and democratization in Central America and Haiti.

COURSES TAUGHT

> • Security in the Americas, George Washington University, Fall 2022

OFFICES AND MEMBERSHIPS

> • Board, Andean Information Network, Cochabamba, Bolivia
> • Board, Border Servant Corps, Las Cruces, New Mexico
> • Member, Friedrich Ebert Foundation Red de Seguridad Incluyente y Sostenible
> • Member, Forum on the Arms Trade
> • Former member, Selection Committee, Letelier-Moffitt Human Rights Award, Institute for Policy Studies
> • Former member, International Consultative Council, Historical Memory Group, National Commission for Reparations and Reconciliation, Government of Colombia
> • Former member, Nominations Committee, Latin American Studies Association
> • Former Board, U.S. Office on Colombia

WEBSITES AND RESOURCES CREATED

> • **"Latin America Today" podcast**, Washington Office on Latin America (2011-present)
> • **Washington Office on Latin America Defense Oversight Program** (2010-present) - wola.org/program/defense-oversight
> • **Washington Office on Latin America Migration and Border Security Program** (2011-present) - www.wola.org/program/migration-border-security
> • **adamisacson.com** (2017-present) – www.adamisacson.com
> • **borderoversight.org** (2022-present) – www.borderoversight.org
> • **colombiapeace.org** (2013-2023) – www.colombiapeace.org
> • **Border Fact Check**, blog of WOLA's Border Security project (2012-2016) – www.borderfactcheck.org
> • **Just the Facts: a civilian's guide to U.S. defense and security assistance to Latin America and the Caribbean** (1998-2014) – www.justf.org; succeeded by the Security Assistance Monitor, securityassistance.org, maintained by the Center for International Policy.
> • **Plan Colombia and Beyond**, blog of the Center for International Policy's Colombia Program (2004-2010) – www.cipcol.org
> • **Center for International Policy Colombia Program** (2000-2008) – www.ciponline.org/colombia

CONGRESSIONAL TESTIMONY

> • Hearing of the House Foreign Affairs Western Hemisphere Subcommittee on "**INL Should Fight Crime, Not Fight Conservatives**," March 27, 2025
> • Hearing of the Senate Committee on Homeland Security and Government Affairs on "**Remain in Mexico**," January 15, 2025

2
APX-V1-344

• Hearing of the House Oversight Subcommittee on National Security, the Border, and Foreign Affairs on "**The Border Crisis: The Cost of Chaos**," September 25, 2024
• Hearing of the Tom Lantos Human Rights Commission on "**Organized Crime, Gangs and Human Rights in Latin America**," December 14, 2023
• Hearing of the House Foreign Affairs Committee on "**The U.S. Border Crisis and the American Solution to an International Problem**," November 30, 2023
• Hearing of the Tom Lantos Human Rights Commission on "**Peace and Victims' Rights in Colombia**," July 19, 2018
• Hearing of the Tom Lantos Human Rights Commission on "**Creating Peace and Finding Justice in Colombia**," October 24, 2013
• Hearing of the House Ways and Means Trade Subcommittee on "**The U.S.-Colombia Free Trade Agreement**," March 17, 2011
• Hearing of the House Government Reform Domestic Policy Subcommittee on "**International Counternarcotics Policies**," July 21, 2010
• Hearing of the Tom Lantos Human Rights Commission on "**Human Rights in Colombia: The Continuing Crisis in Putumayo**," October 20, 2008
• Hearing of the Senate Foreign Relations Western Hemisphere Subcommittee on "**The Impact on Latin America of the American Servicemembers' Protection Act**," March 9, 2006
• Hearing of the House Government Reform Committee on "**A Status Report on Plan Colombia**," June 17, 2004
• Hearing of the House Government Reform Committee on "**America's Heroin Crisis, Colombian Heroin and How We Can Improve Plan Colombia**," December 12, 2002
• Hearing of the Western Hemisphere Subcommittee, House International Relations Committee on "**U.S. Policy Toward Colombia**," April 11, 2002
•  Hearing of the Criminal Justice, Drug Policy, and Human Resources Subcommittee of the House Government Reform Committee on "**US Air Interdiction Efforts in South America After the Peru Incident**," May 1, 2001

---

SELECTED PUBLICATIONS

> • **Columns and commentaries published at:**
> > • Washington Office on Latin America website *(2010-2026)*
> > • *Responsible Statecraft (2026)*
> > • *MSNBC (2023-2025)*
> > • *El Espectador (2004-2023)*
> > • *New York Times or nytimes.com (2018-2022)*
> > • *Razón Pública (2009-2022)*
> > • *Just Security (2021)*
> > • *World Politics Review (2012-2023)*
> > • *Semana (2002, 2005, 2014, 2020)*
> > • *OpenDemocracy (2007-2019)*

> • *El Tiempo (2002-2009, 2016-2017)*
> • *The Brookings Institution (2017)*
> • *The Hill (2017)*
> • *The Cipher Brief (2016)*
> • *Plaza Pública (2013)*
> • *Huffington Post (2011)*
> • *Transnational Institute (2010-2011)*
> • *Americas Quarterly (2010)*
> • *Current History (2010)*
> • *The Guardian (2010)*
> • *Foreign Policy (2009-2010)*
> • *Foreign Affairs en Español (2008)*
> • *NACLA Report on the Americas (2001-2005)*
> • *The Washington Post (2002)*
> • *The Financial Times (2001)*
> • Center for International Policy website *(1996-2010)*

• **U.S.-Mexico Border Updates**, Washington Office on Latin America, 2020-2026.

