**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION,

*Defendants.*

Case No. 3:26-cv-01099-KC

**APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, VOLUME 2 OF 2**

**TABLE OF CONTENTS**


Declaration of Brandt Sheppard Buchanan ........ APX-V2-002

Expert Report of Geert L. Dhondt ........ APX-V2-011

Declaration of Zeynep Graves ........ APX-V2-147

# APPENDIX VOLUME 2

## DOCUMENT 1

Declaration of Brandt Sheppard Buchanan in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>MARKWAYNE MULLIN, et al.,<br><br>*Defendants.* | Case No. 3:26-cv-01099-KC |

**DECLARATION OF BRANDT SHEPPARD BUCHANAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Brandt Sheppard Buchanan, declare as follows:

1. This declaration is based on my personal knowledge. If called as a witness, I could and would competently testify to the facts stated below.

2. I am a member of the Center for Biological Diversity ("the Center") and have been a member since July 2025. I rely on the Center to advocate for the protection of endangered species, wildlife habitat, and biodiversity, including in the Big Bend region and along the Rio Grande. I support the Center's work by following its campaigns, learning about conservation issues through its communications, and I rely on it to represent my interests in protecting wildlife and wild lands.

3. I live and work full time as a ranch manager on a large ranch encompassing tens of thousands of acres in Presidio County, Texas, near the Rio Grande and Big Bend Ranch State Park. I have more than fifteen years of experience working on and managing land in this region.

4. My work and personal life are deeply connected to the land and its wildlife. One of the reasons I work as a ranch manager is because of my lifelong connection to wildlife and the outdoors. I was raised hunting and spending time on the ranch in Presidio County, Texas, before I started working there as a manager. I then studied conservation biology at Sul Ross State University to further pursue my longstanding interest in learning about biodiversity, species interactions, and the importance of habitat connectivity to healthy ecosystems.

5. Through my work, education, and personal life, I have developed strong recreational, economic, professional, and aesthetic interests in the wildlife species and ecosystems of the Big Bend region, including desert bighorn sheep, black bears, mountain lions, and other wildlife that depend on cross-border habitat connectivity.

6. The ranch I manage, which abuts about four miles of the Big Bend Ranch State Park's north-western border, provides habitat for a wide range of wildlife species. I regularly observe and monitor wildlife to better understand how species use the ranch land and because doing so brings me great enjoyment by deepening my connection to the land and its wildlife.

7. For example, in August 2025, I was the first person on the ranch to observe a black bear. I was putting feed out for cattle when I noticed a large dark shape running uphill. I immediately followed to investigate. After a short time, I saw the dark shape again and realized it was a black bear. I was incredibly excited. I had seen sign of black bears for years and long hoped to see one on the ranch. I remained and observed the bear for approximately ten minutes until it wandered off. It was a deeply special experience.

8. Living and working in the Big Bend region, I knew black bears had been pushed out of this area for decades. Then, one female bear with cubs crossed into Texas from Mexico, restoring a lost native species to the region. Seeing the bear was a powerful reminder that the

land and wildlife can heal when given the opportunity. It was also a source of pride. I have implemented ranching practices designed to restore and maintain biodiversity, and observing the bear using and moving through the ranch gave purpose to my work and reaffirmed my commitment to conservation minded ranching.

9. As another example, over the past several years I have spent significant time trying to learn more about mountain lions and to observe their movements across the ranch. They are difficult to survey, but I have gradually collected data by setting camera traps and following up on sightings of individual animals on the ranch. I enjoy looking for lions, and doing so helps me maintain the sense of connection to the landscape and wilderness that I developed at a young age.

10. I visit the area in the State Park that abuts the ranch at least once a month to study and understand what wildlife is moving between the ranch and park lands. For example, just earlier this month on July 9th, I visited the area to repair a fence. Once I had finished fixing the fence, I inspected the area for signs of wildlife and set up a camera trap. I will be returning to this area every few weeks to collect information and adjust the camera trap as needed to better observe the wildlife passing through.

11. Wildlife in this region depends on the ability to move freely across the U.S.-Mexico border. For example, desert bighorn sheep can travel extremely long distances across the border, and Mexican habitat serves as an important source population for species such as black bears and other large mammals. Preventing this movement through walls and other border barrier infrastructure would fragment habitat, reduce genetic diversity, and threaten the long-term survival of these species, impairing my ability to observe, study, and enjoy their presence on the ranch.

12. My recreational and wildlife interests also depend in substantial part on maintaining healthy wildlife populations and intact landscapes, which I get to regularly experience through guided hunting trips with clients who travel from across the country to experience the unique wildlife and remote landscape of the Big Bend region. I guide for between 80 and 100 clients a year. Each hunting trip lasts for about three days and is a significant source of the ongoing recreational and wildlife interests I am able to enjoy on my ranch.

13. The value of the ranch, the sustainability of its operations, and the viability of my work are directly tied to the health of wildlife populations and the natural character of the landscape. Clients are drawn not only to the hunting, but also the experience of moving through a remote desert ecosystem.

14. If wildlife populations decline or habitat is fragmented and disturbed, it would directly reduce the quality of the experience I am able to provide to clients and harm the viability of the ranch and my work. Aside from impacting the wildlife through habitat fragmentation and impairing water access, border wall and related infrastructure would disturb the wild character of the landscape. Some clients don't care whether they actually hunt an animal and are more motivated by the scenery and connecting with the wild. They like the idea of stepping on a rock that no one else has stepped on and the quietness of the area. I take all of my clients to the top of the Cienega mountains on the ranch where they can look for 50 miles in every direction without seeing a building. I visit these mountains at least once a week, with clients or by myself, to look for wildlife and enjoy the landscape. A border wall would ruin the aesthetic of the natural ecosystem from this vantage point, as well as several other points on the ranch, impairing my aesthetic experience of the landscape. You don't see straight lines in nature, and the wall would

stick out as a human-made structure, causing the landscape to lose the frontier feel that people, me included, are drawn to.

15. Like my clients, I also value the remoteness and natural character of this region. I spend the vast majority of my time outdoors on the ranch and in surrounding areas, including near the Rio Grande. The landscape provides a rare sense of openness, where one can see for miles without encountering human structures. Because of its remoteness and minimal development, the area also provides some of the darkest night skies in the United States and is designated as an International Dark Sky Reserve. I enjoy observing the stars, planets, and the Milky Way, and I often share information about the celestial objects visible from the ranch with clients. I stargaze from the front porch of my house on the ranch nearly every evening. The presence of a large artificial structure, additional roads, and associated infrastructure would permanently alter the visual landscape, destroying the natural character and sense of remoteness that define this region. Infrastructure associated with the border wall, including lighting and increased vehicle traffic, would introduce artificial light into an otherwise dark nighttime environment, reducing visibility of the stars and night sky from the ranch. These impacts would diminish my personal enjoyment of the land and night skies, as well as the experiences I provide to others.

16. In 2021, I visited friends at a private conservation reserve east of Big Bend National Park and near the Black Gap Wildlife Management Area. During my visit, I helped with conservation projects, including building wildlife guzzlers that provide water for desert bighorn sheep, mule deer, and other wildlife. After working throughout the morning and early afternoon, we spent time overlooking the Rio Grande, looking for Texas hornshell mussels, relaxing,

watching wildlife, and enjoying the scenery of the river corridor as we caught up and talked into the evening. It remains one of my favorite memories by the river.

17. I work on the ranch just about every day, but when I do have time off, I spend it outside. In two weeks, my partner and I are planning a trip on the Rio Grande in Big Bend National Park with our friend who is a river guide. We look forward to boating, swimming, fishing, and watching wildlife along the river. Trips like this help me reconnect with nature, enjoy time with my partner, and remind me why I value living in this area and ranching in harmony with the wildlife and desert ecosystem.

18. My connection to the land and wildlife in this region is also spiritual. I grew up on the ranch, and it is where I learned to navigate the land, understand wildlife, and ultimately became a man. As a child, I would spend time exploring the ranch on my own, often challenging myself to find my way back using my knowledge of the terrain. Those experiences shaped how I've come to understand the purpose of my life. I've dedicated myself to managing various systems across the ranch to restore and protect biodiversity. When I travel around it, I see my life in these different projects, and they are central to my identity and purpose.

19. I also share this connection with my son, who lives in central Texas and comes to visit me on the ranch. When he is here, we spend time hunting and walking the land together, and I see him developing the same curiosity about wildlife that I had growing up. Last year, at 13 years old, he hunted his first mule deer on the ranch, which was an important milestone for both of us. He is deeply engaged with the landscape, talking about coyotes, mountain lions, and other wildlife he encounters here. His experiences on the ranch and knowledge of wildlife set him apart from many of his peers. Watching him explore and learn from this environment reinforces

for me how important it is to conserve healthy, biodiverse landscapes that can be experienced and appreciated by his generation and future generations.

20. A wall would block wildlife movement across the Rio Grande, cutting off access to essential water sources and habitat. It would sever cross-border migration routes that species rely on for survival, including access to breeding populations and seasonal resources. This would diminish my ability to observe wildlife and connect with the rugged landscape I value so much.

21. As a rancher, I also understand that building a barrier in or near a river creates serious practical problems, including debris, flooding risks, and maintenance challenges, all of which would further degrade the environment and surrounding lands.

22. In my work as a ranch manager and through my education in conservation biology, I have developed substantial knowledge about wildlife, habitat connectivity, and ecosystem management in the Big Bend region. The only publicly available information lacks any meaningful detail about the planned construction and associated risks to the environment and regional wildlife. Environmental laws like the National Environmental Policy Act and Endangered Species Act ordinarily give members of the public an opportunity to share information regarding the potential effects of federal actions on wildlife and natural resources. Because those laws have been waived for this border wall project, I have been denied any meaningful opportunity to review environmental analyses, provide comments, or contribute my local knowledge concerning impacts to species movement, habitat connectivity, the Rio Grande ecosystem, and the natural character of the landscape. Had such opportunities been available, I would have participated and provided comments based on the concerns and observations described in this declaration. The loss of that opportunity has harmed my procedural interests and increased the risk of harm to the wildlife, habitat, and landscapes that are important to me.

23. I intend to continue living, working, and studying wildlife on the ranch for as long as I am able. I plan to return to the State Park at least once a month to check for signs of wildlife crossing from the Park into the ranch and to maintain the camera trap I set up there. I also plan to continue returning to the Rio Grande for recreation and to enjoy the river corridor, including on a river trip in Big Bend National Park at the end of this month. The construction of barriers, roads, lights, and other border infrastructure would impair my aesthetic and recreational enjoyment of the river by introducing prominent human-made features into an otherwise natural landscape. Additionally, debris carried downstream will impair my ability to safely recreate on the river and further degrade its scenic and ecological character.

24. Based on the waivers issued by the federal government and my own observations of construction materials arriving in the area, border wall construction is imminent. If the waivers were not issued, my interests in the area would be protected as the federal government would not be proceeding with construction, or, at the very least, would comply with laws so that harms to wildlife and the landscape are minimized or avoided.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2026, in Presidio County, Texas.

[signature]

Brandt Sheppard Buchanan

**APPENDIX VOLUME 2**

**DOCUMENT 2**

Expert Report of Geert L. Dhondt in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>MARKWAYNE MULLIN, et al.,<br><br>*Defendants.* | Case No. 3:26-cv-01099-KC |

# EXPERT REPORT OF GEERT L. DHONDT

# TABLE OF CONTENTS


Assignment 3
Documents and Data Considered 3
Qualifications 3
Summary of Opinions 6
Supplemental Conditional Opinions 16
Methodology 18
Basis for Opinions 24
  Opinion 1 — Gross Total Economic Cost 27
  Opinion 2 — Direct and Governmental Cost 29
  Opinion 3 — External and Non-Budgetary Costs 32
  Opinion 4 — Mortality and Nonfatal Injury 34
  Opinion 5 — Irreversible or Partially Reversible Costs 37
  Opinion 6 — Distribution of Costs 38
  Opinion 7 — Conservatism of the Estimate 40
  Opinion 8 — Robustness to Assumptions 42
Final Conclusion 43
Declaration and Signature 45
Appendix I — Curriculum Vitae 46
Appendix II — Technical Calculations and Supporting Assumptions 50
Appendix III — Supplemental Conditional Scenario Analyses 109
References 120

## ASSIGNMENT

1. I have been retained by counsel for the Center for Biological Diversity (the "Center") to opine on the various ways border barrier infrastructure results in economic impacts; to determine the overall cost of building a contiguous or nearly contiguous border wall along the U.S.-Mexico border; and to compare those costs with funds that have been appropriated by Congress for border wall construction.

2. I am compensated for a rate of $750 per hour for my time on this assignment, with an overall project payment cap of $30,000.

## DOCUMENTS AND DATA CONSIDERED

3. As part of my assignment, I reviewed the complaint filed by Plaintiffs and the facts and data cited in this report and its appendices. Those materials include federal statutes, appropriations, waivers, regulations, guidance, budget justifications, reports, and planning documents; Customs and Border Protection, Department of Homeland Security, U.S. Army Corps of Engineers, Government Accountability Office, Office of Inspector General, Office of Management and Budget, Congressional Research Service, Bureau of Economic Analysis, Bureau of Labor Statistics, Census, trade, mortality, injury, migration, and land records and datasets; federal contracts and expenditure records; environmental, natural-resource, property, public-health, and geospatial materials; peer-reviewed articles, books, working papers, and other published research; and the calculations, sensitivity analyses, and source materials identified in Appendices II and III. All facts and data I considered in forming the opinions stated here are identified in the report, its footnotes, or its appendices. I reserve the right to supplement this report if I review additional materials.

## QUALIFICATIONS

4. I am an Associate Professor of Economics in the Department of Economics at John Jay College of Criminal Justice, City University of New York. I have taught economics at John

Jay College since 2009. I served as Lecturer in the Department of Economics from 2009 to 2012, Assistant Professor of Economics from 2012 to 2019, and Associate Professor of Economics from 2019 to the present. I also served as Undergraduate Program Coordinator from 2015 to 2020, Interim Chair from 2018 to 2019, and Chair of the Department of Economics from 2020 to 2026. I currently serve as Deputy Chair.

5. I hold a Ph.D. in Economics from the University of Massachusetts Amherst. I also hold two Bachelor of Science degrees from Embry-Riddle Aeronautical University in Aerospace Engineering and in Science, Technology, and Globalization.

6. My areas of expertise include public economics, public expenditure analysis, cost-benefit analysis, economic impact analysis, Total Economic Cost analysis, external-cost analysis, public policy evaluation, migration, labor markets, enforcement policy, the economics of crime and punishment, the economics of state enforcement institutions, labor-market effects of enforcement policy, and quantitative empirical methods.

7. My research examines how public institutions, enforcement policies, infrastructure investments, migration systems, and labor markets shape economic outcomes, allocate public resources, and generate direct governmental and external economic costs. My scholarship has focused particularly on coercive state institutions, including criminal justice and incarceration systems, and on the broader economic consequences of public enforcement interventions. I study enforcement policy as both a legal or administrative matter as well as an economic policy that affects workers, labor markets, communities, public budgets, and the distribution of economic costs.

8. I have published peer-reviewed research on incarceration policy, crime rates, drug markets, punishment, and the economic and social consequences of criminal justice policy. My publications include studies of prison population size and crime rates, incarceration and neighborhood crime, and the relationship between drug markets and crime. My recent and current

work also addresses migration, labor-market structure, prison labor, labor discipline, labor-market segmentation, and the political economy of enforcement institutions.

9. I have conducted federally funded research supported by the National Institute of Justice, a component of the U.S. Department of Justice. That research examined prison cycling, incarceration policy, and crime rates in communities. As a co-investigator on that project, I participated in empirical research involving public policy evaluation and the assessment of the social and economic consequences of enforcement policy.

10. My research and policy analysis use standard quantitative economic methods, including econometric analysis, policy impact evaluation, public expenditure analysis, economic impact estimation, cost-benefit analysis, Total Economic Cost and external-cost analysis, labor-market impact analysis, and statistical analysis. I have experience using Stata, R, SAS, and EViews for empirical economic analysis.

11. My teaching includes undergraduate and graduate courses in Intermediate Microeconomics, Economic Analysis of Crime, Understanding the U.S. Through Economic Data, Economic Development and Crime, Economic History, Seminar in Economics, and Economics for Public Administration. I have also taught courses on labor, political economy, criminal justice, incarceration, and economic data analysis.

12. I have presented invited lectures and conference papers on migration, border enforcement, prison labor, mass incarceration, carceral political economy, and the labor-market effects of enforcement institutions. These presentations include work on neoliberalism and migration, border enforcement, prison labor in U.S. state prisons, mass incarceration, labor discipline, and labor-market segmentation.

13. This matter concerns the economic consequences of a large-scale public enforcement and infrastructure program. Border barrier construction requires analysis of public expenditure, infrastructure investment, land acquisition, enforcement policy, migration systems,

labor-market effects, and direct governmental and external economic costs. Those issues fall within my training and experience as an economist. My opinions apply standard economic methods to evaluate the direct fiscal costs and broader economic costs of a continuous or nearly continuous border wall system.

14. A copy of my curriculum vitae is attached as Appendix I, which includes a list of all publications I have authored in the last ten years.

15. I have not previously testified as an expert at trial or by deposition during the previous four years.

## SUMMARY OF OPINIONS

16. **Assignment.** I was retained to estimate the economic cost associated with completing a nearly continuous border wall system along the 1,954-mile United States-Mexico border (referred to herein as the "Wall") and to identify the principal economic conclusions that follow from that estimate. The estimate and its supporting derivations are set out in the cost sections of this report. These opinions summarize the principal results.

17. **Scope and standard.** I state these opinions to a reasonable degree of professional certainty as an economist. They concern the magnitude, composition, incidence, conservatism, and robustness of the Wall's total Economic Costs. I compare these cost estimates to appropriate funds. They do not address the legal significance of those costs or the constitutional questions presented in this matter.

18. **Cost convention.** This is a gross present-value Total Economic Cost estimate. It is gross in the sense that it reports costs before any deduction of the value of qualifying barrier infrastructure already standing, and the funds Congress has already appropriated toward counted costs. It measures the direct governmental costs and the external and non-budgetary losses attributable to building, operating, maintaining, and decommissioning a nearly continuous border wall system. All figures are stated in constant 2025 dollars. Recurring budgetary, mortality, trade,

enforcement, and community costs are accumulated over a thirty-year horizon, and ecological costs are accumulated over a sixty-year horizon, discounted to present value using a 3 percent real discount rate.[1]

**Summary of Central Estimates**

| **Measure** | **Central Estimate** |
|---|---|
| Direct project cost | Approximately $256 billion |
| External and non-budgetary economic costs | Approximately $257 billion |
| Gross economic cost | Approximately $513 billion |
| Adjusted synthesis figure after one-time credits | Approximately $449 billion |

**Opinion 1: The gross Total Economic Cost of completing the Wall is approximately $513 billion.**

19. It is my opinion, to a reasonable degree of professional certainty as an economist, that the gross Total Economic Cost of building, operating, maintaining, and decommissioning a nearly continuous border wall system along the United States-Mexico border is approximately $513 billion in present value, stated in constant 2025 dollars. The low bound is approximately $220 billion, and the high bound is approximately $1.3 trillion. Recurring budgetary, mortality, trade, enforcement, and community costs are accumulated over thirty years and ecological costs over sixty years, each discounted to present value at a 3 percent real rate.[2]

[1] Discounting is the standard method for putting costs that arrive in different years onto a common footing. A dollar of cost borne in the future is not the same object as a dollar borne today, because a dollar today could be invested and would grow in the interval, and because people ordinarily prefer to have resources sooner. Discounting converts a future cost into the smaller sum that would have to be set aside today to cover it, which is called its present value. The rate at which that conversion runs is the discount rate. At the 3 percent real rate used here, a cost of $1.00 incurred thirty years from now has a present value of about $0.41, and a stream of $1.00 a year for thirty years has a present value of about $19.60 rather than $30.00. Every figure in this report is a present value on that convention, so that costs falling in different years can be added together, and so that the total can be compared directly against the funds Congress has appropriated.

[2] The wall is priced over a thirty-year life, and a structure with a finite life carries a cost at the end of it. Removal is an asset-retirement obligation of the same kind that attends a decommissioned power plant or a capped well, and I price it at approximately $12.5 billion in

20. The estimate measures the direct governmental costs and the external and non-budgetary losses attributable to the Wall. It is a gross cost estimate because it is stated before crediting approximately $15 billion for qualifying barrier infrastructure already standing and approximately $49 billion in identified appropriations for costs included in the ledger. Applying those credits once in the synthesis produces an adjusted central figure of approximately $449 billion. Claimed benefits and the conditional economic consequences of sustained migration reduction are addressed separately in Appendix III. Neither is incorporated into the central cost ledger.

21. The central gross estimate is more than 10 times the approximately $49 billion congressionally appropriated funds specifically for barrier and wall-system construction. The appropriation provides budget authority. It does not measure the resources the Wall consumes or the losses attributable to it.

22. The estimate exceeds the appropriation because the appropriation finances only part of the project and because agency budgets omit the mortality, the ecological loss, the trade disruption, the enforcement-induced harm, and the other costs the Wall imposes outside any federal account.

**Opinion 2: The direct and governmental cost of the Wall is approximately $256 billion, more than five times the wall-system appropriation.**

23. It is my opinion, to a reasonable degree of professional certainty as an economist, that the direct and governmental cost of constructing, maintaining, equipping, administering, and ultimately removing the nearly continuous border wall system is approximately $256 billion in

---

present value. The alternative accounting, in which the wall stands permanently and is never removed, actually raises the cost of the project. Maintenance carried to perpetuity is worth approximately $150 billion rather than the $88 billion the thirty-year figure carries, and the mortality, ecological, trade, and community harms would also be larger over longer perpetual horizons. I have taken the cheaper of the two readings, and the removal cost is part of what makes the estimate a floor. This is addressed in the cost sections.

present value. The low bound is approximately $174 billion and the high bound is approximately $406 billion.

24. The direct project-cost estimate is derived from engineering unit rates, executed construction contracts, agency cost estimates, operations and maintenance requirements, surveillance and technology costs, land acquisition and condemnation, litigation and administration, restart and remobilization costs, and removal costs.

25. The construction figure includes expected cost growth rather than reporting it as a separate additive category. The base construction estimate is approximately $101 billion, or about $52 million per mile across 1,954 miles, before adjustment for foreseeable risk that actual spending will exceed initial estimates. Expected cost growth includes increases associated with design changes, change orders, unforeseen site conditions, difficult access, utility relocation, land acquisition delays, schedule extensions, and contractor claims. The analysis divides the border into open desert, mountain, urban, Lower Rio Grande Valley, and remote-canyon environments rather than applying a single average rate. Rates grounded in completed or modified contracts receive a 15 percent allowance because prior escalation is already reflected in those prices. The uncontracted remote-canyon segment receives a 50 percent allowance because its costs remain subject to greater uncertainty regarding terrain, access, design, logistics, and construction conditions. These adjustments produce a blended allowance is approximately 34 percent and produces expected construction spending of approximately $135 billion. Because this allowance is incorporated into the construction estimate, it is not added again as a separate cost.

26. Expected construction spending of approximately $135 billion covers the physical construction of the wall, while approximately $121 billion in other direct project costs covers associated expenditures such as maintenance, land acquisition, technology, administration, and decommissioning. Together these categories yield a direct-cost estimate of approximately $256 billion. This amount, which is the most firmly grounded in the analysis, exceeds the approximately

$49 billion wall-system appropriation by more than fivefold before any external or non-budgetary cost is counted.

**Opinion 3: External and non-budgetary costs are approximately $257 billion and constitute about half of the total.**

27. It is my opinion, to a reasonable degree of professional certainty as an economist, that the nearly continuous border wall system would impose approximately $257 billion in external and non-budgetary costs at the central estimate. The low bound is approximately $40 billion, and the high bound is $857 billion. Those costs are comparable in magnitude to the approximately $256 billion direct and governmental cost and account for approximately one-half of the Wall's Total Economic Cost.

28. The principal external costs include migrant mortality, ecological and natural-resource damage, forgone cross-border trade and economic integration, enforcement-induced violence and other enforcement-related harms, and costs imposed on border communities.

29. These costs are economic losses. Agency construction budgets omit them, but affected parties bear them. The burden falls on migrants and their families, landowners, businesses, border communities, state and local governments, tribal communities, ecological systems, and the public.

30. Direct governmental costs and external and non-budgetary costs are therefore approximately equal components of the Wall's Total Economic Cost.

31. The Wall imposes costs outside the federal project budget that are comparable in magnitude to the budgetary cost of the structure and its lifecycle obligations.

**Opinion 4: Mortality and nonfatal injury are the largest quantified external costs.**

32. It is my opinion, to a reasonable degree of professional certainty as an economist, that mortality and nonfatal injury are the largest quantified external costs attributable to the nearly continuous border wall system. Their estimated present value is approximately $122 billion, with

a low bound of approximately $17 billion and a high bound of approximately $393 billion. The central estimate includes approximately $94 billion in migrant mortality, approximately $25 billion in serious nonfatal injuries, and approximately $2 billion in pursuit and bystander deaths, Border Patrol agent line-of-duty deaths, and construction-worker mortality and serious injury.

33. A continuous barrier closes lower-risk urban and accessible crossing corridors and displaces a substantial share of crossings onto more hazardous terrain. The available evidence supports the conclusion that this route displacement increases mortality risk.

34. The migrant-mortality estimate is the product of three principal quantities: the annual number of migrant deaths, the share attributable to the wall, and the economic value assigned to each fatality. The central calculation uses 550 recorded migrant deaths per year, within a range of 350 to 750. This range is below the highest recent federal counts and relies on recorded deaths even though available evidence indicates that some remains are recovered later or are never found.

35. The report does not attribute every migrant death along the border to the wall. The analysis assigns the Wall a central contribution share of 62.5 percent. Deaths directly associated with the barrier, including fatal falls and drowning caused by attempts to circumvent the Wall, are attributed fully to it. A lower share is applied to deaths from heat, exposure, dehydration, drowning, and delayed rescue after crossings are displaced into more remote terrain. Those deaths result from combined effects of the Wall, enforcement personnel, surveillance, turn-back practices, terrain, weather, rescue capacity, and smuggling organizations. Applying the 62.5 percent share to the 550 annual deaths yield approximently 344 Wall-attributed deaths per year. Valuing each fatality at $14 million in constant 2025 dollars, consistent with central values for mortality-risk reduction, produces an annual cost of approximately $4.8 billion. Discounting that annual stream over thirty years at a 3 percent real rate produces a present value of approximately $94 billion.

36. The approximately $94 billion migrant-mortality estimate is close in magnitude to the approximately $101 billion base construction estimate before expected cost growth.

37. The estimate is conservative because it prices mortality through standard federal risk-valuation methods, excludes losses that exceed reliable monetary valuation, and assigns the Wall only the mortality burden linked to Wall-induced route displacement rather than the full mortality burden of the broader enforcement system.

**Opinion 5: A significant portion of the cost is irreversible.**

38. It is my opinion, to a reasonable degree of professional certainty as an economist, that a significant portion of the economic cost imposed by a nearly continuous border wall system is irreversible or only partially reversible.

39. The extinction risk the Wall imposes on endemic species, depletion of fossil groundwater, fragmentation of habitat corridors, and destruction of irreplaceable sacred, cultural, archaeological, and historical resources persist after construction and may continue after any later removal of the barrier.

40. Three valuation methods reach parts of these losses. Restoration cost asks what it would cost to return the damaged resource to the condition it was in before Wall construction. Replacement cost asks what it would cost to substitute an equivalent resource. Stated-preference methods ask people what they would pay to avoid the loss. Each captures a portion of the harm and no combination of them captures all of it. A restored site, a substitute habitat, and a stated willingness to pay do not replace an extinct species, a depleted aquifer, or a destroyed sacred or archaeological site.

41. For that reason, the monetary values assigned to irreversible losses should be read as partial measures rather than comprehensive measures of the loss.

**Opinion 6: The costs fall disproportionately on protected resources and parties with limited ability to avoid them.**

42. It is my opinion, to a reasonable degree of professional certainty as an economist, that the costs of a nearly continuous border wall system fall disproportionately on protected resources and on parties with limited practical ability to avoid or prevent harms.

43. The affected interests include endangered species and designated critical habitat, historic and sacred sites, a federally designated wild and scenic river, private property acquired through condemnation, treaty-governed boundary waters, and tribal lands and religious exercise affected by barrier construction.

44. They also include land the Wall devalues without taking. Along the lower Rio Grande the barrier is built as a levee wall set back from the river, and a geospatial analysis measures approximately 283,606 acres, roughly 443 square miles, of American land that a continuous set-back barrier would place on the river side of the Wall. The owners of that land keep title while losing the frontage, the access, and the marketability that gave it value.

45. Costs associated with this stranded land are concentrated on parties and resources that cannot easily relocate, substitute away from the loss, or prevent the project through ordinary regulatory processes. This concentration is part of the economic incidence of the Wall.

46. The incidence of the Wall's cost differs from its financing. The federal government finances the structure; affected communities, landowners, migrants, tribal interests, ecological resources, local governments, and the public bear many of the resulting costs.

**Opinion 7: The estimate's valuation methods, attribution rules, and time horizons are set to the cautious end of the supported range, and several documented costs are left unpriced.**

47. It is my opinion, to a reasonable degree of professional certainty as an economist, that the approximately $513 billion central estimate is conservative in its valuation methods, attribution rules, time horizons, and treatment of unpriced costs.

48. Where the evidence supported a range, the estimate selects cautious values.[3] Where cost categories overlap, the estimate adjusts them to avoid double counting. Where reliable monetary valuation is unavailable, the estimate describes the harm without assigning a speculative dollar value.

49. The central estimate omits several documented costs and prices others only where the evidence supports a reliable monetary method. Documented but unpriced categories include harm to Mexican residents and communities, substantial cultural and religious losses, severance of family and community networks, the conversion of circular migration into longer-term settlement, potential flood-levee degradation, the option value lost by committing to permanent barrier infrastructure rather than reversible alternatives, and light-pollution effects on research, recreation, and nocturnal wildlife. Harms to migrants are valued where the available evidence supports valuation, regardless of the side of the border on which they occur.[4]

50. Where a harm is jointly produced by the Wall and the wider enforcement system, I assign only the Wall's estimated marginal contribution. The community-health and enforcement-induced violence calculations use limited wall-attribution shares. The mortality estimate assigns 62.5 percent of the central recorded death stream to the Wall through a mechanism-specific calculation. The trade estimate measures a limited continuing welfare loss from additional border friction rather than assuming a percentage reduction in the volume of United States-Mexico trade. These conventions reduce the amount included in the ledger.

---

3 The report uses arithmetic range and not a probabilistic range.

4 The report's convention is that harms to migrants are priced wherever they fall, including in Mexico. The costs associated with route violence and funnel deaths do not attempt to exclude harms occurring south of the border. Wall-related harms to Mexican residents, communities, and the Mexican economy are not included in these costs.

**Opinion 8: The estimated cost remains in the hundreds of billions of dollars across reasonable changes in assumptions.**

51. It is my opinion, to a reasonable degree of professional certainty as an economist, that, under reasonable changes in the assumptions used in the analysis, a nearly continuous border wall system imposes economic costs that remain in the hundreds of billions of dollars. The low bound is approximately $220 billion, the central estimate is approximately $513 billion, and the high bound is approximately $1.3 trillion.

52. The discount rate, the construction unit rate, the attribution shares for jointly caused harms, and the valuation ranges for mortality, ecological loss, trade disruption, and community costs affect the placement of the estimate within the stated range. These assumptions move the estimate within the range and leave the core conclusion intact.

53. The most firmly grounded component—the direct and governmental cost of approximately $256 billion—alone is over 5 times the approximately $49 billion wall-system appropriation before any external or non-budgetary cost is included.

54. The central estimate remains approximately $513 billion, the low bound remains approximately $220 billion, and the high bound is approximately $1.3 trillion. Across those results, the economic cost of a nearly continuous wall system remains far larger than the amount appropriated for barrier construction.

55. The conclusion rests on multiple independent components. The cost remains large across the reasonable range of assumptions evaluated in the report.

56. The preceding opinions summarize the gross present-value Total Economic Costs of completing, operating, maintaining, and removing a nearly continuous border wall system. Appendix III separately examines the scale of claimed migration-deterrence benefits required to reach a break-even threshold and the additional macroeconomic consequences that would arise if the Wall substantially and persistently reduced migration.

## SUPPLEMENTAL CONDITIONAL OPINIONS

57. The preceding eight opinions concern the Total Economic Costs included in the central cost ledger. Appendix III presents two supplemental opinions addressing a separate counterfactual scenario: that the Wall achieves a large and sustained reduction in migration. These supplemental analyses are conditional rather than predictive. They are not incorporated into the approximately $513 billion central estimate and are not added mechanically to it.

**Supplemental Opinion A: The available evidence does not support migration-deterrence benefits large enough to reach the break-even threshold.**

58. It is my opinion, to a reasonable degree of professional certainty as an economist, that the available evidence does not support sustained migration-deterrence benefits of the magnitude required to equal the approximately $513 billion gross Total Economic Cost estimated in this report.

59. This is a break-even threshold opinion, not a finding concerning the Wall's net benefits and not a comprehensive cost-benefit analysis. Under the central assumptions used in Appendix III, averting one crossing produces an estimated fiscal benefit of approximately $25,000. At that value, the Wall would have to prevent approximately 1.05 million crossings every year for thirty years to reach the break-even threshold.

60. The available evidence does not support either threshold as a sustained effect of completing the remaining portions of a nearly continuous border wall system. Existing barriers already occupy many of the corridors in which physical infrastructure was expected to produce the greatest deterrent effect. Construction across the remaining remote and difficult terrain is more likely to alter routes, raise crossing costs, and increase reliance on smugglers than to prevent crossings at the scale and duration required by the threshold.

61. The break-even calculation does not assign zero value to border security or assume that the Wall produces no benefits. It establishes the magnitude, persistence, and economic value the claimed benefits would have to achieve before they equaled the estimated costs.

**Supplemental Opinion B: Substantial and sustained migration reduction would impose additional macroeconomic costs through slower labor-force growth and foregone production.**

62. It is my opinion, to a reasonable degree of professional certainty as an economist, that if the Wall substantially and persistently reduces migration, that reduction would impose additional economic costs through slower labor-force growth, lower production, and reduced consumer demand relative to the economic baseline that would otherwise occur. This conclusion is conditional on the Wall achieving a substantial deterrent effect. It is not a forecast and is not used in deriving the approximately $513 billion central Total Economic Cost estimate.

63. Immigrants participate in the economy as workers and consumers. A sustained reduction in migration reduces labor-force growth and the number of consumers supporting demand. Unless productivity, capital formation, automation, or domestic labor substitution fully offsets the reduction, fewer workers produce less output than would otherwise have been produced.

64. The effect would be concentrated in industries with persistent demand for immigrant labor, including agriculture, construction, food processing, warehousing, hospitality, and health-care support. Reduced labor supply should not be treated as a one-for-one transfer of jobs to United States-born workers because immigrant and United States-born workers often perform complementary functions within the same production process.

65. Appendix III presents order-of-magnitude sensitivity calculations rather than structural forecasts. A sustained shortfall of 250,000 employed workers relative to the baseline, evaluated at approximately $150,000 to $200,000 in annual output per worker, corresponds to approximately $37.5 billion to $50 billion in foregone production each year and a thirty-year present value of approximately $735 billion to $980 billion at a 3 percent real discount rate. Larger

sustained employment shortfalls produce correspondingly larger effects. This scenario assumes a constant shortfall of 250,000 workers in each year, not an additional reduction of 250,000 workers every year.

66. The conditional relationship is important. If the Wall has little sustained effect on migration, its claimed migration-deterrence benefit is correspondingly limited. If it has a large sustained effect, the associated reduction in labor-force growth and economic production becomes larger. A high-deterrence scenario therefore cannot be evaluated solely by treating every prevented crossing as a benefit without also recognizing the economic consequences of a smaller labor force.

## METHODOLOGY

67. This report estimates the Total Economic Cost of completing a nearly continuous border wall system along the approximately 1,954-mile United States-Mexico border. The estimate prices the completed system as a whole. Approximately $15 billion for qualifying barrier infrastructure already standing and approximately $49 billion in identified appropriations that finance counted costs are credited once in the synthesis, producing an adjusted figure of approximately $449 billion from the approximately $513 billion gross central estimate.

68. The Total Economic Cost of the Wall is broader than the federally appropriated funds for construction. Congressional appropriations measure the amount of public money made available for the project. They do not measure the full economic burden of the project. A nearly continuous border wall system consumes public resources, imposes costs on third parties, damages natural resources, affects property and trade, increases mortality risk, and creates long-term operation, maintenance, and enforcement costs. Those costs are real economic costs even when they do not appear in a federal construction account.

69. The report uses applied economic methods to measure the cost of public policy. In this report, Total Economic Cost consists of direct governmental costs and external and non-

budgetary losses attributable to the Wall. The report does not separately estimate the value of alternative uses of the labor, land, materials, equipment, or public funds committed to the project.[5]

70. The Wall produces different kinds of economic cost. Each cost is valued by the method appropriate to that cost.

71. Construction, operation, maintenance, land acquisition, litigation, and decommissioning costs are estimated using engineering-economic methods, federal cost documentation, executed contracts, and construction-cost indices. Prospective cost growth is estimated through reference-class forecasting, which compares the project to the realized cost experience of comparable infrastructure projects.[6]

72. Mortality risk is valued using the value of a statistical life.[7] That is the standard federal method for monetizing changes in fatality risk. Non-fatal injury and morbidity are valued through cost-of-illness and quality-adjusted-life-year methods where the evidence permits such valuation. Environmental injury is valued principally through restoration cost, the measure used in natural-resource-damage assessment under United States law.[8] Trade and economic-integration costs are estimated by applying empirical parameters from the literature on border frictions and trade costs to the added impedance caused by a nearly continuous border wall system. Real-

5 The applied-welfare framework is the standard economic method for measuring the full cost of public policy. It includes budgetary costs and external costs borne outside the implementing agency's accounts. See Boardman, Greenberg, Vining, and Weimer, Cost-Benefit Analysis: Concepts and Practice; Office of Management and Budget, Circular A-4.

6 Reference-class forecasting corrects for optimism bias by comparing proposed projects to the realized cost distribution of comparable projects. See Flyvbjerg, From Nobel Prize to Project Management: Getting Risks Right, Project Management Journal (2006).

7 The value of a statistical life is the standard federal measure for monetizing changes in fatality risk. See Viscusi and Aldy, The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World, Journal of Risk and Uncertainty (2003); Department of Transportation and Department of Health and Human Services value-of-statistical-life guidance.

8 Restoration cost is the standard measure used in natural-resource-damage assessment. See *Ohio v. U.S. Department of the Interior*, 880 F.2d 432 (D.C. Cir. 1989); Department of the Interior and National Oceanic and Atmospheric Administration natural-resource-damage-assessment regulations. 43 C.F.R. § 11.10, *et seq.*; 15 C.F.R. § 990.10, *et seq.*

property effects are estimated through hedonic price methods, which identify the capitalized effect of comparable disamenities on land values.[9] Non-market values associated with species, cultural resources, and ecosystem services are valued only where a defensible method exists, and are assigned lower confidence where they depend on stated-preference evidence.[10]

73. The report uses multiple valuation methods because the costs differ in kind. Mortality, construction cost, habitat injury, trade friction, property-value loss, and cultural-resource damage are not the same economic objects. A single valuation method would not measure each of them accurately. The report therefore applies the accepted method for each category of cost and states the assumptions and uncertainty where each estimate is derived.

74. All monetary values are expressed in constant 2025 dollars. Nominal figures from earlier years are converted using the price index appropriate to the resource being measured. Construction costs are adjusted with a heavy civil construction index rather than a general consumer price index. Large civil works depend on input costs that have diverged materially from consumer prices. A general consumer price index would understate current construction cost.

75. Future costs are discounted to present value at a real annual rate of 3 percent.[11] This rate is economically appropriate for valuing long-term public costs borne by affected populations

---

9 Hedonic price methods derive from the economic literature on implicit markets and property-value capitalization. See Rosen, Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition, Journal of Political Economy (1974).

10 Stated-preference methods for non-use values are used in this report only where monetary valuation is necessary and no market-based measure is available. See Arrow, Solow, Portney, Leamer, Radner, and Schuman, Report of the NOAA Panel on Contingent Valuation (1993).

11 Office of Management and Budget, Circular A-94, revised November 9, 2023, provides the guidance on discount rates for the benefit-cost analysis of federal programs and is the authority most directly applicable to a federal infrastructure project. Circular A-4, which governs regulatory analysis, was revised in November 2023, and that revision was rescinded in January 2025, so the 2003 version, specifying real discount rates of 3 percent and 7 percent, is again the operative guidance. The 3 percent rate applied here is the rate Circular A-4 (2003) prescribes for effects falling on consumption, on affected populations, and on natural resources rather than on displaced private capital, which is the character of the costs in this report. It is also the conservative choice measured against the rescinded 2023 revision, which would have applied a central rate near 2 percent and would therefore have produced a larger present value than the one reported here.

and through reduced consumption, and it is consistent with federal benefit-cost guidance. Discounting has its greatest effect on costs that continue over long periods, including maintenance, mortality, and ecological loss. The report therefore presents sensitivity analyses where the choice of discount rate materially affects the aggregate estimate.

76. This rate is economically appropriate for valuing long-term public costs borne by affected populations and through reduced consumption, and it is consistent with federal benefit-cost guidance. Discounting has its greatest effect on costs that continue over long periods, including maintenance, mortality, and ecological loss. The report therefore presents sensitivity analyses where the choice of discount rate materially affects the aggregate estimate.

77. Discounting future mortality and ecological injury raises a separate ethical question.[12] Standard economic practice discounts future harms to present value. That practice is contested when the harms involve death, biodiversity loss, cultural resources, or irreversible ecological damage. This report applies the 3 percent rate as a conventional economic treatment. It does not treat future harms as less real because they occur later in time.

78. The report applies time horizons that match the duration of the underlying cost. Construction and land-acquisition costs are valued when incurred, decommissioning is valued at the end of a thirty-year service period, and recurring operation, maintenance, surveillance, mortality, trade, enforcement, and community effects are evaluated over thirty years. That horizon is conventional for major infrastructure appraisal and conservative for a structure intended to function as a permanent border system. Ecological costs are evaluated over sixty years because desert and riparian systems recover slowly and some affected systems may not return to baseline within the fiscal service life of the Wall.

---

[12] The ethical and economic treatment of long-term discounting is contested in the literature on intergenerational harm. See Stern Review on the Economics of Climate Change (2007); Nordhaus (2007).

79. Some harms are jointly produced by the Wall and the broader enforcement system. Desert fatalities, smuggling-route violence, chronic health effects in the enforcement corridor, and burdens on border communities arise from the interaction of barrier infrastructure, roads, surveillance, checkpoints, detention, personnel, and enforcement policy. The report does not assign the full cost of that wider enforcement system to the Wall. It attributes the Wall's marginal contribution to each jointly produced harm. That rule is conservative. A but-for causation standard would generally support a larger attribution where the harm would not have occurred, or would have occurred at a lower level, absent the barrier.

80. The aggregate is organized by confidence level. The first tier consists of direct budgetary and infrastructure costs, including construction, maintenance, operation, decommissioning, land acquisition, litigation, and related implementation costs. These estimates rest on federal documentation, executed contracts, engineering-economic methods, and observed cost experience. The second tier consists of external costs that are empirically documented and monetized through established valuation methods, including mortality, ecological injury, trade loss, property effects, enforcement-induced harms, and burdens on border communities. The third tier consists of lower-confidence valuations, principally non-market values associated with species, cultural resources, and other losses for which monetary valuation is possible but contested.

81. Each effect is counted once. Where two categories address related harms, the report defines the boundary between them. Habitat injury valued through restoration cost is not counted again as a separate ecosystem-service loss unless the categories measure distinct harms. Fatalities counted in the mortality account are not counted again as county fiscal costs. Construction costs and maintenance costs are separated by function and time period. Enforcement-induced harms are separated from direct federal enforcement expenditures.

82. The report estimates costs gross of offsetting credits. Claimed benefits, appropriated funds, or the value of existing infrastructure are not used to reduce component-level

cost estimates. Appropriations identify the public money made available for the project. They do not reduce the economic cost of the resources consumed. Claimed benefits are addressed separately and may be compared to the gross cost estimate. They are not embedded in the cost methodology.

83. This report attempts to calculate a genuine value of the costs according to the best available evidence wherever doing so is possible. Wherever a parameter is supported by a range of appropriate figures, the value is chosen at the conservative end of the range to avoid overstating the Total Economic Cost of completing a nearly continuous border wall system. At points of material uncertainty, the report uses cautious values. The finite horizon applied to a structure intended to remain in place, the discounting of distant harm, the use of marginal rather than full attribution for jointly produced effects, and the exclusion of harms that cannot be reliably monetized all reduce the aggregate estimate. Several documented costs remain outside the priced total because no reliable monetary method reaches them or because monetization would misstate the character of the harm. The resulting figure is therefore a conservative central estimate under the stated methods, not a maximum estimate.

## BASIS FOR OPINIONS

## ANALYTICAL FRAMEWORK

84. The Summary of Opinions states the principal conclusions I have reached. This section explains the economic logic supporting those conclusions. Appendix II contains the controlling cost ledger, the underlying calculations, the selection of inputs, the source notes, and the sensitivity analysis. The main report explains why those calculations measure economic cost and how they support my opinions.[13]

85. This report estimates the Total Economic Cost of completing a nearly continuous border wall system along the 1,954-mile United States-Mexico border, referred to in this report as the "Wall." Total Economic Cost, as used here, includes direct governmental costs and external and non-budgetary losses attributable to the Wall. The report does not separately estimate the value of alternative uses of the labor, land, materials, equipment, or public funds committed to the project.

86. A congressional appropriation and an economic-cost estimate answer different questions. An appropriation identifies the amount of budget authority Congress has made available for specified purposes. An economic-cost estimate identifies the resources required for the project and the losses attributable to it, whether those costs appear in a federal account or are borne by landowners, businesses, local governments, border residents, Tribal communities, migrants, or the public.

87. The report first estimates the cost of the completed Wall as a whole. That gross measure shows the full scale and composition of the project. The synthesis then applies two one-time credits: the estimated value of qualifying pedestrian-barrier infrastructure already standing and the identified appropriations that finance costs included in the ledger. The resulting figure is

[13] See Appendix II, Methodology and Common Analytical Conventions, "What the Appendix Estimates" and "Common analytical conventions."

the incremental cost of completion after identified credits. It is not a benefit-offset or net-benefit figure.[14]

88. Costs arising in different years are expressed as present values in constant 2025 dollars. Present-value analysis converts future costs to a common date so that construction expenditures, recurring maintenance, mortality risk, trade losses, and long-lived ecological injury can be added on a consistent basis. The central analysis uses a 3 percent real discount rate.

89. The time horizon follows the duration of the underlying cost. Construction and land-acquisition costs are valued when incurred, decommissioning is valued at the end of the thirty-year service period, and recurring operations, maintenance, surveillance, mortality, trade, enforcement, and community effects are evaluated over thirty years. Ecological effects are evaluated over sixty years because desert, riparian, groundwater, and species systems can remain impaired beyond the fiscal service life of the structure. These finite horizons are conservative for infrastructure intended to remain in place indefinitely.

90. The costs are different economic objects and cannot be valued by a single method. Construction and lifecycle expenditures are measured by engineering-economic methods. Mortality risk is valued by the federal value of a statistical life. Natural-resource injury is measured principally by restoration cost and lost ecosystem services. Trade effects are measured through added border friction. Property losses are measured through capitalization into land values. Non-market values are included only where an established method supports a monetary estimate.[15]

91. Some harms are jointly produced by the Wall and the larger enforcement system. The Wall operates together with personnel, surveillance, checkpoints, detention, turn-back practices, and smuggling organizations. In those categories, the report attributes only the Wall's

---

[14] See Appendix II, Executive Cost Ledger, sections 1 and 4; Part VII.1–VII.3.

[15] See Appendix II, Methodology and Common Analytical Conventions, "The valuation of heterogeneous costs."

estimated marginal contribution. It does not assign the Wall the entire cost of the surrounding enforcement system.

92. Each priced line has a low, central, and high value. The central value is the principal estimate. The low and high values are bounds, not forecasts and not confidence intervals. Because the inputs would not ordinarily reach their extremes at the same time, the total range is wider than a probabilistic forecast.[16]

93. The aggregate is also organized by evidentiary confidence. The first tier consists of direct and budgetary costs supported principally by executed contracts, federal records, and engineering methods. The second consists of documented external costs valued by the established method for the particular harm. The third consists of lower-confidence non-market valuations, principally the preservation value of species and places.

94. Each cost is counted once. The report separates a life lost from the county expenditure required to recover and identify the deceased; condemned land from neighboring land that loses value without being taken; restoration cost from distinct ecosystem-service losses; and the cost of operating surveillance from the trade loss caused by diverting resources from lawful commerce.

95. The estimate uses finite horizons, discounts future harms, applies contribution shares to jointly caused effects, and excludes documented harms for which the available evidence does not support a reliable monetary value. These conventions lower the reported total, and several documented costs remain outside the monetary ledger.[17]

16 See Appendix II, Methodology and Common Analytical Conventions, "The construction of the range."

17 See Appendix II, Methodology and Common Analytical Conventions, "The structure of the aggregate" and "What the estimate leaves out."

***Confidence structure of the aggregate***

| Tier | Principal contents | Central estimate | Low and high bounds |
|---|---|---|---|
| Core costs | Construction, maintenance, technology, removal, land, and litigation | ~$256 billion | ~$174–406 billion |
| Documented external costs | Mortality, ecological, trade, enforcement, and community costs valued by established methods | ~$237 billion | ~$40–857 billion |
| Lower-confidence non-market values | Non-market preservation value of species and places | ~$20 billion | ~$6–60 billion |

## OPINION 1

## THE GROSS TOTAL ECONOMIC COST OF COMPLETING THE WALL IS APPROXIMATELY $513 BILLION

***Opinion***

96. It is my opinion, to a reasonable degree of professional certainty as an economist, that building, operating, maintaining, and ultimately decommissioning a nearly continuous border wall system would impose a gross Total Economic Cost of approximately $513 billion in present value, stated in constant 2025 dollars. The low bound is approximately $220 billion and the high bound is approximately $1.3 trillion.[18]

97. The central estimate consists of approximately $256 billion in direct and governmental costs and approximately $257 billion in external and non-budgetary costs. The two components are approximately equal. Costs recorded in governmental accounts therefore make up about half of the total, while losses borne outside those accounts make up the other half.

98. The largest central categories are direct and governmental costs, approximately $256 billion, and mortality and nonfatal injury, approximately $122 billion. The remaining central costs are approximately $56 billion in environmental and natural-resource injury, $37 billion in

18 See Appendix II, Executive Cost Ledger; Part VII.1–VII.3.

enforcement-induced costs, $24 billion in trade and economic-integration costs, and $18 billion in costs to border communities.

***Basis for Opinion***

99. The gross estimate measures the completed system before credits. This convention separates the cost of the completed system from the amount of additional infrastructure and funding required to finish it. It also allows the completed-system estimate to be compared with the separate incremental completion estimate.

100. Appendix II credits approximately $15 billion for qualifying barrier infrastructure already standing and approximately $49 billion in identified appropriations that finance costs included in the ledger. After applying those credits once, the central incremental cost of completion is approximately $449 billion. Approximately $257 billion of that amount consists of external harm that the appropriations do not reach, and approximately $192 billion consists of additional governmental cost.

***Scope and Interpretation***

101. Appropriated funds reduce the amount of additional funding required to complete the project; they do not alter the gross cost of the resources used. The value of qualifying existing barrier likewise reduces the amount of new infrastructure required and is therefore credited once in the incremental completion calculation.

102. No claimed border-security benefit is deducted from the gross cost ledger. A benefit-cost comparison should identify the cost and the claimed benefit separately. The approximately $449 billion incremental figure is therefore a cost after identified funding and infrastructure credits, not a net-benefit calculation.

103. For scale, the approximately $513 billion central estimate is more than 10 times the approximately $49 billion appropriation specifically enacted for the border infrastructure and wall

system. The comparison does not assume that the appropriation was intended to cover every cost in the ledger. It shows that the appropriation is not a measure of the Wall's Total Economic Cost.

***Central composition of Total Economic Cost***

| Cost category | Central estimate | Low and high bounds |
|---|---|---|
| Direct and governmental costs | ~$256 billion | ~$174–406 billion |
| Environmental and natural-resource costs | ~$56 billion | ~$17–150 billion |
| Costs to border communities | ~$18 billion | ~$6–44 billion |
| Trade and economic-integration costs | ~$24 billion | ~$4–104 billion |
| Enforcement-induced costs | ~$37 billion | ~$2–226 billion |
| Mortality and nonfatal injury | ~$122 billion | ~$17–393 billion |
| **Total Economic Cost** | ~$513 billion | ~$220 billion–$1.3 trillion |

## OPINION 2

## THE DIRECT AND GOVERNMENTAL COST OF THE WALL IS APPROXIMATELY $256 BILLION

***Opinion***

104. It is my opinion, to a reasonable degree of professional certainty as an economist, that the direct and governmental cost of completing, operating, equipping, administering, and ultimately removing the Wall is approximately $256 billion in present value. The low bound is approximately $174 billion and the high bound is approximately $406 billion.[19]

105. This component has the highest evidentiary confidence in the report. It rests principally on federal cost documentation, executed construction contracts, observed cost escalation, construction-cost indices, maintenance records, land-acquisition evidence, and established engineering-economic methods.

19 See Appendix II, Part I, Direct and Governmental Costs, especially Parts I.1 and I.2.

106. The central direct-cost ledger includes approximately $135 billion in construction after expected cost growth, $88 billion in operations and maintenance, $19 billion for the lifecycle cost of the freestanding surveillance network, $12.5 billion for decommissioning and removal, $850 million for land acquisition, and $500 million for condemnation litigation and administration.

***Basis for Opinion***

107. The base construction estimate is approximately $101 billion before expected cost growth. It does not apply one average rate to materially different terrain. It divides the border into open desert, mountain, urban, Lower Rio Grande Valley, and remote-canyon environments and applies rates derived from what the federal government has paid for comparable work, carried to 2025 construction-cost conditions.

108. The unbuilt miles are not a random sample of the border. Much of the modern barrier already constructed replaced existing fence, used established access routes, or crossed federal land. The remaining alignment includes privately held Texas riverfront, treaty-constrained setback construction, floodplain terrain, and approximately 904 miles of remote canyon. These conditions require access roads, material transport, grading, drainage, staging, land acquisition, and difficult construction over long distances.

109. Appendix II applies approximately $60 million per mile to the remote-canyon segment. That rate is moderated below the carried cost of the most difficult terrain through which the government has previously built barrier. No additional premium is added for the lack of road access, the scale of continuous mobilization, or the private land and river setback that much of the alignment would require.

110. The base estimate is then adjusted for expected cost growth. The uncontracted canyon segment receives a 50 percent allowance. The resulting blended allowance is approximately 34 percent and produces an expected construction expenditure of approximately

$135 billion, with a low bound of approximately $88 billion and a high bound of approximately $236 billion.

111. Operations and maintenance are estimated at approximately $4.49 billion per year, with a thirty-year present value of approximately $88 billion. The estimate includes inspection, breach repair, road and gate maintenance, drainage work, lighting and attached equipment, and the added expense of reaching failures in remote and flood-prone terrain. The 88 billion corresponds to a wall assumed to stand for 30 years. If the wall is instead assumed to stand indefinitely, the present value of maintenance would be $150 billion. We use the more conservative assumption of a 30-year service life.[20]

112. The approximately $19 billion surveillance estimate measures the lifecycle cost of freestanding towers, radar, cameras, sensors, communications, data systems, power, repair, and periodic replacement. It excludes port-inspection systems, aircraft, biometrics, and other border-security technology not required to operate the Wall.

113. Land acquisition and condemnation administration are separate costs. Land acquisition measures compensation for the property interest taken and ordinary severance damage. Litigation and administration measure title work, surveys, appraisals, service, negotiation, attorney time, court proceedings, and interagency coordination. The distinction is important in south Texas, where fractional ownership and incomplete land records can make legal control expensive even when the physical strip is narrow.[21]

114. Decommissioning measures the cost of taking the Wall out of service. It includes removing steel and concrete, breaking foundations, hauling material, regrading the corridor, stabilizing disturbed ground, and addressing abandoned access infrastructure. It does not include

---

20 See Appendix II, Parts I.3 and I.7.

21 See Appendix II, Parts I.4–I.5.

ecological restoration, which is valued separately. If the wall is not decommissioned the costs would be priced much higher.

***Scope and Interpretation***

115. The approximately $49 billion wall-system appropriation finances specified construction, access, site preparation, and integral technology. It does not establish the final construction price or fund the full thirty-year maintenance obligation, the full surveillance lifecycle, all land and condemnation administration, or eventual removal. Identified appropriations for fixed surveillance increase the total credit for counted costs to approximately $49 billion. These appropriations are separate from the approximately $256 billion direct-cost estimate.[22]

116. The direct and governmental cost alone is more than 5 times the $49 billion wall-system appropriation. This conclusion does not depend on mortality valuation, environmental valuation, trade modeling, or any non-market estimate.

## OPINION 3

## EXTERNAL AND NON-BUDGETARY COSTS ARE APPROXIMATELY $257 BILLION AND CONSTITUTE ABOUT HALF OF THE TOTAL

***Opinion***

117. It is my opinion, to a reasonable degree of professional certainty as an economist, that the Wall would impose approximately $257 billion in external and non-budgetary costs at the central estimate. Those costs are comparable in magnitude to the direct governmental cost and account for approximately one-half of the Wall's Total Economic Cost.[23]

118. An external cost is a loss imposed outside the account of the entity carrying out the project. The term describes who bears the loss, not the certainty or importance of the loss. A death, serious injury, loss of property value, interruption of lawful trade, or destruction of a natural resource remains an economic cost even when no federal construction account records it.

22 See Appendix II, Part I.8 and Part VII.3.
23 See Appendix II, Executive Cost Ledger; Parts II–VI; Part VII.2.

***Basis for Opinion***

119. The relevant environmental, natural-resource, cultural, property, and community injuries are counted in their respective accounts where the evidence supports valuation. Waiver-related harms that cannot be monetized reliably are described but remain outside the summed ledger.[24]

120. Environmental and natural-resource costs are approximately $56 billion. The central estimate includes approximately $8 billion in restoration and replacement, $28 billion in lost ecosystem services and structural externalities, and $20 billion in lower-confidence non-use value. Excluding the entire non-use component leaves approximately $36 billion in central ecological cost supported by restoration, water, hydrology, flood, fire, carbon, and ecosystem-service measures.[25]

121. Costs imposed on border communities are approximately $18 billion. The priced categories include property-value loss, the loss in value of land stranded between a setback wall and the Rio Grande, a limited wall-attributed share of chronic health effects, cultural-resource valuation where a defensible method exists, and county expenditures for recovering and identifying migrant remains.[26]

122. Trade and economic-integration costs are approximately $24 billion. The Wall does not physically block commercial trucks at lawful ports. The central estimate attributes a limited share of delay-related trade costs to the personnel and inspection burden associated with operating the completed system and to illicit traffic redirected toward the ports. Delay consumes driver time, fuel, inventory, and productive capacity. Unreliable delay also forces firms to hold additional inventory and alter production schedules.[27]

---

24 See Appendix II, Executive Cost Ledger, sections 3 and 5; Parts VII.4 and VII.6.
25 See Appendix II, Part II, Environmental and Natural Resource Costs.
26 See Appendix II, Part III, Costs to Border Communities.
27 See Appendix II, Part IV, Trade and Economic-Integration Costs.

123. Enforcement-induced costs are approximately $37 billion. Completing the barrier increases the difficulty of independent crossing and shifts more movement toward routes controlled by organized smuggling groups. The priced costs are serious victimization, real resources consumed in operating and contesting the smuggling market, and additional real journey costs. Gross smuggling payments are not added because much of the payment is a transfer rather than a resource loss.[28]

***Scope and Interpretation***

124. The external-cost ledger is bounded to prevent duplication. Deaths from exposure, falls, and drowning are counted in the mortality section. Route violence is counted in the enforcement section. County expenditures responding to deaths are counted in the community section. Environmental injury, property loss, and trade effects are similarly assigned to one category according to the economic object being valued.

125. These costs are borne by migrants and their families, landowners, border residents, Tribal communities, local governments, hospitals, firms, workers, consumers, and the public. The economic incidence of the Wall is therefore much broader than the federal budget used to finance it.

## OPINION 4

## MORTALITY AND NONFATAL INJURY ARE THE LARGEST QUANTIFIED EXTERNAL COSTS

***Opinion***

126. It is my opinion, to a reasonable degree of professional certainty as an economist, that mortality and nonfatal injury are the largest quantified external costs imposed by the Wall. Their estimated present value is approximately $122 billion. The low bound is approximately $17 billion and the high bound is approximately $393 billion.[29]

---

28 See Appendix II, Part V, Enforcement-Induced Costs.
29 See Appendix II, Part VI, Mortality and Nonfatal Injury.

127. The central estimate includes approximately $94 billion in migrant mortality, $25 billion in serious nonfatal injuries, $900 million in pursuit and bystander deaths, $340 million in Border Patrol agent deaths, and $1 billion in construction-worker mortality and serious injury.

***Basis for Opinion***

128. The Wall changes crossing risk through direct and indirect mechanisms. It increases the risk of direct injury when people fall from a thirty-foot barrier or enter rivers, canals, or maritime routes to pass around it. It also redirects some crossings from accessible routes toward remote desert, mountain, canyon, and river terrain where exposure, dehydration, drowning, abandonment, and delayed rescue are more likely.

129. A barrier need not increase the number of attempted crossings to increase mortality. It can raise the risk attached to the crossings that continue. As enforcement hardens accessible corridors, the remaining crossings become concentrated on more dangerous terrain. The observed death count therefore need not fall in proportion to a decline in encounters.

130. The migrant-mortality calculation uses an annual central baseline of 550 deaths, with a low value of 350 and a high value of 750. The central baseline is below the highest recent federal counts. It also relies on recorded deaths even though the available evidence shows that some remains are recovered outside federal records, recovered years later, never identified, or never found.[30]

131. The report does not assign every border death to the Wall. The central contribution share is 62.5 percent. The calculation assigns direct wall-fall and wall-induced drowning deaths fully to the Wall and applies a lower share to the larger stream of exposure and displacement deaths because barriers operate together with personnel, surveillance, turn-back policy, weather, terrain, rescue capacity, and smuggling organizations.

30 See Appendix II, Parts VI.1–VI.4.

132. Mortality is valued with the federal value of a statistical life. The central value is $14 million in constant 2025 dollars, near the current central values used by the principal federal agencies. The method values changes in fatality risk across a population; it does not assign a market price to an identified person. Federal guidance does not apply a lower value because a person is a noncitizen, has a low income, or is crossing without authorization.

133. Applying the central annual death baseline, the 62.5 percent contribution share, the $14 million federal value, and the thirty-year present-value factor produces approximately $94 billion in migrant mortality. The value is held constant in real terms and the horizon is limited to thirty years. If the same mortality stream continued indefinitely, its present value would be approximately $160 billion. Instead, I use the 30-year life-span in my calculations.

134. Serious nonfatal injuries add approximately $25 billion. The central estimate uses approximately 1,400 serious injuries per year, values each injury by the applicable federal injury-severity fraction of the value of a statistical life, and applies the same contribution share. The injuries include spinal and head trauma, complex fractures, heat stroke, kidney failure, near-drowning injury, and conditions requiring surgery, intensive care, rehabilitation, or long-term treatment.[31]

***Scope and Interpretation***

135. The mortality section does not duplicate the county cost of recovering and identifying remains, route violence inflicted by smugglers, or deaths caused when a barrier obstructs floodwater. Those costs are assigned respectively to the community, enforcement, and environmental accounts.

31 See Appendix II, Parts VI.5–VI.7.

136. The mortality estimate is conservative because the forward rate is below recent peak counts, the recorded data understate the full toll, the value of life is held at the middle of the federal range, and only the Wall's estimated contribution is charged.

## OPINION 5

## A SIGNIFICANT PORTION OF THE WALL'S COST IS IRREVERSIBLE OR ONLY PARTIALLY REVERSIBLE

***Opinion***

137. It is my opinion, to a reasonable degree of professional certainty as an economist, that a significant portion of the Total Economic Cost imposed by the Wall would be irreversible or only partially reversible.

138. Removing the physical structure would not return all affected resources to their prior condition. Construction uses labor, fuel, steel, concrete, land, and equipment when the expenditure occurs. Those inputs are not recovered by later removing the Wall, and removal requires an additional expenditure.

***Basis for Opinion***

139. Desert soils recover slowly from grading, compaction, road construction, altered drainage, and invasive-species establishment. Riparian vegetation, groundwater-fed springs, migration corridors, and food-web relationships can remain impaired after the steel is removed. Restoration can reduce injury, but it cannot guarantee a return to the preconstruction condition.

140. Some losses are not reversible. Extinction cannot be repaired through a conventional remediation contract. Fossil groundwater can be depleted faster than it replenishes. A destroyed burial site, sacred place, archaeological feature, or historical resource cannot be reconstructed in its original context.

141. Economic valuation methods capture different portions of these losses. Restoration cost measures the expenditure required to return a resource as nearly as possible to baseline. Lost-service valuation measures benefits forgone while a resource is impaired. Replacement cost

measures the cost of a substitute. Stated-preference methods estimate preservation value where no market transaction reveals it.[32]

142. These monetary methods do not make an irreversible loss reversible. They provide a common unit for economic analysis. They do not establish that money can recreate an extinct species, replenish a fossil aquifer, or restore the historical and religious meaning of a destroyed site.

***Scope and Interpretation***

143. The environmental central estimate separates approximately $8 billion in restoration and replacement, $28 billion in ecosystem-service and structural losses, and $20 billion in non-use value. The non-use component is reported separately because it carries the greatest methodological uncertainty.

144. Where the available evidence does not support reliable monetization, the report describes the loss and leaves it outside the priced total. The absence of a monetary figure is not a finding that the loss is zero.

## OPINION 6

## THE COSTS FALL DISPROPORTIONATELY ON PROTECTED RESOURCES AND PARTIES WITH LIMITED ABILITY TO AVOID THEM

***Opinion***

145. It is my opinion, to a reasonable degree of professional certainty as an economist, that the Wall's costs would fall disproportionately on resources protected under federal law and on persons and communities with limited practical ability to relocate, substitute away from the loss, obtain compensation, or prevent the harm.

146. Economic incidence concerns who ultimately bears a cost. The federal government would finance the project, but the resulting losses would be distributed among private landowners,

32 See Appendix II, Parts II.2–II.5 and Part III.1.

border residents, local governments, businesses, hospitals, Tribal communities, migrants, and users of affected natural resources.

***Basis for Opinion***

147. Private Texas landowners bear both compensated and uncompensated losses. Compensation for property formally taken and ordinary severance damage is included in the direct land-acquisition estimate. Losses to nearby property and land stranded behind the setback barrier are included in the community account.

148. A continuous Rio Grande setback alignment would place approximately 283,606 acres, or about 443 square miles of land within the United States, between the Wall and the river. Owners would retain title but could lose access, river frontage, security, marketability, and productive use. Less than half of that acreage is privately owned, and the central estimate assigns approximately $1.3 billion to the loss in value of that private share, with the public and tribal acreage carried as an unpriced loss of access and use.[33]

149. Border residents would also bear continuing effects from lighting, surveillance towers, patrol traffic, access restrictions, construction activity, and the concentration of enforcement infrastructure. The community-health calculation attributes only a limited share of the broader enforcement-related burden to the Wall.

150. Tribal, cultural, and religious harms include effects on burial grounds, ceremonial landscapes, sacred springs, archaeological resources, pilgrimage routes, and relationships among people and places on both sides of the international boundary. These resources are location-specific and often have no practical substitute.

151. Migrants and their families bear mortality, injury, victimization, and additional journey costs. Border counties bear recovery, identification, autopsy, and burial expenses.

33 See Appendix II, Parts III.1–III.5; Part I.4; and Part VII.6.

Hospitals absorb uncompensated trauma care. Businesses, workers, and consumers bear the cost of delay and unreliability in lawful commerce.

***Scope and Interpretation***

152. The distribution of cost is part of the economic analysis because many affected parties cannot relocate, replace the affected resource, insure fully against the harm, negotiate an equivalent substitute, or rely on ordinary regulatory procedures to reduce the loss. The incidence of the Wall is therefore more concentrated than its financing.

**OPINION 7**

**THE $513 BILLION CENTRAL ESTIMATE IS CONSERVATIVE**

***Opinion***

153. It is my opinion, to a reasonable degree of professional certainty as an economist, that the approximately $513 billion central estimate's valuation methods, attribution rules, and time horizons are set to the cautious end of the supported range, and several documented costs are left unpriced.[34]

154. The central estimate is not produced by selecting the highest plausible input for each category. Several choices reduce the estimate even where a higher value could be supported.

***Basis for Opinion***

155. The report uses a thirty-year valuation horizon for recurring costs, including maintenance, surveillance, mortality, trade, enforcement, and most community effects. This horizon is a conservative modeling assumption, not a prediction that these costs will cease after thirty years. A contiguous or nearly contiguous border wall is reasonably expected to function as long-lived infrastructure, making it equally reasonable to value its recurring costs in perpetuity. Assuming the central annual cost streams continue at the same real level, perpetual valuation

34 See Appendix II, Parts VII.4 and VII.5.

would increase the present value of maintenance from approximately $88 billion to $150 billion, an increase of $62 billion, and the present value of migrant mortality from approximately $94 billion to $160 billion, an increase of $66 billion. Together, these adjustments would add approximately $128 billion. Because the perpetual scenario would exclude the approximately $12.5 billion in decommissioning costs included at the end of the thirty-year horizon, the net increase would be approximately $115.5 billion. The thirty-year horizon therefore understates total economic costs relative to an equally reasonable assumption that the wall and its associated recurring costs continue indefinitely.

156. Future costs are discounted. Under standard present-value analysis, a death, injury, maintenance obligation, or ecological loss occurring decades from now receives a smaller present value than the same loss occurring today. The use of a 3 percent rate is conventional, but it reduces the monetary total assigned to long-lived harms.

157. Where a harm is jointly produced, only a contribution share is assigned to the Wall. The report does not assign the Wall the full burden associated with personnel, surveillance, detention, checkpoints, turn-back practices, or organized smuggling. This convention reduces the enforcement, community, and mortality estimates.

158. The value of a statistical life is held at the middle of the federal range and is not increased over the thirty-year horizon. The remote-canyon construction rate is held at approximately $60 million per mile, below the carried cost of the most difficult completed terrain, without a separate premium for hundreds of miles of absent access, private setback land, and continuous mobilization.

159. Gross smuggling revenue is not added as a cost. Temporary border-closure scenarios producing larger output losses are reported for context but are not summed with the standing trade-friction estimate. This treatment avoids counting transfers or alternative scenarios as additive costs.

160. Documented but unpriced categories include substantial cultural and religious harm, effects on burial grounds and sacred sites, severance of family and community networks, certain harms to Mexican residents and communities, surveillance and checkpoint burdens on United States residents, the conversion of circular migration into longer-term settlement, the risk that construction degrades federal flood-control levees, and light pollution affecting dark-sky resources and scientific research.[35]

***Scope and Interpretation***

161. The report also uses explicit double-counting controls. A factual event may give rise to more than one line only when the lines measure distinct economic objects, such as a death and the separate public expenditure required to recover and identify the deceased.

162. For these reasons, the approximately $513 billion figure should be read as a best efforts estimate of an accurate cost accounting, where conservative choices were made when a range of appropriate parameters were available, and substantial cost categories are unaccounted for, not as an attempt to assign the maximum possible value to every consequence of the Wall.

**OPINION 8**

**THE ESTIMATED COST REMAINS IN THE HUNDREDS OF BILLIONS UNDER REASONABLE CHANGES IN ASSUMPTIONS**

***Opinion***

163. It is my opinion, to a reasonable degree of professional certainty as an economist, that the estimated cost of the Wall remains in the hundreds of billions of dollars under reasonable changes in the assumptions used in the analysis.

164. The central estimate is approximately $513 billion, the low bound is approximately $220 billion, and the high bound is approximately $1.3 trillion. The conclusion that the cost is

[35] See Appendix II, Executive Cost Ledger, section 3, "Documented Costs Not Assigned a Monetary Value," and Part VII.4.

measured in hundreds of billions of dollars does not depend on the high bound or on every methodologically uncertain valuation component.

***Basis for Opinion***

165. The direct and governmental estimate of approximately $256 billion is supported principally by contracts, federal records, and engineering methods. It alone is more than 5 times the $49 billion wall-system appropriation.

166. The lower-confidence non-market tier of valuing species and places is approximately $20 billion. Excluding that tier entirely would reduce the central total from approximately $513 billion to approximately $493 billion. It would not change the conclusion that external costs are substantial or that the direct cost greatly exceeds the appropriation.[36]

167. The aggregate rests on independent mechanisms and different bodies of evidence. The Wall uses federal resources, creates long-term maintenance and surveillance obligations, occupies and devalues land, changes mortality and injury risk, damages natural resources, adds friction to lawful commerce, alters smuggling markets, and imposes costs on border communities. No single assumption controls all of those effects.

***Scope and Interpretation***

168. After applying approximately $15 billion for qualifying barrier infrastructure already standing and approximately $49 billion in identified appropriations, the central cost of completion remains approximately $449 billion.

## FINAL CONCLUSION

169. The approximately $49 billion wall-system appropriation represents only a fraction of the resources and losses associated with completing a nearly continuous border wall system.

---

[36] See Appendix II, Part VII.2, "The total by tier of confidence."

170. The best-supported central estimate of the gross Total Economic Cost is approximately $513 billion in constant 2025 dollars. The low bound is approximately $220 billion and the high bound is approximately $1.3 trillion. The central estimate consists of approximately $256 billion in direct and governmental costs and approximately $257 billion in external and non-budgetary costs.

171. After applying the estimated value of qualifying barrier infrastructure already standing and identified appropriations for counted costs, the central cost of completion is approximately $449 billion.

172. The estimate is conservative and does not depend on a single method or category. The direct governmental cost alone substantially exceeds the amount appropriated for the Wall. The additional mortality, ecological, community, trade, enforcement, and other external costs establish that the appropriation is not a measure of the Wall's Total Economic Cost.[37]

---

37 See Appendix II, Part VII.6, "What the number shows."

## DECLARATION AND SIGNATURE

Pursuant to 28 U.S.C. § 1746, I, Geert L. Dhondt, declare under penalty of perjury that the foregoing is true and correct.

Executed on July 16, 2026, in New York City, New York.

Geert L. Dhondt, Ph.D.

**APPENDIX I**

# GEERT L. DHONDT, PH.D.

Associate Professor of Economics and Deputy Chair
Department of Economics, John Jay College of Criminal Justice, City University of New York
524 West 59th Street, New York, NY 10019 | 646-557-4845 | gdhondt@jjay.cuny.edu
Faculty Profile | Google Scholar

## PROFESSIONAL SUMMARY

Geert L. Dhondt, Ph.D., is Associate Professor of Economics and Deputy Chair in the Department of Economics at John Jay College of Criminal Justice, City University of New York. His work focuses on public expenditure and policy analysis; migration and labor markets; criminal justice and state enforcement institutions; and the distribution of direct governmental and external economic costs.

His research uses econometric and applied policy methods to examine how public institutions, infrastructure investments, enforcement policies, and labor-market structures shape economic outcomes, allocate public resources, and distribute costs across governments, communities, workers, and firms.

## AREAS OF EXPERTISE

| | |
|---|---|
| Public economics and public expenditure analysis | Labor-market effects of enforcement policy |
| Total Economic Cost, external-cost, and economic-impact analysis | Economics of crime, punishment, and state enforcement institutions |
| Cost-benefit analysis and public policy evaluation | Criminal justice policy and incarceration |
| Public infrastructure and lifecycle-cost analysis | Quantitative empirical methods and econometric analysis |
| Migration, labor markets, and enforcement policy | Political economy of public institutions |

## ACADEMIC APPOINTMENTS

**John Jay College of Criminal Justice, City University of New York**

Associate Professor of Economics, 2019–Present
Assistant Professor of Economics, 2012–2019
Lecturer, Department of Economics, 2009–2012

## ACADEMIC LEADERSHIP

**John Jay College of Criminal Justice, City University of New York**

Deputy Chair, Department of Economics, 2026–Present
Chair, Department of Economics, 2020–2026
Interim Chair, Department of Economics, 2018–2019
Undergraduate Program Coordinator, Department of Economics, 2015–2020

## EDUCATION

Ph.D., Economics, University of Massachusetts Amherst, 2012
B.S., Aerospace Engineering, Embry-Riddle Aeronautical University, 2000
B.S., Science, Technology, and Globalization, Embry-Riddle Aeronautical University, 2000

## PUBLICATIONS DURING THE PREVIOUS TEN YEARS, 2016–2026

### Edited Book

Dhondt, G. L., Z. Kurti, and J. Shanahan, eds. 2022. Treason to Whiteness Is Loyalty to Humanity, by Noel Ignatiev. New York: Verso.

### Peer-Reviewed Journal Articles

Dhondt, G. L. 2026. "The Market." Dialectical Anthropology 50: 465–472. https://doi.org/10.1007/s10624-026-09844-9.

Dhondt, G. L., M. Dufour, and I. J. Seda-Irizarry. 2019. "Keeping Class in the Conversation in the Age of the 1%." American Review of Political Economy 13(1).

Dhondt, G. L. 2018. "The Effect of Prison Population Size on Crime Rates: Evidence from Cocaine and Marijuana Mandatory Minimum Sentencing." American Review of Political Economy 12(1).

Dhondt, G. L., M. Perron-Dufour, and I. J. Seda-Irizarry. 2018. "Behind the Masks of Total Choice: Teaching Alienation in the Age of Inequality." International Journal of Pluralism and Economics Education 9(1–2): 36–49.

Dhondt, G. L., M. Dufour, J. Hamilton, and I. J. Seda-Irizarry. 2017. "Developing Heterodox Economics Curriculum: The Case of John Jay College." American Review of Political Economy 11(2): 126–136.

Wendel, T., G. L. Dhondt, R. Curtis, and J. Hamilton. 2016. "Cheaper Drugs, and Thus Less Crime: The Crime Drop's Philosopher's Stone?" Dialectical Anthropology 40: 385–393.

Wendel, T., G. L. Dhondt, R. Curtis, and J. Hamilton. 2016. "More Drugs, Less Crime: Why Crime Dropped in New York City, 1985–2007." Dialectical Anthropology 40: 319–393.

**Encyclopedia Entry**

Fernandez, L. A., and G. L. Dhondt. 2017. "Anarchist Criminology." In The Routledge Companion to Criminological Theory and Concepts, edited by A. Brisman, E. Carrabine, and N. South, 230–233. Routledge.

## MANUSCRIPT UNDER REVIEW

Dhondt, G. L. "If Workers Are Not Paid What They Produce: From Clark to the Intermediate Microeconomics Classroom." Submitted to Review of Political Economy, June 2026.

## SELECTED EARLIER PUBLICATIONS AND REPORTS

Dhondt, G. L. 2015. Review of The Punishment Imperative: The Rise and Failure of Mass Incarceration, by Todd R. Clear and Natasha A. Frost. Crime, Law and Social Change 64: 201–204.

Clear, T. R., N. A. Frost, M. Carr, G. L. Dhondt, A. A. Braga, and G. A. R. Warfield. 2014. "Predicting Crime Rates Through Incarceration: Assessing the Impact of Rates of Prison Cycling on Rates of Crime in Communities." National Criminal Justice Reference Service, Document No. 247318, Award No. 2009-IJ-CX-4037.

Dhondt, G. L. 2012. "The Bluntness of Incarceration: Crime and Punishment in Tallahassee Neighborhoods, 1995–2002." Crime, Law and Social Change 57(5): 521–538.

## FUNDED RESEARCH

Principal Investigator, PSC-CUNY Research Award, 2017–2018. "The Impact of State-Level Marijuana Budget Initiatives on the Price of Marijuana: An Econometric Analysis." Award amount: $11,945.67.

Co-Investigator, National Institute of Justice, U.S. Department of Justice, 2009–2013. "Predicting Crime Rates Through Incarceration: Assessing the Impact of Rates of Prison Cycling on Rates of Crime in Communities." Award amount: $298,000.

## QUANTITATIVE AND ANALYTICAL METHODS

- Econometric analysis
- Policy impact evaluation
- Public expenditure analysis
- Economic-impact estimation
- Cost-benefit analysis
- Total Economic Cost and external-cost analysis
- Labor-market impact analysis
- Statistical analysis using Stata, R, SAS, and EViews

## RELEVANT TEACHING EXPERIENCE

**John Jay College of Criminal Justice, City University of New York**

**Undergraduate Courses**

- ECO 101: Introduction to Economics and Global Capitalism
- ECO 105: Understanding the U.S. Through Economic Data
- ECO 199: Demystifying Economics
- ECO 170: Crime, Class, and Capitalism / Introduction to Economics and Social Problems
- ECO 225: Intermediate Microeconomics
- ECO 315: Economic Analysis of Crime
- ECO 327: Political Economy of Gender
- ECO 389: History of Economic Thought
- ECO 405: Capstone Seminar in Economics
- ISP 322: Making Waves: Troublemakers, Gadflies, and Whistleblowers

ECO 231: Economic Development and Crime

**Graduate Courses**

ECO 711: Economic History

PAD 704: Economics for Public Administration

ECO 799: Seminar in Economics

**University of Massachusetts Amherst**

Department of Economics: The Political Economy of Women; The Culture and Economics of U.S. Prisons; Labor in the U.S. Economy.

Social Thought and Political Economy Program: Junior Seminar I and II.

Massachusetts College of Art: American Thought and Government.

## SELECTED LECTURES, PRESENTATIONS, AND PUBLIC TALKS

**Migration, Border Enforcement, and Political Economy**

"The Logic of Failure: Success Through Failure in Border Enforcement in the Neoliberal Era." 2026. Association for Heterodox Economics Annual Conference, Coimbra, Portugal.

"Neoliberalism, Migration, and the Logic of Enforcement." 2024. Invited lecture, Western New England University, Springfield, MA.

"Neoliberalism, Migration, and the Logic of Enforcement." 2024. Invited lecture, Bennington College, Bennington, VT.

"Neoliberalism, Migration, and the Logic of Enforcement." 2024. Invited lecture, Hampshire College, Amherst, MA.

**Prison Labor, Carceral Political Economy, and Mass Incarceration**

Keynote speaker, "Carceral Political Economy in the Era of Late Mass Incarceration." 2025. The New School for Social Research, Robert L. Heilbroner Center for Capitalism Studies, and Law and Political Economy Project, New York, NY.

"From Labor Discipline to Labor Segmentation: The Evolving Labor Market Consequences of American Mass Incarceration." 2023. Union for Radical Political Economics session, "Critical Perspectives on Care, Carceral Systems, and Capitalism," Allied Social Science Associations Annual Meeting, New Orleans, LA.

"Prison Labor in U.S. State Prisons, 1974–2016: New Slavery or Enforced Idleness?" 2022. American Society of Criminology Annual Meeting, Atlanta, GA. Presented with Eric Seligman.

"Prison Labor in U.S. State Prisons, 1974–2016: New Slavery or Enforced Idleness?" 2022. Union for Radical Political Economics session, "Modern Prison Labor: Scale, Content, and Wages," Allied Social Science Associations Annual Meeting. Presented with Eric Seligman.

"Prison Labor in U.S. State Prisons, 1974–2016: New Slavery or Enforced Idleness?" 2021. Harvard Kennedy School, Criminal Legal Contact and the Labor Market, Cambridge, MA. Presented with Eric Seligman.

"Prison Labor in U.S. State Prisons, 1974–2016: New Slavery or Enforced Idleness?" 2021. Seventh Annual Transformative Justice and Abolition Criminology Conference, Save the Kids. Presented with Eric Seligman.

"The Impact of State-Level Marijuana Budget Initiatives on the Price of Marijuana." 2018. Eastern Economic Association Annual Conference, Boston, MA.

"Law and Stratification Economics." 2018. Eastern Economic Association Annual Conference, Boston, MA.

"Mass Incarceration and Stratification Economics." 2017. ASHE/NEA Freedom and Justice Summer Conference, New York, NY.

"Race, Mass Incarceration, and Neoliberal Capitalism." 2016. Economic History and Development Workshop, Department of Economics, University of Massachusetts Amherst, Amherst, MA.

"Mass Incarceration and Neoliberalism." 2016. Center for Popular Economics Seminar, Amherst, MA.

"From Ferguson to Trump: Policing and Prisons in Modern Capitalism." 2016. Invited lecture, Western New England College, Springfield, MA.

"From Ferguson to Trump: Policing and Prisons in Modern Capitalism." 2016. Invited lecture, Bennington College, Bennington, VT.

"Logic of the Whip." 2015. American Society of Criminology Annual Meeting, Washington, DC.

"Prison Cycling and Crime in Communities: A Three-City Comparison." 2014. American Society of Criminology Annual Meeting, San Francisco, CA.

"Why Not Tear Down the Walls Now? Incarceration and Crime in the Neoliberal Period in the United States." 2014. National Economic Association and American Society of Hispanic Economists Summer Conference, Lewisburg, PA.

"Why Not Tear Down the Walls Now? Incarceration and Crime in the United States." 2013. Department of Criminology and Criminal Justice, Northern Arizona University, Flagstaff, AZ.

"Prison Cycling, Crime, and the Community: A Replication." 2013. American Society of Criminology Annual Meeting, Atlanta, GA.

"Modeling the Impact of Incarceration on Crime at the Community Level." 2013. American Society of Criminology Annual Meeting, Atlanta, GA.

"The Effect of Prison Population on Crime Rates: Evidence from Mandatory Minimums for Drugs." 2012. American Society of Criminology Annual Meeting, Chicago, IL.

"Logic of the Whip: Mass Incarceration as Labor Discipline in the Neoliberal Era in the U.S." 2012. Allied Social Science Associations Annual Meeting, Chicago, IL.

"The Bluntness of Incarceration: Crime and Punishment in Tallahassee Neighborhoods, 1995–2002." 2011. American Society of Criminology Annual Meeting, Washington, DC.

"Prison Cycling and Crime in Newark, New Jersey." 2011. American Society of Criminology Annual Meeting, Washington, DC.

"More Drugs, Less Crime: Why Crime Dropped in New York City and the U.S., 1981–2007." 2011. Understanding the Crime Decline in New York, John Jay College of Criminal Justice, New York, NY.

"How Incarceration Increases Crime: Theoretical and Empirical Approaches." 2009. Association for Institutional Thought Annual Meeting, Albuquerque, NM.

"The Effect of Prison Population on Crime Rates: Evidence from Mandatory Minimums for Drugs." 2009. Union for Radical Political Economics at the Eastern Economic Association Annual Conference, New York, NY.

"How Prisons Increase Crime." 2007. International Confederation of Associations for Pluralism in Economics Conference, University of Utah, Salt Lake City, UT.

## PROFESSIONAL AFFILIATIONS

American Economic Association
National Economic Association
Union for Radical Political Economics
International Association for Feminist Economics
Eastern Economic Association
Society for the Study of Social Problems
American Society of Criminology
Association for Economic and Social Analysis
Professional Staff Congress, CUNY

## SELECTED SERVICE

Faculty Advisor, Economics Club, John Jay College, 2009–2025
Faculty Advisor, Law and Political Economy Club, John Jay College, 2021–2025
Faculty Advisor, Arab Student Union, John Jay College, 2023–2025
Faculty Advisor, Economics of World-Making Club, John Jay College, 2024–2025
Staff Economist, Center for Popular Economics, 2002–Present

## HONORS AND AWARDS

Distinguished Teaching Award, John Jay College of Criminal Justice, 2015
Faculty Service to Students Award, John Jay College of Criminal Justice, 2012
Dean's List Students Certificate of Appreciation, John Jay College of Criminal Justice, 2010, 2011, and 2012
Excellence in Teaching Award, Continuing and Professional Education, University of Massachusetts Amherst, 2003 and 2004

## PRIOR EXPERT TESTIMONY

None. Dr. Dhondt has not testified as an expert at trial or by deposition during the preceding four years.

# APPENDIX II

## TECHNICAL CALCULATIONS AND SUPPORTING ASSUMPTIONS FOR THE TOTAL ECONOMIC COST OF A NEARLY CONTINUOUS BORDER WALL SYSTEM

Friends of the Ruidosa Church v. Mullin, W.D. Tex. No. 3:26-cv-01099-KC. Unless otherwise stated, figures are expressed as present values in constant 2025 dollars using a 3 percent real discount rate. Budgetary, trade, enforcement, community, and mortality flows are evaluated over 30 years (annuity factor 19.6); ecological flows are evaluated over 60 years (factor 27.7). The summed ledger is the central estimate of total economic cost, and the categories it leaves unpriced are judged to place the true cost higher.

## EXECUTIVE COST LEDGER

### 1. Summed Total Economic Cost, Parts I–VI

| Part | Low | Central | High |
|---|---|---|---|
| I – Government and direct budgetary | ~$174B | ~$256B | ~$406B |
| II – Environmental and natural resource | $17B | $56B | $150B |
| III – Costs to border communities | $6B | $18B | $44B |
| IV – Trade and economic integration | $4B | $24B | $104B |
| V – Enforcement-induced | $2B | $37B | $226B |
| VI – Mortality and nonfatal injury | $17B | $122B | $393B |
| Total economic cost (summed) | ~$220B | ~$513B | ~$1,323B |

The summed ledger is stated before credits. Part VII deducts, once, the identified appropriations and the estimated value of qualifying barrier infrastructure already standing.

| | Amount |
|---|---|
| Gross total economic cost (Parts I–VI, central) | ~$513B |
| Less: appropriation already provided | ~$49B |
| – OBBBA §90001 barrier/wall system | $46.55B |
| – OBBBA §90004 standalone surveillance towers | ~$2.65B |
| Less: value of the barrier already standing | ~$15B ($12–18B) |
| Net total economic cost | ~$449B |

## METHODOLOGY AND COMMON ANALYTICAL CONVENTIONS

### What the Appendix Estimates

This appendix estimates the total economic cost of completing a nearly continuous border wall system along the 1,954-mile U.S.-Mexico border. It first estimates the completed system as a whole and then credits the approximately 644 miles of qualifying primary pedestrian barrier already standing in Part VII.[38] It works within applied welfare economics, under which the cost of

[38] The 644 miles already standing is primary pedestrian barrier a completed wall would not rebuild. Harrity et al. 2024 count about 636 miles of steel-bollard wall and about 105 miles of older vehicle barrier as of 2024. The Congressional Research Service documents the same composition, roughly 300 miles of the pre-2017 barrier impeding vehicles rather than people (CRS R45888), and a 2024 CBP count of about 684 miles of pedestrian and vehicle fence combined is consistent. The vehicle

a policy includes the resource costs borne by government and the external costs imposed on third parties. This appendix does not separately estimate the value of alternative uses of the labor, land, materials, equipment, or public funds committed to the project.[39] The relevant measure is broader than the fiscal outlay. It is the aggregate value the barrier would subtract from society, of which the appropriated expenditure is one component, standing alongside the mortality, the ecological damage, the forgone trade, and the costs that fall outside any government account.

One empirical premise runs across every component that turns on the behavioral response to the barrier. The evidence from prior border-barrier construction is that hardening accessible crossing routes displaces migration toward more hazardous terrain rather than deterring it in proportion, so crossing volumes are largely sustained and redistributed toward higher-fatality corridors, and that displacement response is adopted as the basis for the mortality and enforcement estimates.[40]

**The valuation of heterogeneous costs**

The costs the barrier imposes are heterogeneous in kind, and applied welfare economics prescribes no single technique for valuing them. Each class of effect carries an established method, and to each is applied the one the literature developed for it. Mortality risk takes the value of a statistical life, the standard federal instrument for monetizing changes in fatality risk.[41] Injury to natural resources takes restoration cost, the measure that governs natural-resource-damage assessment in United States law.[42] Trade effects apply the welfare parameters the empirical literature on trade costs and integration recovers to the incremental border friction a barrier imposes.[43] Losses to real property come from hedonic price functions, which identify the capitalized effect of comparable disamenities on land values.[44] Morbidity is valued through cost-of-illness and quality-adjusted-life-year methods. The non-market value of the species and cultural resources the barrier endangers is estimated, where a monetary figure is required at all, by stated-preference methods.[45] Construction, operation, and decommissioning are costed by standard quantity-surveying and engineering-economic methods, and prospective cost growth by reference-class forecasting against the realized overrun distribution of comparable megaprojects.[46] Imposing a single technique across categories to which it is ill-suited would purchase a superficial uniformity at the

barrier, passable on foot, counts among the miles still to build. The report uses the measured counts over CBP's Smart Wall planning map, a planning target rather than an inventory.

[39] The applied-welfare, or social-cost, tradition of cost-benefit analysis. For the standard treatment, (Boardman et al. 2018). For the federal codification, (OMB 2003).

[40] The displacement premise, the documented "prevention through deterrence" posture, is developed with its fatality parameters in the mortality analysis.

[41] The value of a statistical life is recovered mainly from labor-market and stated-preference studies. (Viscusi and Aldy 2003), with the value-of-statistical-life guidance of the Departments of Transportation and Health and Human Services.

[42] See (Ohio v. DOI 1989, 459-64), and the natural-resource-damage-assessment regulations of the Department of the Interior and the National Oceanic and Atmospheric Administration, for restoration cost as the measure of natural-resource damage under United States law.

[43] The trade-cost, border-friction, and integration welfare parameters, and their sources, are set out in the trade analysis.

[44] See (Rosen 1974) for the hedonic price function.

[45] Non-market values are estimated by stated-preference (contingent-valuation) methods. They are applied under the Report of the NOAA Panel on Contingent Valuation (Arrow et al. 1993).

[46] Reference-class forecasting corrects optimism bias by conditioning on the realized outcome distribution of comparable projects. (Flyvbjerg 2006).

cost of validity, so each effect is valued by the method the discipline established for it and that method's assumptions and uncertainty are specified where the cost is derived.

**Common analytical conventions**

Several conventions apply uniformly and are set out once here.

All values are constant 2025 dollars. Nominal figures from earlier periods are carried forward on the price index specific to the resource measured. For example, the heavy-civil-construction index is used for the structure's capital cost rather than a general consumer index, because the input costs of large civil works have diverged sharply from consumer prices over the relevant interval and a general index would materially understate current capital cost.

Intertemporal costs are discounted to present value at a real 3 percent. That rate is the social rate of time preference, approximated by the real yield on long-term government debt, and it is the rate appropriate to a public project whose costs fall on consumption, on the affected population, and on natural resources rather than on displaced private capital, the case for which federal guidance recommends a higher 7 percent rate.[47] The discount rate matters most for the components that accrue over long horizons, maintenance, mortality, and ecological loss, and the aggregate's sensitivity to it is reported in the synthesis. Discounting harm realized decades hence raises a question of intergenerational valuation the theoretical literature divides on, discounting future mortality and ecological loss at the rate applied to deferred consumption being defensible in standard analysis and contested on ethical grounds.[48] The 3 percent rate sits between those poles, and where the point applies this report records that the true cost of a future loss may exceed its discounted value.

Costs accumulate over horizons that differ by component with the temporal profile of the loss. The capital, operating, and decommissioning costs of the structure, with the mortality and trade effects, run 30 years, the conventional appraisal horizon for major federal infrastructure and a defensible service life before substantial reconstruction. That horizon is conservative for a structure meant to be permanent, and for the recurring costs the larger present values a perpetuity assumption gives are also reported. Ecological costs run 60 years, because the recovery trajectory of the affected desert and riparian systems and the forgone service flow extend well beyond the structure's fiscal service life, and truncating the ecological account at the shorter horizon would artificially end the accumulation while the loss continued.

Effects the barrier and the wider enforcement system produce jointly are attributed to the barrier at its marginal contribution. Several priced harms, among them the desert fatalities, the smuggling-route violence, and the chronic health effects of the enforcement corridor, arise from the barrier acting with the apparatus of personnel, surveillance, checkpoints, and detention around it, and in each case only the barrier's marginal share is estimated and charged. This is the conservative rule. A but-for standard asks what portion of the harm would not have occurred absent the barrier and would generally attribute more, and the report identifies the components where the two standards

[47] Circular A-4 set the 3 percent and 7 percent rates (OMB 2003). A 2023 revision lowered the central rate below 3 percent (OMB 2023) before it was rescinded and the 2003 rates reinstated in early 2025. The report applies 3 percent as its principal rate and reports the 7 percent result as a sensitivity in the synthesis.

[48] The rate for discounting harms to future generations divides the literature, the low-rate Stern Review (Stern 2007) against the higher, descriptively grounded Nordhaus (2007). The 3 percent applied here sits between those poles.

diverge. Attribution at marginal contribution holds the aggregate below what a but-for standard would support.

**The construction of the range**

Every priced line carries a low, a central, and a high, built to one rule. The central value is the principal estimate. Each parameter takes the value its own stated selection rule identifies, such as the midpoint of a bounded interval, the meeting point of two independent methods, the rate an executed contract sets, or the value a primary source reports, and where the conservatism convention resolves the choice downward the section states what the higher value would have been worth. The central is never a bound.

The low and the high are bounds, not forecasts and not a confidence interval. Each sets every parameter that drives the line to its own stated limit in the same direction and carries it through the arithmetic. For a product or a chain the low takes the low of every factor and the high the high of every factor. Line bounds are summed across lines without adjustment, which makes the aggregate span wider than a jointly modelled estimate, since the lines do not reach their extremes together. No correlation adjustment is applied and no probability is attached.

The report-wide conventions are held fixed and are not parameters in the range. The 3 percent discount rate, the 2025 price year, and the 30-year and 60-year horizons are reported once as a sensitivity in the synthesis, because each moves every discounted line at once, and a range built by moving a report-wide convention would confound the uncertainty in a line with the choice of a convention. A range built by moving the discount rate is not a range in this sense.[49]

**The structure of the aggregate**

The components are further evaluated according to a degree of confidence in the concreteness of the underlying calculations, each with a running subtotal, so the robustness of the aggregate is transparent and no single component's failure propagates to other components. The first tier includes the direct budgetary cost of construction, maintenance, and decommissioning, resting on federal cost documentation, executed contracts, and established engineering-economic method. The second includes the external costs: mortality, ecological injury, trade loss, enforcement-induced violence, and the burden on border communities, which are empirically documented effects valued at a scoped and documented magnitude. The third is the contingent valuations, principally the non-market value of the species and cultural resources the barrier endangers, resting on the stated-preference methods assigned the lowest confidence. The tiering lets an assessor persuaded of the first tier and skeptical of the third locate exactly the value at issue.

Each effect is counted once. Where components touch a common harm the boundary between them is specified. For example habitat injury valued as restoration cost is not revalued as forgone service, and fatalities counted in the mortality account are not recounted in the county fiscal burden that responds to them. The account is gross of offsetting credits, which are applied once at the synthesis, where the appropriated funds and the value of the existing barrier are deducted from the aggregate rather than netted against individual components.

---

[49] The range departs from the confidence-interval method of the federal cost-estimating guide (GAO-20-195G), which reads a confidence level off a probability distribution over a single project's correlated inputs. The six accounts here have no joint distribution, so the low and high are deterministic bounds, each account at its own stated limits, labelled as bounds throughout.

**What the estimate leaves out**

The central estimate is the report's principal figure for total economic cost. Several of its conventions push the figure down, including the finite horizon applied to a structure meant to be permanent, the discounting of harm realized decades hence, and attribution at marginal rather than but-for contribution. Beyond the priced total, categories of genuine cost are omitted, either because no defensible method reaches them or because the harm does not admit of monetary expression. The components valuing mortality, biodiversity, and cultural heritage rest on methods that understate them by their own construction. The report's account of the limits of its analysis enumerates the omitted categories. It is on those omissions and those understating methods that the report rests its judgment that the true economic cost runs above the figure derived here.

## PART I – DIRECT AND GOVERNMENTAL COSTS

Completing a nearly continuous border wall system across the 1,954-mile southern border would cost the federal government about $256 billion in 2025 dollars, within a range of roughly $174 billion to $406 billion.

| Direct cost | Low | Central | High |
|---|---|---|---|
| Construction, with cost overrun | $88B | $135B | $236B |
| Operations and maintenance, 30-year present value | $67B | $88B | $99B |
| Technology and surveillance, 30-year present value | $12B | $19B | $38B |
| Decommissioning and removal, present value | $6B | $12.5B | $28B |
| Land acquisition | $0.4B | $0.85B | $3.1B |
| Condemnation litigation and administration | $0.15B | $0.5B | $1.6B |
| **Total direct cost** | **~$174B** | **~$256B** | **~$406B** |

### I.1 Construction

Building a continuous barrier along all 1,954 miles of the southwest border would cost about $101 billion before any allowance for cost growth. The border divides into a small number of distinct terrain types, the cost of building barrier differs sharply from one to the next, and the federal government has already awarded contracts to build barrier in most of them. Pricing each terrain type at the rate the government has actually paid for comparable work, carrying those rates forward to 2025 construction costs, and summing across the border produces the base construction figure.

A single national rate applied to the whole line would misstate the cost at both ends. A mile of thirty-foot bollard wall across open desert on an existing access road is a routine job. A mile through roadless mountains, across the leveed floodplain of the Lower Rio Grande, or down into the river canyons of the Big Bend is a far harder and costlier one. The estimate therefore prices five terrain types separately, each at a rate grounded in what the government has paid to build barrier on that kind of ground.

| Terrain | Border miles | Basis (executed contract, award year) | Rate per mile, 2025 | Subtotal |
|---|---|---|---|---|
| Open desert and scrub | 500 | open-country bollard, $18–22M (2020) | $37M | $18.5B |
| Urban border cities | 80 | San Diego and El Centro, $33M (2020) | $58M | $4.6B |

| | | | | |
|---|---|---|---|---|
| Lower Rio Grande Valley | 350 | levee wall, $21–28M (2018–2020) | $43M | $15.1B |
| Mountain and rugged | 120 | Guadalupe Canyon, $41M (2020) | $72M | $8.6B |
| Remote river canyon | 904 | no contract, set below the Guadalupe rate | $60M | $54.2B |
| **Total** | **1,954** | | **~$52M avg** | **~$101B** |

Four of the five rates rest on executed contracts. In the 2017 to 2021 construction program, open-country steel bollard fence ran about $18 to $22 million a mile, the urban replacement barrier in San Diego and El Centro about $33 million, and the levee wall along the Lower Rio Grande Valley about $21 to $28 million.[50] Guadalupe Canyon in the Peloncillo Mountains of Arizona, the steepest and most remote terrain the government has ever walled, ran about $41 million.[51] Executed contract prices for barrier of the kind this estimate prices are the strongest available evidence of what building more of it would cost.

Those contracts were awarded between 2018 and 2020, and heavy civil construction has grown substantially more expensive since. The Federal Highway Administration's construction cost index, which tracks the labor, steel, concrete, and earthwork that dominate a project of this kind, rose about 75 percent between early 2019 and 2025.[52] Carrying the award prices forward on that index puts open desert at about $37 million a mile, the urban segments at about $58 million, the valley levee wall at about $43 million, and Guadalupe-type mountain terrain at about $72 million in 2025 dollars.

The fifth terrain type, the remote river canyon, carries no contract of its own. About 904 miles of the border run through this country, much of it along the Rio Grande, where the 1970 boundary treaty holds the barrier back from the river and onto ground that is steep, roadless, and slow to reach. Pricing those miles calls for a reasoned rate. The estimate carries them at $60 million a mile, set below the $72 million that the Guadalupe experience would otherwise support. Two facts hold

[50] Award-year rates from the border-barrier contracts of the 2017 to 2021 program. Open-country steel bollard ran about $18 to $22 million a mile, in line with the 576-mile system near $11 billion, about $20 million a mile, reported in early 2020 (NPR 2020). The San Diego and El Centro urban replacement ran about $33 million a mile under an April 2020 contract modification that already carried its own escalation (Trevizo and Schwartz 2020). The Lower Rio Grande Valley levee wall ran about $21 to $28 million a mile, the band endpoints a $167 million award for about 8 miles and a $304.6 million award for about 11 miles (Construction Dive 2019 and CBP 2019 levee contracts).

[51] Guadalupe Canyon in the Peloncillo Mountains of Arizona ran about $41 million a mile in 2020, per a U.S. Army Corps of Engineers public affairs officer, across roughly five miles that required switchback roads and blasting (High Country News 2020), corroborated from the Corps by the Arizona Daily Star (Drovers 2022). It is the steepest and most remote ground the government has completed.

[52] Federal Highway Administration National Highway Construction Cost Index, which rose about 75 percent from the first quarter of 2019 to the full-year 2025 average, a factor of about 1.75 (FHWA and DOTa). Heavy civil construction consumes the labor, steel, concrete, and earthwork the index tracks, so it carries award-year barrier prices to 2025 more faithfully than a general consumer price index, which rose only about 26 percent over the same span. A steel-heavy bollard wall escalates faster still, since the Section 232 steel tariff rose to 50 percent in mid-2025.

the rate there. On the accessible canyon ground it has walled, the government has realized about $43 million a mile, and through the roughest Rio Grande canyons it has generally built only patrol roads and low vehicle barrier.[53] A $60 million rate stands above what the government has actually paid on reachable canyon ground and below the cost of the hardest terrain it has attempted.

Summing the five terrain types gives a base construction cost of about $101 billion, an average of roughly $52 million a mile. The remote canyon, at $60 million across 904 miles, accounts for a little more than half of the total, which follows from its length and the difficulty of the ground. The base carries a range of about $77 billion to $125 billion, built by holding the terrain mileage fixed and moving each rate to the low and high ends of the evidence behind it.[54]

This $101 billion prices the barrier at rates the government has already paid, before allowing for the cost growth that federal construction on this scale reliably experiences. That growth is estimated in the next section and carries the construction figure to about $135 billion, the amount that enters the account.

### I.2 Cost Overruns

| Reference point | Overrun | Basis |
|---|---|---|
| Roads | ~20% | reference class [55] |
| Bridges and tunnels | ~34% | reference class |
| Rail | ~45% | reference class |
| Cato, applied to the wall | 50% | assumption, called conservative by its author [56] |

[53] The remote canyon has no current executed reference contract, and the rate is bounded by two realized contracts. On the accessible canyon ground the government has walled, realized cost carries to about $43 million a mile, supported by the Guadalupe build and the 2026 Big Bend primary-wall award of $18.4 million a mile (High Country News 2020 and The Center Square 2026). Through the roughest Rio Grande canyons, in and around Big Bend National Park and the Lower Canyons, it has to date contracted only for patrol roads, sensors, and low vehicle barrier, at about $16.6 million a mile (The Center Square 2026 and Houston Public Media 2026). The inland setback along much of this alignment follows from the 1970 boundary treaty, which holds the barrier back from the Rio Grande (1970 Water Treaty).

[54] The range holds the terrain mileage fixed and moves the rates to the bounds of their evidence. The low of about $77 billion prices the remote canyon at the $43 million realized on reachable canyon ground and the contracted terrains at their band floors, and the high of about $125 billion prices the roadless canyon at $85 million, a premium above the Guadalupe experience, holding the others at their carried anchors. The canyon rate carries the range.

[55] Reference-class overrun averages from 258 public works projects, about 20 percent for roads, 34 percent for bridges and tunnels, 45 percent for rail, right-skewed, with systematic underestimation at the planning stage (Flyvbjerg et al. 2002).

[56] $24.4M × 1.5 = $36.6M/mi, × 1,637 unfenced miles = $59.8B in 2019 dollars, which already contains a 50 percent overrun and is not a base estimate. Cato also states that OMB's figure is the lowest possible estimate, that its own 50 percent overrun is conservative against a sample of federal projects assembled by Chris Edwards in which costs ran 3.3 times the estimate, that a concrete wall could more than double the price, and that the $864,353 maintenance figure is a low-ball (Nowrasteh 2019).

| Reference point | Overrun | Basis |
|---|---|---|
| The wall's own award-to-revision record | ~130% | realized [57] |
| Big Dig, Boston | ~190% | comparable [58] |
| California High-Speed Rail | ~110% | comparable[59] |
| Federal construction sample, Edwards | ~230% | comparable |

This table shows that substantial cost growth is common in large transportation and infrastructure projects. Across broad groups of completed projects, average overruns range from approximately 20 percent for roads to 45 percent for rail. Individual megaprojects have experienced much larger increases. California High-Speed Rail's estimated cost increased by approximately 81 percent even after design changes reduced the project's cost, while the border wall's own contracts have risen by approximately 130 percent from their original award prices. Against these benchmarks, the 34 percent blended overrun applied in this report is not an extreme assumption. It falls below the typical rail benchmark applied to the more uncertain portion of the project and far below the wall program's own observed escalation.

That loading is lower than the reference classes report and far lower than the wall's own record, because most of the escalation is already inside the base. Guadalupe's $41 million a mile and the San Diego modification's $33 million are what those contracts cost after modification. The two largest 2019 contracts were awarded at $9.5 million a mile and carried $22 million within a year, an escalation of about 130 percent, and that escalation is what turned award prices into the realized prices the base uses. Charging it against them a second time would count one failure twice.

The $46.8 billion of realized rates has absorbed its own escalation and carries 15 percent on unbuilt miles of the same terrain. The $54.2 billion of canyon is a moderated rate transferred from Guadalupe onto ground that is roadless and far longer, with no bid behind any of it, and a rate reached by transfer carries forward-estimate risk that a let contract does not. $46.8 billion at 15 percent and $54.2 billion at 50 percent gives $135 billion. The range compounds the base with the overrun, since both run on the same ground, and at its ends a canyon mile costs $54 million realized or $191 million.[60]

---

57 $788M ÷ 83 miles = $9.5M/mi at award, and above $3B ÷ about 135 miles = $22M/mi within a year, an escalation of about 130 percent. Part of that is added mileage on costlier terrain rather than pure price growth, so 130 percent is a gross upper reading (Trevizo and Schwartz 2020).

58 Boston's Central Artery and Tunnel rose from an initial estimate near $2.8 billion to about $14.6 billion nominal, $21.9 billion with interest, an overrun near 190 percent in constant dollars, a representative case of the long right tail in Flyvbjerg's megaproject work.

59 The California State Auditor found that the California High-Speed Rail Authority's systemwide cost estimates had increased by approximately 81 percent since its 2009 business plan. The increase would have been approximately 111 percent absent savings obtained by replacing portions of the originally planned dedicated high-speed system with shared or "blended" rail infrastructure. The audit further found that incomplete land acquisition, unresolved utility relocation, and insufficient coordination with external stakeholders had generated more than $600 million in executed change orders for three Central Valley construction contracts and that another $1.6 billion in contract changes was then expected to complete them. California State Auditor, *California High-Speed Rail Authority: Its Flawed Decision Making and Poor Contract Management Have Contributed to Billions in Cost Overruns and Delays in the System's Construction*, Report No. 2018-108, November 15, 2018, ch. 1.

60 $46.83B × 1.15 + $54.24B × 1.50 = $135.2B, a blended 33.8 percent on the $101.07B base. The $46.83B terrain is priced off let contracts already containing their escalation, so its residual is

Cato's widely cited $59.8 billion is this estimate in 2019 dollars, across a shorter line, on a flat national rate, with a heavier overrun. Carried on the construction index, extended from 1,637 miles to 1,954, put on terrain rates averaging $51.7 million a mile rather than OMB's flat national figure carried to $41.7 million, and loaded at 34 percent rather than Cato's flat 50, it is $135 billion.[61]

### I.3 Operations and Maintenance

Operating and maintaining a nearly continuous border wall system would cost about $4.49 billion a year, with a 30-year present value of about $88 billion at 3 percent, within a range of $67 billion to $99 billion.

| Estimate | Coverage | Year | Per mile, per year | In 2025 dollars |
|---|---|---|---|---|
| DHS realized spending | existing fence, ~650 mi | FY2017 | ~$420,000 | ~$553,000 [62] |
| Texas state segments | its own segments | 2024 | ~$500,000 | ~$514,000 [63] |
| OMB estimate, stated as a floor | steel barrier | 2019 | $864,353 | ~$1.21M [64] |
| U.S. Army Corps, set aside | primary fence | n/a | $5–8M | $5–8M [65] |

Maintenance is closer to a cost per mile than a share of construction. DHS spent $274 million in 2017 keeping up 650 miles of legacy fence that had cost $2.4 billion to install, an annual cost of more than a tenth of what the structure cost to build. A wall that costs fifteen times as much to

---

bounded 5 to 30 percent and loaded at 15. The $54.24B canyon is a moderated rate transferred from Guadalupe with no bid, so 50 percent sits above the 20–45 percent reference classes and well below the 130 percent this program ran on easier ground. Low, $38.13B × 1.05 + $38.87B low canyon × 1.25 = $88B, a canyon mile at $54M realized. High, $48.18B × 1.30 + $76.84B high canyon × 2.25 = $236B, a canyon mile at $191M realized. Parameters are the two loadings and the base rates.

[61] $59.8B × 1.746 (construction index) × 1.1937 (1,954 miles rather than 1,637) × 1.2398 (a terrain-differentiated base averaging $51.7M/mi rather than OMB's flat national average carried to $41.7M) × 0.892 (a 33.8 percent blended overrun rather than Cato's flat 50 percent) = $137B, bracketing the $135B bottom-up build. Cato's $59.8B = $24.4M × 1.5 × 1,637 miles in 2019 dollars, for steel bollard rather than concrete (Nowrasteh 2019).

[62] $274M ÷ 650 miles = $420,000/mi in FY2017, × (322.5 ÷ 245.1) = $553,000 in 2025 dollars. Against the $2.4B that infrastructure cost across 654 miles, about $3.7M/mi, the realized annual charge is over 11 percent of construction cost (AIC 2025 (cost)). Build cost and the 654 miles of primary fencing and 5,000 miles of roads CBP sustains, from GAO-17-331 (FY2007–2015).

[63] $500,000/mi in 2024 × (322.5 ÷ 313.7) = $514,000 in 2025 dollars (Texas Tribune 2024 (Abbott wall)).

[64] The carry blends 70 percent labor and inspection at consumer prices with 30 percent materials at the construction index (1.7104), the weight following the composition of GAO's five maintenance categories. No published breakdown fixes it, so it is bounded 60/40 to 80/20, a span moving the carried floor and the low end of the range, not the central. The figure attaches to OMB's 2019 cost letter (OMB 2019), stated there as a floor, reported by Cato (Nowrasteh 2019).

[65] A U.S. Army Corps estimate of $5–8M/mi/yr for maintaining primary fence(TCS). Against a construction cost near $55M/mi this is 9% -18%a year, which reads as a lifecycle or whole-program figure carried in as an annual rate. It is set aside and informs none of the figures here.

build does not cost fifteen times as much to keep. Between 2010 and 2015 that fencing was cut through 9,287 times and patched at about $784 a breach.[66]

OMB's own estimate for the barrier it was proposing was $864,353 a mile a year, stated in the cost letter as a lower bound and read by Cato as a lower-bound estimate for the heavier bollard wall, and carried to 2025 that floor is $1.21 million. Uplifting it 1.7 times for a thirty-foot steel structure across roadless canyon and flood-scoured floodplain, where reaching a breach costs several times what it costs on a graded desert road, gives $2.05 million. The government's own life-cycle accounting runs higher from the other direction. A 2009 cost study prepared for CBP put the twenty-year life-cycle cost of the tactical infrastructure, the barrier with its roads and lighting, at about $6.5 billion against some $2.4 billion of construction, which is annual operations and maintenance on the order of 6 to 8.5 percent of construction, the surveillance network costed separately.[67] The central takes $2.3 million a mile, the uplift figure carried up slightly, which is 4.5 percent of the construction base per year and sits below the government's own life-cycle rate.

$2.3 million a mile across 1,954 miles is $4.49 billion a year, and at 3 percent over thirty years that is $88 billion. At the ends, the rate runs $1.75 million a mile, the uplift method at its floor, to $2.6 million where the terrain drives it, worth $67 billion to $99 billion.[68] Thirty years understates the obligation, because a wall built to stand is maintained for as long as it stands, and in perpetuity the stream is worth $150 billion. Moving the discount rate instead of the rate per mile puts the thirty-year figure at $56 billion at 7 percent and $101 billion at 2 percent.

### I.4 Land Acquisition

Acquiring the private land required for a nearly continuous border wall system would cost about $0.85 billion, within a range of $0.4 billion to $3.1 billion. Almost all of it falls in Texas, where

[66] 9,287 breaches in pedestrian fencing FY2010–2015 at an average repair cost of $784, treated by CBP as urgent repairs (GAO-17-331).

[67] A life-cycle cost study prepared for CBP, summarized in GAO-09-896, put the total twenty-year life-cycle cost of all tactical infrastructure, the fence with its roads and lighting, at about $6.5 billion against roughly $2.4 billion of construction, which nets to operations and maintenance on the order of 6 to 8.5 percent of construction a year once the build cost is removed; the SBInet surveillance network was a separate line, so this is already the barrier-and-roads rate. The $2.3M/mi central used here is 4.5 percent of the $51.7M/mi base, below the government's own life-cycle rate, and is reached independently from the uplift method (the OMB floor uplifted 1.7 times gives $2.05M), so the maintenance record bounds the estimate from above rather than the report reaching for it. The 1.7 uplift is bounded 1.5 to 2.0.

[68] $2.3M/mi × 1,954 = $4.494B/yr, × 19.60 (30-year annuity at 3 percent) = $88.1B. The $2.3M central is the OMB estimate uplifted 1.7 times ($2.05M) carried up slightly, below the government's own life-cycle rate of 6 to 8.5 percent of construction (GAO-09-896), so the maintenance record bounds it from above. The range runs $1.75M, the uplift method at its floor with a 1.5 uplift and 80/20 weight, to $2.6M where the terrain drives it, or $3.42B to $5.08B a year, worth $67.1B and $99.6B. Moving the discount rate instead, at 7 percent the factor is 12.41 giving $55.8B, at 2 percent 22.40 giving $100.7B. Perpetuity is $4.494B ÷ 0.03 = $149.8B. Parameter is the per-mile rate.

the Rio Grande frontage is privately held, only about 1.8 percent of land is federally owned, and the 1970 Boundary Treaty forces the wall back off the river and onto that private land.[69]

By July 2020, the government had acquired 135 private tracts and was working to acquire 991 more, about 5,275 acres, with 1,090 of the 1,126 tracts in south Texas, and its fee-simple offers ran from $1,440 to $870,261 an acre with a median of $13,336.[70] Among Rio Grande Valley owners who hired attorneys the median award ran 207 percent above the opening bid, $13,100 becoming $40,305, and one Hidalgo County tract went from a $233,000 offer to nearly $5 million.[71] That premium reconciles the $13,336 median with the $35,000 blend used here, which builds on market value rather than on the government's opening offers.

About 1,000 miles of the Texas river is private and unbarriered, and a 150-foot enforcement corridor takes 18.2 acres a mile, so the fee-simple strip runs to roughly 18,000 acres.[72] Most of it is irrigated riverfront cropland at two to four times the south Texas rural median of about $6,000 an acre, and close to a tenth runs through the developed edges of Brownsville and McAllen. Nine-tenths at $18,000 an acre and one-tenth at $190,000 blends to $35,200, and 18,000 acres at $35,000 with severance at 35 percent is $850 million.[73]

Severance damage, the loss in value to the land a taking leaves behind when a parcel is split and its strip condemned, is compensable under the federal appraisal standards, which require that injury to the remainder be valued along with the part taken.[74] The valuation literature puts it at a third to

---

[69] Roughly 30 percent of the nearly 2,000-mile southwest border is federal land, leaving private, tribal, and state ownership along the remaining 70 percent (GAO-21-114). About 1.8 percent of Texas land is federally owned (Nat. Immigration Forum 2019).

[70] As of July 2020 the government had acquired 135 private tracts and was working to acquire 991 more, about 5,275 acres, of which 1,090 of the 1,126 tracts were in south Texas. DOJ filed 109 declarations of taking January 2017 to August 2020. On the fee-simple cases GAO reported proposed compensation of $1,440 to $870,261 an acre, with a median of $13,336 (GAO-21-114).

[71] Among Rio Grande Valley owners represented by attorneys the median award ran 207 percent above the government's opening bid, $13,100 rising to $40,305. One Hidalgo County tract went from a $233,000 offer to nearly $5 million, and one 16-acre Brownsville tract had 257 claimants, each of whom had to be named, served, and paid (ProPublica and The Texas Tribune 2017).

[72] 1,254 Texas river miles, less roughly 110 already carrying levee wall or barrier in the Rio Grande Valley, less roughly 145 miles of federal frontage through Big Bend National Park (about 118 river miles), the Amistad recreation area, and the valley wildlife refuges, leaves about 1,000 miles of private, unbarriered frontage. No parcel census exists, so it is bounded at 800 to 1,200 miles, a span worth about $170M either side of the $850M central.

[73] The $18,000 is irrigated riverfront cropland at three times the south Texas rural median of about $5,850/acre in late 2024 and $6,041 by Q3 2025 (TRERC 2025, Fourth Quarter 2024, Region 6), so the band is $12,000 to $24,000. The $190,000 developed-edge rate sits inside the government's observed $1,440 to $870,261 an acre. Parameters are the per-acre blend, the developed share, the severance loading, and the mileage.

[74] The Uniform Appraisal Standards for Federal Land Acquisitions provide on partial acquisitions that decreases in the market value of the remainder are compensable damage that must be considered (Yellow Book 2016). The 35 percent loading is a valuation assumption approximating ordinary remainder damage from a linear barrier, not a rule the standards prescribe.

the full value of the part taken, so 35 percent sits at the bottom of the range, and severance at the top of that range would carry this line to $1.26 billion.[75]

### I.5 Litigation and Administration

Litigating and administering the condemnations would cost about $0.5 billion, within a range of $0.15 billion to $1.6 billion, roughly half the cost of the land itself. No published figure exists for what the federal government spends to litigate a condemnation case, so the estimate is parametric and should be read as an order of magnitude. It scales the Texas Attorney General's fiscal note for a state border wall to the heavier federal workload.[76][77]

The estimate prices about 4,000 parcels along 1,000 miles of private Rio Grande frontage, half of them litigated at about $147,000 a case.[78] Federal condemnation costs more per case than the state benchmark because title in south Texas is heavily fractionated. Much of the frontage runs through the porciones, Spanish land grants drawn as long riverfront strips and divided among many heirs, so a single tract can carry many co-owners and missing records force the government into condemnation to clear title even where owners are willing to sell.[79]

### I.6 Decommissioning, Suspension, and Restart

Decommissioning the wall would cost about $12.5 billion, within a range of $6 billion to $28 billion. Removal and perpetual maintenance are alternative futures rather than additive ones. A wall left permanently in place carries the maintenance stream and no removal, while a wall taken down carries removal and a shorter maintenance stream, and this appendix prices the finite-horizon maintenance together with a discounted removal rather than summing perpetual upkeep with demolition.

No agency has published a per-mile cost for removing steel bollard wall, and no study of heavy civil demolition fixes a share for a structure of this kind in terrain of this kind. Removal is taken as a share of what the wall costs to build, which is how heavy demolition is standardly estimated.

---

[75] Severance damage can range from a third to the full value of the part taken (Biersdorf). At the top of that range the loading would be 2.0 rather than 1.35, and the line would run 18,000 × $35,000 × 2.0 = $1.26B. The 35 percent used is the ordinary split-parcel loading with the severe stranding premium taken out, since the riverside remainder is priced on its measured acreage among the costs to border communities.

[76] The only federal per-case condemnation study is a 1980 GAO report (CED-80-54), and the DOJ does not budget its Land Acquisition Section separately. The estimate uses a fully loaded rate of about $300 an hour, bounded $250 to $375 (DOJ ENRD 2018).

[77] Texas LBB 2023. Appraisers estimated about 3,000 parcels for a Texas state wall, roughly half litigated at about 105 attorney-hours each. The federal workload is taken at about twice the hours per case, under a 35 percent multi-agency loading covering CBP, the Army Corps, the DOJ Land Acquisition Section, and the U.S. Attorneys.

[78] About 4,000 parcels is 1,000 private river miles at about 3.9 tracts a mile, the density of the government's first-term acquisition of 1,126 tracts across about 5,275 acres, 1,090 of them in south Texas (GAO-21-114). At half litigated, about $147,000 a case (roughly 210 attorney-hours at $300 plus $40,000 in appraisal, survey, and title work), plus settlement and relocation costs and the multi-agency loading, the central is about $0.5 billion. The bounds move the parcel count, litigated share, and per-case cost together. 2025 dollars.

[79] The porciones are about 170 Spanish land grants drawn as long narrow strips with Rio Grande frontage, divided by generations of undivided heirship (UTRGV, GAO-21-114).

The 30 percent used is a judgment inside a 20 to 40 percent interval rather than a derivation.[80] It sits toward the upper part of that interval because a bollard wall cannot be taken down by cutting the posts at grade and leaving the rest. The footings have to be broken out and the floodplain regraded behind them, which is nearer to excavation than to dismantling. What holds it at 30 rather than higher is that an orderly federal removal sells its steel for scrap instead of preserving it.

Thirty percent of the $51.7 million construction base is $15.5 million a mile and $30.3 billion undiscounted, and at 3 percent over a thirty-year life that is $12.5 billion.[81] Arizona took down 4.25 miles of stacked shipping-container wall in 2022 at about $19 million a mile in 2025 dollars, which is roughly 80% of what that barrier had cost to put up, and is the only barrier the government has removed at any scale.[82] The container job carried transport and warehousing of some 2,100 reusable containers that would not apply to a bollard removal, so it stands as a ceiling rather than a match. A light dismantling at 20% of a low construction base, deferred to thirty-five years, is worth $6 billion today, and a heavy removal at 40% of a high base arriving at twenty years is worth $28 billion.[83]

A January 2021 pause in Border wall construction triggered about $1.4 billion in Defense Department termination charges, roughly $950 million in remediation contracts, and a few hundred million in steel bought and never set, a realized total near $2.5 billion and about $3 billion carried to today.[84] Earlier accounts treated that figure as the decommissioning cost. It prices halting the program once and leaves out the removal of the wall, the larger liability. A further halt-and-restart

---

[80] The 20 to 40 percent interval is a judgment, no study fixing a removal share for steel bollard set in concrete footings across remote terrain. Its upper end anchors on the only barrier removed at scale, Arizona's container wall at 76 to 80 percent of build cost, with container haulage a bollard removal does not carry. Its lower end is the light dismantling a bollard wall does not permit, the footings needing excavation and the ground regrading. The central 30 percent of the $51.7M/mi base is $15.5M/mi and $30.3B undiscounted across 1,954 miles. At 20 percent it is $20.2B and at 40 percent $40.4B. This is the weakest-sourced parameter in Part I.

[81] $30.3B × 0.412 (3 percent real over a 30-year service life, OMB 2003) = $12.5B. Thirty years is the standard infrastructure analysis period and the most deferred, and so lowest, reading of when removal occurs.

[82] $76M ÷ 4.25 miles = ~$18M/mi in 2023 dollars, × (322.5 ÷ 304.7) = ~$19M/mi in 2025. Arizona built 4.25 miles of stacked shipping-container barrier in 2022 at $95 to $100M and removed all of it within months for about $76M including restoration, 76 to 80 percent of the build cost (Tucson Sentinel 2023). Transport and warehousing of some 2,100 reusable containers ran more than twice the inbound transport cost (AP 2023). A construction-index carry would run higher, so $19M is the lower reading of the ceiling.

[83] Low, 20 percent of the $77B low construction base = $15.4B undiscounted, × 0.355 (35-year life) = $5.5B. High, 40 percent of the $125B high base = $50.0B, × 0.554 (20 years) = $27.7B. Both ends move the removal share, the service life, and the base. Neither carries a further halt-and-restart cycle, which ran about $3 billion the one time it happened and would sit on top of the high.

[84] An internal Defense Department estimate reported by the Congressional Research Service put suspension and termination costs from the January 2021 pause at approximately $1.4 billion (CRS IN11675). CBP awarded roughly $950 million in contracts to remediate erosion, drainage, and safety hazards left by paused construction, which GAO confirms (GAO-23-106893). Materials bought but never installed have been valued at a few hundred million, with about $100 million in steel reported unused in 2021 and further quantities auctioned in 2023 (CRS R45888).

cycle would add about $3 billion on the last evidence, but this is not included in the estimated costs of this report.

**I.7 Technology and Surveillance**

The completed barrier includes a standalone network of freestanding towers, cameras, radar, and ground sensors that surveil the line alongside the wall. Its lifecycle cost over thirty years is about $19 billion, within a range of $12 billion to $38 billion. This line prices only that standalone network. The detection equipment mounted on the barrier itself is funded within construction and maintenance, and the inspection and screening systems at the ports of entry are a separate program that is not priced here.

The capital cost of building the network is about $5 billion, bracketed by two independent measures. Congress has appropriated about $4.4 billion for standalone border surveillance, which sets a lower anchor.[85] Covering the full 1,954-mile line at the per-mile rate of the autonomous surveillance towers CBP now deploys implies about $6.4 billion, which sets an upper one.[86] The $5 billion central sits between them. Pricing the network instead at the rate of SBInet, the integrated tower system DHS built and then cancelled in 2011, would imply about $53 billion, which is both the reason that system was abandoned as not cost-effective and the reason its rate is not used here.[87]

Most of the lifecycle cost is the operation and replacement of the equipment rather than its purchase, because surveillance hardware is expensive to run and short-lived relative to the concrete and steel it monitors. Operation, sustainment, data, power, and repair run about 10 percent of capital a year, or about $500 million, which over thirty years at a 3 percent discount rate is about $9.8 billion. Because the electronics wear out well before the towers and foundations, the network is refreshed periodically, and replacing about three-fifths of the stock at years ten and twenty adds about $3.9 billion in present value.[88]

Capital of $5 billion, operation of $9.8 billion, and replacement of $3.9 billion give a lifecycle cost of about $19 billion, roughly three-quarters of which falls after the towers are built. The range of

[85] Pub. L. 119-21, § 90004, 139 Stat. 359, appropriates $6,168,000,000 to CBP for border security, technology, and screening. About $2.77 billion is designated for autonomous surveillance towers, and removing $673 million for the biometric entry-exit system and about $1.08 billion for handheld biometric and cargo-screening devices leaves about $4.4 billion for standalone border surveillance (SIA 2025).

[86] At $2.3 million a mile in 2011, carried to $3.30 million in 2025 on the consumer price index, full-line coverage of 1,954 miles is about $6.4 billion. A consumer-price carry is used because surveillance electronics fall in price in real terms, so this is an upper reading. On cancelling SBInet in January 2011, DHS estimated that commercial off-the-shelf surveillance could cover the remaining 323 miles of Arizona's border for about $750 million (CS Monitor 2011).

[87] SBInet, the integrated camera, radar, and sensor tower system Boeing built under the Secure Border Initiative, cost about $1 billion for 53 miles, or $19 million a mile in 2011, which carried to 2025 and applied to 1,954 miles is about $53 billion. DHS cancelled it in January 2011 as not cost-effective to extend (Washington Technology 2011).

[88] Operation at 10 percent of the $5 billion capital is $500 million a year, or $9.8 billion over thirty years at a 3 percent discount. The 10 percent is bounded 7 to 15 percent, the lower end hardware-only sustainment and the upper a full sensor network with data, communications, and repair in remote terrain. Replacement of 60 percent of the stock at years ten and twenty is $3.9 billion in present value. The 60 percent reflects that the towers, foundations, and power supply, a third to a half of capital, outlast the electronics, leaving 50 to 67 percent to refresh.

$12 billion to $38 billion moves the capital figure, the operating rate, and the refresh share together, from a $4.4 billion build sustained at 7 percent to an $8 billion build sustained at 15 percent.[89]

**I.8 Boundaries**

Each cost is included once. The overrun applies to construction alone, since it buys no additional wall, and the delay the condemnation program imposes on construction surfaces there too.[90] Maintenance and removal are computed from the construction base and leave the overrun aside, since both scale with the physical structure and not with what was paid for it. Maintenance covers the barrier, its roads, and the detection equipment fixed to the wall itself, all of which the wall system appropriation funds. The freestanding towers behind it are priced separately, and the inspection and biometric systems at the ports of entry are a different system and are not priced at all.[91] Land acquisition falls inside the construction appropriation, while condemnation litigation runs on the Department of Justice's own budget and adds in full, as removal does.

Three costs the wall imposes appear here only as exclusions. The flood damage the barrier forces onto land and property on either side, and the ecological repair of the ground it crossed, are valued among the environmental costs. The stranding of the riverside land a set-back wall puts on the far side of the barrier is priced on its measured acreage among the costs to border communities, and carrying a stranding premium into the severance loading here would charge one loss twice.

Every figure here is gross of what Congress has already appropriated and of the value of the barrier now standing. Both are subtracted once, at the end.

## PART II – ENVIRONMENTAL AND NATURAL RESOURCE COSTS

A nearly continuous border wall system would impose an estimated ecological cost of $56 billion in 2025 dollars, within a range of $17 billion to $150 billion. Restoring the corridor, the river, and the aquifer in place costs $7.7 billion. The external costs, the ecosystem services the barrier degrades plus the flood damage and carbon its construction causes, add $28 billion. Non-use value adds an additional $20 billion and is the component with the greatest methodological uncertainty.

---

[89] The bounds move the capital figure, the operating rate, and the refresh share together. The low of about $12 billion is a $4.4 billion build, operation at 7 percent ($308 million a year, $6.0 billion over thirty years), and a single refresh of half the stock at year fifteen ($1.4 billion). The high of about $38 billion is an $8 billion build, operation at 15 percent ($1.2 billion a year, $23.5 billion), and a refresh of two-thirds of the stock at years ten and twenty ($7.0 billion). 2025 dollars.

[90] The government valued delay on the wall program at $15,000 a day in one Starr County case and as much as $100,000 a day on larger contracts, which surfaces as added construction cost the overrun carries (ProPublica and The Texas Tribune 2020). The Posillico bid protest (Posillico v. US 2026), filed in the Court of Federal Claims in May 2026 over the award of roughly $14 billion, about 73 percent of contract value, to two firms under waived competition rules, is real but too lumpy to fix a number to and is excluded (The Texas Tribune 2026b).

[91] The wall system appropriation covers the cameras, lights, sensors, and detection technology on the barrier itself, carried by construction and maintenance, so the technology line prices only the freestanding towers, radar, ground sensors, data links, and command-and-control behind it. Port-of-entry inspection and biometric systems are not priced in this report.

The estimate still understates the loss, because monetary methods do not fully capture irreversible harms like the extinction of range-restricted species or the severing of a continental-scale ecosystem.

Figures are in 2025 dollars, carried forward where necessary on the consumer price index.[92] Annual flows capitalize over sixty years at three percent real, a factor of 27.7, because desert and riparian systems recover over decades rather than over the barrier's service life.

**Cost ledger (present value, 2025 dollars)**

| **Component** | **Low** | **Central** | **High** |
|---|---|---|---|
| **Core (in-place restoration)** | **$3B** | **$7.7B** | **$16B** |
| Rio Grande riparian restoration | $2B | $4.5B | $8B |
| Hydrological and drainage repair | $0.4B | $1.25B | $3B |
| Listed-species recovery | $0.5B | $1.2B | $3.5B |
| Corridor revegetation | $0.2B | $0.36B | $1.2B |
| Groundwater and springs loss | $0.1B | $0.3B | $0.6B |
| Small-fauna passages | $0.05B | $0.1B | $0.3B |
| **Broader (external costs)** | **$7B** | **$28B** | **$80B** |
| Riparian and aquifer water service | $2B | $6B | $15B |
| Trophic and dispersal services | $2B | $10B | $30B |
| Insectivore pest control | $1B | $4.3B | $20B |
| Flood damage and flood mortality | $0.6B | $2.4B | $6B |
| Construction and embodied carbon | $0.4B | $1.4B | $2.8B |
| Pollination | $0.5B | $1.5B | $4B |
| Nature-based recreation | $0.5B | $1.5B | $4B |
| Invasive spread and altered fire | $0.1B | $0.5B | $2B |
| Carbon, disturbed desert soil | $0.1B | $0.3B | $0.5B |
| **Contingent (non-use value)** | **$6B** | **$20B** | **$60B** |
| **Additive total** | **~$17B** | **~$56B** | **~$150B** |

Layer subtotals are the sums of their lines, $7.7 billion in core costs, $27.9 billion in external costs, and $20 billion in contingent costs. The low and high totals are round bounds inside the arithmetic sum of the layer ranges, $16.45 billion to $160.9 billion, since the lines do not reach their extremes together.

### II.1 The harm

The barrier crosses six ecoregions and bisects the ranges of more than 1,500 native terrestrial and freshwater species. Of the 346 non-flying species whose ranges it divides, more than a third could be cut off from the majority of their range, which lies in Mexico.[93] A camera study across 163 kilometers of Arizona and Sonora found that crossing success fell from about 65 percent at the earlier vehicle barriers to about 9 percent at the bollard wall, with large-bodied species such as deer, black bear, and mountain lion unable to pass.[94] Suitable jaguar habitat in the borderlands is

[92] Consumer Price Index for All Urban Consumers, U.S. city average, 1982-84=100 (BLS CPI). Annual averages 237.0 (2015), 240.0 (2016), 245.1 (2017), 255.7 (2019), 258.8 (2020) against about 322.5 in 2025 (324.8 in September), so multipliers are 1.36, 1.34, 1.32, 1.26, and 1.25. The CPI is used rather than a faster-rising construction index, the conservative choice for this labor and plant-material work.

[93] Peters 2018, an assessment endorsed by more than 2,500 scientists. The barrier bisects 1,506 native terrestrial and freshwater species, 1,077 animal and 429 plant, 62 of them IUCN-listed, and could cut more than 34 percent of the 346 non-flying species off from most of their range.

[94] Harrity et al. 2024. Across 163.5 kilometers of camera study in Arizona and Sonora, crossing success fell from about 65 percent at vehicle barriers to about 9 percent at the bollard wall, large-

estimated at about 11,000 square kilometers, and adult home ranges that extend over hundreds of square kilometers are divided by a continuous barrier.[95]

Comparable barrier systems document the mechanism. Veterinary cordon fences in Botswana blocked the routes wildebeest used to reach water, and the resulting die-offs are estimated at tens of thousands to several hundred thousand animals.[96] A fence along the Trans-Mongolian railway excluded the Asiatic wild ass from much of its eastern range for about six decades. After a section was removed, the animals recolonized the area within a few years.[97]

As the climate warms, species shift their ranges to track tolerable conditions, and along this boundary those shifts run north and south across the ground the barrier seals. A barrier that fixes a species' range at the international line can convert a climate shift the species might otherwise survive into a local extinction. This effect is not separately monetized, and it is the basis for treating the non-use loss as permanent.[98]

The barrier and its access roads occupy a cleared strip about 60 feet wide, from which desert vegetation recovers over roughly 60 to 80 years.[99] Construction has altered storm-flow across thousands of washes, and federal auditors have documented the resulting flooding, scouring, and blasting near desert springs and burial sites.[100] At Organ Pipe Cactus National Monument, construction drew groundwater at up to 710,000 gallons per mile, lowering the aquifer that feeds Quitobaquito Springs, the only habitat of the Quitobaquito pupfish, the Sonoyta mud turtle, and the Quitobaquito springsnail.[101] The cleared corridor also provides a pathway for invasive grasses,

---

bodied species could not pass the gaps of 10 centimeters or less, and a peccary was recorded fatally trapped.

[95] Hausermann et al. 2024, estimating about 11,385 square kilometers of suitable jaguar habitat (2021) and adult male home ranges over 230 square kilometers. Landau et al. 2022 give 25,463 square kilometers for a wider area, and Sanderson et al. 2022 a carrying capacity of 90 to 151. The habitat figure is descriptive, and the fragmentation loss scales to the 2-million-hectare zone used in the ecosystem-service estimate.

[96] Veterinary cordon fences in Botswana drove wildebeest die-offs whose published carcass estimates run from tens of thousands to as high as 800,000, across Owens and Owens (1980, 1983), Williamson and Williamson (1981), Parry (1987), Mordi (1989), Child (1972) near 300,000 for 1963, and Spinage (1992). The case transfers as a mechanism, not a dollar value.

[97] The roughly 2,215-kilometer Trans-Mongolian railway fence held the khulan out of much of its eastern range for some 65 years (Ito 2013). After about 1,500 meters were removed between 2019 and 2021, several hundred recolonized within a few years (Buuveibaatar et al. 2026).

[98] Peters et al. 2018 identify foreclosed climate-driven range shifts as among the gravest long-term consequences. It is not separately monetized, and it is the reason the non-use loss is treated as permanent.

[99] United States Geological Survey, Aridlands Disturbances and Restoration Ecology program (USGS Aridlands), reporting desert vegetation recovery of about 60 years for blackbrush and more than 80 for sagebrush, which sets the interim-loss horizon.

[100] The Government Accountability Office reports that DHS, CBP, and DOD installed about 458 miles of barrier between January 2017 and January 2021 under waivers of cultural and natural-resource law, with documented impacts to water sources, endangered species, wildlife movement, vegetation, and erosion, including altered surface-water flows and blasting near springs and burial sites (GAO-23-105443).

[101] Customs and Border Protection put the construction water draw at up to 710,000 gallons a mile, measured on a 15-foot Lukeville fence in 2008, so it understates a 30-foot build (Main 2020). The

including buffelgrass and Sahara mustard, which introduce a grass-fire cycle into a desert ecosystem not adapted to fire.[102]

### II.2 Restoration and replacement cost

Repairing the corridor, the river, and the aquifer in place costs $7.7 billion, within a range of $3 billion to $16 billion. Under natural-resource-damage law the governing measure of that harm is restoration cost, the cost of returning a public resource to the condition it would have held but for the injury together with the services lost in the interim, and pricing only lost use value was rejected as the primary measure decades ago.[103] This part prices physical repair alone. The wildlife connectivity a continuous barrier severs cannot be restored while the structure stands, so it is valued as lost services and non-use value in the next part rather than counted here.

| Component | Derivation (2025 dollars) | Range | Central |
|---|---|---|---|
| Rio Grande riparian restoration | 237,000 acres × $19,000 an acre | $2B–$8B | $4.5B |
| Hydrological and drainage repair | 2,500 crossings × $500,000 | $0.4B–$3B | $1.25B |
| Listed-species recovery | 30 species × $40M a program | $0.5B–$3.5B | $1.2B |
| Corridor revegetation | 36,000 acres × $10,000 an acre | $0.2B–$1.2B | $0.36B |
| Groundwater and springs loss | Water replacement + spring restoration + endemic salvage | $0.1B–$0.6B | $0.3B |
| Small-fauna passages | Unit cost × passages along the line | $0.05B–$0.3B | $0.1B |
| **Total** | | **$3B–$16B** | **$7.7B** |

The riparian rate of $19,000 an acre comes from the boundary commission's restoration of a 105-mile canalized reach of the Rio Grande, and the project's realized spending through 2019 supports the same figure independently. A degraded riparian band a kilometer wide along the 600 most-affected river miles is 237,000 acres, which at $19,000 an acre is $4.5 billion. A narrower band or a shorter reach gives $2 billion, a fuller program $8 billion.[104]

daily figure was about 84,000 gallons, and monitors report tens of millions of gallons pumped that the aquifer cannot replace (Sherriff 2021). The drawdown reached a historic low at Quitobaquito Springs, the only habitat of the Quitobaquito pupfish, Sonoyta mud turtle, and Quitobaquito springsnail. The Fish and Wildlife Service Draft Recovery Plan for the Sonoyta Mud Turtle (FWS 2025) finds threat high and recovery prospects low given continued Rio Sonoyta pumping, with a five-year status review opened in 2024 and emergency captive salvage under way (Ingram 2026).

[102] The U.S. Geological Survey describes buffelgrass (Pennisetum ciliare) as able to convert the Sonoran Desert into a grassland monoculture (USGS Buffelgrass FAQ). The grass-fire cycle it drives, in a system where native vegetation does not otherwise carry fire, is documented by the National Park Service and by D'Antonio and Vitousek (1992). A single 1994 fire in Saguaro National Park killed about a quarter of the saguaros in the burned area (DOI 2010). Mapped distribution follows roadways (Nijhuis 2000).

[103] Ohio v. U.S. Department of the Interior held that CERCLA makes restoration cost the primary measure of natural-resource damages and struck the lesser-of-restoration-or-use-value cap (Ohio v. DOI 1989, at 459 to 464). The governing Interior regulations are 43 CFR Part 11. The NOAA regulations at 15 CFR Part 990, §§ 990.10 and 990.53 to 990.56, define restoration as both primary restoration to baseline and compensatory restoration for interim losses

[104] The International Boundary and Water Commission Record of Decision for the Rio Grande Canalization Project and its ten-year review committed 553 acres of habitat restoration and 1,983 acres of grasslands across a 105.4-mile reach (IBWC 2009). Two readings converge on the $19,000-an-acre rate. Riparian treatment ran about $15,000 an acre in mid-2010s dollars, about $20,000 today, and implementation through May 2019 obligated about $11.1 million over roughly

A federal survey of dam removals puts the median cost at $196,000 for structures below 5 meters and $1.03 million for 5 to 10 meters in current dollars. Pricing 2,500 obstructed drainage crossings at a blended $500,000, above the lower median because a continuous wall crosses the large arroyos as well as the small, gives $1.25 billion.[105]

For the existing Rio Grande Valley construction the agencies committed about $43.5 million across two mitigation agreements, the larger a $37.5 million Fish and Wildlife Service program, worth about $46 million today, for a partial barrier through a single region. Taking $40 million a species across the 30 listed species a continuous line most directly threatens gives $1.2 billion.[106]

The three smaller components follow the same unit-cost method. The cleared strip and its access roads cover 36,000 acres, and loaded arid-land revegetation at $10,000 an acre is $360 million.[107]Concrete mixing and haul-road wetting drew up to 710,000 gallons of groundwater a mile, a rate measured on a 15-foot fence and so conservative for a 30-foot wall, and across the arid reaches of a continuous line that is about a billion gallons; replacing it together with spring restoration and the captive-breeding salvage the region's endemic desert species now require is $300 million.[108] The small-fauna passages the agencies install along the bollard wall add $100 million.[109]

Two larger restorations bound the figure from above. The Everglades Comprehensive Restoration Plan was projected at $23.2 billion in fiscal 2020 dollars, about $29 billion today, and the Deepwater Horizon settlement, the largest in United States history, reached $8.8 billion, or $11.8 billion today. The $7.7 billion booked here for a continuous 2,000-mile disturbance reaching the river, the aquifer, and the listed species sits below both, and both differ in ecosystem type, so they

---

508 acres, or $21,850 nominal (IBWC 2019). Because that obligation also covered grasslands, wells, and water rights, netting restoration alone to two-thirds or three-quarters gives about $19,000 to $22,000 today, and the $19,000 taken is the low of that band.

[105] Duda et al. report 668 dam removals costing $1.522 billion in 2020 dollars, with median per-structure costs of about $196,000 below 5 meters and $1.03 million for 5 to 10 meters in current dollars (Duda 2023). The blended $500,000 sits between those two medians, leaning to the complex end because a continuous wall crosses the large arroyos as well as the small.

[106]GAO-23-105443 reports CBP committed about $43.5 million across two Rio Grande Valley mitigation agreements, the larger a $37.5 million Fish and Wildlife Service ocelot program, about $46 million today, the other a USGS agreement. Peters et al. (2018) find 62 IUCN-listed species among the 1,506 the line bisects. The $40 million a species is that realized program's order of magnitude carried across the 30 species a continuous line most directly threatens rather than all 62, and the range runs from $0.5 billion at 25 species to $3.5 billion at 40.

[107] The $10,000-an-acre rate is a fully loaded cost for revegetating a roadless desert corridor, covering soil salvage, repeated native seeding and container outplanting, temporary installed irrigation, invasive control, and years of monitoring. Intensive irrigated desert revegetation runs a few thousand dollars an acre for the planting alone (Bean et al. 2004, Abella et al. 2015), and federal land-treatment cost schedules bracket the seeding methods (Meldrum et al. 2025). The rate sits mid-range and below the boundary commission's riparian rate.

[108] The 710,000 gallons of groundwater a mile is a rate measured on a 15-foot fence and so conservative for a 30-foot wall, and across the arid new-build mileage it is roughly a billion gallons of effectively non-renewable water, priced at replacement plus spring restoration and endemic salvage.

[109] The small-fauna passages are the openings of about 21.5 by 27.8 cm Customs and Border Protection installs along the bollard wall (Harrity et al. 2024).

serve as order-of-magnitude checks rather than direct comparisons.[110] The government's first-term settlement scaled to the full line near $5 billion and Interior's federal-land estimate near $0.9 billion, sit below this figure as well.[111]

### II.3 Lost ecosystem services

The services the barrier degrades are worth $24 billion, within a range of $6 billion to $74 billion. These are the ecosystem services lost while the structure stands, an interim service loss that is a head of damage distinct from and additional to the physical restoration priced in the previous part of this report.[112]

Each line takes a documented national or regional value for the service, scales it to the border region's share, and multiplies by the fraction attributable to the wall. The attribution fractions track how each service is delivered. The barrier obstructs the floodplain directly, so the water-service share is high. Large mammals deliver their ecosystem services across whole home ranges, which scales the fragmentation loss to how far the animals move rather than to the width of the cleared strip. Pollinators and insectivores clear a 30-foot wall, and the wall reaches their services only through lost nesting and roosting habitat and disturbed foraging, so those shares stay low.

| Service | Derivation (annual, capitalized at 27.7) | Range | Central |
|---|---|---|---|
| Riparian and aquifer water service | 96,000 ha × $4,500/ha × 50% = $216M/yr | $2B–$15B | $6B |
| Trophic and dispersal services | 2,000,000 ha × $1,200/ha × 15% = $360M/yr | $2B–$30B | $10B |
| Insectivore pest control | $2.5B/yr × 25% corridor × 25% attribution = $156M/yr | $1B–$20B | $4.3B |
| Pollination | $4.5B/yr × 8% corridor × 15% attribution = $54M/yr | $0.5B–$4B | $1.5B |
| Nature-based recreation | 2M visitor-days × $50 × 55% = $55M/yr | $0.5B–$4B | $1.5B |
| Carbon, disturbed desert soil | 1.24 Mt $CO_2$ committed + foregone sequestration × $175/t | $0.1B–$0.5B | $0.3B |
| **Total** | | **$6B–$74B** | **$24B** |

The barrier and its levees obstruct the floodplain, redirect storm flow, and load the channel with sediment. The Mexican section of the boundary commission found the fence would obstruct 60 to 70 percent of the hydraulic area across the flow. At 96,000 hectares valued at $4,500 a hectare a year, half attributed to the wall, the water service is $216 million a year and $6 billion.[113]

Large and midsized mammals disperse seed and regulate the pests below them across a whole home range rather than at a point, so severing the range degrades the service over its full reach. At

---

[110] The Congressional Research Service puts the Everglades Comprehensive Restoration Plan at $23.2 billion in fiscal 2020 dollars, about $29 billion today, over 18,000 square miles (CRS IF11336). NOAA puts the Deepwater Horizon settlement up to $8.8 billion, about $11.8 billion today (NOAA DARRP). Both differ in ecosystem type and are magnitude checks.

[111] Restoration cost is the governing measure of natural-resource damage (Ohio v. DOI 1989, at 459 to 464, 43 CFR Part 11). The government's first-term settlement scaled to the full line near $5 billion and Interior's federal-land estimate near $0.9 billion, both sit below the $7.7 billion restoration booked here, so they corroborate it as a floor.

[112] Interim service loss is a head of damage distinct from and additive to primary restoration, scaled through habitat equivalency analysis in discounted service-acre-years (15 CFR Part 990, NOAA HEA). It is monetized here through per-hectare values instead.

[113] The $4,500 water-regulation value sits below the river and wetland rates, and the 50 percent attribution rests on the Mexican IBWC section's 60 to 70 percent obstruction finding, which federal auditors corroborate (GAO-23-105443).

2 million hectares, a band several kilometers deep on each side of the line, valued at $1,200 a hectare a year and a 15 percent degradation fraction, the service is $360 million a year and $10 billion.[114] The line is held conservative because its net sign is uncertain. Severing predator movement releases the prey and pests those predators regulate, which is a cost, while the same continuous barrier may slow the spread of feral swine, which is a benefit, so the line claims only the regulating services it can defend and books no offset either way.[115]

Insectivorous bats were valued in 2011 at $22.9 billion a year to United States agriculture, about $33 billion today, and the south-central Texas cotton country anchoring that estimate lies on the corridor.[116] Predatory insects and insectivorous birds add billions more.[117]A causal study that reads the value off agricultural land rents during a bat die-off puts the loss far lower, near $600 million a year.[118] The estimate takes $2.5 billion for the whole insectivore complex, four times the causal figure and about an order of magnitude below the headline, and a 25 percent corridor share with a 25 percent attribution gives $156 million a year and $4.3 billion.[119]

Wild native pollinators were estimated in 2006 to contribute $3 billion a year to United States agriculture, about $4.5 billion today, and the pollinator-dependent winter-vegetable and melon belts of the lower Colorado and the Rio Grande Valley sit on the corridor.[120] An 8 percent corridor share and a 15 percent attribution give $54 million a year and $1.5 billion.[121]

The four southernmost counties of Texas are the second-ranked bird-watching destination in North America, and the refuges a continuous wall runs through account for most of the nearly 2 million visitor-days recorded annually along the border.[122] The federal benefit-transfer database values a

---

[114] The 2 million hectares is a band several kilometers deep on each side of the line, scaled to the animals' home ranges, and the $1,200 residual rate sits below the woodland-and-shrubland rate.

[115]Feral swine cause an estimated $1.5 to $2.5 billion a year in U.S. agricultural damage (USDA APHIS, with University of Georgia toward the upper end). With the net sign uncertain, the trophic line claims only the residual regulating services it can defend and books no predator-release figure.

[116]Boyles et al. value insectivorous bats at about $22.9 billion a year in 2011 dollars, near $33 billion today, range $3.7 billion to $53 billion (Boyles et al. 2011), extrapolated from a south-central Texas cotton study (Cleveland et al. 2006) at about $741,000 a year across eight counties, or $74 a cropland acre.

[117]Predatory and parasitoid insects provided pest control worth about $4.5 billion a year in 2006 dollars, near $7.2 billion today (Losey and Vaughan 2006), and bird crop damage, a separate quantity, exceeds $150 million a year (USDA WS 2023). These add within the conservative band rather than at headline values, since the pest loads overlap.

[118] Frank reads bat pest-control value off farmland rents during the white-nose-syndrome die-off at about $426 to $495 million a year as of 2017, near $560 to $650 million today, far below the headline (Frank 2022). This causal estimate anchors the conservative reading.

[119] The $2.5 billion anchor covers the whole insectivore complex, four times the causal bat value and about an order of magnitude below the summed headlines above $40 billion a year, set near the causal estimate.

[120] Losey and Vaughan value crop pollination by wild native insects above $3 billion a year in 2006 dollars after netting managed honeybees, near $4.5 billion today (Losey and Vaughan 2006).

[121]The 8 percent corridor share reflects the lower Colorado and Rio Grande Valley winter-vegetable and melon belts, and the 15 percent attribution the native-bee habitat the corridor removes.

[122]Texas A&M University reports county output of $463.0 million and 6,613 peak-season jobs across the four southernmost Texas counties (Texas A&M 2012), the second-ranked North

day of wildlife viewing at a consumer surplus now past $60, and $50 is used. A 30-foot wall with surveillance towers inside a refuge repels visitors and degrades the habitat that draws them, and charging the service 55 percent of the surplus gives $55 million a year and $1.5 billion.[123]

Grading the strip destroys desert soil and biological crust holding 34 tonnes of carbon a hectare, and the ground stops sequestering for decades. Across the 10,000-hectare footprint that is 1.24 million tonnes of carbon dioxide committed, and with the foregone sequestration priced at $175 a tonne the line comes to $300 million.[124]

As a cross-check, the per-hectare service values from the global compilation give $7 billion at the upland rate and $10 billion once the riparian fraction is priced at river and wetland rates.[125] The bottom-up build here comes in above that because those compilations price desert at or near zero and do not capture the range-scaled reach of the fragmentation loss.

### II.4 Structural externalities

The structural externalities are worth $4.3 billion, priced from mechanisms already observed along existing barrier segments.

| Mechanism | Basis | Central |
|---|---|---|
| Flood property damage | $80M a year × 27.7 | $2.2B |
| Flood deaths | 0.5 a year × $14.0M × 27.7 | $0.2B |
| Embodied carbon | ~8 Mt $CO_2$ × $175/t | $1.4B |

American bird-watching destination with nearly 500 species (Texas Comptroller 2021). Reporting ties the wall to the Santa Ana and Lower Rio Grande Valley refuges, state parks, and the National Butterfly Center (Texas Monthly). With Organ Pipe and the Cabeza Prieta, Coronado, and San Bernardino units the complex supports about 2 million visitor-days a year.

[123]Kaval and Loomis put wildlife viewing at $35.30 a day in that study's dollars, carrying past $60 (Kaval and Loomis 2003), in the Recreation Use Values Database of 4,023 estimates from 527 studies (Rosenberger and Loomis 2025). The $50 used is conservative against that.

[124]Social cost of carbon, both carbon lines, 3 percent real. EPA's 2023 schedule (EPA 2023) gives $140, $230, and $380 a tonne at 2.5, 2.0, and 1.5 percent Ramsey rates for 2030 emissions in 2020 dollars. The 2.5 percent value carried to 2025 dollars is the $175 central, the low the interagency interim $51 at 3 percent, about $64, which a 2025 executive order withdrew (EO 14154), and the high EPA's 2 percent value, about $287. On the soil-carbon line, a desert carbon accounting (Jia et al. 2023) reports 33.9 tonnes of carbon a hectare, soil 30.3 and vegetation 3.6, with foregone dryland sequestration near half a tonne a hectare a year. Across the 10,000-hectare footprint the committed loss of 1.24 Mt $CO_2$ and that foregone sequestration together come to about $300 million at $175 a tonne.

[125]Costanza et al., drawing on de Groot et al. (2012), value grassland and rangeland near $2,871 a hectare a year, inland wetland near $25,682, rivers and lakes near $4,267, and woodland and shrubland near $1,588, in 2007 international dollars, about 1.5 times higher in 2025 (Costanza et al. 2014). With the desert biome priced at zero, uplands take the woodland-and-shrubland rate and the riparian fraction the river and wetland rates, giving near $7 to $10 billion, which is why the $4,500 and $1,200 rates are conservative.

| | | |
|---|---|---|
| Invasive species and fire | control program and conversion risk | $0.5B |
| **Total** | | **$4.3B** |

A barrier across an ephemeral wash or floodplain traps debris and obstructs flood flows. In July 2008 the fence through the Nogales storm tunnel contributed to flooding that killed two people and did about $8 million in damage on the Sonoran side, about $12 million today, and a debris-obstructed barrier at Organ Pipe drew about $24 million in liftable-gate retrofits that summer, about $36 million today.[126] The existing barrier obstructs a handful of urban floodplain crossings, and a continuous wall obstructs roughly a dozen, from San Diego and Tijuana to Brownsville and Matamoros. A dammed flood does its worst at those twin-city crossings, on the scale of the 2006 event that ran to $200 million on the United States side of the El Paso valley, or $320 million today. At a 1.5 percent annual probability that any one crossing suffers a damaging impoundment, expected urban flood damage is $50 million a year, and scour, debris, and gate failure across the rural crossings add $30 million, which capitalizes to $2.2 billion.[127]

The two people the Nogales impoundment killed are the entire documented barrier-as-dam fatality record across two decades of partial barrier, about 0.1 a year. Scaled to a continuous line on the same basis, that is 0.5 deaths a year, within 0.2 to 1.5, and at the central $14.0 million value of a statistical life, $0.2 billion.[128] These are residents and bystanders caught in impounded water, a different population from the crossers the mortality part prices.

The construction tracker recorded 509,000 short tons of steel and 732,000 cubic yards of concrete for 341 miles of barrier. At standard embodied-carbon factors, the new construction a continuous

[126]Two July 2008 debris impoundments. At Nogales the storm-tunnel fence killed two and did about $8 million on the Sonoran side. At Organ Pipe the barrier drew about $24 million in liftable-gate retrofits, having failed hydrologic performance standards (NPS 2008), and GAO-23-105443 corroborates the altered flows. The 60 to 70 percent hydraulic obstruction finding is the Mexican IBWC section's, in a December 2011 letter protesting the Roma, Rio Grande City, and Los Ebanos segments (IBWC CILA 2011). A later contractor model reported in Nicol (2012) produced a lower 10-to-25-percent range using FLO-2D, but because that review is not publicly available it is treated as contextual and not used. The 1970 boundary treaty bars structures that obstruct the river's floodflows (1970 Water Treaty).

[127]The three observed events anchoring the line are the Nogales and Organ Pipe impoundments of 2008 and the 2006 El Paso valley flood, each carried to 2025 dollars. The bounds run from low recurring wash flooding alone to frequent severe urban events.

[128]The two Nogales deaths are the whole barrier-as-dam fatality record across two decades of partial barrier, about 0.1 a year, scaled to 0.5 for a continuous line, range 0.2 to 1.5. The value of a statistical life is the report's $14.0 million central, band $6.5 million to $21.3 million (HHS ASPE 2026, Table 1). Injuries and near-drownings are not priced.

line requires embodies roughly 6 to 10 million tonnes of carbon dioxide, about 8 million at the center.[129] At $175 a tonne, the social cost of carbon this report uses, that is $1.4 billion.[130]

Disturbed ground along the roads and construction strips is where buffelgrass and Sahara mustard take hold, and both carry fire through a desert not adapted to it. The control program the corridor makes necessary, plus a fraction of the risk that fire converts desert to grassland, comes to $500 million, within $100 million to $2 billion. The causal chain and the magnitude are both uncertain, so the line is held small.[131]

**II.5 Non-use value and the limits of pricing it**

The non-use value of the species the wall imperils is $20 billion, within a range of $6 billion to $60 billion. It is the largest line in this subsection and the least certain.

Stated-preference valuation estimates non-use value by eliciting willingness to pay for preservation. The method draws documented concerns over scope sensitivity, framing, and hypothetical bias, and its results vary across survey designs.[132] Federal practice recognizes passive-use value when specified survey-design conditions are met, so the estimate is reported separately in the lowest-confidence tier and the aggregate is also shown without it.

A meta-analysis of 109 estimates from 47 studies across 19 countries puts average household willingness to pay at $414, a one-time value rather than an annual one, and higher for charismatic and threatened species. In 2025 dollars the average is $556 and the charismatic figure $766.[133] The

---

[129] Embodied-carbon accounting assigns a material's production and installation emissions to the structure (RMI). CBP's construction tracker recorded 509,000 short tons of steel, about 462,000 tonnes, and 732,000 cubic yards of concrete for 341 miles (Construction Dive). Structural steel carries roughly 1.85 to 2.5 tonnes $CO_2e$ (carbon dioxide equivalent) per tonne by recycled content and production route (worldsteel), and concrete roughly 0.3 tonnes a cubic yard.

[130] Across the 1,300 to 1,954 miles of new construction the embodied total is about 6 to 10 million tonnes of $CO_2$, central near 8 million, once transport and diesel are added to the steel and concrete factors. The $0.4 billion low takes 6 Mt at the withdrawn interagency $64 a tonne, the $2.8 billion high 10 Mt at EPA's 2 percent value of $287 (EPA 2023). The $175 central is the soil-carbon value used across the report.

[131] The line prices the chemical and mechanical control program that a decade of Saguaro National Park treatment shows the corridor makes necessary (USGS 2023), plus a fraction of the conversion risk, held to $500 million for the uncertainty in both the causal chain and the magnitude, range $100 million to $2 billion.

[132] The empirical scope-failure critique documents willingness to pay barely moving with the resource at stake (Diamond and Hausman 1994, Hausman 2012, Kahneman and Knetsch 1992). The conceptual objection that aggregated willingness to pay treats an ecological matter as consumer preference is Sagoff's The Economy of the Earth (Sagoff 1988). Federal practice recognizes passive-use value nonetheless, the NOAA Panel on Contingent Valuation (Arrow et al. 1993) treating it as compensable when reliably measured and emphasizing the absence of ordinary market evidence.

[133] Subroy et al. offer a meta-regression of 109 willingness-to-pay estimates from 47 studies across 19 countries, with an average total present value near $414 a household in 2016 dollars, one-time, carried to $556 in 2025, and a charismatic figure near $570 to $766 (Subroy et al. 2019). The annual comparison is Loomis and White, whose annual household willingness to pay across 18 species runs from about $6 for the striped shiner to $95 for the northern spotted owl (Loomis and White 1996). Richardson and Loomis (2009) gives the updated benefit-transfer basis.

borderlands hold the jaguar, the ocelot, the Sonoran pronghorn; the pupfish, mud turtle, and springsnail of Quitobaquito, all of them threatened; and the Quitobaquito endemics confined to a single spring. The central takes $650, between the average and the charismatic values.

The estimate applies the above per-household value across a national household base. The 30 million households in the central estimate are a fifth of the roughly 130 million in the country, and below the 45 million Americans who watch birds.[134] The loss is permanent, because the wall forecloses the range shifts a warming climate forces on these species and an extinction cannot be reversed.

Two conservatisms hold the figure down. The first is the one-time framing. Annual willingness to pay for a charismatic species runs to about $95 a household, which capitalized over 60 years at 3 percent is $2,630, four times the $650 used, so pricing the value as a single payment holds the line at $20 billion rather than above $100 billion. The second is that no bequest or option increment is added, because a total present value of willingness to pay already contains them.

### II.6 Boundaries

Each harm is included once.

The habitat injury divides between the restoration that repairs what can be repaired and the service loss that carries what cannot. The Rio Grande restoration and the riparian water-service line run over the same corridor and are additive rather than duplicative, since restoration cost and interim service loss are separate heads of damage. The fragmentation harm appears as a service loss in the broader layer and as a non-use value in the contingent layer, the standard decomposition of one injury, counted once each. The two carbon lines price different things, the soil carbon released by clearing and the emissions embodied in the wall, and both use the same social cost of carbon. The groundwater line prices the water and the salvage, while the risk of extinguishing the Quitobaquito endemics is carried once, in the non-use layer. The recreation line prices consumer surplus, while the income loss to border businesses is a community cost carried in the border-communities section. The flood line prices the property loss impoundment causes and the deaths it causes, and the mortality section excludes both for that reason. The government's own valuations of the avoided mitigation measure the same habitat injury and corroborate the restoration cost rather than adding to it. Removing the barrier is a decommissioning cost. The per-hectare aggregate is a cross-check and is never summed with the bottom-up lines.

## PART III – COSTS TO BORDER COMMUNITIES

The priced costs imposed on border communities by a nearly continuous border wall system total about $18 billion in 2025 dollars, within a range of $6 billion to $44 billion. Several documented community costs are not assigned monetary values.

Documented but unpriced community effects include damage to burial grounds and sacred sites, division of Tribal lands and cross-border access, and severance of longstanding community and family networks. These effects are described qualitatively because the available evidence does not support reliable comprehensive monetization.

---

[134] The $650 central sits between the deflated $556 all-species and $766 charismatic values, and the 30 million households are benchmarked below the 45 million bird-watchers (FWS 2018). The bounds are 15 million households at $400 and a larger population at the charismatic figure.

The priced total includes only effects for which market, expenditure, health, or stated-preference evidence supports monetization.

The resulting $18 billion central estimate covers only the priced community costs. It excludes the unmonetized cultural, religious, kinship, and community-severance effects described in this Part.

**Summed (present value, 2025 dollars)**

| Component | Low | Central | High |
|---|---|---|---|
| Property value lost to land near and behind the wall, not condemned | $0.9B | $2.6B | $4.7B |
| Cultural-heritage existence value | $0.2B | $0.5B | $1.5B |
| Chronic anxiety and depression from the militarized barrier zone | $5B | $15B | $37B |
| County fiscal burden of migrant-death response | $0.1B | $0.2B | $0.3B |
| **Additive total** | **~$6B** | **~$18B** | **~$44B** |

The approximate $15 billion central estimate measures chronic anxiety and depression from intensive border enforcement. The calculation begins with approximately 8 million people who live near the border and estimates that 2 million live in mixed status households with heightened exposure to immigration enforcement and risk. Based on relationships reported in the public health literature, this analysis estimates that approximately 7 percent of that population or 140,000 people are assigned an additional chronic anxiety and depression condition attributable to enforcement activity.

Each affected person is assigned an annual health loss of 0.05 Quality-Adjusted Life Years (QALY), valued at the federal rate of $726,000 per QALY over 30 years. This produces an estimated gross cost of $100 billion attributable to the broader immigration enforcement system. Because no published study isolates the Wall's separate contribution, the report assigns the Wall and its associated infrastructure to a fifteen percent share. This produces approximately $15 billion in the community-cost ledger.

The $37 billion high bound increases estimated prevalence attributable to enforcement exposure from 7 percent to 13 percent and the Wall's share from 15 percent to 20 percent.

### III.1 Cultural, tribal, and religious harm

Barrier construction damages cultural, archaeological, and burial sites, and the resulting loss is valued at $0.5 billion, within a range of $0.2 billion to $1.5 billion. The estimate is a stated-preference measure of the value the public places on preserving these resources. The loss to the Tohono O'odham Nation's own religious practice is documented separately and is not monetized.

The recorded damage includes several documented sites. At Monument Hill, in Organ Pipe Cactus National Monument, controlled blasting disturbed a ridge containing Tohono O'odham burials and a ceremonial ground.[135] A National Park Service survey of eleven miles of the monument's southern boundary recorded twenty-two archaeological sites that construction would likely damage or destroy. That count is a lower bound, because the remainder of the corridor was not surveyed under the waiver.[136] In April 2026, clearing through the Cabeza Prieta National Wildlife

[135] The blasting at Monument Hill and the waivers that permitted it are documented in GAO-24-107127 and GAO-23-105443, and reported in BBC 2020.

[136] The twenty-two-site count along the surveyed eleven miles is from a National Park Service report obtained by The Washington Post under the Freedom of Information Act (Miroff 2019). The remainder of the corridor was not surveyed under the waiver, so the count is a lower bound.

Refuge destroyed roughly a third of the Las Playas Intaglio, a ground figure about 200 feet long and roughly a thousand years old.[137] The Chairman of the Tohono O'odham Nation testified to the House Natural Resources Subcommittee on the destruction of these sites.[138]

Federal law provides one measure of the loss. Under the Archaeological Resources Protection Act, damage to an archaeological resource is valued at the cost of the scientific work needed to recover the information the destruction removed, plus the cost of restoring the site, rather than at the market value of the objects.[139] In the leading case, a court valued the looting of four archaeological sites at more than $120,000, about $241,000 in 2025 dollars.[140] Applied across the sites this construction has damaged, the formula produces a figure in the low millions of dollars. It is a floor, because it prices only the recoverable scientific information and not the destroyed resource itself.

The value the general public places on preserving these resources is estimated through stated-preference, or contingent-valuation, surveys. Reported household willingness to pay to preserve cultural and archaeological sites ranges from under one dollar to more than $150.[141] Applying $25 per household, near the low end of that range, to 20 million households, about fifteen percent of United States households, gives $500 million, within $0.2 billion to $1.5 billion.[142] The estimate is uncertain. Stated-preference values are unstable across survey designs and insensitive to the scope of the resource valued, and their aggregation is contested on the ground that it treats a collective or ethical value as a consumer preference.[143] These limitations apply with particular force to burial sites. The figure is included because omitting it would record a documented loss at zero.

A further loss is documented but not monetized. The Tohono O'odham reservation runs 62 miles along the border, and the Nation's roughly 34,000 members live on both sides of it.[144] The barrier and the associated enforcement regime obstruct access to sacred sites, including Quitobaquito Springs and Baboquivari Peak, the salt pilgrimage to the Gulf of California, and cross-border

---

[137] Archaeology Southwest 2026 and Archaeology Mag. 2026.

[138] Testimony of Chairman Ned Norris Jr., Tohono O'odham Nation, before the House Natural Resources Subcommittee for Indigenous Peoples of the United States (Norris 2020).

[139] Archaeological Resources Protection Act (16 U.S.C. Sec. 470aa-470mm), with valuation under 43 CFR Part 7, Sec. 7.14, which measures archaeological value by the cost of the scientific recovery the destruction makes necessary plus restoration (McAllister and McManamon 2007).

[140] United States v. Shumway valued the looting of four archaeological sites at more than $120,000, about $137,200, under the ARPA formula (US v. Shumway 1997). Carried to 2025 dollars at CPI-U, 160.5 in 1997 against 322.5 in 2025, that is about $241,000.

[141] Reported household willingness to pay to preserve cultural and archaeological sites ranges from under one dollar to more than $150, used here as scale context.

[142] The 20 million households are about fifteen percent of the roughly 130 million nationwide, and $25 is near the low end of the reported range. The bounds move the participating population and the per-household value together, giving $0.2 billion at $15 across 13 million households and $1.5 billion at $50 across 30 million.

[143] Empirically, stated-preference estimates are unstable, sensitive to survey design, and scope-insensitive (Diamond and Hausman 1994, Hausman 2012, and Kahneman and Knetsch 1992). Conceptually, aggregating willingness to pay treats a collective or ethical value as a consumer preference (Sagoff 1988).

[144] The Tohono O'odham reservation runs 62 miles along the border, and the Nation's roughly 34,000 members include two to three thousand in Sonora. The 1853 Gadsden Purchase divided lands extending from central Arizona to the Gulf of California (Tohono O'odham Nation 2017).

religious observance and family ties. No stated-preference or restoration-cost measure captures these burdens, and they are carried among the report's unpriced costs.

**III.2 Local and regional economy**

The wall lowers the value of nearby property that the government does not condemn or compensate, and it strands private land between the barrier and the river. These losses total $2.6 billion, within a range of $0.9 billion to $4.7 billion.

Property near the wall loses value, estimated by hedonic analysis, which measures how a location-specific disamenity capitalizes into property prices.[145] Comparable disamenities set the range. Residential values fall by about a quarter immediately adjacent to a high-voltage transmission line, declining to a few percent within 100 meters and to near zero by 200 meters, and prison-proximity studies report effects of similar size.[146] The effect is larger in dense urban areas, where land-price gradients along the former Berlin Wall show a substantial capitalized effect that is absent along remote stretches, so the loss concentrates in the border twin cities and the Lower Rio Grande Valley rather than the open desert.[147] About 40,000 residential and commercial properties lie within the affected band of those segments, at a median value near $250,000. Applying a 10 percent discount, the stock-weighted average across the distance gradient, to that $10 billion of property gives about $1 billion.[148]

The largest part of the loss falls on private land the setback wall strands on the river side. Along the Lower Rio Grande the barrier is built as a levee wall set as much as a mile back from the river, and a geospatial analysis measures 283,306 acres of dry land, about 443 square miles, left between the wall and the river, all retaining United States title.[149] Less than half is privately owned. That private share, 131,655 acres of irrigated riverfront cropland, is not condemned, but it loses its river frontage, road access, and marketability while sitting on the river side of the wall. The cropland is worth about $16,000 an acre. Valued at a 60 percent loss, substantial but short of total because gated crossings leave the land some restricted use, the stranded private land comes to $1.3 billion.

[145] The method is hedonic price analysis, which capitalizes a location-specific disamenity into property prices (Rosen 1974). The transmission-line discount figures are from a literature review (Jackson and Pitts 2010).

[146] Hedonic studies of prison proximity report effects on nearby residential values from the low single digits to about ten percent, by facility type and distance (Emblom).

[147] The Berlin land-price gradients, which show a substantial urban effect and almost none along remote stretches, are from Ahlfeldt et al. 2015.

[148] The ten percent is the stock-weighted average across the distance gradient, below the roughly twenty-five percent found immediately against a transmission line because most of the stock lies 50 to 200 meters out, and above a power line's because a floodlit, patrolled wall is a heavier disamenity. The bounds move the count, the median value, and the discount together, giving $0.4 billion at 25,000 properties, $200,000, and 8 percent, and $2.0 billion at 60,000, $300,000, and 11 percent.

[149] A forthcoming Center for Biological Diversity geospatial analysis (CBD stranded acreage forthcoming) measures the land stranded between the boundary and a continuous set-back barrier at 312,068 acres, and 283,306 acres once waterbodies are removed, roughly 443 square miles, all retaining United States title. By ownership the dry-land measure divides into 131,655 private acres, 100,923 federal, 48,339 state, 3,365 Tohono O'odham, and 1,053 local. Mainstream reporting maps the private valley share (The Washington Post 2024). The figures are a party-supplied geospatial measurement pending publication of the final analysis.

Only the private share is priced. The remaining stranded acreage, about 149,000 acres of federal and state land and roughly 4,400 acres of tribal and local land, carries a loss of public and tribal access rather than a loss of sale value, and is left unpriced.[150]

Two smaller losses complete the total. Crossing and smuggling traffic funneled onto private ranchland cuts fences, kills livestock, and damages crops. Valued at about $5,000 a year across 1,500 affected ranches, this loss capitalizes to $150 million; Texas prices the same damage higher, resting its Landowner Compensation Program on an $18 million two-year appropriation, or $9 million a year.[151] Construction itself closes roads and moves heavy equipment through developed areas for years along each segment, a temporary loss taken at about $200 million.[152]

### III.3 Public health, mental health, and family separation

Enforcement in the border region is associated with elevated rates of anxiety and depression among residents, and the share of that burden attributable to the wall is valued at $15 billion, within a range of $5 billion to $37 billion.

The underlying harm is documented in the public-health literature. A study of more than 3,000 United States citizens found higher rates of anxiety, depression, and psychological distress among those who knew someone who had been detained or deported.[153] Related work documents the mechanism in mixed-status households, including reduced use of health coverage for which family

---

[150] 131,655 private acres × $16,000 an acre × 60% = $1.26 billion, carried as $1.3 billion. The $16,000 is the low-middle of the range for the valley's irrigated riverfront cropland, above the $14,000 low and below the $20,000 premium, and well above the $6,000 rural median. The bounds move the per-acre value and the loss fraction together, giving $0.4 billion at $6,000 and 45 percent and $2.2 billion at $20,000 and 85 percent. Only the private share is priced, because the loss valued here is the collapse of private sale value. The 149,262 acres of stranded federal and state land, 3,365 of Tohono O'odham land, and 1,053 locally owned carry a loss of public and tribal access and use rather than a sale loss, and are left unpriced. The land-acquisition part reduced its severance loading from 70 to 35 percent when this line was added, so this untaken land and the taken parcels' severance are not double-counted.

[151] 1,500 ranches × $5,000 a year = $7.5 million a year, capitalized at 19.6 to about $150 million. Texas prices the damage higher through its Landowner Compensation Program (SB 1133, opened by the Attorney General in May 2024), which reimburses border landowners for trespass-related agricultural damage up to $75,000 an incident on an $18 million two-year appropriation, or $9 million a year (Texas AG and Texas Tribune 2024 (landowner comp.)). The $7.5 million sits below that appropriation. The program had disbursed just over $100,000 as of the count, a measure of take-up rather than of damage. The bounds are the appropriation above, about $176 million capitalized, and zero below.

[152] Construction runs for years along each segment, closing roads, raising dust, and moving equipment through developed areas. The disruption is temporary, taken at $200 million one-time, within $100 million to $300 million as the active-segment count and duration vary.

[153] Pinedo 2020, "Immigration Enforcement Policies and the Mental Health of US Citizens," a study of more than 3,000 United States citizens finding higher anxiety, depression, and distress among those who knew someone detained or deported. The mechanism is documented across the literature, including Vargas 2015 on deportation risk reducing Medicaid use among still-eligible families and Ramos-Sánchez and Llamas 2024 on children in mixed-status households.

members remain eligible.[154] A study of birth outcomes after a large 2008 immigration raid reported higher low-birth-weight rates among infants of Latina mothers, though the result is not statistically significant and is not relied on here.[155] Reports of elevated stress among border residents and of post-traumatic symptoms among children in the Lower Rio Grande Valley also appear in advocacy and press accounts, which are not the basis for the estimate.[156]

The gross burden is estimated from the affected population. About 8 million people live in the 44 United States counties within 100 kilometers of the border.[157] One in four lives in a household that includes a non-citizen member. Of those, about 7 percent carry a chronic anxiety or depression condition attributable to enforcement exposure, an excess consistent with odds ratios of 1.3 to 2.0 reported in the literature against a baseline prevalence near 20 percent, or about 140,000 people. At a decrement of 0.05 quality-adjusted life years each per year, valued at the federal figure of $726,000 per QALY and accumulated over 30 years at a factor of 19.6, the gross burden is about $100 billion.

The wall is one component of the enforcement apparatus that produces this burden, alongside personnel, surveillance, checkpoints, and policy. The estimate attributes 15 percent of the gross to the barrier and its physical features, the wall, lighting, surveillance towers, and patrol traffic, the same share the enforcement section assigns the barrier. No published study isolates the barrier's own contribution to this harm. The 15 percent is a reasoned share, derived from the physical footprint the barrier imposes on adjacent residents.[158] Fifteen percent of $100 billion is $15 billion.

---

154 On reduced use of care, Watson 2014 attributes up to three-quarters of a decline in citizen children's Medicaid participation to enforcement, consistent with Vargas 2015.

155 Novak et al. 2017, reporting a 24 percent low-birth-weight rate among infants of Latina mothers in the 37 weeks after the 2008 Postville raid, with none among non-Latina White mothers. The confidence interval crosses one, so the result is not statistically significant. The difference-in-differences design makes it suggestive, and nothing summed depends on it.

156 Reports of elevated stress among border residents and of post-traumatic symptoms among children in the Lower Rio Grande Valley appear in advocacy and press accounts. The specific fractions sometimes cited have not been traced to a peer-reviewed borderland study, and the estimate does not rest on them.

157 The 8,000,000 is the population of the 44 United States border counties within 100 kilometers of the line (CDC, with HHS OGA concurring, and KFF 2025). The 25 percent mixed-status household share (range 15 to 30) is about two and a half times the KFF noncitizen-individual figure near one in ten. The 7 percent attributable fraction (range 4.5 to 13) reflects mixed-status-household membership at an odds ratio of 1.5 (range 1.3 to 2.0) against a baseline near 20 percent (Patler et al. 2021, Hainmueller 2017, Pinedo and Escobar 2024, Hatzenbuehler 2017, and Wang and Kaushal 2019), moving the line from $10 billion at 1.3 to $28 billion at 2.0. The 0.05 QALY decrement (range 0.04 to 0.06) is for mild-to-moderate anxiety and depression, and the $726,000 per QALY (low $339,000, high $1,105,000) is from HHS ASPE 2026, Table 3. The low near $5 billion prices the 44,000 residents of the direct footprint at central parameters and a 15 percent wall share. The high near $37 billion sets the attributable fraction to 13 percent and the wall share to 20 percent. A 20 percent fraction, above the literature, would put the gross at $285 billion and the wall share at $43 billion, held as an upper marker.

158 The 15 percent wall share is 25 percent times 60 percent, the two-stage construction the enforcement section uses. The barrier is about a quarter of border-hardening on an agent-equivalence basis, and a 60 percent completion factor gives 15 percent, bounded 10 to 20 percent

Family separation is documented and severe, with a lifetime cost per separated child estimated near $1.13 million, but it is excluded here, because separation results from detention and deportation rather than from the barrier.[159]

### III.4 The county fiscal burden of migrant death

Recovering, examining, identifying, and burying migrants who die crossing imposes a fiscal burden on county governments and the organizations that assist them. That burden is valued at $183 million, within a range of $73 million to $282 million. It is the public expenditure on the dead, distinct from the value of the lives, which is priced in the mortality part.

A University of Texas study prices the work step by step, from the scene response through transport, examination, identification, and burial. A properly processed death costs about $10,800, and a death processed at the legal minimum, without an autopsy, DNA testing, or a burial plot, costs about $1,400.[160] Border counties, most of which have high poverty rates, generally pay closer to the minimum. Brooks County, Texas, which leads the country in recorded migrant deaths, processed more than 350 deaths between 2009 and 2013 for about $628,000, or roughly $1,800 each, and forensic anthropologists have since exhumed more than 450 of those remains to recover DNA that was not taken at burial.[161]

The identification burden is large and persistent. The Pima County Medical Examiner receives migrant remains from across Arizona's southern desert counties, and about 1,648 sets of remains in Pima and Maricopa counties remain unidentified.[162]

The annual caseload is the number of deaths the mortality part attributes to the wall, 344 a year, so no separate attribution is applied. At $10,800 a case, proper processing costs about $3.7 million a year, and the search, recovery, and identification work that the per-case figure excludes, carried largely by nonprofit organizations and state-funded forensic laboratories, adds about $5 million a year. Together these capitalize at the thirty-year factor of 19.6 to about $171 million, and clearing

---

as the factor ranges from 40 to 80 percent. No study isolates the barrier's own contribution, so the share is reasoned from the physical footprint.

[159] The $1.13 million lifetime cost per separated child is the maltreatment figure in Peterson et al. 2018 (Peterson, Florence, and Klevens), carried to 2025. It is not summed, because the barrier does not perform the detention and deportation that separate families.

[160] Leutert et al. 2020, Table 2, prices the work step by step. At midpoints a properly processed case runs to about $8,681 in 2020 dollars, or $10,800 in 2025, and minimum processing to about $1,100, or $1,400 in 2025. Leutert's $13,100 headline sums every line at its maximum, including a $5,000 plot and a $2,000 exhumation that no single case incurs together, and press accounts reporting it as an average misuse it. The high bound carries that ceiling, $16,324 in 2025 dollars, deliberately.

[161] The Brooks County figures are from Leutert et al. 2020, more than 350 deaths from 2009 to 2013 on a bill of more than $628,000, about $1,800 a body, with Texas State University anthropologists supplying the more than 450 exhumations. Realized county spending near the legal minimum is why this line prices proper processing and carries the backlog separately. Thirteen of nineteen surveyed South Texas counties have poverty rates above 25 percent.

[162] The Pima County Office of the Medical Examiner receives migrant remains from Arizona's southern desert counties on a budget near $4.8 million with 39 staff. Pima and Maricopa counties held 1,648 unidentified decedents as of May 2026, against nearly 4,500 migrant deaths since 1990 (Humane Borders). The forensic burden is documented in Spradley 2019.

the existing backlog of unprocessed and unidentified remains adds about $12 million once, for $183 million.[163]

### III.5 Binational, diplomatic, and treaty-compliance costs

The wall sits in the floodplain of the Rio Grande, which a 1970 treaty forbids either country to obstruct. Neither country may build works that deflect or obstruct the river's normal flow or its floodwaters, and the binational commission that administers the river must approve structures in its floodplain and can order their removal and compensation for the damage they cause.[164] Mexico's section of the commission objected to floodplain barrier designs in 2008 and again in 2011. The commission has warned that an impermeable fence between the river and its levee could violate the treaty, and its engineers found the existing barrier obstructs 60 to 70 percent of the hydraulic area across the flow.[165] Current construction again places a barrier inside the floodplain.[166] The flood damage that obstruction causes is priced among the environmental costs, and a barrier redesigned to pass floodwater would raise the construction figure rather than add a separate cost. What remains is the contingent liability a non-compliant barrier creates, the damage the treaty makes compensable and the dispute it invites, which the as-planned budget omits.

The wall also severs a biological boundary along which a century of cross-border cooperation has been built. The line splits the ranges of more than 1,500 native species, 62 of them threatened, and the assessment documenting this, endorsed by more than 2,500 scientists from 43 countries, found the barrier devalues the binational conservation investment and the cooperative research that span the boundary.[167] The species loss is priced among the environmental costs. The institutional loss, the cooperation and standing the wall spends, does not resolve into a dollar figure and carries none here.

### III.6 Boundaries

Each harm is included once.

---

[163] The $5 million a year is the humanitarian search, recovery, and identification that the per-case figure excludes, and Leutert records that the Border Patrol tracks neither its search-and-rescue nor its migrant-death costs (Leutert et al. 2020). The $12 million clears the backlog once, roughly 2,000 buried remains at about $2,492 for exhumation and $1,859 for DNA, plus the 1,648 unidentified needing the DNA sample alone. The low of $73 million prices minimum processing at $1,400 a death against a $3 million annual effort and a $5 million backlog. The high of $282 million carries the $16,324 ceiling against an $8 million effort and a $20 million backlog.

[164] The 1970 boundary treaty (1970 Water Treaty) is the source for the bar on obstructing the river's flow or floodwaters and for the International Boundary and Water Commission's authority to approve floodplain structures and require their removal and compensation.

[165] The Mexican section objected to floodplain designs in 2008 and in a December 2011 letter, the commission has warned an impermeable fence between river and levee could violate the treaty, and boundary engineers found the existing barrier obstructs 60 to 70 percent of the hydraulic area across the flow, all sourced in full in the environmental part, which prices the flood damage.

[166] Current construction again places barrier inside the Rio Grande floodplain.

[167] The assessment (Peters 2018) was endorsed by more than 2,500 scientists from 43 countries and found the barrier devalues the binational conservation investment and cooperative research across the boundary. The border bisects the ranges of 1,506 native species, 62 IUCN-listed, priced among the environmental costs.

The heritage figure prices the resource lost rather than the avoided historic-preservation process, and the Archaeological Resources Protection Act formula serves only as a floor beneath it. The compensation paid for condemned land, and the severance loss to partially taken parcels, are carried in the land-acquisition part, so the property figure prices only the neighboring land the government never takes, including the farmland it cuts off from the river without taking. The ranchland damage the funneled traffic does is priced here and in neither the enforcement part, which prices violence to migrants, nor the land-acquisition part. The crossing friction that moves cross-border retail is a trade effect carried in the trade part, so the property figure prices capitalized value rather than the flow of sales. The deaths and physical injuries the crossing produces are valued as lost lives in the mortality part, so the fiscal burden here prices the counties' expenditure on recovering and burying the dead rather than the deaths. The flood damage the barrier causes is carried among the environmental costs, so the treaty exposure here is the contingent liability and not the flood. The health line and the property line cover much the same residents, and both are summed, because a lower home value and a worse state of health are distinct losses, the way proximity to a polluting plant lowers nearby property values and damages nearby health as two separate harms.

The desecration of burial grounds and sacred sites, the bisection of the Tohono O'odham Nation and the barrier thrown across its religion, the severance of cross-border communities and families,[168] and the erosion of cooperation and standing with Mexico are carried as documented incommensurables. That the border-community burden runs so largely through losses a market cannot price means the priced total understates it, since the harms that fall most heavily here, on burial grounds, on religious practice, on severed communities, and on a treaty with a neighbor, are the ones a dollar figure captures least.

Several conventions keep the estimate below a broader accounting of community cost. Cultural, Tribal, religious, and community-severance harms are not assigned dollar values. Stated-preference valuation is confined to a narrow heritage-preservation component. The health estimate attributes only a stated share of the broader enforcement-related burden to the wall. The county calculation measures public expenditure without revaluing the underlying deaths, and condemned land is excluded because it is included in Part I. The property, heritage, and county components total approximately $3.3 billion independently of the health estimate; the full priced community total is approximately $18 billion.

## PART IV – TRADE AND ECONOMIC-INTEGRATION COSTS

A nearly continuous border wall system would impose an estimated $24 billion in trade and economic-integration costs, within a range of $4 billion to $104 billion, in 2025 dollars.

The $24 billion central estimate represents the priced welfare cost to U.S.-Mexico trade under the stated assumptions. Documented channels that cannot be monetized reliably are excluded rather than assigned a value of zero.

The central total comprises approximately $9 billion in costs on continuing freight flows, $8 billion in investment effects, and $7 billion in reduced cross-border retail and tourism.

[168] The border twin cities function as single economies, and the line runs through extended families and daily crossings. Severing those ties is a real cost the social-capital literature confirms while offering no defensible figure for it, so it is carried among the incommensurables.

The direct welfare loss associated with the modeled reduction in trade volume is small relative to the costs imposed on trade that continues to cross. Most of the estimated trade cost therefore arises from added friction, investment effects, and reduced cross-border retail and tourism.

**Cost ledger (present value, 2025 dollars, 30-year horizon)**

| Component | Low | Central | High |
|---|---|---|---|
| Costs on continuing freight flows | $1.5B | $9B | $47B |
| Investment effects | $2B | $8B | $22B |
| Reduced cross-border retail and tourism | $0.2B | $7B | $35B |
| **Additive total** | **~$4B** | **~$24B** | **~$104B** |

The central is the sum of the three component centrals, $23.6 billion. The low and the high are joint bounds, every parameter that drives a line set together to its floor or its ceiling, the added wait running from ten minutes to two hours, the weight on unreliable time from a half to three, and the investment and retail parameters moving with them.

### IV.1 Transmission Channels to Trade

U.S.-Mexico merchandise trade, approximately $870 billion in 2025, moves predominantly by truck and rail through land ports of entry, including Laredo, El Paso, Otay Mesa, and other commercial crossings.[169] A barrier located between ports does not directly obstruct this freight; the estimated effects arise through staffing, delay, reliability, and broader border-friction channels.

Staffing and surveilling a continuous barrier is a standing claim on the same enforcement workforce that runs the commercial lanes, and when officers are pulled toward the line the lanes thin and the queues grow. In the spring of 2019, the agency reassigned up to seven hundred fifty port officers to Border Patrol custody duties, told the trade community the move would close commercial lanes and lengthen waits, and average truck crossing times at the affected ports climbed from about one hour to about five.[170]

A barrier that seals the open country between ports also pushes illicit traffic toward the ports themselves, where it competes for the same booths and lanes as legitimate freight.

### IV.2 Distribution of Trade Costs

The trade cost is a real resource cost. A tariff moves money from importers to the Treasury and costs the economy only the small triangle of trade it discourages, while a wall's delay consumes driver-hours, fuel, inventory, and supply-chain reliability, none of which any party collects. The loss falls on the freight that continues to cross at a higher cost and on the freight that no longer crosses at all, and the first is much the larger, because the added cost is small against the value of the goods and nearly all of the trade absorbs it. Across the priced channels the standing cost is

---

[169] The Bureau of Transportation Statistics reports U.S.-Mexico freight of $872.8 billion in 2025, truck $642.2 billion (73.6 percent) and rail $94.7 billion (10.9 percent) (BTS Transborder Freight 2026, Tables 1b and 3). The USTR Mexico trade summary corroborates it at $872.8 billion in 2025 (USTR). Mexico is the largest U.S. goods-trading partner.

[170] U.S. Customs and Border Protection reassigned up to 750 port officers to Border Patrol custody and warned of closed lanes and longer commercial waits (CBP 2019 (border crisis)). The affected ports were in the San Diego, Tucson, El Paso, and Laredo Field Offices (CBP 2019 (reassignment)). Average truck crossing time at those ports rose from about one hour to about five (Supply Chain Dive 2019). It is the closest thing to a natural experiment on diverting the port workforce and it anchors the added-wait parameter.

about $1.2 billion a year against roughly $870 billion in bilateral merchandise trade, about 0.14 percent.

The forgone-freight loss follows from the crossing cost, and the cross-national border literature is set aside. Havranek and Irsova's meta-analysis of 1,271 estimates puts the worldwide border effect at about a one-third reduction in trade, and the canonical gravity estimate puts borders between industrialized countries at 20 to 50 percent, but both measure what a national border does through separate currencies, legal systems, regulatory regimes, and languages, all of which already stand between the United States and Mexico.[171] A wall adds physical friction at the crossings and little else, so applying a fraction of the measured national-border effect would overstate its cost. The one study that models an actual barrier, Allen, Dobbin and Morten on the 2006-to-2010 expansion of about 548 miles, finds a negligible aggregate effect on United States workers.[172]

### IV.3 Incremental Border-Crossing Cost

A completed border wall raises the cost of moving goods across the border by 0.0625 percent of the value of those goods, the product of the value of a day in transit, the wait the wall adds at the crossings, and a multiplier for the unreliability of that wait. This per-crossing rate feeds both the dollar cost on continuing freight and the trade-volume effect that follow.

| Factor | Value | Basis |
|---|---|---|
| Value of a day in transit | 1.0% of goods value | Hummels-Schaur, Djankov et al. |
| Added crossing wait | 45 minutes, or 1/32 of a day | officer-diversion and wait-buildup methods |
| Reliability multiplier | × 2 | freight reliability ratio of 1.0 |
| **Per-crossing cost** | **0.0625% of goods value** | 1.0% × 1/32 × 2 |

A day in transit is worth about 1 percent of the value of the goods. Two independent literatures reach that magnitude, one valuing shipment time directly and one reading it off the fall in trade as shipment times lengthen, and the automotive and electronics supply chains that fill the Laredo and El Paso lanes sit at the high end of the range, so a central figure is cautious for this corridor.[173]

[171] Havranek and Irsova review 1,271 estimates and find a worldwide border effect of about a one-third reduction in trade (Havranek and Irsova 2017). Anderson and van Wincoop find national borders cut trade between industrialized countries by 20 to 50 percent (Anderson and van Wincoop 2003). Both are set aside because they measure the existence of a national border, bundling the separate currencies, legal systems, regulatory regimes, and languages that already stand between the two countries, where a wall adds only physical friction at the crossings.

[172] Allen, Dobbin, and Morten model the 2006-to-2010 expansion of about 548 miles and find the aggregate effect on United States workers negligible (Allen et al. 2019). It is used only as a direction-and-magnitude cross-check and is never summed into the ledger.

[173] Hummels and Schaur value each day in transit at 0.6 to 2.1 percent of the value of the goods (Hummels and Schaur 2013). Djankov, Freund, and Pham reach the same magnitude from the other direction, each added day before shipment cutting trade by at least 1 percent (Djankov et al. 2010). The 1.0 percent used sits in the middle of the first band and at the floor of the second, and both papers value most highly the time-sensitive automotive and electronics inputs this corridor carries.

Two methods fix the added wait. The first prices the labor a continuous barrier draws off the commercial lanes, since staffing and surveilling the line is a standing claim on the same officers who clear freight. A peer-reviewed general-equilibrium study of the twelve major land crossings prices the output the country loses when one officer is pulled from a lane.[174] The 2019 reassignment is the observed case. CBP moved about 750 port officers to custody duty, and truck waits at the affected crossings rose from about one hour to about five. Priced as an output loss with no wait assumed, that diversion is equivalent against the surface-trade base to a 35-minute wait, which the next part carries in dollars. The second method reads the wait off the same episode and scales the surge to a border-wide average, since a continuous wall spreads a smaller increment across all the ports instead of concentrating it at a few. The two converge near 45 minutes, the extra ten minutes covering the smuggling a sealed line pushes into the ports and the disruption from construction along the corridor. The carried range is 10 minutes to 2 hours.

Variability in the wait adds cost beyond the delay itself, because a plant running to a schedule buffers inventory against the tail of the delay rather than its average. The freight literature values a minute of variability at roughly a minute of average delay, so the time cost is doubled.[175]

### IV.4 Costs on Continuing Freight Flows

The estimated welfare cost on freight that continues to cross is $9 billion, within a range of $1.5 billion to $47 billion.

The base is the surface-mode merchandise crossing the land ports, $735 billion a year, which is the truck and rail freight the federal statistics report and which excludes the air and maritime trade the wall does not touch.[176] Applying the added cost of crossing to it gives $458 million a year, and at the thirty-year factor of 19.6 that is $9 billion.[177]

The officers alone account for $7.0 billion of that, priced without reference to any wait at all, at $476,000 of United States output for each officer the wall's standing requirement takes off the

174 Avetisyan et al. 2015 is a peer-reviewed general-equilibrium study of the twelve major land freight crossings. It finds one added officer at a crossing worth about $350,000 a year in United States output and 3.58 jobs, in 2015 dollars, and the authors report the figure as conservative. The output effect is used here as a welfare proxy, standard for a shock of this size, and it is the anchor for the officer-diversion method throughout Part IV.

175 Carrion and Levinson collect reliability-ratio estimates near one (Carrion and Levinson 2012). For freight the ratios run higher, Wigan et al. reporting 0.96 for intraurban and 3.9 for overnight service (Wigan et al. 2000), both carried in the Transportation Research Board's SHRP2 reliability guidebook (TRB 2014). The 1.0 taken sits at the bottom of the freight range even for the just-in-time traffic the higher ratios describe.

176 The base is the truck and rail freight BTS reports for 2025, $642.2B + $94.7B = $736.9 billion, rounded down to $735 billion (BTS Transborder Freight 2026, Tables 1b and 3). It excludes the air and maritime trade the wall does not touch, and rounding down is conservative.

177 The friction derivation. Trade falls 0.375 percent, so surviving trade is $735B × 0.99625 = $732.2 billion, and the resource cost is 0.0625% × $732.2B = $457.7 million a year. Adding the $0.86 million triangle on destroyed trade gives $458.5 million a year, and × 19.6 = $9.0 billion. The 19.6 is the 30-year annuity factor at a 3 percent real discount rate. Low, a 10-minute wait, reliability 0.5, and elasticity 4, gives 0.0104 percent, $76.5 million a year, $1.5 billion. High, 2 hours, 3.0, and 8, gives 0.333 percent, $2.42 billion a year, $47.4 billion.

commercial lanes.[178] The remaining $2 billion is what the smuggling displacement and the construction disruption add on top of them. The $476,000 is the freight-only value. The same research group, pricing an officer across all the traffic at a port rather than the freight alone, puts one at $2.68 million, and the difference is the passenger and shopper traffic this part counts separately.[179]

Texas A&M researchers estimate that border-crossing delays from every cause already cost more than $1.6 billion a year in direct terms, so the wall's marginal contribution as set here is a fraction of a delay cost the border carries even now.[180] A study of northbound commercial waits finds each ten-minute reduction worth about $344 million a year in added United States commerce, which puts a three-quarter-hour increase against roughly $1.5 billion of commerce, of which the welfare loss counted here is a conservative slice.[181]

**IV.5 Trade-Volume and Welfare Effects**

The modeled reduction in trade volume is approximately four-tenths of one percent. Under the structural-elasticity calculation, the associated welfare loss is approximately $1 million per year.

A trade-cost increase of 0.0625 percent reduces trade volume by that rate multiplied by the trade elasticity, which the structural literature brackets between four and eight. At the central elasticity of six, the modeled reduction is 0.375 percent of surface trade, or approximately $2.8 billion per year.[182] The welfare loss associated with the reduced trade volume is the standard Harberger triangle: one-half of the trade-cost increase applied to the reduction in trade. The result is

---

[178] The officer value standing alone, $476,000 of 2025 output per officer times the 750 officers CBP reassigned in 2019 times 19.6, is $7.0 billion, no wait assumed (Roberts et al. 2014, 162–166). That per-officer value is a marginal, bottleneck-relief estimate its authors caution against scaling to large deployments, so read across the full standing requirement it sits toward the high end of this channel and the line's low bound carries the diminishing return. The remaining $2 billion of the friction line is the smuggling displacement and the construction disruption.

[179] Pricing an officer across all traffic rather than freight alone puts one at $2.68 million against the $476,000 freight-only value (Roberts et al. 2014, 162–166). The gap is the passenger and shopper channel priced separately in the retail line, so the freight-only value is the cautious choice for a freight line.

[180] The Texas A&M Transportation Institute, through its Center for International Intelligent Transportation Research, estimates direct border-delay costs above $1.5 billion a year on 2024 data across the 49 major U.S.-Mexico and U.S.-Canada land ports, $1.55 billion in 2025 dollars (TTI 2026). The wall's marginal contribution is a fraction of a delay cost the border carries even now.

[181] The Atlantic Council estimates a ten-minute wait reduction worth about $312 million in added annual commerce from Mexico, $344 million carried to 2025 at 1.102 (Atlantic Council 2022, 6, 12–13). A three-quarter-hour increase is 4.5 ten-minute units, standing against 4.5 × $344M = $1.5 billion of commerce a year, of which the $458 million counted here is a conservative slice.

[182] The trade elasticity, central 6, range 4 to 8. Simonovska and Waugh estimate roughly four (Simonovska and Waugh 2014), nearly fifty percent below the value implied by Eaton and Kortum (2002), near eight, and six is used, the midpoint. It governs only the trade destroyed and the negligible triangle on it, not the resource burn on surviving trade, so at four the line reads $9.0 billion and at eight it reads $9.0 billion. The parameter is worth nothing here.

approximately $1 million per year, or $17 million over thirty years, which is included within the broader friction estimate.[183]

Two published welfare estimates provide independent order-of-magnitude checks. Caliendo and Parro estimate that the agreement's tariff reductions increased U.S. welfare by 0.08 percent while increasing intra-bloc trade by 41 percent, equivalent to approximately $0.85 billion in welfare for each percentage point of intra-bloc trade at the current scale.[184] A separate estimate places the welfare effect of removing the agreement's tariff and non-tariff provisions at 0.22 percent of income, implying approximately $1.35 billion to $2.33 billion per percentage point.[185] The modeled 0.375-percent reduction in surface trade equals approximately 0.21 percent of intra-bloc trade, implying a cross-check of $175 million to $481 million per year. The principal friction estimate is $458 million. This range brackets that estimate and is not added to it, because the reduced-form welfare rate measures the overall adjustment, including resources used on trade that continues to cross.[186]

### IV.6 Investment Effects

The estimated investment effect of a permanent barrier is $8 billion, within a range of $2 billion to $22 billion.

The investment channel is separate from the delay channel. A firm siting a plant weighs whether the border will be a dependable place to operate across over the twenty-year life of the plant, which the 45-minute crossing wait priced in the preceding parts barely affects.

Foreign direct investment into Mexico ran a record $41 billion in 2025, much of it drawn by nearshoring to the land border, though that figure reflects projects committed in the 2023 and 2024 wave completing rather than fresh capital, with forward announcements down 78 percent year on

[183] The volume derivation. At $\tau = 0.0625\%$ and $\varepsilon = 6$, trade falls 0.375 percent, about $2.8 billion a year of the $735 billion base. The welfare loss is the triangle, $\frac{1}{2} \times 0.000625 \times \$2.8B = \$0.86$ million per year, and $\times 19.6 = \$17$ million. The amount rounds to zero at the precision of the ledger and is included within the friction line.

[184] Caliendo and Parro find the tariff cuts raised U.S. welfare 0.08 percent while raising intra-bloc trade 41 percent (Caliendo and Parro 2015). The denominator is the fall, not the rise. A 41 percent rise from the pre-agreement level is a 29.1 percent fall from where trade now stands (41 ÷ 141). U.S. GDP was $30.762 trillion in 2025 (BEA 2026), confirmed against FRED series GDPA, so 0.08 percent is $24.6 billion, and across a 29.1 percent fall that is $0.85 billion of welfare per point.

[185] Stripping the agreement of tariffs and non-tariff barriers together costs about 0.22 percent of income under the ifo trade-model estimates summarized in Bonadio et al. 2019. At $30.762 trillion that is $67.7 billion a year. At the pre-agreement level the fall is 29 percent, worth $2.33 billion a point, and revocation removes the non-tariff integration too, so at a 50 percent fall a point is worth $1.35 billion. The method returns $1.35B to $2.33B per point.

[186] The reduced-form cross-check. The wall cuts surface trade 0.375 percent. Mexico carries 55.0 percent of U.S. intra-bloc trade (BTS Transborder Freight 2026, Mexico $872.8B, Canada $712.8B), so 0.21 percent of intra-bloc trade, and at $0.85B to $2.33B a point the implied loss is $175 million to $481 million a year. The friction line carries $458 million, inside that band. Two methods sharing no inputs land together. They are never added, because a reduced-form rate already contains the resources burned on surviving trade.

year in early 2026.[187] A permanent wall raised into that pipeline is taken to deter 1 percent of the investment at the margin, about $410 million a year. Over the wall's life that builds to an average foregone capital stock near $6.15 billion, which at a 6.5 percent welfare return on the integrated production it would have supported is about $400 million a year, or $8 billion in present value.[188]

Retaliation and the slow erosion of cross-border cooperation that a barrier built over Mexico's objection invites are real, the more so for a complete barrier raised amid the present tariffs and treaty review. The evidence gives their direction but not their magnitude, so they are left at zero, and the total understates the true cost by that amount.

### IV.7 Cross-border retail and tourism

Reduced cross-border shopping and tourism are estimated to impose $7 billion in costs on border-city economies, within a range of $0.2 billion to $35 billion.

Mexican nationals account for as much as 40 to 45 percent of retail sales in Laredo, close to a third in McAllen, and ten to fifteen percent in El Paso, and Tijuana residents spend on the order of $3 billion to $5 billion a year in the San Diego region.[189] Those shoppers cross at the ports on foot and in cars, in the same lanes the wall's diverted officers thin, so a longer wait turns a share of them back at the bridge. The Dallas Fed already attributes part of the recent fall in cross-border shopping in Texas to lengthy border waits, observed before any wall is added to it.[190]

---

[187] Foreign direct investment into Mexico ran a record $41 billion in 2025, reported at $40.9 billion for the first three quarters by Mexico's Ministry of Economy, up 14.5 percent year on year, at $41 billion by UNCTAD (UNCTAD 2026), and at $43.2 billion by ECLAC on Bank of Mexico data. The inflows reflect the 2023 and 2024 nearshoring wave completing while forward commitments fall, with nearshoring-related announcements down 78 percent year on year in the first quarter of 2026, to 22 deals worth $2.63 billion against $14.6 billion a year earlier (Integralia).

[188] The 1 percent marginal deterrence is an assumption, range 0.5 to 2 percent, applied to the record annual flow. The 6.5 percent welfare return is set near the standard real return on productive capital, range 4 to 9 percent, with no study estimating the return on foregone Mexican manufacturing capital specifically. The channel is additive to the friction line, which prices only the queue.

[189] Two independent readings bracket the retail base and $13.5 billion is taken. From shares, the Federal Reserve Bank of Dallas puts 2023 Mexican-national retail sales at $4.9 billion in McAllen (28.2 percent of the metro's sales), $803 million in El Paso (4.8 percent), and $644 million in Laredo (10.8 percent), down from a historical peak as high as 40 to 45 percent in Laredo (Brizuela et al. 2026). With Brownsville and carried to 2025 that is roughly $8 billion for Texas, and San Diego and Arizona bring it near $13 billion. From spending, Coronado reports more than $4.5 billion spent in the four Texas metros in 2011 (Coronado and Phillips 2012, 15), $6.5 billion in 2025 dollars at 1.434, plus $4 billion of Tijuana spending in San Diego and $1 billion in Arizona, giving $11.5 billion. The crossing base is BTS Border Crossing Data 2025, 94.4 million personal-vehicle and 45.1 million pedestrian entries by land (BTS Border Crossing 2026).

[190] Brizuela, Cañas, and Leigh attribute part of the recent decline in cross-border shopping in Texas to lengthy border waits (Brizuela et al. 2026), the mechanism this line prices, observed before any wall.

A shopper crossing to buy makes the trip twice, so the wall costs her an hour and a half on a trip that runs about four hours door to door, which is a 37 percent increase in the time the errand takes. A discretionary trip is responsive to that in a way a scheduled freight shipment is not, and at a trip-time elasticity of 0.2 the crossings fall eight percent.[191]

A cross-border retail base of $13.5 billion a year, an eight percent reduction in the shopping crossings that carry it, and a welfare loss of thirty-two percent of the sales forgone, which is the retail margin net of the resources the sale would have consumed rather than the full ticket, give $346 million a year and $6.8 billion.[192]

**IV.8 The closure scenarios**

The figures most often quoted for the trade cost of border disruption come from scenario studies of a temporary closure. The best known puts the cost of a one-third reduction in cross-border trade sustained over three months at about $87 billion in lost United States gross product in current dollars, with almost half of it falling on Texas.[193] One of these is not a scenario. When Texas ran enhanced state truck inspections at its ports for nine days in April 2022, the measured loss to United States gross domestic product was $1.1 billion a day, some $9.9 billion across the episode, with no wall involved at all.[194]

They describe a genuine cost and they are not added here. They price a temporary shock measured over a quarter, where a wall imposes a standing cost for as long as it stands, and summing the two would fold a one-time loss into a perpetual one. A bad stretch at the ports runs on top of the standing cost of the wall rather than instead of it.

---

[191] The retail derivation. $13.5B (Brizuela et al. 2026) × 8 percent × 32 percent = $346 million a year, × 19.6 = $6.8 billion, carried $7 billion. The 8 percent crossing reduction is derived. A shopper crosses twice, so the 45-minute wait adds 1.5 hours to a roughly 4-hour trip (set, range 3 to 6), a 37.5 percent time rise, and at a trip-time elasticity of 0.2 (set, range 0.05 to 0.5) the crossings fall 7.5 percent, carried 8. No study estimates that elasticity for border waits. The 32 percent welfare share is the retail gross margin (set, range 25 to 40), the loss being the margin net of the resources the sale would consume, not the full ticket. Low, the $11.5B base at a 10-minute wait, 6-hour trip, elasticity 0.05, and 25 percent share, is $0.2 billion. High, the $18B base at a 2-hour wait, 3-hour trip, elasticity 0.5, and 40 percent share, returns a crossing fall above 60 percent a constant elasticity cannot support, so it is capped at 25 percent for $35 billion, the cap binding the high.

[192] The retail line is $13.5B × 8 percent × 32 percent = $346 million a year, × 19.6 = $6.8 billion, carried $7 billion. Parameters, ranges, and priced bounds ($0.2 billion low, $35 billion high) are above.

[193] The Perryman Group finds a one-third reduction in trade over three months would cost the United States over $69.0 billion in gross product and 620,236 job-years counting multipliers, almost half in Texas, which is $87 billion carried to 2025 at 1.26 (Perryman Group 2019). A gross-output figure run through regional multipliers pricing a temporary shock, commissioned by IBC Bank, so it is held beside and never summed.

[194] The Perryman Group prices the enhanced Texas truck inspections of April 6–15, 2022, a realized episode (Perryman Group 2022). Over nine days the daily loss to U.S. GDP was $996.3 million in 2022 dollars, $1.10 billion carried to 2025 at 1.102, for $8.967 billion across the episode, $9.9 billion in 2025 dollars, and 77,019 job-years. It corroborates the mechanism with a measured event. An independent estimate puts a full closure at as much as 0.62 percent of U.S. real GDP, about $130 billion a year in 2019 dollars, $164 billion in 2025 at 1.261 (Econofact 2019).

### IV.9 Boundaries

Each harm is included once.

The budgetary cost of the officers and surveillance the wall requires is part of operating the wall and is carried in the government part, while what is counted here is the separate loss their diversion imposes on the firms and consumers who trade. The cross-border retail priced here is the trade effect the border-communities part sets aside for it, so the shopping loss books here and the property value capitalized into border real estate books there. The smuggling that a sealed line pushes toward the ports is counted here for what it does to the cost of crossing, while what it does to the smuggling market itself is counted in the enforcement part. The welfare loss from trade destroyed is the triangle above the friction line and never a second application of a reduced-form rate that already contains it. The closure scenarios price a temporary shock and are never summed with a permanent one.

A three-quarter-hour wait carries this whole figure, and the wall's own precedent runs above it. When the agency pulled its officers to the line in 2019, the wait at the ports it touched rose by four hours. The channels left at zero, the retaliation, the relationship, and the supply-chain redesign that goes beyond the investment proxy, push the true cost above what a three-quarter-hour wait returns.

## PART V – ENFORCEMENT-INDUCED COSTS

Completing a nearly continuous barrier can alter the market for unauthorized crossing by concentrating routes and increasing reliance on smuggling organizations. The priced components in this Part include route violence and victimization, real resources consumed by smuggling activity, and incremental journey costs. Together, these enforcement-induced costs total approximately $37 billion in 2025 dollars, within a range of $2 billion to $226 billion; route violence is the largest central component, at approximately $34 billion. That figure scales with the volume of crossing, and it rests on the thirty-year mean of that volume rather than the present count, which sits at its lowest since 1970; the sensitivity of the line to that choice is reported where it is derived.

| Component | Low | Central | High |
|---|---|---|---|
| Route violence and victimization | $2.1B | $34B | $207B |
| Resources used in smuggling activity | $0.2B | $2.4B | $13.5B |
| Incremental journey costs | $0.1B | $0.9B | $5.4B |
| **Additive total** | **~$2B** | **~$37B** | **~$226B** |

The range is wide because the four quantities behind the violence figure are each uncertain and each moves it, with the low and high moving all four together.[195] The rents a hardened border

[195] 1,200,000 crossings × 6% = 72,000 × $161,000 = $11.59B × 15% wall share × 19.6 (30-year annuity at 3 percent) = $34B. Joint low 0.4M × 3% × $90,000 × 10% × 19.6 = $2.1B, joint high 2.3M × 8% × $250,000 × 23% × 19.6 = $207B, the bounds moving all four parameters together. (1) Crossing flow 1.2M a year, range 0.4M to 2.3M, realized anchor, the 0.4M bound the fiscal 2011–2017 apprehensions trough (CBP apprehensions FY1960-2019) and the 2.3M the fiscal 2021–2024 mean near 1.85M, each with undetected crossings added. (2) Serious-victimization rate 6%, range 3 to 8%, floor-under-conservatism, about a quarter of the Leyva-Flores transit survey's roughly 24 percent physical-violence rate (Leyva-Flores et al. 2019) and an Innes meta-analysis (31 studies, 25,997 migrants) near 33 percent (Innes et al. 2024), floored by CNDH's tens-of-thousands-a-year kidnapping estimate (HRF 2023), Doctors Without Borders' 57 to 68 percent

transfers to the cartels are not added, because a payment from a migrant to a smuggler is a transfer rather than a loss of resources, though those rents fund the violence and are what its scale is read from.

### V.1 Effects on the Smuggling Market

A barrier between ports of entry displaces crossing toward longer and more difficult routes and increases reliance on paid guides. The additional travel time, fuel, and guiding services are real resource costs rather than transfers. Evidence from the 1986-to-2004 enforcement build-up estimates an increase of about $140 per crossing, or $262 in 2025 dollars.[196] At 1.2 million crossings a year and a 15 percent attribution to the wall, this comes to about $47 million a year, or $0.9 billion over thirty years.[197]

The fees migrants pay smugglers are not counted, because a payment from a migrant to a smuggler is a transfer rather than a resource cost. Those fees have risen from a few hundred dollars in the 1990s to $10,000 to $15,000 today, and much of the payment now goes to criminal organizations

---

exposure (MSF 2020) set aside as care-seeking rather than a ceiling. (3) Per-victimization value $161,000, range $90,000 to $250,000, composition, McCollister, French, and Fang's $42,310 robbery, $107,020 aggravated assault, and $240,776 rape (2008 dollars × 1.498 CPI-U) blended 40/40/20 over robbery and extortion, assault and kidnapping, and sexual violence (McCollister et al. 2010, Table 5 totals net of an embedded homicide-risk term). (4) Wall marginal share 15%, range 10 to 23%, a 25% (20 to 33) barrier share times a 60% (50 to 70) completion increment. The barrier share is an equal-weight prior across the co-acting instruments of hardening rather than a measured split, since the agencies have never isolated the marginal contribution of fencing from that of personnel and technology (GAO-17-331), and Feigenberg's finding that fence construction is no more cost-effective per dollar than an equivalent personnel increase places the barrier among those instruments (Feigenberg 2020); four levers give 25 percent and the three-pillar taxonomy 33, the range spanning both. The turf killing would add a comparable amount at the peace index's per-homicide cost (IEP 2025) if a tenth of organized-crime homicides tied to the migration rent, too weak an attribution for the central.

[196] $140 per crossing carried to $262 in 2025 dollars on the consumer price index. The estimate is from Gathmann 2008, a peer-reviewed instrumental-variables study of the 1986-to-2004 enforcement build-up finding coyote prices up about 17 percent and geographic substitution more than twice that. It measures total enforcement intensity rather than the barrier alone, so it is an upper bound on the substitution cost's elasticity to enforcement.

[197] The low of $0.1 billion takes 0.4 million crossings at $150 and a 10 percent share. The high of $5.4 billion takes 2.3 million at $524, the DHS working paper's elasticity roughly twice Gathmann's (Roberts et al. 2010), and a 23 percent share. Because the easiest segments were built first, a complete wall's marginal diversion per mile runs below the partial build's (Feigenberg 2020 and Allen et al. 2019).

that control the crossing routes.[198][199] Estimates of what those organizations earn range from a few hundred million dollars for the fees they directly control to tens of billions for the smuggling trade as a whole.[200] None of it is included in the total.

The contested criminal rent does, however, generate a real resource cost. Where a valuable prize is contested, competitors expend resources to capture and defend it, and in an illegal market that expenditure takes the form of enforcement, vehicles, weapons, corruption, and violence among rival groups. This dissipation is a social cost rather than a transfer.[201]Taking a migration-related rent of about $4 billion a year, of which about a fifth is dissipated rather than retained, and applying the 15 percent wall share, the resource cost is about $2.4 billion over thirty years, within a wide range of $0.2 billion to $13.5 billion. The figure is a scale marker. The $4 billion rent sits above the payments to criminal organizations that RAND documented for 2017 and below the tens-of-billions figures cited for the trade as a whole.[202]

### V.2 Route Violence and Victimization

Concentrating crossing onto routes controlled by smuggling organizations exposes migrants to extortion, assault, kidnapping, and sexual violence. The share of that harm attributable to the wall is valued at $34 billion, within a range of $2.1 billion to $207 billion. It is the largest enforcement-induced cost.

The underlying violence is documented across several sources. A study of corridors near twenty-three Mexican border cities links increased United States enforcement to stronger criminal control of crossing routes, greater competition among organizations, and higher exposure to extortion,

---

[198] Smuggling fees ran roughly $100 at Tijuana-San Ysidro in the 1990s, $2,000 to $3,500 across the 2000s (DHS Office of Immigration Statistics), and about $8,600 for Mexican and $11,500 for Central American migrants in 2022, rising to $12,000 to $15,000 by 2023 (court-document compilations and border reporting). These are mixed press and advocacy figures carrying only the direction and scale of the escalation, and no summed figure rests on them. The smuggling-cost elasticity to enforcement is anchored on Gathmann and corroborated by the DHS working paper at roughly twice that (Roberts et al. 2010), which sets only the high bound of the journey-cost line.

[199] Senior Border Patrol agents' testimony to the House Committee on Homeland Security, December 2023, carried only for the qualitative account of cartel control of crossings (House Homeland 2023).

[200] RAND's Homeland Security Operational Analysis Center estimates payments to transnational criminal organizations of $30 million to $180 million in 2017, and total smuggling revenue to all actors of $200 million to $2.3 billion, with the cartels not the main actors (Greenfield et al. 2019). Larger circulating figures, $13 billion for 2021 (Homeland Security Investigations) and about $20 billion for 2022 (The Washington Times 2022), mix gross revenue, profit, and whole-trade size. None is included in the total, all being transfers.

[201] Rent dissipation is a social cost rather than a transfer (Tullock 1967 and Krueger 1974). Paul and Wilhite 1994 carry the result into illegal markets and are the warrant for pricing both the dissipation and the violence.

[202] The joint low is $1 billion in rent at 10 percent dissipated and a 10 percent wall share, giving $0.2 billion. The joint high is $10 billion at 30 percent and a 23 percent share, giving $13.5 billion. The $4 billion central rent (range $1 billion to $10 billion) sits above RAND's 2017 cartel-payment figure of $30 to $180 million, fees having risen several-fold since, and below the tens-of-billions whole-trade figures. The 20 percent dissipated share (range 10 to 30 percent) is net of the violence, which is valued separately.

assault, and homicide.[203] A peer-reviewed survey of 12,023 migrants in transit found that 29.4 percent had experienced violence on the journey, about a quarter of them physical violence and about 2 percent sexual violence.[204] Kidnapping for ransom is widely documented. The State Department describes it as reaching across most smuggling routes, and human-rights monitors recorded more than 1,300 kidnappings, extortions, and rapes in a single six-month period, which they treat as a floor because most incidents go unreported. Médecins Sans Frontières reported that about a third of the women it treated had been sexually abused in transit and 10.7 percent raped.[205]

The estimate is built from unit costs rather than from any aggregate. The economic impact of violence on Mexico is large, on the order of a fifth of its output, but the migrant-victimization figure is derived from per-offense values in the crime-cost literature, not from that total.[206] At 1.2 million crossings a year and a serious-victimization rate of 6 percent, about 72,000 victimizations occur each year. Valued at a blended $161,000 each and attributed to the wall at a 15 percent share, the gross harm of about $11.6 billion a year becomes $1.7 billion a year, or $34 billion over thirty years.[207]

The crossing flow of 1.2 million a year is the realized thirty-year mean of southwest-border crossings, not the current level. Border Patrol recorded 237,538 encounters in fiscal 2025, the

[203] Contreras-Velasco 2025, drawing on Mexican gun-violence data, U.S. enforcement records, news reports, and nearly 5,000 migrant survey responses across corridors near twenty-three Mexican cities, 2015 to 2019, with male homicide rates proxying cartel turf violence.

[204] Leyva-Flores et al. 2019, a peer-reviewed survey of 12,023 migrants recruited through five shelters, of whom 3,539 (29.4 percent) suffered some violence, about 24 percent physical and 2 percent sexual, ranging by shelter from 18.3 percent in Tapachula to 38.3 percent in Saltillo. It anchors the serious-victimization rate. It is shelter-based rather than care-seeking, and its window closes in 2015, before the cartel consolidation this part prices.

[205] U.S. Department of State on kidnapping for family money transfers and debt bondage (State Dept 2025), ProPublica on an industrial-scale kidnapping racket expanding as enforcement tightens (Green 2024), and Human Rights First, which documented more than 1,300 kidnappings, extortions, and rapes in roughly six months of 2023, treated as a floor (HRF 2023). Ransoms run $1,500 to $5,000 per migrant and tens of thousands for groups (Bonmatí et al. 2021). Médecins Sans Frontières found about a third of women treated sexually abused in transit and 10.7 percent raped (MSF 2020 and MSF 2017). Underreporting means these counts understate the true scale.

[206] Institute for Economics and Peace, Mexico Peace Index, putting the economic impact of violence at roughly $245 billion in 2024, about 18 percent of Mexico's GDP, with homicide the largest component at roughly half (IEP 2025, and the InSight Crime summary at Woolston 2025). It sets the scale, and the migrant-victimization figure is built from per-offense unit values rather than the index total.

[207] The joint low of $2.1 billion and joint high of $207 billion move all four parameters together. The crossing flow is 1.2 million a year, range 0.4 to 2.3 million, the realized thirty-year mean. The serious-victimization rate of 6 percent, range 3 to 8, is about a quarter of the roughly 24 percent physical-violence rate in the transit survey (Leyva-Flores et al. 2019) and below the roughly 33 percent in a 31-study meta-analysis (Innes et al. 2024). The per-victimization value of $161,000, range $90,000 to $250,000, blends McCollister et al. 2010 unit costs for robbery, assault, and sexual violence at 40/40/20. The 15 percent wall share, range 10 to 23, is a 25 percent barrier share among the co-acting instruments times a 60 percent completion increment. The agencies have never isolated the barrier's marginal contribution from that of personnel and technology (GAO-17-331), and fence construction is found no more cost-effective per dollar than an equivalent personnel increase (Feigenberg 2020).

lowest since 1970, and the flow has varied by a factor of seven across past thirty-year spans. Because a wall built now operates for thirty years, the estimate uses the long-run mean rather than the present trough. If the fiscal 2025 level held for the entire horizon, this line would be $6.7 billion rather than $34 billion.

The 15 percent wall share reflects that the wall is one of several instruments that harden the border, alongside personnel, surveillance, and turn-back policy, and that no study isolates its own contribution to the funneling. It is the product of a one-quarter barrier share among the co-acting instruments and a 60 percent increment for the effect the remaining miles add beyond the barrier already standing, and it is the same share the community-health estimate uses.

The harm is valued wherever it falls, on both sides of the border, on the same convention the mortality part applies to the lives the wall takes. Valuing the victimization on the United States side while treating the same harm in Mexico as zero would understate the cost on a distinction the report does not otherwise draw.[208]

### V.3 Drug Smuggling and Barrier Limitations

Drug-seizure data indicate that most fentanyl seizures occur at ports of entry or interior vehicle checkpoints rather than between ports. The drugs are often concealed in legal traffic, and U.S. citizens account for a large share of convicted fentanyl traffickers. Because inspection intensity differs across channels, seizure shares are not identical to flow shares; however, the available evidence does not support assigning a material drug-interdiction benefit to barriers located between ports.[209] Smuggling between ports can adapt through tunnels, aerial routes, and maritime routes. These channels are small relative to port traffic and are treated as adaptation rather than elimination.[210] Accordingly, the ledger assigns no offsetting drug-interdiction benefit to the nearly continuous barrier system.

### V.4 Effects on Circular Migration and Settlement

Border enforcement also affects the duration of stay. When crossing costs were lower, a larger share of migration was circular. As enforcement increased, the probability of return migration

---

[208] This part values violence wherever it falls, including in Mexico, on the same convention the mortality part uses for the lives the wall takes regardless of nationality. Pricing harms on the northern side while valuing those on the southern side at zero would understate the wall's cost on a distinction the report does not otherwise draw.

[209] CBP seizure data analyzed by the American Immigration Council finds more than 92 percent of fentanyl over fiscal 2018 through 2024 seized at a port of entry or Border Patrol vehicle checkpoint (AIC 2025 (fentanyl)). Cato Institute analysis of FOIA and U.S. Sentencing Commission data finds roughly 88 percent seized at ports over fiscal 2015 through 2024 and most convicted fentanyl traffickers U.S. citizens (Bier 2024). DEA Administrator Anne Milgram told the Senate Foreign Relations Committee in 2023 that the great majority enters through the ports (Milgram 2023), and the DEA's 2025 National Drug Threat Assessment names concealment in vehicles through ports as the principal method (DEA 2025). The counts are government CBP and Sentencing Commission data behind the American Immigration Council and Cato framing.

[210] GAO records tunnels, ultralight incursions, and maritime events in the low hundreds over fiscal 2011 through 2016, a small and generally declining fraction of seizure events (GAO-17-474). The adaptation of smuggling methods, including tunnels, aerial routes, and maritime routes, is documented by the Congressional Research Service (CRS R46218) and GAO (GAO-17-474). No separate tunnel-construction amount is included because no audited cost series was identified.

within twelve months fell from approximately 0.45 before the build-up to approximately 0.17 by 2010, consistent with a shift from circular to longer-term settlement.[211] A completed barrier would extend this mechanism by further increasing the cost and risk of repeated crossing.

A settled population is a less flexible labor force, slower to follow seasonal demand, and the agricultural and service employers who relied on that flexibility bear a cost the enforcement caused.[212] A permanent resident also pays taxes and builds a life in ways a seasonal worker does not. The labor-market rigidity is the component most clearly traceable to reduced circular migration, but the available evidence does not support a reliable monetary estimate, so no amount is included in the ledger.

Barrier enforcement can also change the organization of smuggling activity. Where smuggling organizations collude with corrupt officials at official crossings, tighter controls between ports can divert activity toward more organized and well-connected groups rather than reduce total volume, disadvantaging independent guides and migrants attempting to cross without them.[213]

### V.5 Related Enforcement Expenditures

The 2025 budget law included approximately $45 billion for immigration detention, $3.3 billion in a Department of Justice appropriation that includes immigration courts, and more than $4 billion for Border Patrol hiring and training.[214] These expenditures are part of the wider immigration-enforcement system and are excluded from the wall cost ledger because they would not necessarily vary one-for-one with completion of the barrier. They are reported only for context.

### V.6 Boundaries

Fatalities and crossing injuries associated with route diversion, wall falls, exposure, and drowning are valued in Part VI. Part V includes only violence inflicted by criminal organizations along

[211] Douglas S. Massey, Jorge Durand, and Karen A. Pren, peer-reviewed (Massey et al. 2016). Its roughly $35 billion of border-enforcement spending between 1986 and 2010, which did not slow the undocumented population's net growth, is an input rather than a welfare cost and enters no total.

[212] Recent agricultural-economics work documents temporary but costly reductions in noncitizen farm labor supply after enforcement shocks, and the Department of Labor acknowledged in an October 2025 Federal Register filing that the enforcement campaign threatens domestic food production and consumer prices (DOL 2025). Neither carries a pinpoint here. Both are effects of interior and economy-wide enforcement rather than the barrier, context on the caging effect, no figure resting on them.

[213] Diana Kim and Yuhki Tajima, on enforcement diverting and sorting the smuggling trade rather than cutting its volume where smugglers collude with corrupt officials at the crossings (Kim and Tajima 2022).

[214] Public Law 119-21 appropriated roughly $46.5 billion for border-wall construction and barrier-system attributes, about $45 billion for immigration detention, about $3.3 billion in a Department of Justice lump sum including the immigration courts, and more than $4 billion to hire and train Border Patrol agents, with further sums for retention and technology (Pub. L. 119-21, Sec. 90001 (139 Stat. 357-58)). The detention, court, and personnel figures come from the American Immigration Council's analysis and contemporaneous reporting rather than the statute directly (AIC 2025 (OBBBA)), and are presented as contextual components of the wider enforcement appropriation rather than as costs assigned to the wall. The wall-construction appropriation is treated in the direct-costs part and as the synthesis baseline.

controlled routes, including kidnapping, assault, sexual violence, and homicide among competing organizations. The categories are defined to prevent double counting.

The community-health estimate in Part III and the route-violence estimate in Part V use the same 15 percent attribution share but apply it to different harms and populations. Surveillance and staffing costs are included in Part I, while only the trade delays associated with personnel diversion are included in Part IV. No drug-interdiction benefit is credited because the available evidence does not support a material benefit from between-port barriers. Detention, court, and personnel expenditures are reported contextually and are not included in the wall total.

The estimate uses a crossing flow below the recent between-ports total, a serious-victimization rate below the physical-violence rate reported in the medical literature, and a zero resource-cost value for cartel migration rents because those rents are transfers. These conventions reduce the summed estimate while retaining the documented route-violence costs.

## PART VI – MORTALITY AND NONFATAL INJURY

A nearly continuous border wall system would result in fatalities and nonfatal injuries over its operating life, with an estimated cost of about $122 billion in 2025 dollars, within a range of $17 billion to $393 billion. The largest component is migrant mortality attributed to the wall under the stated methodology, approximately $94 billion.

The value-of-life method the federal agencies use, and that this report uses, measures what people will pay to avoid small risks of death. It is a floor on what a death costs, and it leaves the larger part of the loss unpriced. The figure does not reach the welfare loss to survivors that the method leaves out, and more than four and a half thousand sets of remains still lie unidentified in the medical examiners' offices of two Arizona counties.

| Component | Low | Central | High |
|---|---|---|---|
| Migrant mortality, forward stream | $15.6B | $94.3B | $266.1B |
| Nonfatal injuries | $1.3B | $25.2B | $117.1B |
| Pursuit and bystander deaths | $0.2B | $0.9B | $5.2B |
| Agent line-of-duty deaths | $0.05B | $0.34B | $1.1B |
| Construction-worker mortality and injury | $0.2B | $1.0B | $3.0B |
| **Additive total** | **~$17B** | **~$122B** | **~$393B** |

The range is wide because the death stream rests on three uncertain quantities, the rate at which crossers die, the share of those deaths the wall causes, and the value placed on each life, and the low and high move all three together.[215] Deaths from flooding, where the barrier blocks a storm channel and acts as a dam, are priced among the environmental costs and not counted again here.

### VI.1 The harm

By the International Organization for Migration's count of recovered remains, the U.S.-Mexico border records more migrant deaths than any other land-crossing corridor it tracks. The Border

[215] The death stream. 550 deaths a year × 62.5% wall attribution = 343.75 wall-attributed deaths, × $14.0M × 19.6 (30-year annuity at 3 percent) = $94.3 billion. Rate, share, and value are each bounded and move together. Joint low 350 × 35% × $6.5M × 19.6 = $15.6B. Joint high 750 × 85% × $21.3M × 19.6 = $266.1B. Perpetuity at 3 percent raises the factor to 33.3 and the central to $160 billion, and the 30-year figure is carried.

Patrol has recorded more than eight thousand migrant deaths in its sectors since 1998, reaching an agency record of 895 in fiscal 2022 before falling to 704 in fiscal 2023.[216]

That recorded toll is an undercount, and the Government Accountability Office has found that the Border Patrol does not collect or report complete data on these deaths, that it leaves out the remains county medical examiners and local officials recover, and that it discloses none of these limitations in the figures it publishes. A border-wide database built from medical examiners, coroners, justices of the peace, and sheriffs' departments documents twenty to forty percent more deaths than the agency's own count, depending on the sector, and finds regular errors in its records of name, age, nationality, and date of death. The official figure is used as a lower bound.

As a physical structure the barrier is associated with deaths directly, through falls from a thirty-foot face and through crossings driven into the water to get around it, and both channels have now been measured on the same stretch of wall. As one instrument of a broader enforcement strategy it contributes to deaths indirectly, closing the urban routes and pushing the crossing into the desert and river country, where heat, exposure, and drowning do the rest. The agency has used that strategy since 1994, prevention through deterrence, and the mortality consequence was documented in the literature within a few years of its adoption.[217] The direct deaths are the smaller number and the easier case to prove. The indirect deaths are the larger number, and a barrier with no urban gaps increases exposure to them.

### VI.2 The forward stream

The wall operates for decades, so the cost is the stream of deaths over its operating life, discounted. The forward rate is 550 deaths a year at the central estimate, 350 at the low and 750 at the high, each net of a pre-enforcement baseline of about two dozen a year so that the rate counts only the deaths the funneling adds. The Border Patrol's recorded counts averaged about 355 a year from 1998 through 2019 and have run between 500 and 895 since, so a central of 550 sits below the recent record, and below it again once the 20-to-40-percent undercount is allowed for.[218]

---

[216] The official counts and their undercount. CBP records more than 8,000 migrant deaths in Border Patrol sectors since fiscal 1998, a record 895 in fiscal 2022 and 704 in fiscal 2023 (CBP Border Rescues). GAO found the counts incomplete, omitting remains recovered by county medical examiners and local officials and disclosing no such limitation (GAO-22-105053), and its later review records 704 deaths and over 5,800 rescue events in fiscal 2023 with the Missing Migrant Program still lacking an adequate evaluation design (GAO-25-107548). The International Organization for Migration's Missing Migrants Project records the world's deadliest land crossing (IOM). No More Deaths documents twenty to forty percent more deaths than the official count depending on sector (No More Deaths 2025). The Journal on Migration and Human Security found the Pima County medical examiner recorded 3,634 migrant deaths over fiscal 2000 to 2022 against the Border Patrol's 3,069, a seventeen percent gap in one county (Martínez 2024). The official figure is the lower bound throughout.

[217] Cornelius established within a few years of the strategy's adoption that concentrating enforcement on the urban corridors raised the death toll, and that its architects anticipated the redirection (Cornelius 2001).

[218] The Border Patrol's recorded counts averaged about 355 a year over fiscal 1998 through 2019 and have run between about 500 and 895 since, each net of a pre-enforcement baseline of about two dozen a year. The realized record shows the death rate per crossing moving against volume. Fiscal 2015 ran 251 deaths on 331,000 crossings, or 0.076 percent, fiscal 2021 ran 557 on 1.66

The rate is read from the death record rather than the crossing flow, because the two have come apart. Encounters fell from 2.2 million in fiscal 2022 to 237,538 in fiscal 2025, the lowest since 1970, while the recorded toll barely moved, 895 deaths in fiscal 2022 and 704 in fiscal 2023.[219] The death rate per crossing rises as the flow drops, from 0.041 percent in fiscal 2022 to 0.076 percent in fiscal 2015, because at a low flow the people who still cross take the hardest ground. A falling flow therefore leaves the count roughly where it is, and a completed wall raises the rate further.

The forward rate and the crossing flow carried in the enforcement part are the same band read two ways.

| Scenario | Crossing flow | Death rate | Deaths |
|---|---|---|---|
| Low | 0.4 million | 0.076% | 304 |
| Central | 1.2 million | 0.046% | 552 |
| High | 2.3 million | 0.034% | 782 |

The flow-based construction gives 304 near the 350 floor, 552 at the center, and 782 near the 750 ceiling, agreeing with the rate read independently from the death record.

### VI.3 Attribution

The wall's share of the death stream is 62.5 percent, within a range of 35 to 85 percent. It combines two attributions of different evidentiary strength. The direct deaths, the falls and drownings the wall's height causes, are identified by natural experiment and attributed to the wall in full. The indirect deaths, the desert exposure that follows from displacing the crossing away from the urban routes, are attributed by reasoned judgment.

The funnel is the older and larger of the two mechanisms. The medical examiner in Pima County logged body recoveries rising from about 14 a year before 2000 to about 160 a year afterward, as concentrated enforcement and new barrier in the urban sectors pushed the crossing into the Arizona desert.[220] Geospatial studies tie the placement of barriers and surveillance to the routes migrants take and to where their remains are found.[221] Studies built on the timing and location of fence

million, or 0.034 percent, and fiscal 2022 ran 895 on 2.2 million, or 0.041 percent. The flow-based and record-based constructions of the 550 central are independent and agree.

[219] Pew Research Center, on CBP data, records 237,538 southwest-border encounters in fiscal 2025 against more than 1.5 million in 2024, more than 2 million in 2023, and a record above 2.2 million in 2022, with monthly encounters below 10,000 since February 2025 (Gramlich 2026). The longer CBP series carries the 1.68 million peak of fiscal 2000, the fall to 724,000 by 2008, and the fiscal 2011-2017 trough (CBP apprehensions FY1960-2019). Encounters count events rather than persons.

[220] Recorded body recoveries rose from an average near 14 a year over 1990 through 1999 to about 160 a year over 2000 through 2005 (Rubio-Goldsmith et al. 2006).

[221] Peer-reviewed geospatial deterrence modeling (Chambers et al. 2021, Boyce and Chambers 2021).

construction find the same redirection from the migrant's own side, a fence cutting crossings from the Mexican municipality where it is built by a quarter to a third.[222]

The direct deaths have been measured on one stretch of wall. When the San Diego barrier was rebuilt from a patchwork of 6 to 17 feet to a uniform 30 feet, wall-fall admissions at a trauma center on the United States side rose from 67 in the three years before to 375 in the three years after, while apprehensions across the two periods were nearly identical at about 159,000 each, and deaths from the falls rose from none to 16.[223] Because the crossing volume held constant while only the wall's height changed, the rise identifies the wall's direct contribution rather than assuming it.

A second natural experiment ran on the same wall over the same years, in the water crossings that go around it. Migrant drownings in the Pacific off San Diego rose from 1 across 2016 to 2019 to 33 across 2020 to 2023, after the barrier went from 17 feet to 30.[224] Drownings in the Rio Grande held about level over those years and those in the ditches and canals rose only slightly, which rules out a rise driven by crossing volume. In the one sector where both are counted, the water deaths run to about twice the falls.

The two attributions combine to the 62.5 percent share.

| Death type | Share of stream | Wall's share of it | Contribution |
|---|---|---|---|
| Direct (falls, drownings) | 1/6 | 100% | 16.7% |
| Indirect (desert funnel) | 5/6 | 55% | 45.8% |
| **Combined** | | | **62.5%** |

The direct deaths run about a sixth of the recorded stream, held at that share because the San Diego mechanism is urban-specific and is not scaled border-wide, and those deaths are the wall's in full because of the natural experiments that isolate them. The indirect deaths are the remaining five-sixths, and the wall's share of them is taken at 0.55, the barrier being the dominant funnel instrument among several, since surveillance and turn-back policy funnel alongside it and the desert toll began rising under the agent concentration of the 1990s before much wall stood. The low of 35 percent treats the barrier as one of several equal hardening instruments, and the high of

[222] Feigenberg found fence construction cut migration from the Mexican municipalities where it was built by about a quarter to a third (Feigenberg 2020). The same evidence underlies the border-hardening share in the enforcement part.

[223] Over the 2019 through 2021 rebuild of the San Diego barrier to a uniform 30-foot wall, wall-fall admissions at the UC San Diego trauma center rose from 67 in the three prior years to 375 in the three after, while apprehensions across the two periods were nearly identical, about 159,175 and 159,614 (Liepert et al. 2022). Deaths from the falls rose from none to 16, and injury severity rose. The design holds crossing volume constant and varies only wall height, the cleanest natural experiment available for the wall's direct contribution.

[224] On the Missing Migrants Project data (IOM), migrant drownings in the Pacific off San Diego rose from 1 across 2016 to 2019 to 33 across 2020 to 2023, after the 17-foot barrier became a 30-foot wall, while Rio Grande drownings held about level and ditch and canal drownings rose only slightly, the study's own control against a volume explanation (Lussier and Lindholm 2024). It is a second natural experiment agreeing with the wall-fall study, and because the mechanism operates independent of crossing volume, it persists as the flow falls.

85 percent treats it as nearly the whole funnel. The share carried is a contribution share, and a but-for standard would carry it higher.[225]

One published study runs against this attribution. A difference-in-differences design found no change in the all-cause, overdose, and homicide mortality of United States residents in the border counties, but it measures residents living beside the wall rather than migrants crossing it, a different population and outcome from the funnel toll priced here.[226]

### VI.4 Valuing the lives

The value of a statistical life is the figure the federal agencies use to price changes in the risk of death in their cost-benefit work. The Department of Health and Human Services publishes, for mortality risk changes occurring in 2025 and in constant 2025 dollars, a low of $6.5 million, a central of $14.0 million, and a high of $21.3 million.[227] The Department of Transportation, whose value the Department of Homeland Security formally adopts, carries $14.2 million for a 2025 base year, at the same level. These are the current federal figures and not conservative stand-ins, and the central is held at the middle of the published range.

Federal guidance directs agencies to value a reduction in the risk of death equally across everyone affected, independent of income or legal status. No federal analysis applies a lower value of life to noncitizens or to persons crossing unlawfully, and no method in the valuation literature supports doing so, since the willingness-to-pay estimates the value rests on are population averages.[228]

---

225 A difference-in-differences design found no discernible change in the all-cause, overdose, and homicide mortality of United States residents in the border counties (Bruch et al. 2021). It measures residents living beside the wall rather than migrant crossing deaths, so it does not reach the funnel toll priced here. The same paper attributes about a thousand additional deaths in Mexico over 2007 through 2011 to construction-related violence escalation. It is the strongest published result against this section's attribution.

226 The direct share is held at a sixth of the recorded toll, an author-set floor rather than a measurement, with two measured channels beneath it, the falls and the water deaths, which in the single sector where both are counted run to about twice the falls. The San Diego mechanism is urban-specific, so its rate is not scaled to the whole border. The indirect share of 0.55 reflects the barrier as the dominant funnel instrument among several, with surveillance and turn-back policy acting alongside it. The low of 35 percent treats the barrier as one of several equal hardening instruments, the high of 85 percent as nearly the whole funnel, and attributing the entire stream is not adopted. A but-for causation inquiry would support a higher share than the contribution share carried here.

227 The value of a statistical life. $14.0 million central, $6.5 million low, $21.3 million high, constant 2025 dollars. The HHS Office of the Assistant Secretary for Planning and Evaluation lists, for mortality risk changes occurring in 2025, a low of $6.5 million, a central of $14.0 million, and a high of $21.3 million (HHS ASPE 2026, Table 1). HHS adopts the higher 2026 row ($6.6, $14.1, $21.5 million) for its own current-year analyses, and this report, stated on a 2025 basis, takes the 2025 row, the more conservative and matching vintage. The Department of Transportation carries $14.2 million for a 2025 base year (DOT VSL Guidance), formally adopted by the Department of Homeland Security (DHS OGC 2024), at the same level, an independent corroboration. Holding the 2025 value flat across the thirty-year horizon understates every death after the first, since HHS escalates the VSL with real income growth, a deliberate conservatism.

228 OMB Circular A-4 directs agencies to value mortality-risk reductions equally regardless of income (OMB 2003). It is the operative version, the 2023 revision having been rescinded in

The stream is discounted at 3 percent over a thirty-year operating life, the horizon used for the construction and maintenance costs, which gives an annuity factor of 19.6. At 550 deaths, the central attribution, and $14.0 million, the stream is $94.3 billion. Carried to perpetuity, on the view that the barrier is a permanent obligation, the same stream runs about seventy percent higher, near $160 billion. This part carries the thirty-year figure, the more conservative of the two.

**VI.5 Nonfatal Injuries**

More people survive the crossing badly hurt than die in it, and a count of the dead leaves them out. The heat stroke and kidney failure of the desert, the broken bones, the brain injury of a near-drowning, and the spinal and head injuries from falls off the wall add about $25.2 billion, within $1.3 billion to $117.1 billion.

The trauma literature that measured the deaths also measured the injuries. After the San Diego wall was rebuilt, wall-fall admissions at one trauma center rose more than fivefold, the injuries grew more severe, and intensive-care stays lengthened, and a Palm Springs center recorded a more than twelvefold rise over the same years. Admissions are themselves an undercount, because a study of the prehospital response to wall falls finds injuries treated and released, or never transported, that no hospital dataset records. In fiscal 2023 the Border Patrol conducted more than 5,800 rescue events alongside the 704 deaths it recorded, each rescue a person found in life-threatening distress in time.

Fourteen hundred serious nonfatal injuries a year border-wide, held below the several-per-death ratio the trauma literature reports, each valued at the federal injury-severity fraction of 0.105 of a statistical life for a serious injury and carrying the same central wall share as the deaths, is $1.29 billion a year and $25.2 billion over thirty years.[229]

---

January 2025 and the 2003 circular reinstated, and HHS cites it as governing in the same 2026 publication that supplies the VSL. It is also the source of the 3 percent real discount rate used throughout this report. No federal analysis values noncitizens or unlawful crossers lower, and no valuation method supports it, willingness-to-pay estimates being population averages. The Consumer Product Safety Commission doubles the adult figure for children, which the age profile of the border decedents would support and which this part does not adopt.

[229] The nonfatal injury line. 1,400 injuries a year × (0.105 × $14.0M = $1.47M) × 62.5% wall share × 19.6 = $25.2 billion. Three bounded parameters. (1) The injury count, 1,400, range 600 to 2,200. The several-injuries-per-death ratio the trauma literature reports puts it above 1,650 against a 550-death stream, the Border Patrol's 5,800 rescue events in fiscal 2023 give 1,160 at a fifth involving serious injury and 1,450 at a quarter, and the wall-fall record alone supports a lower figure and binds the low bound. The wall-fall and trauma anchors follow. Liepert and colleagues, as above (Liepert et al. 2022). Azad and McCague, a twelvefold-plus rise at a Palm Springs center (Azad et al. 2023). Ramey and colleagues, 64 cranial and spinal wall-fall injuries over six years in Tucson (Ramey et al. 2019). Two studies by Tenorio and colleagues (Tenorio 2024a, Tenorio 2024b), the second documenting scene-treated falls that admission counts miss. Palacio and colleagues, the crossing-trauma stream generally (Palacio et al. 2021). (2) The severity fraction, 0.105, range 0.05 to 0.15, the federal injury-severity fraction of a statistical life for a serious injury at Abbreviated Injury Scale level 3, the Spicer-Miller fractions the Department of Transportation applies (DOT 2021 VSL, Table 2), the scale running 0.047 at level 2 to 0.266 at level 4. (3) The wall share, 62.5%, range 35% to 85%, the same as the deaths. Joint low 600 × (0.05 × $6.5M) × 35% × 19.6 = $1.3B. Joint high 2,200 × (0.15 × $21.3M) × 85% × 19.6 = $117.1B.

The injuries are treated in United States trauma centers and much of the bill is never paid, because the patients cannot pay and do not qualify for coverage. One San Diego center reported more than $13 million in wall-fall care in a single year, and a Tucson center recovered about a fifth of what it billed across its wall-fall patients.[230] The border hospitals absorb the balance, a documented burden that is not in the figure above.

### VI.6 Agents, bystanders, and the enforcement toll

Three tolls fall outside the migrant stream priced above, on the bystanders caught in enforcement pursuits, on the agents on duty, and on the workers who build the wall. Together they add about $2.2 billion.

| Toll | Deaths | Wall's share | Value |
|---|---|---|---|
| Pursuit bystanders and drivers | 10 a year | 1/3 | $0.9B |
| Border Patrol agents on duty | 2 a year | 62.5% | $0.34B |
| Construction workers | 30 to 40 over the build | 100% | $1.0B |

Vehicle pursuits of suspected smuggling vehicles often end in crashes, and the dead include migrants, drivers, and uninvolved bystanders, among them United States citizens. Independent trackers attribute 126 vehicle-collision deaths to Border Patrol encounters since 2010, most in high-speed chases the agency initiated, with the annual toll climbing to about 23 in 2021.[231] The line carries 10 non-migrant pursuit deaths a year at a one-third wall share, below the crossing-death share because a pursuit follows from the enforcement posture the wall serves rather than from the wall itself, which capitalized over the wall's life is $0.9 billion. Migrant pursuit deaths stay in the migrant stream and are not counted again.

Border Patrol agents die on duty, most often in vehicle crashes on patrol and in the water during rescues. Removing illness and pandemic deaths from the recorded toll leaves about two patrol-related deaths a year.[232] The same 62.5 percent funnel share applies, because the crashes and

[230] The unpaid-care cost the border hospitals absorb, distinct from the welfare loss the severity value captures. The San Diego trauma center reported wall-fall care above $13 million in 2021 alone (Liepert et al. 2022), and the Tucson series recovered about 22 percent of the roughly $3.6 million it billed across 36 wall-fall patients (Ramey et al. 2019), the balance falling on the hospital because the patients could not pay or qualify for coverage. It is not in the summed figure, and a border-wide accounting would exceed the single-center figures.

[231] The ACLU tracker of fatal CBP encounters records pursuit deaths rising roughly elevenfold from 2019 to about 23 in 2021, and the Southern Border Communities Coalition attributes 126 vehicle-collision deaths to CBP encounters since 2010, 110 of them in Border-Patrol-initiated high-speed chases (ACLU-TX, SBCC), both advocacy trackers corroborated by the Senate Judiciary Committee's count of at least 250 injuries and 22 deaths from Border Patrol vehicle pursuits over 2015 to 2018 (Senate Judiciary 2019). The 10 deaths a year carried, range 6 to 25, sit above the roughly eight a year the since-2010 count implies and below the 2021 toll. The one-third wall share, range 20 to 50 percent, is below the crossing-death share because a pursuit follows from the enforcement posture the wall serves rather than the wall itself.

[232] Nowrasteh counts 58 agent deaths, about 2.9 a year, with vehicle accidents the leading cause at roughly 40 percent and COVID-19 next at about 28 percent, and a historical share from drowning during water rescues (Nowrasteh 2024). Removing the illness and pandemic deaths leaves a patrol-

drownings that kill agents happen on the remote ground and at the river crossings the funneling drives them to, which gives $0.34 billion.

Building the wall would kill workers and injure more. Heavy and civil engineering construction runs a fatal-injury rate of 10 to 13 deaths per 100,000 workers a year, above the construction average, and the blasting, remote terrain, and 30-foot height support the upper end. A program near $101 billion carries roughly 253,000 worker-years of on-site labor, so 30 to 40 workers die building it, with a serious-injury stream several times larger.[233] At the same value-of-life and injury-severity method the migrant lines use, that is about $1 billion, the whole of it the wall's because the exposure is building the wall.

**VI.7 Boundaries**

Each death is counted once. Deaths from flooding, where the barrier blocks a storm channel and acts as a dam, including the two recovered after the 2008 Nogales flood, are priced among the environmental costs.[234] The deaths from falls and from the water crossings the wall pushes people toward are already inside the migrant stream, because the forward rate is built from the full recorded toll. The injury estimate prices the survivors, who are a different group from the dead. The violence the criminal organizations do to migrants on the controlled routes, the kidnapping and assault and sexual violence, is priced in the enforcement part, and the crossing deaths and injuries, the falls and the exposure and the drownings, are priced here and kept out of it. Migrant deaths in pursuits could belong to both the pursuit line and the migrant stream, so the pursuit line holds to non-migrants.

Several of the inputs are set toward the cautious end. The death rate is held below the true recent toll. The attribution is a contribution share well under the but-for reading a causation inquiry would apply. The value per life is the middle of the federal range, and it is held flat across thirty years although the publishing agency escalates it with real income growth, which understates every death after the first. The horizon is thirty years rather than perpetuity, which alone holds the stream $66 billion below its alternative. The injuries and deaths of the workers who would build a continuous wall across remote country are carried as a modest line built from standard construction fatality rates held to the middle of the heavy-civil range.

---

related rate near two a year, range 1 to 3. The 62.5 percent funnel share applies because the crashes and rescue drownings are the same funnel exposure.

233 Labor at about 30 percent of the $101 billion program is about $30 billion, or roughly 253,000 worker-years at a loaded $120,000 each. The Bureau of Labor Statistics puts the fatal-injury rate for heavy and civil engineering construction near 10 to 13 per 100,000 full-time workers, above the all-construction average, and remote-terrain blasting and 30-foot heights argue for the upper end (BLS CFOI). The serious nonfatal injuries run several times the deaths at the 0.105 injury-severity fraction, and the range of $0.2 billion to $3.0 billion moves the fatality rate, the labor share, and the injury multiple together.

234 The deaths when the barrier blocks a storm channel and acts as a dam are priced among the environmental costs, not here. The documented instance is the July 2008 Nogales flood, when a Border Patrol barrier in the cross-border storm drain acted as a dam during monsoon rains and two people, believed to be migrants crossing through the tunnel, were found dead (Arizona Daily Star 2008). The forward death rate here is built from the recorded crossing toll and excludes them.

# PART VII – SYNTHESIS: TOTAL ECONOMIC COST OF A NEARLY CONTINUOUS BORDER WALL SYSTEM

## VII.1 The full cost

Completing a nearly continuous border wall system along the full border would have an estimated present-value cost of about $513 billion in 2025 dollars, within a span of roughly $220 billion to $1.3 trillion. That span sums every line at its own low and at its own high, so its ends are not jointly likely and carry no probability, and the report's confidence sits in the central and the tier subtotals rather than at the ends. This gross estimate values the completed system across the full 1,954-mile boundary and includes construction, operations and maintenance, technology, removal, environmental and community effects, trade and enforcement-induced costs, and mortality and nonfatal injury. The two largest central components are direct and governmental costs, approximately $256 billion, and mortality and nonfatal injury, approximately $122 billion.

The $513 billion figure is reported before credits for qualifying existing barrier infrastructure and identified appropriations. Those credits are applied once in Section VII.3.

## VII.2 The anatomy of the total

### The six costs (present value, 2025 dollars)

| Cost | Central | Range |
|---|---|---|
| Government and direct budgetary cost | ~$256B | ~$174–406B |
| Environmental and ecological damage | ~$56B | ~$17–150B |
| Costs to border communities | ~$18B | ~$6–44B |
| Trade and economic integration | ~$24B | ~$4–104B |
| Enforcement-induced violence | ~$37B | ~$2–226B |
| Migrant mortality and injury | ~$122B | ~$17–393B |
| **Total economic cost** | **~$513B** | **~$220B–$1.3T** |

The same total is also presented in three tiers according to the evidentiary and methodological confidence associated with each category. This permits the reader to evaluate narrower or broader versions of the aggregate without changing the calculations assigned to the other tiers.

### The total by tier of confidence

| Tier | What it holds | Central | Range |
|---|---|---|---|
| Core, direct and budgetary | construction, maintenance, technology, removal, land, and litigation | ~$256B | ~$174–406B |
| Broader, evidenced externalities | the mortality, ecological, trade, enforcement, and community costs, valued by their standard methods | ~$237B | ~$40–857B |
| Contingent, method-limited | the existence value of the species and places the wall puts at risk | ~$20B | ~$6–60B |

Migrant mortality and the direct budgetary cost of the structure are the two largest categories. Together, their central estimates total approximately $378 billion. The direct-cost tier, approximately $256 billion, is based principally on engineering rates, executed contracts, and government cost documentation. It is more than 5 times the approximately $49 billion barrier-system appropriation. The tiered presentation permits the reader to evaluate the total under narrower or broader assumptions without changing the calculations assigned to the other tiers.

### VII.3 What already stands, and what is already paid for

The $513 billion gross estimate values the completed system as a whole. Part VII then applies two credits in deriving the incremental cost of completion: approximately $15 billion for qualifying barrier infrastructure already standing and approximately $49 billion in identified appropriations for costs included in the ledger. Those credits do not offset external costs such as mortality, ecological damage, trade loss, or community impacts. After applying both credits, the central incremental cost of completion is approximately $449 billion.[235]

Start with the standing barrier. Most of it is the 458 miles of eighteen-to-thirty-foot steel-bollard wall built between 2017 and 2021 through expensive ground. About 223 of those miles cross Arizona, more than any other state, including the mountain stretches that cost far more to wall than open desert, and the rest runs through the California port cities and the Rio Grande Valley levee. The Army Corps spent about $10.5 billion building it, roughly $15 billion in today's prices, and pricing the same miles at what their terrain costs now lands in the same place.[236] Behind it sits the older, lighter fencing built between 2007 and 2015, about 650 miles for $2.4 billion at the time, much of it low vehicle barrier a person can walk around, which a continuous wall would rebuild rather than keep. Crediting the modern wall at cost and the pedestrian fencing that still holds, the barrier already standing is worth about $15 billion, within $12 billion to $18 billion depending on how much old fencing a finished wall could leave in place.[237]

Congress has also appropriated border-security funding, only part of which finances cost categories included in this appendix.

**Appropriations enacted for the border, and whether each funds the wall**

| Appropriation | Amount | Funds the wall? |
|---|---|---|
| Border infrastructure and wall system, §90001 | $46.55B | Yes. Barrier, access roads, site preparation, and integral detection |
| Surveillance towers, from the §90004 technology fund | ~$2.65B | Yes. The fixed detection network priced separately here |
| Remainder of the §90004 technology fund | ~$3.5B | No. Port inspection, biometrics, air and marine, drug interdiction |

---

[235] The 644 miles is the primary pedestrian barrier already standing, which a completed wall would not rebuild. Harrity et al. (2024) count about 636 miles of steel-bollard wall, gaps under four inches, and 105 miles of older vehicle barrier as of 2024, and the Congressional Research Service the same composition, about 300 miles of it pre-2017 vehicle barrier (CRS R45888). A CBP tally near 684 miles of pedestrian and vehicle fence agrees. Vehicle barrier, passable on foot, counts among the miles still to build. These counts replace CBP's Smart Wall map, whose larger figure is a planning target rather than an inventory.

[236] CBP and DOD installed about 458 miles of 18-to-30-foot steel-bollard panels from 2017 to 2021, and USACE obligated about $10.5 billion, 631 miles under contract and 458 complete as of January 2021 (GAO-23-106893, consistent with $10.7 billion for FY2018–2020 in GAO-21-372), about 223 of them in Arizona (GAO-23-105443). Carried to 2025 on the federal highway construction cost index it is about $14–18 billion, and repriced at 2025 terrain rates about $14–16 billion, bracketing the modern barrier near $15 billion.

[237] The Secure Fence Act fencing of 2007 to 2015 ran about 653 miles for roughly $2.4 billion (Trevizo and Schwartz 2020). The pre-2017 line was about 350 miles of primary pedestrian fence and 300 of vehicle barrier (AIC 2025 (cost)), and as of 2024 the border carried about 636 miles of steel-bollard wall and 105 of vehicle barrier (Harrity et al. 2024). The $12–18 billion band turns on how much old fencing is serviceable enough for a finished wall to credit rather than rebuild.

| **Appropriation** | **Amount** | **Funds the wall?** |
|---|---|---|
| Secure America Act, P.L. 119-98 | ~$69.5B | No. Personnel, detention, and removal |
| State Border Security Reinforcement Fund, §90005(b) | $10B | No. State-built barriers on state-selected ground |
| **Total credited** | **~$49B** | |

Two of these pay for costs this report counts. The larger is the $46.55 billion for the wall system, which builds the barrier and pays for access roads, ground preparation, and the cameras, lights, and sensors mounted on it, of which the spend plan puts about $42.3 billion into the physical barrier and about $4.1 billion into roads and built-in technology.[238] The smaller is about $2.65 billion for the fixed surveillance towers, drawn from a separate $6.168 billion technology fund that pays for the detection network priced apart from the wall.[239] The rest of that fund, roughly $3.5 billion, buys port-of-entry inspection equipment, biometric entry and exit systems, aircraft and boats, and drug-detection gear, none of which builds or holds the wall. Two larger sums stay out for the same reason. The Secure America Act, enacted weeks after the wall money, provides on the order of $69.5 billion, and a full reading of the statute finds no wall money in it, the funds going to enforcement officers, detention, and removals.[240] A separate $10 billion reimburses states for barriers they choose to build on ground they pick, state work outside the federal line.

**The full cost, net of what stands and what is funded (present value, 2025 dollars)**

| | **Amount** |
|---|---|
| Gross total economic cost, Parts I–VI | ~$513B |
| Less the barrier already standing | − ~ $15B |
| Less appropriated funds for counted costs | − ~ $49B |
| **Net total economic cost** | **~$449B** |

After crediting approximately $15 billion for qualifying barrier infrastructure already standing and approximately $49 billion in identified appropriations, the central incremental cost of completion is approximately $449 billion. Approximately $257 billion consists of external costs not addressed by those appropriations. Approximately $192 billion consists of additional budgetary costs, principally operations and maintenance, technology operations, land acquisition and administration, and eventual removal.

---

[238] Section 90001 of the reconciliation act appropriates $46.55 billion for border infrastructure and the wall system (Pub. L. 119-21, Sec. 90001 (139 Stat. 357-58)), of which CBP's spend plan puts about $42.3 billion into physical barrier construction and about $4.1 billion into integral technology, access roads, and site preparation (appropriations reconciliation prepared for this report).

[239] Section 90004 of the same act appropriates $6.168 billion for border-security technology (Pub. L. 119-21). About $2.65 billion funds the fixed surveillance-tower network priced separately here as the detection system. The rest funds port non-intrusive inspection (about $988 million), biometric entry-and-exit (about $613 million), air and marine assets, and drug-interdiction technology (about $500 million), none a barrier cost (same reconciliation).

[240] The Secure America Act appropriates about $69.5 billion for border and immigration enforcement (Pub. L. 119-98, S.2). A full reading of the statute finds no barrier or wall-system appropriation (same reconciliation), the funds going to personnel, detention, and removal, consistent with the CBO estimate (CBO 2026). The State Border Security Reinforcement Fund, §90005(b) of the reconciliation act, provides $10 billion to reimburse states for barrier and related security, eligible for spending on or after January 20, 2021 (Pub. L. 119-21).

### VII.4 The categories left unpriced

The $513 billion central estimate is the report's principal figure, and several of its conventions and omissions place it below a fuller accounting of total economic cost. The analysis applies finite appraisal horizons to a structure intended to remain in place, discounts future harms, and excludes documented categories for which the evidence does not support reliable monetization. The limitations of the value-of-statistical-life and stated-preference methods are disclosed in the relevant sections. Unpriced categories include effects on burial grounds and sacred sites, Tribal religious exercise and kinship networks, cross-border family and community ties, treaty and binational-conservation relationships, certain impacts occurring in Mexico, surveillance and checkpoint burdens, losses associated with permanent rather than circular settlement, the risk that a barrier built onto a federal levee degrades its flood-control function, the option value forgone by choosing an irreversible barrier over reversible alternatives, and light pollution on the border's dark-sky reserves. It is on these exclusions and understating methods that the report rests its judgment that the true economic cost runs higher.

### VII.5 How the total moves with its assumptions

The discount rate moves the total more than any other assumption, because maintenance, removal, the surveillance network, and the human and ecological costs are all present values. At the 3 percent real rate used here, thirty years of maintenance is worth about $88 billion, at the 7 percent rate for private capital about $56 billion, and at 2 percent about $101 billion.[241] The same movement runs through the mortality and ecological costs, so raising the rate from 3 to 7 percent lowers the central total by roughly $123 billion to about $390 billion, and moving toward 2 percent raises it by about $50 billion, while the construction cost, paid up front, barely moves. The thirty-year horizon understates the maintenance further, because a wall built to stand is maintained for as long as it stands, and in perpetuity at 3 percent that upkeep is worth about $150 billion against the $88 billion the thirty-year figure carries. The migrant-mortality stream in perpetuity runs near $160 billion rather than $94 billion.

The construction figure turns most on the one rate with no contract behind it, the $60 million a mile assigned to the remote canyon that runs close to half the length, moderated below the steepest ground the government has built. Moving it within its $43-to-$85 million band, the realized rate on reachable canyon ground to a Guadalupe-plus premium, shifts the construction central and cascades through the overrun, maintenance, and removal.[242] The attribution share is the next lever, because the roughly 15 percent of jointly caused harm the report charges to the wall runs through the enforcement and community costs at once, so a reader who moved that share would move those two together. The value of a statistical life, held at the middle of the federal band and flat across

---

[241] Thirty years of maintenance is worth about $88 billion at the 3 percent real rate, $56 billion at 7 percent, and $101 billion at 2 percent, the multiplier on a constant annual flow being 19.6, 12.4, and 22.4. To perpetuity at 3 percent it is worth about $150 billion (maintenance analysis above, OMB 2003 on the discount rate).

[242] The remote-canyon rate of about $60 million a mile, the one construction input with no awarded contract behind it, is the Guadalupe Canyon rate carried to 2025 (U.S. Army Corps of Engineers contract figures) and then moderated, since no awarded contract has tested even that rate on ground of any kind and the government is declining to wall the Rio Grande canyons at all. It covers close to half the line and runs in a $43-to-$85 million band, the realized rate on reachable canyon ground to a Guadalupe-plus premium, which moves the construction central and cascades through the overrun, maintenance, and removal (construction analysis above).

the horizon though the agency escalates it, and the horizon itself move the mortality and recurring costs within each part's range. The volume of crossing is a further lever, because the enforcement and mortality lines scale with it, and holding the present count rather than the thirty-year mean would lower the route-violence line to about $6.7 billion, the figure reported where that line is derived. None of these changes the finding that the cost is large. They set where within the $220 billion to $1.3 trillion range the central sits.

### VII.6 What the number shows

No comprehensive official accounting of these cost categories has been identified. This appendix assembles the relevant cost categories from available agency records, executed contracts, peer-reviewed literature, and established valuation methods. The resulting figures provide the technical basis for the opinions stated in the report.

Construction expenditure is only one component of total economic cost. Other priced and unpriced costs are borne by border residents, Tribal communities, communities in Mexico, cross-border commerce, migrants, and natural resources. The affected interests include endangered species and critical habitat, historic and sacred sites, the Rio Grande and associated riparian systems, private property subject to condemnation, and resources governed by international boundary agreements.

This appendix estimates the total economic cost of the proposed nearly continuous border wall system. It does not evaluate whether alternative border-security measures could provide equivalent benefits at lower cost, and it does not benchmark the project against unrelated federal programs; both questions fall outside the scope of the cost ledger. Under the stated conventions, the gross central estimate is approximately $513 billion, and the central incremental estimate after crediting qualifying existing infrastructure and identified appropriations is approximately $449 billion. Both are central estimates, and the unpriced categories set out above place the true economic cost higher.

# APPENDIX III

# SUPPLEMENTAL CONDITIONAL SCENARIO ANALYSES

## Purpose and Scope

The report estimates the gross present-value Total Economic Cost of completing, operating, maintaining, and ultimately removing a nearly continuous border wall system along the United States-Mexico border (the "Wall"). The central estimate is approximately $513 billion in constant 2025 dollars. The low bound is approximately $220 billion and the high bound is approximately $1.3 trillion. Claimed benefits are not deducted from that estimate, and the report does not purport to conduct a comprehensive cost-benefit analysis.

This appendix presents two analyses that are separate from the central cost ledger. Both examine counterfactual scenarios that differ from the central empirical assumptions used in the report. In particular, they consider the economic implications of assuming that the Wall achieves a large and sustained reduction in migration, rather than primarily redirecting migration across routes and methods of entry.

Supplemental Analysis A calculates the magnitude of sustained deterrence and associated fiscal savings required for selected claimed benefits to equal the estimated gross costs. It is a break-even threshold exercise. It does not calculate the Wall's net benefits, does not monetize every asserted objective, and is not a comprehensive cost-benefit analysis.

Supplemental Analysis B examines the additional macroeconomic consequences that would arise under the same general counterfactual premise: that the Wall substantially and persistently reduces migration. Those consequences are conditional on the Wall's actual deterrent effect. They are not forecasts, are not incorporated into the approximately $513 billion central estimate, and are not added mechanically to that estimate.

## A. Break-Even Threshold Under a Hypothetical Sustained-Deterrence Scenario

**Supplemental Opinion A: It is my opinion, to a reasonable degree of professional certainty as an economist, that the available evidence does not support sustained migration-deterrence benefits of the magnitude required to equal the gross Total Economic Cost estimated in this report. Under the central assumptions used in this threshold exercise, the Wall would have to prevent approximately 1.05 million crossings every year for thirty years to reach the break-even threshold. This is a threshold calculation, not a finding concerning the Wall's net benefits and not a comprehensive cost-benefit analysis.**

### Analytical Question

The preceding sections of the report estimate the gross present value of the Total Economic Costs of the Wall. This supplemental analysis takes that cost estimate as given and asks a narrower question: how large would selected claimed benefits have to be to equal the estimated costs?

The principal claimed benefits of a nearly continuous border wall system include reduced unlawful entry between ports of entry, increased drug interdiction, reduced crime, terrorism prevention,

fiscal savings from reduced unauthorized immigration, and improved operational control of the border. The empirical basis for these claims varies substantially, and several do not yield a reliable monetized benefit that can be compared with the threshold.[243]

**Claimed Benefits Other Than Migration Deterrence**

The drug-interdiction claim is limited because the principal drug-trafficking pathways do not correspond to the locations where a physical wall operates most directly. Available evidence shows that fentanyl and other hard drugs are primarily seized at official ports of entry, often concealed in vehicles or cargo, rather than from persons crossing on foot between ports of entry. A wall between ports of entry therefore has only an indirect relationship to the principal channels through which fentanyl is interdicted.[244]

The available empirical evidence likewise does not support a large crime-reduction benefit attributable to border-wall construction. Research examining the Secure Fence Act expansion does not identify a statistically significant long-run reduction in violent crime or property crime attributable to completed barriers.[245]

The claimed terrorism-prevention benefit is difficult to monetize because it rests on reducing a potential vulnerability rather than on an observed historical pattern of attacks through the terrain where the Wall would operate. Congressional testimony has identified encounters involving persons listed in terrorism-screening databases. That evidence does not establish a historical pattern of terrorist attacks causing deaths or injuries in the United States by persons who unlawfully crossed the southern border between ports of entry. The terrorism rationale identifies a possible security risk, but it does not supply a reliable monetary estimate of the magnitude required by this threshold exercise.[246]

Operational control is a government objective, but its incremental economic value is not reliably quantified. Existing personnel, technology, roads, barriers, ports of entry, surveillance systems,

---

[243] U.S. Customs and Border Protection, "Walls Work," and "Wall Construction Continues as Part of a Holistic Approach to Stop Illegal Immigration" (cbp.gov/frontline); U.S. Department of Homeland Security and U.S. Customs and Border Protection, Border Wall System Program environmental assessments and Records of Decision for individual sectors, including the FY2018 and FY2019 Rio Grande Valley Levee/Border Wall System construction projects. These government sources state the program's purpose as impeding and denying illegal entry between ports of entry and improving operational control of the border, and are the basis for the claimed benefits summarized in the text.

[244] U.S. Customs and Border Protection, "Frontline Against Fentanyl," and Drug Seizure Statistics; American Immigration Council, "Fentanyl Smuggling and the U.S.-Mexico Border"; David J. Bier, "US Citizens Were 80 Percent of Crossers with Fentanyl at Ports of Entry from 2019 to 2024," and "Fentanyl Is Smuggled for U.S. Citizens By U.S. Citizens, Not Asylum Seekers" (Cato Institute). These sources report that the large majority of fentanyl seized along the southern border is seized at ports of entry, concealed in vehicles and cargo, rather than from persons crossing on foot between ports of entry.

[245] Ryan Abman and Hisham S. Foad, "Border Walls and Crime: Evidence From the Secure Fence Act," Eastern Economic Journal 48, no. 2 (2022). The study finds no appreciable long-run effect of border fencing on property or violent crime rates.

[246] U.S. House Committee on the Judiciary, Subcommittee on Immigration Integrity, Security, and Enforcement, Terrorist Entry Through the Southwest Border, hearing, September 14, 2023; testimony of Alex Nowrasteh before the same hearing.

and enforcement practices already provide varying degrees of monitoring across the southern border. The relevant question for this threshold exercise is whether the additional control produced by completing a nearly continuous border wall system has a measurable value large enough to equal the project's Total Economic Costs.

The same measurement problem appears in the government's own border-security evaluations. The Government Accountability Office found that Customs and Border Protection had not developed metrics capable of assessing fencing's contribution to border-security operations. A Department of Homeland Security Office of Inspector General review similarly found that CBP had not conducted a formal Analysis of Alternatives and instead relied on prior border-wall designs without a documented comparison of the most effective and affordable alternatives. These findings do not support assigning a large monetized value to operational control without independent evidence.[247]

**Migration Deterrence as the Quantifiable Threshold Variable**

Of the claimed benefits examined, migration deterrence is the only one that can plausibly be expressed at a scale capable of affecting the numerical threshold. The relevant calculation asks what an averted crossing would have to be worth, and how many crossings would have to be prevented, for the deterrence claim to equal the estimated Total Economic Costs.

A prevented crossing is not the same event as a prevented long-term settlement. Migration is generated not only by conditions in countries of origin but also by persistent demand inside the United States for labor in agriculture, construction, food processing, warehousing, hospitality, domestic work, and other labor-intensive sectors. A physical barrier may raise crossing costs, change routes, increase reliance on smugglers, or prevent some entries. It does not eliminate the labor demand that contributes to migration. The value assigned to an averted crossing therefore must account for repeat attempts, seasonal and circular movement, route displacement, later removal, and the possibility that enforcement reduces return migration more than initial entry.[248] [249]

**Required Value Per Averted Crossing**

Using the same thirty-year horizon and 3 percent real discount rate applied elsewhere in the report, a crossing prevented in each of the next thirty years has a present-value factor of approximately 19.6. A Wall that prevents N crossings per year therefore prevents approximately

[247] U.S. Government Accountability Office, Southwest Border Security: Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps, GAO-17-331, February 2017; U.S. Government Accountability Office, Border Security: Progress and Challenges with the Use of Technology, Tactical Infrastructure, and Personnel to Secure the Southwest Border, GAO-18-397T, March 2018; U.S. Department of Homeland Security, Office of Inspector General, CBP Has Not Demonstrated Acquisition Capabilities Needed to Secure the Southern Border, OIG-20-52, July 2020.

[248] Christina Gathmann, "Effects of Enforcement on Illegal Markets: Evidence from Migrant Smuggling Along the Southwestern Border," Journal of Public Economics 92 (2008): 1926-1941; Douglas S. Massey, Jorge Durand, and Karen A. Pren, "Why Border Enforcement Backfired," American Journal of Sociology 121, no. 5 (2016): 1557-1600.

[249] Michael J. Piore, Birds of Passage: Migrant Labor and Industrial Societies (Cambridge University Press, 1979). Piore explains migration as a labor-demand phenomenon produced by segmented labor markets in advanced industrial economies.

$19.6 \times N$ crossings in present-value terms. For the deterrence claim to equal \$513 billion, the required value per averted crossing is \$513 billion divided by $19.6 \times N$.[250]

[250] The factor is the thirty-year present-value annuity factor at 3 percent: (1 - 1.03^-30) / 0.03 = 19.6. Applying the same horizon and discount rate used on the cost side keeps the threshold comparison internally consistent.

**Table III-1. Required Value Per Averted Crossing**

| Crossings prevented per year | Present-value crossings over 30 years | Required value per averted crossing |
|---|---|---|
| 100,000 | 1.96 million | Approximately $262,000 |
| 200,000 | 3.92 million | Approximately $131,000 |
| 300,000 | 5.88 million | Approximately $87,000 |
| 600,000 | 11.76 million | Approximately $44,000 |

These required values are high relative to the fiscal benefit that can plausibly be assigned to an averted crossing. That benefit depends on two assumptions: the fiscal saving associated with preventing a long-term settlement and the share of attempted crossings that would otherwise have resulted in such a settlement. The fiscal literature varies widely by method, education profile, age, time horizon, treatment of public goods, legal status, and treatment of descendants. Some estimates are close to neutral; others assign substantial net fiscal costs to selected groups. A central fiscal-cost assumption of approximately $70,000 in present value gives substantial weight to the claimed fiscal-saving benefit.[251]

The second parameter is the settlement share. A crossing and a settlement are separate events. Some encounters represent repeat attempts by the same person; some migration is seasonal or circular; some entries do not result in long-term residence; and some persons are later removed. Border Patrol recidivism data show that repeat attempts can materially inflate encounter counts relative to the number of distinct persons attempting to enter. This analysis therefore uses a central settlement share of 0.35, with a plausible range from 0.20 to 0.50. Multiplying the central fiscal-cost assumption of $70,000 by the central settlement share of 0.35 produces a central claimed benefit of approximately $25,000 per averted crossing.[252]

At $25,000 per averted crossing, the Wall would have to prevent approximately 1.05 million crossings every year for thirty years to equal the $513 billion central cost estimate. The calculation is $513 billion divided by 19.6 × $25,000. The available evidence does not support a sustained effect of that magnitude.

**Evidence Concerning Sustained Deterrence**

The evidence instead indicates diminishing marginal returns and substantial displacement effects. The 548-mile barrier expansion undertaken between 2006 and 2010 altered routes, destinations, and migration decisions, but the completed system was concentrated in the highest-volume

251 National Academies of Sciences, Engineering, and Medicine, The Economic and Fiscal Consequences of Immigration (National Academies Press, 2017); Daniel Di Martino, The Lifetime Fiscal Impact of Immigrants (Manhattan Institute, 2024); Alex Nowrasteh, The Fiscal Impact of Immigration in the United States (Cato Institute, 2023). These sources differ substantially in method and conclusions, including the treatment of education, descendants, public goods, and federal versus state and local fiscal effects.

252 U.S. Customs and Border Protection, CBP Enforcement Statistics, recidivism data; U.S. Department of Homeland Security, Office of Immigration Statistics, FY 2021 Southwest Border Enforcement Report; USAFacts, “Border Recidivism: How Common Are Repeat Illegal Border Crossings?”

crossing corridors and in locations expected to produce the greatest deterrent effect. Additional construction is less likely to reproduce the same marginal effect because much of the terrain most productive for deterrence has already been fenced.[253]

The remaining segments include remote, difficult, environmentally sensitive, and expensive terrain. In those areas, a wall is more likely to redirect movement, raise crossing costs, increase reliance on smugglers, and shift routes than to prevent crossings at the scale required by the threshold. The relevant benefit is not the gross number of encounters avoided; it is the smaller number of long-term settlements actually prevented.

The historical enforcement record also shows that border hardening can reduce return migration. When crossing becomes more expensive and dangerous, migrants who successfully enter have stronger incentives to remain rather than circulate seasonally or return home. Research on border enforcement during the 1990s and 2000s links increased enforcement to reduced circular migration and growth in the settled unauthorized population. That mechanism reduces the fiscal benefit attributed to deterrence because some enforcement measures convert circular migration into longer-term settlement.[254]

The threshold remains demanding under all assumptions. If the fiscal cost is set above $200,000 and the settlement share is set at the upper end of the range, the value of an averted crossing rises to approximately $115,000. Even then, the Wall would have to prevent approximately 228,000 crossings every year for thirty years. That scenario simultaneously assumes high fiscal savings, a high settlement share, and a sustained level of effectiveness over three decades. It does not account for declining marginal returns, route displacement, adaptation in smuggling markets, or continuing labor demand within the United States.

Recent enforcement data further illustrate the scale of the threshold. Border Patrol recorded more than two million southwest-border encounters in fiscal years 2022 and 2023, followed by a sharp decline to approximately 237,500 encounters in fiscal year 2025, the lowest annual total since 1970. That decline occurred alongside major changes in asylum rules, parole programs, enforcement practices, diplomatic arrangements, and migrant expectations; it cannot be attributed to physical barriers alone. It also means that the future flow available to be deterred by additional wall construction may be substantially smaller than peak-year encounter totals suggest.[255]

---

[253] Treb Allen, Cauê de Castro Dobbin, and Melanie Morten, "Border Walls," National Bureau of Economic Research Working Paper No. 25267. The study examines the construction of approximately 548 miles of border wall between 2006 and 2010 using administrative data on primarily unauthorized Mexican migrants and finds effects on routes, destinations, and migration decisions.

[254] Massey, Durand, and Pren, "Why Border Enforcement Backfired." The study links increased border enforcement to reduced circularity, higher costs and risks of crossing, and growth in the settled unauthorized population.

[255] Pew Research Center, "Migrant Encounters at the U.S.-Mexico Border Are at Their Lowest Level in More Than 50 Years," February 2, 2026; U.S. Customs and Border Protection, Southwest Land Border Encounters. Pew reports 237,538 Border Patrol encounters at the U.S.-Mexico border in fiscal year 2025, down from more than 2.2 million in fiscal year 2022 and more than 2 million in fiscal year 2023.

### Conclusion of Supplemental Analysis A

This threshold analysis does not establish the Wall's net costs or net benefits. It establishes the scale, duration, and consistency of the claimed benefits required to equal the gross Total Economic Cost. Under the central assumptions, the Wall would have to prevent approximately 1.05 million crossings each year for thirty years.

## B. Macroeconomic Consequences Under a Hypothetical Sustained-Deterrence Scenario

**Supplemental Opinion B: It is my opinion, to a reasonable degree of professional certainty as an economist, that if a nearly continuous border wall system substantially and persistently reduces migration, that reduction would impose additional economic costs through slower labor-force growth and foregone economic production. This conclusion is conditional on the Wall achieving a substantial deterrent effect. That premise is not used in deriving the approximately $513 billion central Total Economic Cost estimate, and the sensitivity figures in this analysis are not forecasts.**

### Conditional Nature of the Analysis

The central cost accounting measures direct governmental costs and external and non-budgetary losses that arise from constructing and operating the Wall. Those costs include construction, operations and maintenance, surveillance technology, land acquisition, condemnation litigation and administration, decommissioning, environmental and natural-resource injury, costs to border communities, mortality and nonfatal injury, trade and cross-border economic effects, and enforcement-induced costs. Those categories do not require an assumption that the Wall will achieve a large and sustained reduction in migration.

Foregone economic production is different. It arises only if the Wall succeeds in reducing migration. Successful migration reduction lowers labor-force growth, reduces the number of consumers in the economy, and reduces economic activity relative to the baseline that would otherwise have occurred. The magnitude depends on the Wall's actual deterrent effect. This conditional category is therefore presented separately and is not added to the central Total Economic Cost estimate.

### Economic Mechanism

Gross domestic product measures the value of final goods and services produced in the United States. Production depends on labor, capital, productivity, and demand. Immigration affects GDP because immigrants are both workers and consumers. When fewer workers enter the economy, fewer goods and services can be produced unless productivity, capital formation, or domestic labor substitution rises enough to offset the decline in labor. When fewer people live and work in the economy, consumer spending also falls. The result is lower output relative to the baseline associated with higher migration.[256]

---

[256] U.S. Bureau of Economic Analysis, "Gross Domestic Product," explaining that GDP measures the market value of goods and services produced by labor and property located in the United States;

The direction of this effect is well established. If migration is reduced, labor-force growth is reduced. If labor-force growth is reduced, output is lower relative to baseline, all else equal. The magnitude depends on the number of workers prevented from entering the labor force, the sectors affected, the duration of the reduction, and the extent to which capital formation, productivity, automation, or domestic labor substitution offsets the reduction in labor supply.[257]

This mechanism applies whether immigrant labor supply is reduced through lower inflows or through removal of workers already present, although the policies and timing differ. A wall principally operates by reducing future inflows. Deportation removes workers already participating in the economy. Both reduce labor supply relative to baseline and therefore provide relevant evidence concerning the relationship between immigrant labor, production, and GDP.[258]

The conditional structure is important. If the Wall has little effect on migration, its claimed migration-control benefit is small and the induced macroeconomic effect is also small. If the Wall substantially reduces migration, the induced output loss becomes larger because labor-force growth slows. The appendix does not assume that either scenario will occur; it identifies the economic consequence associated with the sustained-deterrence premise.

**Foregone Output Sensitivity Calculation**

As a sensitivity exercise, the annual output effect can be illustrated by applying an annual output-per-worker range to an assumed reduction in labor-force growth. Using a range of $150,000 to $200,000 in annual output per worker, a reduction of 100,000 workers per year implies approximately $15 billion to $20 billion in foregone annual production. A reduction of 250,000 workers per year implies approximately $37.5 billion to $50 billion. A reduction of 500,000 workers per year implies approximately $75 billion to $100 billion. Over ten years, before discounting, those scenarios imply approximately $150 billion to $200 billion, $375 billion to $500 billion, and $750 billion to $1 trillion in foregone production.[259]

---

Federal Reserve Bank of St. Louis, FRED, Gross Domestic Product, series GDP, sourced from BEA.

[257] Congressional Budget Office, Effects of the Immigration Surge on the Federal Budget and the Economy, July 2024. CBO projects that the 2021-2026 immigration surge increases nominal GDP by $1.3 trillion in 2034 and by $8.9 trillion over 2024-2034, identifying faster labor-force growth and greater demand for residential investment as principal channels. See also Wendy Edelberg and Tara Watson, "The Impact of Immigrants on the U.S. Economy," Brookings Institution, March 30, 2026, estimating that the decline in migration between 2024 and 2025 reduces GDP growth by 0.19 to 0.26 percentage points and lowers consumer spending by $40 billion to $60 billion in 2025.

[258] Pia Orrenius, Grace Ozor, Madeline Zavodny, and Xiaoqing Zhou, "Declining Immigration Weighs on GDP Growth, with Little Impact on Inflation," Federal Reserve Bank of Dallas, July 8, 2025; Warwick McKibbin, Megan Hogan, and Marcus Noland, The International Economic Implications of a Second Trump Presidency, Peterson Institute for International Economics Working Paper 24-20, September 2024, pp. 6-8. The Peterson Institute estimates concern deportation rather than a border wall and are used only as evidence of the macroeconomic channel through reduced immigrant labor supply.

[259] Calculation: assumed annual reduction in workers multiplied by assumed annual output per worker. The $150,000 to $200,000 range is used as an illustrative sensitivity range. The calculation is not a structural macroeconomic model.

**Table III-2. Foregone Output Sensitivity Scenarios**

| Sustained employment shortfall relative to baseline | Annual output per worker | Foregone annual production | 30-year present value |
|---|---|---|---|
| 100,000 fewer workers | $150,000-$200,000 | $15B-$20B | $294B-$392B |
| 250,000 fewer workers | $150,000-$200,000 | $37.5B-$50B | $735B-$980B |
| 500,000 fewer workers | $150,000-$200,000 | $75B-$100B | $1.47T-$1.96T |

### Method Note

The sensitivity calculation has two steps. Foregone annual production equals the sustained employment shortfall multiplied by assumed annual output per worker. The thirty-year present value equals that annual production loss multiplied by 19.6, the annuity factor at a 3 percent real discount rate.

The $150,000 to $200,000 range brackets recent aggregate output per employed worker while allowing for uncertainty concerning sectoral mix, hours worked, productivity, and the difference between average and marginal output. Recent current-dollar GDP and civilian employment data imply average output of approximately $196,000 per employed person. The range is used only as an order-of-magnitude sensitivity parameter; it is not a structural estimate of the marginal product of each worker whose entry might be deterred.[260]

The calculation is not a forecast and does not assume that average output per worker equals the marginal output of every worker. It also excludes dynamic effects from reduced consumer spending, lower investment, sectoral bottlenecks, reduced tax revenues, reduced firm formation, or reduced productivity growth. Estimating those effects would require a structural macroeconomic model.

### Labor-Market Complementarity and Sectoral Effects

Reduced migration should not be treated as a simple one-for-one transfer of jobs from immigrant workers to U.S.-born workers. Immigrant and U.S.-born workers often perform complementary functions within production processes. When one category of labor is removed or restricted, output can fall and employment or wages for complementary workers can also decline. This mechanism is especially important in labor-intensive sectors organized around crews, sequential production, and specialized tasks.[261]

[260] Federal Reserve Bank of St. Louis, FRED, Gross Domestic Product, series GDP, reports BEA current-dollar GDP of $31.865721 trillion at a seasonally adjusted annual rate in the first quarter of 2026. FRED, Employment Level, series CE16OV, reports a BLS civilian employment level of 162.264 million in June 2026. Dividing those figures produces approximately $196,000 in current-dollar GDP per employed person. U.S. Bureau of Labor Statistics, Office of Productivity and Technology, explains the relationship between output and labor input.

[261] Chloe N. East, Annie Laurie Hines, Philip Luck, Hani Mansour, and Andrea Velasquez, "The Labor Market Effects of Immigration Enforcement," Journal of Labor Economics 41, no. 4 (2023): 957-996. The study of Secure Communities finds that immigration enforcement reduced

Residential construction illustrates the mechanism. A reduction in immigrant construction labor can reduce construction output, raise new-construction prices, and reduce employment for U.S.-born workers in complementary occupations. Many production processes require combinations of workers; removing one part of the labor chain can slow or stop production for the entire project.[262]

The same logic applies to agriculture, food processing, warehousing, hospitality, health care support, and other labor-intensive sectors with persistent demand for immigrant labor. The Wall can reduce the supply of workers entering the economy. It cannot eliminate employers' demand for labor. When demand remains and labor supply falls, firms adjust through slower production, higher labor costs, reduced output, automation where feasible, relocation where feasible, or higher prices. Each adjustment carries an economic consequence.[263]

**Price Effects**

Inflation is a secondary and more limited induced effect. The strongest measurable macroeconomic consequence is lower output relative to baseline. Price effects depend on the sector, the elasticity of labor supply, employers' ability to substitute other workers or capital, and the extent to which higher costs are passed through to consumers. Where immigrant labor is a significant input and replacement is limited, successful migration reduction can increase production costs and raise prices.[264]

This conclusion should be stated carefully. Reduced migration is not, by itself, a general explanation of inflation. It is a potential supply-side pressure concentrated in sectors where immigrant labor is an important input and replacement is limited. The stronger conclusion is that substantial and sustained migration reduction lowers GDP relative to baseline and may raise prices in affected labor-intensive sectors.

**Conclusion of Supplemental Analysis B**

Successful migration reduction is not economically costless. To the extent that the Wall substantially and persistently reduces migration, it reduces labor-force growth, production, consumer demand, and sectoral capacity relative to baseline. The more effective the Wall is at reducing migration, the larger the potential induced cost through foregone economic production.

---

employment among likely undocumented immigrants and also reduced employment and hourly wages among U.S.-born individuals.

[262] Troup Howard, Mengqi Wang, and Dayin Zhang, Cracking Down, Pricing Up: Housing Supply in the Wake of Mass Deportation, working paper, November 10, 2025, pp. 1-4, 19, 24-26. The study finds that Secure Communities reduced residential construction, increased new-construction prices, and produced only partial replacement by U.S.-born workers.

[263] Pew Research Center, "Record 14 Million Unauthorized Immigrants Lived in the U.S. in 2023," August 21, 2025. Pew reports that unauthorized immigrants represented 5.6 percent of the U.S. workforce in 2023 and identifies construction, agriculture, and leisure and hospitality among industries with the highest shares. U.S. Department of Agriculture, Economic Research Service, "Legal Status of Hired Crop Farmworkers, Fiscal 1991-2022," September 12, 2025, reports that 42 percent of hired crop farmworkers in 2020-2022 lacked work authorization.

[264] Orrenius, Ozor, Zavodny, and Zhou, "Declining Immigration Weighs on GDP Growth, with Little Impact on Inflation." The Dallas Fed finds a substantial negative effect on GDP growth and comparatively modest inflation effects. See also McKibbin, Hogan, and Noland, The International Economic Implications of a Second Trump Presidency, pp. 7-8, reporting short-run inflationary pressure in modeled deportation scenarios.

Under these illustrative constant-shortfall scenarios, the thirty-year present value of foregone production is approximately $294 billion to $392 billion for a sustained shortfall of 100,000 workers, $735 billion to $980 billion for 250,000 workers, and $1.47 trillion to $1.96 trillion for 500,000 workers. These values are conditional sensitivities rather than forecasts.

These conditional macroeconomic effects do not belong in the central cost ledger and are not added mechanically to the approximately $513 billion Total Economic Cost estimate. They show that a high-deterrence scenario cannot be evaluated solely by assigning a benefit to fewer crossings. The same assumed reduction in migration would also produce economic consequences through a smaller labor force, lower production, reduced consumer demand, and, in some sectors, higher prices.

# REFERENCES

Sources are cited in the footnotes by short author-date key. Full details follow, grouped by type and ordered by key. URLs are the last-confirmed locations as of the reference audit.

## Journal articles

**Abella et al. 2015.** Abella, Scott R.; Chiquoine, Lindsay P.; Newton, Alice C.; Vanier, Cheryl H. "Restoring a desert ecosystem using soil salvage, revegetation, and irrigation." *Journal of Arid Environments* 115: 44–52. (2015). https://doi.org/10.1016/j.jaridenv.2015.01.003

**Ahlfeldt et al. 2015.** Ahlfeldt, Gabriel M.; Redding, Stephen J.; Sturm, Daniel M.; Wolf, Nikolaus. "The Economics of Density: Evidence from the Berlin Wall," Econometrica 83(6):2127–2189. (2015). https://doi.org/10.3982/ecta10876

**Anderson and van Wincoop 2003.** Anderson, James E.; van Wincoop, Eric. "Gravity with Gravitas: A Solution to the Border Puzzle," American Economic Review 93(1):170–192. (2003). https://doi.org/10.1257/000282803321455214

**Avetisyan et al. 2015.** Avetisyan, Misak; Heatwole, Nathaniel; Rose, Adam; Roberts, Bryan. "Competitiveness and macroeconomic impacts of reduced wait times at U.S. land freight border crossings," Transportation Research Part A: Policy and Practice 78:84–101. (2015). https://www.sciencedirect.com/science/article/abs/pii/S0965856415001135

**Azad et al. 2023.** Azad, Sharmeen; McCague, Andrew; Henken-Siefken, Austin. "Increased Mortality and Morbidity Due to the Increase in Border Wall Height," Cureus 15(12):e51113. (2023). https://doi.org/10.7759/cureus.51113

**Bean et al. 2004.** Bean, Travis M.; Smith, Steven E.; Karpiscak, Martin M. "Intensive revegetation in Arizona's hot desert: the advantages of container stock." *Native Plants Journal* 5(2): 173–180. (2004). https://rngr.net/npn/journal/articles/intensive-revegetation-in-arizonas-hot-desert-the-advantages-of-container-stock

**Boyce and Chambers 2021.** Boyce, Geoffrey Alan; Chambers, Samuel Norton. "The corral apparatus: counterinsurgency and the architecture of death and deterrence along the Mexico/United States border," Geoforum 120:1–13. (2021). https://doi.org/10.1016/j.geoforum.2021.01.007

**Boyles et al. 2011.** Boyles, Justin G.; Cryan, Paul M.; McCracken, Gary F.; Kunz, Thomas H. "Economic Importance of Bats in Agriculture," Science 332(6025):41–42. (2011). https://doi.org/10.1126/science.1201366

**Bruch et al. 2021.** Bruch, Joseph Dov; Barin, Ozlem; Venkataramani, Atheendar S.; Song, Zirui. "Mortality Before and After Border Wall Construction Along the US-Mexico Border, 1990-2017," American Journal of Public Health 111(9):1636–1644. (2021). https://doi.org/10.2105/ajph.2021.306329

**Buuveibaatar et al. 2026.** Buuveibaatar, Bayarbaatar; Kaczensky, Petra; Walzer, Chris; Chuluunbat, Bayarmaa; Galtbalt, Batbayar; Sanjaa, Bolortsetseg; Alexander, Justine Shanti. "Crossing the line: evidence of khulan recolonization east of the Trans-Mongolian Railway," Oryx. (2026). https://doi.org/10.1017/s0030605326102865

**Caliendo and Parro 2015.** Caliendo, Lorenzo; Parro, Fernando. "Estimates of the Trade and Welfare Effects of NAFTA," The Review of Economic Studies 82(1):1–44. (2015). https://academic.oup.com/restud/article/82/1/1/1547758

**Campbell et al. 2014.** Campbell, Daniel E.; Lu, H.; Walker, Henry A. "Relationships Among the Energy, Emergy, and Money Flows of the United States From 1900 to 2011," Frontiers in Energy Research 2. (2014). https://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=289823

**Carrion and Levinson 2012.** Carrion, Carlos; Levinson, David. "Value of Travel Time Reliability: A Review of Current Evidence," Transportation Research Part A: Policy and Practice 46(4):720–741. (2012). https://www.sciencedirect.com/science/article/abs/pii/S0965856412000043

**Chambers et al. 2021.** Chambers, Samuel Norton; Boyce, Geoffrey Alan; Launius, Sarah; Dinsmore, Alicia. "Mortality, Surveillance and the Tertiary"Funnel Effect" on the U.S.-Mexico Border: A Geospatial Modeling of the

Geography of Deterrence," Journal of Borderlands Studies 36(3):443–468. (2021). https://doi.org/10.1080/08865655.2019.1570861

**Child 1972.** Child. "Observations on a wildebeest die-off in Botswana," Arnoldia 5:1–13. (1972).

**Cleveland et al. 2006.** Cleveland, Cutler J.; et al. "Economic value of the pest control service provided by Brazilian free-tailed bats in south-central Texas," Frontiers in Ecology and the Environment 4(5):238–243. (2006). https://doi.org/10.1890/1540-9295(2006)004[0238:evotpc]2.0.co;2

**Contreras-Velasco 2025.** Contreras-Velasco, Oscar. "When Elephants Fight, It's the Grass That Suffers: Organized Crime Violence and Risks for Migrants at the U.S.-Mexico Border," Social Forces. (2025). https://doi.org/10.1093/sf/soaf202

**Cornelius 2001.** Cornelius, Wayne A. "Death at the Border: Efficacy and Unintended Consequences of US Immigration Control Policy," Population and Development Review 27(4):661–685. (2001). https://doi.org/10.1111/j.1728-4457.2001.00661.x

**Costanza et al. 2014.** Costanza, Robert; de Groot, Rudolf; Sutton, Paul; et al. "Changes in the global value of ecosystem services," Global Environmental Change 26:152–158. (2014). https://doi.org/10.1016/j.gloenvcha.2014.04.002

**D'Antonio and Vitousek 1992.** D'Antonio, Carla M.; Vitousek, Peter M. "Biological Invasions by Exotic Grasses, the Grass/Fire Cycle, and Global Change," Annual Review of Ecology and Systematics 23:63–87. (1992).

**de Groot et al. 2012.** de Groot, Rudolf; Brander, Luke; van der Ploeg, Sander; et al. "Global estimates of the value of ecosystems and their services in monetary units," Ecosystem Services 1(1):50–61. (2012). https://doi.org/10.1016/j.ecoser.2012.07.005

**Diamond and Hausman 1994.** Diamond, Peter A.; Hausman, Jerry A. "Contingent Valuation: Is Some Number Better than No Number?," Journal of Economic Perspectives 8(4):45–64. (1994). https://doi.org/10.1257/jep.8.4.45

**Djankov et al. 2010.** Djankov, Simeon; Freund, Caroline; Pham, Cong S. "Trading on Time," The Review of Economics and Statistics 92(1):166–173. (2010). https://direct.mit.edu/rest/article/92/1/166/57797/Trading-on-Time

**Duda 2023.** Duda, Jeffrey J. "Patterns, drivers, and a predictive model of dam removal cost in the United States," Frontiers in Ecology and Evolution 11. (2023). https://doi.org/10.3389/fevo.2023.1215471

**Eaton and Kortum 2002.** Eaton, Jonathan; Kortum, Samuel. "Technology, Geography, and Trade," Econometrica 70(5):1741–1779. (2002). https://doi.org/10.1111/1468-0262.00352

**Feigenberg 2020.** Feigenberg, Benjamin. "Fenced Out: The Impact of Border Construction on US-Mexico Migration," American Economic Journal: Applied Economics 12(3):106–139. (2020). https://doi.org/10.1257/app.20170231

**Flyvbjerg 2006.** Flyvbjerg, Bent. "From Nobel Prize to Project Management: Getting Risks Right," Project Management Journal 37(3):5–15. (2006). https://doi.org/10.1177/875697280603700302

**Flyvbjerg et al. 2002.** Flyvbjerg, Bent; Skamris Holm, Mette K.; Buhl, Søren L. "Underestimating Costs in Public Works Projects: Error or Lie?," Journal of the American Planning Association 68(3):279–295. (2002). https://doi.org/10.1080/01944360208976273

**Frank 2022.** Frank, Eyal. "Ecosystem Services and Land Rental Markets: Producer Costs of Bat Population Crashes," Journal of the Association of Environmental and Resource Economists 9(6). (2022). https://doi.org/10.1086/720303

**Gathmann 2008.** Gathmann, Christina. "Effects of Enforcement on Illegal Markets: Evidence from Migrant Smuggling along the Southwestern Border," Journal of Public Economics 92(10-11):1926–1941. (2008). https://www.sciencedirect.com/science/article/abs/pii/S0047272708000674

**Hainmueller 2017.** Hainmueller, Jens. "Protecting unauthorized immigrant mothers improves their children's mental health," Science 357(6355):1041–1044. (2017). https://doi.org/10.1126/science.aan5893

**Harrity et al. 2024.** Harrity, Eamon J.; Traphagen, Myles; Bethel, Meagan; Facka, Aaron N.; Dax, Michael; Burns, Emily. "USA-Mexico border wall impedes wildlife movement," Frontiers in Ecology and Evolution 12:1487911. (2024). https://doi.org/10.3389/fevo.2024.1487911

**Hatzenbuehler 2017.** Hatzenbuehler, Mark L. "Immigration policies and mental health morbidity among Latinos: A state-level analysis," Social Science & Medicine 174:169–178. (2017). https://doi.org/10.1016/j.socscimed.2016.11.040

**Hausermann et al. 2024.** Hausermann, Heidi; Hutchinson, Eliot; Walder-Hoge, Zoey. "A spatial analysis of border 'security' and jaguars in the U.S.-Mexico borderlands," Frontiers in Conservation Science 5. (2024). https://doi.org/10.3389/fcosc.2024.1355997

**Hausman 2012.** Hausman, Jerry A. "Contingent Valuation: From Dubious to Hopeless," Journal of Economic Perspectives 26(4):43–56. (2012). https://doi.org/10.1257/jep.26.4.43

**Havranek and Irsova 2017.** Havranek, Tomas; Irsova, Zuzana. "Do Borders Really Slash Trade? A Meta-Analysis," IMF Economic Review 65(2):365–396. (2017). https://doi.org/10.1057/s41308-016-0001-5

**Hummels and Schaur 2013.** Hummels, David L.; Schaur, Georg. "Time as a Trade Barrier," American Economic Review 103(7):2935–2959. (2013). https://doi.org/10.1257/aer.103.7.2935

**Innes et al. 2024.** Innes, Alexandria; Carlisle, Sophie; Manzur, Hannah; Cook, Elizabeth; Corsi, Jessica; Lewis, Natalia V. "Prevalence of physical violence against people in insecure migration status: A systematic review and meta-analysis," PLOS ONE. (2024). https://doi.org/10.1371/journal.pone.0300189

**Ito 2013.** Ito, Takehiko Y. "Fragmentation of the Habitat of Wild Ungulates by Anthropogenic Barriers in Mongolia," PLoS ONE 8(2). (2013). https://doi.org/10.1371/journal.pone.0056995

**Jackson and Pitts 2010.** Jackson, Thomas O.; Pitts, Jennifer. "The Effects of Electric Transmission Lines on Property Values: A Literature Review," Journal of Real Estate Literature 18(2):239–259. (2010). https://doi.org/10.1080/10835547.2010.12090275

**Jia et al. 2023.** Jia, Xiaohong; Li, Jia; Ye, Jingyun; Fei, Bingqiang; Bao, Fang; Xu, Xiaotian; Zhang, Lingguang; Wu, Bo. "Estimating carbon storage of desert ecosystems in China," International Journal of Digital Earth 16(2). (2023). https://doi.org/10.1080/17538947.2023.2263415

**Kahneman and Knetsch 1992.** Kahneman, Daniel; Knetsch, Jack L. "Valuing public goods: The purchase of moral satisfaction," Journal of Environmental Economics and Management 22(1):57–70. (1992). https://doi.org/10.1016/0095-0696(92)90019-s

**Kim and Tajima 2022.** Kim, Diana; Tajima, Yuhki. "Smuggling and Border Enforcement," International Organization 76(4):830–867. (2022). https://doi.org/10.1017/s002081832200011x

**Krueger 1974.** Krueger, Anne O. "The Political Economy of the Rent-Seeking Society," The American Economic Review 64(3):291–303. (1974).

**Landau 2022.** Landau. "Integrating presence-only and occupancy data to model habitat use for the northernmost population of jaguars," Ecological Applications. (2022). https://doi.org/10.1002/eap.2619

**Leyva-Flores et al. 2019.** Leyva-Flores, René; Infante, César; Gutierrez, Juan Pablo; Quintino-Perez, Frida; Gómez-Saldivar, MariaJose; Torres-Robles, Cristian. "Migrants in Transit through Mexico to the US: Experiences with Violence and Related Factors, 2009-2015," PLOS ONE 14(8):e0220775. (2019). https://doi.org/10.1371/journal.pone.0220775

**Liepert et al. 2022.** Liepert; Berndtson; Hill. "Association of 30-ft US-Mexico Border Wall in San Diego With Increased Migrant Deaths, Trauma Center Admissions, and Injury Severity," JAMA Surgery 157(7):633–635. (2022). https://doi.org/10.1001/jamasurg.2022.1885

**Loomis and White 1996.** Loomis, John B.; White, Douglas S. "Economic benefits of rare and endangered species: summary and meta-analysis," Ecological Economics 18(3):197–206. (1996). https://doi.org/10.1016/0921-8009(96)00029-8

**Losey and Vaughan 2006.** Losey, John E.; Vaughan, Mace. "The Economic Value of Ecological Services Provided by Insects," BioScience 56(4):311–323. (2006). https://doi.org/10.1641/0006-3568(2006)56[311:tevoes]2.0.co;2

**Lussier and Lindholm 2024.** Lussier, Anna; Lindholm, Peter. "Rate of Aquatic and Maritime Drowning Deaths After US-Mexico Border Wall Height Increase," JAMA 331(12):1059–1060. (2024). https://doi.org/10.1001/jama.2024.1275

**Martínez 2024.** Martínez, Daniel E. "Migrant deaths in Southern Arizona / along the Arizona-Sonora border (Pima County vs. Border Patrol counts, FY2000-2022)," Journal on Migration and Human Security 12(3). (2024). https://doi.org/10.1177/23315024241256642

**Massey et al. 2016.** Massey, Douglas S.; Durand, Jorge; Pren, Karen A. "Why Border Enforcement Backfired," American Journal of Sociology 121(5):1557–1600. (2016). https://doi.org/10.1086/684200

**McCollister et al. 2010.** McCollister, Kathryn E.; French, Michael T.; Fang, Hai. "The Cost of Crime to Society: New Crime-Specific Estimates for Policy and Program Evaluation," Drug and Alcohol Dependence 108(1-2):98–109. (2010). https://doi.org/10.1016/j.drugalcdep.2009.12.002

**Meldrum et al. 2025.** Meldrum, James R.; Huber, Christopher; Monroe, Adrian P.; Tarbox, Bryan C.; Jeffries, Michelle I.; Pilliod, David S.; Aldridge, Cameron L. "Costs of land treatments on public lands in the western United States." *Rangeland Ecology & Management* 100: 99–110. (2025). https://doi.org/10.1016/j.rama.2025.03.004

**Mordi 1989.** Mordi, A. Richard. "The Future of Animal Wildlife and Its Habitat in Botswana," Environmental Conservation 16(2):147–156. (1989). https://doi.org/10.1017/s0376892900008924

**Nordhaus 2007.** Nordhaus, William D. "A Review of the Stern Review on the Economics of Climate Change," Journal of Economic Literature 45(3):686–702. (2007). https://doi.org/10.1257/jel.45.3.686

**Novak et al. 2017.** Novak, Nicole L.; Geronimus, Arline T.; Martinez-Cardoso, Aresha M. "Change in birth outcomes among infants born to Latina mothers after a major immigration raid," International Journal of Epidemiology 46(3):839–849. (2017). https://doi.org/10.1093/ije/dyw346

**Owens and Owens 1980.** Owens, Mark; Owens, Delia. "Botswana's fences and the depletion of Kalahari wildlife," Oryx. (1980). https://www.cambridge.org/core/journals/oryx/article/botswanas-fences-and-the-depletion-of-kalahari-wildlife/6CBA4E8305CEF9DF66D8A5CF49B36488

**Palacio et al. 2021.** Palacio, Carlos H.; Cruz, Bianca; Vanier, Cheryl; Cano, Jose; Scott, Bradford G. "The mechanism and pattern of injuries of undocumented immigrants crossing the Texas-Mexico border along the Rio Grande Valley," Injury Epidemiology 8:58. (2021). https://doi.org/10.1186/s40621-021-00341-x

**Parry 1987.** Parry. "Wildebeest (Connochaetes taurinus) mortalities at Lake Xau, Botswana," Botswana Notes and Records 19:95–101. (1987).

**Patler et al. 2021.** Patler, Caitlin; Hamilton, Erin R.; Savinar, Robin L. "Limits of Gaining Rights while Remaining Marginalized: The Deferred Action for Childhood Arrivals (DACA) Program and the Psychological Wellbeing of Latina/o Undocumented Youth," Social Forces 100(1):246–272. (2021). https://doi.org/10.1093/sf/soaa099

**Paul and Wilhite 1994.** Paul, C.; Wilhite, Al. "Illegal Markets and the Social Costs of Rent-Seeking," Public Choice 79(1-2):105–115. (1994). https://doi.org/10.1007/bf01047921

**Peters 2018.** Peters, Robert. "Nature Divided, Scientists United: US-Mexico Border Wall Threatens Biodiversity and Binational Conservation," BioScience 68(10):740–743. (2018). https://doi.org/10.1093/biosci/biy063

**Peterson et al. 2018.** Peterson, Cora; Florence, Curtis; Klevens, Joanne. "The economic burden of child maltreatment in the United States, 2015," Child Abuse & Neglect 86:178–183. (2018). https://pubmed.ncbi.nlm.nih.gov/30308348/

**Pinedo 2020.** Pinedo, Miguel. "Immigration Enforcement Policies and the Mental Health of US Citizens: Findings from a Comparative Analysis," American Journal of Community Psychology. (2020). https://doi.org/10.1002/ajcp.12464

**Pinedo and Escobar 2024.** Pinedo, Miguel; Escobar, C. "Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults, 2021," American Journal of Public Health 114(S6):S495-S504. (2024). https://doi.org/10.2105/ajph.2024.307660

**Ramey et al. 2019.** Ramey, Wyatt L.; Walter, Christina M.; Zeller, Jeffrey; Dumont, Travis M.; Lemole, Gerald M.; Hurlbert, R. John. "Neurotrauma From Border Wall Jumping: 6 Years at the Mexican-American Border Wall," Neurosurgery 85(3):E502-E508. (2019). https://doi.org/10.1093/neuros/nyz050

**Ramos-Sánchez and Llamas 2024.** Ramos-Sánchez, Lucila; Llamas, Jasmín D. "Immigration Policy and Latinx/é Children from Mixed-Status Families: Mental Health Consequences and Recommendations for Mental Health Providers," Children 11(11). (2024). https://doi.org/10.3390/children11111357

**Richardson and Loomis 2009.** Richardson, Leslie; Loomis, John B. "The total economic value of threatened, endangered and rare species: An updated meta-analysis," Ecological Economics 68(5):1535–1548. (2009). https://doi.org/10.1016/j.ecolecon.2008.10.016

**Roberts et al. 2014.** Roberts, Bryan; Rose, Adam; Heatwole, Nathaniel; Wei, Dan; Avetisyan, Misak; Chan, Oswin; Maya, Isaac. "The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry," Transport Policy 35:162–175. (2014). https://www.sciencedirect.com/science/article/abs/pii/S0967070X14001097

**Rosen 1974.** Rosen, Sherwin. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," Journal of Political Economy 82(1):34–55. (1974). https://doi.org/10.1086/260169

**Sanderson et al. 2022.** Sanderson, Eric W.; Fisher, Kim; Peters, Rob; Beckmann, Jon P.; Bird, Bryan; Bradley, Curtis M.; Bravo, Juan Carlos; Grigione, Melissa M.; Hatten, James R.; Lopez Gonzalez, Carlos A.; Menke, Kurt; Miller, Jennifer R. B.; Miller, Philip S.; Mormorunni, Cristina; Robinson, Michael J.; Thomas, Robert E.; Wilcox, Sharon. "A systematic review of potential habitat suitability for the jaguar Panthera onca in central Arizona and New Mexico, USA," Oryx 56(1):116–127. (2022). https://doi.org/10.1017/s0030605320000459

**Simonovska and Waugh 2014.** Simonovska, Ina; Waugh, Michael E. "The Elasticity of Trade: Estimates and Evidence," Journal of International Economics 92(1):34–50. (2014). https://www.sciencedirect.com/science/article/abs/pii/S0022199613000986

**Spinage 1992.** Spinage, C. A. "The decline of the Kalahari wildebeest," Oryx 26(3):147–150. (1992). https://www.cambridge.org/core/journals/oryx/article/decline-of-the-kalahari-wildebeest/70A5E472782E025D0E684BF589EF6018

**Spradley 2019.** Spradley, M. Kate. "Identifying migrant remains in South Texas: policy and practice," Forensic Sciences Research 4(1):60–68. (2019). https://doi.org/10.1080/20961790.2018.1497437

**Subroy et al. 2019.** Subroy, Vandana; Gunawardena, Asha; Polyakov, Maksym; Pandit, Ram; Pannell, David J. "The worth of wildlife: A meta-analysis of global non-market values of threatened species," Ecological Economics 164:106374. (2019). https://doi.org/10.1016/j.ecolecon.2019.106374

**Tenorio 2024a.** Tenorio, Alexander. "Traumatic Brain Injuries After Falls From Height vs Falls at the US-Mexico Border Wall," JAMA Surgery 159(6):715–718. (2024). https://doi.org/10.1001/jamasurg.2024.0008

**Tenorio 2024b.** Tenorio, Alexander. "Characterizing Prehospital Wall Fall Injuries at the US-Mexico Border," JAMA Network Open 7(10):e2437160. (2024). https://doi.org/10.1001/jamanetworkopen.2024.37160

**Tullock 1967.** Tullock, Gordon. "The Welfare Costs of Tariffs, Monopolies, and Theft," Western Economic Journal 5(3):224–232. (1967).

**Vargas 2015.** Vargas, Edward D. "Immigration Enforcement and Mixed-Status Families: The Effects of Risk of Deportation on Medicaid Use," Children and Youth Services Review 57:83–89. (2015). https://pmc.ncbi.nlm.nih.gov/articles/PMC4592159/

**Viscusi and Aldy 2003.** Viscusi, W. Kip; Aldy, Joseph E. "The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World," Journal of Risk and Uncertainty 27(1):5–76. (2003). https://doi.org/10.1023/a:1025598106257

**Wang and Kaushal 2019.** Wang, Julia Shu-Huah; Kaushal, Neeraj. "Health and Mental Health Effects of Local Immigration Enforcement," International Migration Review 53(4):970–1001. (2019). https://doi.org/10.1177/0197918318791978

**Watson 2014.** Watson, Tara. "Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation," American Economic Journal: Economic Policy 6(3):313–338. (2014). https://doi.org/10.1257/pol.6.3.313

**Wigan et al. 2000.** Wigan, M.; Rockliffe, N.; Thoresen, T.; Tsolakis, D. "Valuing Long-Haul and Metropolitan Freight Travel Time and Reliability," Journal of Transportation and Statistics 3(3):83–89. (2000).

**Williamson and Williamson 1981.** Williamson; Williamson. "An assessment of the impact of fences on large herbivore biomass in the Kalahari," Botswana Notes and Records 13:107–110. (1981).

## Reports and working papers

**AIC 2025 (cost).** American Immigration Council. *The High Cost and Diminishing Returns of a Border Wall*. American Immigration Council. (2025). https://www.americanimmigrationcouncil.org/fact-sheet/cost-of-border-wall/

**Allen et al. 2019.** Allen, Treb; Dobbin, Cauê de Castro; Morten, Melanie. *Border Walls*. NBER Working Paper Series NBER Working Paper 25267. (2019). https://doi.org/10.3386/w25267

**Arrow et al. 1993.** Arrow, Kenneth J.; Solow, Robert; Portney, Paul R.; Leamer, Edward E.; Radner, Roy; Schuman, Howard. *Report of the NOAA Panel on Contingent Valuation*. (1993).

**Atlantic Council 2022.** Atlantic Council. *The Economic Impact of a More Efficient US-Mexico Border: How Reducing Wait Times at Land Ports of Entry Would Promote Commerce, Resilience, and Job Creation*. (2022). https://www.atlanticcouncil.org/in-depth-research-reports/report/the-economic-impact-of-a-more-efficient-us-mexico-border/

**BEA 2026.** U.S. Bureau of Economic Analysis. *Gross Domestic Product, 4th Quarter and Year 2025 (Third Estimate)*. (2026). https://www.bea.gov/news/2026/gdp-third-estimate-industries-corporate-profits-state-gdp-and-state-personal-income-4th

**Bier 2024.** Bier, David J. *US Citizens Were 80 Percent of Crossers with Fentanyl at Ports of Entry from 2019 to 2024*. Cato at Liberty. (2024). https://www.cato.org/blog/us-citizens-were-80-crossers-fentanyl-ports-entry-2019-2024

**BTS Transborder Freight 2026.** U.S. Department of Transportation, Bureau of Transportation Statistics. *Transborder Freight Data Annual Report: 2025*. (2026). https://www.bts.gov/newsroom/transborder-freight-data-annual-report-2025-0

**California State Auditor 2018.** California State Auditor. California High-Speed Rail Authority: Its Flawed Decision Making and Poor Contract Management Have Contributed to Billions in Cost Overruns and Delays in the System's Construction. Report No. 2018-108. (2018). https://information.auditor.ca.gov/reports/2018-108/chapter1.html

**CBD stranded acreage forthcoming.** Center for Biological Diversity. *Geospatial measurement of stranded acreage between the border and set-back barrier (forthcoming)*. (forthcoming geospatial analysis supplied by the Center; final publication details to be substituted when available)

**CBO 2026.** Congressional Budget Office. *Estimated Budgetary Effects of S. 2, the Secure America Act*. (2026). https://www.cbo.gov/publication/62454

**CED-80-54.** United States General Accounting Office. *Federal Land Acquisitions by Condemnation–Opportunities To Reduce Delays and Costs*. CED-80-54. (1980). https://www.gao.gov/assets/ced-80-54.pdf

**CRS IF11336.** Congressional Research Service. *Recent Developments in Everglades Restoration*. CRS In Focus IF11336. (2025). https://www.congress.gov/crs-product/IF11336

**CRS IN11675.** Congressional Research Service. *An Update on Military Funding for the Border Wall*. IN11675. (2021). https://crsreports.congress.gov/product/pdf/IN/IN11675

**CRS R45888.** Congressional Research Service. *DHS Border Barrier Funding Through FY2021*. Congressional Research Service R45888. (2024). https://crsreports.congress.gov/product/pdf/R/R45888

**CRS R46218.** Congressional Research Service. *Illicit Drug Smuggling Between Ports of Entry and Border Barriers*. R46218. (2020). https://www.congress.gov/crs-product/R46218

**DEA 2025.** Drug Enforcement Administration. *2025 National Drug Threat Assessment*. (2025). https://www.dea.gov/sites/default/files/2025-07/2025NationalDrugThreatAssessment.pdf

**DHS 2026.** United States Department of Homeland Security. *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended*. Federal Register 91. (2026). https://www.federalregister.gov/documents/2026/06/09/2026-11473/determination-pursuant-to-section-102-of-the-illegal-immigration-reform-and-immigrant-responsibility

**DHS OGC 2024.** U.S. Department of Homeland Security, Office of the General Counsel. *Memorandum adopting DOT value of a statistical life (May 9, 2024)*. (2024). https://www.dco.uscg.mil/Portals/9/VSL%202024%209May24%20FINAL%20for%20DIST.pdf

**DOJ ENRD 2018.** U.S. Department of Justice, Environment and Natural Resources Division. *FY2018 Congressional Budget Submission (border-security increase, Land Acquisition Section)*. (2018). https://www.justice.gov/d9/12_environment_and_natural_resources_division_enrd.pdf

**DOL 2025.** U.S. Department of Labor. *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States (Interim Final Rule)*. Federal Register 2025-19365. (2025). https://www.federalregister.gov/documents/2025/10/02/2025-19365/adverse-effect-wage-rate-methodology-for-the-temporary-employment-of-h-2a-nonimmigrants-in-non-range

**DOT 2021 VSL.** U.S. Department of Transportation. *Departmental Guidance: Treatment of the Value of Preventing Fatalities and Injuries in Preparing Economic Analyses*. (2021). https://www.transportation.gov/sites/dot.gov/files/2021-03/DOT%20VSL%20Guidance%20-%202021%20Update.pdf

**DOT VSL Guidance.** U.S. Department of Transportation. *Departmental Guidance on Valuation of a Statistical Life in Economic Analysis*. https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-on-valuation-of-a-statistical-life-in-economic-analysis

**Emblom.** Emblom, Allyson. *The Effect of Correctional and Rehabilitation Facilities on Property Values*. https://abemblom.github.io/AllysonEmblomHooe.github.io/assets/files/JMP_AEH.pdf

**EPA 2023.** U.S. Environmental Protection Agency. *Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances*. (2023). https://www.epa.gov/system/files/documents/2023-12/epa_scghg_2023_report_final.pdf

**FWS 2018.** U.S. Fish and Wildlife Service. *2016 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*. (2018). https://www.fws.gov/media/2016-national-survey-fishing-hunting-and-wildlife-associated-recreation

**FWS 2025.** U.S. Fish and Wildlife Service. *Draft Recovery Plan for the Sonoyta Mud Turtle*. (2025). https://www.fws.gov/sites/default/files/documents/2025-08/draft-recovery-plan-for-sonoyta-mud-turtle-august-2025.pdf

**GAO-09-244R.** U.S. Government Accountability Office. *Secure Border Initiative Fence Construction Costs*. U.S. Government Accountability Office GAO-09-244R. (2009). https://www.gao.gov/products/gao-09-244r

**GAO-09-896.** U.S. Government Accountability Office. *Secure Border Initiative: Technology Deployment Delays Persist and the Impact of Border Fencing Has Not Been Assessed*. U.S. Government Accountability Office GAO-09-896. (2009). https://www.gao.gov/products/gao-09-896

**GAO-17-331.** U.S. Government Accountability Office. *Southwest Border Security: Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps*. U.S. Government Accountability Office GAO-17-331. (2017). https://www.gao.gov/assets/gao-17-331.pdf

**GAO-17-474.** U.S. Government Accountability Office. *Border Security: Additional Actions Could Strengthen DHS Efforts to Address Subterranean, Aerial, and Maritime Smuggling*. GAO-17-474. (2017). https://www.gao.gov/products/gao-17-474

**GAO-20-195G.** U.S. Government Accountability Office. *Cost Estimating and Assessment Guide: Best Practices for Developing and Managing Program Costs*. U.S. Government Accountability Office GAO-20-195G. (2020). https://www.gao.gov/products/gao-20-195g

**GAO-21-114.** United States Government Accountability Office. *Southwest Border: Information on Federal Agencies' Process for Acquiring Private Land for Barriers*. GAO-21-114. (2021). https://www.gao.gov/assets/gao-21-114.pdf

**GAO-21-372.** U.S. Government Accountability Office. *Southwest Border: Schedule Considerations Drove Army Corps of Engineers' Approaches to Awarding Construction Contracts through 2020*. GAO-21-372. (2021). https://www.gao.gov/products/gao-21-372

**GAO-22-105053.** U.S. Government Accountability Office. *Southwest Border: CBP Should Improve Data Collection, Reporting, and Evaluation for the Missing Migrant Program*. GAO-22-105053. (2022). https://www.gao.gov/products/gao-22-105053

**GAO-23-105443.** U.S. Government Accountability Office. *Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction*. U.S. Government Accountability Office GAO-23-105443. (2023). https://www.gao.gov/products/gao-23-105443

**GAO-23-106893.** U.S. Government Accountability Office. *Southwest Border: Award and Management of Barrier Construction Contracts*. U.S. Government Accountability Office GAO-23-106893. (2023). https://www.gao.gov/products/gao-23-106893

**GAO-24-107127.** U.S. Government Accountability Office. *Southwest Border: Cultural and Natural Resource Impacts from Barrier Construction*. GAO-24-107127. (2023). https://www.gao.gov/products/gao-24-107127

**GAO-25-107548.** U.S. Government Accountability Office. *Border Security: Additional Actions Needed to Evaluate the Missing Migrant Program*. GAO-25-107548. (2025). https://www.gao.gov/products/gao-25-107548

**Greenfield et al. 2019.** Greenfield, Victoria A.; Nunez-Neto, Blas; Mitch, Ian. *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States?*. RR-2852-DHS. (2019). https://www.rand.org/pubs/research_reports/RR2852.html

**HHS ASPE 2026.** U.S. Department of Health and Human Services, ASPE. *Standard Values for Regulatory Analysis, 2026*. (2026). https://aspe.hhs.gov/sites/default/files/documents/2d83af5823915d81871334ee08ad03d9/Standard-RIA-Values-2026.pdf

**HRF 2023.** Human Rights First. *Human Rights First details violence against asylum seekers at U.S. border*. (2023). https://humanrightsfirst.org/library/human-rights-first-details-violence-against-asylum-seekers-at-u-s-border/

**IBWC 2009.** International Boundary and Water Commission. *Record of Decision, River Management Alternatives for the Rio Grande Canalization Project*. (2009). https://www.ibwc.gov/reports-studies/rgcp/

**IBWC 2019.** U.S. Section, International Boundary and Water Commission. *Final Report on the Ten-Year Implementation of the Record of Decision, River Management Alternatives for the Rio Grande Canalization Project*. (2019). https://www.ibwc.gov/wp-content/uploads/2023/06/Final_Report_TenYear_Imp_RodwAppendices_061719.pdf

**IBWC CILA 2011.** International Boundary and Water Commission, Mexican Section (CILA). *Letter objecting to border-fence segments proposed in the Rio Grande floodplain (Roma, Rio Grande City, Los Ebanos)*. IBWC/CILA December 13, 2011. (2011). https://www.scribd.com/document/98818275/December-13-2011-Mexico-IBWC-rejects-border-walls-in-the-Rio-Grande-flood-plain

**IEP 2025.** Institute for Economics and Peace. *Mexico Peace Index*. (2025). https://www.visionofhumanity.org/economic-impact-violence-mexico/

**Kaval and Loomis 2003.** Kaval, Pamela; Loomis, John B. *Updated Outdoor Recreation Use Values with Emphasis on National Park Recreation*. (2003).

**KFF 2025.** Kaiser Family Foundation. *Health and Health Care in the U.S.-Mexico Border Region*. (2025). https://www.kff.org/racial-equity-and-health-policy/health-and-health-care-in-the-u-s-mexico-border-region/

**Leutert et al. 2020.** Leutert, Stephanie; Lee, Sam; Rossi, Victoria. *Migrant Deaths in South Texas*. (2020). https://www.strausscenter.org/publications/migrant-deaths-in-south-texas/

**McAllister and McManamon 2007.** McAllister, Martin E.; McManamon, Francis P. *Archeological Resource Damage Assessment: Legal Basis and Methods*. National Park Service Technical Brief 20. (2007). https://www.nps.gov/subjects/archeology/upload/tchBrf20_508.pdf

**MSF 2017.** Médecins Sans Frontières. *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis*. (2017). https://www.doctorswithoutborders.org/latest/report-forced-flee-central-americas-northern-triangle

**MSF 2020.** Médecins Sans Frontières. *No Way Out*. (2020). https://www.doctorswithoutborders.org/latest/report-no-way-out

**Nat. Immigration Forum 2019.** National Immigration Forum. *Eminent Domain Along the Southern Border: Government Seizures of Private Property*. (2019). https://forumtogether.org/wp-content/uploads/2019/07/Fact-Sheet-Eminent-Domain-and-the-Southern-Border-FINAL.pdf

**Nowrasteh 2024.** Nowrasteh, Alex. *Border Patrol Agent Deaths in the Line of Duty, 2003-2023*. (2024). https://www.cato.org/blog/border-patrol-agent-deaths-line-duty-2003-2023

**NPS 2008.** U.S. National Park Service. *Effects of the International Boundary Pedestrian Fence in the Vicinity of Lukeville, Arizona, on Drainage Systems and Infrastructure*. (2008).

**OMB 2003.** Office of Management and Budget. *Circular A-4, Regulatory Analysis*. (2003). https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4/

**OMB 2019.** Office of Management and Budget. Letter from Russell T. Vought, Acting Director, to Senator Richard Shelby, Chairman, Senate Committee on Appropriations (Jan. 6, 2019), at 1 (requesting $5.7 billion for approximately 234 miles of new physical barrier). https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/01/Final-Shelby-1-6-19.pdf

**OMB 2023.** Office of Management and Budget. *Circular A-4, Regulatory Analysis (2023 revision)*. (2023). https://bidenwhitehouse.archives.gov/wp-content/uploads/2023/11/CircularA-4.pdf

**Perryman Group 2019.** The Perryman Group. *The Economic Cost of the US-Mexico Border Slowdown*. (2019). https://www.perrymangroup.com/publications/report/2019/05/03/the-economic-cost-of-the-usmexico-border-slowdown/

**Perryman Group 2022.** The Perryman Group. *The Economic Costs of the Recent Border Delays*. (2022). https://www.perrymangroup.com/publications/brief/2022/04/20/the-economic-costs-of-the-recent-border-delays/

**Roberts et al. 2010.** Roberts, Bryan; Hanson, Gordon; Cornwell, Derekh; Borger, Scott. *An Analysis of Migrant Smuggling Costs along the Southwest Border*. DHS Office of Immigration Statistics Working Paper. (2010). https://www.dhs.gov/xlibrary/assets/statistics/publications/ois-smuggling-wp.pdf

**Rubio-Goldsmith et al. 2006.** Rubio-Goldsmith, Raquel; McCormick, M. Melissa; Martinez, Daniel; Duarte, Inez Magdalena. *The "Funnel Effect" and Recovered Bodies of Unauthorized Migrants Processed by the Pima County Office of the Medical Examiner, 1990-2005*. (2006). https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040107

**Senate Judiciary 2019.** U.S. Senate Committee on the Judiciary. *Feinstein Calls on Border Patrol to Examine Vehicle Pursuit Policies After Recent Deaths*. (2019). https://www.judiciary.senate.gov/press/dem/releases/feinstein-calls-on-border-patrol-to-examine-vehicle-pursuit-policies-after-recent-deaths

**State Dept 2025.** U.S. Department of State. *2025 Trafficking in Persons Report: Mexico*. (2025). https://www.state.gov/reports/2025-trafficking-in-persons-report/mexico/

**Texas A&M 2012.** Texas A&M University. *Economic Impact of Nature Tourism on the Rio Grande Valley*. (2012). https://texasbirding.org/wp-content/uploads/2018/08/STNMC-Final-report-4-16-12.pdf

**Texas LBB 2023.** Texas Legislative Budget Board. *Fiscal Note, S.B. 1481, 88th Legislature*. S.B. 1481 (88R). (2023). https://capitol.texas.gov/tlodocs/88R/fiscalnotes/html/SB01481I.htm

**Tohono O'odham Nation 2017.** Tohono O'odham Nation. *Issue Brief: Tohono O'odham Nation Opposes Border Wall*. (2017). https://www.tonation-nsn.gov/wp-content/uploads/2017/02/Issue-Brief-Tohono-Oodham-Nation-Opposes-Border-Wall.pdf

**TRB 2014.** Transportation Research Board. *Guidebook: Placing a Value on Travel Time Reliability*. SHRP 2 Reliability Project L17. (2014). https://onlinepubs.trb.org/onlinepubs/shrp2/SHRP2_L17_Gap-Filling_Project_5_GuidebookPlacingAValueOnTimeReliability.pdf

**TTI 2026.** Texas A&M Transportation Institute. *Simplifying the Financial Impact of Border Crossing Delays*. (2026). https://ciitr.tti.tamu.edu/2026/04/02/simplifying-the-financial-impact-of-border-crossing-delays/

**UNCTAD 2026.** United Nations Conference on Trade and Development. *World Investment Report 2026*. (2026). https://unctad.org/publication/world-investment-report-2026-international-investment-turbulent-era

**USDA APHIS.** USDA Animal and Plant Health Inspection Service. *Feral swine agricultural damage estimates*. https://www.aphis.usda.gov/operational-wildlife-activities/feral-swine

**USDA WS 2023.** USDA Animal and Plant Health Inspection Service, Wildlife Services. *USDA Wildlife Services Posts Fiscal Year 2022 Data on Management Actions and Funding Sources*. (2023). https://www.aphis.usda.gov/news/program-update/usda-wildlife-services-posts-fiscal-year-2022-data-management-actions-funding

**worldsteel.** World Steel Association. *Life Cycle Inventory (steel)*. https://worldsteel.org/wider-sustainability/life-cycle-thinking/life-cycle-inventory-data-and-eco-profiles/

## Statutes, regulations, and treaties

**8 U.S.C. 1103 note.** United States Congress. *Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Section 102(c)*. 8 U.S.C. 1103 note. (1996).

**15 CFR Part 990.** National Oceanic and Atmospheric Administration. *Natural Resource Damage Assessments (Oil Pollution Act)*. Code of Federal Regulations 15. https://www.ecfr.gov/current/title-15/subtitle-B/chapter-IX/subchapter-E/part-990

**16 U.S.C. Sec. 470aa-470mm.** United States Congress. *Archaeological Resources Protection Act of 1979*. 16 U.S.C. Sec. 470aa-470mm. (1979). https://www.law.cornell.edu/uscode/text/16/470aa

**25 U.S.C. Sec. 3001 et seq.** United States Congress. *Native American Graves Protection and Repatriation Act*. 25 U.S.C. Sec. 3001 et seq. (1990). https://www.law.cornell.edu/uscode/text/25/3001

**43 CFR Part 7.** U.S. Department of the Interior. *Protection of Archaeological Resources (43 CFR Part 7)*. Code of Federal Regulations. https://www.ecfr.gov/current/title-43/part-7/section-7.14

**43 CFR Part 11.** U.S. Department of the Interior. *Natural Resource Damage Assessments*. Code of Federal Regulations 43. https://www.ecfr.gov/current/title-43/subtitle-A/part-11

**44 CFR 59.1.** U.S. Department of Homeland Security, Federal Emergency Management Agency. *General Provisions, Definitions, National Flood Insurance Program (44 CFR 59.1)*. Code of Federal Regulations 44.

**54 U.S.C. Sec. 300101 et seq.** United States Congress. *National Historic Preservation Act*. 54 U.S.C. Sec. 300101 et seq. (1966). https://www.law.cornell.edu/uscode/text/54/300101

**1970 Water Treaty.** United States; Mexico. *Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary*. (1970). https://www.ibwc.gov/treaties-minutes/treaties/

**2004/35/EC.** European Parliament and Council of the European Union. *Directive 2004/35/EC on environmental liability with regard to the prevention and remedying of environmental damage*. (2004). https://eur-lex.europa.eu/eli/dir/2004/35/oj/eng

**EO 14154.** President of the United States. *Executive Order 14154: Unleashing American Energy*. (2025). https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/

**Pub. L. 91-646.** *Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970*. Pub. L. 91-646. (1970).

**Pub. L. 119-21.** *One Big Beautiful Bill Act*. 139:357–359. (2025). https://www.govinfo.gov/content/pkg/PLAW-119publ21/html/PLAW-119publ21.htm

**Pub. L. 119-98.** *Secure America Act*. Pub. L. 119-98. (2026). https://www.congress.gov/bill/119th-congress/senate-bill/2

**SB 1133.** Texas Legislature. *Senate Bill 1133 (Landowner Compensation Program)*. 88th Texas Legislature, Regular Session SB 1133. (2023). https://capitol.texas.gov/BillLookup/History.aspx?LegSess=88R&Bill=SB1133

**Secure Fence Act of 2006.** United States Congress. *Secure Fence Act of 2006*. (2006).

## Legal cases

**Friends of Ruidosa Church v. Mullin 2026.** *Friends of the Ruidosa Church v. Mullin*. U.S. District Court for the Western District of Texas. (2026).

**Ohio v. DOI 1989.** *State of Ohio v. United States Department of the Interior*. U.S. Court of Appeals, D.C. Circuit 880:432. (1989). https://www.doi.gov/sites/doi.gov/files/migrated/restoration/upload/laws_Ohio1989.pdf

**Posillico v. US 2026.** *Posillico Civil, Inc. v. United States*. U.S. Court of Federal Claims. (2026).

**Sierra Club v. Biden 2023.** Settlement Agreement, Sierra Club v. Biden (formerly Sierra Club v. Trump), No. 4:19-cv-00892-HSG, ECF No. 372-1 (N.D. Cal. July 17, 2023).

**US v. Shumway 1997.** *United States v. Shumway*. 112 F.3d 1413 (10th Cir. 1997) 112:1413. (1997). https://caselaw.findlaw.com/court/us-10th-circuit/1027010.html

## Testimony and hearings

**DOI 2010.** U.S. Department of the Interior. *Testimony on the War on Buffelgrass (statement of Herbert C. Frost, NPS), House Subcommittee on National Parks, Forests, and Public Lands*. (2010). https://www.doi.gov/ocl/hearings/111/WarOnBuffelgrass_041010

**House Homeland 2023.** U.S. House Committee on Homeland Security (Majority). *"Now Nobody Crosses Without Paying": Senior Border Patrol Agents Describe Unprecedented Cartel Control at Southwest Border*. (2023). https://homeland.house.gov/2023/12/14/now-nobody-crosses-without-paying-senior-border-patrol-agents-describe-unprecedented-cartel-control-at-southwest-border/

**Milgram 2023.** Milgram, Anne. *Statement before the Senate Foreign Relations Committee (hearing: Countering Illicit Fentanyl Trafficking)*. U.S. Senate Committee on Foreign Relations. (2023). https://www.foreign.senate.gov/download/021523_milgram_testimony

**Norris 2020.** Norris, Ned, Jr. *Testimony of Chairman Ned Norris Jr., Tohono O'odham Nation*. U.S. House of Representatives, Committee on Natural Resources, Subcommittee for Indigenous Peoples of the United States. (2020). https://www.congress.gov/116/meeting/house/110587/witnesses/HMTG-116-II24-Wstate-NorrisJrN-20200226.pdf

## Books

**Boardman et al. 2018.** Boardman, Anthony E.; Greenberg, David H.; Vining, Aidan R.; Weimer, David L. Cost-Benefit Analysis: Concepts and Practice. 5th ed. Cambridge University Press. (2018). https://doi.org/10.1017/9781108235594

**Sagoff 1988.** Sagoff, Mark. *The Economy of the Earth: Philosophy, Law, and the Environment*. (1988). https://www.cambridge.org/core/books/economy-of-the-earth/D55E87B7AA1437E9A555887A321E0B55

**Stern 2007.** Stern, Nicholas. *The Economics of Climate Change: The Stern Review*. (2007).

**Yellow Book 2016.** Interagency Land Acquisition Conference. *Uniform Appraisal Standards for Federal Land Acquisitions*. 2016 ed. (2016). https://www.justice.gov/d9/enrd/legacy/2015/04/13/uniform-appraisal-standards.pdf

## News articles

**AP 2023.** Associated Press. "Arizona's shipping container wall on border is coming down," KOIN.com. (2023). https://www.koin.com/news/national/ap-arizonas-shipping-container-wall-on-border-is-coming-down/

**Arizona Daily Star 2008.** "2 suspected illegal immigrants found dead in Nogales' damaged waterway," Arizona Daily Star. (2008). https://tucson.com/news/local/border/article_3c82e2b8-defd-5dad-b4cf-c706059c3955.html

**Arizona Daily Star 2026.** Arizona Daily Star. "New images show Arizona archaeological site scarred by border wall work," Arizona Daily Star. (2026). https://tucson.com/news/local/border/article_20b0276a-2ed2-4f13-8e91-93dd9fb669b5.html

**BBC 2020.** BBC. "Native American burial sites blown up for US border wall," BBC. (2020). https://www.bbc.com/news/world-us-canada-51449739

**Bonmatí et al. 2021.** Bonmatí, Damià; Cooper, Juan; Meza, Aldo; Morillo, Belisa. "Terrifying Videos and Threats: Kidnappers Extort Migrants' Relatives for Ransoms," Noticias Telemundo Investiga (via NBC News). (2021). https://www.nbcnews.com/news/latino/terrifying-videos-threats-kidnappers-extort-migrants-relatives-ransoms-rcna2387

**Construction Dive.** Construction Dive. "Border wall construction accelerates with $773M in new government contracts," Construction Dive. https://www.constructiondive.com/news/border-wall-construction-accelerates-with-773m-in-new-government-contracts/586378/

**Construction Dive 2019.** "$976M of border wall contracts awarded," Construction Dive. (2019). https://www.constructiondive.com/news/976m-of-border-wall-contracts-awarded/552417/

**CS Monitor 2011.** The Christian Science Monitor. "US cancels 'virtual fence' along Mexican border. What's Plan B?," The Christian Science Monitor. (2011). https://www.csmonitor.com/USA/2011/0115/US-cancels-virtual-fence-along-Mexican-border.-What-s-Plan-B

**Drovers 2022.** "Arizona Ranch Sues Over Border Wall Construction," Drovers. (2022). https://www.drovers.com/news/industry/arizona-ranch-sues-over-border-wall-construction

**Green 2024.** Green, Emily. "Held for Ransom in Animal Pens, Migrants Face Mass Kidnappings as U.S. and Mexico Ramp Up Enforcement," ProPublica. (2024). https://www.propublica.org/article/immigration-mexico-us-migrants-mass-kidnappings-cartels-border

**Houston Public Media 2026.** "New $1.7 billion contract in Big Bend National Park won't be used for border wall, CBP says," Houston Public Media. (2026). https://www.houstonpublicmedia.org/articles/news/texas/2026/05/20/552458/new-1-7-billion-contract-in-big-bend-national-park-wont-be-used-for-border-wall-cbp-says/

**Ingram 2026.** Ingram, Paul. "Enviros sue to protect snail in Quitobaquito Springs from border wall construction," Arizona Mirror. (2026). https://azmirror.com/2026/05/29/enviros-sue-to-protect-snail-in-quitobaquito-springs-from-border-wall-construction/

**Miroff 2019.** Miroff, Nick. "Border fence construction could destroy archaeological sites, National Park Service finds," The Washington Post. (2019). https://www.washingtonpost.com/immigration/border-fence-construction-could-destroy-archaeological-sites-national-park-service-finds/2019/09/17/35338b18-d64b-11e9-9343-40db57cf6abd_story.html

**NPR 2020.** "$11 Billion And Counting: Trump's Border Wall Would Be The World's Most Costly," NPR. (2020). https://www.npr.org/2020/01/19/797319968

**ProPublica and The Texas Tribune 2017.** ProPublica; The Texas Tribune. "The Taking," ProPublica. (2017). https://features.propublica.org/eminent-domain-and-the-wall/the-taking-texas-government-property-seizure/

**ProPublica and The Texas Tribune 2020.** ProPublica; The Texas Tribune. "The Trump Administration Keeps Awarding Border Wall Contracts but Doesn't Own the Land to Build On," ProPublica. (2020). https://www.propublica.org/article/texas-border-wall-contracts-land-trump-administration

**Texas Tribune 2024 (Abbott wall).** "At half a mile a week, Gov. Greg Abbott's border wall will take around 30 years and $20 billion to build," The Texas Tribune. (2024). https://www.texastribune.org/2024/07/03/texas-mexico-border-wall-greg-abbott-progress-cost/

**Texas Tribune 2024 (landowner comp.).** The Texas Tribune. "Texas to pay landowners for damage caused by border crime," The Texas Tribune. (2024). https://www.texastribune.org/2024/05/09/texas-border-property-damage-compensation-migrants/

**The Center Square 2026.** "Installation of Big Bend border wall set for August in Texas," The Center Square. (2026). https://thecentersquare.com/texas/article_3756257e-7ce2-47c3-a11c-42bdbac89ee8.html

**The Texas Tribune 2019.** "Border wall funding goes to three contracts for 65 miles of new fencing," The Texas Tribune. (2019). https://www.texastribune.org/2019/09/30/federal-government-awards-contracts-65-new-miles-border-fencing-texas/

**The Texas Tribune 2026a.** "Feds plan to put 536 miles of floating barriers on Rio Grande," The Texas Tribune; Inside Climate News. (2026). https://www.texastribune.org/2026/03/23/texas-border-rio-grande-buoys-federal-barrier-brownsville/

**The Texas Tribune 2026b.** The Texas Tribune. "The Trump administration is facing scrutiny over its billion-dollar border wall contracts in Texas' Big Bend region," The Texas Tribune. (2026). https://www.ksat.com/news/texas/2026/05/21/the-trump-administration-is-facing-scrutiny-over-its-billion-dollar-border-wall-contracts-in-texas-big-bend-region/

**The Washington Post 2024.** The Washington Post. "The land between the U.S.-Mexico border wall and the Texans who live on it," The Washington Post. (2024). https://www.washingtonpost.com/immigration/interactive/2024/border-wall-mexico-texas-land/

**The Washington Times 2022.** "$20 billion payday: Joe Biden's border surge sends smuggling prices soaring," The Washington Times. (2022). https://www.washingtontimes.com/news/2022/sep/27/20-billion-payday-joe-bidens-border-surge-sends-sm/

**Trevizo and Schwartz 2020.** Trevizo, Perla; Schwartz, Jeremy. "Records Show Trump's Border Wall Is Costing Taxpayers Billions More Than Initial Contracts," ProPublica / The Texas Tribune. (2020). https://www.propublica.org/article/records-show-trumps-border-wall-is-costing-taxpayers-billions-more-than-initial-contracts

**Tucson Sentinel 2023.** Tucson Sentinel. "After Ducey's container wall dismantled, enviro groups push for remediation on border," Tucson Sentinel. (2023). https://www.tucsonsentinel.com/local/report/021123_container_wall_removed/

**Woolston 2025.** Woolston, Sam. "Murders May Be Dropping But the Cost of Crime Is Rising in Mexico," InSight Crime. (2025). https://insightcrime.org/news/murders-may-be-dropping-but-the-cost-of-crime-is-rising-in-mexico/

## Magazine articles

**Archaeology Mag. 2026.** Archaeology Magazine. "Las Playas Intaglio Damaged by Border Wall Construction in Arizona," Archaeology Magazine. (2026). https://archaeology.org/news/2026/05/04/las-playas-intaglio-damaged-by-border-wall-construction-in-arizona/

**Brizuela et al. 2026.** Brizuela, Isabel; Cañas, Jesús; Leigh, Robert. "Mexican Residents Favor Local Retailers over Cross-Border Shopping in Texas," Southwest Economy (Federal Reserve Bank of Dallas). (2026). https://www.dallasfed.org/research/swe/2026/swe2602

**Coronado and Phillips 2012.** Coronado, Roberto A.; Phillips, Keith R. "Spotlight: Dollar-Sensitive Mexican Shoppers Boost Texas Border Retail Activity," Southwest Economy (Federal Reserve Bank of Dallas). (2012).

**High Country News 2020.** "In Arizona, building a wall — and destroying a canyon," High Country News. (2020). https://www.hcn.org/articles/borderlands-border-wall-construction-and-environmental-destruction-in-a-remote-arizona-canyon/

**Main 2020.** Main, Douglas. "Sacred Arizona spring drying up as border wall construction continues," National Geographic. (2020). https://www.nationalgeographic.com/science/article/quitobaquito-springs-arizona-drying-up-border-wall

**Nicol 2012.** Nicol, Scott. "New Border Walls Designed to Flood Texas Towns," The Texas Observer July 11, 2012. (2012). https://www.texasobserver.org/new-border-walls-designed-to-flood-texas-towns/

**Nijhuis 2000.** Nijhuis, Michelle. "Bonfire of the Superweeds," High Country News. (2000). https://www.hcn.org/issues/issue-352/bonfire-of-the-superweeds/

**Sherriff 2021.** Sherriff, Lucy. "How the Trump border wall sapped a desert oasis dry," Popular Science. (2021). https://www.popsci.com/story/environment/border-wall-damage-water-west/

**Supply Chain Dive 2019.** Supply Chain Dive. "Truck wait times rise to 5 hours as CBP reassigns staff on US-Mexico border," Supply Chain Dive. (2019). https://www.supplychaindive.com/news/truck-wait-times-rise-US-Mexico-border-CBP/552033/

**Texas Monthly.** Texas Monthly. "The Rio Grande Valley's Natural Areas Are Being Sacrificed for the Border Wall," Texas Monthly. https://www.texasmonthly.com/travel/rio-grande-valley-border-wall/

**Washington Technology 2011.** Washington Technology. "Boeing's SBInet contract gets the axe," Washington Technology. (2011). https://www.washingtontechnology.com/2011/01/boeings-sbinet-contract-gets-the-axe/350491/

## Web pages and datasets

**ACLU-TX.** ACLU of Texas. "CBP Fatal Encounters," https://www.aclutx.org/cbp-fatal-encounters-tracker/

**AIC 2025 (fentanyl).** American Immigration Council. "Facts About Fentanyl Smuggling: Most Seizures Occur At Ports of Entry Where U.S. Citizens Are The Primary Smugglers," (2025). https://www.americanimmigrationcouncil.org/fact-sheet/fentanyl-smuggling/

**AIC 2025 (OBBBA).** American Immigration Council. "What's in the Big Beautiful Bill? Immigration & Border Security Unpacked," (2025). https://www.americanimmigrationcouncil.org/fact-sheet/big-beautiful-bill-immigration-border-security/

**Archaeology Southwest 2026.** Archaeology Southwest. "Las Playas Intaglio Destroyed During Border Wall Expansion," Archaeology Southwest. (2026). https://www.archaeologysouthwest.org/2026/05/07/las-playas-intaglio-destroyed-during-border-wall-expansion/

**Biersdorf.** Biersdorf & Associates. "Severance Damages in Eminent Domain," condemnation-law.com. https://www.condemnation-law.com/eminent-domain/severance-damages/

**BLS CFOI.** U.S. Bureau of Labor Statistics. *Census of Fatal Occupational Injuries*. https://www.bls.gov/iif/fatal-injuries-tables.htm

**BLS CPI.** U.S. Bureau of Labor Statistics. *Consumer Price Index for All Urban Consumers (CPI-U), U.S. City Average, 1982-84=100*. Bureau of Labor Statistics. https://www.bls.gov/cpi/

**Bonadio et al. 2019.** Bonadio, Barthelemy; Levchenko, Andrei; Auer, Raphael. "The Distributional Consequences of NAFTA and the 2016 US Presidential Election Vote," VoxEU / CEPR. (2019). https://cepr.org/voxeu/columns/distributional-consequences-nafta-and-2016-us-presidential-election-vote

**BTS Border Crossing 2026.** Bureau of Transportation Statistics. *Border Crossing Data Annual Release: 2025*. (2026). https://www.bts.gov/browse-statistical-products-and-data/border-crossing-data/border-crossingentry-data

**CBP 2019 (border crisis).** U.S. Customs and Border Protection. "CBP Commissioner Addresses Current Border Crisis," (2019). https://www.cbp.gov/newsroom/national-media-release/cbp-commissioner-addresses-current-border-crisis

**CBP 2019 (levee contracts).** U.S. Customs and Border Protection. "Contract Awards for New Levee Wall and Border Wall Gates in the Rio Grande Valley," U.S. Customs and Border Protection. (2019). https://www.cbp.gov/newsroom/national-media-release/contract-awards-new-levee-wall-and-border-wall-gates-rio-grande

**CBP 2019 (reassignment).** U.S. Customs and Border Protection. "Temporary re-assignment of CBP officers to Border Patrol Sectors," (2019). https://www.cbp.gov/newsroom/speeches-and-statements/temporary-re-assignment-cbp-officers-border-patrol-sectors

**CBP apprehensions FY1960-2019.** U.S. Customs and Border Protection. *U.S. Border Patrol Fiscal Year Southwest Border Sector Apprehensions (FY1960-FY2019)*. (2019). https://www.cbp.gov/document/stats/us-border-patrol-fiscal-year-southwest-border-sector-apprehensions-fy-1960-fy-2019

**CBP Big Bend Sector.** U.S. Customs and Border Protection. "Big Bend Sector Texas," U.S. Customs and Border Protection. https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/big-bend-sector-texas

**CBP Border Rescues.** U.S. Customs and Border Protection. *Border Rescues and Mortality Data*. https://www.cbp.gov/newsroom/stats/border-rescues-and-mortality-data

**CDC.** Centers for Disease Control and Prevention. "About U.S.-Mexico Border and Binational Health," https://www.cdc.gov/migration-border-health/about/about-binational-health.html

**DOTa.** U.S. Department of Transportation. *NHCCI (quarterly series open-data export)*. data.transportation.gov r94d-n4f9. https://data.transportation.gov/Research-and-Statistics/NHCCI/r94d-n4f9

**Econofact 2019.** Econofact. "The Mexican Border and U.S. Trade: What Would Be the Impact of a Border Closure?," Econofact. (2019). https://econofact.org/the-mexican-border-and-u-s-trade-what-would-be-the-impact-of-a-border-closure

**El Paso OEM 2006.** City of El Paso, Office of Emergency Management. "History" (flooding of July 27–August 4, 2006). https://elpasoready.org/history/.

**EVOSTC.** Exxon Valdez Oil Spill Trustee Council. "Settlement," https://evostc.state.ak.us/oil-spill-facts/settlement/

**FHWA.** Federal Highway Administration. *National Highway Construction Cost Index (NHCCI)*. Federal Highway Administration. https://www.fhwa.dot.gov/policy/otps/nhcci/

**Gramlich 2026.** Gramlich, John. "Migrant Encounters at the U.S.-Mexico Border Are at Their Lowest Level in More Than 50 Years," Pew Research Center. (2026). https://www.pewresearch.org/short-reads/2026/02/02/migrant-encounters-at-the-us-mexico-border-are-at-their-lowest-level-in-more-than-50-years/

**HHS OGA.** U.S. Department of Health and Human Services, Office of Global Affairs. "U.S.-Mexico Border Health Commission," https://www.hhs.gov/about/agencies/oga/about-oga/what-we-do/international-relations-division/americas/border-health-commission/index.html

**IOM.** International Organization for Migration. *Missing Migrants Project (Americas)*. https://missingmigrants.iom.int/region/americas

**Landquire.** Landquire. "Pipeline easements: reading, negotiating, and valuing land," landquire.com. https://landquire.com/en/pipeline-easements/

**No More Deaths 2025.** No More Deaths. *US-Mexico Border Death Database*. (2025). https://nomoredeaths.org/us-mexico-border-death-map/

**NOAA DARRP.** National Oceanic and Atmospheric Administration. "Deepwater Horizon (Damage Assessment, Remediation, and Restoration Program)," NOAA DARRP. https://darrp.noaa.gov/oil-spills/deepwater-horizon

**NOAA HEA.** National Oceanic and Atmospheric Administration. "Habitat Equivalency Analysis," NOAA DARRP. https://darrp.noaa.gov/economics/habitat-equivalency-analysis

**Nowrasteh 2019.** Nowrasteh, Alex. "The Cost of the Border Wall Keeps Climbing and It's Becoming Less of a Wall," Cato at Liberty (Cato Institute). (2019). https://www.cato.org/blog/cost-border-wall-keeps-climbing-its-becoming-less-wall

**NPS.** National Park Service. "Buffelgrass Management at Saguaro National Park," National Park Service. https://www.nps.gov/articles/buffelgrass-management-saguaro.htm

**Pima County OME.** Humane Borders; Pima County Office of the Medical Examiner. *Arizona OpenGIS Initiative for Deceased Migrants (Migrant Death Mapping)*. https://humaneborders.info/

**RMI.** RMI. "Embodied Carbon 101: Building Materials," https://rmi.org/embodied-carbon-101/

**Rosenberger and Loomis 2025.** Rosenberger, Randall S.; Loomis, John B. *Recreation Use Values Database*. (2025). https://recvaluation.forestry.oregonstate.edu/

**SBCC.** Southern Border Communities Coalition. "Deaths by Border Patrol," https://www.southernborder.org/deaths_by_border_patrol

**SIA 2025.** Security Industry Association. "What the One Big Beautiful Bill Act Means for the Security Industry," securityindustry.org. (2025). https://www.securityindustry.org/2025/07/15/what-the-one-big-beautiful-bill-act-means-for-the-security-industry/

**TCS.** Taxpayers for Common Sense. "Fact Sheet: Border Fence Costs Out of Bounds," Taxpayers for Common Sense. https://www.taxpayer.net/national-security/fact-sheet-border-fence-costs-out-of-bounds/

**Texas AG.** Texas Office of the Attorney General. "Landowner Compensation Program," https://www.texasattorneygeneral.gov/crime-victims/landowner-compensation-program

**Texas Comptroller 2021.** Texas Comptroller of Public Accounts. "Nature Tourism in Texas," Fiscal Notes. (2021). https://comptroller.texas.gov/economy/fiscal-notes/archive/2021/may/nature.php

**TRERC 2025.** Texas Real Estate Research Center. *Texas Rural Land Values, Region 6 (South Texas)*. Texas Real Estate Research Center at Texas A&M University. (2025). https://trerc.tamu.edu/data/rural-land/

**USGS 2023.** U.S. Geological Survey. "A decade of research reveals best practices to control highly invasive nonnative buffelgrass in the desert Southwest," (2023). https://www.usgs.gov/centers/southwest-biological-science-center/news/a-decade-research-reveals-best-practices-control

**USGS Aridlands.** U.S. Geological Survey. "Aridlands Disturbances and Restoration Ecology," USGS Western Ecological Research Center. https://www.usgs.gov/centers/werc/science/aridlands-disturbances-and-restoration-ecology

**USGS Buffelgrass FAQ.** U.S. Geological Survey. "What is buffelgrass?," U.S. Geological Survey. https://www.usgs.gov/faqs/what-buffelgrass

**USTR.** Office of the United States Trade Representative. "Mexico (Trade Summary)," https://ustr.gov/countries-regions/americas/mexico

**UTRGV.** University of Texas Rio Grande Valley. "Spanish Land Grants," Special Collections & Archives, UTRGV Library Guides. https://utrgv.libguides.com/SCA/landgrants

**APPENDIX VOLUME 2**

**DOCUMENT 3**

Declaration of Zeynep Graves in Support of Plaintiffs' Motion for Summary Judgment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION,

*Defendants.*

Case No. 3:26-cv-01099-KC

**DECLARATION OF ZEYNEP J. GRAVES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Zeynep J. Graves, declare as follows:

1. I have personal knowledge of the facts contained in this Declaration and, if called upon to do so, could and would testify competently thereto under oath.

2. I am a member in good standing of the Bar of the State of California and am admitted pro hac vice in this matter. I am a senior attorney at the Center for Biological Diversity, and represent all Plaintiffs in the above-captioned case. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment.

3. Attached hereto as **Exhibit 1** is a true and correct copy of a news article published by TIME on or about June 16, 2015, titled *Here's Donald Trump's Presidential Announcement Speech*, which is publicly available online at https://time.com/3923128/donald-trump-announcement-speech/ and was last accessed on July 17, 2026. The article quotes Donald Trump's

2015 Presidential Announcement Speech which states, in relevant part, "I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border. And I will have Mexico pay for that wall."

4. Attached hereto as **Exhibit 2** is a true and correct copy of a webpage published by The American Presidency Project on or about July 18, 2024, titled *Address Accepting the Presidential Nomination at the Republican National Convention in Milwaukee*, which is publicly available online at https://www.presidency.ucsb.edu/documents/address-accepting-the-presidential-nomination-the-republican-national-convention-milwaukee and was last accessed on July 17, 2026. The article quotes Donald Trump's Address Accepting the Presidential Nomination at the Republican National Convention in Milwaukee which states, in relevant part, "I will end the illegal immigration crisis by closing our border and finishing the wall, most of which I've already built."

5. Embedded in the Facebook webpage linked below is a video posted by Fox Business, titled *DHS Secretary Markwayne Mullin pledges to complete the border wall from the Pacific to the Gulf of America by mid-2027 as the administration ramps up construction*. The webpage reflects a posting date of May 7, 2026. The video is publicly available online at https://www.facebook.com/FoxBusiness/videos/new-dhs-secretary-markwayne-mullin-pledges-to-complete-the-border-wall-from-the-/1685170129649459/ and was last accessed on July 17, 2026. The video shows DHS Secretary Markwayne Mullin discussing the Trump Administration's border wall construction efforts and stating, in relevant part:

> The President had made it an initiative in his first term, he's made it a strong initiative to finish the wall in his second term. We're building miles of wall every single week. We expect to have the first preliminary wall put up that's going to go from the Pacific to the Gulf of America by hopefully April or June of next year. Now, we still have a secondary wall we've got build with that, but we'll be done before the President's out of office.

6. The C-SPAN webpage located at the URL below contains a video of a congressional hearing before the House Homeland Security Committee titled *Department of Homeland Security Fiscal Year 2027 Budget Request*. The video is publicly available online at https://www.c-span.org/program/house-committee/department-of-homeland-security-fiscal-year-2027-budget-request/680394 and was last accessed on July 17, 2026. In this video Defendant Secretary of Homeland Security Markwayne Mullin testified on various issues, including border wall construction. At approximately 1:17:45, Secretary Mullin states, in part:

> We are on track to have the primary wall done, completed, from the Pacific to the Gulf of America this time next year. We'll have all contracts out by the end of this month. We're having great progress. Now, the primary wall's not the secondary wall. The primary wall is the first wall up. Because of the way the cartels adjust and their criminals, and their thugs, and their terrorists, we have to push out a secondary wall because they've been going in and cutting the wall and before we can respond in some of these remote areas, they've been able to get through . . . so we're putting 150-foot, some places, sometimes it's smaller than that, for a secondary wall that they've got to go over plus a smart wall which will tell us approximately how many people are there . . . So, we're well within track . . . We'll probably complete [the secondary wall] the Summer of '28 and so all of it will be fully completed.

7. Linked below is a YouTube video posted by the Newsmax YouTube channel, titled *Markwayne Mullin: We're Building a Permanent Border Wall with Technology*, which is publicly available online at https://www.youtube.com/watch?v=5J_WTEansSE and was last accessed on July 17, 2026. The video features an interview with DHS Secretary Markwayne Mullin and shows Secretary Mullin stating, in part, at approximately 5:02:

> It will be done. So, this time next year, if we're on the track that we're projected to be and that we're currently on, this time next year, you and I can have the same meeting right here. In fact, we'll go to the wall. And the first primary, the preliminary wall, will be built from the Pacific to the Gulf of America. And then we're going to be already building the secondary wall. . . . So now we're building the primary wall with technology on it that we can see when it's being tampered with. What the secondary wall does, is it gives us time to respond as they're trying to get through the second wall. So some of those are 150 ft apart. Some are 60 ft apart.

8. Attached hereto as **Exhibit 3** is a true and correct copy of the USASPENDING.gov webpage for Contract No. Contract No. 70B01C26F00000169, awarded by the Department of Homeland Security ("DHS") to Fisher Sand & Gravel Co., which is publicly available online at: https://www.usaspending.gov/award/CONT_AWD_70B01C26F00000169_7014_70B01C26D00000012_7014 and was last accessed on July 17, 2026. The webpage reflects that the contract was for over $1.2 billion with a start date of Feb 13, 2026, and a contract description that states "BORDER WALL CONSTRUCTION - VERTICAL BARRIER, BIG BEND TEXAS SECTOR (BBT-2)."

9. Attached hereto as **Exhibit 4** is a true and correct copy of the USASPENDING.gov webpage for Contract No. Contract No. 70B01C26F00000152, awarded by DHS to Barnard Construction Co., Inc., which is publicly available online at: https://www.usaspending.gov/award/CONT_AWD_70B01C26F00000152_7014_70B01C26D00000006_7014 and was last accessed on July 17, 2026. The webpage reflects that DHS awarded over $1 billion for this contract with a start date of March 05, 2026, and a project description that states "BORDER BARRIER CONSTRUCTION IN HUDSPETH COUNTY, TX."

10. Attached hereto as **Exhibit 5** is a true and correct copy of the USASPENDING.gov webpage for Contract No. Contract No. 70B01C26F00000201, awarded by DHS to Barnard Construction Co., Inc., which is publicly available online at: https://www.usaspending.gov/award/CONT_AWD_70B01C26F00000201_7014_70B01C26D00000006_7014 and was last accessed on July 17, 2026. The webpage reflects that DHS awarded over $960.4 million for this contract with a start date of March 05, 2026, and a project description that states "BBT-3 BORDER BARRIER CONSTRUCTION PROJECT."

11. Attached hereto as **Exhibit 6** is a true and correct copy of the USASPENDING.gov webpage for Contract No. 70B01C26F00000345, awarded by DHS to Southwest Valley Constructors Co., which is publicly available online at: https://www.usaspending.gov/award/CONT_AWD_70B01C26F00000345_7014_70B01C26D00000007_7014 and was last accessed on July 17, 2026. The webpage reflects that DHS awarded over $1.7 billion for this contract with a start date of May 11, 2026, and a contract description that states "AWARD OF CONSTRUCTION TASK ORDER FOR BORDER WALL IN BIG BEND TEXAS, SEGMENT IDENTIFIED AS BBT-4."

12. Attached here to as **Exhibit 7** is a true and correct copy of the USASPENDING.gov webpage for Contract No. 70B01C26F00000405, awarded by DHS to Fisher Sand & Gravel Co., which is publicly available online at: https://www.usaspending.gov/award/CONT_AWD_70B01C26F00000405_7014_70B01C26D00000012_7014 and was last accessed on July 16, 2026. The webpage reflects that DHS awarded over $2.59 billion for this contract with a start date of June 3, 2026, and a contract description that states "BORDER BARRIER DESIGN BUILD FOR BBT-5."

13. Attached hereto as **Exhibit 8** is a true and correct copy of a National Park Service webpage, titled *Rio Grande Wild & Scenic River: Learn About the Park*, which is publicly available online at: https://www.nps.gov/rigr/learn/index.htm and was last accessed on July 17, 2026. The webpage states, in part, that "For 1,250 miles, the Rio Grande forms the boundary between the United States and Mexico."

14. Attached hereto as **Exhibit 9** is a true and correct copy of an excerpt from a Center for Big Bend Studies Advisory Council report. This report is titled *A Sampling of Archeological Resources in Big Bend National Park, Texas: Report Submitted to Big Bend National Park and the*

*Intermountain Archaeology Program National Park Service*, which is publicly available online at: https://pubs.nps.gov/eTIC/ARPO-BLCA/BIBE_155_188242_0001.pdf and last accessed on July 17, 2026. The report states, in relevant part, that Big Bend National Park contains "evidence of nearly 12,000 years of human occupation from Paleoindian to historic times" and that "a total of 2,755 sites have been recorded within the park boundaries and over 287,000 museum objects (including biological, geological, and paleontological specimens in addition to archeological materials) have been cataloged."

15. Attached hereto as **Exhibit 10** is a true and correct copy of relevant excerpts from the U.S. Department of the Interior, National Park Service's *Rio Grande Wild and Scenic River Final General Management Plan / Environmental Impact Statement*, which is publicly available online at: https://www.nps.gov/rigr/learn/management/upload/RIGR_gmp-eis.pdf and was last accessed on July 17, 2026.

16. Attached hereto as **Exhibit 11** is a true and correct copy of a U.S. Fish and Wildlife Services webpage titled *Rio Grande*, which is publicly available online at: https://www.fws.gov/rivers/river/rio-grande-texas and was last accessed on July 17, 2026. The webpage displays a map of the Rio Grande with color coded sections indicating which portions of the Rio Grande are designated as recreational, scenic, and wild.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Los Angeles, California on July 17, 2026.

Zeynep Graves

Zeynep J. Graves

**GRAVES DECLARATION**

**EXHIBIT 1**

a true and correct copy of a news article published by TIME on or about June 16, 2015, titled
*Here's Donald Trump's Presidential Announcement Speech*

SUBSCRIBE

IDEAS POLITICS

# Here's Donald Trump's Presidential Announcement Speech

ADD TIME ON GOOGLE




Donald Trump announces his candidacy for president during a rally at his Trump Tower on Fifth Avenue in New York city on Tuesday June 16, 2015. *Victor J. Blue—Bloomberg/Getty Images*

by TIME Staff

JUN 16, 2015 11:32 AM PT

Wow. Whoa. That is some group of people. Thousands.

So nice, thank you very much. That's really nice. Thank you. It's great to be at Trump Tower. It's great to be in a wonderful city, New York. And it's an honor to have everybody here. This is beyond anybody's expectations. There's been no crowd like this.

And, I can tell, some of the candidates, they went in. They didn't know the air-conditioner didn't work. They sweated like dogs.

They didn't know the room was too big, because they didn't have anybody there. How are they going to beat ISIS? I don't think it's gonna happen.

Trending Shorts

Sponsored




Deadly Heatwaves in Europe Will Occur...

Sponsored

WATCH SHORTS

Our country is in serious trouble. We don't have victories anymore. We used to have victories, but we don't have them. When was the last time anybody saw us beating, let's say, China in a trade deal? They kill us. I beat China all the time. All the time.

When did we beat Japan at anything? They send their cars over by the millions, and what do we do? When was the last time you saw a Chevrolet in Tokyo? It doesn't exist, folks. They beat us all the time.

When do we beat Mexico at the border? They're laughing at us, at our stupidity. And now they are beating us economically. They are not our friend, believe me. But they're killing us economically.

The U.S. has become a dumping ground for everybody else's problems.

Thank you. It's true, and these are the best and the finest. When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people.

But I speak to border guards and they tell us what we're getting. And it only makes common sense. It only makes common sense. They're sending us not the right people.

It's coming from more than Mexico. It's coming from all over South and Latin America, and it's coming probably— probably— from the Middle East. But we don't know. Because we have no protection and we have no competence, we don't know what's happening. And it's got to stop and it's got to stop fast.

Islamic terrorism is eating up large portions of the Middle East. They've become rich. I'm in competition with them.

They just built a hotel in Syria. Can you believe this? They built a hotel. When I have to build a hotel, I pay interest. They don't have to pay interest, because they took the oil that, when we left Iraq, I said we should've taken.

So now ISIS has the oil, and what they don't have, Iran has. And in 19— and I will tell you this, and I said it very strongly, years ago, I said— and I love the military, and I want to have the strongest military that we've ever had, and we need it more now than ever. But I said, "Don't hit Iraq," because you're going to totally destabilize the Middle East. Iran is going to take over the Middle East, Iran and somebody else will get the oil, and it turned out that Iran is now taking over Iraq. Think of it. Iran is taking over Iraq, and they're taking it over big league.

*Advertisement*

We spent $2 trillion in Iraq, $2 trillion. We lost thousands of lives, thousands in Iraq. We have wounded soldiers, who I love, I love — they're great — all over the place, thousands and thousands of wounded soldiers.

And we have nothing. We can't even go there. We have nothing. And every time we give Iraq equipment, the first time a bullet goes off in the air, they leave it.

## See the 2016 Candidates' Campaign Launches



Sen. Ted Cruz kicked off his campaign for 2016 Republican presidential nomination at Liberty University in Lynchburg, Va. on March 23. *Tom Williams—CQ-Roll Call/Getty Images*



Kentucky Sen. Rand Paul launched his bid for the Republican nomination at the Galt House Hotel in Louisville on April 7. Supporters held signs with the slogan "Defeat the Washington Machine / Unleash the American Dream." *Amy Harris—Corbis*

*Advertisement*



Former Secretary of State Hillary Clinton announced her campaign in a YouTube video posted April 12 that has been seen nearly 4.5 million times. One boy featured in the video boasted about playing a fish in a school play. *Hillary For America*




Florida Sen. Marco Rubio announced his campaign for the Republican nomination during a rally at the Freedom Tower in Miami on April 13. He took a drink of water during the speech, a callback to his State of the Union response in 2013. *Wilfredo Lee—AP*



Vermont Sen. Bernie Sanders announced his bid for the Democratic nomination across the street from the U.S. Capitol on April 30, 2015. The backdrop was unusual, since most candidates rail against Washington. *Jonathan Ernst—Reuters*

*Advertisement*



Retired neurosurgeon Ben Carson announced his bid for the Republican nomination at the Music Hall Center for the Performing Arts May 4, 2015 in Detroit, Michigan. The launch featured a gospel choir covering Eminem's "Lose Yourself." *Bill Pugliano—Getty Images*




Former Hewlett-Packard CEO Carly Fiorina announced her campaign for the Republican nomination in a conference call on May 4, then went on "Good Morning America" to talk to George Stephanopoulos. *Lou Rocco—Getty Images*




APX-V2-162

Former Arkansas Gov. Mike Huckabee announced his campaign at a community college in his hometown of Hope, Ark., on May 5. Singer Tony Orlando (right) performed. *Left: Danny Johnston; Right: Matt Sullivan—Getty Images*

*Advertisement*



Republican presidential candidate and former New York Governor George Pataki (C) greets supporters after formally announcing his candidacy for the 2016 Republican presidential nomination in Exeter, N.H. on May 28, 2015. *Dominick Reuter—Reuters*




Former Rhode Island Sen. Lincoln Chafee announces his candidacy for the democratic presidential nomination at George Mason University in Arlington, Va. on June 3, 2015. *Win McNamee—Getty Images*



Republican Senator Lindsey Graham announces his 2016 presidential candidacy in Central, S.C. on June 1, 2015. *Erik S. Lesser—EPA*

*Advertisement*




Former Maryland Governor Martin O'Malley is joined by his wife Katie O'Malley (R) as he announces his intention to seek the Democratic presidential nomination during a speech at Federal Hill Park in Baltimore on May 30, 2015. *Jim Bourg—Reuters*




Former Texas governor Rick Perry announces his candidacy for Republican presidential nominee at an event held at Addison Airport in Addison, Texas on Thursday, June 4, 2015.
*Louis DeLuca—Dallas Morning News/Corbis*




Former Florida Governor Jeb Bush waves on stage as he announces his candidacy for the Republican presidential nomination during an event at Miami-Dade College - Kendall Campus in Miami on June 15 , 2015. *Joe Raedle—Getty Images*

Advertisement




Donald Trump holds up his financial statement showing his net worth as he formally announces his campaign for the 2016 Republican presidential nomination during an event at Trump Tower in New York City on June 16, 2015. *Brendan McDermid—Reuters*



Republican presidential candidate and Louisiana Governor Bobby Jindal formally announces his campaign for the 2016 Republican presidential nomination in Kenner, La. on June 24, 2015. *Jonathan Bachman—Reuters*



Republican presidential candidate and New Jersey Governor Chris Christie formally announces his campaign for the 2016 Republican presidential nomination during a kickoff rally at Livingston High School in Livingston, N.J. on June 30, 2015. *Brendan McDermid—Reuters*

*Advertisement*



Wisconsin Governor Scott Walker greets supporters after announcing that he will seek the Republican nomination for president in Waukesha, Wis. on July 13, 2015 . *Scott Olson—Getty Images*




Ohio Governor John Kasich arrives on stage to formally announce his campaign for the 2016 Republican presidential nomination during a kickoff rally in Columbus, Ohio on July 21, 2015. *Aaron P. Bernstein—Reuters*

Last week, I read 2,300 Humvees— these are big vehicles— were left behind for the enemy. 2,000? You would say maybe two, maybe four? 2,300 sophisticated vehicles, they ran, and the enemy took them.

Last quarter, it was just announced our gross domestic product— a sign of strength, right? But not for us. It was below zero. Whoever heard of this? It's never below zero.

*Advertisement*

Our labor participation rate was the worst since 1978. But think of it, GDP below zero, horrible labor participation rate.

And our real unemployment is anywhere from 18 to 20 percent. Don't believe the 5.6. Don't believe it.

That's right. A lot of people up there can't get jobs. They can't get jobs, because there are no jobs, because China has our jobs and Mexico has our jobs. They all have jobs.

But the real number, the real number is anywhere from 18 to 19 and maybe even 21 percent, and nobody talks about it, because it's a statistic that's full of nonsense.

Our enemies are getting stronger and stronger by the way, and we as a country are getting weaker. Even our nuclear arsenal doesn't work.

It came out recently they have equipment that is 30 years old. They don't know if it worked. And I thought it was horrible when it was broadcast on television, because boy, does that send signals to Putin and all of the other people that look at us and they say, "That is a group of people, and that is a nation that truly has no clue. They don't know what they're doing. They don't know what they're doing."

Advertisement

We have a disaster called the big lie: Obamacare. Obamacare.

Yesterday, it came out that costs are going for people up 29, 39, 49, and even 55 percent, and deductibles are through the roof. You have to be hit by a tractor, literally, a tractor, to use it, because the deductibles are so high, it's virtually useless. It's virtually useless. It is a disaster.

And remember the $5 billion website? $5 billion we spent on a website, and to this day it doesn't work. A $5 billion website.

I have so many websites, I have them all over the place. I hire people, they do a website. It costs me $3. $5 billion website.

Well, you need somebody, because politicians are all talk, no action. Nothing's gonna get done. They will not bring us— believe me— to the promised land. They will not.

As an example, I've been on the circuit making speeches, and I hear my fellow Republicans. And they're wonderful people. I like them. They all want me to support them. They don't know how to bring it about. They come up to my office. I'm meeting with three of them in the next week. And they don't know— "Are you running? Are you not running? Could we have your support? What do we do? How do we do it?"

Advertisement

I like them. And I hear their speeches. And they don't talk jobs and they don't talk China. When was the last time you heard China is killing us? They're devaluing their currency to a level that you wouldn't believe. It makes it impossible for our companies to compete, impossible. They're killing us.

But you don't hear that from anybody else. You don't hear it from anybody else. And I watch the speeches.

I watch the speeches of these people, and they say the sun will rise, the moon will set, all sorts of wonderful things will happen. And people are saying, "What's going on? I just want a job. Just get me a job. I don't need the rhetoric. I want a job."

And that's what's happening. And it's going to get worse, because remember, Obamacare really kicks in in '16, 2016. Obama is going to be out playing golf. He might be on one of my courses. I would invite him, I actually would say. I have the best courses in the world, so I'd say, you what, if he wants to— I have one right next to the White House, right on the Potomac. If he'd like to play, that's fine.

Advertisement

In fact, I'd love him to leave early and play, that would be a very good thing.

But Obamacare kicks in in 2016. Really big league. It is going to be amazingly destructive. Doctors are quitting. I have a friend who's a doctor, and he said to me the other day, "Donald, I never saw anything like it. I have more accountants than I have nurses. It's a disaster. My patients are beside themselves. They had a plan that was good. They have no plan now."

We have to repeal Obamacare, and it can be— and— and it can be replaced with something much better for everybody. Let it be for everybody. But much better and much less expensive for people and for the government. And we can do it.

So I've watched the politicians. I've dealt with them all my life. If you can't make a good deal with a politician, then there's something wrong with you. You're certainly not very good. And that's what we have representing us. They will never make America great again. They don't even have a chance. They're controlled fully— they're controlled fully by the lobbyists, by the donors, and by the special interests, fully.

Advertisement

Yes, they control them. Hey, I have lobbyists. I have to tell you. I have lobbyists that can produce anything for me. They're great. But you know what? it won't happen. It won't happen. Because we have to stop doing things for some people, but for this country, it's destroying our country. We have to stop, and it has to stop now.

Now, our country needs— our country needs a truly great leader, and we need a truly great leader now. We need a leader that wrote "The Art of the Deal."

We need a leader that can bring back our jobs, can bring back our manufacturing, can bring back our military, can take care of our vets. Our vets have been abandoned.

And we also need a cheerleader.

You know, when President Obama was elected, I said, "Well, the one thing, I think he'll do well. I think he'll be a great cheerleader for the country. I think he'd be a great spirit."

He was vibrant. He was young. I really thought that he would be a great cheerleader.

Advertisement

He's not a leader. That's true. You're right about that.

But he wasn't a cheerleader. He's actually a negative force. He's been a negative force. He wasn't a cheerleader; he was the opposite.

We need somebody that can take the brand of the United States and make it great again. It's not great again.

We need— we need somebody— we need somebody that literally will take this country and make it great again. We can do that.

And, I will tell you, I love my life. I have a wonderful family. They're saying, "Dad, you're going to do something that's going to be so tough."

You know, all of my life, I've heard that a truly successful person, a really, really successful person and even modestly successful cannot run for public office. Just can't happen. And yet that's the kind of mindset that you need to make this country great again.

So ladies and gentlemen…I am officially running… for president of the United States, and we are going to make our country great again.

Advertisement

It can happen. Our country has tremendous potential. We have tremendous people.

We have people that aren't working. We have people that have no incentive to work. But they're going to have incentive to work, because the greatest social program is a job. And they'll be proud, and they'll love it, and they'll make much more than they would've ever made, and they'll be— they'll be doing so well, and we're going to be thriving as a country, thriving. It can happen.

I will be the greatest jobs president that God ever created. I tell you that.

I'll bring back our jobs from China, from Mexico, from Japan, from so many places. I'll bring back our jobs, and I'll bring back our money.

Right now, think of this: We owe China $1.3 trillion. We owe Japan more than that. So they come in, they take our jobs, they take our money, and then they loan us back the money, and we pay them in interest, and then the dollar goes up so their deal's even better.

Advertisement

How stupid are our leaders? How stupid are these politicians to allow this to happen? How stupid are they?

I'm going to tell you— thank you. I'm going to tell you a couple of stories about trade, because I'm totally against the trade bill for a number of reasons.

Number one, the people negotiating don't have a clue. Our president doesn't have a clue. He's a bad negotiator.

He's the one that did Bergdahl. We get Bergdahl, they get five killer terrorists that everybody wanted over there.

We get Bergdahl. We get a traitor. We get a no-good traitor, and they get the five people that they wanted for years, and those people are now back on the battlefield trying to kill us. That's the negotiator we have.

Take a look at the deal he's making with Iran. He makes that deal, Israel maybe won't exist very long. It's a disaster, and we have to protect Israel. But...

So we need people— I'm a free trader. But the problem with free trade is you need really talented people to negotiate for you. If you don't have talented people, if you don't have great leadership, if you don't have people that know business, not just a political hack that got the job because he made a contribution to a campaign, which is the way all jobs, just about, are gotten, free trade terrible.

Advertisement

Free trade can be wonderful if you have smart people, but we have people that are stupid. We have people that aren't smart. And we have people that are controlled by special interests. And it's just not going to work.

So, here's a couple of stories happened recently. A friend of mine is a great manufacturer. And, you know, China comes over and they dump all their stuff, and I buy it. I buy it, because, frankly, I have an obligation to buy it, because they devalue their currency so brilliantly, they just did it recently, and nobody thought they could do it again.

But with all our problems with Russia, with all our problems with everything— everything, they got away with it again. And it's impossible for our people here to compete.

So I want to tell you this story. A friend of mine who's a great manufacturer, calls me up a few weeks ago. He's very upset. I said, "What's your problem?"

He said, "You know, I make great product."

Advertisement

And I said, "I know. I know that because I buy the product."

He said, "I can't get it into China. They won't accept it. I sent a boat over and they actually sent it back. They talked about environmental, they talked about all sorts of crap that had nothing to do with it."

I said, "Oh, wait a minute, that's terrible. Does anyone know this?"

He said, "Yeah, they do it all the time with other people."

I said, "They send it back?"

"Yeah. So I finally got it over there and they charged me a big tariff. They're not supposed to be doing that. I told them."

Now, they do charge you tariff on trucks, when we send trucks and other things over there.

Ask Boeing. They wanted Boeing's secrets. They wanted their patents and all their secrets before they agreed to buy planes from Boeing.

Hey, I'm not saying they're stupid. I like China. I sell apartments for— I just sold an apartment for $15 million to somebody from China. Am I supposed to dislike them? I own a big chunk of the Bank of America Building at 1290 Avenue of the Americas, that I got from China in a war. Very valuable.

Advertisement

I love China. The biggest bank in the world is from China. You know where their United States headquarters is located? In this building, in Trump Tower. I love China. People say, "Oh, you don't like China?"

No, I love them. But their leaders are much smarter than our leaders, and we can't sustain ourself with that. There's too much— it's like— it's like take the New England Patriots and Tom Brady and have them play your high school football team. That's the difference between China's leaders and our leaders.

They are ripping us. We are rebuilding China. We're rebuilding many countries. China, you go there now, roads, bridges, schools, you never saw anything like it. They have bridges that make the George Washington Bridge look like small potatoes. And they're all over the place.

We have all the cards, but we don't know how to use them. We don't even know that we have the cards, because our leaders don't understand the game. We could turn off that spigot by charging them tax until they behave properly.

Advertisement

Now they're going militarily. They're building a military island in the middle of the South China sea. A military island. Now, our country could never do that because we'd have to get environmental clearance, and the environmentalist wouldn't let our country— we would never build in an ocean. They built it in about one year, this massive military port.

They're building up their military to a point that is very scary. You have a problem with ISIS. You have a bigger problem with China.

And, in my opinion, the new China, believe it or not, in terms of trade, is Mexico.

So this man tells me about the manufacturing. I say, "That's a terrible story. I hate to hear it."

But I have another one, Ford.

So Mexico takes a company, a car company that was going to build in Tennessee, rips it out. Everybody thought the deal was dead. Reported it in the Wall Street Journal recently. Everybody thought it was a done deal. It's going in and that's going to be it, going into Tennessee. Great state, great people.

Advertisement

All of a sudden, at the last moment, this big car manufacturer, foreign, announces they're not going to Tennessee. They're gonna spend their $1 billion in Mexico instead. Not good.

Now, Ford announces a few weeks ago that Ford is going to build a $2.5 billion car and truck and parts manufacturing plant in Mexico. $2.5 billion, it's going to be one of the largest in the world. Ford. Good company.

So I announced that I'm running for president. I would…

… one of the early things I would do, probably before I even got in— and I wouldn't even use— you know, I have— I know the smartest negotiators in the world. I know the good ones. I know the bad ones. I know the overrated ones.

You get a lot of them that are overrated. They're not good. They think they are. They get good stories, because the newspapers get buffaloed. But they're not good.

But I know the negotiators in the world, and I put them one for each country. Believe me, folks. We will do very, very well, very, very well.

Advertisement

But I wouldn't even waste my time with this one. I would call up the head of Ford, who I know. If I was president, I'd say, "Congratulations. I understand that you're building a nice $2.5 billion car factory in Mexico and that you're going to take your cars and sell them to the United States zero tax, just flow them across the border."

And you say to yourself, "How does that help us," right? "How does that help us? Where is that good"? It's not.

So I would say, "Congratulations. That's the good news. Let me give you the bad news. Every car and every truck and every part manufactured in this plant that comes across the border, we're going to charge you a 35-percent tax, and that tax is going to be paid simultaneously with the transaction, and that's it.

Now, here's what is going to happen. If it's not me in the position, it's one of these politicians that we're running against, you know, the 400 people that we're (inaudible). And here's what's going to happen. They're not so stupid. They know it's not a good thing, and they may even be upset by it. But then they're going to get a call from the donors or probably from the lobbyist for Ford and say, "You can't do that to Ford, because Ford takes care of me and I take care of you, and you can't do that to Ford."

Advertisement

And guess what? No problem. They're going to build in Mexico. They're going to take away thousands of jobs. It's very bad for us.

So under President Trump, here's what would happen:

The head of Ford will call me back, I would say within an hour after I told them the bad news. But it could be he'd want to be cool, and he'll wait until the next day. You know, they want to be a little cool.

And he'll say, "Please, please, please." He'll beg for a little while, and I'll say, "No interest." Then he'll call all sorts of political people, and I'll say, "Sorry, fellas. No interest," because I don't need anybody's money. It's nice. I don't need anybody's money.

I'm using my own money. I'm not using the lobbyists. I'm not using donors. I don't care. I'm really rich. I (inaudible).

And by the way, I'm not even saying that's the kind of mindset, that's the kind of thinking you need for this country.

So— because we got to make the country rich.

Advertisement

It sounds crass. Somebody said, "Oh, that's crass." It's not crass.

We got $18 trillion in debt. We got nothing but problems.

We got a military that needs equipment all over the place. We got nuclear weapons that are obsolete.

We've got nothing. We've got Social Security that's going to be destroyed if somebody like me doesn't bring money into the country. All these other people want to cut the hell out of it. I'm not going to cut it at all; I'm going to bring money in, and we're going to save it.

But here's what's going to happen:

After I'm called by 30 friends of mine who contributed to different campaigns, after I'm called by all of the special interests and by the— the donors and by the lobbyists— and they have zero chance at convincing me, zero— I'll get a call the next day from the head of Ford. He'll say. "Please reconsider," I'll say no.

He'll say, "Mr. President, we've decided to move the plant back to the United States, and we're not going to build it in Mexico." That's it. They have no choice. They have no choice.

*Advertisement*

There are hundreds of things like that. I'll give you another example.

Saudi Arabia, they make $1 billion a day. $1 billion a day. I love the Saudis. Many are in this building. They make a billion dollars a day. Whenever they have problems, we send over the ships. We say "we're gonna protect." What are we doing? They've got nothing but money.

If the right person asked them, they'd pay a fortune. They wouldn't be there except for us.

And believe me, you look at the border with Yemen. You remember Obama a year ago, Yemen was a great victory. Two weeks later, the place was blown up. Everybody got out— and they kept our equipment.

They always keep our equipment. We ought to send used equipment, right? They always keep our equipment. We ought to send some real junk, because, frankly, it would be— we ought to send our surplus. We're always losing this gorgeous brand-new stuff.

But look at that border with Saudi Arabia. Do you really think that these people are interested in Yemen? Saudi Arabia without us is gone. They're gone.

*Advertisement*

And I'm the one that made all of the right predictions about Iraq. You know, all of these politicians that I'm running against now— it's so nice to say I'm running as opposed to if I run, if I run. I'm running.

But all of these politicians that I'm running against now, they're trying to disassociate. I mean, you looked at Bush, it took him five days to answer the question on Iraq. He couldn't answer the question. He didn't know. I said, "Is he intelligent?"

Then I looked at Rubio. He was unable to answer the question, is Iraq a good thing or bad thing? He didn't know. He couldn't answer the question.

How are these people gonna lead us? How are we gonna— how are we gonna go back and make it great again? We can't. They don't have a clue. They can't lead us. They can't. They can't even answer simple questions. It was terrible.

But Saudi Arabia is in big, big trouble. Now, thanks to fracking and other things, the oil is all over the place. And I used to say it, there are ships at sea, and this was during the worst crisis, that were loaded up with oil, and the cartel kept the price up, because, again, they were smarter than our leaders. They were smarter than our leaders.

*Advertisement*

There is so much wealth out there that can make our country so rich again, and therefore make it great again. Because we need money. We're dying. We're dying. We need money. We have to do it. And we need the right people.

So Ford will come back. They'll all come back. And I will say this, this is going to be an election, in my opinion, that's based on competence.

Somebody said — thank you, darlin'.

Somebody said to me the other day, a reporter, a very nice reporter, "But, Mr. Trump, you're not a nice person."

That's true. But actually I am. I think I am a nice person. People that know me, like me. Does my family like me? I think so, right. Look at my family. I'm proud of my family.

By the way, speaking of my family, Melania, Barron, Kai, Donnie, Don, Vanessa, Tiffany, Evanka did a great job. Did she do a great job?

Great. Jared, Laura and Eric, I'm very proud of my family. They're a great family.

*Advertisement*

So the reporter said to me the other day, "But, Mr. Trump, you're not a nice person. How can you get people to vote for you?"

I said, "I don't know." I said, "I think that number one, I am a nice person. I give a lot of money away to charities and other things. I think I'm actually a very nice person."

But, I said, "This is going to be an election that's based on competence, because people are tired of these nice people. And they're tired of being ripped off by everybody in the world. And they're tired of spending more money on education than any nation in the world per capita, than any nation in the world, and we are 26th in the world, 25 countries are better than us in education. And some of them are like third world countries. But we're becoming a third word country, because of our infrastructure, our airports, our roads, everything. So one of the things I did, and I said, you know what I'll do. I'll do it. Because a lot of people said, "He'll never run. Number one, he won't want to give up his lifestyle."

*Advertisement*

They're right about that, but I'm doing it.

Number two, I'm a private company, so nobody knows what I'm worth. And the one thing is that when you run, you have to announce and certify to all sorts of governmental authorities your net worth.

So I said, "That's OK." I'm proud of my net worth. I've done an amazing job.

I started off— thank you— I started off in a small office with my father in Brooklyn and Queens, and my father said — and I love my father. I learned so much. He was a great negotiator. I learned so much just sitting at his feet playing with blocks listening to him negotiate with subcontractors. But I learned a lot.

But he used to say, "Donald, don't go into Manhattan. That's the big leagues. We don't know anything about that. Don't do it."

I said, "I gotta go into Manhattan. I gotta build those big buildings. I gotta do it, Dad. I've gotta do it."

And after four or five years in Brooklyn, I ventured into Manhattan and did a lot of great deals— the Grand Hyatt Hotel. I was responsible for the convention center on the west side. I did a lot of great deals, and I did them early and young. And now I'm building all over the world, and I love what I'm doing.

*Advertisement*

But they all said, a lot of the pundits on television, "Well, Donald will never run, and one of the main reasons is he's private and he's probably not as successful as everybody thinks."

So I said to myself, you know, nobody's ever going to know unless I run, because I'm really proud of my success. I really am.

I've employed— I've employed tens of thousands of people over my lifetime. That means medical. That means education. That means everything.

So a large accounting firm and my accountants have been working for months, because it's big and complex, and they've put together a statement, a financial statement, just a summary. But everything will be filed eventually with the government, and we don't [use] extensions or anything. We'll be filing it right on time. We don't need anything.

And it was even reported incorrectly yesterday, because they said, "He had assets of $9 billion." So I said, "No, that's the wrong number. That's the wrong number. Not assets."

Advertisement

So they put together this. And before I say it, I have to say this. I made it the old-fashioned way. It's real estate. You know, it's real estate.

It's labor, and it's unions good and some bad and lots of people that aren't in unions, and it's all over the place and building all over the world.

And I have assets— big accounting firm, one of the most highly respected— 9 billion 240 million dollars.

And I have liabilities of about $500 million. That's long-term debt, very low interest rates.

In fact, one of the big banks came to me and said, "Donald, you don't have enough borrowings. Could we loan you $4 billion"? I said, "I don't need it. I don't want it. And I've been there. I don't want it."

But in two seconds, they give me whatever I wanted. So I have a total net worth, and now with the increase, it'll be well-over $10 billion. But here, a total net worth of—net worth, not assets, not— a net worth, after all debt, after all expenses, the greatest assets— Trump Tower, 1290 Avenue of the Americas, Bank of America building in San Francisco, 40 Wall Street, sometimes referred to as the Trump building right opposite the New York— many other places all over the world.

Advertisement

So the total is $8,737,540,00.

Now I'm not doing that...

I'm not doing that to brag, because you know what? I don't have to brag. I don't have to, believe it or not.

I'm doing that to say that that's the kind of thinking our country needs. We need that thinking. We have the opposite thinking.

We have losers. We have losers. We have people that don't have it. We have people that are morally corrupt. We have people that are selling this country down the drain.

So I put together this statement, and the only reason I'm telling you about it today is because we really do have to get going, because if we have another three or four years— you know, we're at $8 trillion now. We're soon going to be at $20 trillion.

According to the economists— who I'm not big believers in, but, nevertheless, this is what they're saying— that $24 trillion— we're very close— that's the point of no return. $24 trillion. We will be there soon. That's when we become Greece. That's when we become a country that's unsalvageable. And we're gonna be there very soon. We're gonna be there very soon.

*Advertisement*

So, just to sum up, I would do various things very quickly. I would repeal and replace the big lie, Obamacare.

I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border. And I will have Mexico pay for that wall.

Mark my words.

Nobody would be tougher on ISIS than Donald Trump. Nobody.

I will find — within our military, I will find the General Patton or I will find General MacArthur, I will find the right guy. I will find the guy that's going to take that military and make it really work. Nobody, nobody will be pushing us around.

I will stop Iran from getting nuclear weapons. And we won't be using a man like Secretary Kerry that has absolutely no concept of negotiation, who's making a horrible and laughable deal, who's just being tapped along as they make weapons right now, and then goes into a bicycle race at 72 years old, and falls and breaks his leg. I won't be doing that. And I promise I will never be in a bicycle race. That I can tell you.

*Advertisement*

I will immediately terminate President Obama's illegal executive order on immigration, immediately.

Fully support and back up the Second Amendment.

Now, it's very interesting. Today I heard it. Through stupidity, in a very, very hard core prison, interestingly named Clinton, two vicious murderers, two vicious people escaped, and nobody knows where they are. And a woman was on television this morning, and she said, "You know, Mr. Trump," and she was telling other people, and I actually called her, and she said, "You know, Mr. Trump, I always was against guns. I didn't want guns. And now since this

happened"— it's up in the prison area— "my husband and I are finally in agreement, because he wanted the guns. We now have a gun on every table. We're ready to start shooting."

I said, "Very interesting."

So protect the Second Amendment.

End— end Common Core. Common Core should— it is a disaster. Bush is totally in favor of Common Core. I don't see how he can possibly get the nomination. He's weak on immigration. He's in favor of Common Core. How the hell can you vote for this guy? You just can't do it. We have to end education has to be local.

Advertisement

Rebuild the country's infrastructure.

Nobody can do that like me. Believe me. It will be done on time, on budget, way below cost, way below what anyone ever thought.

I look at the roads being built all over the country, and I say I can build those things for one-third. What they do is unbelievable, how bad.

You know, we're building on Pennsylvania Avenue, the Old Post Office, we're converting it into one of the world's great hotels. It's gonna be the best hotel in Washington, D.C. We got it from the General Services Administration in Washington. The Obama administration. We got it. It was the most highly sought after— or one of them, but I think the most highly sought after project in the history of General Services. We got it. People were shocked, Trump got it.

Well, I got it for two reasons. Number one, we're really good. Number two, we had a really good plan. And I'll add in the third, we had a great financial statement. Because the General Services, who are terrific people, by the way, and talented people, they wanted to do a great job. And they wanted to make sure it got built.

Advertisement

So we have to rebuild our infrastructure, our bridges, our roadways, our airports. You come into La Guardia Airport, it's like we're in a third world country. You look at the patches and the 40-year-old floor. They throw down asphalt, and they throw.

You look at these airports, we are like a third world country. And I come in from China and I come in from Qatar and I come in from different places, and they have the most incredible airports in the world. You come to back to this country and you have LAX, disaster. You have all of these disastrous airports. We have to rebuild our infrastructure.

Save Medicare, Medicaid and Social Security without cuts. Have to do it.

Get rid of the fraud. Get rid of the waste and abuse, but save it. People have been paying it for years. And now many of these candidates want to cut it. You save it by making the United States, by making us rich again, by taking back all of the money that's being lost.

*Advertisement*

Renegotiate our foreign trade deals.

Reduce our $18 trillion in debt, because, believe me, we're in a bubble. We have artificially low interest rates. We have a stock market that, frankly, has been good to me, but I still hate to see what's happening. We have a stock market that is so bloated.

Be careful of a bubble because what you've seen in the past might be small potatoes compared to what happens. So be very, very careful.

And strengthen our military and take care of our vets. So, so important.

Sadly, the American dream is dead.

But if I get elected president I will bring it back bigger and better and stronger than ever before, and we will make America great again.

Thank you. Thank you very much.

*Read next: How Donald Trump Stole Jeb Bush's Moment*

*Listen to the most important stories of the day.*

Sections

Home
Climate
Politics
Ideas
Health
Entertainment
AI
Sports
World
Technology

Business

Newsletters

Science

## More

The TIME Vault

TIME Studios

TIME Africa

Video

TIME France

Red Border

TIME For Kids

Supplied Partner Content

TIME Futures

## About Us

Our Mission

Masthead

Contact the Editors

Careers

Press Room

Site Map

Media Kit

Modern Slavery Statement

Reprints & Permissions

## Your Subscriptions

Subscribe

Buy an Issue

Access My Digital Magazine

Shop the Cover Store

Manage My Subscription

Give a Gift

Global Help Center

© 2026 TIME USA, LLC. All Rights Reserved. Use of this site constitutes acceptance of our NEW Terms of Service, Privacy Policy and Do Not Sell or Share My Personal Information.

TIME may receive compensation for some links to products and services on this website. Offers may be subject to change without notice.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

**<u>GRAVES DECLARATION</u>**

**EXHIBIT 2**

A true and correct copy of a webpage published by The American Presidency Project on or about July 18, 2024, titled *Address Accepting the Presidential Nomination at the Republican National Convention in Milwaukee*

# Address Accepting the Presidential Nomination at the Republican National Convention in Milwaukee, Wisconsin

Thank you very much. Thank you very, very much. And thank you, Dana. Thank you, Kid Rock, sometimes referred to as "Bob." And thank you, Lee, right from the beginning, thank you very much. What a talent. What a beautiful, beautiful song. Thank you.

Friends, delegates and fellow citizens. I stand before you this evening with a message of confidence, strength and hope. Four months from now, we will have an incredible victory, and we will begin the four greatest years in the history of our country.

Together, we will launch a new era of safety, prosperity and freedom for citizens of every race, religion, color and creed.

The discord and division in our society must be healed. We must heal it quickly. As Americans, we are bound together by a single fate and a shared destiny. We rise together. Or we fall apart.

I am running to be president for all of America, not half of America, because there is no victory in winning for half of America.

So tonight, with faith and devotion, I proudly accept your nomination for president of the United States. Thank you. Thank you very much.

Thank you very much. And we will do it right. We're going to do it right.

Let me begin this evening by expressing my gratitude to the American people for your outpouring of love and support following the assassination attempt at my rally on Saturday.

As you already know, the assassin's bullet came within a quarter of an inch of taking my life. So many people have asked me what happened. "Tell us what happened, please." And therefore, I will tell you exactly what happened, and you'll never hear it from me a second time, because it's actually too painful to tell.

It was a warm, beautiful day in the early evening in Butler Township in the great Commonwealth of Pennsylvania. Music was loudly playing, and the campaign was doing really well. I went to the stage and the crowd was cheering wildly. Everybody was happy. I began speaking very strongly, powerfully and happily. Because I was discussing the great job my administration did on immigration at the southern border. We were very proud of it.

Behind me, and to the right, was a large screen that was displaying a chart of border crossings under my leadership. The numbers were absolutely amazing. In order to see the chart, I started to, like this, turn to my right, and was ready to begin a little bit further turn, which I'm very lucky I didn't do, when I heard a loud whizzing sound and felt something hit me really, really hard. On my right ear. I said to myself, "Wow, what was that? It can only be a bullet."

And moved my right hand to my ear, brought it down. My hand was covered with blood. Just absolutely blood all over the place. I immediately knew it was very serious. That we were under attack. And in one movement proceeded to drop to the ground. Bullets were continuing to fly as very brave Secret Service agents rushed to the stage. And they really did. They rushed to the stage.

These are great people at great risk, I will tell you, and pounced on top of me so that I would be protected. There was blood pouring everywhere, and yet in a certain way I felt very safe because I had God on my side. I felt that.

The amazing thing is that prior to the shot, if I had not moved my head at that very last instant, the assassin's bullet would have perfectly hit its mark and I would not be here tonight. We would not be together. The most incredible aspect of what took place on that terrible evening, in the fading sun, was actually seen later. In almost all cases, as you probably know. And when even a single bullet is fired, just a single bullet, and we had many bullets that were being fired, crowds run for the exits or stampede. But not in this case. It was very unusual.

This massive crowd of tens of thousands of people stood by and didn't move an inch. In fact, many of them bravely but automatically stood up, looking for where the sniper would be. They knew immediately that it was a sniper. And then began pointing at him. You can see that if you look at the group behind me. That was just a small group compared to what was in front.

Nobody ran and, by not stampeding, many lives were saved. But that isn't the reason that they didn't move. The reason is that they knew I was in very serious trouble. They saw it. They saw me go down. They saw the blood, and thought, actually most did, that I was dead.

They knew it was a shot to the head. They saw the blood. And there's an interesting statistic. The ears are the bloodiest part. If something happens with the ears they bleed more than any other part of the body. For whatever reason the doctors told me that.

And I said, "Why is there so much blood?"

He said, "It's the ears, they bleed more."

So we learned something. But they just —

They just, this beautiful crowd, they didn't want to leave me. They knew I was in trouble. They didn't want to leave me. And you can see that love written all over their faces. True.

Incredible people. They're incredible people. Bullets were flying over us, yet I felt serene. But now the Secret Service agents were putting themselves in peril. They were in very dangerous

territory.

Bullets were flying right over them, missing them by a very small amount of inches. And then it all stopped. Our Secret Service sniper, from a much greater distance and with only one bullet used, took the assassin's life. Took him out.

I'm not supposed to be here tonight. Not supposed to be here.

[*Crowd chants "Yes, you are."*]

Thank you. But I'm not. And I'll tell you. I stand before you in this arena only by the grace of almighty God.

And watching the reports over the last few days, many people say it was a providential moment. Probably was. When I rose, surrounded by Secret Service, the crowd was confused because they thought I was dead. And there was great, great sorrow. I could see that on their faces as I looked out. They didn't know I was looking out; they thought it was over.

But I could see it and I wanted to do something to let them know I was OK. I raised my right arm, looked at the thousands and thousands of people that were breathlessly waiting and started shouting, "Fight, fight, fight."

Thank you.

Once my clenched fist went up, and it was high into the air, you've all seen that, the crowd realized I was OK and roared with pride for our country like no crowd I have ever heard before. Never heard anything like it.

For the rest of my life, I will be grateful for the love shown by that giant audience of patriots that stood bravely on that fateful evening in Pennsylvania. Tragically, the shooter claimed the life of one of our fellow Americans: Corey Comperatore. Unbelievable person, everybody tells me. Unbelievable.

And seriously wounded two other great warriors. Spoke to them today: David Dutch and James Copenhaver. Two great people. I also spoke to all three families of these tremendous people.

Our love and prayers are with them and always will be. We're never going to forget them. They came for a great rally. They were serious Trumpsters, I want to tell you. They were serious Trumpsters and still are. But Corey, unfortunately, we have to use the past tense.

He was incredible. Yeah. He was a highly respected former fire chief. Respected by everybody. Was accompanied by his wife, Helen. Incredible woman. I spoke to her today. Devastated. And two precious daughters. He lost his life selflessly acting as a human shield to protect them from flying bullets. He went right over the top of them and was hit. What a fine man he was.

I want to thank the fire department and the family for sending his helmet, his outfit and it was just something, and they're going to do something very special when they get it.

But we did something which cannot match what happened. Not even close. But I am very proud to say that over the past few days we've raised $6.3 million. For the families of David, James and Corey. Including from a friend of mine just — called up, he sent me a check, right here, just got it. One million dollars. From Dan Newlin, thank you, Dan.

And again, when speaking to the family, I told them, I said, "Well, I'm going to be sending a lot of money, but it can't compensate."

They all said the same thing: "You're right, sir; we appreciate so much what you're doing, but nothing can take the place, in the case of Corey." And the other two. By the way, they were very, very seriously injured. But now they're doing very well. They're going to be OK. They're going to be doing very well. They're warriors.

So now, I ask that we observe a moment of silence in honor of our friend Corey. There is no greater love than to lay down one's life for others. This is the spirit that forged America in her darkest hours. And this is the love that will lead America back to the summit of human achievement and greatness. This what we need.

Despite such a heinous attack, we unite this evening, more determined than ever. I am more determined than ever and so are you. So is everybody in this room.

[*Crowd chants, "We love Trump."*]

Thank you. Thank you very much. Our resolve is unbroken and our purpose is unchanged, to deliver a government that serves the American people better than ever before. Nothing will stop me in this mission, because our vision is righteous and our cause is pure.

No matter what obstacle comes our way, we will not break. We will not bend. We will not back down and I will never stop fighting for you, your family and our magnificent country. Never.

And everything I have to give with all of the energy and fight in my heart and soul, I pledge to our nation tonight. Thank you very much. I pledge that to our nation. We're going to turn our nation around and we're going to do it very quickly. Thank you.

This election should be about the issues facing our country and how to make America successful, safe, free and great again.

In an age when our politics too often divide us, now is the time to remember that we are all fellow citizens — we are one nation under God, indivisible, with liberty and justice for all.

And we must not criminalize dissent or demonize political disagreement, which is what's been happening in our country lately, at a level that nobody has ever seen before. In that spirit, the Democrat party should immediately stop weaponizing the justice system and labeling their political opponent as an enemy of democracy. Especially since that is not true. In fact, I am the one saving democracy for the people of our country.

And very big news, as you probably just read. On Monday, a major ruling was handed down from a highly respected federal judge in Florida, Aileen Cannon, finding that the prosecutor

and the fake documents case against me were totally unconstitutional, and the entire case was thrown out of court. With all of that publicity — thrown out of court.

If Democrats want to unify our country, they should drop these partisan witch hunts, which I've been going through for approximately eight years. And they should do that without delay and allow an election to proceed that is worthy of our people. We're going to win it anyway.

But worthy of our people.

On this journey, I am deeply honored to be joined by my amazing wife, Melania. And, Melania, thank you very much. You also did something really beautiful, a letter to America calling for national unity. And it really took the Republican Party by surprise, I will tell you; it was beautiful. In fact, some very serious people said that we should take that letter and put it as part of the Republican platform. That would be an honor, wouldn't it? Right? Mr. congressman? But it captivated so many, so ...

I also want to thank my entire family — Don and Kimberly, Ivanka and Jared, Eric and Lara, Tiffany and Michael, Barron, we love our Barron. And of course, my 10 wonderful grandchildren.

You saw a few of them up there on my lap before. And how good was Dana? Was Dana good? I mean, wasn't he good? You know, he was on probably the only vacation he's had in about — maybe ever. Because he works. But about 10 years, with his wife — very far away. I won't tell you where, but very, very far away, beautiful place.

And my people called and he said, "Yeah, I won't be able to do it. This is many, many years. I promised my wife. I can't do it." And they came and they said, "Dana won't be able to do it." Because he was my first, second and third choice. I said, "Well, you know, that's too bad." But I understand, he's away and it's good. It's good for him. And that was it. About 30 minutes later, she came back in: "Sir, Dana just called; he's going to do it." And his wife, she said, "You can't turn him down. You just can't do it. You have to go." That's a good wife.

So he got in a plane, he got here a little while ago. Now he's going to get on the plane in a little while and he's going to go back home to his wife. But they're great. And I just want to thank her and him and their whole family because that's not easy.

And Kid Rock, same thing. Called, he said, "I want to be a part of it." I want to be a part, because, you know, Kid does this great song. Big, big monster song. I had no idea. You know, he became a friend of mine over the last 10 years. And, uh, he's amazing. Everyone loves him.

I didn't even know how big he was. You know, he has rallies. Thirty-five, 40,000 people he gets, every time he goes out. I think he's making so much money he doesn't know what the hell to do with it, you want to know ...

And then we have my other friend, and I've known him so long and we took that song and it was a big success. But we made that. I saw a chart of great songs to America. That was No. 1 on the chart recently. No. 1, so. That's Lee Greenwood, very special, beautiful person. He's a beautiful man.

But they all wanted to be here. They called ... And how about the Hulkster? How good was he? You see that? Where is he? Boy, oh boy.

You know, they may call it, they may call that entertainment. I know about entertainment, but when he used to lift a 350-pound man over his shoulders and then bench press him two rows into the audience, I say maybe entertainment, but he is one strong son of a gun, I tell you. I watched it many times. There aren't a lot of entertainers that could do that, right? You were fantastic. Thank you very much.

Followed by ... Eric? What was that all about? Boy, that was good. I didn't want to really come up here.

But he was so great. And he's such a good young man. He went through a lot of trouble, and Don, last night, was incredible. They went through so much trouble. They got subpoenaed more than any people probably in the history of the United States. Every week they get another subpoena from the Democrats. Crazy Nancy Pelosi, the whole thing. Just boom, boom, boom.

They've got to stop that because they're destroying our country. We have to work on making America great again, not on beating people. And we won. We beat them in all. We beat them on the impeachments. We beat them on the indictments. We beat them. But the time that you have to spend, the time that you have to spend. If they would devote that genius to helping our country, we'd have a much stronger and better country.

And Jason. The biggest star in country music. Jason, thank you for being here. Jason, thank you very much. Jason Aldean, he's good. I like his wife even better, by the way. She's here. Thank you, Jason.

But I'm thrilled to have a new friend and partner fighting by my side: the next vice president of the United States, the current senator from Ohio, J.D. Vance, and his incredible wife, Usha.

He's going to be a great vice president, he's going to be great. He'll be with this country and with this movement. Greatest movement in the history of our country. Make America Great Again. When they criticize it, they say, "We're going to try and stop MAGA." MAGA is "Make America Great Again." What are you going to stop? There's nothing to stop. Then they say, "Oh, that's right." It's very tough to fight it.

And all of the people that did try and fight it have failed, but he's going to be with us for a long time, and it was an honor to select him. Great, great student at Yale. His wife was a student at Yale; they met at Yale. These are two smart people. So J.D., you're going to be doing this for a long time; enjoy the ride.

And a very special thank you to the extraordinary people of Milwaukee and the great state of — oh, there they are. There they are, that's — You are so easy to spot. And Green Bay's going to have a good team this year, right? They're going to have a good team. They're going to have a good team. Most of the audience doesn't like it, but it's true. You're going to have a very good team this year.

And by the way, Wisconsin, we are spending over $250 million here, creating jobs and other economic ... development all over the place. So I hope you will remember this in November and give us your vote. I am trying to buy your vote. I'll be honest about that. And I promise we will make Wisconsin great again. We're going to make this ... Thank you. Mr. governor, thank you very much. Thank you.

I am here tonight to lay out a vision for the whole nation. To every citizen, whether you're a young or old, man or woman, Democrat, Republican or Independent, Black or white, Asian or Hispanic, I extend to you a hand of loyalty and of friendship.

Together, we will lead America to new heights of greatness like the world has never seen before.

We were right there in the first term. We got hit with Covid. We did a great job. Nobody knew what it was. But nobody's ever seen an economy pre-Covid, and then we handed over a stock market that was substantially higher than just prior to Covid. Coming in, did a great job. Never got credit for that. We got credit for the war and defeating ISIS and so many things. The great economy. The biggest tax cuts ever. The biggest regulation cuts ever. The creation of Space Force, the rebuilding of our military. We did so much. We do so much.

Right to Try, Right to Try is a big deal. We've got Right to Try. They were trying to get that for 52 years. Somebody's terminally ill. And hopefully there's nobody in this audience, but it does happen, a lot. They're terminally ill and they can't use our new space-age drugs and other things that we are way ahead with. We have the greatest doctors in the world. The greatest laboratories in the world, and you can't do it. They've been trying to get that approved for 52 years, wasn't that easy. The insurance companies didn't want to do it. They didn't want the risk. The labs didn't want to do it because if it didn't work, people are pretty far down the line toward death. They didn't want to do it. The doctors didn't want to have it on their record.

So I got everybody into an office — 52 years, they tried. Sounds simple, but it's not. And I got them to agree that somebody that needs it will, instead of going to Asia or Europe or some place, or if you have no money, going home and dying — just die — we got them to sign an agreement. They agreed to it, where they're not going to sue anybody. They can get all of this stuff. They're going to get it really fast, and what's happened is we're saving thousands and thousands of lives. It's incredible. Right to Try. It's ... great feeling.

Under our leadership, the United States will be respected again. No nation will question our power. No enemy will doubt our might. Our borders will be totally secure. Our economy will soar. We will return law and order to our streets, patriotism to our schools, and importantly, we will restore peace, stability and harmony all throughout the world.

But to achieve this future, we must first rescue our nation from failed and even incompetent leadership. We have totally incompetent leadership. This will be the most important election in the history of our country.

Under the current administration, we are indeed a nation in decline.

We have an inflation crisis that is making life unaffordable, ravaging the incomes of working and low-income families, and crushing, just simply crushing our people like never before. They've never seen anything like it.

We also have an illegal immigration crisis, and it's taking place right now, as we sit here in this beautiful arena. It's a massive invasion at our southern border that has spread misery, crime, poverty, disease, and destruction to communities all across our land. Nobody's ever seen anything like it.

Then there is an international crisis, the likes of which the world has seldom been part of. Nobody can believe what's happening. War is now raging in Europe and the Middle East, a growing specter of conflict hangs over Taiwan, Korea, the Philippines, and all of Asia, and our planet is teetering on the edge of World War III, and this will be a war like no other war because of weaponry. The weapons are no longer army tanks going back and forth, shooting at each other. These weapons are obliteration.

It's time for a change. This administration can't come close to solving the problems. We're dealing with very tough, very fierce people. They're fierce people. And we don't have fierce people. We have people that are a lot less than fierce, except when it comes to cheating on elections and a couple of other things, then they're fierce. Then they're fierce.

So tonight, I make this pledge to the great people of America.

I will end the devastating inflation crisis immediately, bring down interest rates and lower the cost of energy . We will drill, baby, drill. Can you believe what they're doing?

But by doing that, we will lead a large-scale decline in prices. Prices will start to come down.

Energy... Raised it, they took our energy policies and destroyed them. Then they immediately went back to them, but by that time, so much was lost. But we will do it at levels that nobody's ever seen before, and we'll end lots of different things. We'll start paying off debt and start lowering taxes even further. We gave you the largest tax cut. We'll do it more.

Now, people don't realize, I brought taxes way down, way, way down. And yet we took in more revenues the following year than we did when the tax rate was much higher. Most people said, how did you do that? Because it was incentive. Everybody was coming to the country, they were bringing back billions and billions of dollars into our country. The companies made it impossible to bring it back. The tax rate was too high and the legal complications were far too great. I changed both of them, and hundreds of billions of dollars by Apple and so many other companies would work back into our nation, and we had an economy the likes of which nobody, no nation had ever seen. China, we were beating them at levels that were incredible. And they know it. They know it. We'll do it again, but we'll do it even better.

I will end the illegal immigration crisis by closing our border and finishing the wall, most of which I've already built.

On the wall, we were dealing with a very difficult Congress and I said, "Oh, that's OK. We won't go to Congress." I call it an "invasion." We gave our military almost $800 billion. I said, "I'm going to take a little of that money, because this is an 'invasion.'" And we built — Most of the wall is already built, and we built it through using the funds, because what's more, what's better than that? We have to stop the invasion into our country that's killing hundreds of thousands of people a year. We're not going to let that happen.

I will end every single international crisis that the current administration has created, including the horrible war with Russia and Ukraine, which would have never happened if I was president. And the war caused by the attack on Israel, which would never have happened if I was president. Iran was broke. Iran had no money. Now Iran has $250 billion. They made it all over the last two and a half years. They were broke.

I watched the other day on a show called "Deface the Nation," has anyone seen it? And they had a congressman who was a Democrat say, Well, whether you like him or not, Iran was broke dealing with Trump. I told China and other countries, "If you buy from Iran, we will not let you do any business in this country, and we will put tariffs on every product you do send in of 100 percent or more." And they said to me, Well, I think that's about it. They weren't going to buy any oil. And they were ready to make a deal. Iran was going to make a deal with us.

And then we had that horrible, horrible result that we'll never let happen again. The election result. We're never going to let that happen again. They used Covid to cheat. We're never going to let it happen again. And they took off all the sanctions, and they did everything possible for Iran and now Iran is very close to having a nuclear weapon, which would have never happened.

This is a shame, what this administration, the damage that this administration has done. And I say it often. If you took the 10 worst presidents in the history of the United States. Think of it. The 10 worst. Added them up, they will not have done the damage that Biden has done. Only going to use the term once. Biden. I'm not going to use the name anymore. Just one time. The damage that he's done to this country is unthinkable. It's unthinkable.

Together, we will restore vision, strength, competence and we're going to have a thing called common sense making most of our decisions actually. It's all common sense.

Just a few short years ago under my presidency, we had the most secure border and the best economy in the history of our country, in the history of the world. We had the greatest economy in the history of the world. We had never done anything like it. We were beating every country, including China, by leaps and bounds. Nobody had seen anything like it.

We had no inflation, soaring incomes, we're going —

Nobody's —

Nobody can believe it. You can't believe what happened four years ago is happening now in reverse.

And the world was at peace. Inflation has been a killer for our country. No matter what you're making, it doesn't matter because inflation is eating you alive. People that were putting away money, they were making great wages. The highest they've ever made. But they were putting away a lot of money. Now they are just being destroyed. They're not putting away anything. They're barely living. They're going into saving accounts. They're taking out their money to live because of inflation.

Inflation, remember, it's called a country buster. You can go back to Germany from 100 years ago. You can go back to any country that's suffered great inflation. We've suffered the worst inflation we've ever had. But go back and see what's happened to those countries. We've had the worst inflation we've ever had under this person.

But in less than four years, our opponents have turned incredible success into unparalleled tragedy and failure. It's been a tremendous failure.

Today, our cities are flooded with illegal aliens. Americans are being squeezed out of the labor force and their jobs are taken. By the way, you know who's taking the jobs, the jobs that are created? One hundred and seven percent of those jobs are taken by illegal aliens.

And you know who's being hurt the most by millions of people pouring into our country? The Black population and the Hispanic population. Because they're taking the jobs from our Black population, our Hispanic population. And they're also taking them from unions. The unions are suffering because of it.

Thank you. Thank you. I like you too. Thank you very much.

Inflation has wiped out the life savings of our citizens, and forced the middle class into a state of depression and despair. That's what it is. It's despair and depression.

We cannot, and will not, let this continue. Less than four years ago, we were a great nation, and we will soon be a great nation again. We're going to be a great nation again. Thank you.

With proper leadership, every disaster we are now enduring will be fixed — and it will be fixed very, very quickly.

So tonight, whether you've supported me in the past or not, I hope you will support me in the future, because I will bring back the American dream. That's what we're going to do. You don't even hear about the American dream anymore.

With great humility, I am asking you to be excited about the future of our country. Be excited. Be excited.

And by the way, the news reports. All, look at all of those big networks. Look at them. They're all here. But everyone one of them has said this could be the most organized, best run and most enthusiastic convention of either party that they've ever seen. Every single one.

And it's true. It's true. And there's love in the room. There's great love in the room.

So I'd better finish strong. Otherwise, we'll blow it, and we can't let that happen. No, this was great. All of the great people that spoke and everybody hit a home run. I mean, there's not one that I can think of where I said, "Oh, gee, that wasn't great." Every single person. I refuse to be the only one. Don't do that to me. They're already getting ready. See, I gave them an idea.

No, we had a, this was a great convention. This was —

I think we're actually going to go home and miss it. You know usually with a —

First of all, look at these crowds. You'd never have this at a convention. Look at these crowds. Love, it's about love.

This week, the entire Republican Party has formally adopted an agenda for America's renewal. And you saw that agenda, and it's very short compared to the long, boring, meaningless agendas of the past. Including the Democrats. They write these things that are hundreds of pages long and they never read them after they're done. In their case, fortunately they don't read them because they're pretty bad.

It's a series of bold promises that we will swiftly implement when you give us a Republican House. And Mr. Speaker, thank you very much. We have our great speaker of the House with us tonight. Mr. Speaker, thank you very much. Thank you.

A Republican Senate. We have many senators here. And send me back to our beautiful White House just a few short months from now. We're talking about just months. It can't come fast enough. We have to get it done.

First, we must get economic relief to our citizens. Starting on Day 1, we will drive down prices and make America affordable again. We have to make it affordable. It's not affordable. People can't live like this.

Under this administration, our current administration, groceries are up 57 percent, gasoline is up 60 and 70 percent, mortgage rates have quadrupled, and the fact is it doesn't matter what they are because you can't get the money anyway. Can't buy houses. Young people can't get any financing to buy a house. The total household costs have increased an average of $28,000 per family under this administration.

Republicans have a plan to bring down prices, and bring them down very, very rapidly. By slashing energy costs, we will in turn reduce the cost of transportation, manufacturing and all household goods. So much starts with energy. And remember, we have more liquid gold under our feet than any other country by far. We are a nation that has the opportunity to make an absolute fortune with its energy. We have it and China doesn't. Under the Trump administration just three and a half years ago, we were energy independent. But soon we will actually be better than that. We will be energy dominant and supply not only ourselves, but we will supply the rest of the world.

With numbers that nobody has ever seen and we will reduce our debt, $36 trillion. We will start reducing that. And we will also reduce your taxes still further. Next, and by the way they

want to raise your taxes four times. Think of it. And all my life I grew up watching politicians. I always loved politics, I guess. I was on the other side. I'd watch the — and they were always talking about we will give you a tax cut, we will give you a tax cut. My whole life I was watching I will give you a tax cut, right Mr. Congressman? That's all they talked about. This is the only administration that said we're going to raise your taxes by four times what you're paying now. And people are supposed to vote for them? I've never heard it. You're paying too much, we're going to reduce your taxes still further. We gave you the biggest one, as I said. We're going to give you more and it's going to lead to tremendous growth. We want growth in our country. That's what's going to pay off our debt.

And next, we will end the ridiculous and actually incredible waste of taxpayer dollars that is fueling the inflation crisis. They've spent trillions of dollars of things having to do with the Green New Scam. It's a scam. And that has caused tremendous inflationary pressures in addition to the cost of energy.

And all of the trillions of dollars that are sitting there not yet spent, we will redirect that money for important projects like roads, bridges, dams and we will not allow it to be spent on the meaningless Green New scam ideas.

And I will end the electric vehicle mandate on day one. Thereby saving the U.S. auto industry from complete obliteration, which is happening right now and saving U.S. customers thousands and thousands of dollars per car.

And right now as we speak, large factories, just started, are being built across the border in Mexico. So, with all the other things happening at our border, and they're being built by China to make cars and to sell them into our country, no tax, no anything. The United Autoworkers ought to be ashamed for allowing this to happen and the leader of the United Auto Workers should be fired immediately and every single autoworker, union and nonunion, should be voting for Donald Trump because we're going to bring back car manufacturing and we're going to bring it back fast.

They are building some of the largest auto plants anywhere in the world. Think of it. In the world. And we are going to bring it back. We're going to make them. We don't mind the —

We don't mind it happening but plants will be built in the United States and our people are going to man those plants. And if they don't agree with us, we'll put a tariff of approximately 100 to 200 percent on each car and they will be unsellable in the United States.

We have long been taken advantage of by other countries. And think of it, oftentimes these other countries are considered so-called allies. They've taken advantage of us for years.

We lose jobs. We lose revenue and they gain everything and wipe out our businesses, wipe out our people. I stopped it for four years, I stopped it. And we're really ready to make changes like nobody had seen before. And remember, U.S.M.C.A. I got rid of NAFTA the worst trade deal ever made and replaced it with U.S.M.C.A. which is, they say, the best trade deal ever made. Actually, probably the best trade deal was the deal I made with China where they buy $50 billion of our product. They were buying nothing. They buy $50 billion worth. They

had to but I don't even talk about it because of Covid. I don't even mention it frankly because of what happened with the China virus.

We will not let countries come in, take our jobs, and plunder our nation. They come and do that. They plunder our nation.

The way they will sell their product in America is to build it in America, very simple. Build it in America and only in America. And this very simple formula, and congress has to go along with us and they will. This very simple formula will create massive numbers of jobs. We will take over the auto industry again and many many, hundreds of thousands of jobs, we lost so many jobs over the years. If you go back 20, 25 years they've stolen, going to China and Mexico, about 68 percent of our auto industry. Manufacturing jobs. We're going to get them all back. We're going to get them all back, every single one of them.

At the center of our plan for economic relief are massive tax cuts for workers that include something else that stood out to be very popular actually. Here it's very popular. In this building and all those hotels that are so nice, I'm staying in a nice one. It's called no tax on tips. No tax on tips. No tax on tips.

And I got that by having dinner recently in Nevada where we're leading by about 14 points.

Hello. I'll see you there very soon, everybody.

And we were having dinner at a beautiful restaurant in the Trump building on the Strip. And it's a great building and the waitress comes over.

"How's everything going?"

Really nice person.

"How's everything going?"

"Oh sir, it's so tough. The government is after me all the time on tips, tips, tips."

I said, "Well, they give you cash, would they be able to find them?"

And she said, "Actually," and I didn't know this, very little cash is given. It's all put right on the check. And they come in and they take so much of our money it's just ridiculous. And they don't believe anything we say. They've just hired, as you know, 88,000 agents to go after them even more.

And I said, "This shows the level of—"

You know, most people who go out they hire consultants.

They pay them of dollars.

But I said to her, "Let me just ask you a question. Would you be happy if you had no tax on tips?"

She said, "What a great idea."

I got my information from a very smart waitress. That's better than spending millions of dollars. And everybody, everybody loves it. Waitresses and caddies and drivers and everybody. It's a large, large group of people that are being hurt badly. They make money, let them keep their money.

I am going to protect Social Security and Medicare. Democrats are going to destroy Social Security and Medicare because all of these people, by the millions, they're coming in. They're going to be on Social Security and Medicare and other things and you're not able to afford it. They are destroying your Social Security and your Medicare.

Under my plan, incomes will skyrocket, inflation will vanish completely, jobs will come roaring back, and the middle class will prosper like never, ever before and we're going to do it very rapidly.

But no hope or dream we have for America can succeed unless we stop the illegal immigrant invasion. The worst that's ever been seen anywhere in the world. There's never been an invasion anywhere. Third world countries would fight with sticks and stones not to let this happen. The invasion at our southern border, we will stop it and we will stop it quickly. You heard Tom Homan yesterday. Tom Homan, put him in charge and just sit back and watch. Brandon Judd, a border patrol, he's incredible. These guys they, you know, they, they really their job is a lot easier if they don't have to do anything but they want to. They're patriots.

Brandon Judd. Border Patrol. ICE. ICE goes out. You have to see what ICE does with M.S. 13. You have, these, these are probably the worst gang and ICE goes in there. And I know a lot of people in these rows here. And they're very tough people. But they don't want to do this job. They'll go into a pack of M.S. 13 killers. They're the worst, probably the worst gangs in the world. We have thousands of them. I moved thousands and thousands out in my four years. We moved them out. And it was a pleasure, but ICE would go right into a pack of these killers. And you see fist flying, you see everything flying and they take them. They put them in a paddy wagon. They take them back and they get them out of our country. And the other countries weren't accepting them back. And I called up and I said tell them that we're not giving them economic aid any more. And the next day I got calls from all these countries that were terminated. Billions of dollars we spend on economic aid to countries that does us frankly no good. And the next day I was called by everybody, I couldn't take all the calls.

"Sir, sir, what's the problem?"

I said, "You won't take your killers back that you sent in caravans into America. You won't take them back."

"Well sir, if you'd like us to, we would give very serious consideration to doing that."

In 24 hours, they were being taken back. For years and years when I first came in, they said President Obama tried to get them to go back and they wouldn't accept them. They'd put planes on the runway so you couldn't land the plane. They'd close the roads so you couldn't take the buses; they'd all have to turn back.

As soon as they said no more economic aid of any kind to any country that does that, they called back and they said, "Sir, it would be our great honor to take M.S. 13. We love them very much. We love them very much, sir. We'll take them back."

At the heart of the Republican platform is our pledge to end this border nightmare, and fully restore the sacred and sovereign borders of the United States of America. And we're going to do that on Day 1.

That means two things on Day 1, right? Drill, baby, drill and close our borders.

And by the way, and I think everybody as a Republican, as a patriot in this. Less than four years ago, I handed this administration the strongest border in American history. But you can see on the chart that saved my life. That was the chart that saved my life. I said, "Look at, I'm so proud of it." I think it's one of the greatest — it was done by the Border Patrol — one of the greatest charts I've ever seen. It showed everything, just like that. You know the chart. Oh, there it is. That's pretty good. Wow.

Last time I put up that chart I never really got to look at it. But without that chart, I would not be here today. Never got to look at it. I said, "You've got to see this chart." I was so proud of it. But by the time I got to there. I never got to see it that day. But I'm seeing it now and I was very proud.

If you look at the arrow on the bottom, that's the lowest level, the one on the bottom, heavy red arrow, that's the lowest level of illegal immigrants ever to come into our country in recorded history. Right there. Right there. And that was my last week in office. And then you see what happened after I left. Look at the rest. And if you go out a little bit further, it's getting to be a little bit old, but I love it anyway right, but you can go much higher with those numbers.

Look what happened right after that. The invasion began. We had the opposite. We stopped the invasion. But the invasion we stopped was peanuts by comparison to what happened after I left. Look at what happened after I left. They took over our country.

We ended all catch-and-release. We shut down asylum fraud. We stopped human trafficking and forged historic agreements to keep illegal aliens on foreign soil. We want them to stay on their soil.

Under the Trump administration, if you came in illegally, you were apprehended immediately and you were deported. You went right back.

The current administration terminated every single one of those great Trump policies that I put in place to seal the border. I wanted a sealed border. Again, come in but come in legally. You know how unfair it is? So many people, hundreds of thousands of people have been working for years to come into our country. And now they see these people pour into our country at levels that are unprecedented. So unfair. And we're not going to do it. We're not going to stand for it.

They suspended wall construction, ended "Remain in Mexico." We had a policy, "Remain in Mexico." You think that was easy to get from the Mexican government? But I said, "You must give it to us. If you don't give it to us, there will be repercussions." And they gave it to us, but not easy.

Canceled our Safe Third agreements, demolished Title 42, implemented nationwide catch-and-release. That's catch-and-release where we catch them and release them into our country. I had we catch them and release them into Mexico. There's a slight difference. And took 93, this is the previous administration, 93 executive actions to throw open our border to the world. The entire world is pouring into our country because of this very foolish administration.

The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. They're coming from everywhere. They're coming at levels that we've never seen before. It is an invasion indeed, and this administration does absolutely nothing to stop them.

They're coming from prisons. They're coming from jails. They're coming from mental institutions and insane asylums. I, you know the press is always on because I say this. Has anyone seen "The Silence of the Lambs"? The late, great Hannibal Lecter. He'd love to have you for dinner. That's insane asylums. They're emptying out their insane asylums. And terrorists at numbers that we've never seen before. Bad things are going to happen.

Meanwhile, our crime rate is going up, while crime statistics all over the world are going down. Because they're taking their criminals and they're putting them into our country. A certain country, and I happen to like the president of that country very much, but he's been getting great publicity because he's a wonderful shepherd of the country.

He says how well the country's doing because their crime rate is down. And he said he's training all of these rough people. They're rough, rough, rough. He's training them. And I've been reading about this for two years. I think, "Oh that's wonderful, let's take a look at it." But then I realize he's not training them; he's sending all of his criminals, his drug dealers, his people that are in jails, he's sending them all to the United States. And he's different in that he doesn't say that.

He's trying to convince everybody what a wonderful job he does in running the country. Well, he doesn't do a wonderful job. And by the way, if I ran one of the countries, many countries, many, many countries from all over, I would be worse than any of them. I would have had the place totally emptied out already.

But we have become a dumping ground for the world, which is laughing at us. They think we're stupid. And they can't believe that they're getting away with what they're getting away with, but they're not going to be getting away with it for long. That's what I can tell you.

In Venezuela, Caracas, high crime, high crime. Caracas, Venezuela, really a dangerous place. But not anymore, because in Venezuela, crime is down 72 percent. In fact, if they would ever in this election, I hate to even say that, we will have our next Republican convention in

Venezuela because it will be safe. Our cities, our cities will be so unsafe we won't be able, we will not be able to have it there.

In El Salvador, murders are down 70 percent. Why are they down? Now, he would have you convinced that because he's trained murderers to be wonderful people, no. They're down because they're sending their murderers to the United States of America. This is going to be very bad. And bad things are going to happen.

And you're seeing all the time. That's why, to keep our family safe, the Republican platform promises to launch the largest deportation operation in the history of our country. Even larger than that of President Dwight D. Eisenhower, from many years ago. You know, he was a moderate but he believed very strongly in borders. He had the largest deportation operation we've ever had.

Just recently, I spoke to the grieving mother of Jocelyn Nungaray, a wonderful woman. A precious 12 year-old girl from Houston who last month was tied up, assaulted and strangled to death after walking to the convenience store just a block away from her house. Her body was dumped near the side of the road in a shallow creek, found by some onlookers who couldn't believe what they had witnessed. Charged with Jocelyn's heinous murder, two illegal aliens from Venezuela who came across our border, were in custody and were then released into the country by this horrible, horrible administration that we have right now.

I also met recently with the heartbroken mother and sister of Rachel Morin. Rachel was a 37-year-old mom of five beautiful children who was brutally raped and murdered while out on a run. She wanted to keep herself in good shape. It was very important to her. She was murdered. The monster responsible first killed another woman in El Salvador before he was let into America by the White House. This White House let them in. He then attacked a 9-year-old girl and her mother in a home invasion in Los Angeles before murdering Rachel in Maryland. Traveled all throughout the country, doing tremendous damage. Rachel's mother will never be the same. I spent time with her. She will never be the same.

I've also met with the wonderful family of Laken Riley, the brilliant 22-year-old nursing student. She was so proud of being first in her class, who was out for a run on the campus of the University of Georgia when she was assaulted, beaten and horrifically killed. Yet another American life was stolen by a criminal alien set free by this administration. These were incredible people we're talking about. These were incredible people who died.

Tonight, America, this is my vow. I will not let these killers and criminals into our country. I will keep our sons and daughters safe.

As we bring security to our streets, we will help bring stability to the world.

I was the first president in modern times to start no new wars. You know, we were the toughest. We were the most respected. And you saw this. Hungary, strong country. Run by a very powerful, tough leader. He's a tough guy. The press doesn't like him because he's tough. And he came out recently. They were asking him at an interview: The whole world is exploding, what's happening, what's going on. Viktor Orban, prime minister of Hungary, very

tough man. He said, "I don't want people coming into my country and blowing up our shopping centers and killing people."

But they said to him, "Tell us, what's going wrong? What's happening? What is it?"

He said, "There's only one way you're going to solve it. You got to bring President Trump back to the United States because he kept everybody at bay."

True. He used a word I wouldn't use because I can't use that word. Because you'd say it was braggadocious. The press would say, "He was a braggart." I am not a braggart.

But Viktor Orban said it. He said "Russia was afraid of him. China was afraid of him. Everybody was afraid of him. Nothing was going to happen."

The whole world was at peace, and now the world is blowing up around us. All of these things you read about were not going to happen.

Under President Bush, Russia invaded Georgia. Under President Obama, Russia took Crimea. Under the current administration, Russia is after all of Ukraine. Under President Trump, Russia took nothing.

We defeated 100 percent of ISIS in Syria and Iraq, something that was said to take "five years, sir, it'll take five years, sir." We did it in a matter of a couple months. We have a great military. Our military is not woke. It's just some of the fools on top that are woke.

I got along very well, North Korea, Kim Jung Un. I got along very well with him. The press hated when I said that.

"How could you get along with him?"

Well, you know, it's nice to get along with someone who has a lot of nuclear weapons or otherwise. See, in the old days, you'd say that's a wonderful thing. Now they say, "How can you possibly do that?"

But no, I got along with him and we stopped the missile launches from North Korea. Now, North Korea is acting up again. But when we get back, I get along with him. He'd like to see me back too. I think he misses me, if you want to know the truth.

Our opponents inherited a world at peace and turned it into a planet of war. We're in a planet of war. Look at that attack on Israel. Look at what's happening with Ukraine. The cities are just bombed out. How can people live like that, where buildings, massive buildings are falling to the ground.

It began to unravel with the disastrous withdrawal from Afghanistan, the worst humiliation in the history of our country. We have never had a humiliation like that. Thirteen heroic U.S. service members were tragically and needlessly killed. Forty-five others were horrifically wounded. Nobody ever talks about that. No arms, no legs, face explosions. Horrifically, horrifically wounded. And by the way, we have a man in this room who is running for the U.S.

Senate from a great state, Nevada, named Sam Brown, who paid the ultimate price. Thank you, Sam. Thank you, Sam. Thank you. He paid the biggest price probably ever paid by anybody that is running for office, and I think he is going to do great. He's running against a person that is not good, not respected. A total lightweight.

But Sam, I think, paid really —

We were talking about it with some of the senators that are working so hard for Sam. But he paid the biggest price of any senator ever to run for the Senate. I don't think anybody has ever, what he did. He's a real hero, a really great person. And he's running and I hope that everybody gets out and votes for Sam Brown.

And we also left behind $85 billion dollars' worth of military equipment, along with many American citizens were left behind. Many, many American citizens.

Emboldened by that disaster, Russia invaded Ukraine. They saw this group of people that were incompetent. We took the soldiers out first, no, no. We're going to take the soldiers out second. If they would have followed my plan; we had a great plan. But the plan only kicked in if they did everything perfectly, and they weren't doing things perfectly. So we said it doesn't kick in. You know, 18 months in Afghanistan, we didn't have one — they were killing them left and right, snipers. And I spoke to the head of the Taliban. You've heard this story. Abdul, still there. Still the head of the Taliban. The press got on me, "Why would you speak to him?" I said, "Because that's where the killing is." I don't have to speak to somebody that has nothing to do with it.

And I told him: "Don't ever do that. Don't ever do that again. Don't ever, ever do that again, you're going to stop." Because during the Obama administration, many great people and soldiers, a lot of soldiers, were being killed from long distance. I said, "If you keep doing that, you're going to be hit harder than anybody has ever been hit by a country before." And he said, "I understand, Your Excellency." He called me "Your Excellency." I wonder if he calls the other guy "Your Excellency." I doubt it.

The other guy gave him everything. I mean, what kind of a deal was that? He walked out, gave him everything. You know that right now Afghanistan is one of the largest sellers of weapons in the world? They're selling the brand-new, beautiful weapons that we gave them.

But think of it. He actually said to me, "But why, but why, do you show me a picture of my home?"

I said, "You'll have to ask your people or one of your wives."

But he could figure it out. And for 18 months we had not one attack on an American soldier by the Taliban. Eighteen months. And then we had that horrible day where soldiers were killed. I was not there because of a ridiculous election. But we had that horrible attack.

And they also gave up Bagram, one of the biggest bases anywhere in the world, air bases, anywhere in the world. The longest runways, most powerful hardened, thickened runways.

We gave it up. And I liked it not because of Afghanistan, I liked it because of China. It's one hour away from where China makes their nuclear weapons. And you know who has it now? China has it now.

We were keeping that, and now China is likewise circling Taiwan, and Russian warships and nuclear submarines are operating 60 miles off the coast in Cuba. Do you know that? The press refuses to write about it. If that were me running this country and we had nuclear submarines in Cuba, I will tell you that headlines every day would be "What's Wrong With Our President?". You don't even hear this. You're not hearing about this. Russia has nuclear submarines and warships 60 miles away, Mr. Congressman. From Miami, by the way, happens to be here. Correct? In Cuba. That would not be stood for if it were somebody else. They don't want to mention it, but now maybe they will.

And to the entire world, I tell you this, we want our hostages back — and they better be back before I assume office, or you will be paying a very big price.

With our victory in November, the years of war, weakness and chaos will be over.

I don't have wars. I had no wars, other than ISIS, which I defeated, but that was a war that was started. We had no wars. I could stop wars with a telephone call. I could stop wars with just a telephone call. It properly stated it would never start. We will replenish our military and build an iron dome missile defense system to ensure that no enemy can strike our homeland.

And this great iron dome will be built entirely in the U.S.A. We're going to build it in the U.S.A. And Wisconsin, Wisconsin, just like I gave you that massive ship contract, and you're doing a very nice job, governor, right? Thank you, governor. And they're doing a great job. In fact, I had a little design change and we gave them a tremendous for, essentially, what we used to call destroyers. These are now the most beautiful. They look like yachts.

I said, "We have to take the bow, and we have to make it a little nicer, and a little point at the top instead of a flat nose." And the people at the shipyards said, "This guy sort of knows what he's doing." We had the most beautiful ships, right, governor? And everybody sitting over there? And it was a big contract that everybody wanted. I gave it to Wisconsin, but we're going to have a lot of that built right here in the state of Wisconsin and all other states.

Israel has an Iron Dome. They have a missile defense system. Three hundred forty-two missiles were shot into Israel, and only one got through a little bit. It was badly wounded, it fell to the ground, but most of them are — And Ronald Reagan wanted this many years ago, but we really didn't have the technology many years ago. Remember, they called it starship, spaceship, anything to mock him. But he was a very good president, very, very good.

But now we have unbelievable technology. And why should other countries have this, and we don't? No, no, we're going to build an iron dome over our country, and we're going to be sure that nothing can come and harm our people. And again, from an economic development standpoint, I'm going to make it all right here. No more sending it out to other countries in order to help. It's America first, America first.

We will unleash the power of American innovation, and as we do, we will soon be on the verge of finding the cures to cancer, Alzheimer's disease and many other diseases. We're going to get to the bottom of it. You remember this gentleman that I don't want to mention, other than one time I had to, because when you say "the 10 worst," I had to do it. I didn't want anybody to be confused.

But this man said we're going to find a cure to cancer; nothing happened. We're going to get to the cure for cancer and Alzheimer's and so many other things. We're so close to doing something great. But we need a leader that will let it be done.

We will not have men playing in women's sports. That will end immediately.

And we will restore and renovate our nation's once-great cities, making them safe, clean and beautiful again. And that includes our nation's capital, which is a horrible killing field. So many things — they leave from Wisconsin, they go to look at the Washington Monument, they end up getting stabbed, killed or shot. We will be, very soon, very proud of our capital again, Washington, D.C.

America's on the cusp of a new golden age, but we will have the courage to seize it. We're going to take it, we're going to make it a current — I mean, we're going to bring this into a golden age like never seen before. Remember this: China wants to do it, Japan wants to do it. All of these countries want to do it.

We have to produce massive amounts of energy. If we're going to produce the new — if you look at some of the things that have been done, and some of the things that we're going to do. But A.I. needs tremendous — literally, twice the electricity that's available now in our country, can you imagine? But instead we're spending places where they recharge electric cars.

They built eight chargers at a certain location, toward the Midwest. Eight chargers for $9 billion? Think of them as a tank for filling up your gas. Think of it. They spent $9 billion on eight chargers, three of which didn't work. And if you are going to do this all over our country, this crazy electric Band-Aid. If you're going to do this ... And by the way, I'm all for electric. They have their application. But if somebody wants to buy a gas-powered car, gasoline-powered car, or a hybrid, they're going to be able to do it. And we're going to make that change on Day 1.

So, to conclude, just a few short days ago, my journey with you nearly ended. We know that. And yet, here we are tonight, all gathered together, talking about the future, promise and a total renewal of a thing we love very much. It's called America.

We live in a world of miracles. None of us knows God's plan, or where life's adventure will take us. I want to thank Franklin Graham for being here tonight; he's an outstanding man. He wrote me a note recently; I have a lot of respect for him. "Sir, I love your storytelling, I think it's great, in front of these big rallies, but, sir, please do me one favor. It won't make any difference. Please. Don't use any foul language."

I was a little embarrassed, I said. He said, "It won't make any difference." Actually, it does, the story's not quite as good, but I've been very good. The story is not quite as good, to be honest.

I've got to have a little talk with Franklin, but he was great. He's a great gentleman, his father was so incredible, Billy Graham. My father used to love taking me to see Billy Graham. My father would take me to see Billy Graham at Yankee Stadium. He had the biggest rallies you've ever seen. He was a good rally guy, too.

But he'd get up and he was a fantastic guy. My father loved Billy Graham. But I love Franklin Graham, I think Franklin's been fantastic. And I'm trying, I'm just working so hard to adhere to his note to me. I'm working hard on it, Franklin.

But if the events of last Saturday make anything clear, it is that every single moment we have on Earth is a gift from God. We have to make the most of every day for the people and for the country that we love.

The attacker in Pennsylvania wanted to stop our movement, but the truth is, the movement has never been about me. It has always been about you. It's your movement. It's the biggest movement in the history of our country by far. It can't be stopped. It can't be stopped. It has always been about the hardworking, patriotic citizens of America.

For too long, our nation has settled for too little. We settled for too little. We've given everything to other nations, to other people. You have been told to lower your expectations and to accept less for your families.

I am here tonight with the opposite message: Your expectations are not big enough. They're not big enough. It is time to start expecting and demanding the best leadership in the world, leadership that is bold, dynamic, relentless and fearless. We can do that.

We are Americans. Ambition is our heritage. Greatness is our birthright.

But as long as our energies are spent fighting each other, our destiny will remain out of reach. And that's not acceptable. We must instead take that energy and use it to realize our country's true potential — and write our own thrilling chapter of the American story. We can do it together. We will unite. We are going to come together and success will bring us together.

It is a story of love, sacrifice and so many other things. And remember the word: Devotion. It's unmatched devotion. Our American ancestors crossed the Delaware, survived the icy winter at Valley Forge and defeated a mighty empire to establish our cherished republic.

They fought so hard, they lost so many. They pushed thousands and thousands of miles across a dangerous frontier, taming the wilderness to build a life and a magnificent home for their family. They packed their families into covered wagons, trekked across hazardous trails. Scaled towering mountains and braved rivers and rapids to stake their claim on the wide-open, new and very beautiful frontier. When our way of life was threatened, American patriots marched onto the battlefield, raced into enemy strongholds and stared down death — and

stared down those enemies — to keep alive the flame of freedom. At Yorktown, Gettysburg, and Midway, they joined the roll call of immortal heroes. So many — just so many heroes, so many great, great people. And we have to cherish those people. We can't forget those people. We have to cherish those people.

And building monuments to those great people is a good thing, not a bad thing. They saved our country. No challenge was too much. No hardship was too great. No enemy was too fierce. Together, these patriots soldiered on and endured, and they prevailed. Because they had faith in each other, faith in their country, and above all, they had faith in their God.

Just like our ancestors, we must now come together, rise above past differences. Any disagreements have to be put aside, and go forward united as one people, one nation, pledging allegiance to one great, beautiful — I think it's so beautiful — American flag.

Tonight, I ask for your partnership, for your support and I am humbly asking for your vote. I want your vote. We're going to make our country great again. Every day, I will strive to honor the trust you have placed in me, and I will never, ever let you down. I promise that. I will never let you down.

To all of the forgotten men and women who have been neglected, abandoned and left behind, you will be forgotten no longer. We will press forward, and together, we will win, win, win.

Win, win, win, win, win, win.

Nothing will sway us. Nothing will slow us. And no one will ever stop us.

No matter what dangers come our way, no matter what obstacles lie in our path, we will keep striving toward our shared and glorious destiny — and we will not fail. We will not fail.

Together, we will save this country, we will restore the republic, and we will usher in the rich and wonderful tomorrows that our people so truly deserve.

America's future will be bigger, better, bolder, brighter, happier, stronger, freer, greater and more united than ever before.

And quite simply put, we will very quickly make America great again.

Thank you very much. Thank you very much, Wisconsin. God bless you, God bless you, Wisconsin, and God bless the United States of America, our great country. Thank you very much, everybody. Thank you.

■

**GRAVES DECLARATION**

**EXHIBIT 3**

A true and correct copy of the USASPENDING.gov webpage for Contract No. Contract No. 70B01C26F00000169, awarded by the Department of Homeland Security ("DHS") to Fisher Sand & Gravel Co.

An official website of the United States government
Here's how you know

USASPENDING.gov

# Contract Summary

Delivery Order (DO)

PIID 70B01C26F00000169
In Progress
(1 year, 1 month remains)

Awarding Agency

Department of Homeland Security (DHS)

Recipient

FISHER SAND & GRAVEL CO
1302 W DRIVERS WAY
TEMPE, AZ 85284-85284
UNITED STATES
Congressional District: AZ-04

Related Awards

Parent Award Unique Key

CONT_IDV_70B01C26D00000012_7014

Dates

Today

| | |
|---|---|
| Start Date | Feb 13, 2026 |
| Current End Date | Sep 05, 2027 |
| Potential End Date | Sep 05, 2027 |

## $ Award Amounts




| | |
|---|---|
| Outlayed Amount | $38,450,000.00 |
| Obligated Amount | $1,223,124,000.00 |
| Current Award Amount | $1,223,124,000.00 |
| Potential Award Amount | $1,371,800,000.00 |

View Transaction History

## Description

**North American Industry Classification System (NAICS) Code**

23 : Construction

2362: Nonresidential Building Construction

**236220: Commercial and Institutional Building Construction**

**Product or Service Code (PSC)**

SERVICES

Y: CONSTRUCT OF STRUCTURES/FACILITIES

Y1: CONSTRUCTION OF BUILDINGS

**Y1LB: CONSTRUCTION OF HIGHWAYS, ROADS, STREETS, BRIDGES, AND RAILWAYS**

## Contract Activity



View transactions table

## Federal Accounts

| Federal Account | Combined Obligated Amount | Percent of Total | Funding Agency |
|---|---|---|---|
| PROCUREMENT, CONSTRUCTION, AND IMPRO... | $1,223,124,000 | 100% | (DHS) DEPARTMENT |

**NOTE:** Result count may differ between treemap view and table view. Treemap view only displays accounts with a positive combined obligated amount, while table view displays all accounts.

### Summary of All Federal Accounts used by this Award

| | |
|---|---|
| Total Funding Obligated | $1,223,124,000.00 |
| Total Count of Funding Agencies | 1 |
| Total Count of Awarding Agencies | 1 |
| Total Count of Federal Accounts | 1 |

View federal funding submissions

## Award History

This section displays the awards:

**Transaction History** - Displays modification records for an award. Each modification appears as a row in the table below.

**Sub-Awards** - Displays any sub-contracts reported by this contract's recipient (the 'prime recipient' in the sub-award context). Sub-contracts are contractual agreements that a prime recipient makes with another

entity (sub-recipient) to furnish supplies or services for the prime contract. Above the Sub-Award table, we display the total number of reported sub-contract actions and their total value.

**Federal Account Funding** - Each row in this table shows a transaction in the awarding agency's financial system that promises spending for the award from a federal account (a rollup of TAS, or Treasury accounts), broken down by program activity and object class.

Transaction History 1 | Sub-Awards 0 | Federal Account Funding 5

| Modification Number | Action Date | Amount | Action Type |
|---|---|---|---|
| 0 | 03/05/2026 | $1,223,124,000 | -- |

1

1-1 of 1 results

## Additional Information

Expand All

Unique Award Key

Agency Details

Parent Award Details

Place Of Performance

Period Of Performance

**GRAVES DECLARATION**

**EXHIBIT 4**

A true and correct copy of the USASPENDING.gov webpage for Contract No. Contract No. 70B01C26F00000152, awarded by DHS to Barnard Construction Co., Inc.

An official website of the United States government
Here's how you know

USASPENDING.gov

# Contract Summary

**Delivery Order (DO)**

PIID 70B01C26F00000152
In Progress
(2 years, 1 month remains)

## Awarding Agency

**Department of Homeland Security (DHS)**

## Recipient

**BARNARD CONSTRUCTION COMPANY, INCORPORATED**
701 GOLD AVE
BOZEMAN, MT 59715-2453
UNITED STATES

Congressional District: MT-01

## Related Awards

Parent Award Unique Key

CONT_IDV_70B01C26D00000006_7014

## Dates

Today

| | |
|---|---|
| Start Date | Mar 05, 2026 |
| Current End Date | Aug 31, 2028 |
| Potential End Date | Aug 31, 2028 |

## $ Award Amounts




Outlayed Amount
$50,088,510.49

Obligated Amount
$1,025,996,158.00

Current Award Amount
$1,025,996,158.00

Potential Award Amount
$1,098,524,722.00

View Transaction History

## Description

BORDER BARRIER CONSTRUCTION IN HUDSPETH COUNTY, TX

**North American Industry Classification System (NAICS) Code**

23 : Construction

2362: Nonresidential Building Construction

**236220: Commercial and Institutional Building Construction**

**Product or Service Code (PSC)**

SERVICES

Y: CONSTRUCT OF STRUCTURES/FACILITIES

Y1: CONSTRUCTION OF BUILDINGS

**Y1PZ: CONSTRUCTION OF OTHER NON-BUILDING FACILITIES**

## Contract Activity




APX-V2-220

View transactions table

## Federal Accounts

| Federal Account | Combined Obligated Amount | Percent of Total | Funding Agency |
|---|---|---|---|
| PROCUREMENT, CONSTRUCTION, AND IMPRO... | $1,025,996,158 | 100% | (DHS) DEPARTMENT |

**NOTE:** Result count may differ between treemap view and table view. Treemap view only displays accounts with a positive combined obligated amount, while table view displays all accounts.

### Summary of All Federal Accounts used by this Award

| | |
|---|---|
| Total Funding Obligated | $1,025,996,158.00 |
| Total Count of Funding Agencies | 1 |
| Total Count of Awarding Agencies | 1 |
| Total Count of Federal Accounts | 1 |

View federal funding submissions

## Award History

This section displays the awards:

**Transaction History** - Displays modification records for an award. Each modification appears as a row in the table below.

**Sub-Awards** - Displays any sub-contracts reported by this contract's recipient (the 'prime recipient' in the sub-award context). Sub-contracts are contractual agreements that a prime recipient makes with another

entity (sub-recipient) to furnish supplies or services for the prime contract. Above the Sub-Award table, we display the total number of reported sub-contract actions and their total value.

**Federal Account Funding** - Each row in this table shows a transaction in the awarding agency's financial system that promises spending for the award from a federal account (a rollup of TAS, or Treasury accounts), broken down by program activity and object class.

Transaction History 1 | Sub-Awards 0 | Federal Account Funding 3

| Modification Number | Action Date | Amount | Action Type |
|---|---|---|---|
| 0 | 03/05/2026 | $1,025,996,158 | -- |

1

1-1 of 1 results

## Additional Information

Expand All

Unique Award Key

Agency Details

Parent Award Details

Place Of Performance

Period Of Performance

**GRAVES DECLARATION**

**EXHIBIT 5**

A true and correct copy of the USASPENDING.gov webpage for Contract No. Contract No. 70B01C26F00000201, awarded by DHS to Barnard Construction Co., Inc.

An official website of the United States government
Here's how you know

USASPENDING.gov

# Contract Summary

**Delivery Order (DO)**

PIID 70B01C26F00000201
In Progress
(10 months remain)

## Awarding Agency

**Department of Homeland Security (DHS)**

## Recipient

**BARNARD CONSTRUCTION COMPANY, INCORPORATED**
701 GOLD AVE
BOZEMAN, MT 59715-2453
UNITED STATES
Congressional District: MT-01

## Related Awards

Parent Award Unique Key
CONT_IDV_70B01C26D00000006_7014

## Dates




| | |
|---|---|
| Start Date | Mar 05, 2026 |
| Current End Date | May 26, 2027 |
| Potential End Date | May 26, 2027 |

## $ Award Amounts




| | |
|---|---|
| ● Outlayed Amount<br>$46,559,189.99 | |
| ● Obligated Amount<br>$960,423,540.00 | |
| ● Current Award Amount<br>$960,423,540.00 | |
| ● Potential Award Amount<br>$960,423,540.00 | |

View Transaction History

## Description

BBT-3 BORDER BARRIER CONSTRUCTION PROJECT

**North American Industry Classification System (NAICS) Code**

23 : Construction

2362: Nonresidential Building Construction

**236220: Commercial and Institutional Building Construction**

**Product or Service Code (PSC)**

SERVICES

Y: CONSTRUCT OF STRUCTURES/FACILITIES

Y1: CONSTRUCTION OF BUILDINGS

**Y1PZ: CONSTRUCTION OF OTHER NON-BUILDING FACILITIES**

## Contract Activity



View transactions table

## Federal Accounts

| Federal Account | Combined Obligated Amount | Percent of Total | Funding Agency |
|---|---|---|---|
| PROCUREMENT, CONSTRUCTION, AND IMPRO... | $960,423,540 | 100% | (DHS) DEPARTMENT |

**NOTE:** Result count may differ between treemap view and table view. Treemap view only displays accounts with a positive combined obligated amount, while table view displays all accounts.

### Summary of All Federal Accounts used by this Award

| | |
|---|---|
| Total Funding Obligated | $960,423,540.00 |
| Total Count of Funding Agencies | 1 |
| Total Count of Awarding Agencies | 1 |
| Total Count of Federal Accounts | 1 |

View federal funding submissions

## Award History

This section displays the awards:

**Transaction History** - Displays modification records for an award. Each modification appears as a row in the table below.

**Sub-Awards** - Displays any sub-contracts reported by this contract's recipient (the 'prime recipient' in the sub-award context). Sub-contracts are contractual agreements that a prime recipient makes with another

entity (sub-recipient) to furnish supplies or services for the prime contract. Above the Sub-Award table, we display the total number of reported sub-contract actions and their total value.

**Federal Account Funding** - Each row in this table shows a transaction in the awarding agency's financial system that promises spending for the award from a federal account (a rollup of TAS, or Treasury accounts), broken down by program activity and object class.

Transaction History 2 | Sub-Awards 0 | Federal Account Funding 4

| Modification Number | Action Date | Amount | Action Type |
|---|---|---|---|
| 0 | 03/05/2026 | $960,423,540 | -- |
| P00001 | 03/11/2026 | $0 | B: SUPPLEMENTAL AGREEMENT FOR WORK WITHIN SCOPE |

1

1-2 of 2 results

## Additional Information

Expand All

Unique Award Key

Agency Details

Parent Award Details

Place Of Performance

Period Of Performance

**GRAVES DECLARATION**

**EXHIBIT 6**

A true and correct copy of the USASPENDING.gov webpage for Contract No. 70B01C26F00000345, awarded by DHS to Southwest Valley Constructors Co.

An official website of the United States government
Here's how you know

USASPENDING.gov

## Contract Summary

**Delivery Order (DO)**

PIID 70B01C26F00000345
In Progress
(9 months remain)

Awarding Agency

**Department of Homeland Security (DHS)**

Recipient

**SOUTHWEST VALLEY CONSTRUCTORS CO**
7770 JEFFERSON ST NE
STE 101
ALBUQUERQUE, NM 87109-4359
UNITED STATES
Congressional District: NM-01

Related Awards

Parent Award Unique Key

CONT_IDV_70B01C26D00000007_7014

Dates



Today

| | |
|---|---|
| Start Date | May 11, 2026 |
| Current End Date | May 11, 2027 |
| Potential End Date | Dec 07, 2028 |

## $ Award Amounts




Outlayed Amount

$0.00

Obligated Amount

$1,720,040,000.00

Current Award Amount
$1,720,040,000.00

Potential Award Amount
$1,720,040,000.01

View Transaction History

## Description

AWARD OF CONSTRUCTION TASK ORDER FOR BORDER WALL IN BIG BEND TEXAS, SEGMENT IDENTIFIED AS BBT-4.

**North American Industry Classification System (NAICS) Code**

23 : Construction

2362: Nonresidential Building Construction

**236220: Commercial and Institutional Building Construction**

**Product or Service Code (PSC)**

SERVICES

Y: CONSTRUCT OF STRUCTURES/FACILITIES

Y1: CONSTRUCTION OF BUILDINGS

**Y1PZ: CONSTRUCTION OF OTHER NON-BUILDING FACILITIES**

## Contract Activity




View transactions table

## Federal Accounts

| Federal Account | Combined Obligated Amount | Percent of Total | Funding Agency |
|---|---|---|---|
| PROCUREMENT, CONSTRUCTION, AND IMPRO... | $1,720,040,000 | 100% | (DHS) DEPARTMENT |

**NOTE:** Result count may differ between treemap view and table view. Treemap view only displays accounts with a positive combined obligated amount, while table view displays all accounts.

### Summary of All Federal Accounts used by this Award

| | |
|---|---|
| Total Funding Obligated | $1,720,040,000.00 |
| Total Count of Funding Agencies | 1 |
| Total Count of Awarding Agencies | 1 |

| | |
|---|---|
| Total Count of Federal Accounts | 1 |

View federal funding submissions

## Award History

This section displays the awards:

**Transaction History** - Displays modification records for an award. Each modification appears as a row in the table below.

**Sub-Awards** - Displays any sub-contracts reported by this contract's recipient (the 'prime recipient' in the sub-award context). Sub-contracts are contractual agreements that a prime recipient makes with another entity (sub-recipient) to furnish supplies or services for the prime contract. Above the Sub-Award table, we display the total number of reported sub-contract actions and their total value.

**Federal Account Funding** - Each row in this table shows a transaction in the awarding agency's financial system that promises spending for the award from a federal account (a rollup of TAS, or Treasury accounts), broken down by program activity and object class.

Transaction History 1 | Sub-Awards 0 | Federal Account Funding 4

| Modification Number | Action Date | Amount | Action Type |
|---|---|---|---|
| 0 | 05/11/2026 | $1,720,040,000 | -- |

‹ 1 ›

1-1 of 1 results

## Additional Information

**GRAVES DECLARATION**

**EXHIBIT 7**

A true and correct copy of the USASPENDING.gov webpage for Contract No. 70B01C26F00000405, awarded by DHS to Fisher Sand & Gravel Co.

An official website of the United States government
Here's how you know

USASPENDING.gov

# Contract Summary

Delivery Order (DO)

PIID 70B01C26F00000405
In Progress
(1 year remains)

Unlinked Award

Awarding Agency

**Department of Homeland Security (DHS)**

Recipient

**FISHER SAND & GRAVEL CO**
1302 W DRIVERS WAY
TEMPE, AZ 85284-85284
UNITED STATES
Congressional District: AZ-04

Related Awards

Parent Award Unique Key

CONT_IDV_70B01C26D00000012_7014

Dates




- Start Date Jun 03, 2026
- Current End Date Jul 27, 2027
- Potential End Date Jul 27, 2027

## $ Award Amounts




Outlayed Amount

$0.00

Obligated Amount

$2,594,040,000.00

Current Award Amount

$2,594,040,000.00

Potential Award Amount

$2,594,040,000.00

View Transaction History

## Description

BORDER BARRIER DESIGN BUILD FOR BBT-5

**North American Industry Classification System (NAICS) Code**

23 : Construction

2362: Nonresidential Building Construction

**236220: Commercial and Institutional Building Construction**

**Product or Service Code (PSC)**

SERVICES

Y: CONSTRUCT OF STRUCTURES/FACILITIES

Y1: CONSTRUCTION OF BUILDINGS

**Y1PZ: CONSTRUCTION OF OTHER NON-BUILDING FACILITIES**

## Contract Activity




View transactions table

## Federal Accounts

This award has not been linked to any federal account.

## Award History

This section displays the awards:

**Transaction History** - Displays modification records for an award. Each modification appears as a row in the table below.

**Sub-Awards** - Displays any sub-contracts reported by this contract's recipient (the 'prime recipient' in the sub-award context). Sub-contracts are contractual agreements that a prime recipient makes with another entity (sub-recipient) to furnish supplies or services for the prime contract. Above the Sub-Award table, we display the total number of reported sub-contract actions and their total value.

**Federal Account Funding** - Each row in this table shows a transaction in the awarding agency's financial system that promises spending for the award from a federal account (a rollup of TAS, or Treasury accounts), broken down by program activity and object class.

Transaction History 1 | Sub-Awards 0 | Federal Account Funding 0

| Modification Number | Action Date | Amount | Action Type |
|---|---|---|---|
| 0 | 06/02/2026 | $2,594,040,000 | -- |

1

1-1 of 1 results

## Additional Information

Expand All

Unique Award Key

Agency Details

Parent Award Details

Place Of Performance

Period Of Performance

Legislative Mandates

**GRAVES DECLARATION**

**EXHIBIT 8**

A true and correct copy of a National Park Service webpage, titled *Rio Grande Wild & Scenic River: Learn About the Park*

# Learn About the Park

**For 1,250 miles, the Rio Grande forms the boundary between the United States and Mexico. In a remote stretch in West Texas, the river makes a curve to the northeast to form the "big bend." Winding its way through deep canyons and vast desert expanses, it is here that the wild character of the river lives on.**

Park Ranger floating through Mariscal Canyon

*Admiring the beauty of Mariscal Canyon*

*NPS*

### Why Is It Special?

In 1968, Congress passed the National Wildand Scenic Rivers Act to protect free flowing rivers with "outstandingly remarkable scenic,recreational, geologic, fish and wildlife, historic, cultural, or other similar values."

As part of the only river system in the Chihuahuan Desert, the Rio Grande serves as the lifeblood for numerous threatened species. Recognizing the dramatic scenery and spectacular geology, as well as the recreational opportunities, and vital habitat it provides for plants and animals, Congress established the Rio Grande Wild and Scenic River as a unit of the National Park System on November 10, 1978.

Today, Congress has designated more than 225 rivers as National Wild and Scenic Rivers. Of the country's 3.5 million miles of rivers, only 13,412 miles are designated. In fact, only 2% of the rivers in the United States are free flowing and pristine enough to qualify for wild and scenic designation.

### Boundaries

The Wild and Scenic designation applies to 200 miles of the United States portion of theRio Grande from the Chihuahua-Coahuila (Mexico) state line upstream of Mariscal Canyon to the Terrell-Val Verde county (Texas) line. The national park sections of Rio Grande

upstream of Mariscal Canyon, including Santa Elena Canyon are not part of the Wild and Scenic River.

In 2009 the government of Mexico established the Monumento Natural Rio Bravo del Norte, thereby protecting the Mexican half of the river for 300 miles.Together, Big Bend National Park and the Rio Grande Wild and Scenic River protect 250 miles of river – one fifth of the section of the Rio Grande that is shared by the United States and Mexico.

Most of the U.S. land downstream from Big Bend National Park is privately owned. Rights of private landowners must be respected on both sides of the river.




*Map of Rio Grande Wild and Scenic River*

## Challenges for the Future

The Rio Grande is a slender ribbon of life that supports a myriad of plants and wildlife. People find a haven here, too. Recreation and solitude allow for a chance to escape the cacophony of our modern world, and reconnect with nature. The mission of the National Park Service is to preserve the free-flowing and natural condition of the Rio Grande Wild and Scenic River and its immediate environment for the benefit and enjoyment of present and future generations.

Despite these protections, a variety of challenges exist. Upstream diversions and consumptive water use in both the U.S. and Mexico have led to reduced river flows, buildup of excess sediment, diminished ecosystem function, and have fostered ideal conditions for the establishment of invasive exotic vegetation such as giant river cane and tamarisk that further restrict flows.

Managers from both countries are working together to learn from each other, improve environmental flows of the river, and reduce exotic vegetation. The establishment of three protected areas in Mexico, adjacent to Big Bend National Park, has given new life to the international cooperation in managing this critical shared resource.

■

**GRAVES DECLARATION**

**EXHIBIT 9**

A true and correct copy of an excerpt from a Center for Big Bend Studies Advisory Council report titled *A Sampling of Archeological Resources in Big Bend National Park, Texas: Report Submitted to Big Bend National Park and the Intermountain Archaeology Program National Park Service*

# A Sampling of Archeological Resources in Big Bend National Park, Texas



Report Submitted to Big Bend National Park
and the Intermountain Archaeology Program
National Park Service

**Center for Big Bend Studies**
Sul Ross State University
Alpine, Texas
2022

## Center for Big Bend Studies Advisory Council

**Chairman:** Tom Crum,
**Director:** Bryon Schroeder

Félix D. Almaráz Jr.
Steve Black
J. P. Bryan
Paul Carlson
Ken Durham
David Fannin
Rick Hendricks
Jerry Johnson
Tim Johnson
John Klingemann
Ben Love
Caitlin Murray
J. Travis Roberts Jr.
David G. Rogers
J. Tillapaugh
William Wright

**Ex Officio**
**from Sul Ross State University:**

Pete Gallego, President
Melleta Bell, Senior Archivist, Archives of the Big Bend
Mary Bones, Director, Museum of the Big Bend
Robert Kinucan, Provost and Vice President for Academic Affairs
James W. Downing, Dean, School of Arts and Sciences
Mark Saka, Chairman, Behavioral and Social Sciences

## Editorial Advisory Board

Félix D. Almaráz, Jr.
Arnoldo De León
Earl H. Elam
Rick Hendricks
John Klingemann
Rubén Osorio-Zuñiga
Judy A. Parsons
J. Tillapaugh


**Report Certification**

I certify that the report entitled *A Sampling of Archeological Resources in Big Bend National Park*, produced by the Center for Big Bend Studies at Sul Ross State University in Alpine, Texas, has been reviewed against the criteria contained in 43 CFR 7.18(a)(1), and upon the recommendation of the National Park Service's Intermountain Archaeology Program has been classified as Available.[1]

ROBERT KRUMENAKER Digitally signed by ROBERT KRUMENAKER
Date: 2023.04.20 16:45:28 -05'00'

Superintendent, Big Bend National Park Date

[1]Making the report available to the public meets the criteria of 43 CFR 7.18(a)(1).

# 1

# Introduction

Big Bend National Park (BBNP) is located within the eastern Trans-Pecos in the far southwestern tip of Texas where the Rio Grande makes its large V-shaped bend. Encompassing 324,220 ha (801,163 ac), it is the 15th largest in the U.S. national park system. With mountain "islands," lowland shrub desert, and over 100 river miles of the Rio Grande, the park contains the best example of the Chihuahuan Desert ecoregion in the United States and is host to an extraordinary array of plants and animals, including many endemic and relict species (National Park Service 2009).



*Figure 1.1. The Chisos Mountains at dawn with the Rio Grande in the foreground. Photo by D. Keller.*

The park's outstanding vistas—rivaling those of other world-class southwestern U.S. national parks—are due primarily to the fantastic array of geological features (Figure 1.1). Because of arid conditions and scant vegetation, these geological features stand in bold relief as mesas, buttes, pinnacles, ridges, dikes, plugs, and volcanic domes. In total, over 500 million years of geological history are exhibited in the various formations visible within the park (Maxwell 1968).

In addition to its diverse physiography, the park is extremely remote; the nearest town having a population of over 500 is 145 km (90 mi) away. As far as it is from urban centers and major highways, the greater Big Bend region is largely free of industrialization and "retains more features of the Old West than perhaps any area of its size in the United States" (Maxwell et al. 1967:4). Its remoteness is made even more dramatic by its stark and overpowering geological grandeur.

The park's southern boundary is defined by 190 km (118 mi) of the Rio Grande that also comprises the international border with Mexico, bordering the states of Chihuahua and Coahuila. Adjacent to two protected areas in Mexico—Maderas del Carmen and Cañon de Santa Elena, the park is part of one of the largest transboundary protected areas in North America, together encompassing more than 810,000 ha (2 million acres) of classic Chihuahuan Desert (National Park Service 2009).

Established in 1944, BBNP was the 27th national park in the United States and the first in Texas. Originally designated as Texas Canyons State Park by the State of Texas in 1933, the name was soon changed to Big Bend State Park. Although Congress authorized the establishment of the national park as early as 1935, BBNP was not officially opened until June 12, 1944 (National Park Service 2009).

Averaging between 300,000 and 400,000 visitors per year, the park offers over 480 km (300 mi) of roads and 320 km (200 mi) of hiking trails as well as 219 frontcountry campsites and 116 backcountry campsites. In addition to hiking, camping, and backpacking, the stretch of the Rio Grande bordering the park includes more than 97 km (60 mi) of monumental canyons that draw hundreds of river runners annually. Boasting nearly 1,300 species of flora, 75 species of mammals, and more than 450 species of birds, the park's biological diversity ranks among the highest in the national park system. The park also offers the best night sky viewing in the continental United States. To administer and oversee park affairs and visitor services, the park has 103 permanent employees and 58 seasonal employees in addition to many volunteers and student interns (National Park Service 2009).

Within BBNP is evidence of nearly 12,000 years of human occupation from Paleoindian to historic times. As of 2021, a total of 2,755 sites have been recorded within the park boundaries and over 287,000 museum objects (including biological, geological, and paleontological specimens in addition to archeological materials) have been cataloged. There are four National Register of Historic Places (NRHP) districts within the park consisting of the Burro Mesa Archeological District, the Castolon Historic District, the Hot Springs Historic District, and the Mariscal Mining District. In addition, there are four NRHP sites within the park—the Homer Wilson Blue Creek Ranch, Rancho Estelle, Daniel's Farmhouse, and Luna's Jacal (National Park Service 2009).

The BBNP project's over-arching goals were to sample archeological resources within the park and to produce a predictive model of site occurrence. Spawned in 1990 by then-State Archeologist Robert J. Mallouf, the project took place over the course of almost 10 years. Nearly 25,000 ha (61,766 ac) of the park were intensively surveyed in this most remote and rugged part of the state. It was, consequently, one of the largest—if not the largest—survey of its kind in the state's history. Enduring extremes of triple-digit heat, blinding sunlight, dust storms, flash floods, rattlesnakes, scorpions, Africanized honeybees, cone-nosed beetles, and a vast array of wicked vegetation, crews were often pressed to the limits of endurance. Sometimes a little beyond.

**GRAVES DECLARATION**

**EXHIBIT 10**

A true and correct copy of relevant excerpts from the U.S. Department of the Interior, National Park Service's *Rio Grande Wild and Scenic River Final General Management Plan / Environmental Impact Statement*

Case 3:26-cv-01099-KC Document 19-3 Filed 07/17/26 Page 251 of 260


National Park Service
U.S. Department of the Interior

# Rio Grande Wild and Scenic River

## Final General Management Plan / Environmental Impact Statement



**Final**
**General Management Plan / Environmental Impact Statement**
# RIO GRANDE WILD AND SCENIC RIVER
Brewster and Terrell Counties, Texas
August 2004

Congress designated a segment of the Rio Grande in Texas as the Rio Grande Wild and Scenic River in 1978 because of its "outstandingly remarkable" scenic, geologic, fish and wildlife, and recreational values. A 196-mile strip of land on the American side of the Rio Grande in the Chihuahuan Desert protects the river. The National Park Service (NPS) at Big Bend National Park is responsible for managing the wild and scenic river. This *General Management Plan / Environmental Impact Statement* will define a direction for the management of the Rio Grande Wild and Scenic River for the next 15 to 20 years, specifying the resource conditions and visitor experiences that the National Park Service would like to achieve.

To establish the desired experiences and resource conditions for the wild and scenic river, a partnership team was established with representatives from Texas Parks and Wildlife, local counties, an international environmental organization, river user groups, and private landowners. On the basis of public comments and within the framework established by legislation and mandates, the planning team and partners developed a no-action alternative (continuation of current management) and an "action" alternative for managing the wild and scenic river.

**Alternative A, the no-action alternative,** would continue current management practices into the future. Its goal would be to retain the existing visitor experiences. No new management plan would be implemented. The National Park Service would respond to future needs and conditions associated with the existing wild and scenic river designation without major actions or changes in course. Compliance with the Wild and Scenic Rivers Act and associated guidelines requires a river management plan, which would not be prepared under this alternative. No agreements with landowners would be initiated, and there would be no changes in river access from federal land. Private and state landowners could open or close public access as they wished. The river boundary would remain at the default 0.25 mile from the ordinary high water mark on the United States side of the river.

The intent of **Alternative B, the preferred alternative,** would be to enhance resource protection and offer high-quality visitor experiences. The protection of natural and cultural resources would be emphasized, as would the visitor experience. A permanent boundary for the wild and scenic river would be established to reflect the river's outstandingly remarkable values. The National Park Service would negotiate individual agreements with each nonfederal landowner to specify the rights and responsibilities of the National Park Service and each landowner. The National Park Service would recommend to Congress that the upper segment of the Rio Grande in Big Bend National Park be designated a wild and scenic river, bringing the total federal and state ownership along the river to more than 50%.

**Alternative A** (which would continue the management pattern of the past 25 years) would not ensure the protection of outstandingly remarkable values on private lands. It would mean that no partnership for resource protection would be established between the National Park Service and private landowners. Resources could be damaged, and private lands now available to the public for recreational use at the sufferance of landowners could be closed off. The National Park Service would not assist private landowners in resource protection or law enforcement, and there could be continued mistrust of NPS intentions with respect to regulations and land acquisition.

Landowner agreements in **alternative B** would foster a cooperative relationship, allowing the National Park Service to play a role in protecting resources and values on nonfederal lands. NPS assistance would be available to landowners to protect outstandingly remarkable values on their land. An increase in Big Bend National Park staff would be included in this alternative. Beneficial effects on landowner relations, natural resources, cultural resources, scenic values, and recreational use would result from alternative B.

# SUMMARY

Congress designated a segment of the Rio Grande in Texas as the Rio Grande Wild and Scenic River in 1978 because of its "outstandingly remarkable" scenic, geologic, fish and wildlife, and recreational values. A 196-mile strip of land on the American side of the Rio Grande in the Chihuahuan Desert protects the river. The responsibility for managing the wild and scenic river was given to the National Park Service at Big Bend National Park, but no management plan has been approved that would guide the long-term management of the wild and scenic river.

The purposes of this *General Management Plan / Environmental Impact Statement* are to define a direction for the management of the Rio Grande Wild and Scenic River and to specify the resource conditions and visitor experiences to be achieved on the wild and scenic river. The plan is intended to provide a framework to help guide management programs and set priorities for the next 15 to 20 years. The approved plan will provide a framework for making decisions about the future direction for the management and use of the wild and scenic river.

In this plan, the official boundary of the Rio Grande Wild and Scenic River is described. Within that boundary, the outstandingly remarkable scenic, geological, fish and wildlife, recreational, scientific, and cultural values would be protected and the rights and needs of private property owners respected.

The National Park Service (NPS) regards the public as an integral team member in establishing the desired experiences and conditions of resources that will guide the management of the Rio Grande Wild and Scenic River. A vital partnership team was established with representatives from Texas Parks and Wildlife, local counties, an international environmental organization, river user groups, and private landowners.

## ALTERNATIVES

On the basis of public comments and within the framework established by legislation and mandates, the planning team and partners developed a no-action alternative (continuation of current management) and an "action" alternative for the management of the wild and scenic river.

### Alternative A: Existing Management Direction (No Action)

The no-action alternative represents the existing conditions at the Rio Grande Wild and Scenic River and what would happen if the current management practices continued into the future. The goal in this alternative would be to maintain the existing visitor experiences and the river's outstandingly remarkable values of scenery, recreation, geology, fish and wildlife, cultural resources, and scientific resources. No management plan would be implemented, and the Rio Grande Wild and Scenic River would be managed as at present.

"No action" does not imply or direct discontinuing the present uses or management actions or removing the existing designation. The National Park Service would respond to future needs and conditions associated with the existing wild and scenic river designation without major actions or changes in course. The river would continue to be managed without conflicting with the Wild and Scenic Rivers Act and associated guidelines, NPS management policies, and current park management and implementation plans. No agreements with landowners would be implemented; the National Park Service would not make any changes in river access; and private and state landowners could open or close public access as they wished. The river boundary would remain at the default 0.25 mile from the

ordinary high water mark on the United States side of the river.

**Alternative B: Enhance Resource Protection and Continue High-Quality Visitor Experiences (Preferred Alternative)**

The concept of alternative B, the alternative preferred by the National Park Service, would be to emphasize the protection of natural and cultural resources and of the visitor experience in the Lower Canyons (outside of Big Bend National Park boundaries). This would be done by enlisting landowners as full partners in protecting resources and establishing a permanent boundary reflective of outstandingly remarkable values.

A cornerstone of the preferred alternative is the implementation of individual agreements that the National Park Service would negotiate with each nonfederal landowner. These binding landowner agreements would specify what rights and responsibilities the National Park Service and each landowner would have in regard to the property within the established boundary. The National Park Service would discuss with landowners the outstandingly remarkable values on the property and boundary appropriate to protect those values. The agreements also would foster a spirit of cooperation instead of confrontation.

As another component of this alternative, the upper segment of the Rio Grande in Big Bend National Park would be recommended for wild and scenic river designation by Congress. This additional designation would bring the total federal and state ownership along the river to more than 50%, thus prohibiting the acquisition of fee title through condemnation of nonfederal lands. This point is extremely important among private landowners in the area.

## ENVIRONMENTAL CONSEQUENCES

The consequences to the environment, to the visitor experience, and to nonfederal landowners that could result from each alternative were evaluated.

**Effects of Alternative A**

With the existing default 0.25-mile boundary remaining in effect and no agreements being made between the National Park Service and private landowners under alternative A, the protection of outstandingly remarkable values on private lands would not be ensured. Partnerships would not be established between the National Park Service and landowners to protect the resources. Resources could be damaged, and private lands now available for public recreational use could be closed off. Without landowner agreements, the National Park Service would not be able to help landowners in resource protection or law enforcement, and there could be continued mistrust of NPS intentions with respect to regulations and land acquisition.

**Effects of Alternative B**

Implementing agreements with landowners would foster a cooperative relationship, allowing the National Park Service to play a role in the protection of resources and values on nonfederal lands along the wild and scenic river. Clauses in the agreements would allow the National Park Service to consult with and assist landowners in preserving outstandingly remarkable values and managing the use of their property by visitors. A recommendation to increase the staff of Big Bend National Park for river management would be included in this alternative. Beneficial effects on landowner relations, natural resources, cultural resources, scenic values, and recreational use would be realized from alternative B.







# PURPOSE OF AND NEED FOR THE PLAN

## INTRODUCTION

This *General Management Plan / Environmental Impact Statement* River presents and analyzes two alternative future directions for the management and use of the Rio Grande Wild and Scenic River. One of the alternatives, alternative B, has been identified as the alternative the National Park Service (NPS) prefers. The potential environmental impacts of both alternatives have been identified and assessed.

A general management plans is intended to be a long-term document that establishes and articulates a management philosophy and framework to guide decision-making for a period of 15 to 20 years. The plan will establish goals for desired future conditions of resources and visitor experiences, but it will not commit to specific actions to achieve these conditions. Such specific actions will be determined in lower-level planning documents. The purpose of a general management plan is to be a general programmatic-level document; therefore, the analysis of potential impacts in the environmental impact statement is also general.

This plan for the Rio Grande Wild and Scenic River contains several chapters. This chapter contains an explanation of why the plan is necessary and what it will accomplish, along with background information about the wild and scenic river. The river's purpose and significance are explained, and the management goals for this area are described. The legislative commitments, mandates, and policies that have guided and continue to guide the management of the river are discussed, as are the major issues and concerns that are addressed in the plan. Special terms used in this document are defined on page 11.

The "Alternatives" chapter presents two alternatives for the management of the wild and scenic river. Alternative A, the no-action alternative, would continue the current approach to managing the wild and scenic river. This is required as a baseline of comparison for other "action" alternatives. Alternative B would follow the management approach preferred by the National Park Service (NPS) and its key partners.

The "Affected Environment" chapter contains a description of selected natural and cultural resources, the available visitor experience, and the socioeconomic conditions in the Rio Grande region that might be affected by implementing this plan.

The "Environmental Consequences" chapter contains descriptions of the potential effects on the environment that could result from each alternative.

In the "Consultation and Coordination" chapter are descriptions of the processes used by the planning team to solicit public comments and to consult with other agencies. Comments that were received about the draft document also are addressed in this chapter, along with responses to those comments.

Further information about legislation and a sample landowner agreement are included in the appendixes.

## PURPOSE

The primary purpose of this plan is to protect the free-flowing river and provide a foundation from which to protect natural and cultural resources while providing for meaningful visitor experiences. A secondary purpose is to encourage compatible activities on adjacent lands so as to minimize adverse effects on river values. Although this plan will provide overall direction for river management, subsequent action plans, such as a river use management plan, may be necessary to guide specific actions for implementing the plan. This plan fulfills the obligation for a comprehensive

river management plan required by the Wild and Scenic Rivers Act.

This plan will specify the desired future resource conditions and visitor experiences in the Rio Grande Wild and Scenic River and prescribe management strategies for achieving those conditions. This conceptual plan will provide the basic framework for decision-making for the next 15 to 20 years. It contains a map and a description of the proposed boundary of the wild and scenic river, within which the outstandingly remarkable scenic, recreational, geologic, fish and wildlife and cultural values would be protected and the needs of private property owners respected. (Also see appendix A, "Legislation.")

Part 1 (b) of the Wild and Scenic Rivers Act (16 USC 1271-1287; Public Law 90-542 of October 2, 1968) designates that outstandingly remarkable values are to be protected, as follows:

> It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

The National Park Service has developed a series of management objectives to guide future decision-making (see "Goals" beginning on p. 13).

Actions directed by general management plans or in subsequent implementation plans are accomplished over time. Budget restrictions, requirements for additional data or regulatory compliance, and competing national park system priorities might prevent the immediate implementation of some actions. Major or especially costly actions could be implemented ten or more years into the future.

## NEED

According to the Wild and Scenic Rivers Act, the boundaries and classification are to be completed within one year after designation. After the designation of a river, a comprehensive river management plan with official boundaries is to be completed within three years. The Rio Grande Wild and Scenic River was designated in 1978, and the National Park Service developed a general management plan / development concept plan for the river in 1981. According to that plan, the boundary of the wild and scenic river was to include only the area from the center of the river to the gradient boundary on the United States side. The National Park Service, in consultation with the Department of the Interior Solicitor's Office, later determined that boundary to be inadequate to protect the outstandingly remarkable values, and hence legally deficient. The plan never was implemented. Later, congressional action specified that the boundaries on all wild and scenic rivers without approved management plans were, by default, 0.25 mile from the ordinary high-water mark.

Therefore, there never has been a plan to guide the long-term management of the Rio Grande Wild and Scenic River. A plan is needed to identify and protect specific outstandingly remarkable values and to comply with the law, NPS *Management Policies 2001* and Director's Order (DO) *2, Planning Process Guidelines.*

In addition, preparing this plan presents an excellent opportunity to foster cooperative working relationships between the U.S. government, represented by the National Park Service, and state and local governments, river users, owners of adjacent property, and the government of Mexico.

# BACKGROUND

## DESCRIPTION AND LOCATION

In 1978 Congress designated a segment of the Rio Grande a national wild and scenic river under the Wild and Scenic Rivers Act (16 USC 28 §1274):

> The segment on the United States side of the river from river mile 842.3 above Mariscal Canyon downstream to river mile 641.1 at the Terrell–Val Verde County line, to be administered by the Secretary of the Interior . . .

The International Boundary and Water Commission later revised the river miles on the Rio Grande, changing the beginning and ending points to 853.2 and 657.5, respectively. This component of the national wild and scenic river system is unique in that only half of the river is designated. The southern half of the river could not be included in the designation because it is owned by Mexico.

### Location

The designated stretch of the Rio Grande begins in Big Bend National Park, opposite the boundary between the Mexican states of Chihuahua and Coahuila. It then flows through Mariscal and Boquillas canyons in the national park. Downstream from the park, it extends along the state-managed Black Gap Wildlife Management Area and several parcels of private land in the Lower Canyons. The wild and scenic river segment ends at the county line between Terrell and Val Verde counties, Texas (see the Location / Current Management map).

### Outstandingly Remarkable Values

Congress designated the Rio Grande Wild and Scenic River because of its outstandingly remarkable scenic, geologic, fish and wildlife, recreational, and other similar values.

**Scenic Values.** Rugged canyons, verdant riparian areas, scenic rapids, and unspoiled views contribute to the scenic allure and outstanding visual quality of this area.

**Geologic Features.** Rock layers exposed by the Rio Grande were deposited about 100 million years ago. Subsequent uplifting, folding, faulting, and cutting of the river have produced the present topography. Near its upstream end, the Rio Grande has sliced through the surrounding rocks to form steep-walled, sometimes narrow canyons. Downstream from Boquillas Canyon, the river flows across a relatively broad and open floodplain, or *vega*. Near Reagan Canyon, the floodplain narrows abruptly, and the river flows in a continuous deeply cut canyon for almost 40 miles. In the Lower Canyons portion of this segment, the river and its tributaries lie 500 to 1,500 feet below the surrounding plateaus.

**Fish and Wildlife.** The Rio Grande Wild and Scenic River corridor represents an exceptional example of Chihuahuan Desert fauna in association with species that depend on the rare aquatic and riparian habitats of the river. It is an isolated outpost of rapidly dwindling and irreplaceable natural resources such as several fauna in association with species, including threatened and endangered species, that depend on the rare aquatic and riparian habitats of the river. A number of wildlife species (especially birds) use the Rio Grande as a travel corridor. Many species of animals depend on the riverine habitat for survival.

**Recreational Opportunities.** Spectacular river canyons, occasional rapids, the primitive character of the river, and its international flavor create a stimulating environment for a high-quality recreational experience. The river can be enjoyed from canyon rims, along the shore, or in a boat. The designated segment is long enough to offer several varied and meaningful recreational experiences lasting from a few hours to several days.

**GRAVES DECLARATION**

**EXHIBIT 11**

U.S. Fish and Wildlife Service's webpage titled *Rio Grande*




## Rio Grande (/rivers/river/rio-grande-texas)

# Rio Grande

Texas

This 191-mile stretch of the United States side of the Rio Grande along the Mexican border begins in Big Bend National Park. The NPS's jurisdiction on the Rio Grande downstream from the Big Bend National Park's boundary includes only the river area from the United States/Mexico international boundary in the middle of the deepest channel to the gradient boundary at the edge of the river on the United States' side. The river cuts through isolated, rugged canyons and the Chihuahuan Desert as it flows through some of the most critical wildlife habitat in the country.




VIEW LARGER MAP (/RIVERS/MAP?RIVER=RIO-GRANDE-TEXAS)

## Designated Reach

November 10, 1978. The segment on the United States side of the river from river mile 842.3 above Mariscal Canyon downstream to river mile 651.1 at the Terrell-Val Verde County line.