Dustin Rynders (TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 1108
Houston, TX 77251
Tel: (832) 767-3630 ext. 196
dustin@texascivilrightsproject.org

Kate Gibson Kumar (TX Bar No. 2413588)
Alana Park (TX Bar No. 24150568)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 17757
Austin, TX 78760
Tel: (512) 474-5073 ext. 225
kate@texascivilrightsproject.org
alana@texascivilrightsproject.org

Zeynep J. Graves (CA Bar No. 298533)*
Emma Yip (CA Bar No. 352446)*
Shannon Eva Labuschagne (CA Bar No. 365633)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel: (206) 858-2297
Fax: (520) 623-9797
zgraves@biologicaldiversity.org
eyip@biologicaldiversity.org
slabuschagne@biologicaldiversity.org

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION, <br><br> *Defendants*. | Case No. 3:26-cv-01099-KC <br><br> **FIRST AMENDED AND SECOND SUPPLEMENTED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

**INTRODUCTION**

*Colorful immensity and primeval magnificence fill the beholder with a great sense of upheaval, a feeling that gods older than ours clapped their hands to command the canyons into sudden glorious being. The pedestrian mind of man is linked for an instant with the force that created man and mountain. Up among the craggy cliffs and precipitous ledges there is a sense of gigantic turbulence. One feels that the gods are still engaged in a primordial rough and tumble, an Olympian roughhouse that gouges and rends chasms through the heart of the mountains . . . No man has altered that country, but it has altered many a man.*

Mary Lasswell, *Coloraturas in the Canyon* (1958).

1.     In this action, Plaintiffs challenge the U.S. Department of Homeland Security's ("DHS" or "the Agency") unconstitutional repeal of bedrock environmental and historic protections and dozens of other federal laws to expedite massive border wall construction on the Texas-Mexico border that will destroy iconic sections of the Rio Grande corridor in the United States while tarnishing the carefully wrought web of laws meant to protect a vast universe of biological, historic, cultural, and other interests.

2.     Texas's far west region is called the "Big Bend" because it encompasses the Rio Grande's south and then northward curvature around the Chisos mountains. The river corridor is life-sustaining for an extraordinarily diverse range of rare and endemic plants and animals in the Chihuahuan Desert, houses abundant archeological, cultural, and historic resources, and boasts some of the darkest skies in the continental U.S. Mammals such as the pronghorn, black bear, javelina, bighorn sheep, and a unique type of whitetail deer, the Carmen Mountain deer, roam this region.

3.     On February 17, June 9, and July 27, 2026, the Secretary of Homeland Security announced that the Agency will construct "additional barriers and roads" in the Big Bend region: one project area spans over 250 miles along the Rio Grande ("West Wall Project"), the second project area encompasses Big Bend National Park and covers an additional 180 miles of border

("National Park Wall Project"), and the third project area stretches downriver from the National Park an additional 176 miles, ending at Lake Amistad ("Lower Canyons Wall Project") (together, "Big Bend Wall Project" or "Project"). *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 7297 (Feb. 17, 2026), *as amended by* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 40550 (July 2, 2026) (together, the "West Waiver");[1] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 27969 (May 15, 2026), *as amended by* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 34831 (June 9, 2026) (together, the "National Park Waiver");[2] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 46939 (July 27, 2026) (the "Lower Canyons Waiver") (together, with the West Waiver and National Park Waiver, the "Big Bend Waivers").

4.      The West Waiver authorizes immense construction of walls, lights, and roads, including the erection of new 30-foot-tall bollard walls sprawling from near Quitman Point, Texas, traversing along the Rio Grande, through much of Big Bend Ranch State Park, and ending near Closed Canyon. The National Park Waiver picks up where the West Waiver ends, authorizing the same types of construction through the remainder of the State Park and through the entirety of Big

---

[1]      On July 2, 2026 DHS published another waiver that "amends the February 17, 2026, notice of determination by including additional legal requirements that are being waived." Plaintiffs challenge both waivers and refer to them jointly as the "West Waiver."

[2]      The May 15, 2026 waiver contained errors in its description of the project area. As a result, on June 9, 2026 DHS published another waiver described as "a republication of the May 15, 2026, document with the correct project area description." Plaintiffs challenge both waivers and refer to them jointly as the "National Park Waiver."

Bend National Park and Black Gap Wildlife Management Area. The National Park Waiver covers some of the most remote sections of the Rio Grande's Wild and Scenic River designations, and includes Santa Elena Canyon, Mariscal Canyon, Warm Springs, and Boquillas del Carmen. The Lower Canyons Waiver starts where the National Park Waiver ends, encompassing the lower canyons of the Rio Grande's Wild and Scenic River designations and ending at Lake Amistad. Together, the Big Bend Waivers authorize massive projects that would cleave through the Chihuahuan Desert, sever public and wildlife access to iconic sections of the Rio Grande, and mark one of the final—and most consequential—steps towards completing "the Wall."

5.     The Chihuahuan Desert is the largest desert in North America and one of the most biologically diverse desert ecosystems on the planet. The Rio Grande, called the Rio Bravo in Mexico, is the primary major river flowing through the Chihuahuan Desert and is the main artery of the Big Bend region. This area boasts extraordinary geology, biology, and history, and lies at the confluence of multiple major ecosystems, including desert grasslands, limestone canyons, sky islands, and riparian corridors.

6.     Because this substantial Project will result in numerous adverse impacts on cultural, recreational, wildlife, and environmental resources, DHS typically would be required to comply with the nation's essential environmental protection and historic preservation laws before proceeding with the Project. For example, DHS would be mandated to engage in consultation under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, to evaluate the impacts of the Project on imperiled species and ensure it does not threaten their survival or recovery. Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, DHS would also be required to evaluate the environmental impacts of the Project, receive and respond to public comment, and consider reasonable alternatives. Similarly, under the National Historic Preservation

Act ("NHPA"), 54 U.S.C. §§ 300101–307108, DHS would be required to identify and evaluate the Project's effects on historic properties listed or eligible for listing on the National Register of Historic Places, consult with appropriate parties to assess any adverse effects, and, where such effects are found, develop and evaluate alternatives or modifications to the Project to avoid, minimize, or mitigate such effects.

7.      However, the Big Bend Waivers invoked Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended. IIRIRA grants the DHS Secretary authority to "waive all legal requirements," that the Secretary determines, in their "sole discretion," are "necessary to ensure expeditious construction" of physical barriers and roads in the vicinity of the U.S.-Mexico border "to deter illegal crossings in areas of high illegal entry." 8 U.S.C. § 1103(a), (c) note.

8.      Since 2017, IIRIRA Section 102(c) has been deployed as part of an executive program to achieve a complete, cross-continental, border-length barrier through piecemeal, sector-by-sector waivers, including nine sector-wide waivers of procurement laws issued on October 15, 2025 that collectively span the entire southern border, followed by the Big Bend Waivers that purport to set aside NEPA, the ESA, NHPA, and more than two dozen additional federal statutes for this Project.

9.      That assertion of sweeping authority—effectively to serially displace multiple statutory regimes across vast geography in service of an unmandated and controversial border-wide barrier bisecting the entire North American continent—threatens the carefully wrought architecture of our Constitution's separation of powers. Article I vests in Congress alone the exclusive legislative authority to make, amend, and repeal laws for the country. U.S. Const.

art. I, § 8. Article II vests in the Executive Branch alone the duty to faithfully execute those laws. U.S. Const. art. II, § 3. Here, five constitutional doctrines speak firmly to find the DHS Secretary's assertion of authority unconstitutional: First, the major questions doctrine requires that Congress "speak clearly" when it delegates powers of "vast economic and political significance." *See, e.g. West Virginia v. EPA,* 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Utility Air Regulatory Group v. EPA,* 573 U.S. 302, 324 (2014)). IIRIRA lacks such a clear statement for a cross-continental border project. Second, if the Big Bend Waivers do not exceed the Secretary's statutory authority as a major question, then the waiver authority provided by IIRIRA Section 102(c) violates the Constitution's foundational principle of the nondelegation doctrine because it lacks an intelligible principle. Third, the Secretary's sweeping invocation of waiver authority violates the Take Care Clause of the U.S. Constitution by disregarding the substantive limitations Congress imposed in IIRIRA. Section 102 confines waiver authority to the "expeditious construction of barriers and roads" in areas of high illegal entry, such that extending the waiver to additional infrastructure—such as lighting, cameras, and sensors—and to areas beyond those statutory limits constitutes a failure to "faithfully execute" applicable laws as required by the Take Care Clause. Fourth, the Big Bend Waivers violate the Constitution's Fifth Amendment because they deprive Plaintiffs of their property and liberty interests by eliminating access to the Rio Grande without any due process. Fifth, IIRIRA's waiver authority unconstitutionally grants the DHS Secretary— an unelected Executive Branch official—the lawmaking power to independently nullify portions of duly enacted statutes without complying with bicameralism and presentment procedures, violating the Presentment Clause.

