**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION,

Defendants.

**CASE NO. 3:26-CV-01099-KC**

**BRIEF OF AMICI CURIAE**

**CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT**

The Coalition to Protect America's National Parks and Keep Big Bend Wild are non-profit organizations. The Coalition represents thousands of current and former National Park Service employees and volunteers. Keep Big Bend Wild is a voluntary association of wilderness advocates. These organizations are without any parent corporation, and no publicly held corporation owns these organizations or any portion of these organizations.

## TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT ..... i

INTEREST OF AMICI CURIAE ..... 1

SUMMARY AND INTRODUCTION ..... 2

- I. This Court has Jurisdiction to Review Plaintiffs' Claims Under the Constitution. ..... 7
  - A. The General Policy of the IIRIRA Require Limitations on Section 102(a). ..... 10
  - B. IIRIRA Legislative History and Context Demonstrate Limits on DHS. ..... 12
- II. This Court has Jurisdiction to Review Plaintiffs' Claims Against *Ultra Vires* Action. ..... 15
- III. The Court's Decision Will Have a Profound Effect on the Separation of Powers. ..... 18

CONCLUSION ..... 22

CERTIFICATE OF SERVICE ..... 23

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) .................................................. 9

*Bd. of Govenors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .................................................. 16

*Big Time Vapes, Inc. v. Food & Drug Admin.*,
963 F.3d 436 (5th Cir. 2020) .................................................. 9

*Brotherhood of Ry. & S.S. Clerks v. Ass'n for the Benefit of Non-Cont. Emps.*,
380 U.S. 650 (1965) .................................................. 16

*Center for Biological Diversity v. McAleenan*,
404 F. Supp. 3d 218 (D.D.C. 2019) .................................................. 10

*City of Arlington v. FCC*,
569 U.S. 290 (2013) .................................................. 15

*D&G Holdings, L.L.C. v. Becerra*,
22 F.4th 470 (5th Cir. 2022).................................................. 15

*Defenders of Wildlife v. Chertoff*,
527 F. Supp. 2d 119 (D.D.C. 2007) .................................................. 9, 10

*Gundy v. United States*,
588 U.S. 128 (2019) .................................................. 9

*Kirby Corp. v. Pena*,
109 F.3d 258 (5th Cir. 1997) .................................................. 16

*Leedom v. Kyne*,
358 U.S. 184 (1958) .................................................. 15

*Mistretta v. United States*,
488 U.S. 361 (1989) .................................................. 9

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
No. 26-5123, 2026 WL 2276494 (D.C. Cir. Aug. 7, 2026).................................................. 15

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ........................................ 16

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........................................ 9

*Zapata County, Texas v. Biden*,
No. 20-cv-00106, 2023 WL 11915719 (S.D. Tex. Mar. 31, 2023) .................. 8, 16

**Statutes**

8 U.S.C. § 1103 note........................................passim

16 U.S.C. § 156........................................ 2, 5

54 U.S.C. § 100101(a) ........................................ 2

Consolidated Appropriations Act, 2008,
Pub. L. No. 110-161, div. E, title V, § 564, 121 Stat. 1844, 2090,
2091........................................ 13, 17, 18

Consolidated Appropriations Act, 2018,
Pub. L. No. 115-141, div. F, title II, § 230(a), 132 Stat. 348, 616 *et seq*........................................ 14

Consolidated Appropriations Act, 2020,
Pub. L. No. 116-93, div. D, Title II, § 210, 133 Stat 2317, 2512.................. 14

Consolidated Appropriations Act, 2021,
Pub. L. No. 116-260, div. F, Title II, § 211, 134 Stat. 1183, 1457 .................. 14

Consolidated Appropriations Act, 2022,
Pub. L. No. 117-103, div. F, title II, § 210, 136 Stat. 49, 322 .................. 14

Consolidated Appropriations Act, 2023,
Pub. L. No. 117-328, div. F, title II, § 209, 136 Stat. 4459, 4735 .................. 15

Emergency Supplemental Appropriations Act for Defense, the Global
War on Terror, and Tsunami Relief, 2005,
Pub. L. No. 109-13, div. B, title I, § 102, 119 Stat. 231, 306.................. 17

Further Consolidated Appropriations Act, 2024,
Pub. L. No. 118-47, div. C, title II, § 209, 138 Stat. 460, 603 .................. 15

National Wildlife Refuge. Consolidated Appropriations Act, 2019,
Pub. L. No. 116-6, div. A, Title II, §§ 230(a) and 231, 133 Stat 13, 28.................. 14

Omnibus Consolidated Appropriations Act, 1997,
Pub. L. No. 104-208, div. C, title 1, § 102(a-d), 110 Stat. 3009-554, 3009-555 .......... 17

Secure Fence Act of 2006,
Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2639 .......... 12, 13, 17

**OTHER AUTHORITIES**

90 Fed. Reg. 48281 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48282 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48283 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48284 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48285 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48286 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48287 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48288 (Oct. 15, 2025) .......... 6

90 Fed. Reg. 48289 (Oct. 15, 2025) .......... 6

91 Fed. Reg. 27969 (May 15, 2026) .......... 5

91 Fed. Reg. 7297 (Feb. 17, 2026) .......... 5

91 Fed. Reg. 34831 (June 9, 2026) .......... 5

Fed. R. Civ. P. 12(b)(6) .......... 8

*A Border Wall Plan Unites Republicans and Democrats in Texas: 'This Is Insane'*, NEW YORK TIMES, Apr. 4, 2026 .......... 20

Commission for Environmental Cooperation, *Conservation Assessment for the Big Bend—Rio Bravo Region* (2014), https://perma.cc/KW9A-7QEP .......... 3

