**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FRIENDS OF THE RUIDOSA CHURCH; DANNY WILLIAM MILLER JUNIOR; and CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION,

*Defendants.*

Case No. 3:26-cv-01099-KC

**PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

STATEMENT OF ISSUES ..... vii

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 2

I. The Parties ..... 2

II. The Great Wall and the Big Bend Waivers ..... 3

III. Necessity for Preliminary Injunction ..... 4

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. Plaintiffs are likely to succeed on the merits of their claims that the Big Bend Waivers are unconstitutional. ..... 7

a. The Big Bend Waivers Violate the Major Questions Doctrine. ..... 7

b. The Waivers Violate the Take Care Clause. ..... 11

c. Alternatively, IIRIRA Section 102(c) and the Big Bend Waivers Violate the Nondelegation Doctrine. ..... 12

d. The National Park and Lower Canyons Waivers Violate the Presentment Clause. ..... 13

II. Border barrier construction and associated activities will irreparably harm Plaintiffs. ..... 16

III. The balance of equities and the public interest favor an injunction. ..... 18

CONCLUSION ..... 20

## TABLE OF AUTHORITIES

### Cases

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 9

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 9

*Big Time Vapes v. FDA*,
963 F.3d 436 (5th Cir. 2020) .......... 13

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) .......... 10

*Clinton v. City of New York*,
524 U.S. 417 (1998) .......... 13, 14, 15

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
710 F.3d 579 (5th Cir. 2013) .......... 7

*Defenders of Wildlife v. Chertoff*,
527 F. Supp. 2d 119 (D.D.C. 2007) .......... 13

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 16

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000) .......... 2

*Gundy v. United States*,
588 U.S. 128 (2019) .......... 7, 10

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... 2

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) .......... 6, 16

*Kendall v. United States*,
37 U.S. 524 (1838) .......... 12

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 7, 8, 10

*Mayfield v. U.S. DOL*,
117 F.4th 611 (5th Cir. 2024) .......... 8, 9

*Mistretta v. United States*,
488 U.S. 361 (1989) .......... 13

*Myers v. United States*,
272 U.S. 52 (1926) .......... 11

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 18

*Nuziard v. Minority Bus. Dev. Agency*,
721 F. Supp. 3d 431 (N.D. Tex. 2024) .......... 16

*Opulent Life Church v. City of Holly Springs, Miss.*,
697 F.3d 279 (5th Cir. 2012) .......... 16

*Planned Parenthood Ctr. for Choice v. Abbott*,
450 F. Supp. 3d 753 (W.D. Tex. 2020) .......... 7

*Printz v. United States,*
521 U.S. 898 (1997) .......... 11

*Texas Top Cop Shop, Inc. v. Garland,*
758 F.Supp.3d 607 (E.D. Tex. 2024) .......... 16

*Texas v. United States*,
787 F.3d 733 (5th Cir. 2015) .......... 19

*Tohono O'odham Nation v. Mullin*,
Case No. 2026-cv-02127 (D.D.C. Aug 6, 2026) .......... 5

*Trump v. Slaughter,*
609 U.S. ___, (2026) .......... 11

*United States v. Abbott*,
557 F. Supp. 3d 810 (W.D. Tex. 2021) .......... 18

*Util. Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014) .......... 7

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 8, 9, 10

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ... 11

**Constitutional Provisions**

U.S. Const. art I, § 1 ... 13

U.S. Const. art I, § 7 ... 13

U.S. Const. art. I ... 13

U.S. Const. art. II, § 3 ... 11, 12

**Statutes**

8 U.S.C. § 1103 note ... 1

8 U.S.C. § 1103(a)(5) ... 19

8 U.S.C. § 1103(c) note ... 3

8 U.S.C. § 1103(c)(2)(A) note ... 7

16 U.S.C. § 1271(b) ... 14

16 U.S.C. § 1274(a)(17) ... 14, 15

16 U.S.C. § 1281(a) ... 14

Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208,
Div. C, 110 Stat. 3009-546 ... 1

IIRIRA § 102 ... 10

IIRIRA § 102(a) ... 3

IIRIRA § 102(c) ... 1, 12, 14

**Rules**

Federal Rule of Civil Procedure 65 ... 1

W.D. Tex., Local Rule 65 ... 1

## Federal Register

82 Fed. Reg. 8793 (Jan. 25, 2017) .......... 3

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 27969 (May 15, 2026) .......... 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 34831 (June 9, 2026) .......... 1, 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 40550 (July 2, 2026) .......... 1, 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 46939 (July 27, 2026) .......... 1, 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 7297 (Feb. 17, 2026) .......... 4

## Other Authorities

Executive Order 13767—Border Security and Immigration Enforcement Improvements .......... 3

## STATEMENT OF ISSUES

1. Whether Plaintiffs are likely to succeed on the merits of their claim that the West Waiver (91 Fed. Reg. 7297–98 (Feb. 17, 2026), *as amended by* 91 Fed. Reg. 40550–51 (July 2, 2026)), National Park Waiver (91 Fed. Reg. 27969–70 (May 15, 2026), *as amended by* 91 Fed. Reg. 34831–33 (June 9, 2026)), and Lower Canyons Waiver (91 Fed. Reg. 46939–41 (July 27, 2026)) (collectively, the "Big Bend Waivers" or "Waivers"), issued by the Secretary of the U.S. Department of Homeland Security pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") violate the major questions doctrine.

2. Whether Plaintiffs are likely to succeed on the merits of their claim that the Big Bend Waivers violate the Take Care Clause.

3. If the Court does not resolve Plaintiffs' claims under the major questions doctrine or Take Care Clause, whether Plaintiffs are likely to succeed on the merits of their claim that IIRIRA Section 102(c) and the Big Bend Waivers violate the nondelegation doctrine.

4. Whether Plaintiffs are likely to succeed on their claim that the National Park and Lower Canyons Waivers violate the Presentment Clause.

5. Whether border barrier-related construction currently underway and planned within the Big Bend Waiver areas will likely cause Plaintiffs irreparable harm absent injunctive relief.

6. Whether the balance of equities and public interest favor preserving the status quo and preliminarily enjoining or restraining further border barrier-related construction pending resolution of this action.

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65, Local Rule 65, and this Court's Order denying Plaintiffs' Motion to Expedite (ECF No. 28), Plaintiffs Friends of the Ruidosa Church, Danny William Miller Junior, and the Center for Biological Diversity ("Plaintiffs") respectfully move for a temporary restraining order or a preliminary injunction enjoining Defendants Secretary of Homeland Security Markwayne Mullin, the U.S. Department of Homeland Security ("DHS"), and U.S. Customs and Border Protection's ("CBP") (collectively, "Defendants") from undertaking border barrier construction and associated ground-disturbing activities[1] pursuant to the challenged waivers[2] issued under Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note). Absent immediate injunctive relief, Plaintiffs will suffer additional irreparable injuries resulting from border barrier related construction that has already commenced. A temporary restraining order or preliminary injunction is therefore necessary to preserve the status quo and prevent further irreparable harm pending resolution of this action. Because Plaintiffs are likely to succeed on the merits of their constitutional claims, and because the balance of equities and the public interest favor maintaining the status quo, preliminary relief is warranted. In support of this motion, Plaintiffs state as follows:

---

[1] This encompasses "construction of physical barriers and roads (including, but not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors) in the project area," inasmuch as those activities are purportedly authorized pursuant to the challenged waivers. *See* 91 Fed. Reg. 34831–33; 91 Fed. Reg. 40550–51; 91 Fed. Reg. 46939–41.

[2] *See* Section II, *infra,* describing the challenged waivers.

## STATEMENT OF FACTS

### I. The Parties[3]

Plaintiff Friends of the Ruidosa Church is a nonprofit organization dedicated to preserving and restoring the historic El Corazón Sagrado de la Iglesia de Jesús (the Sacred Heart of the Church of Jesus) in Ruidosa, Texas. PUF ¶ 71. Its members regularly visit and enjoy the Church and its surrounding landscapes for community gatherings, historic preservation, and the aesthetic beauty of the surrounding landscape. *See* PUF ¶¶ 74–75. Border infrastructure and construction threatens the fragile adobe structure of the Church. *See* PUF ¶¶ 80−83.

Plaintiff Danny William Miller Jr. is a longtime resident of and river guide in the Big Bend region who regularly visits the Rio Grande for work and to experience its wilderness character, scenic beauty, wildlife, and recreational opportunities. PUF ¶¶ 63–66. The challenged construction activities impair his ability to enjoy these lands and continue operating as a river guide in the region. *Id.* ¶ 68; Miller Decl. ¶¶ 9–13.

Plaintiff Center for Biological Diversity (the "Center") is a national nonprofit conservation organization with members who live in, visit, study, and recreate throughout the Big Bend region. PUF ¶¶ 84–85, 88, 92, 96–97, 102. The Center works to protect the region's native species,

[3] To show standing, a plaintiff must show an "injury in fact" that is "concrete and particularized," and "actual or imminent," that "the injury is fairly traceable to the challenged action of the defendant," and that the injury would likely be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000). Associations have standing "when its members would otherwise have standing to sue," the interests at risk of harm "are germane to the organization's purpose," and individual members are not required to participate in the lawsuit. *Id.; see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (organizational standing). Here, Plaintiffs have standing. *See* Proposed Undisputed Facts in Supp. of Pls.' Mot. for Summ. J. (ECF No. 19-1) ("PUF") ¶¶ 63–108; Decl. of Danny William Miller Jr. in Supp. of Pls.' Mot. for Prelim. Inj. ("Miller Decl.") ¶¶ 6–8; Decl. of Bernadette Devine in Supp. of Pls.' Mot. for TRO or Prelim. Inj. ("Devine Decl.") ¶¶ 6–8.

ecosystems, and habitat connectivity from border industrialization, and its members are harmed by habitat destruction, landscape fragmentation, diminished wildlife values, the elimination of opportunities to participate in procedural processes, and the loss of opportunities to experience the affected areas in an undeveloped state. *See Id.* ¶¶ 86, 91, 95, 98, 105–06; Devine Decl. ¶¶ 9–15; Decl. of Laiken Jordahl in Supp. of Pls.' Mot. for TRO or Prelim. Inj. ("Jordahl Decl.") ¶¶ 4–13.

## II. The Great Wall and the Big Bend Waivers

Upon entering the White House in 2017, President Trump directed DHS to construct a "secure, contiguous, and impassable physical barrier" along the entirety of the nearly 2,000-mile-long U.S.-Mexico border. Exec. Order No. 13767 §§ 2(a), 3(e), 82 Fed. Reg. 8793 (Jan. 25, 2017). During his first term, President Trump was unsuccessful in completing his goal of constructing a "Great Wall." *See* PUF ¶¶ 4, 6–7. Additional legislative efforts to finish the Wall or expand statutory authority for its construction during President Biden's presidency also failed. *See* PUF ¶¶ 8–10. Upon reentering the White House, President Trump recommitted to finishing the Wall, PUF ¶¶ 11–13, which Defendant Mullin states will "go from the Pacific to the Gulf" and be completed by the Summer of 2027, PUF ¶¶ 14–16.

In order to effectuate this massive project, Defendants have waived dozens of laws under Section 102(c) of IIRIRA, codified at 8 U.S.C. § 1103(c) note. Rather than invoking IIRIRA's waiver authority as Congress intended, to "deter illegal crossings" in discrete "areas of high illegal entry" pursuant to Section 102(a), Defendants claim newfound authority to apply such waivers across the entire border. *See* PUF ¶ 17 (citing to nine IIRIRA waivers issued on the same day, which waive procurement laws across the entire border).

Now, and in unprecedented excess of constitutionally delegated authority, Defendants seek to waive additional laws in the Big Bend region to expedite border barrier and road construction

across approximately one third of the border, in areas that, under any metric, are not "areas of high illegal entry." *See* 91 Fed. Reg. 7297 (Feb. 17, 2026), *as amended by* 91 Fed. Reg. 40550 (July 2, 2026) (together, the "West Waiver");[4] 91 Fed. Reg. 27969 (May 15, 2026), *as amended by* 91 Fed. Reg. 34831 (June 9, 2026) (together, the "National Park Waiver");[5] 91 Fed. Reg. 46939 (July 27, 2026) (the "Lower Canyons Waiver") (together, with the West Waiver and National Park Waiver, the "Big Bend Waivers" or "Waivers"); PUF ¶¶ 34−36.

## III. Necessity for Preliminary Injunction

Until recently, Plaintiffs reasonably believed that this case could be resolved on cross-motions for summary judgment without emergency relief. That belief rested on Defendants' commitment to provide Plaintiffs with, among other things, at least thirty days' notice before commencing ground disturbing activities within Big Bend National Park (the "Agreement"). Plaintiffs agreed to a merits-focused litigation schedule in reliance on that Agreement, which Defendants subsequently disregarded.

Despite Plaintiffs' requests to confirm that they would honor the Agreement, Defendants provided only a matter of days' notice before construction activities commenced in Big Bend National Park during the week of August 3. *See* Pls.' Unopposed Mot. to Expedite Consideration of Pls.' Mot. for Summ J. (ECF No. 21) ("Motion to Expedite") at 3–4; Decl. of Emma Yip in Supp. of Mot. to Expedite (ECF No. 21-1) ("Yip Expedite Decl.") ¶ 3 & Ex. 1 (ECF No. 21-2) at 4–6 (emails regarding construction in National Park); Decl. of Laiken Jordahl in Supp. of Mot. to

---

4 The July 2, 2026 waiver "amends the February 17, 2026, notice of determination by including additional legal requirements that are being waived." Plaintiffs challenge both waivers and refer to them jointly as the "West Waiver."

5 The May 15, 2026 waiver contained errors in its description of the project area. As a result, DHS's June 9, 2026 waiver described it as "a republication of the May 15, 2026, document with the correct project area description." Plaintiffs challenge both waivers and refer to them jointly as the "National Park Waiver."

Expedite (ECF No. 21-7) ("Jordahl Expedite Decl.") ¶¶ 5–6 (documenting the start of ground disturbing activities in the National Park on August 4 and 5, 2026). Defendants additionally declined to pause construction pending judicial review or, consistent with the Parties' Agreement, pause construction in the National Park until 30 days after notice. Mot. to Expedite at 4; Yip Expedite Decl. ¶ 3 & Ex. 1 at 2–4. Despite overwhelming evidence to the contrary, Defendants asserted that the work did not constitute "ground disturbing" activities. Yip Expedite Decl. ¶ 3 & Ex. 1 at 2–6 (describing the work as "pre-construction planning work" that "does not necessitate advance notice"); Decl. of Emma Yip in Supp. of Pls.' Mot. for TRO or Prelim. Inj. ("Yip Decl.") ¶ 8 & Ex. 6 (CBP Commissioner Rodney Scott stating: "What people are seeing right now is survey and design work.").[6]

Subsequently, on August 17, 2026, CBP announced it is "pausing all construction activity" in the National Park while CBP Commissioner Rodney Scott conducts a "personal, on-the-ground evaluation." Yip Decl. ¶ 12 & Ex. 9. Commissioner Scott purportedly arrived in El Paso earlier today, on August 17, 2026. Yip Decl. ¶ 13. Resumption of construction is therefore imminent, given CBP's framing of the stoppage as a "paus[e]" and Defendants' notice that additional barrier-related construction is anticipated to begin September 9, 2026. Yip Decl. ¶¶ 10, 12 & Exs. 8–9. Indeed, on August 10, 2026, after the bulldozing, vegetation clearing, and road building were already well underway in Big Bend National Park, Defendants notified Plaintiffs that CBP anticipates additional "ground disturbing activities in support of construction" to begin on

---

6 Plaintiffs' experience mirrors a broader pattern of Defendants failing to meaningfully coordinate with affected stakeholders and governmental entities regarding border barrier construction. *See* Yip Expedite Decl. ¶¶ 6–7 & Exs. 4–5 (ECF Nos. 21-5, 21-6); *see also* Yip Decl. ¶ 9 & Ex. 7 (Notice of United States' Planned Activity on Tohono O'odham Reservation at 2, *Tohono O'odham Nation v. Mullin*, Case No. 2026-cv-02127, ECF No. 41 (D.D.C. Aug 6, 2026) (noting that Plaintiffs received two business days' notice prior to construction)).

September 9, 2026. *Id*. Plaintiffs dispute Defendants' contention that the commenced activities are not "ground disturbing." Even under Defendants' own characterization, however, the August 10 notice confirms that additional and more extensive construction activity is imminent. *See id.*

Absent immediate injunctive relief, Plaintiffs face further irreparable injury. Construction has already begun in Big Bend National Park. *See*, *e.g.*, Jordahl Decl. ¶¶ 4–12. If allowed to continue, additional vegetation will be removed, habitat will be fragmented, cultural and historic resources may be disturbed, and the character of the Big Bend landscape will be permanently altered. These injuries cannot be undone through subsequent judicial relief and will worsen before the Court can adjudicate the merits of Plaintiffs' claims. *See*, *e.g.*, Yip Decl. ¶ 10 & Ex. 8; Devine Decl. ¶ 15; Miller Decl. ¶ 13. Moreover, a voluntary and temporary "pause" provides no safeguard against imminent further injury because Defendants may resume construction activities in the National Park at any moment.

Accordingly, Plaintiffs seek a temporary restraining order or preliminary injunction to preserve the status quo pending resolution of this action and to prevent Defendants from undertaking construction and related ground-disturbing activities pursuant to the challenged Waivers.

## LEGAL STANDARD

To prevail on their motion for temporary injunctive relief, Plaintiffs must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted)

(preliminary injunction); *Planned Parenthood Ctr. for Choice v. Abbott*, 450 F. Supp. 3d 753, 757 (W.D. Tex. 2020) (temporary restraining order).

**ARGUMENT**

**I. Plaintiffs are likely to succeed on the merits of their claims that the Big Bend Waivers are unconstitutional.**

To demonstrate a likelihood of success on the merits, a movant "must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013). Plaintiffs satisfy that standard here. Whether under the major questions doctrine, nondelegation doctrine, the Take Care Clause, or Presentment Clause—Defendants' asserted authority to issue the Big Bend Waivers contravenes the Constitution.

**a. The Big Bend Waivers Violate the Major Questions Doctrine.**

Because the major questions doctrine claim before this Court constitutes a violation of the Constitution's separation of powers principles, this Court has jurisdiction to resolve it. *See* 8 U.S.C. § 1103(c)(2)(A) note ("cause of action or claim may only be brought alleging a violation of the Constitution"). The doctrine was borne of "the hydraulic pressures of our constitutional system" and the Court's need to "rein in Congress's efforts to delegate legislative power." *Gundy v. United States*, 588 U.S. 128, 166–67 (2019) (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting); *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Were we to recognize the authority claimed by EPA. . . we would deal a severe blow to the Constitution's separation of powers."). A majority of the Supreme Court agrees that the major questions doctrine is a clear-statement rule, rooted in constitutional separation of powers principles.[7]

[7] *See Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (Roberts, C.J., joined by Gorsuch, J. and Barrett, J.) ("if Congress were to relinquish [a core congressional power] to another

Against that backdrop, the Supreme Court instructs that "in certain extraordinary cases," courts should be "reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *W. Virginia*, 597 U.S. at 723 (cleaned up). To assess the character of an agency's assertion of authority—courts look towards the larger context in which an action arises. *See id.* at 727–78 (relying on the text of the Clean Power Plan, EPA's description of the intent and purpose in the Federal Register for the Plan, and statements made by the EPA Administrator regarding the Plan at a Senate Committee hearing). If major questions is triggered by the authority asserted, the government must point to a clear congressional statement authorizing the asserted power it claims. *Id.* at 732. Under both Supreme Court and Fifth Circuit precedent, when an agency's assertion of authority has "great political significance" or "vast economic" consequences, it triggers major questions scrutiny. *W. Virginia*, 597 U.S. at 716; *Mayfield v. U.S. DOL*, 117 F.4th 611, 616 (5th Cir. 2024). Both are met here.

The political significance of the government's assertion of authority to divide the North American Continent by constructing a "Great Wall" and issuance of the Big Bend Waivers is extraordinary. The Big Bend Waivers are a substantial component of a coordinated federal effort

---

branch, a 'reasonable interpreter' would expect it to do so 'clearly'") (citation omitted); *id.* at 305 (Kagan, J., concurring, joined by Sotomayor & Jackson, JJ.) (declining to join the principal opinion's section discussing the major questions doctrine, noting that "use of a clear-statement rule here is unnecessary" where the "ordinary principles of statutory interpretation lead to the same result"); *id.* at 278 (Gorsuch, J., concurring) ("Article I—a substantive value external to a statute—imposes a clear-statement rule when executive officials claim Congress has afforded them an extraordinary authority") (cleaned up); *see also W. Virginia v. EPA*, 597 U.S. 697, 735 (2022) (Gorsuch, J., concurring, joined by Alito, J.) (characterizing the major questions doctrine as a "clear-statement rule[]" which "operates to protect foundational constitutional guarantees"). Even Justice Barrett, a proponent of interpreting the major questions doctrine as an interpretive principle, recognizes that the doctrine puts down roots in the Constitution, *Learning Resources*, 607 U.S. at 301 (Barrett, J., concurring) ("Part of this context . . . is Article I of the Constitution, which vests Congress with all legislative Powers.") (cleaned up), and Justice Thomas acknowledges that the doctrine has been used to prevent unconstitutional delegations of legislative power, *id.* at 330 (Thomas, J., dissenting).

to implement President Trump's promise to "finish[]" the "Great, Great Wall," PUF ¶¶ 4, 11, described by Secretary Mullin as a barrier that will span "from the Pacific to the Gulf of America," PUF ¶¶ 14–16. A conservative estimate of the "Great Wall" approximates that it would span around 1,748 miles. PUF ¶ 2. The Big Bend Waivers alone authorize construction along nearly one-half of the remaining unwalled border, or one-third of the entire U.S.-Mexico border. Decl. of Connor Phillips in Supp. of Pls' Mot. for TRO or Prelim. Inj. ("Phillips Decl.") ¶ 6. This massive project is the subject of "earnest and profound debate across the country," *Biden v. Nebraska*, 600 U.S. 477, 504 (2023) (quoting *W. Virginia*, 597 U.S. at 743), and especially in situations such as this, where "Congress considered and rejected" legislation that would have provided DHS with the authority it now asserts, *Mayfield*, 117 F.4th at 617 (cleaned up); *see* PUF ¶¶ 8–10 (describing the "Finish the Wall Act" and "Secure the Border Act of 2023"), and given the widespread and bipartisan opposition to this project in Big Bend, these Waivers and the overall plan to build the "Great Wall" carry profound political significance.

Second, where the costs associated with the government's asserted authority amount to some billions of dollars, those economic impacts are considered significant. *See*, *e.g.*, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) ($50 billion). Here, a conservative calculation of the wall's total cost, is $513 billion. PUF ¶ 58. Even considered in isolation, the Big Bend Waivers span nearly one-third of the entire southern border and account for costs in the range of $159 billion. Suppl. Dhondt Decl. in Supp. of Pls.' MSJ Opp'n and Reply (ECF No. 32-4) ¶ 44. These economic impacts are vast.

Under Fifth Circuit precedent, either political significance *or* economic significance alone is sufficient to trigger the major questions doctrine, *Mayfield*, 117 F.4th at 616, and here, both are present. Thus, Defendants must point to clear congressional authorization for the power they claim.

*W. Virginia*, 597 U.S. at 732. The Supreme Court has repeatedly rejected efforts to locate sweeping authority in ambiguous statutory language; in these cases, "the statutory text might as a matter of definitional possibilities have been read to delegate the asserted power."[8] *Learning Res., Inc. v.*, 607 U.S. at 243 (opinion of Roberts, C.J.) (cleaned up). Here, the statutory text of IIRIRA confirms the absence of any clear authorization. IIRIRA authorizes construction only in "areas" that see "high illegal entry." IIRIRA § 102. These textual limitations imposed by Congress are irreconcilable with the government's assertion of authority to facilitate a border-length barrier through sweeping waivers applied across vast geography, including regions like Big Bend, that see minimal unlawful crossings and record the lowest levels of such crossings across all border patrol sectors. PUF ¶ 35. Thus, although the DHS Secretary has been authorized waiver authority under IIRIRA, invocation of that power is limited to "areas" (not the entire border) of "high illegal entry" (not areas of low or moderate unlawful entry). PUF ¶¶ 34–36 ("The Big Bend Sector is the largest sector" and is "also the least active" only accounting "for 1.1 percent of all migrants apprehended this century."). If Congress had intended to build a continent-long barrier system, regardless of unlawful rates of entry, it would, and could, have authorized IIRIRA to waive laws across the entire border. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

---

[8] The doctrine reflects a familiar feature of constitutional adjudication: interpreting a statutory grant of authority to enforce constitutional limits. Courts likewise implement constitutional principles through doctrines such as the nondelegation doctrine, *see Gundy*, 588 U.S. at 129 ("a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I"); and challenges to a statute for overbreadth, *see, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973) ("It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn . . .").

**b. The Waivers Violate the Take Care Clause.**

Article II of the U.S. Constitution vests the executive power in the President and directs the President to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. The President carries out that constitutional duty through executive officers and other subordinates, including the Secretary. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 117 (1926); *see also Trump v. Slaughter,* 609 U.S. ___, (2026) (slip op at 14) (Gorsuch, J., concurring) (noting "the executive *branch* must faithfully execute th[e] laws") (emphasis added) ; *Printz v. United States,* 521 U.S. 898, 922 (1997) ("[T]he President . . . 'shall take Care that the Laws be faithfully executed,' . . . personally and through officers whom he appoints."). As the Supreme Court explained in *Youngstown Sheet & Tube Co. v. Sawyer*, "[i]n the framework of our Constitution," the President's Take Care Clause duty "refutes the idea that he is to be a lawmaker," and instead limits the President's role in the legislative process "to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." 343 U.S. 579, 587 (1952). And it "is neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* As the Court recently reaffirmed, "[o]ur Constitution creates three branches, but only one President. That President is not all powerful—not by any means." *Trump v. Slaughter,* 609 U.S. at ___ (slip op at 35) (citations omitted).

Here, the Secretary is purporting to be a lawmaker by suspending or dispensing with duly enacted statutes without being confined and guided by any Congressional limits. Through the multiple waivers discussed herein, the Executive has sought to construct the "Great Wall"—a project that would result in unprecedented and permanent changes to the Nation's borderlands. In furtherance of that plan, the Executive has unilaterally dispensed with bedrock environmental,

historic-preservation, and numerous other statutory mandates, invoking the purported authority of IIRIRA Section 102(c) to expedite construction. PUF ¶¶ 17, 19, 20, 23, 25.

Supreme Court precedent establishes that the Take Care Clause is judicially enforceable against executive assertions of a dispensing power. In *Kendall v. United States*, 37 U.S. 524 (1838), for example, the Court affirmed the issuance of mandamus compelling a cabinet official to settle claims with mail contractors as required by an act of Congress. The official argued that he could disregard the act because the President possessed exclusive authority to execute the laws. *Id.* at 545–47, 612. The Court rejected that contention: "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution and entirely inadmissible." *Id.* at 613.

By invoking IIRIRA's limited waiver authority to authorize construction even in areas that do not experience high levels of unlawful entry, PUF ¶¶ 34–36, the Executive has effectively dispensed with duly enacted laws governing the construction project. Such action exceeds any constitutionally permissible construction of IIRIRA and violates the Executive Branch's obligation to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

**c. Alternatively, IIRIRA Section 102(c) and the Big Bend Waivers Violate the Nondelegation Doctrine.**

If this Court does not resolve Plaintiffs' claims under the major questions doctrine or Take Care Clause, then those principles fail to act as the final doctrinal safeguards against a nondelegation violation. *See Gundy*, 588 U.S. at 166–67 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting) (noting that the major questions doctrine avoids nondelegation shortcomings). While affirming that Congress cannot altogether forfeit its legislative powers to the Executive, the Fifth Circuit and Supreme Court have explained that a delegation is constitutionally adequate "if Congress (1) clearly delineates its general policy, (2) the public agency which is to

apply it, and (3) the boundaries of that delegated authority." *Big Time Vapes v. FDA*, 963 F.3d 436, 443–44 (5th Cir. 2020) (cleaned up) (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989)). Moreover, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (citation omitted).

Here, if this Court finds that the major questions doctrine or Take Care Clause do not prevent the Secretary from issuing the Big Bend Waivers under IIRIRA, then a confrontation with the nondelegation doctrine is unavoidable. Under a statutory scheme that grants tremendous power with few guardrails, if "areas of high illegal entry" applies to the entire border and authorizes the Big Bend Waivers, it fails to set forth an intelligible principle. *See* PUF ¶¶ 17–18, 34–36. What remains is not a bounded delegation or clearly delineated general policy, but a grant of unreviewable authority to waive any law, anywhere along the border, in service of any barrier project the Secretary deems expedient. This transformation presents a nondelegation problem of a fundamentally different order than those previously considered, and one that the Constitution does not permit. *See e.g., Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 127 (D.D.C. 2007) (the general policy is clearly delineated: "to expeditiously install additional physical barriers and roads to deter illegal crossings *in areas of high illegal entry*") (cleaned up, emphasis added).

#### d. The National Park and Lower Canyons Waivers Violate the Presentment Clause.

The authority to legislate is entrusted solely to Congress. U.S. Const. art I, §§ 1, 7; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). This includes the "[a]mendment and repeal of statutes, no less than enactment, [all of which] must conform with" the bicameralism and presentment requirements of Article I. *INS v. Chadha*, 462 U.S. 919, 954 (1983). Indeed, the

Supreme Court has held that the Executive Branch cannot void any law, in whole or in part, without an act of Congress that is presented to the President for signature. *Clinton*, 524 U.S. at 448–49. But IIRIRA grants the Secretary—an unelected executive official—precisely that power.

By invoking Section 102(c) to waive the Wild and Scenic Rivers Act ("WSRA") for border construction along congressionally designated sections of the National Wild and Scenic Rivers System, the Secretary has stripped a section of U.S. Code, specifically 16 U.S.C. Section 1274(a)(17)—which designates "[t]he segment on the United States side of the river from river mile 842.3 above Mariscal Canyon downstream to river mile 651.1 at the Terrell-Val Verde County line"— of the legal and practical effect Congress conferred upon it. Through bicameralism and presentment, Congress made a place-specific legislative judgment that the Rio Grande segment designated in Section 1274(a)(17) must be administered to "protect and enhance the values which caused it to be included" in the National Wild and Scenic Rivers System, including its scenic, historic, archeological, and scientific features. 16 U.S.C. §§ 1281(a), 1274(a)(17). The National Park and Lower Canyons Waivers directly and permanently amend that congressional judgment. By waiving the WSRA, the Secretary authorized the construction and maintenance of physical barriers, roads, and other border infrastructure across the *entire* river segment Congress designated and protected. *See* Phillips Decl. ¶ 7; *see also* 16 U.S.C. § 1281(a) (administering agencies must "protect and enhance the values which caused [the river] to be included"); *id.* § 1271(b) (protecting "selected rivers" and their "immediate environments"). This has the effect of amending Section 1274(a)(17) to essentially eliminate the Congressionally designated and statutorily protected component of the Wild and Scenic River System. Thus, in function, IIRIRA's Section 102(c) Waiver authority was employed to unilaterally rescind or amend the entirety of Section 1274(a)(17).

The authority to permanently alter the effect of a duly enacted statute is precisely what makes IIRIRA, in this context, analogous to the Line Item Veto Act invalidated in *Clinton*, 524 U.S. at 438. There, the Line Item Veto Act granted the President authority to strike portions of duly enacted statutes concerning statutory spending and taxes, which effectively permitted the President to "amend" the underlying laws. *Id*. While the remaining uncancelled provisions continued to have legal force, the Court held that the Act effectively authorized the President to amend laws by depriving enacted provisions of their intended "legal and practical effect." *Id.* Thus, *Clinton* also involved partial, not wholesale, repeal.

The same principle is implicated here. Congress enacted Section 1274(a)(17) to protect a specific segment of the Rio Grande and preserve the remarkable values that justified its inclusion in the National Wild and Scenic River System. Yet the National Park and Lower Canyons Waivers authorize activities that will permanently degrade and destroy those values. Because that degradation is permanent, the National park and Lower Canyons Waivers do more than temporarily excuse compliance with the WSRA during construction; they effectively redraw the geographic designation Congress enacted. And because the National park and Lower Canyons Waivers extend across the entirety of the river segment protected by Section 1274(a)(17), they leave no portion of the congressionally designated reach untouched by the Secretary's waiver of the WSRA's protections. *See* Phillips Decl. ¶ 7. Thus, although Section 1274(a)(17) remains on the books, the Secretary's Waivers permanently alter the practical and legal effect of the protections Congress enacted for this river segment. In that respect, the Waivers function as an amendment to Section 1274(a)(17), just as the Line Item Veto Act authorized the President to alter the effects of duly enacted laws in *Clinton*.

## II. Border barrier construction and associated activities will irreparably harm Plaintiffs.

To obtain preliminary relief, a plaintiff must show that "irreparable injury is likely in the absence an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600.[9]

Here, Plaintiffs seek to preserve one of the last great wilderness landscapes in the United States. The Big Bend region is renowned for its dramatic canyons, expansive desert vistas, remarkable biodiversity, and the Rio Grande's winding course through some of the most remote country in the Lower 48. For Plaintiffs, the area's value lies not only in its ecological significance, but also in the opportunity it provides for solitude, reflection, recreation, spirituality, and connection with an unspoiled landscape. Miller Decl. ¶ 12; Devine Decl. ¶ 13. That landscape is now being irreversibly altered. Miller Decl. ¶¶ 9−13; Devine Decl. ¶¶ 10−15; Jordahl Decl. ¶¶ 4–13; Yip Decl. ¶¶ 3–7 & Exs. 1–5.

Border barrier construction has already begun, bringing with it vegetation clearing, habitat destruction, earthmoving, roadbuilding, and other ground-disturbing activities. Miller Decl. ¶¶ 9, 10, 13; Jordahl Decl. ¶¶ 4–11; Devine Decl. ¶¶ 9, 11. These impacts are only the beginning. As construction progresses, steel bollards will replace natural viewsheds, restrict access to the Rio

[9] Defendants' constitutional violations provide an additional basis for finding irreparable harm. The Fifth Circuit has long recognized that the loss of constitutional freedoms constitutes irreparable injury. *See, e.g., Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (finding alleged violations of the First Amendment satisfies the irreparable harm requirement); *Elrod v. Burns*, 427 U.S. 347, 373, (1976). *See also Texas Top Cop Shop, Inc. v. Garland,* 758 F.Supp.3d 607, 635−36 (E.D. Tex. 2024) (rejecting the view that the irreparable harm presumption is limited to First Amendment claims and finding irreparable harm where plaintiffs alleged violations of constitutional limits on Congress's authority and individual rights); *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 503 (N.D. Tex. 2024) ("[C]onstitutional violations are irreparable. Such rights . . . must be vindicated if infringed.").

Grande, fragment that landscape, and transform an intact wilderness corridor into an industrialized border zone. The accompanying patrol roads, vehicle barriers, and related infrastructure inflict their own harms by degrading the scenic character and wilderness qualities that Plaintiffs seek to enjoy and protect. Miller Decl. ¶¶ 12, 13; Jordahl Decl. ¶ 13; Devine Decl. ¶¶ 12–15. For a historic adobe structure like the Ruidosa Church, construction in the vicinity of the Church could cause collapse the structure. Decl. of Michael Green in Supp. of Pls.' Mot. for Summ. J. (ECF No. 19-2) ¶¶ 10, 21–24.

These injuries are not speculative, nor are they confined to a single construction site. The challenged Waivers collectively authorize border barrier construction across hundreds of miles in the Big Bend region, extending from the northwest reaches of Texas through Big Bend Ranch State Park, Big Bend National Park, the entirety of Texas's designated Rio Grande Wild and Scenic River designation, and eastward through the Lower Canyons to Lake Amistad. Once bulldozers clear vegetation, roads are cut into previously undeveloped terrain, lights mounted, and steel barrier infrastructure is effected, those qualities cannot be restored through monetary compensation or after-the-fact relief.

Waiting until final judgment would significantly hinder meaningful relief. Defendants have already begun ground disturbing activities, including bulldozing new roads through previously undisturbed lands in Big Bend National Park. Jordahl Decl. ¶¶ 4, 7; Devine Decl. ¶¶ 9, 11. This harms Plaintiffs by reducing the Park's wilderness characteristics, destroying its aesthetic values, devastating archeological sites, killing native species, and diminishing the professional and recreational use of the Rio Grande. Miller Decl. ¶ 13; Jordahl Decl. ¶ 13; Devine Decl. ¶¶ 12–15. As stated by Plaintiff Miller, "[e]very additional day of construction risks further damage to the scenery, wildlife habitat, ecological integrity, and wilderness character of Big Bend." Miller Decl.

¶ 13. "[T]he time [lost] experiencing these places in their current condition cannot be recovered, and much of the physical damage to the landscape cannot be quickly or easily undone." *Id.*

Defendants have made clear that prior communication regarding construction plans is either not possible or not in alignment with their priorities. Yip Decl. ¶¶ 8, 9, 11 & Exs. 6–7. By the time the Court reaches merits, it is thus likely that substantial portions of this landscape will have been entirely transformed from undeveloped wilderness into a corridor of roads, lights, vehicle barriers, and border wall infrastructure. *See* Miller Decl. ¶ 13; Jordahl Decl. ¶ 8; Devine Decl. ¶ 15. Today's "pause" in construction in the National Park does nothing to maintain the status quo, given that Defendants have refused to pause work until this case is resolved and have not paused construction throughout the Waiver areas. The purpose of preliminary relief is to prevent that irreversible loss before it occurs. If an injunction does not issue now, Plaintiffs risk permanently losing the very values this action seeks to protect.

**III. The balance of equities and the public interest favor an injunction.**

"When the federal government is a party, the balance of equities and public interest factors merge." *United States v. Abbott*, 557 F. Supp. 3d 810, 822 (W.D. Tex. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors favor Plaintiffs.

Defendants will not be harmed by a preliminary injunction preserving existing conditions while the Court considers the merits of this case. Defendants cannot claim a substantial interest in proceeding under Waivers that Plaintiffs have shown are likely unconstitutional. Nor would an injunction prevent Defendants from carrying out their broader border-security responsibilities. Although Defendants may frame this case as a challenge to border security itself, Plaintiffs challenge only Defendants' reliance on the Big Bend Waivers to circumvent dozens of otherwise applicable laws in constructing unnecessary border barrier in the region with the lowest levels of

unlawful entry. PUF ¶ 34–36. Indeed, Defendants have ample means to advance border-security objectives without commencing construction during the pendency of this litigation and CBP's voluntary "pause" indicates that a judicially enforced pause would not burden the government. *See, e.g.*, 8 U.S.C. § 1103(a)(5) (authorizing the DHS Secretary "the power and duty to control and guard the boundaries and borders"); Yip Decl. ¶ 12 & Ex. 9 (announcing "pause").

The balance of equities is especially favorable to Plaintiffs because the government has failed to demonstrate any urgent need for expedited barrier construction in the Big Bend region. The record reflects that Big Bend experiences the lowest rates of unlawful entry along the southern border. PUF ¶¶ 34–36. Apprehension rates are even lower in the National Park and have long been managed through existing enforcement strategies. *See id.* ¶ 36. These low levels have been maintained for years notwithstanding the absence of a continuous border barrier through the region, demonstrating that border security objectives have long been pursued through patrols, surveillance, detection technology, intelligence gathering, and other traditional enforcement mechanisms. There is no evidence that a brief pause pending judicial review would meaningfully impair border security, which is further supported by today's (August 17, 2026) voluntary construction pause in the National Park. *See* Yip Decl. ¶ 12 & Ex. 9. Rushed construction creates the sort of emergency conditions that threaten the permanent destruction of wilderness, wildlife habitat, scenic resources, and recreational opportunities. Where unlawful entry levels are already low and alternative enforcement tools remain available, the government's interest in immediate construction pursuant to unconstitutionally asserted authority carries little weight.

Moreover, "[i]njunctions often cause delays, and the government can resume work if it prevails on the merits." *Texas v. United States*, 787 F.3d 733, 768 (5th Cir. 2015) (finding "the government's allegation that [an] injunction" delays "preparatory work . . . unpersuasive"). If

Defendants prevail, any delay occasioned by an injunction would therefore be temporary and fully remediable. By contrast, the harms facing Plaintiffs are irreversible. Once this landscape is transformed it cannot be restored through a later judgment in Plaintiffs' favor.

The public likewise has a compelling interest in ensuring that a massive federal project, one that would permanently transform hundreds of miles of the Nation's borderlands, proceeds within constitutional limits. The public interest is always served by ensuring that federal agencies remain within the bounds of authority established by Congress and our nation's Constitution.

The public also has a strong interest in preserving the outstanding scenic, recreational, wildlife, historical, and wilderness values of the Big Bend region while the legality of the Waivers is resolved. If Defendants ultimately prevail, construction can resume. If Plaintiffs prevail after construction proceeds further, however, much of the injury to the landscape will be permanent. *See* Miller Decl. ¶ 13; Jordahl Decl. ¶ 13; Devine Decl. ¶¶ 10, 15. Faced with this asymmetry, the equities and public interest weigh decisively in favor of preserving existing conditions until the Court can decide whether Defendants' actions comply with the Constitution.

Accordingly, the balance of the equities and the public interest tip decidedly in favor of enjoining further irreparable harm to the Big Bend region from border barrier construction pursuant to the Waivers.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court temporarily restrain and/or preliminarily enjoin Defendants from undertaking border barrier construction and associated activities within the Big Bend Sector pursuant to the challenged Waivers until this Court has resolved the merits of Plaintiffs' claims.

DATED: August 17, 2026

Respectfully submitted,

*/s/* Emma Yip

Emma Yip (CA Bar No. 352446)*
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (206) 858-2297
Fax: (520) 623-9797
eyip@biologicaldiversity.org

Zeynep J. Graves (CA Bar No. 298533)*
Shannon Eva Labuschagne (CA Bar No. 365633)
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (510) 844-7160
Fax: (520) 623-9797
zgraves@biologicaldiversity.org
slabuschagne@biologicaldiversity.org

Dustin Rynders (TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 1108
Houston, TX 77251
Tel: (832) 767-3630 ext. 196
dustin@texascivilrightsproject.org

Kate Gibson Kumar (TX Bar No. 2413588)
Alana Park (TX Bar No. 24150568)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 17757
Austin, TX 78760
Tel: (512) 474-5073 ext. 225
kate@texascivilrightsproject.org
alana@texascivilrightsproject.org

* *Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that the foregoing document and its attachments were filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means.

DATED: August 17, 2026

Respectfully submitted,

*/s/* Emma Yip

Emma Yip (CA Bar No. 352446)
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (206) 858-2297
Fax: (520) 623-9797
eyip@biologicaldiversity.org

*Admitted Pro Hac Vice*