IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF LA JUNTA FOR PRESERVATION, FAR FLUNG OUTDOOR CENTER, ANDREW AUSTIN, and CHRISTINA HERNANDEZ, Plaintiffs, | * | NO. SA-26-CV-5245 OLG |
| v. | * | AUGUST 28, 2026 |
| DEPARTMENT OF HOMELAND SECURITY, *et al.*, Defendants. | * | SAN ANTONIO, TEXAS |

---

TRANSCRIPT OF TESTIMONY OF FACT WITNESS
SHERIFF THADDEUS CLEVELAND
BEFORE THE HONORABLE ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE

---

Proceedings recorded by electronic mechanical stenography.
Transcript produced by Computer-Aided transcription.

**A P P E A R A N C E S**

For the Plaintiffs:

GUTIERREZ LAW FIRM
BY: MR. ROLAND GUTIERREZ
104 Babcock Road
San Antonio, Texas 78201

DeGUERIN & DICKSON
BY: MR. DICK DeGUERIN
1018 Preston Avenue, 7th Floor
Houston, Texas 77002

LAW OFFICE OF MARTIN GOLANDO, PLLC
BY: MR. MARTIN GOLANDO
2326 Magnolia
San Antonio, Texas 78201

For the Defense:

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: MS. PAMELA AMAECHI
1100 L. Street, N.W.
Washington, D.C., 20005

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: MS. KATHERYN BARRAGAN
1100 L. Street, N.W.
Washington, D.C., 20005

UNITED STATES ATTORNEY'S OFFICE
BY: MS. KRISTY CALLAHAN, AUSA
601 N.W. LOOP 410, SUITE 600
SAN ANTONIO, TEXAS 78216

ALSO IN ATTENDANCE:

MS. SARAH GUTIERREZ
MR. JORGE VASQUEZ
MS. MEGAN RAMIREZ

* * * * * *

(9:56:52 A.M., START OF REQUESTED EXCERPT)

THE COURT: Okay. All right, counsel, if you'll call your first witness. And as I said, you'll take whatever necessary time with your witness. Don't be duplicative. And then the government will have an equal amount of time or -- if more, they'll have that time. Okay? We're not in any rush. Okay? I know it's Friday. That doesn't mean anything. If we have to reconvene Monday morning, we'll do that or whatever. We're not in any rush.

Okay. Can you call your first witness, please.

MR. DeGUERIN: Yes, Your Honor. We call Sheriff Thaddeus Cleveland.

THE COURT: Okay.

MR. DeGUERIN: His testimony is intended to educate the Court about the particular problems.

THE COURT: Okay. And -- and will you tell me which claim does his testimony go to, or are they impactful of all the claims?

MR. DeGUERIN: It -- it impacts everything, Your Honor.

THE COURT: Okay.

MR. DeGUERIN: And we'll show -- I'll try to get to it as briefly and quickly as I can.

THE COURT: Well, it can -- as long as it's effective.

Okay. Go ahead.

**THADDEUS CLEVELAND,**

having first been duly sworn, testified to the following:

DIRECT EXAMINATION

BY MR. DeGUERIN

Q Lets just start by introducing yourself to the Court and the record.

A Yes, sir. My name is Thaddeus Cleveland. I'm the Sheriff of Terrell County, Texas, and a retired Border Patrol agent.

Q And Terrell County is the third county that's impacted by the -- the parks, the -- in Big Bend, correct?

A Yes, sir, that is correct.

Q It's the one furthest to the east?

A That is correct, yes, sir.

Q In addition to being Sheriff of Terrell County, do you have experience on the border as a Border Patrol agent?

A Yes, sir, I do. I have 26 years' experience.

Q All right. So, you had 26 years of Border Patrol. Then how many years as Sheriff?

A Just over four years now.

Q So, does that give you a -- a good overall view of whatever problems there are on the border with immigration, smuggling, and so forth? Illegal crossings?

A Yes, sir, without a doubt.
Q Is it fair to say that there is only one problem in crossing, or is -- or does the terrain and what's down there make it several different kinds of problems?
A Yes, sir. So, of course, the entire southwest border is -- is, you know, rocky and rough terrain. But like to describe, of course the Big Bend area, or the Big Bend region, the Big Bend sector as being some of the -- the most difficult area to cross because of those natural barriers that are -- that are there.
Q Okay. The -- the natural barriers that you speak of would be the cliffs and valleys and so forth right on the border, correct?
A Yes, sir. That's correct.
Q However, in order to cross the border, you got to come from someplace and you got to be going someplace. Are there more problems from the Mexican side with the terrain there, arriving at the border, and more problems once you cross the border on the Texas, U.S. side, with where to go?
A I would -- I would say on both sides of the border, definitely in Mexico, as well as the United States side. But what I like to describe is there's no infrastructure on the Mexican side to facilitate people arriving at the immediate border area, and then making their -- their entry into the United States. And then once they do make their illegal entry into the United States, there's not a lot of infrastructure in

that portion of Texas as well to get people smuggled further into the United States.

Q Okay. Now, does the Border Patrol consider various sectors of the border -- of the entire border of Mexico with the United States?

A Yes, sir. There's a total of nine sectors along the U.S./ Mexico border.

Q And the Big Bend Sector, does it cover over 500 miles of the entire U.S. border?

A It covers exactly 517 miles, or as also I'd say, a quarter of the U.S./Mexico border.

Q So 25 percent of the U.S. border is in the Big Bend Sector?

A Yes, sir. That is correct.

THE COURT: How -- how many miles is the total border?

THE WITNESS: Roughly 2,000 miles.

THE COURT: 2,000?

THE WITNESS: Yes, sir.

THE COURT: And -- and Big Bend covers how many?

THE WITNESS: 517 miles.

THE COURT: Okay. A quarter.

THE WITNESS: Yes, sir.

THE COURT: Okay. Go ahead.

Q (By MR. DeGUERIN) Now, are there figures that show the encounters or the -- the arrests, or whatever you want to call them, of people illegally entering the United States all along

the border? Are there border figures that are kept; statistics that are kept?

A Yes, sir, there are. Of course, by U.S. Border Patrol and you can go online to CBP.gov and then research those numbers as well.

MR. DeGUERIN: We have a -- a chart here, Your Honor.

THE COURT: Go ahead.

MR. DeGUERIN: If I might display it.

Q (By MR. DeGUERIN) Would you explain --

THE COURT: Does the government have a copy of that?

MR. DeGUERIN: Yes.

THE COURT: Did you see that?

MS. AMAECHI: Can you just show it to us?

MS. CALLAHAN: I don't believe we have seen this before, Your Honor.

MR. GUTIERREZ: It's just demonstrative.

THE COURT: Okay. Go ahead.

MR. DeGUERIN: I apologize. I thought they had.

THE COURT: Okay.

Q (By MR. DeGUERIN) Explain what this --

THE COURT: Do you -- do you need a recess to look at this?

(BRIEF PAUSE AS THE AUSA REVIEWS THE DEMONSTRATIVE EXHIBIT)

THE COURT: Is it okay to proceed?

MS. CALLAHAN: It's okay.

THE COURT: Okay. Thank you.

Q (By MR. DeGUERIN) Let me summarize quickly what this shows. There are Border Patrol sectors that are set up by the Border Patrol, correct?

A Yes, sir.

Q And of those sectors, the largest in mileage sector is the Big Bend Sector; is that right?

A That is correct.

Q It's 25 percent of the border of Mexico with the United States?

A Yes, sir, that is correct.

Q By the Border Patrol's own figures, do the illegal crossings in the Big Bend Sector represent only one to two percent of the total illegal crossings of Mexico and -- and the United States?

A Yes, sir. On that map it shows fiscal year 2025, Border Patrol apprehensions on this border. It does show Big Bend with the least amount of apprehensions in that fiscal year. It -- and that's pretty common for prior fiscal years as well.

Q So, and it's consistent with previous years. And to summarize it, with 25 percent of the border in the Big Bend area, only two percent of the total crossings?

A Yes, sir. And what it indicates there is -- it looks like about 2800. I can't quite read the number. Is it 2800 apprehensions?

Q So this figure is two thousand --
A 686.
Q -- six hundred eighty-six.
A Yes, sir.
Q 1.2 percent of the total crossings, about 25 percent of the border.
A Yes, sir.
Q All right. Why is that?
A Because of the terrain. Because as I -- as I mentioned earlier, the lack of infrastructure in Mexico to get people to that immediate border region in the Big Bend area, as well as the ability to get out of the area. The terrain is rough and tough. As I have described before, some of the roughest and toughest along the U.S./Mexico border.
Q You're in law enforcement, you're a sheriff, and you're -- have a long history with the Border Patrol. Are you in favor of controlling our borders and controlling immigration?
A 100 percent. I would say I'm probably one of the most outspoken sheriffs when it comes to border security along the U.S./Mexico border.
Q At various parts of the U.S./Mexico border, a wall might be appropriate; is that correct?
A Yes, sir. That is correct.
Q But in the Big Bend area is it appropriate?
A No, sir.

Q And again, why not?
A First and foremost, I would describe the terrain that we have, the natural barriers that we have. Secondly, the U.S. Border Patrol, the way that they supply to the Big Bend Sector in the past, we have not received the proper allocations of technology, infrastructure, or manpower because of those low numbers of apprehensions. They would focus on those other areas where you had higher numbers of apprehensions. That would be -- the foremost reasons why.
Q Let me touch on just one area that I'm personally familiar with, but -- that one of our other witnesses will testify about. That Santa Elena Canyon, describe to the Court Santa Elena Canyon.
A Wow. First and foremost, a beautiful place; a place that I have been to many times. And when you walk up to Santa Elena Canyon where the Rio Grande River comes down from upstream, you encounter two vertical cliffs that are approximately 1500 foot in height.
Q So in order to cross the border at Santa Elena Canyon, a person would have to first come down a thousand-foot cliff and then scale on the other side a thousand-foot cliff?
A Yes, sir, if they were going to cross in that immediate border area.
Q Is there any practical way that an automobile or any kind of vehicle could cross Santa Elena Canyon?

A No, sir.
Q With or without a wall or bollards or anything in the way?
A No, sir.
Q Is -- now, I'm just using an example of Santa Elena Canyon. There are a number of other canyons in the Big Bend area, aren't there?
A Yes, sir, there sure is.
Q Mariscal. I'm not sure that Mariscal is in your county, but you're familiar with it, aren't you?
A I am, sir. I've hiked that trail before --
Q All right.
A -- as a civilian.
Q If there is a problem with illegal crossings, where do those crossings occur; in the Big Bend area or elsewhere?
A So for the Big Bend Sector, Terrell County or the Sanderson Border Patrol station is the busiest station for illegal alien apprehensions.
Q The Sanderson area?
A Yes, sir.
Q But that's not in the canyons, right?
A Actually, it is. It's what they call the lower canyons of the Rio Grande.
Q Well, the -- let me ask you this: Are there other sort -- other sorts of security measures that can be and are being used to detect and apprehend illegal crossings?

A Yes, sir. So, of course, we still continue to use seismic sensors that are buried underground. If someone walks over, creates a violation of the earth, then that's going to signal so we can go out and check that area.
Q Let me stop you right there.
A Yes, sir.
Q And this kind of sensor, that -- that doesn't destroy or alter the landscape, does it?
A No, sir. You -- you're burying a little -- just a little node that detects the people walking across that area.
Q Are they effective?
A Yes, sir.
Q All right. What else?
A Then we use a similar device, like a game camera. What a hunter would use. We'd go out -- they're called a "Buck-eye System." We'd put those on trails where we've had -- historically had people crossing and they actually send us an image of whatever crossed that path, whatever made that sensor activate. So then if it's an animal, we don't have to waste the resources to -- to run down to the river or the area where it's deployed to find out what it is; we actually have that image.
Q Are those in place now?
A Yes, sir.
Q And are they effective?

A Most certainly.
Q What else?
A We have what's called "Anduril Autonomous Surveillance Towers." They're towers that have a radar and cameras, and the -- the radar is spinning, looking for humans. It's -- it's programmed to look for the way a human walks, the human gait. They cover about a five-mile radius. And when I was still at Border Patrol, we deployed our first eight in the Sanderson area of responsibility.

Once that radar is spinning and looking for humans, once it detects a human, it will turn the cameras to that area, and then it will send that over to the supervisory Border Patrol agent manning the desk, the super -- the supervisor desk. And then he will -- if it detects people that are here illegally or they suspect, they will send agents to that area to ensure that those people are either arrested or encountered.
Q Are they in place now?
A Yes, sir. I think we have 11 of them in Terrell County alone.
Q Are they efficient?
A They are. Yes, sir.
Q Do they require the destruction of any of the natural terrain?
A No -- no, sir. Well, I'll say what you need about those is required by the 25 by 25 area to set them down. So you don't

have to bring -- bring a road to that area. You can fly them in, which we've done with Chinook helicopters. They don't require electricity, so you're not having to run a -- electrical lines to it, you're not having to take propane to them. Those are both in the past, the way we powered our technology. These work off solar -- solar panels, so they're working off the sun's -- sunshine.

Q What about manned patrols?

A Yes, sir. And we -- we still utilize, of course, our God-given skills; our sight, our smell, our sound to go out and patrol those areas.

Q Blimps?

A We have a blimp deployed in -- in our area, tethered air-strapped balloons. And -- but those were only detailed to our area for a short time. Those are equipped with -- with cameras as well, and the radars. And -- and they are effective.

Q And so what we've discussed and what you've discussed of what's in place now and effective and being used, those -- none of those affect the natural beauty in the -- of the Big Bend area, do they?

A No, sir. Not at all. But if I may, we left one out, one that I'd love to highlight, which are the Predator B drones. Those are what we used in Iraq and Afghanistan. They were finally released to CBP in the early 2000s, equipped with radars, equipped with cameras. And they're -- they're based out

of two places along the southwest border, Fort Huachuca, Arizona, which is in Sierra Vista, and then out of San Angelo, Texas. The ones in San Angelo that -- that cover my area, they go from the big new sector first, west station, which is Sierra Blanca Station, and cover all the way down to the Rio Grande Valley to the Gulf of Mexico. Again, that technology is superb. We get very little support from it because of the very little activity we -- we do have, but when we do have activity that comes out, it increases our effect -- effectiveness and certainty of arrests. Tremendous type of technology.

Q You mentioned the Arizona, Fort Huachuca -- and of course from El Paso on to San Diego, the entire border along that way, there's not the same natural barriers to crossing as there is in Big Bend; is that right?

A That is correct. And I spent approximately ten years out in Arizona as a Border Patrol agent. That's where I began my career in 1996, and that's where we had some border barriers in those urban to urban environments. But they weren't the 30-foot walls. They were about 12-foot at that time. And outside of those earlier urban environments, you would have the five-strand of barbed wire fence. And then as we became more effective in those border communities, whether it was Nogales to Nogales, Douglas to Agua Prieta, Naco to Naco, it drove the smugglers to start taking their contraband, whether that's people or humans, further out of those communities. And then that's where we

started seeing the vehicles coming through the five-strand barbed wire fence. And therefore, that is why we started building vehicle barriers to prevent those vehicles from loading up. Because what they would do is they'd take five pickup trucks and load it with 2,000 pounds of marijuana and drive through. And if we apprehended one of them, which typically most of them get away, it was a success for them. They could -- they could afford to give up one load and -- and get four through.

Q So but what you're describing now is a problem that's not problem in the -- in the Big Bend area?

A Yes, sir. The differential is that, again, from New Mexico, Arizona, California, it -- it's nothing more than just a line in the sand. That's -- that's what separates Mexico from the United States. In Texas -- everywhere in Texas we have the Rio Grande River that -- that divides Texas or the United States from Mexico.

Q Okay. Now, let's -- let's talk about what's happened already. Are you familiar with what's going on now with the bulldozers and the road graders and the --

A Yes, sir.

Q There seems to be a problem of definition that we don't agree on. The government says that they're not doing any construction, they're just doing a survey. But have you seen what they're surveying has meant to the terrain and to the park?

A Yes, sir, I sure have.
Q Describe it.
A I haven't see it with my own eyes. I've seen, definitely, videos on social media and -- and news outlets. But what they're calling the survey of a geotechnical --

MS. BARRAGAN: Your Honor --

MS. CALLAHAN: Objection, Your Honor. He's testifying to something he doesn't have personal knowledge of now. He just said he hasn't seen it with his own eyes.

THE COURT: Okay, I'll sustain that. Let's move on.

MR. DeGUERIN: Okay. All right. May I have just a moment?

THE COURT: Yes. Of course.

(BRIEF PAUSE)

MR. DeGUERIN: Your Honor, we have some technical difficulties in that we have MacBooks and not PCs, and so your court has been kind enough to allow us the use of the Elmo for the photos --

THE COURT: Uh-huh.

MR. DeGUERIN: Whether it's this witness or any other.

THE COURT: All right. Right.

MR. DeGUERIN: These are exhibits that have been agreed to, I believe. Number -- Numbers 13 --

THE COURT: Does the government have -- does the government have that?

MR. DeGUERIN: Yes, Your Honor. They have it, and we've stipulated that they would be offered in --

THE COURT: All right.

MR. DeGUERIN: -- we could offer them into evidence.

THE COURT: Is that correct? Okay.

MR. DeGUERIN: Our Exhibits 13 through --

THE COURT: Let -- let me ask this while you're setting that up, Mr. Gutierrez.

How many counties adjoin -- or are within the park?

THE WITNESS: Just one. Brewster County.

THE COURT: Okay. And do you believe or do you know if the other law enforcement officials or the sheriff in that county has the same view as perhaps you do?

THE WITNESS: Yes, sir. I would say so. I talk to Sheriff Dodson of Brewster County quite often.

THE COURT: Any doubt about that?

THE WITNESS: I'm sorry, sir? What was --

THE COURT: Any doubt about that, that you and he have similar views?

THE WITNESS: No, sir.

THE COURT: Now, you -- you spoke of this technology. Is technology in existence now in the park?

THE WITNESS: I'm not sure if it's in Big Bend National Park. I cannot answer that, but it --

THE COURT: But you're suggesting that that technology

would be as efficient as a wall, bollard, or vehicle --

THE WITNESS: More sufficient.

THE COURT: Why is it more sufficient?

THE WITNESS: Because regardless -- whether it's myself; Rodney Scott, who's the Commissioner of Customs and Border Protection; Tom Homan, who's the border czar, they've all said and will tell you that a border wall is not going to stop anything. It's the right foundation of technology.

THE COURT: Now, why wouldn't a border wall -- wouldn't a border wall --

THE WITNESS: It's meant as a deterrent, sir.

THE COURT: Wait a minute. But wouldn't a border wall be more clearly effective than technology?

THE WITNESS: No, sir.

THE COURT: Why's that?

THE WITNESS: Because the technology can actually detect people crossing. It -- it detects people as they enter the United States illegally.

THE COURT: All right. Now, have representatives of the government -- federal, state, or county, whatever -- sat down with you and talked to you about this?

THE WITNESS: Not until recently, when I actually -- I invited Commissioner Scott out and he finally came out.

THE COURT: Okay. When was that?

THE WITNESS: About a week ago; week and a half ago.

THE COURT: But the -- the construction, bulldozing, began before that meeting?

THE WITNESS: That is correct.

THE COURT: Did you all know that was going to begin?

THE WITNESS: No, sir.

THE COURT: So -- okay. Go ahead.

MR. DeGUERIN: Thank you for clarifying that, Judge. I was going to ask him those -- those questions.

You mentioned the other two sheriffs. We have our Exhibit 11, the declaration of Danny Dominguez, who's the Sheriff of Presidio County, and the declaration of Ronny Dodson, which is our Exhibit 12, and we would offer those. We've submitted them to the prosecution.

THE COURT: Okay. Now, let me ask you, does it really matter -- well, this may not sound right. Can't the government proceed -- your point is there's so little number of people crossing the border or been apprehended in this area of the park. Is it your contention that it -- if it's not a high enough percentage or a high enough number of people, the government shouldn't or is not permitted under the law, under -- let's see, hold on a second.

MR. DeGUERIN: RFRA.

THE COURT: Is not permitted to proceed and have vehicle barriers and bollards or anything?

MR. DeGUERIN: Our position is, Your Honor, that it's

not necessary.

THE COURT: But -- but it may not be necessary, but does the law permit it in any event?

MR. DeGUERIN: No, because of the destruction that we want -- there's two phases of that. One is a necessity or a lack thereof of these measures, and the other is what the measures would do if they're allowed. And that is destruction of the land --

THE COURT: Let me ask you this. Even if there were no necessity or compelling need, would the government be permitted to build this wall in any event?

MR. DeGUERIN: They should not.

THE COURT: Well, I know that they should not, but the government may -- we'll hear from them. Are they permitted to build a wall in any event?

MR. DeGUERIN: We say that under RFRA they're not because --

THE COURT: That's a different claim. Okay. But you're claiming that -- or are you claiming that since there's not a sufficient number of illegal crossings, the law then prevents or prohibits -- not whether they should, but prevents or prohibits the construction of a wall or even placement of vehicle barriers?

MR. DeGUERIN: Yes, we are saying that.

THE COURT: Okay. You may continue.

MR. DeGUERIN: So, we have for the Court our Exhibits 11 and 12, the declaration -- or affidavits of the sheriff of Presidio County --

THE COURT: Okay. And -- and the government has those declarations?

MR. GUTIERREZ: They do.

MS. AMAECHI: Yes, Your Honor.

THE COURT: Okay. Thank you, ma'am.

Go ahead.

MR. DeGUERIN: And we also would move to introduce the photographs. I believe we're -- there's no objection to this. Our Exhibits 13 through 91.

THE COURT: Okay. Does the government have any declaration from any law enforcement officer that states to the contrary?

MS. AMAECHI: Your Honor, we've received two declarations from plaintiff's side for two sheriffs.

THE COURT: From who?

MS. AMAECHI: Two declarations. One is Officer Thaddeus Cleveland, and...

We do not. The government has not presented any contrary declarations.

THE COURT: Has -- has the government met with the -- the sheriffs of these counties?

MS. AMAECHI: Yes, Your Honor. Last week.

THE COURT: For the first time?

MS. AMAECHI: We have been in communication with them throughout, but the commissioner did finally meet with them last week. The Commissioner of CBP.

THE COURT: You filed what?

MS. AMAECHI: The Commissioner of the Customs and Border Patrol, Rodney Scott, he did fly out himself to meet with --

THE COURT: And when -- when was that?

MS. AMAECHI: That was a week and a half ago, Your Honor.

THE COURT: Okay. And that was after the construction began?

MS. AMAECHI: Yes, Your Honor. The construction began on August 3rd.

THE COURT: Okay. All right. Thank you, ma'am.

Go ahead.

MR. DeGUERIN: And -- and that's -- that's the -- the problem. The construction -- and we say destruction of this beautiful land has already started and we're trying to stop it.

THE COURT: Go ahead. Well, if you have the law on your side, it may stop it. But if you don't have the law on your side, whether it's destruction or destroyed -- destroys the beauty of the park, you may be on the losing end. But we're a long way from making that determination. But -- but go ahead.

MR. DeGUERIN: At this point, Your Honor, we have these photographic exhibits that I'd like to display to the Court in --

THE COURT: Yes.

MR. DeGUERIN: -- the most efficient way possible --

THE COURT: Are they --

MR. DeGUERIN: -- but there's a bunch of them.

THE COURT: -- are they contained within my notebook?

MR. DeGUERIN: I don't know they're -- if they're in there or not.

THE COURT: They're not. Okay.

MR. DeGUERIN: No.

THE COURT: They're not. You -- you may present them.

MR. DeGUERIN: Exhibit 13.

THE COURT: Okay, what am I seeing here? Is this --

MR. DeGUERIN: This is what we --

THE COURT: -- Exhibit 13 on the screen?

MR. DeGUERIN: -- are calling a "man camp." It's --

THE COURT: The what?

MR. DeGUERIN: A "man camp." It's a large area that's been cleared for construction materials such as bulldozers and places for the workers to stay.

MS. BARRAGAN: Your Honor --

THE COURT: And this was constructed --

MS. BARRAGAN: Your Honor --

THE COURT: -- after the government started being -- in other words, this was here before any talking to each other?

MR. DeGUERIN: This was before they started talking.

MS. BARRAGAN: Your Honor, it appears that counsel is testifying.

COURT REPORTER: Can you speak up, please.

MS. BARRAGAN: Yes. My apologies.

THE COURT: Okay. Yeah.

MS. BARRAGAN: It appears that counsel's --

THE COURT: Well, I need more clarity. I know the government's going to be testifying and -- and getting evidence here that's going to determine -- just like we tell jurors, what the lawyers say to the jury is not evidence.

But I appreciate your -- your reminding me.

MS. BARRAGAN: Thank you, Your Honor.

THE COURT: Okay. So, is any construction or movement toward completion continuing right now, or that's in the pause?

MR. DeGUERIN: We believe, Your Honor, that it -- that it ceased last week --

THE COURT: Okay.

MR. DeGUERIN: -- after we started making all our noise.

THE COURT: Previous to the pause. Okay. Go ahead.

MR. DeGUERIN: This is another view of the same area showing more of the clearing. And I'm -- I'm just giving a

description of what the photographs show.

THE COURT: Right. Okay.

MS. CALLAHAN: Your Honor, can we clarify where we are. I mean, I get he's saying there's a man camp. That's a very vast region, so where exactly are we?

THE COURT: Where -- where in the park; that's what you want to know?

MS. CALLAHAN: Yes, Your Honor.

THE COURT: Where in the park is that?

MR. DeGUERIN: I -- I don't know.

THE COURT: But it's in the park.

MR. DeGUERIN: It's in the park or -- or close to the park.

THE COURT: Okay.

MS. AMAECHI: Your Honor, can I just say something on the record. Again, what's planned for inside the park, there is no pedestrian barrier. It's only going to be one access road. That's what the government is -- plans to build, installing the technology, and then vehicle barriers in strategic and limited locations.

THE COURT: And -- and you'll able to show me that, right?

MS. AMAECHI: Absolutely.

THE COURT: All right.

MR. DeGUERIN: You know, Judge, I'm just reminded by

counsel, we have another witness who would --

THE COURT: Yes, I understand.

MR. DeGUERIN: -- would be better to describe this. So we can -- I'll --

THE COURT: That'll be better.

MR. DeGUERIN: -- I'll forego it any further.

THE COURT: Okay. All right.

MR. DeGUERIN: Except for one.

THE COURT: Okay.

MR. DeGUERIN: This is our Exhibit 16. And this shows an area where a new road has been cut parallel to a road already in the park, and it's near Santa Elena Canyon. But we'll wait until we get a different witness --

THE COURT: Okay.

MR. DeGUERIN: -- to go through these. And that's all the questions I have --

THE COURT: All right.

MR. DeGUERIN: -- for the Sheriff.

THE COURT: Thank you. Counselor?

You'll have a -- you'll have an opportunity -- you'll have an opportunity for redirect.

Go -- go ahead.

And again for the record, can you -- ma'am, can you state your name.

MS. BARRAGAN: Yes, Your Honor. My name is Kathryn

Barragan. I'm from the Department of Justice, Civil Division, appearing on behalf of defendants.

THE COURT: You're from D.C.?

MS. BARRAGAN: Yes, Your Honor. But I am from Texas, if that gives me some credibility here.

THE COURT: So what -- what made you move to D.C.? If you're from Texas, is there any real need to move anywhere else?

MS. BARRAGAN: I -- you know, I -- I actually agree with that, Your Honor, but I did go to law school on the east coast, which may have been a mistake, but --

THE COURT: Which law school?

MS. BARRAGAN: Harvard. Harvard Law School, Your Honor.

THE COURT: In Texas, it is a mistake.

MS. BARRAGAN: I understand. As -- as the daughter of two graduates of the University of Texas Law School in Austin, I -- I do understand that. And my -- my husband is --

THE COURT: I clearly also understand that. But go ahead.

MS. BARRAGAN: Thank you, Your Honor.

CROSS EXAMINATION

BY MS. BARRAGAN

Q So good morning, Sheriff Cleveland.

A Howdy, ma'am.

Q So you are the elected sheriff of Terrell County; is that

correct?
A That is correct.
Q Terrell County is the county immediately east of Brewster County; is that right?
A Yes, ma'am.
Q And Brewster County is where Big Bend National Park is located; is that correct?
A Yes, ma'am.
Q Big Bend National Park is not in your county, Terrell County; is that correct?
A It is not.
Q And the construction at issue in this case, the Big Bend 4 project is in the national park; is that correct?
A Right.
Q And the Big Bend 2 project is in Presidio County; is that correct?
A I'd have -- I'd have to look at that just to make sure, but I'll take your word for it, ma'am.
Q Thank you. And so you're not currently employed by Customs and Border Protection; is that correct?
A No, ma'am. I just receive a retirement check from them.
Q Okay. So last week -- you mentioned this during your direct examination. Last week you met with Rodney Scott, who is the Commissioner of the Customs and Border Protection currently, correct?

A Yes, ma'am. We communicate regularly as well.
Q Okay. And you spoke with him last week about proposed construction in the Big Bend area, correct?
A That's correct.
Q And at that meeting last week, there were several other local officials and state judges as well; is that correct?
A There were county judges, and county sheriffs, and then we had representatives from Senator Cornyn's office, Senator Cruz's office. And I think that may wrap it up. But there was a participation from each county judge in the Big Bend region or each county sheriff. There were some that were missing.
Q Okay. And you'd agree about Rodney Scott, the CBP commissioner, that he has a good head on his shoulders when it comes to border security; is that correct?
A I would.
Q And you're aware that the commissioner has committed to working with local leaders and officials about the border construction plans in the Big Bend area, correct?
A Not the Big Bend area, just Big Bend National Park and big Bend Ranch State Park. He -- he did let us know that Big Bend Project 5 -- which encompasses the last 37 miles of Brewster County, all of Terrell County, and 65 miles of Val Verde County -- he had not planned to make any changes to those plans, as well as the project from Redford all the way up to Hudspeth County.

Q With respect to the construction on federal land in the national park, however, you'd agree that he has committed to working with local officials on that -- those construction plans, correct?
A Yes. He stated that he would.
Q And so let's talk about the proposals in the park, the national park. You recognize that there is not going to be a 30-foot pedestrian wall in the national park, correct?
A According to what Commissioner Scott has said and -- and others, that there will not be a 30-foot barrier within Big Bend National Park.
Q And you recognize there's no plans to install stadium lighting in the park; is that correct?
A That is something else that he said they would not do.
Q And you recognize the importance of upgrading the existing roads in the park; is that correct?
A Existing roads, 100 percent. Not creating new roads.
Q So, for instance -- I'm talking about existing roads. You said before that they're in need of updates because they flood during the rainy season; is that correct?
A Correct.
Q And the CBP commissioner also committed to not building new roads that are unnecessary in the park; is this correct?
A Yes, ma'am. He committed to not building new roads if they were not necessary.

Q And you also have recognized that vehicle barriers are needed in some areas of Big Bend National Park; is that correct?
A In the Big Bend region. I would say, yes, I made that statement in public to journalists that there are areas that would need a vehicle barrier.
Q Well, you said that they're needed in some areas of the national park; is that right?
A I don't recall if I specified the national park, but...
Q Well, you were interviewed on CBS Texas last week, August 21?
A Okay.
Q And that interview is on YouTube.
A Okay.
Q And you have stated when you're asked: Are some vehicle barriers needed in some areas? And you said they are.
A Okay.
Q Is this correct?
A If it's recorded as such, then, yes, ma'am.
Q Okay. And you also recognize that the CBP commissioner has committed to getting design input on vehicle barrier plans from local officials and others such as yourself, correct?
A Yes, ma'am.
Q And you also know that the CBP commissioner has sought input from business owners of river rafting and canoeing businesses? I think you mentioned Judge Henington of Brewster

County; is that correct?
A Correct.
Q Okay. And when you were testifying earlier today, counsel mentioned the Santa Elena Canyon --
A Uh-huh.
Q -- in the national park. You're not aware of any barrier walls that are going up next to the Santa Elena Canyon, are you?
A I am not aware. But that doesn't mean that their plans call for them. I haven't seen what their -- their plans call for.
Q I understand. So just to wrap this up, you would agree that border security is -- in this Big Bend region is very important, correct?
A I would say all across the U.S./Mexico border security is important.
Q And in the Big Bend region as well, correct?
A For sure. All -- all of the border.
Q It's 25 percent of the border, correct?
A Correct, but it represents one -- one or two percent in fiscal year 2025 of illegal alien apprehensions.
Q But you'd agree that illegal alien crossings are happening, correct, in the Big Bend area?
A Yes, ma'am. And -- and as I mentioned, in my county is the busiest station within the Big Bend Sector. And -- and the reason for that is to my west, in Brewster County, you have two

immigration checkpoints coming out of the Big Bend National Park. Coming out of Presidio, Texas, you have another immigration checkpoint. To the east of Terrell County and Sanderson -- well, I'm sure you have the Comstock checkpoint, the Del Rio checkpoint, as well as the Uvalde checkpoint. We have no checkpoint, therefore, it's a natural draw for people to cross illegally.

Q I understand. For my questions, a simple "yes" or "no" is -- is perfect.

A Okay.

Q But I agree to the context.

A You bet.

Q And you'd agree alien smuggling is happening in the Big Bend region, correct?

A Yes.

Q Okay. And you'd also agree that guns are being smuggled across the border, correct?

A I'm not familiar with -- I haven't seen anything of recent seizures. I have personally apprehended smugglers that have brought weapons down and they pick up illegals, but I've not ever -- I don't recall a weapon seizure happening in Big Bend even -- are you talking about coming north or going south? Because typically we know Americans smuggle guns into Mexico, but we don't -- we really don't see guns coming into the United States.

Q Okay. I'll -- I'll move on.

But overall, you would agree that border security is very important, correct?

A Yes, ma'am.

Q And you also agree that the commissioner has committed to working with local officials in the area on any construction plans; is that correct?

A Yes, ma'am.

Q Thank you.

MS. BARRAGAN: No further questions.

THE COURT: Let me ask. Is it the government's position whether -- does the law permit the construction or placement of vehicle barriers, construction of a wall -- even though it's been said there's not going to be a wall.

Is it the government's position that whether one person crosses the border or a hundred people cross the border that the government is still permitted within the law to place a vehicle barrier or a wall or whatever else?

MS. AMAECHI: Yes, Your Honor. It is the government's position that -- we understand that the number of crossings, et cetera, may be more limited in comparison to other areas. However, there's no basis in the law that that should be a reason why the government cannot ensure operational -- ensure operational control of the border as a mandated by Congress.

Also, the funneling effect is real. If there's a

fence in -- if you -- if the CBP has operational control in 90 percent of areas, but leaves ten percent exposed, realistically there's going to be funneling into that area and increased crime. For those reasons, we do believe that the --

THE COURT: Okay.

MS. AMAECHI: -- the law's on our side here.

THE COURT: Let me ask. I want to make sure I have interpreted this correctly. Does the statute -- Section 102, Illegal Immigration Reform and Immigrant Responsibility, authorizes the Secretary to construct additional physical barriers and roads near the international border to deter unlawful crossings in high illegal entry [sic]...

So when it says "high illegal entry," is that sort of like giving a message to the government that perhaps this is not an area that needs a wall? Or does it make a difference that it says -- or does the language "high illegal entry" mean anything? Is that -- is that in the statute?

MS. AMAECHI: I believe -- one second, Your Honor.

THE COURT: Go ahead.

(BRIEF PAUSE)

THE COURT: I mean, I just want to know if that's in the statute. Because if it's not in the statute, then it doesn't matter whether it's one person or a thousand people. Meaning, if it's not in the statute, then the government can place vehicle barriers, bollards, walls. Is that correct? Or

does it make a difference? Is this language in the statute?

(BRIEF PAUSE)

MS. AMAECHI: Your Honor, in the statute it -- it says explicitly that Congress defined "operational control" as the prevention of all unlawful entries into the United States. And --

THE COURT: Oh, I'm sorry. Go ahead.

MS. AMAECHI: Including -- I think this part might be helpful -- including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband.

THE COURT: Okay, so let me ask you. If that's the case, would the government be permitted, then, to build a wall, place barrier -- vehicle barriers, bollards from Brownsville, Texas, all across the border to California? If the government wanted to do that, could they do that?

MS. AMAECHI: Yes, Your Honor, they -- they could.

THE COURT: Okay. But even if it's only a few crossings or not high enough crossings; is that correct?

I mean, I don't know. That -- that's why I'm asking.

MS. AMAECHI: The definition of "operational control" here, Your Honor, is zero crossings.

THE COURT: Okay.

MS. AMAECHI: And so --

THE COURT: Okay. So --

MR. DeGUERIN: Your Honor, may I -- may I -- may I respond?

THE COURT: Who's speaking? No, no, you'll have an opportunity to come back, Mr. Gutierrez [sic].

MR. DeGUERIN: Thank you.

THE COURT: Okay. So, for clarity, the government -- you're telling me the government, our government, can build a wall from Brownsville to California, regardless of the number of crossings at that point; is that correct?

MS. AMAECHI: That is correct, Your Honor. Congress explicitly gave authority --

THE COURT: Okay. So is there -- what was the compelling need or this rationale? And I guess it doesn't make a difference if it was compelling need or rationale. But what was the reasoning in starting or including the Big Bend area? Is there a wall near Brownsville or near the valley?

THE WITNESS: Some, sir.

THE COURT: Okay. Some.

MS. AMAECHI: I'm -- I'm not sure as to that fact, but to answer --

THE COURT: Okay. You're not sure. So do you know the -- the reason that the Secretary -- and it doesn't -- and according to you, there doesn't have to be a reason. I -- I understand that, if -- if that's what the law says. But by

chance, do you happen to know what the reason was?

MS. AMAECHI: Yes, Your Honor. The reason was because between 2021 and 2025, Border Patrol has apprehended 89,000 undocumented people attempting to enter the U.S. in the Big Bend Sector.

THE COURT: Okay.

MS. AMAECHI: With --

THE COURT: Go ahead.

MS. AMAECHI: And within that same sector, there have been thousands of pounds of narcotics seized as well, as well as other illicit materials.

THE COURT: And yet that only represents one percent of -- one, two, three percent?

MS. AMAECHI: Yes, in comparison to other regions.

THE COURT: Okay.

MS. AMAECHI: But there is a funneling effect here --

THE COURT: Right. But as you say, it doesn't matter whether it's a pound, half a pound, or one person.

MS. AMAECHI: That's correct, Your Honor. CBP is using its expertise to do -- to execute its job the way that it knows best, and it's been given the authority by Congress to ensure operational control of the border and to ensure expeditious -- that is done expeditiously.

THE COURT: Okay. And does the statute address a preference for the kind of deterrence; that is, vehicle

barriers, bollards, or walls? Or does the statute even address that?

MS. AMAECHI: The statute grants all discretion to DHS and CBP, Your Honor. And what DHS and CBP have done with that discretion is reach out to local stakeholders.

THE COURT: And has that been done?

MS. AMAECHI: That has been done. Rodney -- the commissioner himself of the CBP came out a week and a half ago to speak to local people here. He like -- even --

THE COURT: Right.

MS. AMAECHI: -- the pause itself is reflective --

THE COURT: Right.

MS. AMAECHI: -- of CBP wanting to work --

THE COURT: Right.

MS. AMAECHI: -- with folks here.

THE COURT: And -- and that was done rather -- but that was done after the construction began?

MR. DeGUERIN: Yes.

MS. AMAECHI: Yes, Your Honor.

THE COURT: Okay. Go ahead.

MS. AMAECHI: How --

THE COURT: I'm sorry. Go ahead.

MS. AMAECHI: Yes. However, CBP and DHS have been working with local stakeholders far beyond a week and a half ago. They have solicited notice and comment from the public.

THE COURT: Uh-huh. And in your view, the law doesn't even require that?

MS. AMAECHI: Precisely, Your Honor. It does not.

THE COURT: And is it the government's position that it will continue, because you can, without conferring with a single person from that area? But you -- you've indicate -- you've represented to me that the government is going to continue meeting with interested stakeholders.

MS. AMAECHI: That is correct, Your Honor.

THE COURT: All right. Go ahead, ma'am.

MS. BARRAGAN: I have no further questions for the witness, Your Honor.

THE COURT: Okay. Any redirect?

MR. DeGUERIN: No redirect, Your Honor.

May I cover -- while this particular exchange is fresh in your mind --

THE COURT: Sure. If you'll speak at the podium.

MR. DeGUERIN: Yes, Your Honor.

MS. BARRAGAN: Your Honor, I apologize. Could I just -- just privy to that discussion --

THE COURT: Hold on. Hold on, Mr. Gutierrez [sic].

I'm sorry?

MS. BARRAGAN: I just want to clarify, when we use the word "construction," my understanding is that there hasn't been any construction that's begun. It's -- it's actually the

clearing of brush to --

THE COURT: Okay.

MS. BARRAGAN: -- prepare for construction.

THE COURT: All right. There have been preparatory acts in -- in anticipation of some kind of construction?

MS. BARRAGAN: That is correct, Your Honor.

THE COURT: Okay. Go ahead.

MR. DeGUERIN: Thank you, Your Honor, to just give us this chance to argue the law here. And the statute does actually say "areas of high illegal entry." And that's in subsection (a), within the first part, the -- the general statement of the law. It says, Roads, including the removal of obstacles to detection of illegal immigrants in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. That's -- that's the statute.

THE COURT: But -- but according to the government, whether it's one person, one pound, or whatever -- one pound of illegal substance, they can proceed.

Is that the government's position?

MS. AMAECHI: That is the government's position, Your Honor. They have the -- they have -- they have their own expertise.

THE COURT: Uh-huh.

MS. AMAECHI: Congress has given them the authority to

carry out their mission in the best way that they know how.

THE COURT: Okay.

MR. DeGUERIN: And this is my response to this, Judge, because I think, respectfully, what you're getting at and you've made this very clear: Has the government violated the law?

102(c) --

THE COURT: How has the government violated the law?

MR. DeGUERIN: 102(c), Your Honor. I call it the magic wand. What the government is telling us right now is, We can do whatever we want --

THE COURT: Right.

MR. DeGUERIN: -- whenever we want. That's what we're hearing. But other laws -- clean air, clean water -- say, Wait a minute, you got to do this.

So then you got an amendment through Congress, creating 102(c) that says, This is our magic wand to do whatever we want.

On June 9th, the CBP commissioner, who never talked to this community before -- on June 9th waived many of the aforementioned laws, but he did not waive the Religious Freedom Restoration Act.

THE COURT: Okay, but --

MR. DeGUERIN: And he did not waive this other law.

THE COURT: That's a different part of your argument. But -- but I see what you're saying.

MR. DeGUERIN: Well, my argument, Your Honor, is that the government currently is in violation of laws that are here to protect our religious freedoms.

THE COURT: Okay. And we'll get to that when --

MR. DeGUERIN: Yes, Your Honor.

THE COURT: -- when we get to that area.

Okay. Thank you.

Any more questions of the sheriff?

MR. DeGUERIN: No more questions.

MS. BARRAGAN: No, Your Honor.

THE COURT: Thank you, sir.

THE WITNESS: Thank you, sir.

(10:47:11 A.M., END OF REQUESTED EXCERPT)

-oOo-

**C E R T I F I C A T E**

U.S. DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )
SAN ANTONIO DIVISION )

I, Vickie-Lee Garza, Certified Shorthand Reporter, do hereby certify that the above-styled proceedings were reported by me, later reduced to typewritten form, and that the **excerpt** of the foregoing pages is a true and correct transcript of the original notes to the best of my ability.

Certified to by me this 2nd day of September, 2026.

/s/ VICKIE-LEE GARZA
TX CSR #9062, Expires 10/31/2027
U.S. District Court
262 W. Nueva Street, Suite 1-400
San Antonio, Texas 78283