**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF RIUDOSA CHURCH, et al.<br>*Plaintiffs,*<br>*v.*<br>MULLIN, et al.<br>*Defendants.* | Civil Action No. 3:26-cv-01099-KC |

**THIRD DECLARATION OF PAUL ENRIQUEZ**

I, Paul Enriquez, declare as follows:

1. I am the Director of the Infrastructure Portfolio, U.S. Border Patrol Program Management Office Directorate ("PMOD"), U.S. Customs and Border Protection ("CBP"), an agency of the U.S. Department of Homeland Security ("DHS"). I have held this position since January 2023 and support the planning and execution of border infrastructure projects from construction to maintenance. From May 2021 to December 2022, I served as the Deputy Director for the Infrastructure Portfolio. From August 2018 to May 2021, I served as the Real Estate and Environmental Director for the Infrastructure Portfolio. From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM"), Facilities Management and Engineering, Office of Facilities and Asset Management. From 2011 to 2013, I was employed as an Environmental Protection Specialist in BPAM. In that role, I performed environmental analyses for various border infrastructure projects. From 2008 to 2011, I was a contractor assigned to BPAM and provided environmental support on various border infrastructure

projects.

2. CBP is the DHS component with primary responsibility for border security. CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.

3. Within CBP, PMOD has expertise in managing and executing border infrastructure projects. PMOD is tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

4. Based upon my current and past job duties, I am familiar with the funding appropriated to CBP for barrier system construction and CBP's planned and on-going border barrier construction on the southern border.

5. I previously submitted a declaration in this case dated August 24, 2026 that, among other things, described the Big Bend 1, Big Bend 2, Big Bend 3, Big Bend 4, and Big Bend 5 projects (hereinafter the Big Bend 1-5 projects) within the USBP Big Bend Sector that are at issue in this case and the IIRIRA waivers issued for each project.

**BACKGROUND**

6. On October 2, 2026, the Court issued an order granting a preliminary injunction. The Court's order states that, effective immediately, "Defendants **SHALL NOT** build border barrier or related infrastructure, or engage in any construction or ground disturbing activities, in the Big Bend Sector until and unless Defendants comply with all applicable laws . . . notwithstanding the [IIRIRA waivers]" issued for the Big Bend 1-5 projects.

7. To comply with the Court's order, on October 2, 2026, CBP sent suspension notices to the contractors for the Big Bend 1-5 projects. The suspension notices require that the contractors immediately suspend "all construction and ground disturbing activities in the Big Bend Sector." There will be some continued activity as CBP's contractors effectuate an orderly wind down of project activities, including securing active work sites and equipment and making them safe.

8. CBP continues to assess whether other contracts that do not directly involve the construction

of border barrier or ground disturbing activities in the Big Bend Sector need to be suspended. While these contracts do not involve border barrier construction or ground-disturbing activities, they are dependent upon barrier construction (e.g., environmental monitoring during active construction). As such, if barrier construction is enjoined, there may not be a need for such services during the injunction period.

**HARMS**

9. The Court's Order has and will continue to result in substantial harms on the government.

10. The contracts for the Big Bend 1, Big Bend 2, and Big Bend 3 projects were awarded on March 5, 2026. The total contract value at award for the Big Bend 1 contract was $1,025,996,158. The total contract value at award for the Big Bend 2 contract was $1,223,124,000. The total contract value at award for the Big Bend 3 contract was $960,423,540.

11. The contract for the Big Bend 4 project was awarded on May 11, 2026. The total contract value at award for the Big Bend 4 project was $1,720,040,000.

12. The contract for the Big Bend 5 project was awarded on June 2, 2026. The total contract value at award of the Big Bend 5 project was $2,594,040,000.00.

13. The Big Bend 1-5 projects are funded by appropriations made by Congress for barrier system construction as part of the Working Families Tax Cut Act, Pub. L. No. 119-21, tit. IX, § 90001 (1)-(3), 139 Stat. 72, 357-58 (2025).[1]

14. The Big Bend 1-5 projects were in various stages of execution prior to the Court's Order.

15. For the Big Bend 1 project, CBP issued notice to proceed ("NTP") for construction for portions of the Big Bend 1 project on March 30, 2026. In accordance with that directive, the contractor deployed field personnel to the project area, including engineers, project managers, equipment operators, and laborers, usually working 10 hours per day, 6 days per week. Heavy

[1] Prior declarations addressing the Big Bend Sector barrier projects referred to Public Law 119-21 as the "One Big Beautiful Bill Act." I understand that this Act is now commonly referred to as the Working Families Tax Cut Act.

equipment was also already mobilized to facilitate construction. The contractor had erected a temporary concrete batch plant where concrete is mixed for construction, as well as water delivery systems, temporary field offices, and supply yards for taking daily deliveries of steel and other material. Security cordons were established to protect personnel and equipment. At the time of the Court's injunction, approximately 3/4 mile of border barrier had been installed in the Big Bend 1 project area. Given the significant scale of this effort, the suspension of work is now imposing, and will continue to impose, significant costs on the Government, on the contractor and hundreds of individual workers.

16. On August 31, 2026, CBP agreed to pause all ground disturbing activities for the Big Bend 2 and Big Bend 4 projects to allow for additional public engagement. On September 30, 2026, CBP lifted the pause on ground disturbing activities for the Big Bend 2 project. CBP expected that ground disturbing activities in support of design and construction for portions of the Big Bend 2 project would begin this week, but that is no longer possible due to the Court's October 2nd Order.

17. For the Big Bend 4 project, CBP is actively considering adjustments to reduce the scope and avoid or minimize impact of the original project based on the input it has received from the National Park Service and other stakeholders. CBP expected to make a final decision on the revised scope of the Big Bend 4 project this week. CBP also expected ground disturbing and construction activities to resume within a few weeks of a final decision on the scope of the Big Bend 4 projects. Due to the Court's October 2nd Order, once a final decision is made on the scope Big Bend 4, CBP will be unable to move forward with the project.

18. Ground disturbing activities had already begun for portions of the Big Bend 3 project. The contractor had already cleared and grubbed and performed geotechnical surveys. It has also mobilized personnel and equipment, transported materials, and set up batch plants and laydown yards. CBP and its contractor are addressing an issue related to access to the project area. When that issue is resolved, however, the Court's Order will prohibit CBP's contractor from constructing barrier in the Big Bend 3 project area.

19. The Big Bend 5 is in the design phase. Completion of the design for the Big Bend 5 project requires ground disturbing activities, including, for example, geotechnical surveys and clearing and grubbing necessary for geotechnical surveys. These activities cannot proceed due to the Court's October 2nd Order.

20. Each day the Court's injunction continues and contract performance on the projects is suspended, CBP will incur financial liabilities to the contractors for significant, otherwise-unnecessary costs, all of which CBP would not have incurred but for the Court's injunction. Despite the suspension of work, the contractors will continue to incur costs for every day that the contracts are suspended. The costs include land leases, offices, maintaining equipment at multiple locations, costs for security to keep the equipment and materials from being stolen or vandalized, and labor costs to ensure that personnel who have been trained and are dedicated to execute the barrier construction projects remain available (*e.g.*, engineers, project managers, laborers). To this end, CBP is incurring substantial contract suspension costs, which are estimated to be at least $462,800 per day based on rough projections provided by the contractors. CBP will be obligated to pay these additional costs, all of which would not have been incurred but for the Court's injunction. Further, CBP will be obligated to pay these additional costs from funds that would otherwise be spent on actual barrier construction activities.

21. In addition to these per day suspension costs, the injunction may result in the payment of delay damages in the form of acceleration costs to maintain the original project schedules in the event the suspension is lifted. Here again, CBP will be obligated to pay these additional costs from funds that would otherwise be spent on actual barrier construction activities.

22. The suspension and acceleration costs that CBP incurs cannot be recouped from the contractors if the injunction were to be lifted at a later date.

23. Depending on the duration of the injunction, CBP's contractors may also have to demobilize personnel and equipment from the project sites. This will also result in substantial harms to the government. Given the tight market for border barrier construction labor and equipment,

if the injunction is stayed after the contractors have demobilized, the costs of remobilizing manpower and resources are likely to be significant. Contractors have provided rough estimates of the cost to demobilize and remobilize, and the cost to demobilize the Big Bend 1-5 projects could be well upwards of $7 million.

24. In addition, based on input from CBP's contractors, CBP understands that equipment availability within the industry is extremely limited. If equipment has to be demobilized, it may not be available for remobilization.

25. Similarly, at least one of CBP's contractors spent several months putting together a team of qualified craft personnel who have relocated to a remote project area within the Big Bend Sector from all over the country. Similar to equipment, qualified craft resources are difficult to find in the current market. If this team is demobilized, the project will experience schedule delays if the injunction is lifted and construction activities are authorized to resume. t.

26. In addition to harming the government, enjoining CBP from further construction of border barrier infrastructure will harm the general public. As stated in the IIRIRA waivers that were issued for the Big Bend border barrier system projects, the Secretary of Homeland Security determined that the Big Bend and Del Rio Sectors are areas of high illegal entry. Between fiscal year 2021 and fiscal year 2025, Border Patrol apprehended over 89,000 illegal aliens attempting to enter the United States between border crossings in the Big Bend Sector. In that same time period Border Patrol seized over 87,574 pounds of marijuana, over 867 pounds of cocaine, over 1,156 pounds of methamphetamine, over 12 pounds of heroin, and over 94 pounds of fentanyl. 91 Fed. Reg. 7297. Also in that same time period, Border Patrol apprehended over 1,410,330 illegal aliens attempting to enter the United States between border crossings in the Del Rio Sector. Border Patrol also seized over 277 pounds of marijuana, over 198 pounds of cocaine, over 353 pounds of methamphetamine, and over five pounds of fentanyl. Though apprehension numbers in the Big Bend and Del Rio Sectors may have declined recently, as also stated in the IIRIRA waivers, the statistics cited above show that illegal aliens and drug smugglers regularly try to exploit the Big Bend and

Del Rio Sectors. The lack of border barrier infrastructure within the Big Bend and Del Rio Sectors makes it harder for Border Patrol to achieve operational control of the border. Thus, if CBP is unable to construct additional border infrastructure in the Big Bend and Del Rio Sector, it will remain an area that can be exploited by illegal aliens and drug smugglers.

***

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of October 2026.

Paul Enriquez
Infrastructure Portfolio Director
Program Management Office Directorate
U.S. Border Patrol