**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **FRIENDS OF THE RUIDOSA CHURCH, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. EP-26-CV-1099-KC** |
| | § | |
| **MARKWAYNE MULLIN, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION**

On August 17, 2026, Plaintiffs Center for Biological Diversity, Friends of the Ruidosa Church, and Danny William Miller Junior filed their Motion for Preliminary Injunction ("Motion"), ECF No. 34. On October 2, 2026, the Court **GRANTED** the Motion with a memorandum opinion to follow. Oct. 2, 2026, Order, ECF No. 66. The Court now issues its opinion.

## I. BACKGROUND

This case involves Plaintiffs' claims that the Government lacks the authority to build border enforcement infrastructure in a remote swath of West Texas. *See* 1st Am. 2d Supp. Compl. ¶¶ 1–4, ECF No. 26. That construction proceeded pursuant to a series of waivers issued between February and July 2026 by the Secretary of the Department of Homeland Security (the "Secretary"). *See id.* ¶ 3. The Secretary invoked the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") to waive the application of dozens of laws, mainly environmental laws, along a 517-mile stretch of the U.S.-Mexico border. *See* 91 Fed. Reg. 7297 (Feb. 17, 2026), as amended by 91 Fed. Reg. 40550 (July 2, 2026) (the "West Waiver"); 91 Fed. Reg. 27969 (May 15, 2026), as amended by 91 Fed. Reg. 34831 (June 9, 2026) (the "National

Park Waiver"); 91 Fed. Reg. 46939 (July 27, 2026) (the "Lower Canyons Waiver") (collectively, the "Big Bend Waivers").

The area of the border at issue includes Big Bend National Park, Big Bend Ranch State Park, and other public and private land in Hudspeth, Jeff Davis, Presidio, Brewster, Terrell, and Val Verde Counties, Texas. Pls.' Ex. 1 ("Map of Big Bend Area").[1] The area is co-extensive with the section of the border encompassed by the United States Border Patrol's "Big Bend Sector." *Id.*; Hr'g Tr. 28:10–23, 35:25–36:5, ECF No. 72. The Big Bend Waivers invoked "an acute and immediate need to construct additional physical barriers and roads" to prevent "illegal entry" and the "smuggl[ing of] illicit drugs." National Park Waiver; Lower Canyons Waiver; West Waiver.

On April 16, 2026, Plaintiffs brought suit, claiming on various grounds that the Secretary's waivers are unconstitutional. Compl. ¶¶ 63–94, ECF No. 1. They contend that they would be personally and irreparably harmed by the construction of border wall and related infrastructure in the Big Bend Sector. *Id.* ¶¶ 14, 22, 24. After fully briefing cross-motions for summary judgment, *see* Pls.' Mot. Summ. J., ECF No. 19; Defs.' Mot. Summ. J., ECF No. 24, Plaintiffs filed the instant Motion, citing ongoing construction as the basis for immediate, preliminary relief. Mot. 4–6. Defendants filed a Response, ECF No. 38, in opposition, to which Plaintiffs filed a Reply, ECF No. 39. Amicus Briefs, ECF Nos. 33, 42, were also filed by the Coalition to Protect America's National Parks, Keep Big Bend Wild, National Parks Conservation Association, the Sierra Club, and its Lone Star Chapter.

[1] The exhibits presented by the parties at the October 2, 2026, Preliminary Injunction Hearing were submitted via a secure cloud-based file-sharing system and remain on file with the Court as part of the record of the case.

On October 2, 2026, the Court convened an evidentiary hearing. Minute Entry, ECF No. 64. After hearing the parties' evidence and argument, the Court granted Plaintiffs' Motion and entered a preliminary injunction as follows:

> Effective immediately and until the Court orders otherwise, Defendants shall not build border barrier or related infrastructure, or engage in any construction or ground disturbing activities, in the Big Bend Sector until and unless Defendants comply with all applicable laws. Defendants must comply with all applicable laws notwithstanding the "Big Bend Waivers," including the "West Waiver," 91 Fed. Reg. 7297 (Feb. 17, 2026), as amended by 91 Fed. Reg. 40550 (July 2, 2026), the "National Park Waiver," 91 Fed. Reg. 27969 (May 15, 2026), as amended by 91 Fed. Reg. 34831 (June 9, 2026), and the "Lower Canyons Waiver," 91 Fed. Reg. 46939 (July 27, 2026). The effect of all "Big Bend Waivers" is stayed for the duration of this Injunction.

Oct. 2, 2026, Order 1–2 (emphasis omitted).

## II. DISCUSSION

### A. Standard

Whether to grant a preliminary injunction is within the district court's discretion. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). "The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable injury until the court renders a decision on the merits." *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *4 (5th Cir. Feb. 17, 2022) (citing *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)).

To prevail on a request for a preliminary injunction, a movant must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat that [the movant] will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the [non-movant], and (4) that the injunction will not disserve the public interest." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (citing *Planned Parenthood of Hous. & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005)).

A plaintiff's likelihood of success on the merits is determined by reference to the applicable substantive law. *William E. McBryde, Inc. v. Rodriguez*, No. 5:07-cv-143-XR, 2007 WL 628793, at *2 (W.D. Tex. Feb. 13, 2007) (quoting *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997)). A preliminary injunction is an extraordinary, equitable remedy that "should only be granted when the movant has clearly carried the burden of persuasion." *Svoboda v. Bank of Am., N.A.*, 964 F. Supp. 2d 659, 673 (W.D. Tex. 2013) (citing *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right." (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008))).

**B. Analysis**

**1. Substantial Likelihood of Success on the Merits**

Plaintiffs argue that they are substantially likely to succeed on the merits of their major questions doctrine claim. Mot. 7–10. Defendants disagree. Resp. 5–8. They argue that the Court does not have jurisdiction, and even if it had jurisdiction, the major questions doctrine claim fails on the merits because the Congressional delegation of authority is clear. *Id.*

**a. Jurisdiction**

Defendants' jurisdictional argument is predicated on a jurisdiction-stripping provision that follows IIRIRA's delegation of authority to the Secretary "to waive all legal requirements" as "necessary to ensure expeditious construction" of certain border enforcement infrastructure. 8 U.S.C. § 1103 note, § 102(c)(1) (2009) (Improvement of Barriers at Border). For challenges to such waivers, "[a] cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear [any other claim]." *Id.* § 102(c)(2)(A); *accord Zapata County v. Biden*, No. 20-cv-106, 2023 WL

11915719, at *2 & n.3 (S.D. Tex. Mar. 31, 2023). Defendants argue that the Court lacks jurisdiction to hear Plaintiffs' major questions doctrine claim, because the major questions doctrine is a "'tool' or 'rule' of statutory interpretation." Resp. 5–6. While they concede that it is "animated by constitutional principles," they contend that a violation of the major questions doctrine is not a violation of the Constitution. *Id.* Plaintiffs, on the other hand, claim that Defendants' actions amount to "a violation of separation of powers and Article I's Vesting Clause," which present a "justiciable constitutional question squarely within this Court's Jurisdiction." Reply 1.

Whether the major questions doctrine is merely a textual tool of statutory interpretation or a substantive rule of constitutional magnitude is a "heady question" and "the subject of ongoing debate." *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 616 (5th Cir. 2024). Some justices on the Supreme Court view the doctrine as a canon of interpretation, while others view it as "a clear-statement rule" with a constitutional dimension. *Id.* n.2 (citations omitted). Major questions doctrine jurisprudence is thus pervaded by "both separation of powers principles and a practical understanding of legislative intent." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (quoting *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723–24 (2022)).

By Plaintiffs' count, "a majority of the Supreme Court agrees that the major questions doctrine is . . . rooted in constitutional separation of powers principles." Mot. 7 & n.7 (citations omitted). But such tallying is unhelpfully reductive—it cobbles together the justices' scattered statements on the doctrine and obscures the nuances of the debate. *See id.* Indeed, Defendants concede that the major questions doctrine "is animated by background constitutional principles," but still insist that it does not provide a vehicle for Plaintiffs to claim that the Big Bend Waivers

amount to a "violation of the Constitution," as required to confer jurisdiction in this case. Resp. 6.

The constitutional view of the major questions doctrine is that "to sustain a claim that Congress has granted them an extraordinary power, executive officials must identify clear authority for that power." *Learning Res., Inc.*, 607 U.S. at 262 (Gorsuch, J., concurring). This so-called "clear statement rule" derives from the core of the Constitution's structure: "Article I of the Constitution vests all federal legislative power in Congress, and Article II charges the executive branch with seeing that Congress's laws are faithfully executed." *Id.* at 268. To be sure, "federal legislation cannot anticipate every eventuality," so members of Congress "sometimes draft broad delegation language to account for this." *Id.* at 270. "And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). But when the executive arrogates to itself a major legislative power without a clear statement from Congress, such an action is not within constitutional limits. *Learning Res., Inc.*, 607 U.S. at 278 ("Article I—a substantive value external to statute—imposes a clear-statement rule when executive officials claim Congress has afforded them an extraordinary authority.") (cleaned up) (Gorsuch, J., concurring). In other words, an assertion of extraordinary authority not clearly delegated violates a "constitutional rule[]" implicit in Article I. *West Virginia*, 597 U.S. at 740 (Gorsuch, J., concurring).

Proponents of the view that the major questions doctrine is instead a linguistic tool of statutory construction contend that it is common sense to doubt that Congress would cede extraordinary powers vaguely or lightly. *Biden v. Nebraska*, 600 U.S. 477, 514–16 (2023) (Barrett, J., concurring). After all, sweeping authority is not usually communicated in general

instructions. *See id.* The doctrine is akin to other commonsense canons of textual interpretation, as embodied in the maxim that "Congress does not 'hide elephants in mouseholes.'" *Id.* at 518 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Even under this view, however, the Constitution is still relevant—demanding more clarity and specificity from a delegation of major legislative authority than from run-of-the-mill delegations makes sense "in a system of separated powers." *Id.* at 515.

The Fifth Circuit has largely declined to weigh in on either side of the debate. *See, e.g.*, *Rest. Law Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 174 n.9 (5th Cir. 2024) (taking "no position" on whether the doctrine is "a substantive clear-statement rule" or "a purely linguistic canon of construction"). But the constitutional view has obtained at least some limited recognition. *See VDX Distro, Inc. v. U.S. Food & Drug Admin.*, 179 F.4th 356, 363 (5th Cir. 2026) (describing the major questions doctrine as "closely related" to the nondelegation doctrine, which itself is grounded in separation of powers) (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 142 (2022) (Gorsuch, J., concurring)).

While acknowledging that the law is unsettled, the Court rules that the major questions doctrine is a constitutional clear statement rule grounded in separation of powers. The doctrine's fundamental notion, that courts should expect Congress to speak clearly when it delegates major lawmaking authority to the executive, finds its genesis nowhere but the Constitution. Advocates of the textual canon theory claim that it is common sense to demand greater clarity from Congress when they delegate extraordinary powers. *Biden*, 600 U.S. at 513–16 (Barrett, J., concurring). But as Justice Gorsuch persuasively explains, common sense only counsels such a demand in the context of this country's constitutional structure. *See Learning Res., Inc.*, 607 U.S. at 277 ("[T]his version of common sense *does* require us to account for 'values' entirely

'external to a statute,' including specifically the 'substan[ce]' of Article I.") (citation omitted). In other words, the doctrine cannot be a canon of textual interpretation because there is nothing intrinsic to the English language that warrants looking askance at a delegation of authority simply because that authority is expansive. The source of the skepticism is not linguistic—it is constitutional.

Accordingly, the Court finds that it has jurisdiction to consider Plaintiffs' major questions doctrine claim because it alleges a Constitutional violation. *See* 8 U.S.C. § 1103 note, § 102(c)(2)(A).

**b. Clear Congressional Authorization**

Turning to the merits, Plaintiffs argue that the Secretary exceeded her authority when issuing the Big Bend Waivers. The "major-questions doctrine bars agencies from exploiting ambiguous statutes to grant themselves broad new powers." *Tex. Tobacco Barn, L.L.C. v. U.S. Dep't of Health & Hum. Servs.*, 180 F.4th 229, 233 (5th Cir. 2026) (citations omitted). It asks (1) whether the power claimed by an executive agency is "of major economic and political significance" and (2) whether the agency identified "'clear' congressional authorization to sustain those actions." *Learning Res.*, 607 U.S. at 231, 280 (citing *W. Virginia*, 597 U.S. at 721). Both parties appear to agree that the waiver of all legal requirements to construct a border wall in the Big Bend Sector is of "major economic and political significance." Mot. 9; *see also* Resp. 5–8 (making no arguments on this issue). Thus, the Court must only decide whether the Secretary had "clear congressional authorization" to issue the Big Bend Waivers.

For clear congressional authorization, it is not enough that "the statutory text might '[a]s a matter of definitional possibilities' have been read to delegate the asserted power." *Learning Res., Inc.*, 607 U.S. at 243 (citation omitted). The court should be "skeptical" of "broad" or

"uncertain" delegations of authority on major questions. *Id.* at 232, 242–43. And should consider "other language within the statute," read in the context of common sense and our constitutional structure, to find limiting principles that cabin any potentially extraordinary delegation of authority. *See id.* at 243.

Defendants' main argument is that Congress "unequivocally authorized DHS to construct barriers along the southern border and waive laws in furtherance thereof." Resp. 6. And certainly, the narrow provision of IIRIRA authorizing waivers speaks in broad language: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section . . . ." 8 U.S.C. § 1103 note, § 102(c)(1). But at the outset, that same section of IIRIRA—i.e., "this section"—states: "The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." *Id.* § 102(a). Reading these provisions together, the construction under "this section" for which the Secretary is authorized to waive legal requirements includes only construction "to deter illegal crossings in areas of high illegal entry." *See id.*

To this point, Defendants argue that "the Big Bend Sector is an area of high illegal entry given the rates of illegal crossings and drug smuggling." Resp. 8. In support, they contend that over 89,000 individuals were apprehended attempting to enter the United States illegally in the Big Bend Sector between 2021 and 2025. *Id.* at 11. Evidence submitted by Plaintiffs at the Hearing showed this gross total to be undisputed. Pls.' Ex. 2 ("Illegal Migrant Activity in Big Bend Nat'l Park").

However, Plaintiffs presented additional evidence putting this number in context. The evidence shows that the Big Bend Sector of the border was in "extraordinarily distant last place" for apprehensions compared to the other six Southern border sectors. Hr'g Tr. 54:22–25. The Big Bend Sector experienced both the lowest aggregate number of apprehensions and the lowest number of apprehensions per mile of border. *See* Pls.' Ex. 5 ("Suppl. Expert Report of Adam B. Isacson"); *see also* Mot. Suppl. Ex. 1, at 12–42, ECF No. 55-3. While the Big Bend Sector comprises over 25% of the U.S.-Mexico border, for the last thirty years, annual apprehensions in the Big Bend Sector fluctuated between 0.3% and 2.2% of total border-wide apprehensions. *See* Pls.' Ex. 5. Even assuming that apprehensions reflect only a small portion of total illegal entries,[2] there was no evidence adduced at the hearing to suggest that there is a lower rate of apprehensions in the Big Bend Sector compared to any other sector. Therefore, even if total apprehensions are a poor proxy for total entries border-wide, the comparative data on apprehensions is still probative of the relative number of entries, sector to sector.

As for narcotics, the evidence showed that "the Big Bend Sector accounts for one percent of non-marijuana drug seizures and fifteen percent of all drug seizures in the . . . period for which we have data, 2020 to 2026." Hr'g Tr. 45:19–22. These totals include not only drugs seized at or near the border or otherwise determined to have recently entered the country, but also drugs seized while moving through the interior of the country. *Id.* at 46:8–23. The Big Bend Sector includes several highway checkpoints, at which twenty-five to fifty percent of border patrol drug seizures occur, nationally. *Id.* at 40:9–22, 46:2–4.

In sum, the key evidence—data regarding apprehensions and narcotics seizures—is essentially undisputed. The parties' disagreement boils down to how the "areas of high illegal

[2] *But see* Hr'g Tr. 60:7–16 (Plaintiffs' expert testifying that there was an 80% apprehension rate in the Big Bend Sector); *see also* Pls.' Ex. 3 ("Krumenaker FOIA Request") (reporting the number of "Got Away[s]" compared to the number of Apprehensions).

entry" limitation on the Secretary's waiver authority should be understood. Defendants point to over 89,000 apprehensions in five years, and similarly large quantities of drugs seized in the Big Bend Sector and the neighboring Del Rio Sector to argue that because these are "high" numbers, Big Bend is an area of high illegal entry. Resp. 11–12. But this argument elides the comparative dimension. The unrebutted evidence shows that the Big Bend Sector is, by far, the sector with the lowest rate of migrant apprehensions along the entire U.S.-Mexico border, both in terms of gross totals and apprehensions per mile of border.[3] Therefore, if the Big Bend Sector is an area of high illegal entry, so is every other sector, and the waiver authority would apply to the entire U.S.-Mexico border. If that were the case, Congress could have simply authorized construction "to deter illegal crossings." Instead, it authorized construction "to deter illegal crossings in areas of high illegal entry."

Under the major questions doctrine, courts eschew interpretations that would render limiting language meaningless. *See, e.g.*, *Learning Res., Inc.*, 607 U.S. at 231 (rejecting an interpretation that would delegate "power to unilaterally impose unbounded tariffs" considered "[a]gainst [a] backdrop of clear and limited delegations" of tariff authority); *Biden*, 600 U.S. at 497 (rejecting an interpretation "that avoids any need to show compliance with the statutory limitation on [the relevant secretary's] authority"). For "high illegal entry" to impose any limit, it must at least mean, "not the lowest rate of illegal entry." And the evidence shows that the Big Bend Sector has the lowest rate of illegal entry along the entire U.S.-Mexico border. Therefore, the Court finds that Plaintiffs are likely to succeed on the merits of their major questions doctrine claim that the Big Bend Waivers were issued in excess of the Secretary's authority.

[3] The evidence also shows that the Big Bend Sector has comparatively low drug seizure rates, especially for non-marijuana drug seizures. From the evidence presented during the Hearing, the Court finds it likely that at least a significant portion of drug seizures in the Big Bend Sector represent drugs moving through the interior of the country, not drugs entering the country from Mexico. *See* Hr'g Tr. 45:10–48:10.

**2. Substantial Threat of Irreparable Harm**

Having established a likelihood of success on the merits,[4] Plaintiffs must also show a substantial threat of irreparable harm if an injunction is not issued. *Nichols*, 532 F.3d at 372. To obtain preliminary injunctive relief, Plaintiffs must show that they are "'likely to suffer irreparable harm,' that is, harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).

Plaintiffs argue that, absent a preliminary injunction, they will be irreparably harmed because the Big Bend Sector is "one of the last great wilderness landscapes in the United States," Mot. 16, and "[a] later order cannot undo the harms resulting from Plaintiffs' injuries," Hr'g Tr. 170:8–9. At the October 2 Hearing, Plaintiffs' witnesses described how construction has and will restrict their livelihood, affect their spiritual, recreational and aesthetic interests, and impact the natural ecosystem.

First, the evidence shows that border wall construction will restrict Plaintiffs' livelihood. Plaintiff Miller, a riverboat guide, described how barriers would prevent him from launching boat tours on the Rio Grande. *See* Hr'g Tr. 96:7–21. Bill Guerra-Addington, a member of Plaintiff Center for Biological Diversity and a rancher whose family has lived on their land for at least three generations, testified that construction would cut him off from the river and, with no alternative water sources, prevent him from growing crops. *See id.* at 119:23–25, 132:19–133:16. And Bernadette Devine, a member of Plaintiff Center for Biological Diversity and an educator and river guide, testified that the placement of waterborne barriers in the Rio Grande would disrupt any river activity she planned to lead. Mot. Ex. 4 ("Devine Decl.") ¶¶ 2, 4, ECF No. 34-4; Hr'g Tr. 146:4–15.

[4] The Court need not consider likelihood of success on the merits of Plaintiffs' remaining claims, because the claim discussed suffices to demonstrate their entitlement to the injunctive relief sought. *See, e.g.*, *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 519 (S.D. Tex. 2020) (collecting cases).

In addition, they highlight the harm to the natural ecosystem, including local wildlife. Guerra-Addington testified that the influx of construction contractors' vehicles in his area has already caused a dramatic uptick in roadkill. Hr'g Tr. 125:4–16. And that if construction of border barriers proceeded, both wildlife and livestock would be prevented from accessing the river, both as a source of water and a migration route. *See id.* at 136:22–137:14. The Court also heard extensive testimony regarding the effect of construction on the overall ecosystem. *See* Hr'g Tr. 155:4–167:12. An ecologist and soil scientist testified that construction activities would destroy the hydrologic function of the riparian habitat, impacting soil, vegetation, and wildlife in and beyond the Big Bend Sector. *Id.* at 161:13–163:11. The associated vegetation loss, invasion by non-native vegetation, and soil disruption would take decades to recover, if ever. *Id.* at 163:3–164:21.

Lastly, the witnesses also testified at length about their enjoyment of the wild spaces in the Big Bend Sector, which they appreciate from spiritual, recreational, and aesthetic perspectives. Miller testified that the appeal of his riverboat trips are so individuals can "escape from modern life," and that the wilderness "saved [his] life." *Id.* at 81:20; 83:17–18. Devine stated that she enjoyed viewing the dark skies in Big Bend, where she "can see by starlight," as well as go birding, which is "phenomenal along the river." *See id.* at 142:9–143:2. Both testified at length regarding how ground disturbing and construction activities have and will continue to deteriorate the spiritual, recreational, and aesthetic value of the area. *See, e.g.*, *id.* at 86:13–87:4, 145:17–147:19.

For these reasons, Plaintiffs have established a substantial threat of irreparable harm. As one witness neatly summarized it, the impact of construction on the land amounts to a "visible scar that'll never go away." Hr'g Tr. 85:11.

### 3. Balance of Harms and Public Interest

The third and fourth factors—the balance of the harms and the public interest, respectively—"merge when the Government is the opposing party." *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)).

As Plaintiffs have demonstrated, without an injunction, they and the public at large stand to permanently lose protected wilderness that benefits tourism, recreation, farming, ranching, spirituality, aesthetic sensibilities and education. On the other hand, if enjoined, Defendants only suffer a temporary delay while this Court assesses the merits of the pending summary judgment motions. Oct. 2, 2026, Order. Thus, the final factors, balance of harms and the public interest, also weigh in favor of Plaintiffs. In sum, all four factors weigh in favor of issuing a preliminary injunction.

## III. CONCLUSION

Accordingly, the Motion for Preliminary Injunction, ECF No. 34, is **GRANTED**.

**SO ORDERED**.

**SIGNED this 14th day of October, 2026.**

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE