**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| FRIENDS OF THE RUIDOSA CHURCH, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, et al.,<br><br>*Defendants.* | Case No. 3:26-cv-01099-KC |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PRELIMINARY INJUNCTION PENDING THE FILING AND RESOLUTION OF A PETITION FOR A WRIT OF CERTIORARI**

## STATEMENT OF ISSUES

1. Whether the Court should stay the preliminary injunction entered in this case pending Defendants' petition for a writ of certiorari to the Supreme Court.

## TABLE OF AUTHORITIES

**Cases**


*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 19

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 17, 18

*Border Infrastructure Env't Litig. v. U.S. Dep't of Homeland Sec.*,
915 F.3d 1213 (9th Cir. 2019) .......... 20

*Center for Biological Diversity v. U.S. Customs and Border Protection*,
3:26-cv-00976-KC (W.D. Tex. Oct. 9, 2026) .......... 4

*El Paso Cnty. v. Trump*,
407 F. Supp. 3d 655 (W.D. Tex. 2019) .......... 6

*Foresight Coal Sales, LLC v. Chandler*,
60 F.4th 288 (6th Cir. 2023) .......... 12

*Gegenheimer v. Stevenson*,
No. 1:16-CV-1270-RP, 2017 WL 2880867 (W.D. Tex. July 5, 2017) .......... 12

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......... 18

*Gundy v. United States*,
588 U.S. 128 (2019) .......... 15

*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*,
41 F.4th 564 (D.C. Cir. 2022) .......... 12

*Interfirst Bank of Abilene, N.A. v. Lull Mfg.*,
778 F.2d 228 (5th Cir. 1985) .......... 13

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) .......... 11

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 11

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 15, 16

*Louisiana v. Becerra*,
20 F.4th 260 (5th Cir. 2021) .......... 11

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) .......... 11

*Mayfield v. U.S. DOL*,
117 F.4th 611 (5th Cir. 2024) .......... 16

*Missouri v. Biden*,
681 F. Supp. 3d 603 (W.D. La. 2023) ........ 12

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*,
595 U.S. 109 (2022) ........ 16

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 3

*ODonnell v. Harris Cnty.*,
260 F. Supp. 3d 810 (S.D. Tex. 2017) ........ 3, 4

*People of La Junta for Pres. v. Dep't of Homeland Sec.*,
No. 5:26-cv-5245-OLG (W.D. Tex. Oct. 1, 2026) ........ 2

*R.R. Mgmt. Co. v. CFS La. Midstream Co.*,
428 F.3d 214 (5th Cir. 2005) ........ 4

*Realogy Holdings Corp. v. Jongebloed*,
957 F.3d 523 (5th Cir. 2020) ........ 14

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ........ 3

*Sierra Club v. Trump*,
977 F.3d 853 (9th Cir. 2020), *vacated*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021) ........ 6

*Simon v. United States*,
891 F.2d 1154 (5th Cir. 1990) ........ 3

*State v. Biden*,
10 F.4th 538 (5th Cir. 2021) ........ 11

*Texas v. Becerra*,
89 F.4th 529 (5th Cir. 2024) ........ 11

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 11

*Trump v. Sierra Club*,
588 U.S. 930 (2019) ........ 5

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........ 15

*Virginian R. Co. v. United States*,
272 U.S. 658 (1926) ........ 3

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........ 14, 16, 17, 18

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........ 19

**Statutes**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended

IIRIRA § 102(a) .......... 12, 18, 19, 20

IIRIRA § 102(b) .......... 20

IIRIRA § 102(b)(1) .......... 19

IIRIRA § 102(b)(1)(D) .......... 20

IIRIRA § 102(c) .......... 12, 15, 18, 20

**Rules**

Fed. R. Civ. P. 52(a)(1) .......... 13

Fed. R. Civ. P. 52(a)(2) .......... 13

Fed. R. Civ. P. 65(d)(1)(A) .......... 13

Fed. R. Evid. 1002 .......... 4

**Legislative Materials**

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Sec. 564, 121 Stat. 2090 (Dec. 26, 2007) .......... 19

Secure Fence Act, Pub. L. No. 109-367, 120 Stat. 2638 (Oct. 26, 2006) .......... 19

**Federal Register**

91 Fed. Reg. 27969 (May 15, 2026) .......... 1

91 Fed. Reg. 34831 (June 9, 2026) .......... 1

91 Fed. Reg. 40550 (July 2, 2026) .......... 1

91 Fed. Reg. 46939 (July 27, 2026) .......... 1

91 Fed. Reg. 7297 (Feb. 17, 2026) .......... 1

**Other Authorities**

Fed. Acquisition Regul. Council, FAR Overhaul Part 52, Sections 52.242-14, 52.242-15, https://www.acquisition.gov/far-overhaul/far-part-deviation-guide/far-overhaul-part-52. .......... 8

# TABLE OF CONTENTS

STATEMENT OF ISSUES ........ i
TABLE OF AUTHORITIES ........ ii
TABLE OF CONTENTS ........ iv
INTRODUCTION ........ 1
STATEMENT OF FACTS ........ 1
LEGAL STANDARD ........ 3
ARGUMENT ........ 3
I. Defendants may not relitigate the preliminary injunction. ........ 3
II. Defendants have failed to establish irreparable harm, and the balance of harms supports an injunction. ........ 4
III. The Court's injunction is not overbroad. ........ 11
IV. Plaintiffs are likely to succeed on the merits. ........ 13
a. The Preliminary Injunction complies with the Federal Rules of Civil Procedure. ........ 13
b. This Court has jurisdiction to resolve Plaintiffs' major questions doctrine claim. ........ 14
c. The Big Bend Waivers violate the major questions doctrine. ........ 16
CONCLUSION ........ 20

## INTRODUCTION

Following full briefing, supplemental briefing, and an evidentiary hearing at which Plaintiffs presented eight witnesses and Defendants presented none, this Court determined that Plaintiffs are likely to succeed on the merits of their constitutional challenge to the Big Bend Waivers[1] and entered a preliminary injunction preserving the status quo pending final resolution of this case. *See* Order Granting Prelim. Inj. ("Order"), ECF No. 66; Mem. Op., ECF No. 75. Defendants now seek a stay, not because they can satisfy the demanding standards governing that extraordinary relief, but because they wish to relitigate questions the Court has already resolved. Even if the Court considers Defendants' late-filed declarations, that evidence fails to establish any concrete or imminent harm from maintaining the injunction. Defendants assert, at most, unsupported construction delays and ordinary project costs, while Plaintiffs and the public face irreversible harm to the unique environmental, cultural, historic, and recreational resources of the Big Bend region. Nor does the injunction prevent Defendants from securing the border or constructing infrastructure. It merely requires them to comply with applicable law before doing so. Because Defendants have failed to show that they are likely to prevail, have not demonstrated irreparable injury absent a stay, and cannot overcome the substantial harms and public interests favoring continued enforcement of the Court's Order, their Motion should be denied.

## STATEMENT OF FACTS

During the week of August 3, 2026, and in direct contravention of their agreement to provide Plaintiffs with 30-days prior notice before doing so, Defendants began border barrier construction in Big Bend National Park. Emerg. Mot. TRO or Prelim. Inj., ECF No. 34 ("Emergency

[1] The "Big Bend Waivers" or "Waivers" are the "West Waiver" (91 Fed. Reg. 7297 (Feb. 17, 2026), *as amended by* 91 Fed. Reg. 40550 (July 2, 2026)); "National Park Waiver" (91 Fed. Reg. 27969 (May 15, 2026), *as amended by* 91 Fed. Reg. 34831 (June 9, 2026)); and "Lower Canyons Waiver" (91 Fed. Reg. 46939 (July 27, 2026)).

Motion") at 4. On August 17, 2026, Plaintiffs filed the Emergency Motion, requesting that this Court preliminarily enjoin Defendants from undertaking border barrier construction and associated activities within the Big Bend Sector pursuant to the challenged Waivers until final resolution on the merits of Plaintiffs' claims. *Id.* 20. On that same day, Defendants initiated a voluntary pause on "all construction activity" in the National Park. *Id.* 5. The voluntary pause was later described as encompassing all of BBT-2 and BBT-4.[2] Second Decl. of Paul Enriquez, ECF No. 60-1 ¶ 7. On September 19, 2026, Plaintiffs filed supplemental evidence in conjunction with their Emergency Motion, including evidence of ongoing and imminent construction in BBT-1 and imminent construction in BBT-2 or 3. ECF No. 55. Defendants did not oppose the filing. *See* ECF No. 59 at 1 (treating Plaintiffs' motion as unopposed). On September 21, 2026, this Court set a hearing on Plaintiffs' Emergency Motion, requesting that the parties' attorneys present evidence on four enumerated factual disputes. ECF No. 56. On September 29, 2026, Defendants filed a notice regarding the end of the construction pause in BBT-2 and BBT-4. ECF No. 60.

The Court held a hearing on Plaintiffs' Emergency Motion on October 2, 2026, during which Plaintiffs presented live testimony from six fact witnesses and two expert witnesses, in addition to prior testimony from Sheriff Thaddeus Cleveland during an August 28, 2026, hearing in *People of La Junta for Pres. v. Dep't of Homeland Sec.*, No. 5:26-cv-5245-OLG (W.D. Tex. Oct. 1, 2026). Defendants called no witnesses. From the bench, this Court granted Plaintiffs' Emergency Motion—stating that "Defendants SHALL NOT build border barrier or related infrastructure, or engage in any construction or ground disturbing activities, in the Big Bend Sector until and unless Defendants comply with all applicable laws . . . notwithstanding the 'Big Bend Waivers.'" Order,

[2] From west to east, the five Big Bend construction projects ("BBT") are BBT-1, BBT-3, BBT-2, BBT-4, and BBT-5. *See* Pls.' Hr'g Ex. 1 (map depicting general boundaries of BBT projects).

ECF No. 66. On October 14, 2026, this Court issued a memorandum opinion setting forth the rationale for the Order. ECF. No. 75.

## LEGAL STANDARD

In deciding whether to grant a stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). A stay "is not a matter of right, even if irreparable injury might otherwise result to the [applicant]." *Id.* at 427 (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)).

## ARGUMENT

### I. Defendants may not relitigate the preliminary injunction.

Defendants request a second bite at the apple. However, "a motion to stay [a preliminary injunction] should not be used to relitigate matters, submit new evidence, or 'raise arguments which could, and should, have been made before the judgment issued.'" *ODonnell v. Harris Cnty.*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990))). Since Plaintiffs filed their Emergency Motion on August 17, 2026, Defendants have entertained multiple opportunities to oppose Plaintiffs' request for injunctive relief: through briefing on the Emergency Motion itself, through briefing on Plaintiffs' supplemental evidence for the Emergency Motion, ECF No. 55, and through live testimony at the nearly five-hour hearing on October 2, 2026 ("Hearing"). Defendants chose not to submit the declarations they now rely on, nor did they present a single witness for examination and cross-examination. Having litigated the Emergency Motion and lost, Defendants now ask for a second chance. But it is too little, too late.

Defendants put forth two new declarations in support of their Motion—neither of which contains information that was unavailable to Defendants while the parties briefed the Emergency Motion. *See* Third Decl. of Paul Enriquez ("Third Enriquez Decl."), ECF No. 74-1; Decl. of Josh B. Barrett, ECF No. 74-2. Thus, the Court should decline to consider those declarations and deem any arguments predicated on them waived. *See ODonnell*, 260 F. Supp. 3d at 815 (determining that defendants' novel arguments and authorities presented in a motion to stay a preliminary injunction were waived). Moreover, the Third Declaration of Paul Enriquez contains numerous references to contracts issued for Big Bend border barrier construction projects but fails to proffer those contracts. *See, e.g.*, Third Enriquez Decl. ¶¶ 10–12, 20–22. Affidavits offered to prove the contents of a writing, instead of the writing itself, are barred by the best evidence rule. Fed. R. Evid. 1002; *see also R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 219 (5th Cir. 2005) (upholding the exclusion of affidavits concerning the rights under an assignment agreement). Defendants have repeatedly refused Plaintiffs' requests for those contracts. *See* Declaration of Emma Yip ("Yip Decl.") ¶ 3 & Ex. 1; *see also* Joint Status Report, ECF No. 18, *Center for Biological Diversity v. U.S. Customs and Border Protection*, 3:26-cv-00976-KC (W.D. Tex. Oct. 9, 2026).

As a result, Defendants' late-submitted declarations in support of their Motion should be excluded from this Court's consideration of Defendants' request for a stay. To the extent the Court determines the declarations are otherwise proper, the best evidence rule still forecloses any statement on the contents of the Big Bend contracts until and unless Defendants enter those documents into the record.

## II. Defendants have failed to establish irreparable harm, and the balance of harms supports an injunction.

Even if this Court considers the new evidence proffered by Defendants, Defendants have not shown that continuing the injunction pending a final ruling on the merits will impair border

security in the Big Bend Sector. Instead, they rely on generalized border-security assertions, isolated incidents, and speculative future impacts untethered to the conditions on the ground in the Sector. At most, Defendants make conclusory assertions of construction delay and associated financial costs unconnected to any genuine security interest.

Plaintiffs, by contrast, have established irreparable injuries that cannot be remedied after the fact, including lasting, severe damage to environmental, historical, and scenic resources. Importantly, the injunction does not prevent Defendants from securing the border in any manner they choose; it simply requires them to comply with existing laws. *See* ECF No. 66 (enjoining border barrier related construction "until and unless Defendants comply with all applicable laws"). Requiring Defendants to act in accordance with the Constitution and federal law while this litigation continues is not a cognizable harm, whereas the destruction of irreplaceable resources plainly is. Accordingly, because Defendants have failed to establish irreparable harm absent a stay, whereas Plaintiffs and the public would be substantially harmed by one, the stay factors weigh strongly against granting a stay.

As a threshold matter, Defendants incorrectly suggest that the Supreme Court has already balanced the equities presented here and resolved them in the Government's favor. *See* Defs.' Mot. 10. In *Trump v. Sierra Club*, the Supreme Court granted a stay because the Government had "made a sufficient showing . . . that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005 of the Department of Defense Appropriations Act, 132 Stat. 2999." 588 U.S. 930 (2019). The Court did not "necessarily conclude[]" that the Government's interests in border security and drug interdiction outweigh environmental, cultural, or other irreparable injuries under any and all circumstances, *see* Defs.' Mot. 10, nor did it suggest that the district court abused its discretion in weighing the equities or assessing the public interest. Indeed,

the Ninth Circuit expressly rejected the same argument Defendants advance here. Although the decision was later vacated on other grounds, the Ninth Circuit explained that the "Supreme Court's stay order does not address the appropriateness of injunctive relief" and "contains nowhere a suggestion that the district court abused its discretion in balancing the equities and weighing the public interest." *Sierra Club v. Trump*, 977 F.3d 853, 888–89 (9th Cir. 2020), *vacated*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021) (concluding that the court "cannot read into the order more than its text supports"). Nor does *El Paso County* support Defendants' position. Although the court there declined to issue an injunction that would conflict with the Supreme Court's stay as to the specific projects before it, the court rejected the notion that *Trump v. Sierra Club* resolved the equities categorically in the Government's favor. *See El Paso Cnty. v. Trump*, 407 F. Supp. 3d 655, 661 (W.D. Tex. 2019). This Court should therefore evaluate the harms based on the record before it, not on Defendants' overreading of a one paragraph stay order in a different case.

The record here does not support Defendants' claim that maintaining the injunction threatens border security in the Big Bend Sector. Here, Defendants manufacture harm by invoking generalized border-security concerns and speculative future impacts untethered to conditions on the ground in the Big Bend Sector. As this Court has already recognized, the Big Bend Sector is unlike other sectors along the southern border. *See* Mem. Op. 9–11. Should the Court consider it, even Defendants' supplemental evidence shows only a handful of individuals apprehended in recent years after reportedly crossing within the Sector. Defs.' Mot. 12–13 (discussing the apprehension of five individuals between 2023 and 2026 who reportedly crossed in the Big Bend Sector). Defendants likewise identify only a single marijuana seizure in 2022 that was "confirmed to have crossed the border in the Big Bend Sector." Defs.' Mot. 12. Those isolated incidents do not

transform the Sector into one of "high illegal entry," and do little to support Defendants' warnings of an ongoing border-security emergency.

Indeed, even while requesting a stay and effectively seeking a second opportunity to present evidence in opposition to Plaintiffs' Emergency Motion, Defendants present remarkably little evidence of unlawful crossings within the Big Bend Sector. Instead, they rely on generalized concerns regarding border security nationwide and present unsupported allegations regarding "funnel points." *See* Defs.' Mot. 11–13. As Plaintiffs have demonstrated, apprehension rates in the Big Bend Sector amount to by far the lowest per-border mile rates across the entire southern border—and even then, apprehension rates spanning a sector the size of Germany are unrepresentative of actual "illegal" crossing rates.

Defendants' claimed financial and logistical harms likewise carry little weight. Those assertions are speculative, unsupported by the best available evidence that Defendants have failed to file or provide to Plaintiffs, and difficult to reconcile with the current status of parts of the project. Most notably, Defendants had already voluntarily stopped construction in BBT-2 and 4, and there is no indication that Defendants have re-mobilized in these areas. Nor have Defendants shown that construction could immediately proceed absent the injunction. Defendants still lack all rights of entry necessary to perform the work. *See* ECF No. 60 at 2. And with respect to BBT-4, Defendants have yet to make a final decision concerning the revised scope of the project, advising the Court that they will "promptly update the court and the parties" once such a decision is made. *Id.* 2–3.

Defendants' cost assertions are no more persuasive. Although they claim the injunction has generated expenses "all of which would not have been incurred but for the Court's injunction," they identify costs such as land leases, offices, equipment maintenance, security, and labor costs that appear to be ordinary project expenses that would have been incurred regardless. *See* Defs.'

Mot. 14–15; Third Enriquez Decl. ¶ 20. Nor have Defendants produced the underlying contracts necessary to evaluate their assertions, despite Plaintiffs' request for that information. *See* Yip Decl. ¶ 3 & Ex. 1. Review of the contracts would allow Plaintiffs to test the veracity of those assertions—including ascertaining whether costs associated with a court-ordered pause may be covered by insurance, fall into work performance exemptions, require cost minimization, or trigger other measures that may substantially reduce any actual costs associated with a temporary pause in performance.[3]

Instead, Defendants repeatedly speculate that the injunction "*may*" result in delay damages and that contractors "*may*" need to demobilize personnel and equipment from the project sites. *See* Defs.' Mot. 15 (emphases added). But personnel and equipment have already been demobilized from portions of the project, and Defendants have acknowledged that it will likely take several weeks to "re-mobilize equipment and personnel" even if construction resumes. ECF No. 60 at 3. Defendants thus fail to identify any concrete, imminent harm attributable to maintaining the injunction pending the filing and disposition of Defendants' anticipated petition for writ of certiorari.

By contrast, Plaintiffs have demonstrated serious, concrete, and irreparable harms. First, Plaintiff Danny William Miller Junior alleges cognizable injuries through the vast majority of the Big Bend Sector. Contrary to Defendants' statements, his interests are not "primarily" focused on the "Big Bend National Park and the Lower Canyons corridor." Defs.' Mot. 9. Instead, Mr. Miller's interests and alleged harms span some 300 miles of the Rio Grande corridor, from his property located near Redford—discussed at length in his declarations and throughout his live testimony—

[3] *See, e.g.*, Fed. Acquisition Regul. Council, FAR Overhaul Part 52, Sections 52.242-14 (standard government "Suspension of Work" clause, under which the contractor is not automatically entitled to recover all costs associated with a work stoppage), 52.242-15 (requiring cost minimization during a work stoppage), available at: https://www.acquisition.gov/far-overhaul/far-part-deviation-guide/far-overhaul-part-52 (last accessed Oct. 20, 2026).

through the Lower Canyons. Pls.' Hr'g Ex. 1 (map depicting the Big Bend region and Mr. Miller's property).[4] Border barrier construction through this area stands to destroy Mr. Miller's interests in the Rio Grande and his livelihood as a river guide. Hr'g Tr. 92:12 –94:10.

Likewise, members of Plaintiff Center for Biological Diversity who testified before this Court maintain interests and face threat of irreparable injury across hundreds of miles of the Rio Grande corridor and greater Big Bend region. Ms. Devine regularly uses and enjoys the same stretches of river identified by Mr. Miller,[5] and Mr. Guerra-Addington owns property and regularly recreates along the Rio Grande in Hudspeth County.[6] *See* Pls.' Hr'g Ex. 1 (map depicting the Big Bend region and Mr. Guerra-Addington's property). At the Hearing, Ms. Devine described her injuries from the construction activities that have already taken place, and the injuries she will face if border barrier construction activities continue—including loss of scenic and wilderness values, loss of recreational opportunities on the river, and loss of a community gathering space. Hr'g Tr. 144:13–147:19. And Mr. Guerra-Addington described his injuries—including loss of access, loss of wildlife, and significant impairment to aesthetic, recreational, and spiritual enjoyment. Hr'g Tr. 120:18–122:13, 123:23–125:16, 127:5–131:6.

Further, the record contains additional declarations from Center members who have interests and injuries within the area encompassed by the injunction. For example, Samuel Stavinoha grew up in the greater Big Bend region and describes hiking, boat, and motorcycle trips through

---

4 *See* Decl. of Danny William Miller Junior in Supp. of Pls.' Mot. for Summ. J., ECF No. 19-2, at APX-V1-003–006 ¶¶ 7–11; Decl. of Danny William Miller Junior in Supp. of Pls.' Emergency Mot., ECF No. 34-6 ¶¶ 5–8; Hr'g Tr. 79–83.

5 *See* Decl. of Bernadette Devine in Supp. of Pls.' Mot. for Summ. J., ECF No. 19-2, at APX-V1-122–125 ¶¶ 3–8; Decl. of Bernadette Devine in Supp. of Pls.' Emergency Mot., ECF No. 34-4 ¶¶ 3–8; Hr'g Tr. 141:11–143:11.

6 *See* Decl. of Willard "Bill" Guerra-Addington in Supp. of Pls.' Emergency Mot., ECF No. 55-1 ¶¶ 3–17; Hr'g Tr. at 117:19–131:6.

Big Bend National Park and State Park, plus more remote stretches along Pinto Canyon Road and the Chinati Mountains in Presidio County, between Ruidosa and Big Bend Ranch State Park. Decl. of Samuel Stavinoha, ECF No. 19-2, at APX-V1-130–137 ¶¶ 2–21. Border barrier construction through these areas would significantly impair Mr. Stavinoha's aesthetic, spiritual, and recreational interests. *Id.* ¶ 26. Similarly, Brandt Buchanan is a full-time rancher in Presidio County near the Rio Grande, and details scientific, wildlife, aesthetic, and recreational interests in his property located northwest of Big Bend Ranch State Park, and through the National Park and Black Gap Wildlife Management Area. Decl. of Brandt Buchanan, ECF No. 19-3, at APX-V2-003–005 ¶¶ 3–18. Border barrier infrastructure and related construction pursuant to the challenged Waivers harms Mr. Buchanan's recreational, aesthetic, scientific, and procedural interests. *Id.* ¶¶ 20–23.

Finally, Plaintiff Friends of the Ruidosa Church provided live and declaration testimony from Michael Green. Mr. Green described how border barrier construction threatens imminent and serious damage to the Ruidosa Church's fragile adobe structure. Decl. of Michael Green, ECF No. 19-2, at APX-V1-019–021 ¶¶ 19, 22–25. Increased traffic on FM 170—running approximately twelve feet from the Church—or construction for wall installation would increase seismic activity and pose threats to the Church's structures. Hr'g Tr. 103:22–104:7, 105:4–21, 107:5–108:6.

Additionally, the public interest strongly favors maintaining the injunction. As this Court has already found, "Plaintiffs have demonstrated, without an injunction, they and the public at large stand to permanently lose protected wilderness that benefits tourism, recreation, farming, ranching, spirituality, aesthetic sensibilities and education." Mem. Op. 14. The public interest likewise favors preserving the constitutional separation of powers and ensuring that agencies act within the limits imposed by Congress. As the Fifth Circuit has recognized, "there is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017,

1035 (5th Cir. 2022) (quoting *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)) (cleaned up); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted) ("[i]t is always in the public interest to prevent the violation of a party's constitutional rights."). And where, as here, the Court has found Plaintiffs likely to succeed on the merits of at least one of their constitutional claims, the Government cannot claim a legitimate interest in continuing conduct that is likely unlawful. To the contrary, the government has no legitimate "interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also id.* ("[t]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (cleaned up).

**III. The Court's injunction is not overbroad.**

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (cleaned up). When tailored to the issues, parties, and evidence in the record, a preliminary injunction is not overbroad. *See Texas v. Becerra*, 89 F.4th 529, 546 (5th Cir. 2024); *Louisiana v. Becerra*, 20 F.4th 260, 263–64 (5th Cir. 2021). The Court's Order comports with these principles in every way: it enjoins Defendants from "build[ing] border barrier or related infrastructure, or engag[ing] in any construction or ground disturbing activities, in the Big Bend Sector until and unless Defendants comply with all applicable laws." Order Granting Prelim. Inj., ECF No. 66. Notably, the Court's Order does not bar Defendants from building a contiguous barrier spanning the southern border—nor does it displace the general authority of IIRIRA Section 102. In fact, the Order does not even prohibit construction of border barrier in the Big Bend Sector, it merely suspends the effect of the Big Bend Waivers, thus requiring Defendants to comply with the same laws they and all other agencies must comply with as a matter of course.

Properly tailored to the issues Plaintiffs raised in this case, the Order applies only to border barrier or related infrastructure pursuant to the challenged Waivers. Defendants claim that the Court's injunction is a "blanket halt on all construction across the entire Big Bend Sector." Defs.' Mot. 9. However, the Court's preliminary injunction "only prohibits what the Defendants have no right to do"—apply IIRIRA's waiver authority across the entire Big Bend Sector. *See Missouri v. Biden*, 681 F. Supp. 3d 603, 611 (W.D. La. 2023). As a result, Defendants are not barred from pursuing border barrier construction or any other border security activities—they are merely required to comply with "all applicable laws" before doing so. Order, ECF No. 66.

To follow the laws that apply to other agencies (and Defendants themselves when no waiver authority has been authorized) is no extraordinary burden, *see Missouri v. Biden*, 681 F. Supp. 3d at 611 (declining to stay preliminary injunction that merely prohibited illegal conduct)—and in fact courts often apply a "presumption of regularity" premised on foundational assumptions that the government understands how to follow the law and is readily capable of doing so. *See Foresight Coal Sales, LLC v. Chandler*, 60 F.4th 288, 299 (6th Cir. 2023) (assuming an agency "will follow the law"); *Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 575 (D.C. Cir. 2022) (describing a "fundamental principle that the government must follow the law") (quotation marks and citation omitted); *Gegenheimer v. Stevenson*, No. 1:16-CV-1270-RP, 2017 WL 2880867, at *2 (W.D. Tex. July 5, 2017) (presuming that officials "will properly discharge their duties"). IIRIRA's waiver authority is an exception to the standard set of rules designed to guide government projects, intended by Congress to be used for the "expeditious construction of barriers and roads" in specific "areas of high illegal entry." IIRIRA § 102(a), (c), 8 U.S.C. § 1103. Without the IIRIRA waiver authority, Defendants are not prohibited "from undertaking any border wall construction activity" in the Big Bend Sector, Defs.' Mot. 8, but they do face the unextraordinary

task of complying with the law before doing so, a requirement that has not prevented the Government from maintaining border security in the Big Bend Sector.[7]

Properly tailored to the parties and evidence before the Court, the injunction is limited to the Big Bend Sector. *See* Mem. Op. 12–13. As discussed above, the record demonstrates that Plaintiffs and the organizational Plaintiffs' members face concrete and particularized harms spanning hundreds of miles of the U.S.-Mexico border in the Big Bend Sector absent injunctive relief. *See* Section II, *supra* at 8–10.

All told, Plaintiffs have "established a substantial threat of irreparable harm," Mem. Op. 13, and documented imminent and concrete injuries across the full span of the Big Bend Sector's Rio Grande corridor and adjacent wilderness areas. The Court's injunction is narrowly tailored to the harms alleged by Plaintiffs, where it only suspends the Big Bend Waivers, is limited to within the Big Bend Sector, and does no more than maintain the status quo until a final decision on the merits.

**IV. Plaintiffs are likely to succeed on the merits.**

**a. The Preliminary Injunction complies with the Federal Rules of Civil Procedure.**

Federal Rule of Civil Procedure 65(d)(1)(A) requires an injunction to state the reasons it was issued. Relatedly, Rule 52 expressly contemplates that findings and conclusions may be stated orally on the record or may appear in a later opinion or memorandum decision. Fed. R. Civ. P. 52(a)(1), (2). The touchstone is whether the district court's findings ultimately "afford the reviewing court a clear understanding of the factual basis for the trial court's decision." *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985). Consistent with that principle, the

[7] *See* Test. of Thaddeus Cleveland, ECF No. 55-5, at 12–15 (describing Border Patrol technologies currently in place as effectively protecting the border).

Fifth Circuit has reviewed a district court's "oral findings together with its written order" when evaluating a preliminary injunction. *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 530 (5th Cir. 2020). The sufficiency of the Court's order therefore turns on both the oral record and any subsequent memorandum orders. The Court's October 2, 2026 Order from the bench, ECF No. 66, and subsequent October 14, 2026 Memorandum Opinion, ECF No. 75, fully satisfy the Court's obligations under the Federal Rules. To the extent there was any merit in Defendants' allegations of procedural violation, they are moot in view of this Court's October 14 Memorandum Opinion.

**b. This Court has jurisdiction to resolve Plaintiffs' major questions doctrine claim.**

When the government seeks to assert extraordinary authority, it must "point to clear congressional authorization" for the power it claims. *West Virginia v. EPA*, 597 U.S. 697, 732 (2022) (quotation marks and citation omitted). Here, the Government aims to build a wall bifurcating the North American continent, stretching from the Pacific to the Gulf. Proposed Undisputed Facts in Support of Pls.' Mot. for Summ. J. ("PUF"), ECF No. 19-1 ¶ 15. To effectuate this massive project, it relies on IIRIRA Section 102 to waive laws across the entirety of the Big Bend Sector—an area that amounts to one quarter of the U.S.-Mexico border. Under any metric, that assertion of authority is extraordinary. And, under our nation's Constitution—decisions of "great political significance" or "vast economic" consequence must be made by Congress, not the Executive. Failing to identify any clear congressional authorization for the power it claims, the Big Bend Waivers violate the major questions doctrine.

As a threshold matter, and as this Court has held, this Court has jurisdiction to resolve Plaintiffs' major questions claim because it alleges a violation of the U.S. Constitution. Mem. Op. 7. Under IIRIRA Section 102(c), a "cause of action or claim" challenging a waiver determination "may only be brought alleging a violation of the Constitution." 8 U.S.C. § 1103 note. Supreme

Court precedent, this Court's Memorandum Opinion, and an understanding of the history and mechanics of the major questions doctrine make clear that it is, at core, a constitutional doctrine designed to protect separation of powers.

The major questions doctrine was borne of "the hydraulic pressures of our constitutional system" and the Court's need to "rein in Congress's efforts to delegate legislative power." *Gundy v. United States*, 588 U.S. 128, 166–67 (2019) (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Were we to recognize the authority claimed by EPA. . . we would deal a severe blow to the Constitution's separation of powers."). Operationally, it works as a "dice-loading" rule, where something extrinsic to the plain meaning of a statute's text tips the scales towards a particular outcome. In major questions cases, that extrinsic source is the Constitution. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 274 (2026) (Gorsuch, J., concurring).

Indeed, the major questions doctrine operates to interpret a statutory grant of authority, but any contention that this feature is divorced from constitutional underpinnings is misplaced. *See* Defs.' Mot. 4. For example, the nondelegation doctrine, which implicates the same separation of powers safeguards as major questions, also operates through statutory interpretation. *See Gundy*, 588 U.S. at 129 ("a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I"). That a doctrine is *effectuated* through statutory interpretation does not change its constitutional source or purpose. Numerous legal canons encompass a similar space in protecting the Constitution through statutory interpretation, including the void for vagueness doctrine and overbreadth challenges to a statute. Ultimately, in protecting Article I, both the nondelegation and major questions doctrines "are

designed to protect the separation of powers" and to ensure that any new laws affecting the lives of Americans "are subject to the robust democratic processes the Constitution demands." *Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring); *see also Learning Res.*, 607 U.S. at 284 (Gorsuch, J., concurring) ("Like the nondelegation doctrine, the major questions doctrine protects Article I's Vesting Clause"). Both doctrines enforce an affirmative constitutional prohibition against overexpansive delegations of Congress's legislative power. Thus, "the major questions doctrine is a constitutional clear statement rule grounded in separation of powers." Mem. Op. 7.

**c. The Big Bend Waivers violate the major questions doctrine.**

Under both Supreme Court and Fifth Circuit precedent, when an agency's assertion of authority has "vast economic and political significance," it triggers major questions scrutiny. *West Virginia*, 597 U.S. at 716; *Mayfield v. U.S. DOL*, 117 F.4th 611, 616 (5th Cir. 2024). Defendants do not and cannot dispute that both are met here, and Plaintiffs will not re-litigate what is not contested. *See* Defs.' Mot. 4 (declining to challenge the political or economic significance of the Big Bend Waivers); Mem. Op. 8 ("Both parties appear to agree that the waiver of all legal requirements to construct a border wall in the Big Bend Sector is of 'major economic and political significance.'"); *see also* Pls.' Mot. for Summ. J., ECF No. 19, at 4–8 (describing the political and economic significance of the Big Bend Waivers); Emergency Mot., ECF No. 34, at 7–9 (same).

Instead, Defendants claim that an additional factor, asking "whether the agency has previously claimed the authority at issue" compels the Court to find the Big Bend Waivers are not extraordinary. Defs.' Mot. 4 (quoting *Mayfield*, 117 F. 4th at 617). At the outset, Defendants provide no support for their position that consideration of this factor is sufficient to overcome undisputed showings of profound political and economic significance. Regardless, to whatever extent this

Court considers the novelty of Defendants' assertion of authority in its analysis, the Big Bend Waivers mark a newfound shift in authority in every way.

Prior to October 15, 2026, never before had a DHS Secretary issued IIRIRA waivers spanning the entire U.S.-Mexico border, including areas of demonstrably low border crossings. PUF, ECF No. 19-1 ¶ 17. But on this date, then-Secretary Noem took this unprecedented step, waiving dozens of laws across the entirety of the southern border. *Id*. In a continuation of this newly discovered and expansive assertion of authority, Defendants have since issued the five waiver determinations at issue in this litigation, for the first time waiving environmental, cultural, and historic preservation laws across the entirety of the Big Bend Sector. Thus, the Secretary's assertion of authority here is novel: never before has DHS applied IIRIRA waivers across the entirety of the U.S.-Mexico border to facilitate construction of a cross-continental wall—and never before has DHS declared that the entirety of the Big Bend Sector, the sector with the *lowest* recorded apprehension rates, is an area of high illegal entry.

Defendants' position that the "Secretary has repeatedly invoked his waiver authority under the IIRIRA for the past two decades" misapplies this factor under major questions precedent. Defs.' Mot. at 4. Instead, the relevant framing should consider the nuances of the asserted authority. For example, in *West Virginia*, EPA had previously promulgated regulations under Clean Air Act Section 111(d)—but EPA's newfound application of that authority to establish a generation shifting mechanism set the Clean Power Plan apart. 597 U.S. 697, 710–711, 725. As another example, in *Biden v. Nebraska*, although the Secretary of Education had previously issued waivers and modifications under the HEROES Act, the Court viewed the scale of a comprehensive student loan forgiveness plan as unprecedented. 600 U.S. 477, 501 (2023). In other words, major questions precedent instructs that the relevant question here is not whether the Secretary has relied on

IIRIRA's authority in the past, but rather, whether the Secretary has "previously claimed powers of this magnitude" to expansively waive federal laws even in areas of very low unlawful entry. *Id.* They have not.

Finally, turning to whether IIRIRA offers clear congressional authorization for the extraordinary power Defendants now claim, Defendants fail to justify their actions against a statute that contemplates a limited grant of authority. When assessing a statute at this stage, courts are "reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia*, 597 U.S. at 723 (cleaned up). Thus, "something more than a merely plausible textual basis for the agency action is necessary." *Id.*

IIRIRA Section 102 grants the Secretary of Homeland Security limited authority to take actions "necessary to install . . . physical barriers and roads" along the U.S. border in "areas of high illegal entry," and to waive laws that, in his "sole discretion," are "necessary to ensure expeditious construction of the barriers and roads" IIRIRA § 102(a), (c). But nothing authorizes a single Executive Branch official to waive statutory safeguards in areas that have, by far, the lowest illegal entry across the entire border. The question before the Court "is not whether something should be done; it is who has the authority to do it." *Biden v. Nebraska*, 600 U.S. at 501; *see also Gonzales v. Oregon*, 546 U.S. 243, 265 (2006) (the Government's sought after authority was "inconsistent with the design of the statute").

Here, the statutory text of IIRIRA confirms the absence of any clear authorization. IIRIRA authorizes construction only in "areas of high illegal entry," and limits waiver authority to what is "necessary" to ensure the "expeditious construction" of "barriers and roads." These textual limitations imposed by Congress are irreconcilable with the Government's assertion of authority to facilitate a border-length barrier through sweeping waivers applied across vast geography, including

regions like Big Bend, that see minimal unlawful crossings and record the lowest levels of such crossings across all Border Patrol sectors. Mem. Op. 11. The Waivers amount to an unprecedented interpretation of IIRIRA, leaving to the Secretary's "sole" discretion, whatever actions he deems "necessary"—making it "hard to see what measures" would be "outside the [government's] reach." *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) . If Congress had intended to build a continent-long barrier system in the absence of any legal safeguards that would ordinarily apply, it would have authorized IIRIRA waivers across the entire border, not limited to "areas" with "high illegal" crossings. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").[8]

Defendants raise the Secure Fence Act of 2006 as evidence of a clear grant of congressional authority for the Secretary to establish "operational control" of the southern border. Defs.' Mot. 5. However, the Secure Fence Act's amendments to IIRIRA Section 102 did not change the statutory language of subsection (a) nor did it incorporate the term "operational control" into the text of IIRIRA. Pub. L. No. 109-367, 120 Stat. 2638 (Oct. 26, 2006). It was not until the 2008 Consolidated Appropriations Act amendments to subsection (b)(1)(A) of IIRIRA that Congress directed the Secretary "to gain operational control of the southwest border." Pub. L. No. 110-161, Sec. 564, 121 Stat. 2090 (Dec. 26, 2007). And, in that Act, Congress also added a limitation, stating: "[n]otwithstanding subparagraph (A), *nothing in this paragraph shall require*" the Secretary to install border barrier infrastructure "if the Secretary determines that the use or placement of such resources *is not the most appropriate means to achieve and maintain operational control*." *Id.* 2091

---

[8] Context reinforces this conclusion. Congress has repeatedly considered—and declined—to enact legislation requiring completion of a contiguous border wall or expanding DHS's authority under IIRIRA to do so. PUF, ECF No. 19-1, ¶¶ 8–10. For example, the Secure the Border Act of 2023 sought to revise IIRIRA § 102(a) by removing its limitation to "areas of high illegal entry," and expanding the statute to encompass the entire "southwest border." PUF ¶ 9.

(emphases added). Moreover, the Ninth Circuit previously determined that Section 102(b)(1) does not limit Section 102(a): where subsection (a) is a "broad grant of authority," subsection (b) "applies to some but not all of the construction authorized by section 102(a)" and "merely denotes certain priority projects Congress intended DHS to complete first." *Border Infrastructure Env't Litig. v. U.S. Dep't of Homeland Sec.*, 915 F.3d 1213, 1225 (9th Cir. 2019).

In other words, there is nothing to suggest that Section 102(b) of IIRIRA applies to the Big Bend Waivers, in any way limits Section 102(a), or somehow commands border barrier construction in areas with low rates of unlawful entry. Indeed, IIRIRA's reference to achieving "operational control" of the border cannot be squared with an understanding that this commands barrier construction, when Section 102(b)(1)(D) clearly contemplates that control may be achieved through other, more "appropriate" means. As a result, Section 102(a)'s authorization to build border barrier construction in specific "areas" (*i.e.*, not across the entire border) "of high illegal entry" (*i.e.*, not low illegal entry) continues to govern the waiver provision in Section 102(c)—and does not clearly authorize the Big Bend Waivers.

**CONCLUSION**

Accordingly, Plaintiffs respectfully request that this Court deny Defendants' Motion to Stay this Court's Preliminary Injunction.

DATED: October 20, 2026

Respectfully submitted,

*/s/* Emma Yip

Emma Yip (CA Bar No. 352446)
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (206) 858-2297
Fax: (520) 623-9797
eyip@biologicaldiversity.org

Zeynep J. Graves (CA Bar No. 298533)*

Shannon Eva Labuschagne (CA Bar No. 365633)
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (510) 844-7160
Fax: (520) 623-9797
zgraves@biologicaldiversity.org
slabuschagne@biologicaldiversity.org

Dustin Rynders (TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 1108
Houston, TX 77251
Tel: (832) 767-3630 ext. 196
dustin@texascivilrightsproject.org

Charlotte Weiss (NY Attorney ID: 6313639)*
TEXAS CIVIL RIGHTS PROJECT
P. O. Box 17757
Austin, TX 78760
Tel: (512) 474-5073 ext. 225
cweiss@texascivilrightsproject.org

** Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means.

DATED: October 20, 2026

Respectfully submitted,

*/s/* Emma Yip

Emma Yip (CA Bar No. 352446)
Center for Biological Diversity
2100 Franklin St., Ste 375
Oakland, CA 94612
Tel: (206) 858-2297
Fax: (520) 623-9797
eyip@biologicaldiversity.org