• *Killing Spree: Extrajudicial Executions in the U.S. Boat Strikes Campaign*, Washington Office on Latin America, July 2026

• *Key things to know about the proposed foreign aid budget for FY2027*, Washington Office on Latin America, April 2026

• *Before More People Are Hurt: Why the Trump Administration's 'Joint Targeting' Model Needs a Rethink*, Washington Office on Latin America, April 2026

• *Denouncing Into the Void: The Dismantling of Internal Oversight and Accountability at DHS*, Washington Office on Latin America, March 2026

• *The "boat strikes" are still happening. Five things you need to know*, Washington Office on Latin America, February 2026

• *Facts to Inform the Debate about the U.S. Government's Anti-Drug Offensive in the Americas*, Washington Office on Latin America, October 2025

• *"Dispatches" about migration, from Honduras, Guatemala, Tapachula, and Ciudad Juárez*, Washington Office on Latin America, July-August 2025

• *Trump Budget Bill Threatens Migrant Rights and Civil Liberties: Ugly Consequences of a Police State Agenda*, July 2025

• *The Trump Administration's Unprecedented Military Deployment in Los Angeles Echoes the Overreach We've Long Opposed in Latin America*, Washington Office on Latin America, June 2025

• *Key Facts About the Experience of LGBTIQ+ Migrants*, Washington Office on Latin America, June 2025

• *$160 Billion to Detain and Deport: Congress's "Reconciliation" Bill is a Betrayal of Priorities and Will Harm the Most Vulnerable*, Washington Office on Latin America, May 2025

• *The frightening popularity of El Salvador's Nayib Bukele's authoritarianism*, *MSNBC*, April 2025

• *Soldiers Aren't Border Police: the perils of using troops against migrants*, Washington Office on Latin America, March 2025

• *From the Field: The First 14 Days of Border Impacts Under the Trump Administration's Executive Orders*, Washington Office on Latin America, February 2025

• *Five Migration and Security Trends at the U.S.-Mexico Border*, Washington Office on Latin America, November 2024

• *Soldiers Confronting Migrants: Texas's Dangerous Precedent*, Washington Office on Latin America, September 2024

• *Fewer Migrants, Greater Danger: The Impact of 2024's Crackdowns*, Washington Office on Latin America, August 2024

• *Migrants in Colombia: Between government absence and criminal control*, Washington Office on Latin America, June 2024

• *Why Ecuador Should Not Replicate the 'Bukele Model'*, Washington Office on Latin America, February 2024

• *Abuses at the U.S.- Mexico Border: How To Address Failures and Protect Rights*, Washington Office on Latin America, August 2023

• *Halfway to the U.S.: A Report from Honduras on Migration*, Washington Office on Latin America, June 2023

• *A Long Way to Go: Implementing Colombia's peace accord after five years*, Washington Office on Latin America, November 2021

• *Estados Unidos y su influencia en el nuevo militarismo latinoamericano*, Fundación Carolina, November 2021

• *In Latin America, COVID-19 Risks Permanently Disturbing Civil-Military Relations*, Washington Office on Latin America, July 2020

• *The 'Wall' Before the Wall: Mexico's Crackdown on Migration at its Southern Border*, Washington Office on Latin America, December 2019

• **Chapter** in Bruce Bagley, Jonathan Rosen, Jorge Chabat (eds), *The Criminalization of States: The Relationship between States and Organized Crime*, Lexington Books, May 2019

• **Epilogue: Will Governments Confront Coca Cultivation, or its Causes?** in Paul Gootenberg, Liliana M. Dávalos (eds), *The Origins of Cocaine Colonization and Failed Development in the Amazon Andes*, Routledge, January 2019

• *Colombia Transforma program mid-term performance evaluation: evaluation report*, U.S. Agency for International Development, May 2018

• *A National Shame: The Trump Administration's Separation and Detention of Migrant Families*, Washington Office on Latin America, August 2018

• *"Come Back Later": Challenges for Asylum Seekers Waiting at Ports of Entry*, Washington Office on Latin America, August 2018

• *The Zero Tolerance Policy*, Washington Office on Latin America, July 2018

• *Lessons from San Diego's Border Wall*, Washington Office on Latin America, December 2017

• *Mexico's Southern Border – Security, Central American Migration, and U.S. Policy*, Washington Office on Latin America, June 2017

• *Putting the Pieces Together: A Global Guide to U.S. Security Aid Programs*, Washington Office on Latin America, April 2017

• *Not a National Security Crisis: The U.S.-Mexico Border and Humanitarian Concerns, Seen from El Paso*, Washington Office on Latin America, October 2016

• *Increased Enforcement at Mexico's Southern Border*, Washington Office on Latin America, November 2015

• **Chapter** in Bruce Bagley, Jonathan Rosen (eds), ***Colombia's Political Economy at the Outset of the Twenty-First Century: From Uribe to Santos and Beyond***, Lexington Books, July 2015

• *On the Front Lines: Border Security, Migration, and Humanitarian Concerns in South Texas*, Washington Office on Latin America, February 2015

• **Chapter** in Bruce Bagley, Jonathan Rosen, Hanna Samir Kassab (eds), ***Reconceptualizing Security in the Americas in the Twenty-First Century***, Lexington Books, January 2015

• *Mexico's Other Border: Security, Migration, and the Humanitarian Crisis at the Line with Central America*, Washington Office on Latin America, June 2014

• *Ending 50 Years of Conflict in Colombia*, Washington Office on Latin America, April 2014

• *Border Security and Migration: A Report from Arizona*, Washington Office on Latin America, December 2013

• *Time to Listen: New Trends in U.S. Security Assistance to Latin America and the Caribbean*, Washington Office on Latin America, September 2013

• *Mucho más que las FARC: el persistente reto del narcotráfico*, chapter in *Conflicto Armado: La Paz Es la Victoria*, ed. Daniel Mejía, Molinos Vásquez editores, 2013.

• *Consolidating 'Consolidation': Colombia's "security and development" zones await a civilian handoff, while Washington backs away from the concept*, Washington Office on Latin America, January 2013

• **Appendix Essay** in Sibylla Brodzinsky (ed), *Throwing Stones at the Moon: Narratives from Colombians Displaced by Violence,* Mcsweeney's Books, 2012

• *Governance Gaps and the Hydra's Heads: Would a successful negotiation with the FARC reduce violence in Colombia?* World Peace Foundation, Tufts University, December 4, 2012

• *A Buildup in Search of a Threat: U.S. Policy, "Securitization," and Migration Along a Dramatically Changed Border*, paper presented at Ford Foundation Mexico office 50th anniversary event, September 10, 2012

• *Beyond the Border Buildup: Security and Migrants Along the U.S.-Mexico Border,* by Adam Isacson and Maureen Meyer, Washington Office on Latin America, April 19, 2012

• *Waiting for Consolidation: Monitoring Colombia's U.S.-aided counterinsurgency and development program*, by Adam Isacson and Abigail

Poe, Washington Office on Latin America / Center for International Policy, February, 2012
• *A Cautionary Tale: Plan Colombia's Lessons for U.S. Policy Toward Mexico and Beyond*, by Adam Isacson and Lisa Haugaard, Washington Office on Latin America / Latin America Working Group, November 10, 2011
• *Tackling Urban Violence in Latin America: Reversing Exclusion through Smart Policing and Social Investment*, by Ashley Morse, Adam Isacson and Maureen Meyer, Washington Office on Latin America, June 2011
• *Stabilization and Development: Lessons of Colombia's "Consolidation" Model*, by Abigail Poe and Adam Isacson, CIP *International Policy Report*, April 2011
• *The Midterm Elections' Impact on U.S. Latin America Policy*, in Norwegian Peacebuilding Centre, *Current Trends in Latin America and the Caribbean*, December 2010
• *Preach What You Practice: The Separation of Military and Police Roles in the Americas*, by George Withers, Lucila Santos and Adam Isacson, WOLA, November 2010
• *Colombia: Don't Call it a Model*, WOLA, July 2010
• *Engagement in search of an agenda: Secretary Gates visits Latin America*, in Norwegian Peacebuilding Centre, *Current Trends in Latin America and the Caribbean*, June 2010
• *Waiting for Change: Trends in U.S. Security Assistance to Latin America and the Caribbean*, by WOLA, LAWG and CIP, May 2010
• *Uribe y EE.UU.: tan cerca y tan lejos*, in Iván Cepeda, *Las Perlas Uribistas*, Random House Mondadori (Colombia), March 2010
• *After Plan Colombia: Evaluating "Integrated Action," the next phase of U.S. assistance*, by Adam Isacson and Abigail Poe, CIP *International Policy Report*, December 2009
• *Enmendando el "Pacto". El Cambio en el Equilibrio Civil-Militar en la Colombia de Álvaro Uribe*, in Felipe Agüero and Claudio Fuentes, *Influencias y resistencias. Militares y poder en América Latina*, Editorial Catalonia, November 2009
• *Origins, Evolution, and Lessons of the Colombian Peace Movement*, by Adam Isacson and Jorge Rojas Rodriguez in U.S. Institute of Peace, *Colombia: Building Peace in a Time of War*, July 2009
• *Ecuador's Humanitarian Emergency: The Spillover of Colombia's Conflict*, by Abigail Poe and Adam Isacson, CIP *International Policy Report*, April 2009
• *A Compass for Colombia Policy*, by WOLA, LAWG and CIP, October 2008
• *"El Camino de la Paz Pasa por el Intercambio,"* by Rep. Jim McGovern (D-Massachusetts) and Adam Isacson, *El Tiempo (Colombia)*, March 16, 2008
• *Ready, Aim, Foreign Policy: How the Pentagon's role in foreign policy is growing*, by WOLA, LAWG and CIP, March 2008
• *Good "Politics," Bad Policy: Washington's Approach to Latin America*, in Canadian Foundation for the Americas, *FocalPoint* 7:2, March 2008

- *Taking "No" for an Answer: The American Servicemembers' Protection Act and the Bush Administration's Security Relations with Latin America*, CIP International Policy Report, May 2007
- *Below the Radar: U.S. Military Programs with Latin America, 1997-2007*, by WOLA, LAWG and CIP, March 2007
- *Plan Colombia - Six Years Later: Report of a CIP staff visit to Putumayo and Medellín, Colombia*, CIP, November 2006
- *U.S. Military and Police Assistance to Poorly Performing States*, by Adam Isacson and Nicole Ball in Nancy Birdsall, Milan Vaishnav and Robert L. Ayres, *Short of the Goal: U.S. Policy and Poorly Performing States*, Center for Global Development, May 2006
- *United States Security Cooperation Policy in Latin America*, in Reality of Aid Network, *The Reality of Aid 2006*, Zed Books, 2006
- *Plan Colombia: Failing the Test*, in *Drugs and Drug-Fighting in Colombia*, edited by Olga L. González and Laurent Laniel, *Les Cahiers de la Sécurité* no. 59, Institut National des Hautes Etudes de Sécurité (France), December 2005
- *Erasing the Lines: U.S. Military Programs in Latin America and the Caribbean*, published jointly with the Washington Office on Latin America and the Latin America Working Group Education Fund, December 2005
- *Failing Grades: Evaluating the Results of Plan Colombia*, *Yale Journal of International Affairs*, Summer/Fall 2005
- *Peace - or "Paramilitarization?"* CIP *International Policy Report*, July 2005.
- *Estados Unidos, las AUC y la extradición*, *Hechos del Callejón 5* (UN Development Program), July 2005
- *Blueprint for a New Colombia Policy*, by Adam Isacson, Lisa Haugaard, Kimberly Stanton, John Walsh and Jeff Vogt, March 2005
- *The U.S. Military in the War on Drugs*, in Coletta A. Youngers and Eileen Rosin, editors, *Drugs and Democracy in Latin America: The Impact of U.S. Policy*, Lynne Rienner / WOLA, November 2004
- *Informe de la Misión de Observación sobre los Efectos del Plan Colombia en los Departamentos de Nariño y Putumayo,* report issued jointly with several Colombian and Ecuadorian NGOs, November 2004.
- *Blurring the Lines: Trends in U.S. military programs with Latin America*, by Adam Isacson, Lisa Haugaard and Joy Olson, October 2004
- *The United States and Colombia in 2003,* by Adam Isacson, Brown University Journal of International Affairs, Winter-Spring 2004
- *Paint by Numbers: Trends in U.S. military programs with Latin America and challenges to oversight*, by Adam Isacson, Lisa Haugaard and Joy Olson, August 2003
- *Was Failure Avoidable? Learning From Colombia's 1998-2002 Peace Process*, North-South Center, March 2003
- *International Policy Report: The 'War on Drugs' Meets the 'War on Terror,'* by Ingrid Vaicius and Adam Isacson, February 2003
- *Firm Hand, Large Heart,* *Human Rights Dialogue*, Carnegie Council for Ethics in International Affairs, Fall 2002

• *After Plan Colombia: Why Doesn't Washington Learn from Failure in Colombia?* Canadian Foundation for the Americas *Spotlight on the Americas,* December 2002

• *Deberán Luchar su Propia Guerra* in Cecilia Orozco, *¿Y Ahora Qué?: El futuro de la guerra y la paz en Colombia* (Bogotá, Colombia: El Ancora, October 2002)

• *Colombia's Human Security Crisis,* UN Disarmament Journal, vol. 2, May 2002

• *International Policy Report – Just the Facts 2001-2002: A Quick Tour of U.S. Defense and Security Relations With Latin America and the Caribbean.* Published by the Center for International Policy, November 2001.

• *International Policy Report – Plan Colombia's "Ground Zero."* Published by the Center for International Policy, April 2001.

• *International Policy Report – "The New Masters of Barranca."* Published by the Center for International Policy, April 2001.

• *Just the Facts 2000-2001 Edition: A Civilian's Guide to U.S. Defense and Security Assistance to Latin America and the Caribbean.* Published by the Center for International Policy and Latin America Working Group, January 2001.

• *La Asistencia Estadounidense a la Seguridad en los Países de la Región Andina, 2000-2001.* Colombia Internacional, Centro de Estudios Internacionales de la Universidad de los Andes, Mayo-Diciembre 2000.

• *International Policy Report – Plan Colombia: The Debate in the United States* Published by the Center for International Policy, December 2000

• *U.S. Military Aid to Colombia: The Human Rights Implications* published in LASA Forum, Latin American Studies Association, Fall 2000

• *International Policy Report – The Colombian Dilemma: After half a century of fighting, can a fragile peace process succeed?* Published by the Center for International Policy, February 2000.

• *International Policy Report – Getting in Deeper: The United States' growing involvement in Colombia's conflict.* Published by the Center for International Policy, February 2000.

• *Just the Facts 1999 Edition: A Civilian's Guide to U.S. Defense and Security Assistance to Latin America and the Caribbean.* Published by the Center for International Policy, December 1999.

• *Just the Facts: A Civilian's Guide to U.S. Defense and Security Assistance to Latin America and the Caribbean.* Published by the Center for International Policy, July 1998.

• *International Policy Report - Just the Facts: A Quick Tour of U.S. Defense and Security Assistance to Latin America.* Published by the Center for International Policy, January 1999.

• *Altered States: Security and Militarism in Central America.* Published by the Center for International Policy and the Arias Foundation for Peace and Human Progress, October 1997.

• *Open the Files: A Chance to Aid Demilitarization in Honduras.* Published by the Center for International Policy, September 1997.

SPEAKING

              **• Panels and guest lectures at:**
- Johns Hopkins University SAIS Latin America Security Forum *(2025-2026)*
- Foreign Service Institute *(2016-2025)*
- Perry Center for Hemispheric Defense Studies *(2013-2025)*
- Briefings of Southern Command Foreign Area Officers *(2024-2025)*
- Latin American Studies Association congresses *(1998-2024, most years)*
- Congresses of the Friedrich Ebert Foundation Red de Seguridad Incluyente y Sostenible (2019-2024)
- *La Silla Vacía (2020-2021)*
- Inter-American Defense College *(2005-2024, most years)*
- Johns Hopkins University SAIS *(2025-2026)*
- UN High Commissioner for Human Rights Colombia Field Office *(2019-2025, intermittently)*
- Syracuse University in Washington *(2008-2021, most years)*
- State Department / DNI analytic exchanges *(2015-2020, most years)*
- Inter-American Dialogue *(2008, 2009, 2018)*
- Brookings Institution *(2010, 2011, 2017)*
- Woodrow Wilson Center *(2008, 2014)*

• ***Nexus of Immigration and Democracy***, Johns Hopkins University, June 2026

• ***2026 Hemispheric Security Conference***, Florida International University, May 2026

• ***Gran Foro Colombia 2026***, *Revista Semana,* Bogotá, February 2026

• ***Nuevos Retos de la Seguridad***, DeJusticia, Bogotá, December 2025

• ***The Fentanyl Crisis***, CUNY Graduate School, October 2025

• ***Authoritarianism, Emergency Powers, and the Rise of Absolute Rule: A Threat to Global Human Rights***, American University Washington College of Law, June 2025

• ***Conference on Migration***, Universidad Nacional Autónoma de México, May 14, 2025 (virtual)

• ***Las Elecciones en Estados Unidos y su impacto en América Latina***, Latin American Studies Association, September 26, 2024 (virtual)

• ***Migración en tránsito: opciones de política pública y las exigencias de la política estadounidense***, Universidad de Antioquia, May 15, 2024

• ***Coyuntura de la Política Antidrogas en los Estados Unidos***, Virtual forum in Congress of Colombia, August 23, 2023

• ***Military Roles in Migration Management?***, SOUTHCOM Human Rights Initiative 25th Anniversary Commemoration, December 1, 2022

• ***Drug war, risk of failed states, and regional security***, Quincy Institute for Responsible Statecraft, October 28, 2022

• ***20 Years After Plan Colombia: the United States and the Petro Administration***, Swarthmore College, September 29, 2022

- *The late COVID-period migration boom*, CUNY Spitzer School of Architecture, September 19, 2022
- *Una propuesta de política sobre el tema de narcotráfico para el nuevo gobierno*, IEPRI / Universidad Nacional de Colombia, June 13, 2022
- *Beyond "soldiers as police": The military's growing role in 21st century Latin American democracies*, CALACS Congress, August 23, 2021
- *Mercados de drogas ilegales: Seguridad, corrupción y violencia*, Senate of Colombia webinar, December 4, 2020
- *Building Institutional Capacity for Citizen Security in the Time of COVID-19*, **Caribbean Basin Security Technical Working Group**, November 4, 2020
- *Debating U.S. Policy in Latin America*, University of Florida Alexander Hamilton Society, October 19, 2020
- *Clarke Forum for Contemporary Issues*, Dickinson College, September 10, 2020
- *A "Complex" Matter*, John Jay College Historical Memory Project, February 28, 2020
- *Beyond the Headlines: Redefining Responsibility in the Arms Trade*, Stimson Center and other organizations, January 14, 2020
- *The Border Wall: From "Mnemonic Device" to "National Emergency,"* Kent State University, November 15, 2019
- *Broad Lecture: Saving Colombia's Fragile Peace*, Florida State University, October 30, 2019
- *The Human Cost of Border Crackdowns*, Yale Law School, September 5, 2019
- *The Colombia Peace Process After Two Years*, Kroc Institute for International Peace Studies, June 10, 2019
- *Seguridad Ciudadana e Intervención Militar en América Latina*, Foro Mexicano para la Seguridad Democrática, May 21, 2019
- *Las posturas de los actores claves de la política de Estados Unidos frente a Venezuela*, Friedrich Ebert Stiftung Colombia, May 14, 2019
- *Geographies of Peace in Colombia*, American Association of Geographers Annual Meeting, April 5, 2019
- *Continuidades de las Políticas de Seguridad Hacia América Latina entre los Gobiernos Obama y Trump*, Centro de Investigaciones de Política Internacional (CIPI, Cuba), December 2018
- *Derechos Humanos y el Sector de Seguridad en el Colombia Pos-Acuerdo*, Universidad del Rosario, December 2018
- *Gangs and Migration*, George Mason University, October 2018
- *U.S.-Mexico Relations and Border Policy*, Washington College, September 2018
- *Retooling on a budget: the late-2010s U.S. military relationship with Latin America*, University of Central Florida, April 2018
- *The U.S.-Mexico Border in the Trump Era*, Vassar College, March 5, 2018

• *La Creciente Participación de las FFAA en Tareas de Seguridad Interna y el Debilitamiento del Sector de Seguridad*, Inter-American Defense Board, January 31, 2018

• *Drugs and peace in Colombia: Which way forward*, The Brookings Institution, May 1, 2017

• *Peace v. Democracy in Colombia:  What's Next for the Peace Process?* University of Texas Austin, November 10, 2016

• *The post-conflict phase in Colombia,* The Carter Center, July 21, 2016

• *The post-conflict phase in Colombia: What role for the international community?* The Carter Center, June 29, 2016

• *El Papel Actual de las Organizaciones No Gubernamentales,* Western Hemisphere Institute for Security Cooperation, June 16, 2016

• *Politics, Security, and the U.S. Role in a Changing Latin America,* Partnership for a Secure America Congressional Partnership Program Retreat, May 17, 2015

• *The State of Cartels in Latin America,* "Latin America on the Rise" Briefing Series, U.S. Congress, May 17, 2015

• *Prospects and Challenges for Colombia's Peace Process,* Yale University, November 18, 2014

• *Panel Internacional Sobre la Solución al Problema de las Drogas Ilícitas*, PNUD/Universidad Nacional de Colombia, September 24, 2013

• *Seguridad Fronteriza, Más Allá de la Muralla*, Secretaría de Gobernación, Mexico City, November 5, 2012

• *New Wars, New Peace: Colombia*, World Peace Foundation, Tufts University, October 29, 2012

• *Seguridad y Migración en la Política Fronteriza Estadounidense*, Universidad de Baja California, Mexicali, Mexico, October 16, 2012

• *A Buildup in Search of a Threat*, Ford Foundation Mexico office 50th anniversary event, Mexico City, September 10, 2012

• *Security and Policy Options in Honduras*, Senate Democratic Policy Committee, July 27, 2012

• *Why Latin America is Rearming*, U.S. Air Force Washington visitors, July 2012 and November 2011

• *State Weakness, Impunity and Insecurity: Breaking the Cycle*, Taller "Los impactos de la violencia y el crimen en el Desarrollo Humano," PNUD-Georgetown University, July 11, 2012

• *Visita a WOLA del Colegio de Altos Estudios Militares de Colombia*, WOLA, Washington, June 4, 2012

• *La Seguridad Pública y el Papel de las ONG en la Defensa de los Derechos Humanos y el DIH*, Seminario Sobre Derechos Humanos y DIH, Colegio Interamericano de Defensa, May 31, 2012

• *Proteger y Servir: Entrenamiento y Prácticas de Militares y Policías, e Interacción con Poblaciones Civiles*, U.S. Southern Command, Guatemala, May 16, 2012

• *Violence and Anti-Violence Strategies in Colombia*, Discussion before Social Cohesion and Violence Prevention Team, World Bank Group, March 2, 2012

• *International Illicit Drug Trafficking*, George Washington University School of Law: SSDP, Human Rights Law Society, Student Animal Legal Defense Fund, February 22, 2012

• *Disarmament, Demobilization and Reintegration in Colombia,* Johns Hopkins School of Advanced International Studies, November 28, 2011

• *¿Es posible armonizar la política de consolidación con las Zonas de Reserva Campesina?* Ministerio de Agricultura de Colombia, November 3, 2011

• *U.S. Drug Policy, Yesterday and Today,* University of Texas at El Paso, October 13, 2011

• *Colombia 2020*, Center for Strategic and International Studies, June 13, 2011

• *La Lucha Contra el Crimen Organizado: Hacia una Estrategia Integral*, Friedrich Ebert Stiftung / Colectivo de Análisis de Seguridad con Democracia, Mexico City, Mexico, April 5, 2011

• *Antinarcotics Efforts in the Hemisphere*, Elliott School, George Washington University, Washington DC, February 28, 2011

• *Stabilization and Development: Lessons of Colombia's 'Consolidation' Model*, CIP-U.S. Institute of Peace, Washington DC, December 9, 2010

• *The U.S. Military Presence in Latin America today*, Hampshire College, Amherst MA, October 21, 2010

• *National and International Dimensions of Criminal Violence in Latin America*, Norwegian Peacebuilding Centre / NorLARnet, Oslo, October 5, 2010

• *What is the South American Defense Council?* Panel discussion with Ecuador's defense minister, WOLA, Washington, September 20, 2010

• *Política exterior colombiana en las Américas 2010 – 2014 Oportunidades y desafíos*, Universidad Sergio Arboleda, Bogotá, September 15, 2010

• *La Reforma del Sector Seguridad en contextos de narcotráfico y crimen organizado: Colombia y México en una perspectiva comparada*, CIDE / Colegio de México, June 28, 2010

• *Los retos de Colombia en las relaciones internacionales*, Army of Colombia – University of Oslo, Santa Marta, Colombia, May 7, 2010

• *U.S. Policy in Latin America*, Hofstra University, Hempstead NY, April 29, 2010

• *U.S. Bases in Colombia*, School of the Americas Watch, Washington DC, April 18, 2010

• *Droits de l'homme et politique dans les Amérique*, Institut D'Etudes Politiques D'Aix en Provence (Sciences Po), Aix-en-Provence, France, March 12, 2010

• *Cooperación Militar de EE.UU en América Latina: Impactos Regionales*, Centro de Investigación Drogas y Derechos Humanos, Lima, Peru, December 18, 2009

• *Organized Crime in the Western Hemisphere: An Overlooked Threat?*
Council on Foreign Relations, New York, November 18, 2009
• *2nd Annual Public Diplomacy Symposium,* Association of Public
Diplomacy Scholars, Maxwell School, Syracuse University, Syracuse NY,
October 16, 2009
• *Trade and Investment in the Americas*, Corporación Andina de Fomento -
OAS - Inter-American Dialogue, Washington, September 10, 2009
• *Colombia: Building Peace in a Time of War*, U.S. Institute of Peace,
Washington, June 14, 2009
• *Riesgos, Seguridad y Defensa en el Siglo XXI*, Escuela Superior de Guerra
de las Fuerzas Armadas Colombianas, Bogotá, April 27, 2009
• *Winds of Change? What to Expect from the Obama Administration on
U.S. Policy towards Latin America*, Ecumenical Advocacy Days, Washington
DC, March 14, 2009
• *Militarization of U.S. Foreign Relations with Latin America: Prospects for
Change*, University of Chicago, Chicago, November 11, 2008
• *Límites y Desafíos de la Agenda de Seguridad Hemisférica*, Observatorio
de Democracia y Seguridad (Bolivia) / Woodrow Wilson Center Latin
America Program, La Paz, Bolivia, June 19, 2008
• *Colombia's Crossroads: The FARC and the Future of the Hostages*, U.S.
Institute of Peace, Washington DC, May 2008
• *Colombia: The Conflict and the Political Context*, Beloit College, Beloit
WI, April 5, 2008
• *Protecting the Rights of Internally Displaced Persons in Colombia*,
Georgetown Center for Latin American Studies, Washington, March 28, 2008
• *The Cocaine Curse: perspectives for the future*, London School of
Economics, London, March 7, 2008
• *Coloquio Internacional "Acuerdos Humanitarios y Construcción de Paz,"*
Fundación Alvaralice and Pontificia Universidad Javeriana, Cali, Colombia,
November 19, 2007
• *Las Relaciones Colombia-Estados Unidos: Enfrentando la Encrucijada*,
Revista Semana – Universidad Nacional (IEPRI), Bogotá, November 15, 2007
• *U.S. Foreign Policy and Militarization in Colombia*, Oak Institute, Colby
College, Waterville ME, October 15, 2007
• *Congress Steps Back from Militarized US Policies in Colombia: What are
the implications for relations with Colombia and Latin America?* Peace and
Security Funders' Group, Washington, September 28, 2007
• *Peacemaking and Mediation in Colombia*, U.S. Institute of Peace,
Washington DC, May 23, 2007
• *Andean Drug Policy*, Harry Frank Guggenheim Foundation, New York,
May 4-6, 2007
• *An NGO perspective on human rights and security in the Western
Hemisphere*, U.S. Southern Command, Miami, March 21, 2007
• *Parapolitics and Human Rights in Colombia: An Evening with Senator
Gustavo Petro and Carlos Rodriguez Mejia*, (Discussant) George
Washington University, Washington, March 6, 2007

• *II Foro Internacional de la Hoja de Coca*, Universidad de Buenos Aires, Argentina, October 7, 2006

• *Los Estados Unidos y la Militarización en América Latina*, Universidad Nacional Autónoma de Nicaragua, Matagalpa and Managua, Nicaragua, October 2, 2006

• *Los Estados Unidos y la Militarización en América Latina*, Fundación Arias, San José Costa Rica, July 31, 2006

• *Conflict Resolution in the Americas*, University of Wisconsin-Milwaukee, Milwaukee WI, April 28-29, 2006

• *U.S. Drug Policy in Colombia*, New York University, New York, April 5, 2006

• *Colombia's 2006 elections*, George Washington University, Washington DC, March 1, 2006

• *Peace Initiatives in Colombia*, U.S. Institute of Peace - Latin American Studies Program at Cornell University, Ithaca NY, November 19-20, 2005

• *Peace, Human Rights and Drugs: A Debate on U.S. Policy Toward Colombia*, American University, Washington DC, November 2005

• *New Ideas for U.S. Policy Toward Colombia: A look at the alternatives*, hosted event with nine speakers from Colombia, Washington, DC, October 2005

• *¿Un Conflicto que va más allá de las Fronteras? Efectos y perspectivas de la internacionalización del Conflicto Armado,* Universidad de la Sabana, Bogotá, November 2005

• *Peace Initiatives in Colombia,* Cornell University, Ithaca, NY, November 2005

• *The Reality of Aid,* DESCO and ALOP, Lima, Peru, June 2005

• *Brazilian Drug Trafficking and the Andean Connection,* Andean Seminar, George Washington University, Washington DC, May 2005

• *Blueprint for a New Colombia Policy,* briefing hosted by House International Relations Committee Democrats, Washington DC, May 2005

• *Challenges to Democracy in Latin America,* Marine War College, Washington DC, May 2005

• *U.S. Counter-Narcotics Policy in Colombia: Status and Issues,* briefing hosted by House International Relations Committee Democrats, Washington DC, May 2005

• *U.S. Policy Toward Colombia,* debate with State Department official, George Washington University, Washington DC, April 2005

• *U.S. Air Interdiction Policy,* Andean Seminar, George Washington University / WOLA, Washington DC, April 2005

• *Negotiating Peace in Colombia,* Maxwell School, Syracuse University, Syracuse, April 2005

• *Southern Command's Human Rights Curriculum,* Security in a New Century Project, U.S. Congress / Stimson Center, Washington DC, March 2005

• *Dialogue for Peace Initiatives: Colombia,* Swarthmore College, Swarthmore, PA, March 2005

• *Ecumenical Advocacy Days,* plenary speaker, Latin America section, Washington DC, March 2005

• *U.S. Colombia Policy at the Crossroads,* Yale University, New Haven, February 2005

• *Security Sector Reform,* American University, Washington, February 2005

• *Colombia overview,* Peace Brigades International Orientation Weekend, February 2005

• *Colombia's Democratic Security: Assessing Progress and Near-Term Risks,* the National Defense University Institute for National Strategic Studies, Washington, DC, January 2005

• *Security, Democracy and Development in the Western Hemisphere,* Heinrich Böll Foundation, WOLA and CIP, Washington, DC, December 2004

• *Drugs and Democracy in Latin America,* Washington Office on Latin America and George Washington University, Washington, DC, December 2004

• *Colombia: Counter-Narcotics, Counter-Insurgency, Counter-Terrorism?* Stimson Center, Washington, DC, July 2004

• *U.S. Policy and Internal Displacement in Plan Colombia*, U.S. Committee for Refugees, Washington, DC, April 2004

• *A Critical View of Plan Colombia*, Monterey Institute for International Studies, Monterey, CA, April 2004

• *U.S. Policy Toward Colombia and the Afro-Colombians*, Embassy of Colombia, the Afro-Latino Development Alliance and several others, February 2004

• *U.S. Military Assistance to Latin America and Human Rights*, American University, February 2004

• *La Política de los Estados Unidos*, Colectivo de Abogados "José Alvear Restrepo," Bogotá, Colombia, November 2003

• *President Uribe's First Year*, State Department Bureau of Intelligence and Research, July 2003

• *Foro Social Mundial Temático*, two panels at international conference in Cartagena, Colombia, June 2003

• *The Future of the Former School of the Americas*, debate at the University of Southern California, Los Angeles, CA, April 2003

• *Forging Transnational Ties: Nongovernmental Organizations Working for Peace in Colombia*, Latin American Studies Association, Dallas, TX, March 2003

• *U.S. International Counternarcotics Policy: U.S. Military Programs and Aid* Latin American Studies Association / Washington Office on Latin America, Dallas, TX, March 2003

• *Seguridad, Drogas y Terrorismo: La Política de los Estados Unidos hacia la Región Andina*, Week-long seminar at Universidad Nacional Simón Bolívar, Quito, Ecuador, March 17-21, 2003.

• *The Optional Protocol on Child Soldiers: Next Steps Toward Making a Difference*, Congressional Human Rights Caucus, Washington, DC, February 13, 2003.

• ***Oil Wars in the Americas***, American University, Washington, DC, February 12, 2003.
• ***Forum on Democracy, Political Representation, Social Exclusion and Security in the Andes,*** Canadian Foundation for the Americas, Ottawa, October 29, 2002.
• ***Joining Efforts for Colombia***, Georgetown University, Washington, DC, June 24, 2002.
• ***Privatizing the Military,*** Transnational Institute, Amsterdam, the Netherlands, May 24, 2002.
• ***Ayuda de los Estados Unidos y Política Antidrogas,*** Congreso Nacional de Paz y País, Bogotá, Colombia, May 24, 2002.
• ***El Futuro del Plan Colombia,*** Escuela Superior de Administración Pública, Bogotá, Colombia, June 16, 2001.
• ***La ayuda militar de los Estados Unidos,*** Agenda for Overcoming the Human Rights Crisis in Colombia, hosted by Diakonia Swedish aid agency, September 6-7, 2000.
• ***Civil-Military Relations in Central America,*** Centro de Estudios Estratégicos de Nicaragua (CEEN), February 1999.
• ***Los intereses en seguridad de los Estados Unidos y el Centro Multinacional Antidrogas en Panamá.*** Commission in Defense of Human Rights in Central America (CODEHUCA), Panama City, Panama, April 1998.

17