10.    Plaintiffs FRIENDS OF THE RUIDOSA CHURCH, DANNY WILLIAM MILLER JUNIOR, and CENTER FOR BIOLOGICAL DIVERSITY are harmed by the DHS

6

Secretary's unlawful issuance of the Big Bend Waivers—as well as Section 102(c) of IIRIRA generally—and bring this action seeking declaratory and injunctive relief and other remedies as set forth below.

## JURISDICTION

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346, 5 U.S.C. §§ 701 to 706, and 8 U.S.C. § 1103 note. The causes of action arise under the laws of the United States and the U.S. Constitution, and the United States is a defendant. The relief requested is authorized pursuant to 28 U.S.C. §§ 1651 and 2201 to 2202, and 5 U.S.C. §§ 701 to 706.

## VENUE

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring here, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by Federal Defendants, and/or Federal Defendants' failure(s) to act.

## PARTIES

13. Plaintiff FRIENDS OF THE RUIDOSA CHURCH ("Friends") is a non-profit organization dedicated to the preservation and maintenance of El Corazón Sagrado de la Iglesia de Jesús (the Sacred Heart of the Church of Jesus) in Ruidosa, Texas. In 2026, the National Trust for Historic Preservation designated El Corazón Sagrado de la Iglesia de Jesús as one of America's 11 Most Endangered Historic Places. Friends' mission is to stabilize, restore, and revitalize the historic site of the church through community engagement, teaching traditional adobe restoration practices, and sustainable preservation efforts. Friends brings this action on its own behalf and on behalf of its adversely affected members.

14. Friends' member Mike Green of Marfa, Texas is an architect and historic

7

preservation advocate who has long been involved in efforts to preserve and restore the historic Sacred Heart church along the Rio Grande. Mr. Green has been a member of Friends since its inception in 2020 and currently serves as its president. He has been visiting the area since the 1980s and was deeply moved by the church's deteriorating condition, which inspired his involvement in its preservation. Mr. Green has worked alongside other community members to protect, as well as stabilize and restore the structure using traditional adobe construction methods. These efforts include organizing and participating in regular community workshops that bring volunteers together to make adobe bricks and rehabilitate the building. He values the site for its historic, architectural, spiritual, and community significance, as well as its peaceful and remote setting along the border. Mr. Green's longstanding professional, preservation, aesthetic, educational, historic, and spiritual interests would be directly and irreparably harmed by the DHS's planned border infrastructure. Such construction would fragment the landscape, degrade the scenic and spiritual character of the area, and pose a direct physical threat to the fragile adobe structure through vibration and other impacts, threatening ongoing preservation efforts and the community's connection to the historic property.

15.    The West Waiver will additionally deprive Mr. Green of the opportunity to participate in the public process typically required for projects of this scale, as well as access to critical information regarding environmental and structural impacts, including the risk that construction-related vibrations could damage the fragile adobe structure. Mr. Green has been visiting the Ruidosa area, including the church grounds, for decades and intends to continue returning regularly—on average, at least once every other month. He plans to return again in the late summer/early fall 2026 to prepare for a community day in November 2026, continuing the preservation work and community engagement efforts central to his involvement.

16.     Plaintiff DANNY WILLIAM MILLER JUNIOR is a longtime resident of the Big Bend region of Texas and a professional river and outdoor recreation guide who has lived and worked in the area since 2005. Mr. Miller's personal, professional, and family life is deeply intertwined with the Rio Grande. He resides in Terlingua, Texas, where he has built his home, career, and community around the river and the surrounding landscape. Additionally, Mr. Miller owns and regularly uses a family property situated on the banks of the Rio Grande and neighboring Big Bend Ranch State Park to recreate and access the river.

17.     For more than twenty-one years, Mr. Miller has maintained professional and personal ties to the Rio Grande, earning his livelihood as a river guide while also using the river and surrounding lands to recreate with his family. He has worked in the regional recreation industry for decades, including approximately twelve years with Far Flung Outdoor Center. Mr. Miller regularly uses his family property located next to the Rio Grande to access the river for both his professional guiding activities and for personal recreation, including river trips, camping, fishing, and wildlife observation with his family. Mr. Miller frequently visits sections of the river impacted by the Big Bend Waivers.

18.     When river conditions are high enough, Mr. Miller visits the Rio Grande and his neighboring property multiple times each week to guide river trips, recreate, and spend time outdoors with his family. During periods of low water, he regularly goes to his property to camp, hike, and observe wildlife near the river. These repeated and ongoing uses of the river are essential to both his livelihood and quality of life. He plans to continue these regular weekly visits for the foreseeable future, unless accessing the river becomes impossible due to border wall construction.

19.     The Big Bend Waivers and Project harm Mr. Miller's professional, aesthetic, moral, and recreational interests in accessing and using the river. The wall would block or severely

restrict access at river locations he has used for decades, physically preventing him from safely guiding commercial rafting trips and recreating on the Rio Grande as he has historically done. The Project would also cause ecological fragmentation, result in visual degradation of the landscape, reduce the area's wilderness character, and degrade wildlife habitat. These harms would substantially diminish the area's appeal for Mr. Miller and visitors to the area, which depends on an ecologically intact river ecosystem and barrier-free access to the Rio Grande. As a result, Mr. Miller would lose his primary livelihood as a professional river guide on the Rio Grande and his family would be unable to continue using the river and their neighboring property for boating, fishing, camping, and other recreational activities as they have done in the past. Construction of a border wall, through its restriction of access, ecological fragmentation, and visual degradation of the landscape, would significantly diminish the area's appeal, preventing Mr. Miller from continuing in his profession and harming his ongoing enjoyment of the Rio Grande.

20. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has more than 101,600 members and is headquartered in Tucson, Arizona. The Center brings this action on behalf of its adversely affected members.

21. Center members live in or regularly visit the U.S.-Mexico borderlands region in the Big Bend region and vicinity of the Big Bend Wall Project. Center members regularly use areas impacted by and/or adjacent to the location of the Project for hiking, camping, boating, viewing and researching wildlife, photography, and other vocational, recreational, and professional activities. Center members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their interactions with wildlife, their signs, and their habitat in these areas.

Center members have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

22.     For example, Bernadette Devine has been a member of the Center for over 30 years and has lived and worked in the Big Bend region for just as long. Ms. Devine is a former river guide who regularly recreates on the Rio Grande between Redford and the Rancherias launch, including trips to Colorado Canyon and the Hoodoos of Big Bend Ranch State Park, and through the National Park, which she has visited over the years for family recreation, commemorative and memorial river trips, camping, and celebrations of life. She and her family have long used the areas impacted by the Big Bend Waivers for river trips, dark-sky viewing, and gathering with friends and community. Her son, now in his 20s, learned boating and river skills in these waters. Ms. Devine is an educator in the Terlingua Common School District, where she has taught Pre-K through eighth grade, serves as the ESL coordinator, and has led multiple outdoor education trips along the Rio Grande to locations including Colorado Canyon and Fort Leaton, fostering students' connections to the river and public lands. Ms. Devine is directly and irreparably harmed by the Big Bend Waivers and Project, which would degrade the wild and dark-sky character of the landscape, harm river access and cultural sites, and disrupt outdoor education and recreation.

23.     As another example, Laiken Jordahl has been a Center member since 2017 and works to protect wildlife, ecosystems, and public lands in his position as National Public Lands Advocate and Borderlands Campaigner for Plaintiff Center. He previously served as a National Park Service Wilderness Fellow, where he prepared in-depth reports assessing threats to wilderness character to national parks, including Big Bend National Park, and assessing such harms as those arising from U.S. Border Patrol activities like road development, infrastructure, and vehicle use. Having spent significant time in the borderlands, including the Texas-Mexico

borderlands, Mr. Jordahl feels a strong emotional connection to public lands, especially along the southern border. As an avid hiker, boater, and camper, he has spent a great deal of time traversing, birdwatching, stargazing, boating, swimming, and wildlife-watching in and near the Rio Grande and Texas Big Bend region. Mr. Jordahl has witnessed firsthand the environmental devastation inflicted by border wall construction elsewhere along the borderlands, and the lasting impacts on soil, vegetation, and the halting of migrating wildlife in their tracks, preventing animals like desert bighorn sheep, mule deer, Sonoran pronghorn, and black bears from finding water, food, and mates. The destruction of one of the last intact wild places along the borderlands, especially one so physically and emotionally tied to his professional and spiritual identity, and a place that Mr. Jordahl has spent years trying to protect, would undoubtedly harm his aesthetic, recreational, and spiritual interests, and forever alter his reasons to be in this region. The Big Bend Waivers will additionally deprive him of the opportunity to participate in the public process normally involved with similar large-scale environmental projects, as well as access to important information regarding the far-reaching environmental impacts likely to occur, such as the likely installation and use of artificial lighting that harms sensitive species who live near or otherwise rely on this important area. Mr. Jordahl first visited the Big Bend region in 2015 and has continued to visit regularly over the years. He intends to continue returning to this region as long as he is alive, and as soon as late summer/early fall of 2026.

24.     Similarly, Sam Stavinoha is another Center member who lives and works in the Big Bend region of Texas, where he owns and operates the historic French Company Grocer in Marathon and a hospitality property in Terlingua that serves visitors to Big Bend National Park, Big Bend Ranch State Park, and the Rio Grande corridor. Mr. Stavinoha has lifelong, ongoing aesthetic, recreational, spiritual, environmental, economic, and moral interests in the Big Bend

landscape, which he regularly uses for hiking, boating, river trips, scenic travel, wildlife viewing, and dark-sky recreation. The remote, open, and ecologically intact character of the Rio Grande corridor and surrounding desert is central to his personal well-being. Mr. Stavinoha would be directly and irreparably harmed by DHS's waiver of environmental laws and planned border wall construction in the Big Bend region, which would fragment and industrialize currently wild public lands, degrade scenic and spiritual values, restrict access to river corridors and geologic features, harm wildlife habitat, and deter visitors from his small businesses.

25.    The Center itself has a long history of environmental advocacy within the borderlands region and has worked for decades to oppose environmentally harmful border fencing and other harmful border security projects along the U.S.-Mexico border. The Center also has a long history of advocating for the protection of rare wildlife habitats that are impacted by border wall construction, as well as advocating for specific species that are harmed by border wall construction, including endangered jaguars and ocelots, plus Sonoran pronghorns, bighorn sheep, black bears, and mountain lions.

26.    Plaintiff Center and its respective members are harmed by Defendants' constitutional violations. The proposed Big Bend Wall Project and the larger, cross-continental border project entail massive construction operations with associated noise, lighting, and other impacts, and which will likely necessitate new land clearing, grading, staging, and other associated activities that will impact the surrounding environment. The construction—which will occur without the benefit of compliance with NEPA, the ESA, NHPA, and other laws—will negatively impact the wildlife habitat and imperiled species described above, which will injure the Center and its members' aesthetic, conservation, recreational, scientific, educational, wildlife preservation, professional, and spiritual interests in those habitats and species. These injuries would be redressed

by the requested relief, as absent the Big Bend Waivers, the harmful construction either would not occur or would only occur after compliance with the requirements of NEPA, the ESA, NHPA, and other laws, which are designed to eliminate, reduce and/or mitigate the negative environmental, historic, and cultural consequences of federal agency actions and provide meaningful public notification, comment, and government transparency.

27.     Plaintiffs have no other adequate remedy at law.

28.     Defendant MARKWAYNE MULLIN, Secretary of DHS, is sued in his official capacity. Secretary Mullin is the official ultimately responsible under federal law for ensuring that the actions and management decisions of DHS and its component agency U.S. Customs and Border Protection comply with all applicable laws and regulations. Secretary Mullin's predecessor, Kristi Noem, invoked the IIRIRA Section 102(c) waiver authority for the West Waiver on February 17, 2026. Secretary Mullin subsequently invoked the IIRIRA Section 102(c) waiver authority for the National Park Waiver on May 15, 2026 and June 9, 2026; to amend the West Waiver on July 2, 2026; and to issue the Lower Canyons Waiver on July 27, 2026.

29.     Defendant U.S. DEPARTMENT OF HOMELAND SECURITY is an agency within the executive branch of the U.S. government. The Department is responsible for ensuring border security along the U.S.-Mexico border consistent with applicable legal requirements.

30.     Defendant U.S. CUSTOMS AND BORDER PROTECTION is an agency within DHS and is responsible for ensuring border security along the U.S.-Mexico border consistent with applicable legal requirements.

**LEGAL BACKGROUND**

**A.     The Illegal Immigration Reform and Immigrant Responsibility Act of 1996**

31.     Congress initially enacted IIRIRA in 1996 to, for the first time, provide federal

agencies with specific direction regarding the location and extent of border barriers to be constructed. P.L. 104-208, div. C., codified at 8 U.S.C. § 1103 note. Prior to IIRIRA, the authority to construct border barriers derived from the general statutory responsibility of the Attorney General (now the DHS Secretary) to "guard the boundaries and borders of the United States against the illegal entry of aliens." Immigration and Nationality Act, § 103(a)(5), 8 U.S.C. § 1103(a)(5). That authority continues to exist independent of IIRIRA.

32.     While it has been amended several times, IIRIRA Section 102 remains the primary federal statutory provision addressing border barriers. Section 102(a) remains substantively the same as originally enacted in 1996, providing the U.S. Attorney General (now the DHS Secretary) with the general policy direction to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."

33.     At the time Section 102(a) was enacted, Congress also provided that "to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this Section," the specific requirements of the ESA and NEPA may be waived.

34.     As originally enacted, IIRIRA Section 102(b) "carr[ied] out subsection (a)" by identifying specific border barriers to be constructed, establishing specific deadlines for the construction of such barriers, and other requirements. The only border fence segment initially mandated by Congress under IIRIRA Section 102(b) was the construction of 14 miles of fencing in San Diego, California.

**B.     The 2005 REAL ID Act Amendments to IIRIRA Section 102(c)**

35.     Enacted in 2005 as an unrelated legislative rider to the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005," Section

15

102 of the REAL ID Act amended the Section 102(c) IIRIRA waiver provision in two primary ways. *See* P.L. 109-13, div. B.

36. First, the REAL ID Act amendment expanded the IIRIRA Section 102(c) waiver authority beyond NEPA and the ESA to permit the DHS Secretary "to waive all legal requirements [that] such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads" in areas of high illegal entry. IIRIRA § 102(a), (c). Congress provided neither specific laws to be voided nor any further guidance in such authority granted to the Secretary.

37. Second, Section 102 of the REAL ID Act amended the waiver authority under IIRIRA Section 102(c) to severely restrict judicial review concerning any waiver decision in the following respects: (i) purporting to limit "all causes or claims" arising from any waiver determination made by the DHS Secretary to alleged constitutional violations only; (ii) requiring any such constitutional challenge to be filed not later than 60 days after the Secretary's determination, effective upon being published in the Federal Register; and (iii) eliminating appellate court review of the district court's decision on the alleged constitutional violations and instead only permitting review upon a writ of certiorari to the U.S. Supreme Court.

**C.    The 2006 Secure Fence Act Amendments to IIRIRA Section 102(b)**

38. The Secure Fence Act further amended IIRIRA in 2006. P.L. 109-367. Section 3 of the Secure Fence Act ("Construction of Fencing and Security Improvements in Border Area from Pacific Ocean to Gulf of Mexico") significantly expanded upon IIRIRA Section 102(b). Under the Secure Fence Act amendments to IIRIRA Section 102(b), Congress removed the provisions referring specifically to the 14-miles of fencing in San Diego and instead directed DHS to "provide for at least 2 layers of reinforced fencing [and] the installation of additional physical barriers,

roads, lighting, cameras, and sensors" in five specific segments along the U.S.-Mexico border totaling approximately 850 miles. Former IIRIRA §102(b)(1)(A)(i)-(v).

**D.    The 2008 Consolidated Appropriations Act Amendments to IIRIRA Section 102(b)**

39.    Section 564 of the 2008 Consolidated Appropriations Act amended Section 102(b) of IIRIRA once again. P.L. 110-161. These modifications—which remain the law to date—include eliminating the prior Congressional parameters that border barriers be built in specific locations, and instead simply outlining that such barriers be placed "along not less than 700 miles of the southwest border where fencing would be most practical and effective," and amending the "priority areas" requirement to direct that DHS identify and construct 370 miles of border barriers by December 31, 2008. IIRIRA § 102(b)(1)(A)–(B).

40.    While giving DHS this new power to unilaterally determine where to undertake environmentally destructive border barrier activities, Congress also maintained its delegation limiting IIRIRA's barrier-building authority to "areas of high illegal entry." IIRIRA § 102(a).

**E.    IIRIRA Section 102, As Amended**

41.    The relevant Sections of IIRIRA Section 102, codified at 8 U.S.C. § 1103 note, in its current version to date, provide:

> **(a) In general.--**The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.
> **(b) Construction of fencing and road improvements along the border.—**
>     **(1) Additional fencing along southwest border.—**
>         **(A) Reinforced fencing.--**In carrying out subsection (a) [of this note], the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

**(B) Priority areas**.--In carrying out this Section [Pub. L. 104-208, Div. C, Title I, § 102, Sept. 30, 1996, 110 Stat. 3009-554, which amended this Section and enacted this note], the Secretary of Homeland Security shall—

    (i)    identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

    (ii)    not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

**(C) Consultation.**

    (i)    **In general.--**In carrying out this Section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed

    **(ii)**    **Savings provision.--**Nothing in this subparagraph may be construed to—

        **(I)**    create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

        **(II)**    affect the eminent domain laws of the United States or of any State.

**(D) Limitation on requirements.--**Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

\*            \*            \*

**(c) Waiver.—**

**(1) In general.--**Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

**(2) Federal court review.—**

    **(A) In general.--**The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

    **(B) Time for filing of complaint.--**Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

    **(C) Ability to seek appellate review.--**An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

## FACTUAL BACKGROUND

**A.**     **Past Use of the Waiver Authority Under IIRIRA and the Goal of a "Great Wall" Spanning the Southern Border**

42.     In the period between IIRIRA's 2005 amendment granting the DHS Secretary broad waiver authority through the end of 2016, the federal government relied on the Section 102(c) waiver authority five times. *See* 70 Fed. Reg. 55622 (Sept. 22, 2005); 72 Fed. Reg. 2535 (Jan. 19, 2007); 72 Fed. Reg. 60870 (Oct. 26, 2007); 73 Fed. Reg. 18293 (April 3, 2008), as amended; 73 Fed. Reg. 18294 (April 3, 2008), as amended.

43.     Prior to his inauguration, President Donald J. Trump campaigned on a promise to build "the Great Wall" along America's southern border, paid for by Mexico.[3]

44.     Upon entering the White House in 2017, then-President Trump directed DHS to construct a "secure, contiguous, and impassable physical barrier" along the entirety of the nearly 2,000-mile-long U.S.-Mexico border. Exec. Order No. 13767 § 3(e), 82 Fed. Reg. 8793 (Jan. 25,

---

[3]     Louis Nelson, *Trump slams media on border wall: Mexico will pay us back*, POLITICO (Jan. 6, 2017), https://www.politico.com/story/2017/01/trump-border-wall-tweet-mexico-233265.

2017). The term "wall" was defined as "a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier." *Id.* § 3(e).

45.     Over the course of his first term, President Trump's administration utilized the waiver authority in Section 102(c) of IIRIRA over two dozen times[4] and constructed approximately 450 miles of barrier along the southern border.[5] Despite these actions, substantial portions of the "Great Wall" remained without physical barriers at the conclusion of his first term.

46.     Following President Trump's departure from office, Congress sought to revive efforts to complete the border wall. On April 21, 2021, Representative Clay Higgins introduced H.R. 2729, titled *Finish the Wall Act*, which would have required DHS to resume border wall construction. *See* H.R. 2729, 117th Cong. § 2 (2021). Representative Higgins reintroduced substantively similar legislation on January 12, 2023, again titled *Finish the Wall Act*. *See* H.R. 336, 118th Cong, § 2 (2023). On March 8, 2023, Senator James Risch introduced the *Solving the Border Crisis Act*, which likewise would have required DHS to "immediately resume border wall system construction" along the southern border. *See* S. 716, 118th Cong. § 6(a) (2023). That same year, Representative Mario Diaz-Balart and Senator Ted Cruz introduced companion legislation titled *Secure the Border Act of 2023* which would have mandated the immediate resumption of border wall construction and amended IIRIRA Section 102 to eliminate the limitation that barriers be constructed only in "areas of high illegal entry," while further directing that the DHS Secretary "*shall waive* all legal requirements necessary to ensure the expeditious design, testing, construction, installation, deployment, integration, operation, and maintenance of the physical

---

[4]     Dr. Kenneth D. Madsen, DHS Sec. 102(c) Border Barrier Waivers, Ohio State University, https://u.osu.edu/madsen.34/dhs-waivers/ (last accessed Apr. 15, 2026).

[5]     Sabrina Rodriguez, *Trump's partially built 'big, beautiful wall,'* POLITICO (Jan. 12, 2021), https://www.politico.com/news/2021/01/12/trump-border-wall-partially-built-458255.

barriers, tactical infrastructure, and technology under this section." *See* H.R. 2, 118th Cong. § 103 (2023) (emphasis added); S. 2824, 118th Cong. § 103 (2023) (same). The terms "tactical infrastructure" and "technology" were defined to include, among other things, lighting, cameras, and sensors. Congress did not enact any of these bills.

47.     Upon President Trump's return to the White House, on January 20, 2025, he again directed the DHS Secretary to "construct additional physical barriers along the southern border" and declared a "national emergency at the southern border." *See* Presidential Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025). On the same day, President Trump issued an executive order further directing the DHS Secretary, in conjunction with the Secretary of Defense, to "take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States." Exec. Order 14165, Securing Our Borders, 90 Fed. Reg. 8467 (Jan. 20, 2025).

48.     On October 15, 2025, the DHS Secretary issued nine new waivers pursuant to Section 102(c), waiving dozens of procurement laws for barrier construction along the border. Each waiver encompasses the totality of a border patrol sector and for the first time, taken together, these waivers span the entirety of the U.S.-Mexico border. *See* 90 Fed. Reg. 48286 (Oct. 15, 2025) (Big Bend Sector) ("Big Bend Procurement Waiver"); 90 Fed. Reg. 48281 (Oct. 15, 2025) (Tucson Sector); 90 Fed. Reg. 48282 (Oct. 15, 2025) (El Centro Sector); 90 Fed. Reg. 48283 (Oct. 15, 2025) (Del Rio Sector); 90 Fed. Reg. 48284 (Oct. 15, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48285 (Oct. 15, 2025) (Yuma Sector); 90 Fed. Reg. 48287 (Oct. 15, 2025) (Laredo Sector); 90 Fed. Reg. 48288 (Oct. 15, 2025) (El Paso Sector); 90 Fed. Reg. 48289 (Oct. 15, 2025) (San Diego Sector) (together, the "Procurement Waivers").

49.     Since President Trump's 2017 executive order directing DHS to build a wall along the entirety of the U.S.-Mexico border, the executive branch has exercised its waiver authority under Section 102(c) of IIRIRA in over 60 waiver decisions.

50.     Today, as a result of the Procurement Waivers, there is no segment of the U.S.-Mexico border that lacks a Section 102(c) waiver. As a result, the entirety of the border, from California through Arizona, New Mexico, and Texas, has been deemed an "area of high illegal entry."

51.     On the date Plaintiffs filed the initial complaint (ECF No. 1), U.S. Customs and Border Protection's online "Smart Wall Map" indicated that 100 percent of the U.S.-Mexico border was either planned for construction, had construction contracts awarded, was under construction, complete, or planned to "be covered by detection technology."[6] Since then, the agency has repeatedly changed the map, indicating different and conflicting plans for planned border construction. At one point, the agency removed the Smart Wall Map entirely from its website.

**B.     The West Waiver**

52.     On February 17, 2026, then-Secretary Noem issued a Determination in the Federal Register purporting to invoke IIRIRA Section 102(c) in order to waive the application of NEPA, the ESA, NHPA, and numerous additional laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and

---

[6]     U.S. Customs and Border Protection, Smart Wall Map, available at: https://www.cbp.gov/border-security/along-us-borders/smart-wall-map (last accessed June 10, 2026).

installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors" within the "project area." 91 Fed. Reg. 7297, 7298 (Feb. 17, 2026).

53.    The "project area" is defined as the area in the vicinity of the border between GPS points 31.037623, −105.579877 and 29.325866, −104.046466. *Id.* at 7298.

54.    The DHS Secretary characterized the Big Bend Sector as "an area of high illegal entry," noting that there were over 89,000 apprehensions over a span of half a decade. *Id*. Despite this assertion, U.S. Customs and Border Protection has announced elsewhere that the Big Bend Sector has seen "a decline of 74 percent" over the last two years and only recorded a total of approximately 3,000 apprehensions in fiscal year 2025.[7] This amounted to just over 1% of total apprehensions.

55.    On July 2, 2026, Secretary of Homeland Security Markwayne Mullin issued another Determination in the Federal Register to "amend[] the February 17, 2026, notice of determination by including additional legal requirements that are being waived." 91 Fed. Reg. 40550 (July 2, 2026).

56.    The West Waiver purports to waive "in their entirety" the following federal statutes—and "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of":

    i.    National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*.;

    ii.    Endangered Species Act, 16 U.S.C. § 1531 *et seq.*;

---

[7]    U.S. Customs & Border Protection, *Illegal border crossings in Big Bend Sector fall significantly in FY 2025* (Dec. 5, 2025), https://www.cbp.gov/newsroom/local-media-release/illegal-border-crossings-big-bend-sector-fall-significantly-fy-2025.

iii. Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

iv. National Historic Preservation Act, 54 U.S.C. §§ 100101 note, 300101 *et seq.*;

v. Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*;

vi. Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*;

vii. Clean Air Act, 42 U.S.C. § 7401 *et seq.*;

viii. Archaeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*;

ix. Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*;

x. Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*;

xi. National Trails System Act, 16 U.S.C. § 1241 *et seq.*;

xii. Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*;

xiii. Noise Control Act, 42 U.S.C. § 4901 *et seq.*;

xiv. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*;

xv. Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*;

xvi. Archaeological and Historic Preservation Act, 54 U.S.C. § 312502 *et seq.*;

xvii. Antiquities Act, 54 U.S.C. § 320301 *et seq.*;

xviii. Historic Sites, Buildings, and Antiquities Act, 54 U.S.C. § 320301–320303 & 320101–320106;

xix. Eagle Protection Act, 16 U.S.C. § 668 *et seq.*;

xx. Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*;

xxi.     Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

xxii.    Section 438 of the Energy Independence and Security Act, 42 U.S.C. § 17094;

xxiii.   National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a *et seq.*;

xxiv.    Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*;

xxv.     Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*;

xxvi.    Wild Horse and Burro Act, 16 U.S.C. § 1331 *et seq.*;

xxvii.   43 U.S.C. § 387;

xxviii.  Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq.*;

xxix.    Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*;

xxx.     33 U.S.C. § 408; and

xxxi.    Rivers and Harbors Act of 1899, 33 U.S.C. § 403 *et seq.*

91 Fed. Reg. at 7298; 91 Fed. Reg. at 40551.

## C.    The National Park Waiver

57.    On May 15, 2026, Secretary of Homeland Security Markwayne Mullin issued a Determination in the Federal Register purporting to again invoke IIRIRA Section 102(c) in order to waive the application of NEPA, the ESA, the Wild and Scenic Rivers Act, and numerous additional laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors" within the "project area." 91 Fed. Reg. at 27969 (May 15, 2026).

58.    The "project area" is again defined with geographic coordinates, but here they

contain apparent errors. DHS states that the project area starts "at approximately GPS point 29.7275568-101.6848011 and extend[s] east to approximately GPS point 29.727557-102.684802." *Id.* However, the latter point is identified as "east" of the former point even though the former point is the easternmost point listed. Additionally, GPS point 29.727557-102.684802 is over two miles south of the border, in Mexico. As a result, the waiver does not define a legally sufficient geographic scope for a waiver area.

59. On June 9, 2026 Secretary Mullin again issued a determination in the Federal Register pursuant to IIRIRA Section 102, stating that the determination published on May 15, 2026 contained an "incorrect" description of the project area, and was therefore republishing the "document with the correct project area description." 91 Fed. Reg. at 34832 (June 9, 2026).

60. The determination published on June 9, 2026 defines the project area as beginning "at approximately GPS point 29.325866, -104.046466 and extending east to approximately GPS point 29.728522, -102.683945." *Id.*

61. Again, the DHS Secretary described the Big Bend Sector as "an area of high illegal entry," and cited the same low apprehension figures as the West Waiver.

62. The National Park Waiver purports to waive "in their entirety" the following federal statutes—and "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of":

    i. National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*;

    ii. Endangered Species Act, 16 U.S.C. § 1531 *et seq.*;

    iii. Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

    iv. National Historic Preservation Act, 54 U.S.C. § 100101 note, 54 U.S.C. § 300101 *et seq.*;

v.      Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*;

vi.      Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*;

vii.      Clean Air Act, 42 U.S.C. § 7401 *et seq.*;

viii.      Archeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*;

ix.      Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*;

x.      Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*;

xi.      National Trails System Act, 16 U.S.C. § 1241 *et seq.*;

xii.      Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*;

xiii.      Noise Control Act, 42 U.S.C. § 4901 *et seq.*;

xiv.      Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*;

xv.      Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*;

xvi.      Archaeological and Historic Preservation Act, 54 U.S.C. § 312502 *et seq.*;

xvii.      Antiquities Act, 54 U.S.C. § 320301 *et seq.*;

xviii.      Historic Sites, Buildings, and Antiquities Act, 54 U.S.C. §§ 320301-03, 320101-06;

xix.      Eagle Protection Act, 16 U.S.C. § 668 *et seq.*;

xx.      Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*;

xxi.      Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

xxii.      Section 438 of the Energy Independence and Security Act, 42 U.S.C. § 17094;

xxiii.   National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a, *et seq.*;

xxiv.   Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*;

xxv.   Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*;

xxvi.   Wild Horse and Burro Act, 16 U.S.C. § 1331 *et seq.*;

xxvii.   43 U.S.C. § 387;

xxviii.   Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq.*;

xxix.   Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*;

xxx.   Wilderness Act, 16 U.S.C. § 1131 *et seq.*;

xxxi.   National Park Service Organic Act and the National Park Service General Authorities Act 54 U.S.C. §§ 100101-02, 100301-03, 100501-07, 100701-07, 100721-25, 100751-55, 100901-06, 102101-02;

xxxii.   16 U.S.C. § 156;

xxxiii.   16 U.S.C. § 157;

xxxiv.   16 U.S.C. § 157c; and

xxxv.   16 U.S.C. § 157d.

91 Fed. Reg. at 27969–70; 91 Fed. Reg. at 34832–33.

**D.    The Lower Canyons Waiver**

63.    On July 27, 2026, Secretary of Homeland Security Markwayne Mullin issued a Determination in the Federal Register purporting to again invoke IIRIRA Section 102(c) in order to waive the application of a similar slate of laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls,

28

safety features, lighting, cameras, and sensors" within the "project area." 91 Fed. Reg. 46939, 46940 (July 27, 2026).

64.     The "project area" is defined as the area in the vicinity of the U.S. border, between GPS points 29.728522, -102.683945 and 29.449892, -101.058017.

65.     Again, the DHS Secretary describes the Big Bend Sector as "an area of high illegal entry," and cites the same low apprehension figures as the earlier waivers. Because the Lower Canyons Waiver encompasses areas in both the Big Bend and Del Rio Sectors, the Secretary also describes the Del Rio Sector as "an area of high illegal entry," and states that between fiscal years 2021 and 2025, "1,410,330 illegal aliens" were apprehended in that sector.

66.     The Lower Canyons Waiver purports to waive "in their entirety" the following federal statutes—and "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of":

  i.  The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*;

  ii.  Endangered Species Act, 16 U.S.C. § 1531 *et seq.*;

  iii.  Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

  iv.  National Historic Preservation Act, 54 U.S.C. § 100101 note and 54 U.S.C. § 300101 *et seq.*;

  v.  Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*;

  vi.  Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*;

  vii.  Clean Air Act, 42 U.S.C. § 7401 *et seq.*;

  viii.  Archeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*;

  ix.  Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*;

  x.  Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*;

xi. National Trails System Act, 16 U.S.C. § 1241 *et seq.*;

xii. Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*;

xiii. Noise Control Act, 42 U.S.C. § 4901 *et seq.*;

xiv. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*;

xv. Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*;

xvi. Archaeological and Historic Preservation Act, 54 U.S.C. § 312502 *et seq.*;

xvii. Antiquities Act, 54 U.S.C. § 320301 *et seq.*;

xviii. Historic Sites, Buildings, and Antiquities Act, 54 U.S.C. § 320301–320303 & 320101–320106;

xix. Eagle Protection Act, 16 U.S.C. § 668 *et seq.*;

xx. Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*;

xxi. Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

xxii. Section 438 of the Energy Independence and Security Act, 42 U.S.C. § 17094;

xxiii. National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a, *et seq.*;

xxiv. Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*;

xxv. Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*;

xxvi. Wild Horse and Burro Act, 16 U.S.C. § 1331 *et seq.*;

xxvii. 43 U.S.C. § 387;

xxviii. Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq.*;

xxix.   Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*;

xxx.   Wilderness Act, 16 U.S.C. § 1131 *et seq.*;

xxxi.   National Park Service Organic Act and the National Park Service General Authorities Act, 54 U.S.C. §§ 100101–100102, 100301–100303, 100501–100507, 100701–100707, 100721–100725, 100751–100755, 100901–100906, 102101–102102;

xxxii.   16 U.S.C. § 156;

xxxiii.   16 U.S.C. § 157;

xxxiv.   16 U.S.C. § 157c; and

xxxv.   16 U.S.C. § 157d.

91 Fed. Reg. at 46940–41.

**E.    The Border Wall**

67.    The DHS Secretary's Big Bend Waivers purport to waive the application of the ESA, NEPA, NHPA, the Wild and Scenic Rivers Act, and numerous other laws as applied to the Big Bend Wall Project, which spans approximately 607 miles of the Texas-Mexico border. *See* 91 Fed. Reg. at 7298; 91 Fed. Reg. at 34832; 91 Fed. Reg. at 46940. This amounts to nearly one-third of the U.S.-Mexico border and encompasses the area with the lowest rates of illegal crossings. *See* map below.



68.     Although the public lacks access to final construction plans for the Big Bend Sector

and U.S. Customs and Border Protection has revised its stated plans multiple times,[8] the Big Bend

Waivers purport to authorize DHS and U.S. Customs and Border Protection to execute extensive

new 30-foot-high steel bollard walls across the *entirety* of the Project area. *See* 91 Fed. Reg. at

7298 (waiving laws "with respect to the construction of physical barriers and roads"); 91 Fed. Reg.

---

[8]     *See e.g.*, Heather Richards and Mike Lee, *Trump admin rethinks border wall in Big Bend National Park*, E&E NEWS (March 10, 2026), https://www.eenews.net/articles/trump-admin-rethinks-border-wall-in-big-bend-national-park/ (no wall planned for National Park); Mary Cantrell, *Border wall plans changed to avoid Big Bend Ranch State Park*, MARFA PUBLIC RADIO (March 23, 2026), https://www.marfapublicradio.org/news/2026-03-23/border-wall-plans-changed-to-avoid-big-bend-ranch-state-park (no wall planned for state park).

at 34832 (same); 91 Fed. Reg. at 46940 (same). This sweeping waiver authority means Defendants retain discretion to augment and expand construction plans well beyond the short sixty-day window in which Plaintiffs may challenge the waivers.

69.    This Project stands to fragment critical riparian and desert habitats, obstruct wildlife movement essential for endangered and transboundary species, disrupt natural river dynamics, and permanently damage fragile soils and vegetation that cannot be restored. The region provides essential habitat, migratory corridors, and breeding grounds for hundreds of species of birds, mammals, reptiles, amphibians, fish, and invertebrates. Many of these species are federally listed under the ESA or otherwise imperiled, including but not limited to the Mexican long-nosed bat, black-capped vireo, Big Bend gambusia, Rio Grande silvery minnow, and multiple endemic plant species uniquely adapted to the Chihuahuan Desert's fragile soils and hydrology. Disruption to the Rio Grande corridor risks cascading ecological impacts across the entire desert ecosystem, including groundwater depletion, habitat fragmentation, increased erosion, and permanent loss of native vegetation. It will bisect transboundary populations of mountain lions, black bears, desert bighorn sheep, and regionally unique Carmen Mountain whitetail deer, restricting critical movement, migration, and geneflow.

70.    Wall infrastructure also brings with it associated roads, traffic, construction, lighting, and patrol activity that degrade dark skies, impair nocturnal wildlife behavior, and diminishes the region's scientific and aesthetic values. The Big Bend Region is internationally recognized as one of the darkest night sky locations in the continental U.S. Its low levels of light pollution provide exceptional opportunities for astronomical observation, scientific research, and public enjoyment. Dark sky conditions are essential for numerous nocturnal species, migratory birds, and pollinators whose behavior, navigation, and reproduction depend on natural light cycles.

33

71.    The wall would also destroy, maroon, or irrevocably disturb archaeological sites and landscapes of immense cultural and historical significance to Indigenous peoples and border communities. The Rio Grande corridor has been inhabited by humans for thousands of years. Indigenous people, including descendants of the Chizo, Jumano, Apache, and Comanche Tribes have deep and enduring spiritual and cultural connections to this landscape. Archaeological sites throughout the region have abundant and irreplaceable cultural resources, including rock art, village remnants, burial grounds, and ceremonial sites. Wall construction would also create increased vibrations along the border, caused by excavations and increased heavy truck traffic. Similar to the effects of a seismic event, this could cause permanent damage to historical buildings, like the Sacred Heart Church, which is made of adobe.

72.    Significantly, border wall construction would also eliminate access to the Rio Grande from the U.S., effectively ending recreational, navigational, and economic uses along long stretches of the river. The region has historically provided unparalleled recreational river access and supports a thriving ecotourism economy for river-based activities such as paddling, rafting, fishing, guided wilderness trips, and wildlife viewing. Single and multi-day river trips along the Rio Grande draw visitors from across the United States and internationally, serving as a cornerstone of the regional tourism economy. Outfitters, guides, lodging providers, restaurants, and small businesses in surrounding communities depend directly on the Rio Grande's continued ecological integrity, navigability, and scenic character.

73.    The Big Bend Wall Project thus stands to cause significant adverse effects on wildlife and their habitats, cultural and historic sites, indigenous values, river economies and recreation, and numerous other resources. By exempting border wall construction from NEPA, the ESA, NHPA, the Wild and Scenic Rivers Act, and other laws, DHS cuts the public out of an

34

important decision-making process and short-circuits well-established federal processes designed to safeguard our environmental, cultural, and historical resources. These harms are not incidental or isolated; they are the foreseeable and direct consequences of constructing a continuous, hardened border barrier across an interconnected landscape. The Big Bend Wall Project represents one segment of a much larger undertaking that, taken together, would operate as a single, expansive system of border fortifications.

74.    When viewed cumulatively, this Project is thus an essential component of the "Great Wall," a contiguous or nearly contiguous barrier spanning the entire southern border. At this scale and permanence, the undertaking is not merely an infrastructure project but a transformation of the continent itself. Spanning North America, it would sever ancient migration routes, fragment watersheds, bisect large mammal populations, and permanently interrupt ecological and geological processes that have developed over millennia. Few human-made structures rival such an intervention in scope or consequence, but historic walls like the Great Wall of China and the Berlin Wall depict how this Project stands to reshape society, the landscape, and history. This "Great Wall" would alter the patterns of ecology, movement, and evolutionary history of an entire continent. In effect, it would fundamentally reengineer the natural, ecological, and evolutionary fabric of North America, transforming it into one divided by permanent infrastructure. Decisions of this magnitude do not fall easily to unelected executive bodies under the carefully wrought architecture of the U.S. Constitution.

## CLAIMS FOR RELIEF

75.    Each claim set forth below is brought against all Defendants.

## FIRST CLAIM FOR RELIEF

## Violation of the Major Questions Doctrine Under the U.S. Constitution, Article I, Section 1

76.     The preceding paragraphs are incorporated herein by reference.

77.     The major questions doctrine demands a clear congressional statement before an executive body may assert authority over "decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). The doctrine enforces the Constitution's allocation of legislative power to Congress by counseling skepticism where an agency claims sweeping authority absent unmistakably clear text.

78.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. Const. art. 1, § 1, thereby forming "a separation of powers between the legislative and executive branches that the Framers viewed as essential to the preservation of individual liberty." *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1371 (Ct. Int'l Trade 2025) (citing The Federalist No. 48 (James Madison)). Thus, where "[t]he Constitution lodges the Nation's lawmaking powers in Congress alone . . . the major questions doctrine safeguards that assignment against executive encroachment." *Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 146 S. Ct. 628, 646 (Feb. 20, 2026) (Gorsuch, J., concurring).

79.     The executive's project to build a "Great Wall" imposes significant economic consequences. It displaces entire regulatory regimes that ordinarily govern large infrastructure, eliminating environmental review, consultation, and mitigation duties that internalize harms and shift costs to states, tribes, local governments, landowners, and regional industries. Moreover, it permanently alters land values and access, foreclosing established economic uses such as ranching, recreation, observational astronomy, and ecotourism. The "Great Wall" also reallocates flood, drainage, and maintenance risks across thousands of miles without typical permitting and

engineering safeguards and disturbs market behavior in affected sectors (*e.g.*, construction, transportation, and tourism). Taken together, these and other effects will have vast economic impacts.

80.    The breadth of Federal Defendants' asserted authority also maintains staggering political significance. Whether the U.S. should construct the "Great Wall" through cross-continental applications of IIRIRA waivers is a matter of "earnest and profound debate across the country." *Biden v. Nebraska*, 600 U.S. 477, 504 (2023) (characterizing student debt forgiveness as a "profound debate") (quoting *West Virginia*, 597 U.S. at 743 (characterizing EPA's generation-shifting regulations addressing climate change as a "profound debate") (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006) (characterizing physician-assisted suicide as a "profound debate") (quoting *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (same)))). Like major questions precedent, the actions challenged by Plaintiffs arise against the backdrop of sustained national debate—here, over immigration reform, border security, and the proper role of the federal government in immigration enforcement. And although Congress has repeatedly considered amending or expanding DHS's barrier-building authority since 2008, it has ultimately declined to do so. That history supports the conclusion that the sweeping authority Federal Defendants now assert is staggering—and one Congress did not clearly confer.

81.    "Both separation of powers principles and a practical understanding of legislative intent suggest[] Congress would not have delegated highly consequential power through ambiguous language." *Learning Res.*, 146 S. Ct. 628, 639 (Roberts, C.J.) (cleaned up). The Big Bend Waivers purport to invoke IIRIRA Section 102(c) to waive NEPA, the ESA, NHPA, and more than two dozen other federal statutes to contribute to constructing a section of a cross-continental barrier from the Pacific Ocean to the Gulf of Mexico. However, the text of IIRIRA

37

contains no clear grant of authority for such a significant project. IIRIRA authorizes "additional physical barriers and roads" along the border, 8 U.S.C. § 1103(a) note, but nothing in IIRIRA's text clearly authorizes DHS to waive laws for the purpose of creating a complete, contiguous or nearly contiguous, continental border-length barrier. In fact, the plain language of IIRIRA indicates the opposite: Congress directed border construction only "in areas of high illegal entry," and the Big Bend Sector cannot be described as such. Spanning over a quarter of the entire U.S.-Mexico border, in fiscal year 2025 the Big Bend Sector accounted for just 1.3% of total apprehensions at the border. This makes the Big Bend Sector the *lowest* area of illegal entry across the entire southern border.

82. Piecemeal issuance cannot evade the major questions doctrine, whereas here, context confirms the breadth of the authority asserted by the Executive Branch. Take for example, the October 15, 2025 waivers, where the DHS Secretary issued nine sector-wide waivers that span the entire southern border, covering Tucson, El Centro, Del Rio, Rio Grande Valley, Yuma, Big Bend, Laredo, El Paso, and San Diego Sectors. These actions, alongside presidential directives calling for a "secure, contiguous, and impassable physical barrier" and "complete operational control" and expanded barrier construction, reflect an executive decision to realize a complete, border-length "Great Wall" by serial waivers, including the waivers at issue here.

83. Congress knows how to grant the Executive Branch authority to construct border barriers when it wishes to, and in fact has done so through various amendments of IIRIRA over the decades. But Congress has never directed DHS to construct a cross-continental barrier spanning the southern border. Nevertheless, Federal Defendants have chosen to pursue such a project, including as to the Big Bend Wall Project at issue here, even though IIRIRA contains no clear authorization empowering the DHS Secretary to displace dozens of federal statutes wholesale

for barrier construction on a continent-wide scope, whether attempted all at once or segment by segment.

84.   Especially in situations where the Government has "never previously claimed powers of this magnitude," the major questions doctrine may be implicated. *Biden v. Nebraska*, 600 U.S. at 501. Ultimately the question "is not whether something should be done; it is who has the authority to do it." *Biden v. Nebraska*, 600 U.S. at 501; *see also Gonzales*, 546 U.S. at 265 (reasoning that the Government's sought after authority was "inconsistent with the design of the statute"). Here, the framework of IIRIRA and Congress's grant of authority extend only so far as to support waiver of laws in areas of "high illegal entry"—indicating that Congress in fact did not delegate the authority to blanket the entire border in waivers or build a cross-continental barrier.

85.   Because Congress did not clearly authorize DHS or U.S. Customs and Border Protection to create a complete, cross-continental border-length wall, the Secretary's efforts to do so through serial waivers, and particularly the Big Bend Waivers, exceeds Congress's grant of authority. If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major questions doctrine, whether the U.S. should barricade the entirety of its southern border is clearly it. *West Virginia*, 597 U.S. at 716.

**SECOND CLAIM FOR RELIEF**

**In the Alternative, Violation of Nondelegation Doctrine of the U.S. Constitution, Article I, Section 1**

86.   The preceding paragraphs are incorporated herein by reference.

87.   In the alternative, to the degree the Court finds that the Big Bend Waivers do not violate the major questions doctrine, Plaintiffs challenge IIRIRA Section 102(c) and the waivers as invalid because they violate the nondelegation doctrine.

39

88.     Article I, Section 1 of the U.S. Constitution directs that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." Article II, Section 1 of the U.S. Constitution directs that "[t]he executive Power shall be vested in a President of the United States of America."

89.     Under these constitutional provisions, Congress may not delegate legislative authority to an executive branch agency—or, in the case of IIRIRA Section 102(c), may not delegate legislative authority to an individual executive branch official. *See Loving v. U.S.*, 517 U.S. 748, 758 (1996).

90.     "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Specifically, the doctrine bars Congress from "transfer[ring] to another branch powers which are strictly and exclusively legislative." *Gundy v. U.S.*, 588 U.S. 128, 128 (2019) (cleaned up).

91.     IIRIRA does not authorize a contiguous border project, and this Court should so hold. But even if IIRIRA did grant the DHS Secretary broad, standardless discretion that the Secretary now claims, it would be an unlawful delegation of authority without any intelligible governing principle.

92.     IIRIRA Section 102(c) unconstitutionally delegates to the Executive Branch, namely the DHS Secretary, the quintessential legislative power of prioritizing competing public policies through the sweeping "authority to waive" any laws that, in the Secretary's "sole discretion," are "necessary to ensure expeditious construction" of physical barriers in the borders' vicinity. This capacious provision grants the Executive the classic legislative functions of: (i) considering the relative prioritization of expeditiously constructing the border wall against the

universe of all other legally protected public and private interests; and (ii) making the major policy decision of choosing which laws to disregard—and which to comply with—in pursuing border wall construction. Such an action that "[d]ecid[es] what competing values will or will not be sacrificed to the achievement of a particular objective" is "the very essence of *legislative choice*." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (emphasis added).

93.     Substantial delegation of legislative powers from Congress to the Executive may be permissible only if Congress "lay[s] down by legislative act an intelligible principle" which "clearly delineates the general policy" and "boundaries of th[e] delegated authority." *Mistretta*, 488 U.S. at 372–73 (cleaned up).

94.     Congress failed to pass the permissible bar here. It proffered neither general policy nor boundaries to guide the DHS Secretary's decision-making as to which laws to strike or keep when undergoing border construction. The mere objective of building barriers does not circumscribe the Secretary's waiver discretion. Nor do the terms "necessary" and "expeditious" act as boundaries for waiving laws because they are defined exclusively by whatever the Secretary desires them to mean in the Secretary's "sole discretion." Indeed, if the Secretary may invoke IIRIRA's authority for the Big Bend Wall Project, then even "areas of high illegal entry" carries no force or meaning at all.

95.     Moreover, the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Federal Communications Commission v. Consumers' Research*, No. 24–354, 606 U.S. ___, slip op. at 11 (2025) (cleaned up). Where Congress seeks to grant the Executive broad and important authority—exemplified in IIRIRA's power to waive any statutorily-protected interest in perpetuity as applied to a vast and undefined geographical scope—concerns for liberty are heightened, and Congress is thus required to provide

more detailed instruction to channel the broad authority in keeping with legislative intent.

96.    Therefore, IIRIRA and the Big Bend Waivers violate Article I, Section 1 of the U.S. Constitution, the non-delegation doctrine, and the separation of powers doctrine, rendering DHS's reliance on IIRIRA to support its waiver determinations unconstitutional.

## THIRD CLAIM FOR RELIEF

### Violation of the Take Care Clause of the U.S. Constitution Article II, Section 3

97.    The preceding paragraphs are incorporated herein by reference.

98.    Article II of the U.S. Constitution provides that the "executive Power shall be vested in a President," U.S. Const. Art. II, § 1, Cl 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3.

99.    Among the laws the Take Care Clause mandates be "faithfully executed" are NEPA, the ESA, NHPA, and the conditions and limitations of IIRIRA section 102 itself. Among the conditions and limitations of IIRIRA Section 102 are the limitations of barrier construction to areas of "high illegal entry" under subsection (a), the geographical and temporal restrictions for such construction, along with the requirements for consultation with affected entities under subsection (b), and the restriction on waiver authority under subsection (c) to the "expeditious construction of the barriers and roads" otherwise authorized by the statute.

100.    The DHS Secretary's purported waivers of NEPA, the ESA, and NHPA, and more than two dozen additional laws under the Big Bend Waivers—including for the construction of barriers and roads in areas that do not experience high levels of illegal entry, as well as the installation of lighting, cameras, and sensors—failed to comply with the laws that the Executive Branch is required to "faithfully execute."

**FOURTH CLAIM FOR RELIEF**

**<u>Violation of the Fifth Amendment's Due Process Clause</u>**

101.    The preceding paragraphs are incorporated herein by reference.

102.    The Fifth Amendment to the U.S. Constitution states that nobody shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. At minimum, procedural due process requires notice and a meaningful opportunity to be heard. *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976); *Armstrong v. Manzo*, 380 U.S. 545, 550, 552 (1965).

103.    Through issuance of the Big Bend Waivers, Defendants violated the Fifth Amendment by depriving Plaintiffs of their protected property and liberty interests to access, navigate, and use the waters of the Rio Grande, without providing constitutionally required procedural safeguards.

104.    Plaintiffs rely on reasonable physical access to Texas's navigable waters, including the Rio Grande. Such state-created entitlements to navigable waters are held in trust for the public. *See Ill. C. R. Co. v. Illinois*, 146 U.S. 387, 455 (1892) ("property is held by the State, by virtue of its sovereignty, in trust for the public. The ownership of the navigable waters . . . is a subject of public concern to the whole people of the State."); Tex. Const. Art. XVI, § 59 ("The conservation and development of all of the natural resources of this State . . . the waters of its rivers and streams . . . the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties."); *State v. Bradford*, 50 S.W.2d 1065, 1069 (Tex. 1932) ("From its earliest history this state has announced its public policy that lands underlying navigable waters are held in trust for the use and benefit of the public."). Additionally, Plaintiff Miller maintains ongoing personal and established commercial interests in using the Rio Grande as a commercial river guide whose work depends on

accessing the Rio Grande partly through state-maintained access points as well as an access point from his personal property.

105.   DHS's issuance of the Big Bend Waivers authorizes large scale border wall construction along the north bank of the Rio Grande. This wall will physically block Plaintiffs from reaching the river at traditional access points. Plaintiffs, as members of the public and regular users of the Rio Grande, are beneficiaries of the public trust and have legitimate expectations of continued, reasonable access to the river for navigation and recreation. Plaintiff Miller, a commercial river outfitter, also holds a protected interest in continued access to the river as necessary to pursue an established occupation. As such, Plaintiffs have constitutionally protected interests in continued access and use of the Rio Grande's waters.

106.   Defendants issued and authorized the Big Bend Waivers and Project without affording Plaintiffs even the bare minimum procedural protections of notice and a meaningful opportunity to respond. *Armstrong*, 380 U.S. at 552. "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

107.   Defendants have not issued any meaningful notice of where additional barriers and infrastructure will be constructed, when construction will begin, or how construction will affect access to the river, nor have Defendants provided Plaintiffs with any opportunity to be heard. Indeed, Plaintiffs have received conflicting and inconsistent information about the Agency's plans for wall construction, impeding efforts to inform other members of the public and direct community organizing efforts toward elected officials—and the statutory frameworks like NEPA that would ordinarily provide public notice of the planned actions and an opportunity to comment have been waived.

## FIFTH CLAIM FOR RELIEF

### Violation of the Presentment Clause
### Article I, Section 7 of the U.S. Constitution

108.    The preceding paragraphs are incorporated herein by reference.

109.    Article I, § 7 of the Constitution provides that any federal statute must pass both houses of Congress, and "before it become a Law, be presented to the President of the United States: If he[/she] approve he shall sign it, but if not he shall return it, with his Objections to that House it which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."

110.    The "[a]mendment and repeal of statutes, no less than enactment," must conform with the presentment and bicameralism requirements of Article I. *INS v. Chadha*, 462 U.S. 919, 954 (1983). Specifically, the Supreme Court has stated that the Executive Branch cannot void any law without Congress passing a law voiding the previous law and presenting it to the President for signature. *Clinton v. City of New York*, 524 U.S. 417 (1998).

111.    IIRIRA Section 102(c), as written, is facially invalid because it vests unilateral power in the DHS Secretary to, in effect, repeal portions of duly-enacted statutes via its delegation of waiver authority in areas along the border for purpose of border construction without Congress passing a law to void or amend the specific laws at issue or limit their application, and presenting it to the President, as required by Article I, Section 7 of the U.S. Constitution.

112.    Separately, the statute is also invalid as applied to this case. The National Park and Lower Canyons Waivers purport to waive the Wild and Scenic Rivers Act and numerous other laws that would otherwise apply to the Big Bend Wall Project at issue in this litigation. In so doing, the Secretary unilaterally repealed legal protections provided by statute for certain Congressionally

designated areas. For example, the National Park and Lower Canyons Waivers remove legal protections provided under the Wild and Scenic Rivers Act for a segment of the Rio Grande specifically designated for such protections by Congress. *See* 16 U.S.C. § 1274(a)(17) (designating the segment of the Rio Grande in Texas "on the United States side of the river from river mile 842.3 above Mariscal Canyon downstream to river mile 651.1 at the Terrell-Val Verde County line" as a "component[] of the national wild and scenic river system"); *see also id*. §§ 1271(b) (declaring the national policy that "certain selected rivers" and their immediate environments that "possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values" be preserved in free-flowing condition and that they be protected for the benefit and enjoyment of present and future generations), 1281(a) (mandating that responsible agencies administer components of the national wild and scenic rivers system "in such a manner as to protect and enhance the values which caused it to be included in said system . . . ."). The Secretary's waiver of the Wild and Scenic Rivers Act for the construction of border barriers and roads in the vicinity of this Congressionally-protected segment of the Rio Grande would degrade or destroy the scenic, geologic, fish and wildlife, and recreational values that make the area eligible for inclusion as part of the wild and scenic river system, and thus preclude the responsible agency—here, the National Park Service—from administering the area in a manner that would protect and enhance these values. Once the values that make this specified portion of the Rio Grande eligible for inclusion and serve as the basis for protection as a component of the wild and scenic river system are permanently diminished or destroyed by such construction, the statute no longer has the same legal effect as when it was enacted by Congress. In other words, through the National Park and Lower Canyons Waivers, the Secretary struck the portion of the Wild and Scenic Rivers Act designating this specific area for its "outstandingly remarkable" values

46

and guaranteeing its protection, effectuating an amendment or partial repeal of the statute. 16 U.S.C. §§ 1271(b), 1272(b), 1274(a)(17), 1283(a).

113.   Accordingly, the IIRIRA Section 102(c) waiver authority generally, and the DHS Secretary's National Park and Lower Canyons Waivers specifically, are unconstitutional infringements upon the lawmaking procedures required under Article I, § 7 of the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Friends of the Ruidosa Church, Danny William Miller Junior, and the Center for Biological Diversity pray that this Court grant the following relief:

1.   Declare that IIRIRA grants no individual or agency the authority to waive laws across the entirety of the U.S.-Mexico border;

2.   Declare that IIRIRA does not authorize Section 102 waivers in areas lacking high levels of illegal entry;

3.   Declare that IIRIRA does not authorize Section 102 waivers for the installation of technologies like lights, cameras, sensors, or other equipment falling outside the scope of "barriers and roads";

4.   Declare that the Big Bend Waivers specifically and the IIRIRA Section 102(c) waiver authority generally violate the U.S. Constitution;

5.   Set aside and declare null and void the Big Bend Waivers to avoid constitutional infirmities;

6.   Enjoin Defendants from implementing the Big Bend Wall Project, until and unless Defendants comply with NEPA and all other laws that would apply absent the unlawful waivers;

7.   Retain jurisdiction in this action to ensure compliance with the Court's Orders;

8.   Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys'

47

fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or other authority; and

9.      Grant such other and further relief as the Court may deem just and proper.


DATED: August 7, 2026                    Respectfully submitted,

                                         /s/ Emma Yip
                                         Emma Yip (CA Bar No. 352446)*
                                         Center for Biological Diversity
                                         2100 Franklin St., Ste 375
                                         Oakland, CA 94612
                                         Tel: (206) 858-2297
                                         Fax: (520) 623-9797
                                         eyip@biologicaldiversity.org

                                         Dustin Rynders (TX Bar No. 24048005)
                                         TEXAS CIVIL RIGHTS PROJECT
                                         P. O. Box 1108
                                         Houston, TX 77251
                                         Tel: (832) 767-3630 ext. 196
                                         dustin@texascivilrightsproject.org

                                         Kate Gibson Kumar (TX Bar No. 2413588)
                                         Alana Park (TX Bar No. 24150568)
                                         TEXAS CIVIL RIGHTS PROJECT
                                         P. O. Box 17757
                                         Austin, TX 78760
                                         Tel: (512) 474-5073 ext. 225
                                         kate@texascivilrightsproject.org
                                         alana@texascivilrightsproject.org

                                         Zeynep J. Graves (CA Bar No. 298533)*
                                         Shannon Eva Labuschagne (CA Bar No. 365633)
                                         Center for Biological Diversity
                                         2100 Franklin St., Ste 375
                                         Oakland, CA 94612
                                         Tel: (510) 844-7160
                                         Fax: (520) 623-9797
                                         zgraves@biologicaldiversity.org
                                         slabuschagne@biologicaldiversity.org

                                         * Admitted Pro Hac Vice

48

*Attorneys for Plaintiffs*