Lavandera and A. Killough, *Bulldozers rip into Big Bend National Park, driving anger and heartbreak*, CNN (last updated Aug. 14, 2026), https://www.cnn.com/2026/08/13/us/texas-big-bend-national-park-border-wall .......... 4

Letter from 14 County Judges to Secretary Markwayne Mullen at 2 (Apr. 21, 2026), https://perma.cc/958N-T5EB ........................................................ 21

Memorandum of Understanding Among U. S. Department of Homeland Security and U.S. Department of the Interior and U.S. Department of Agriculture Regarding Cooperative National Security and Counterterrorism Efforts on Federal Lands along the United States' Borders (Mar. 31, 2006), https://perma.cc/735V-ZCKC ........................................................ 12

National Park Service, Big Bend National Park, Texas, https://www.nps.gov/bibe/index.htm (last visited August 13, 2026) ....................... 2

*Sheriffs unite against border wall*, BIG BEND SENTINEL, Mar. 10, 2026, https://perma.cc/J3ZE-CYHX ........................................................ 21

Statement of Bob Krumenaker Before the Subcommittee on Fed. Lands, H. Comm. on Nat. Res., 119th Cong. (Mar. 11, 2025), https://perma.cc/L7XA-SVJT ........................................................ 10

U.S. Department of the Interior, *Secretaries Salazar, Elvira Underscore Commitment to Protecting and Preserving the Big Bend/Rio Bravo Region* (Oct. 24, 2011), https://perma.cc/TS54-SD6S (last edited Sept. 5, 2019) ........................................................ 3

## INTEREST OF AMICI CURIAE[1]

**The Coalition to Protect America's National Parks ("Coalition")** is a non-profit organization made up of over 5,100 members, all of whom are current or former employees and volunteers of the National Park Service (NPS). Together, they have accumulated over 50,000 years of experience protecting, interpreting, and maintaining America's national parks for the public. Their members include former National Park Service directors, deputy directors, regional directors, superintendents, park rangers (both law enforcement and interpretive), maintenance professionals, administrative staff, and many other dedicated career professionals. Members include former superintendents, deputy superintendents, and rangers who served at Big Bend and other national parks along the U.S.-Mexico border. The Coalition's goal is to support the preservation and protection of the National Park System and the mission-related programs of the NPS to ensure the survival of the park system for generations to come. The Coalition's members are regular and avid users of the National Park System and participants in NPS programs, including at Big Bend National Park.

**Keep Big Bend Wild** is a collaborative, nonpartisan, non-profit, citizen initiative seeking to permanently protect the wilderness characteristics of Big Bend National Park. Its primary mission is to build political support for congressional designation of the remaining undeveloped parts of Big Bend as federal wilderness. Keep Big Bend Wild includes former superintendents, deputy superintendents, and rangers at Big Bend National Park.

[1] All parties have consented to the filing of this brief. Amici state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person other than amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY AND INTRODUCTION

This case presents the question whether Congress authorized the Department of Homeland Security (DHS) to build fencing, roads, and related border-security facilities in Big Bend National Park and adjacent areas by waiving the law that established the park along with virtually every other law potentially pertinent to conservation or management of the park. Amici believe and seek to demonstrate here that Congress did not authorize DHS's proposed actions and that DHS is acting *ultra vires*, violating the Constitution by acting outside its authority.

* * *

> There is a place in Far West Texas where night skies are dark as coal and rivers carve temple-like canyons in ancient limestone. Here, at the end of the road, hundreds of bird species take refuge in a solitary mountain range surrounded by weather-beaten desert. Tenacious cactus bloom in sublime southwestern sun, and species diversity is the best in the country. This magical place is Big Bend.

National Park Service, Big Bend National Park, Texas, https://www.nps.gov/bibe/index.htm (last visited August 13, 2026).

Big Bend National Park, authorized by Congress in 1935, was "dedicated, and set apart as a public park for the benefit and enjoyment of the people," 16 U.S.C. § 156, to be managed by the NPS "by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations" 54 U.S.C. § 100101(a). For more than 90 years, the NPS has preserved this magical place unimpaired and isolated.

Big Bend National Park has avoided human migration pressure because it is inhospitable—remote and naturally isolated by surrounding desert, canyons, and mountains. Across the Rio Grande, the landscape is every bit as isolated and managed by Mexico via three federal protected

areas. Commission for Environmental Cooperation, *Conservation Assessment for the Big Bend—Rio Bravo Region* at 22 (2014), https://perma.cc/KW9A-7QEP. As home to 446 species of birds, 3,600 species of insects, more than 1,500 plants, and 75 species of mammals, the Big Bend region of Texas and the Mexican states of Chihuahua and Coahuila provides a unique opportunity for scientists, natural resource managers, and park staff to collaborate in areas that benefit the people, the landscapes, and the wildlife on both sides of the border. U.S. Department of the Interior, *Secretaries Salazar, Elvira Underscore Commitment to Protecting and Preserving the Big Bend/Rio Bravo Region* (Oct. 24, 2011), https://perma.cc/TS54-SD6S (last edited Sept. 5, 2019).

The NPS has performed its mission in cooperation with DHS and state and local law enforcement authorities to protect the national park while deterring illegal crossings of the border. Because of geography and effective law enforcement, illegal crossings in the Big Bend region are minimal. Though numbers vary year-to-year, in 2025 Big Bend National Park, which covers roughly 118 miles the border, reported 613 illegal immigrant encounters, representing approximately 0.698 percent of all illegal crossings of the U.S.-Mexico border. See NPS Memorandum "Yearly Border Apprehension totals for BIBE" (Aug. 7, 2026) (Exhibit 1). This graphic puts the entire Big Bend Sector's illegal crossing activity into context:




Lavandera and A. Killough, *Bulldozers rip into Big Bend National Park, driving anger and heartbreak*, CNN (last updated Aug. 14, 2026), https://www.cnn.com/2026/08/13/us/texas-big-bend-national-park-border-wall.

Congress enacted a series of laws over the last 30 years to give the Attorney General and, later, the DHS Secretary broad authority to construct fencing and other security measures along the U.S.-Mexico border and to waive compliance with any otherwise applicable laws that, in the Secretary's discretion, would delay construction of the border facilities. Though remarkably broad, the waiver authority granted by Congress to DHS is not unlimited, and it does not extend to Big Bend National Park. Section 102(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (IIRIRA), 8 U.S.C. § 1103 note, authorizes the Secretary of Homeland Security "to install additional physical barriers and roads . . . to deter illegal crossings *in areas of high illegal entry* into the United States." (emphasis added).

DHS has declared the Big Bend Sector of the U.S.-Mexico Border, including Big Bend National Park to be an "area[] of high illegal entry into the United States" and has waived numerous laws and regulations that would otherwise apply to construction in Big Bend. On February 17, 2026, then-Secretary Noem issued a Determination in the Federal Register invoking IIRIRA Section 102(c) to waive the application of the Administrative Procedure Act, National Environmental Policy Act (NEPA), Endangered Species Act (ESA), National Historic Preservation Act, and twenty-five other laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors" within the a "project area" spanning the Big Bend. 91 Fed. Reg. 7297, 7298 (Feb. 17, 2026). Secretary of Homeland Security Markwayne Mullin issued follow-up Determinations in the Federal Register again invoking IIRIRA Section 102(c) to waive the application of NEPA, ESA, Wild and Scenic Rivers Act, and thirty-three other laws "with respect to the construction of physical barriers and roads," which includes "but [is] not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors" within the "project area." 91 Fed. Reg. 27,969, 27969 (May 15, 2026). See also, 91 Fed. Reg. 34831, 34832 (June 9, 2026) (republishing the "document with the correct project area description"). These Determinations waive the statute establishing the Big Bend National Park, 16 U.S.C. § 156. 91 Fed. Reg. at 27969–70; 91 Fed. Reg. at 34832–33.

The DHS Secretary's waivers of law, assertedly allowed by IIRIRA Section 102, now span the entire border. See 90 Fed. Reg. 48286 (Oct. 15, 2025) (Big Bend Sector) ("Big Bend Procurement Waiver"); 90 Fed. Reg. 48281 (Oct. 15, 2025) (Tucson Sector); 90 Fed. Reg. 48282 (Oct. 15, 2025) (El Centro Sector); 90 Fed. Reg. 48283 (Oct. 15, 2025) (Del Rio Sector); 90 Fed. Reg. 48284 (Oct. 15, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48285 (Oct. 15, 2025) (Yuma Sector); 90 Fed. Reg. 48287 (Oct. 15, 2025) (Laredo Sector); 90 Fed. Reg. 48288 (Oct. 15, 2025) (El Paso Sector); 90 Fed. Reg. 48289 (Oct. 15, 2025) (San Diego Sector) (collectively, the "Procurement Waivers").

The Secretary's Determinations show no basis in fact indicating that installation of "additional physical barriers and roads" in Big Bend National Park will "deter illegal crossings in areas of high illegal entry into the United States." The Secretary would encounter great difficulty presenting any such findings because the 118 miles of Big Bend National Park's border is not an area of high illegal crossings in absolute or relative terms. See Exhibit 1. For perspective, encounters in Big Bend National Park for all of 2025 amounted to just five encounters per mile, roughly one encounter per mile every couple of months. Accordingly, the Secretary, before waiving dozens of laws, must demonstrate how construction of new facilities in Big Bend would have deterrent effects in areas that do have high levels of illegal entry. The effectiveness of additional barriers and roads in deterring illegal crossings in the national park is likely to be negligible in relation to the existing deterrent effects of Big Bend's geography and strong law enforcement activities and would, even if highly effective, deter only a small number of persons per year.

The Secretary's Big Bend Determinations exceed the authority granted by Congress. Congress chose to limit the Secretary's waiver authority to those locations along the border with

high illegal entry. If Congress had intended to grant the Secretary authority to waive law everywhere along the border, it could have done so easily. But a fair reading of the Secretary's Section 102(a) authority is that the authority does not extend to areas of "low" or even "moderate" illegal entry. Congress's choice of limiting language cannot reasonably be read to include all areas along the border, least of all the sector with the fewest crossings, namely, Big Bend. Big Bend exemplifies what Congress meant to exclude from the Section 102(a) authority when drawing a distinction between areas of "high" illegal crossings and other locations along the border.

Defendants have so broadly construed their authority under the IIRIRA as to eviscerate its limitation to "areas of high illegal entry into the United States." Here, the executive branch of the federal government has chosen to ignore a key provision of law to suit its interest in being unconstrained by environmental and other laws. Defendants' actions transgress the Constitutional boundary between legislative and executive functions. Only Congress writes the law; executive branch agencies have no power to rewrite statutory provisions that agency officials find inconvenient. As applied to Big Bend, the Determinations are unconstitutional and *ultra vires*. Defendants' Big Bend Determinations manifest the unconstitutional overreach and abuse of discretion that Congress empowered this Court to review and, if appropriate, enjoin.

## I. This Court has Jurisdiction to Review Plaintiffs' Claims Under the Constitution.

Congress tightly constrained but did not eliminate the jurisdiction of this Court to review the Secretary's exercise of discretion in implementing the IIRIRA. In sum, the district courts have jurisdiction only to review claims arising under the Constitution:

> (A) In general.-The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

> (B) Time for filing of complaint.-Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.
>
> (C) Ability to seek appellate review.-An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

IIRIRA § 102(c)(2) (codified at 8 U.S.C. § 1103 note). That grant of jurisdiction, albeit slender, should be read to confer meaningful, not merely fanciful authority on this Court to uphold the structure and substance of the Constitution.

Under the DHS reading of the IIRIRA, the grant of authority to hear cases and controversies under the Constitution amounts to an illusory grant of jurisdiction because, Defendants assert, Plaintiffs' claims "have no credible basis in constitutional jurisprudence." Defendants' Mot. for Summ. Judgment and Opp. to Plaintiffs' Mot. for Summ. Judgment at 9 (Aug. 7, 2026), Doc. 24. The Court should view Defendants' position with skepticism, given the principles of Constitutional law and unique, irreplaceable public resources at stake. It is telling in this regard that Defendants overlook *Zapata County, Texas v. Biden*, No. 20-cv-00106, 2023 WL 11915719 (S.D. Tex. Mar. 31, 2023), in which the court found that plaintiffs' Appointments Clause and statutory *ultra vires* claims were sufficient to survive a Rule 12(b)(6) analysis. This Court, too, should use the authority provided by Congress to analyze Plaintiffs' constitutional claims and do so with particular rigor because Defendants' determined efforts to operate outside of generally applicable law will needlessly destroy irreplaceable public resources of incalculable but quite real value.

Defendants point to a strong track record of prevailing in IIRIRA litigation. Plaintiffs recognize that the IIRIRA has been interpreted by other courts in other circumstances to allow Defendants to act without regard for the laws that otherwise apply to virtually all other government actions, including those by DHS, outside the U.S.-Mexico border area. But arguments that have

failed in other contexts warrant reexamination in the unique circumstances of the Big Bend Sector and Big Bend National Park.

There must be some constitutional limit to DHS's authority to waive all other laws in a sector of the border that is not an area "of high illegal entry into the United States." IIRIRA § 102(a). These are unusual factual circumstances to which the Court must apply Constitutional law, but there are relevant principles and precedents to apply. Under the Nondelegation Doctrine, the Court must "constru[e] the challenged statute to figure out what task it delegates and what instructions it provides." *Gundy v. United States*, 588 U.S. 128, 136 (2019) (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001)). A court's task is not limited to the text of the statute alone—"when evaluating whether Congress laid down a sufficiently intelligible principle, we're meant also to consider 'the purpose of the [statute], its factual background[,] and the statutory context.'" See *Big Time Vapes, Inc. v. Food & Drug Admin.*, 963 F.3d 436, 443 (5th Cir. 2020) (citing *Gundy*, 588 U.S.at 141 (plurality)). A delegation is constitutionally sufficient "if Congress [(1)] clearly delineates [its] general policy, [(2)] the public agency which is to apply it, and [(3)] the boundaries of th[at] delegated authority." *Big Time Vapes, Inc.*, 963 F.3d at 443–44 (alterations in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

In *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007), the court found that the general policy of the IIRIRA was "clearly delineated"—"*i.e.* to expeditiously install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry." *Id.,* at 127 (citation modified) (quoting *Mistretta*, 488 U.S. at 372–73; 8 U.S.C. § 1103 note). The general purpose of a statute is not the same thing as the boundaries set on an agency's authority to achieve that purpose. Here, the DHS Secretary "is directed to construct fencing only 'in the vicinity

of the United States border to deter illegal crossings in areas of high illegal entry into the United States.'" *Id.* (quoting 8 U.S.C. § 1103 note).

Consideration of the purpose of the statute, its factual background, and the statutory context requires consideration of whether Congress envisioned its delegation of discretionary authority to result in the construction of physical barriers and roads in a national park in the sector of the border with the lowest level of illegal entry. In *Center for Biological Diversity v. McAleenan,* 404 F. Supp. 3d 218 (D.D.C. 2019), Judge Jackson's analysis of Non-Delegation Doctrine claims are in the context of the Secretary's determination that specified a 20-mile stretch of border in New Mexico qualifies as an "area of high illegal entry" under section 102(a) of the IIRIRA. *Id*. at 230. Judge Jackson's analysis largely adopts Judge Huvelle's analysis in *Defenders of Wildlife*, which is similarly limited by context. *Id.* at 247–48. Big Bend National Park is the area of least illegal entry and, thanks to natural factors and existing law enforcement activity, is not a place where DHS can credibly argue that it so urgently needs to build barriers and roads that compliance with normal statutory law must be sacrificed to achieve the general purpose of the IIRIRA. This Court should not adopt the reasoning of prior cases arising out of dissimilar contexts.

**A. The General Policy of the IIRIRA Require Limitations on Section 102(a).**

Amici agree that we need a secure border at Big Bend National Park. Amici's representatives have testified to Congress in support of effective border security measures. Statement of Bob Krumenaker Before the Subcommittee on Fed. Lands, H. Comm. on Nat. Res., 119th Cong. (Mar. 11, 2025) (Krumenaker Testimony), https://perma.cc/L7XA-SVJT. Former National Park superintendents and other members of The Coalition to Protect America's National Parks and Keep Big Bend Wild have spent decades working with the Border Patrol and local law enforcement leaders to ensure the border remains secure. Krumenaker Testimony at 2–3. But a

physical wall, additional paved roads, vehicle barriers, or other large scale infrastructure projects within the park are not the only way or necessary to accomplish the purpose of the statute.

The fact is that the rugged terrain, natural barriers, isolation, and distance from highways in Mexico are the reasons this area already has, by far, the lowest level of illegal activity of the entire border. The Big Bend Sector, and the national park in particular, are not by any definition areas of high illegal entry. Amici have grave concerns that installing vehicle barriers, building new patrol roads, and paving any existing unpaved roads in the park's remote backcountry are counter to border security (i.e., roads attract traffic and facilitate movement, especially in darkness or adverse weather) and needlessly destructive to the public values of the area, the very things that people care about in the national park. Not only is there no risk of vehicles crossing the river in these locations, but the landscape would be altered forever for illusory improvements to security.

DHS's road- and fence-building plans for Big Bend would require massive infrastructure installation and significant terrain modification to cross the area's extreme terrain, including dozens of desert washes subject to flash flooding, all of which would be vulnerable to damage by future flash floods and shifts in channel locations. DHS's plans would inflict significant visual intrusions and damage the plants, animals, and iconic desert landscapes that define Big Bend. DHS's plans would impede public access to the Rio Grande for recreation and diminish or eliminate opportunities to experience the darkest night sky in the nation. These destructive changes would damage the area's economy, which is highly dependent upon tourism. Installation of buried or above-ground communications or power cables along backcountry roads in the park would also damage the landscape, require expensive and frequent maintenance, and is technologically unnecessary as communications with sensors can continue to be done wirelessly. If wireless

communication capacity needs to be improved in Big Bend National Park, there are far less obtrusive means to accomplish that than anything now proposed by DHS.

Amici urge this Court to hold unlawful and set aside Defendants' waivers of otherwise applicable laws. The Court should require Defendants to follow the law by considering the consequences of their proposed actions with alternatives, public review, and interagency coordination and mitigation. If upgrades to the existing robust electronic sensor system are needed and can be accomplished as unobtrusively as the existing installations, Amici would support such measures.

Border security in the Big Bend Sector today functions as a collaborative effort of the Border Patrol, the NPS, and county sheriffs. No waivers of existing law have been needed to make the existing system work, and any operational or other changes can be made by relying on the same cooperative system. The Border Patrol and NPS have a successful multi-decade history of working together in support of both agencies' missions. The agencies co-operate pursuant to a 2006 Memorandum of Understanding between DHS and the land management agencies regarding cooperative national security on federal borderlands. Memorandum of Understanding Among U. S. Department of Homeland Security and U.S. Department of the Interior and U.S. Department of Agriculture Regarding Cooperative National Security and Counterterrorism Efforts on Federal Lands along the United States' Borders (Mar. 31, 2006), https://perma.cc/735V-ZCKC.

### B. IIRIRA Legislative History and Context Demonstrate Limits on DHS.

The original language of IIRIRA Section 102(b) specifically provided for the construction of secondary and tertiary fencing, with roads between them, along a 14-mile stretch of the border extending inland from San Diego, California. Later, Section 2 of the Secure Fence Act of 2006 amended IIRIRA Section 102(b) to specifically provide for at least two layers of reinforced

fencing, additional barriers, roads, lighting, cameras, and sensors in several specific sections of the border, including two five-mile segments, one from Columbus, New Mexico, to ten miles east of El Paso and another from five miles northwest of Del Rio, Texas to five miles southeast of Eagle Pass Texas, and a 15-mile segment extending from 15 miles northwest of Laredo, Texas to Brownsville, Texas, with specific deadlines for their completion, and expanded the overall area of authority to encompass the entire southwest border. Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2639. The statute contemplated construction of both a surveillance camera system and fence construction.

Two years later, IIRIRA Section 102(b) was amended in an appropriations law to replace prior headers reading "in the border area" with "along the border" and to replace "security features" in another header with "additional fencing along the southwest border." Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, title V, § 564, 121 Stat. 1844, 2090, 2091. Instead of specifying specific priority segments, as was done in the past, the appropriations bill directed the construction of reinforced fencing along at least 700 miles of the southwest border where fencing would be "most practical and effective," in addition to other physical barriers, roads, lighting, cameras, and sensors to gain operational control. The Secretary was further obligated to identify 370 of those miles as priority areas, in which reinforced fencing was to be completed by the end of 2008. The Secretary was further obligated to consult with the Secretaries of Agriculture and the Interior, States, local governments, Tribal governments, and U.S. property owners "to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." 18 U.S.C. § 1103 note. The amendment to IIRIRA Section 102 also excused the Secretary from installing fencing, physical barriers, roads, lighting, camera, and sensors in a particular location if

Secretary determined such features were not the most appropriate means of achieving and maintaining operational control of the border at that location. Appropriations for 2018 included funding for 14 miles of secondary fencing in the San Diego sector, 25 miles of primary pedestrian levee fencing (and additional funds for additional primary fencing) in the Rio Grande Valley Sector, as well as additional appropriations for primary fencing along the southwest border generally. Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, title II, § 230(a), 132 Stat. 348, 616 *et seq*.

While providing for construction in the Rio Grande Valley, the 2018 appropriations also specifically prohibited the use of funds for construction of a border barrier in the Santa Ana National Wildlife Refuge. *Id.* at 618. The following year, Congress also provided for construction in the Rio Grande Valley, it also specifically prohibited the use of funds for construction of pedestrian fencing not only in the Santa Ana National Wildlife Refuge, but also in the Bentsen-Rio Grande Valley State Park, the La Lomita Historical Park, the National Butterfly Center, and within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, Title II, §§ 230(a) and 231, 133 Stat 13, 28. Those limitations were changed by Congress in 2024 legislation that authorized and appropriated $46.6 billion for the construction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers, access roads. barrier system attributes, including cameras, lights, sensors, and other detection technology, and any work necessary to prepare the ground at or near the border to conduct operations, including the construction and maintenance of the barrier system. See Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. D, Title II, § 210, 133 Stat 2317, 2512; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. F, Title II, § 211, 134 Stat. 1183, 1457; Consolidated

Appropriations Act, 2022, Pub. L. No. 117-103, div. F, title II, § 210, 136 Stat. 49, 322; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. F, title II, § 209, 136 Stat. 4459, 4735; Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, title II, § 209, 138 Stat. 460, 603.

The robust legislative history of the IIRIRA demonstrates that Congress has paid careful, continuous attention to the law and amended it numerous times to change its boundaries as needed achieve the law's general purpose. At no point has Congress determined that the Secretary's discretionary authority to waive other laws should be extended to include any portions of the border that are not areas of "high illegal crossings." Congress has never determined that the specific circumstances of the Big Bend Sector matched the characteristics of the areas of high illegal crossings such as San Diego, California and Del Rio, Texas. The statutory boundaries of DHS's delegated authority do not encompass discretion to waive the law in Big Bend National Park, nor does achievement of the IIRIRA's general purpose require that DHS have such discretion. In these circumstances, the Court should review whether DHS's actions violate the Non-Delegation Doctrine and, accordingly, are *ultra vires*.

## II. This Court has Jurisdiction to Review Plaintiffs' Claims Against *Ultra Vires* Action

An agency's "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*." *D&G Holdings, L.L.C. v. Becerra*, 22 F.4th 470, 477 (5th Cir. 2022) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). *Ultra vires* review "provides a critical backstop when 'there is no other means * * * to protect and enforce [a statutory] right.'" *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 26-5123, 2026 WL 2276494, at *25 (D.C. Cir. Aug. 7, 2026) (quoting *Leedom v. Kyne*, 358 U.S. 184, 190 (1958)). It applies only when an agency

"has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Brotherhood of Ry. & S.S. Clerks v. Ass'n for the Benefit of Non-Cont. Emps.*, 380 U.S. 650, 660 (1965)). *Ultra vires* claims are allowed as a "narrow exception that permits judicial intervention—even when the relevant statutory language precludes jurisdiction—when an agency exceeds the scope of its delegated authority or violates a clear statutory mandate." *Kirby Corp. v. Pena*, 109 F.3d 258, 268 (5th Cir. 1997); *Bd. of Govenors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991). In *Zapata County,* the Southern District of Texas found that Plaintiffs could maintain a statutory *ultra vires* claim against DHS that was not "arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1)." *Zapata County*, 2023 WL 11915719, at *2 n.3.

Paragraph (1), cited by the *Zapata* court, is the authorization to waive all laws that the Secretary "determines necessary to ensure expeditious construction of the barriers and roads under this section." 8 U.S.C. § 1103 note. Importantly for *ultra vires* analysis, while Congress wrote the IIRIRA to limit claims against a waiver decision—and with it claims regarding the application of waived statutes to the construction of barriers and roads undertaken pursuant to that waiver—the limitation on judicial review does not bar the court from reviewing claims that the Secretary has exceeded the general authority of Subsection 102(a) "to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." *Id*.

Section 102(a) has remained essentially the same since its enactment, when it was paired with a more limited waiver provision:

> (c) WAIVER.—The provisions of the Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 are waived to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section.

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, div. C, title 1, § 102(a-d), 110 Stat. 3009-554, 3009-555; 8 U.S.C. § 1103 note. Congress amended the waiver provision to address litigation under other statutes and updated the language to reflect transfer of authority from the Attorney General to the Secretary of Homeland Security in light of the establishment of DHS and the transfer of border patrol responsibilities to that new agency. See Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, div. B, title I, § 102, 119 Stat. 231, 306; Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, title V, § 564, 121 Stat. 1844, 2090 *et. seq*. Congress has not waived judicial review of the Secretary's general authority to act under Section 102(a) of the IIRIRA. Rather, in Section 102(c) Congress has so limited the opportunity for judicial review as to necessitate judicial review independent of statute, or plaintiffs would otherwise be wholly deprived of a meaningful opportunity of vindicating their rights to judicial review of DHS action under Section 102(a).

DHS authority and responsibility with regard to border infrastructure have been revised primarily through changes to IIRIRA Section 102(b) in authorizing legislation and various appropriations bills. Subsequent enactments, by statute and appropriations law, established a general goal of "operational control" over the entire border, but did not remove the important limitation on the Secretary's authority to waive other laws under Section 102(a). Secure Fence Act of 2006, § 2(a) (directing DHS to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States"). The Secure Fence Act of 2006 requirement to achieve and maintain "operational control" applies to the entirety of the U.S. land and maritime border,

presumably including areas other than those of "high illegal entry." But Congress has never delegated authority to DHS to waive other laws to achieve "operational control" outside of areas with high levels of illegal crossings.

Congress has, in fact, authorized DHS to use technical and other means to achieve "operational control." The 2007 appropriations act excused the Secretary from installing fencing, physical barriers, or other means where the Secretary deemed them not to be the most appropriate means of achieving and maintaining operational control. Consolidated Appropriations Act, 2008, § 564(a)(2)(D). The Secretary unquestionably has authority to refrain from deploying measures that could conflict with or require waivers of other laws. This discretion, to not transgress or waive other laws, is a key component of the boundary set by Congress on the Secretary's discretion to implement the general purposes of the IIRIRA. The legislative history since 1996 has shown that Congress was ready and able to specify fencing when that was what Congress wanted. "Operational control" does not conflict with the limit on the Secretary's discretion under IIRIRA Section 102(a), as fencing and roads are not the only means of achieving operational control, and are simply among the tools to be used.

## III. The Court's Decision Will Have a Profound Effect on the Separation of Powers.

Amici urge the Court to view skeptically and grant to Defendants' arguments none of the deference traditionally afforded the executive branch of the federal government by the judicial branch. Defendants' position, if accepted as presented, means that the legislative branch—entirely by implication—has granted the head of an executive branch department discretion to establish a territory along the U.S.-Mexico border where the chosen official (of any administration) has effectively unlimited discretion to choose which laws to follow and where the judicial branch will have no role except to assess the constitutionality of the official's choice. It is not immediately

obvious that the legislative branch could have granted the executive branch such discretion. Setting aside those fundamental issues of constitutional law, it is not at all obvious that Congress intended or attempted to do so in this case. An interpretation of the IIRIRA so extreme cannot stand on selective reading of the law or mere inference.

The concept, authority, and social acceptance of a single individual representing the Law West of the Pecos was discredited and rejected long ago. For many reasons that have become bedrock principles of the social contract framed by the Constitution of the United States, the federal government does not often or casually work that way. Nor does it need to here.

This Court should look past Defendants' arguments with the utmost doubt. Would Congress do—by implication—what Defendants claim? Would Defendants' stated and unstated premises about Congressional intent, statutory interpretation, and judicial authority enjoy an instant of credibility if the IIRIRA or its equivalent were applied to a national park on the Canadian border? To Yellowstone National Park? To Grand Canyon? Would those interpretive premises and constraints on the judiciary apply if the executive branch department in question were the Department of the Interior or Agriculture or Transportation?

Amici recognize that Defendants insist on a maximalist view of DHS's waiver authority based on the premise that only with a law-free hand can the Department fulfill its border security mission. Amici believe that the Court must assess the merit of Defendants' extreme view in light of the fact that the laws that DHS claims it must set aside in Big Bend are the same laws that DHS is expected to comply with elsewhere outside the U.S.-Mexico border and, in fact, apply to federal law enforcement by DHS and other agencies in every other national park, forest, or federal rangeland, including the entire 5,525-mile extent of the border between the U.S. and Canada, and that apply to every other federal agency action in or impacting the U.S.-Mexico border area. Under

the assumption that DHS and other federal law enforcement agencies manage their business generally within the boundaries of the law, Defendants invite doubt by arguing that only by freeing DHS from the bounds of statutory law in every location along the U.S.-Mexico border—including the sector with the fewest illegal crossings and most effective natural barriers to human migration and survival—can DHS do the job delegated to it by Congress.

In contrast to Defendants, Plaintiffs seek nothing extreme from this Court, nor do Plaintiffs ask this Court to use its jurisdiction to advance a politically partisan agenda. Texans who oppose Defendants' waiver of the law establishing Big Bend and laws that grant the public a voice in agency decisionmaking come from across the partisan spectrum, including local law enforcement officials and businesspeople. *A Border Wall Plan Unites Republicans and Democrats in Texas: 'This Is Insane*', NEW YORK TIMES, Apr. 4, 2026, https://www.nytimes.com/2026/03/30/us/a-border-wall-plan-unites-republicans-and-democrats-in-texas-this-is-insane.html.

Those opposing Defendants' plans for Big Bend include the sheriff for the county in which the park is located and sheriffs for the adjacent counties in the Big Bend region. In March 2026, the five Big Bend area sheriffs issued a joint statement opposing Defendants' plans:

> Based on decades of combined experience working this terrain, we believe that construction of a continuous physical border wall in the Big Bend region would not represent the most practical or strategic approach to border security in this area.
>
> The Big Bend region, consisting of Hudspeth, Culberson, Presidio, Brewster and Terrell counties, is geographically distinct from heavily trafficked urban corridors along the southern border. Steep mountain ranges, deep canyons, expansive desert landscapes and the Rio Grande itself create formidable natural barriers that significantly limit large-scale movement. These realities must be considered when evaluating appropriate enforcement strategies.
>
> Modern surveillance technology, including advanced aerial systems currently deployed by U.S. Customs and Border Protection, has proven highly effective in detecting and interdicting activity in remote terrain.

> Targeted patrol deployment supported by aerial and sensor-based monitoring allows law enforcement to respond precisely and efficiently without the need for extensive permanent infrastructure.
>
> We are also mindful of the unique character of the Big Bend region. This area includes nationally and internationally significant public lands, ranchlands, tourism-based economies, and critical wildlife habitat.
>
> Major permanent infrastructure, accompanied by lighting systems, access roads and maintenance corridors would permanently alter one of the most remote and ecologically significant border landscapes in the United States.
>
> Border security is not a one-size-fits-all proposition. Strategies that may be appropriate in high-traffic urban sectors are not necessarily appropriate in geographically remote regions such as ours. Sound policy must be informed by local terrain, operational realities and fiscal responsibility.

*Sheriffs unite against border wall*, BIG BEND SENTINEL, Mar. 10, 2026, https://perma.cc/J3ZE-CYHX. The judges for every Texas county along the border wrote DHS Secretary Mullen in April stating, among other things, that

> [C]ollaborative efforts in the Big Bend region, including Big Bend National Park and Big Bend Ranch State Park, have demonstrated the effectiveness of adapting from a traditional physical barrier approach to a more strategic use of technology and smart infrastructure. That approach reflects how thoughtful coordination can meet security objectives while preserving natural resources, access, and the unique character of the region.

Letter from 14 County Judges to Secretary Markwayne Mullen at 2 (Apr. 21, 2026), https://perma.cc/958N-T5EB.

Amici urge the Court to focus on the many reasons to set aside Defendants' protestations of urgency and expediency. Big Bend will remain inhospitable and remote and only infrequently crossed by unauthorized migrants for the time Defendants might need to comply with existing law before deciding whether to construct new fencing or roads in Big Bend. The executive branch is fully capable of petitioning Congress to amend the IIRIRA if the courts interpret the statute in a manner that DHS considers unacceptable in light of its mission. The stakes for the country are low if the Court finds that the IIRIRA waiver authority does not apply to Big Bend. But the stakes are

very high if the Court accepts Defendant's position. Big Bend National Park is one of America's most wild, beautiful, and important natural and cultural assets. The Constitution's division of powers among three co-equal branches is likely the most important asset of our Nation, and far from invulnerable. This Court should take up the issues presented by Plaintiffs to ensure that the Nation's most important—and vulnerable—assets are honored.

## CONCLUSION

The Court should hold that the Department of Homeland Security development of physical barriers and roads in Big Bend National Park pursuant to IIRIRA Section 102 are unconstitutional and *ultra vires*.

Dated: August 14, 2026

Respectfully submitted,

*/s/ Janice Ta*

Janice Ta
Janice.Ta@ashurstperkins.com
ASHURST PERKINS COIE US LLP
405 Colorado St., Suite 1700
Austin, TX 78701
(512) 578-8402

Edward A. Boling (*pro hac vice pending*)
Ted.Boling@ashurstperkins.com
Thomas C. Jensen (*pro hac vice pending*)
Thomas.Jensen@ashurstperkins.com
ASHURST PERKINS COIE US LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
(202) 654-6200

*Counsel for Amici Counsel for Amici The Coalition to Protect America's National Parks and Keep Big Bend Wild*

**CERTIFICATE OF SERVICE**

This is to certify that on August 14, 2026, I electronically filed the foregoing Brief of Amici Curiae with the United States District Court for the Western District of Texas by using the appellate CM/ECF system, thereby serving the Brief via ECM system on all counsel of record.

Dated: August 14, 2026

*/s/ Janice Ta*
Janice Ta

# Exhibit 1

**United States Department of the Interior**

**NATIONAL PARK SERVICE**
**Big Bend National Park**
**Rio Grande Wild and Scenic River**
**P.O. Box 129**
**Big Bend National Park, Texas 79834-0129**

August 7, 2026
Electronic Transmission – no hard copy to follow

MEMORANDUM

| | |
|---|---|
| To: | Alison Yamato, Regional FOIA Coordinator, IMR - Serving Interior Regions 6, 7 & 8 |
| From: | Steven Cape, Chief Ranger, Big Bend National Park (BIBE) |
| Subject: | Yearly Border Apprehension totals for BIBE |
| Memo Type: | Informational |
| Due Date(s): | 08/04/2026 |
| Contact: | Steven Cape, Office: 432.477.1185, Steven_Cape@nps.gov |

**Reason for Request**
Operational summary information of illegal border crossing apprehensions submitted for compilation in response to FOIA request 2026-006568.

**Background Information**
This information was compiled for operational summary and in response to FOIA request.

Data: Total annual summary of illegal border crossing apprehensions at BIBE

2016 - 20
2017 - 02
2018 - 60
2019 - 615
2020 - 20
2021 - 797
2022 - 268
2023 - 130
2024 - 102
2025 - 613

# Illegal Migrant Activity In Big Bend National Park (BBNP)

Compiled by Bob Krumenaker, Keep Big Bend Wild

Updated as of 8/7/2026

| | Apprehensions / Encounters With Border Patrol | | | | | |
|---|---|---|---|---|---|---|
| Year | Inside Big Bend National Park (BBNP) | Entire Big Bend Sector | Entire Southwest Border | BBNP % of Total Southwest Border | BBNP % of Entire Big Bend Sector | Big Bend Sector % of Total Southwest Border |
| 2016 | 20 | 6,366 | 408,870 | 0.005% | 0.314% | 1.557% |
| 2017 | 2 | 6,002 | 303,916 | 0.001% | 0.033% | 1.975% |
| 2018 | 60 | 8,045 | 396,579 | 0.015% | 0.746% | 2.029% |
| 2019 | 615 | 9,637 | 851,508 | 0.072% | 6.382% | 1.132% |
| 2020 | 20 | 8,628 | 400,651 | 0.005% | 0.232% | 2.153% |
| 2021 | 797 | 37,266 | 1,659,206 | 0.048% | 2.139% | 2.246% |
| 2022 | 268 | 31,948 | 2,370,000 | 0.011% | 0.839% | 1.348% |
| 2023 | 130 | 11,823 | 2,475,669 | 0.005% | 1.100% | 0.478% |
| 2024 | 102 | 4,921 | 2,135,005 | 0.005% | 2.073% | 0.230% |
| 2025 | 613 | 3,096 | 443,671 | 0.138% | 19.800% | 0.698% |
| 2021-2025 Total | 1910 | 89,054 | 9,083,551 | 0.021% | 2.145% | 0.980% |
| **Miles of Border** | **118** | **517** | **1952** | 6% | 23% | 26% |

NPS /BBNP counts by calendar year; BP counts by fiscal year
NPS/BBNP data source: NPS Response to FOIA Request dated 8/4/26 "Yearly Border Apprehension totals for BIBE"

Border Patrol Sector and Total data by fiscal year FY16-18 from
https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/BP%20Apps%20by%20Sector%20and%20Citizenship%20FY07-FY18.pdf

Border Patrol Sector and Total data by fiscal year FY16-22 from
https://ohss.dhs.gov/topics/immigration/yearbook/2022/table35

Border Patrol Southwest Border data FY23-25 from
https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters